SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br>AFFILIATED FM INSURANCE COMPANY, a corporation; and DOES 1 through 50, inclusive,<br><br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br>ISLANDS RESTAURANTS, LP, a Delaware Limited Partnership; and CFBC, LLC, a California Limited Liability Company, | *FOR COURT USE ONLY*<br>*(SOLO PARA USO DE LA CORTE)*<br><br>F I L E D<br>Clerk of the Superior Court<br><br>SEP 1 5 2020 |

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* | CASE NUMBER:<br>*(Número del Caso):*<br>**37-2020-00032166-CU-IC-NC** |

Superior Court of California, County of San Diego
325 South Melrose Drive
Vista, California 92081

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Michael J. Bidart, Esq.  #60582 Telephone: (909) 621-4935 Email:  mbidart@shernoff.com
SHERNOFF BIDART ECHEVERRIA LLP
600 South Indian Hill Boulevard, Claremont, California 91711

| | | |
|---|---|---|
| DATE: SEP 1 5 2020<br>*(Fecha)* | Clerk, by K. MCDONALD<br>*(Secretario)* | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

| [SEAL]<br>COPY | NOTICE TO THE PERSON SERVED: You are served<br>1. ☐ as an individual defendant.<br>2. ☐ as the person sued under the fictitious name of *(specify):*<br><br>3. ☒ on behalf of *(specify):* Affiliated FM Insurance Company, a Corporation<br>   under: ☒ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)<br>   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)<br>   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)<br>   ☐ other *(specify):*<br>4. ☐ by personal delivery on *(date):* |
|---|---|

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | American LegalNet, Inc.<br>www.FormsWorkflow.com |

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Michael J. Bidart, SBN. 60582<br>SHERNOFF BIDART ECHEVERRIA LLP<br>600 South Indian Hill Boulevard<br>Claremont, California 91711<br>TELEPHONE NO.: (909) 621-4935     FAX NO.: (909) 625-6915<br>ATTORNEY FOR (Name): Plaintiff, Islands Restaurants, LP, et al. | F I L E D<br>Clerk of the Superior Court<br><br>SEP 1 5 2020 |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN DIEGO
STREET ADDRESS: 325 South Melrose Drive
MAILING ADDRESS: - same -
CITY AND ZIP CODE: Vista, 92081
BRANCH NAME: North County Division

CASE NAME:
Islands Restaurants, LP v. Affiliated FM Insurance Co.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER:<br>37-2020-00032166-CU-IC-NC |
|---|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br>DEPT: |

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[✓] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is  [✓] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties     d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel     e. [ ] Coordination with related actions pending in one or more courts
        issues that will be time-consuming to resolve             in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence       f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [✓] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [✓] punitive
4. Number of causes of action (specify): 2
5. This case [ ] is  [✓] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: September 11, 2020

Michael J. Bidart
(TYPE OR PRINT NAME)                                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkFlow.com

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
    or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-
    domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO |
|---|
| STREET ADDRESS:   325 S Melrose DRIVE |
| MAILING ADDRESS:   325 S Melrose DRIVE |
| CITY AND ZIP CODE:   Vista, CA 92081-6695 |
| BRANCH NAME:   North County |
| TELEPHONE NUMBER: (760) 201-8028 |

| PLAINTIFF(S) / PETITIONER(S):   Islands Restaurants, LP et.al. |
|---|

| DEFENDANT(S) / RESPONDENT(S): Affiliated FM Insurance Company |
|---|

| ISLANDS RESTAURANTS, LP VS AFFILIATED FM INSURANCE COMPANY [IMAGED] |
|---|

| NOTICE OF CASE ASSIGNMENT and CASE MANAGEMENT CONFERENCE | CASE NUMBER:<br>37-2020-00032166-CU-IC-NC |
|---|---|

CASE ASSIGNED FOR ALL PURPOSES TO:

Judge:  Earl H. Maas, III                                      Department: N-28

COMPLAINT/PETITION FILED: 09/15/2020

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 07/02/2021 | 10:00 am· | N-28 | Earl H. Maas, III |

Due to the COVID-19 pandemic, all hearings will be conducted remotely until further notice. Absent an order of the court, personal appearances at the hearing will not be allowed. For information on arranging telephonic or video appearances, contact CourtCall at (888)882-6878, or at www.courtcall.com. Please make arrangements with CourtCall as soon as possible.

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS:  The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time.  General civil cases consist of all civil cases except: small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS:  Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants.

DEFENDANT'S APPEARANCE:  Defendant must generally appear within 30 days of service of the complaint.  (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES:  In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

COURT REPORTERS: Court reporters are not provided by the Court in Civil cases. See policy regarding normal availability and unavailability of official court reporters at www.sdcourt.ca.gov.

*ALTERNATIVE DISPUTE RESOLUTION (ADR):  THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).



# Superior Court of California
## County of San Diego

# NOTICE OF ELIGIBILITY TO eFILE
# AND ASSIGNMENT TO IMAGING DEPARTMENT

This case is eligible for eFiling. Should you prefer to electronically file documents, refer to General Order in re procedures regarding electronically imaged court records, electronic filing, and access to electronic court records in civil and probate cases for rules and procedures or contact the Court's eFiling vendor at www.onelegal.com for information.

This case has been assigned to an Imaging Department and original documents attached to pleadings filed with the court will be imaged and destroyed. Original documents should not be filed with pleadings. If necessary, they should be lodged with the court under California Rules of Court, rule 3.1302(b).

On August 1, 2011 the San Diego Superior Court began the Electronic Filing and Imaging Pilot Program ("Program"). As of August 1, 2011 in all new cases assigned to an Imaging Department all filings will be imaged electronically and the electronic version of the document will be the official court file. The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and on the Internet through the court's website.

You should be aware that the electronic copy of the filed document(s) will be the official court record pursuant to Government Code section 68150. The paper filing will be imaged and held for 30 days. After that time it will be destroyed and recycled. Thus, you should not attach any original documents to pleadings filed with the San Diego Superior Court. Original documents filed with the court will be imaged and destroyed except those documents specified in California Rules of Court, rule 3.1806. Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant or petitioner to serve a copy of this notice with the complaint, cross-complaint or petition on all parties in the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words "IMAGED FILE" in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.



# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

CASE NUMBER: 37-2020-00032166-CU-IC-NC          CASE TITLE: Islands Restaurants, LP vs Affiliated FM Insurance Compa

<u>NOTICE</u>: All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:

(1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),
(2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), <u>and</u>
(3) the Notice of Case Assignment form (SDSC form #CIV-721).

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

## Potential Advantages and Disadvantages of ADR
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

**Potential Advantages**
· Saves time
· Saves money
· Gives parties more control over the dispute resolution process and outcome
· Preserves or improves relationships

**Potential Disadvantages**
· May take more time and money if ADR does not resolve the dispute
· Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable

## Most Common Types of ADR
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:** A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:** A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:** A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

**Other ADR Processes:** There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute. Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

## Local ADR Programs for Civil Cases

**Mediation:** The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

On-line mediator search and selection: Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005). The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:** The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:** The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

More information about court-connected ADR: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:** The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:** To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

## Legal Representation and Advice

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at *www.courtinfo.ca.gov/selfhelp/lowcost*.

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 325 S. Melrose | |
| MAILING ADDRESS: 325 S. Melrose | |
| CITY, STATE, & ZIP CODE: Vista, CA 92081-6695 | |
| BRANCH NAME: North County | |

| PLAINTIFF(S): Islands Restaurants, LP et.al. |
|---|
| DEFENDANT(S): Affiliated FM Insurance Company |
| SHORT TITLE: ISLANDS RESTAURANTS, LP VS AFFILIATED FM INSURANCE COMPANY [IMAGED] |

| STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: 37-2020-00032166-CU-IC-NC |
|---|---|

Judge: Earl H. Maas, III                                                                         Department: N-28

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process. Selection of any of these options will not delay any case management timelines.

☐ Mediation (court-connected)                    ☐ Non-binding private arbitration

☐ Mediation (private)                                  ☐ Binding private arbitration

☐ Voluntary settlement conference (private)      ☐ Non-binding judicial arbitration (discovery until 15 days before trial)

☐ Neutral evaluation (private)                      ☐ Non-binding judicial arbitration (discovery until 30 days before trial)

☐ Other (specify e.g., private mini-trial, private judge, etc.): _____

_____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

Alternate neutral (for court Civil Mediation Program and arbitration only): _____

Date: _____                    Date: _____

_____                    _____
Name of Plaintiff                                         Name of Defendant

_____                    _____
Signature                                                 Signature

_____                    _____
Name of Plaintiff's Attorney                            Name of Defendant's Attorney

_____                    _____
Signature                                                 Signature

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385. Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

IT IS SO ORDERED.

Dated: 09/15/2020                                          _____
                                                            JUDGE OF THE SUPERIOR COURT

1   MICHAEL J. BIDART #60582
    RICARDO ECHEVERRIA #166049
2   SHERNOFF BIDART ECHEVERRIA LLP
3   600 South Indian Hill Boulevard
    Claremont, California 91711
4   Telephone:    (909) 621-4935
    Facsimile:    (909) 625-6915
5

6   Attorneys for Plaintiffs
7

8
9                SUPERIOR COURT OF THE STATE OF CALIFORNIA
10               IN AND FOR THE COUNTY OF SAN DIEGO

11  ISLANDS RESTAURANTS, LP, a              Case No. 37-2020-00032166-CU-IC-NC
12  Delaware Limited Partnership; and
    CFBC, LLC, a California Limited Liability   COMPLAINT AND DEMAND FOR
13  Company,                                 JURY TRIAL
14
15              Plaintiffs,                   1.  BREACH OF THE IMPLIED
                                                 COVENANT OF GOOD FAITH AND
16      vs.                                       FAIR DEALING
17
18  AFFILIATED FM INSURANCE                   2.  BREACH OF CONTRACT
19  COMPANY, a corporation; and DOES 1
    through 50, inclusive,
20
21              Defendants.
22
23
24
25
26
27
28

F I L E D
Clerk of the Superior Court

SEP 15 2020

- 1 -

COMPLAINT AND DEMAND FOR JURY TRIAL

1

I.

2

INTRODUCTION

3       1.      Business Interruption coverage is an optional insurance benefit available

4   to businesses to minimize their risk and sustain them when a suspension of business

5   operations causes a loss of business income. This coverage allows businesses to pay

6   continuing operating expenses, additional expenses incurred because of the suspension,

7   and supplement their lost business income.

8       2.      As California Insurance Commissioner Ricardo Lara stated in a notice on

9   April 14, 2020 to all admitted and non-admitted insurance companies in California,

10  "small and large California businesses purchase Business Interruption insurance to

11  protect against the loss of income and other losses caused by an interruption to the

12  normal operations of the business" (Exhibit 1).

13      3.      Plaintiff Islands Restaurants, LP ("Islands") opened its first restaurant in

14  May of 1982. Over the years, it expanded to more than 59 restaurants, the majority of

15  which are located in California, with a few in Arizona, Nevada and Hawaii. By March

16  2020, it had 55 locations open, including two in Arizona and one in Hawaii.

17      4.      Islands is a tropical-themed, family restaurant where patrons can enjoy

18  fine burgers, tacos, fresh cut fries and specialty drinks while watching sports events or

19  surf videos on large screens. Islands adheres to the basic philosophy that fresh food,

20  friendly service, a laid-back atmosphere is a perfect end to a hard day of work or play.

21      5.      As part of an expansion and diversification process, in or about October

22  2015, Islands invested in a different type of restaurant and formed a new partnership.

23  The partnership, Plaintiff CFBC, LLC ("CFBC"), operates the Champagne French

24  Bakery Cafés, which first opened in San Diego in 1987. CFBC recreates the cozy

25  experience and warm atmosphere of true café dining in France. CFBC also provides off-

26  site catering. The menu provides traditional French cuisine, including breakfast, baked

27  goods, sandwiches, soups, salads and desserts. CFBC also serves a variety of coffees,

28  teas, and other beverages, and prides itself on fresh, local ingredients.



- 2 -

1    6.    Islands and CFBC (collectively "Plaintiffs") purchased, timely paid all

2  premiums, and performed all duties required of them to be performed under an "All

3  Risk" commercial property and general liability insurance policy issued by defendant

4  Affiliated FM Insurance Company ("Affiliated FM"), Policy No. SS790 with coverage

5  dates from August 1, 2019 to August 1, 2020 (the "Policy") (Exhibit 2).

6    7.    Under an "All Risk" policy, all risks of physical loss or damage are

7  covered unless specifically and unambiguously excluded. Stated differently, all non-

8  excluded perils are covered.

9    8.    The Policy "insures Business Interruption loss, as provided in the Business

10  Interruption Coverage, as a direct result of physical loss or damage of the type

11  insured...." (Exhibit 2, p. EX02-40).

12    9.    The Coronavirus ("COVID-19") originated in China in late 2019, spread to

13  Europe, and eventually came to the United States. Although COVID-19 was present in

14  California by late January 2020, all businesses and restaurants, including Islands' and

15  CFBC's restaurants, were allowed to remain open throughout February and the first

16  half of March. On January 30, 2020 the World Health Organization (the "W.H.O.")

17  declared a public health emergency of international concern. On March 4, 2020,

18  California Governor Gavin Newsom proclaimed a State of Emergency to exist in

19  California "as a result of the threat of COVID 19." The same day, Hawaii Governor

20  David Y. Ige also proclaimed a State of Emergency in "response[] to COVID-19". One

21  week later, on March 11, 2020, the W.H.O. made the assessment that COVID-19 could

22  be characterized as a pandemic. On March 17, 2020, the city of Phoenix, Arizona

23  followed and declared a State of Emergency.

24    10.    On March 17, 2020, Orange County, Ventura County, San Bernardino

25  County, and Monterey County in California issued governmental orders prohibiting

26  on-site person dining. On March 19, 2020, Los Angeles County, Sacramento County,

27  and Placer County issued governmental orders prohibiting on-site dining. On March 27,

28  2017, San Diego County issued a governmental order prohibiting all on-site dining

- 3 -

SHERNOFF BIDART ECHEVERRIA<sup>LLP</sup>
LAWYERS FOR INSURANCE POLICYHOLDERS

1    beginning on March 29, 2020 (The California Governmental Orders are collectively

2    attached as Exhibit 3).

3         11.    Other states in which there are Islands restaurants also issued

4    governmental orders prohibiting on-site dining. In Arizona, a governmental order was

5    issued on March 20, 2020 in which all on-site dining was prohibited in any county that

6    had a confirmed COVID-19 case. In Hawaii, a governmental order on March 23, 2020

7    prohibited all on-site dining.  [The Other States Governmental Orders are attached as

8    Exhibit 4.] The Governmental Orders for California and the other states are collectively

9    referred to as the Governmental Orders.

10        12.    These Governmental Orders caused an interruption and suspension to the

11   business operations of Islands and CFBC by preventing all on-premises dining and

12   events, except for take-out which has traditionally constituted a very small portion of

13   Plaintiffs' business income since Plaintiffs' business model is centered on the dining

14   experience, and/or severely reducing the capacity of dining services. As a direct result

15   of these Governmental Orders, Islands and CFBC suffered a suspension of its

16   operations, which resulted in an immediate loss of business income. Plaintiffs

17   submitted a claim for their business income loss to Affiliated FM.

18        13.    Engaging in the business of insurance in California imposes upon insurers

19   the legal obligation to promptly conduct fair, balanced and thorough investigations of

20   all bases of claims for benefits made by their insureds, with a view toward honoring the

21   claims. As part of these obligations, an insurance company is obligated to diligently

22   search for and consider evidence that supports coverage of the claimed loss, and in

23   doing so must give at least as much consideration to the interests of its insured as it

24   gives to its own interests.

25        14.    During the COVID-19 Pandemic, Commissioner Lara issued a notice after

26   the California Department of Insurance "ha[d] received numerous complaints from

27   businesses, public officials, and other stakeholders asserting that certain insurers,

28   agents, brokers, and **insurance company representatives** [we]re attempting to dissuade

- 4 -

1    policyholders from filing a notice of claim under its Business Interruption insurance

2    coverage, or **refusing to** open and **investigate these claims** upon receipt of a notice of

3    claim" (Exhibit 1, p. 1, emphasis added).

4           15.     The Commissioner's notice reminded insurers facing these claims of the

5    importance of complying with their obligations, citing the California Fair Claims

6    Settlement Practices Regulations (Cal. Code Regs., tit. 10, §§ 2695.1 *et seq.*

7    ("Regulations")). His notice went on to state, "[t]herefore, Insurance Commissioner

8    Ricardo Lara finds it necessary to issue this Notice to ensure that all agents, brokers,

9    **insurance companies**, and other licensees accept, forward, acknowledge, and **fairly**

10    **investigate all business interruption insurance claims** submitted by businesses"

11    (Exhibit 1, pp. 1-2, emphasis added). The Commissioner stated that "every insurer is

12    required to conduct and diligently pursue a thorough, fair, and objective investigation

13    of the reported claim" (*Id.* at 2).

14           16.     The Commissioner further reminded insurers that "[i]f the claim is denied

15    in whole or in part, the insurer is **required to** communicate the denial in writing to the

16    policyholder **listing all the legal and factual bases** for such denial (Regulations, §

17    2695.7(b)(1)). Where the denial of a first party claim is based on a specific statute,

18    applicable law or policy provision, condition, or exclusion, the written denial must

19    include reference to and provide an explanation of the application of the statute,

20    applicable law, or policy provisions, condition, or exclusion to the claim…Regulations,

21    § 2695.7(b)(1)" (Exhibit 1, p. 3, emphasis added).

22           17.     Consistent with all of these well-established and non-controversial

23    California insurance claims handling standards, Plaintiffs had the right to rely on

24    Affiliated FM to handle their insurance claims for business interruption losses in a

25    manner consistent with these standards of good faith and fair dealing. Unfortunately,

26    Affiliated FM failed in all respects, and abruptly, unreasonably and with a callous

27    disregard for the interests of its insured denied Plaintiffs' business interruption claim,

28    except as to the sub-limit for Communicable Disease for the actual presence of the

SHERNOFF BIDART ECHEVERRIA™
LAWYERS FOR INSURANCE POLICYHOLDERS

- 5 -

1    COVID-19 virus at one specified location, and possibly one additional location

2    depending on additional information available.

3          18.    In order to obtain the benefits promised under the Policy and required by

4    California law, Plaintiffs were compelled to institute this lawsuit to pursue all available

5    legal and equitable remedies available to them.

6

7                                        II.

8                                     PARTIES

9          19.    Islands is, and at all relevant times was, a Delaware Limited Partnership,

10   with its principal place of business in Carlsbad, California.

11         20.    CFBC is, and at all relevant times was, a California Limited Liability

12   Corporation, with its principal place of business in Carlsbad, California.

13         21.    Affiliated FM is, and at all relevant times was, conducting business in the

14   State of California as an insurer. It issued the subject policy to Plaintiffs in Carlsbad,

15   California.

16         22.    The true names or capacities, whether individual, corporate, associate, or

17   otherwise, of defendants Does 1 through 50, inclusive, are unknown to Plaintiffs, who

18   therefore sue said defendants by such fictitious names. Plaintiffs are informed and

19   believe and based on such information and belief allege that each of the defendants

20   sued herein as a Doe is legally responsible in some manner for the events and

21   happenings referred to herein, and will ask leave of this Court to amend this complaint

22   to insert their true names and capacities in place and instead of the fictitious names

23   when the same become known to Plaintiffs.

24         23.    Plaintiffs are informed and believes and based thereon alleges that at all

25   times mentioned herein, each of the defendants was the agent, partner, joint venturer,

26   associate and/or employee of one or more of the other defendants and was acting in the

27   course and scope of such agency, partnership, joint venture, association and/or

28   employment when the acts giving rise to this action occurred.

COMPLAINT AND DEMAND FOR JURY TRIAL

III.

INSURANCE

24.   Plaintiffs obtained the Policy with coverage dates from August 1, 2019 to August 1, 2020.

25.   Plaintiffs timely paid all premiums that were due under the Policy.

26.   In exchange for payment of the premiums, Affiliated FM agreed to provide the insurance coverage described in the Policy.

27.   The Declarations section indicates that the Policy provides "ALL RISK" coverage:

> "E. INSURANCE PROVIDED:
> This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as follows:
> See Attached Location Schedule" (Exhibit 2, p. EX02-007).

28.   The terms "PHYSICAL LOSS OR DAMAGE" are not defined in the Policy.

29.   The Business Interruption coverage in the Policy provides:

> "BUSINESS INTERRUPTION
> The Business Interruption loss, as provided in the Business Interruption Coverage and Business Interruption Coverage Extensions of this section, is subject to all the terms and conditions of this Policy, including but not limited to, the limits of liability, deductibles and exclusions shown in the Declarations section" (*Id.*, p. EX02-040).

30.   The Business Interruption coverage contains the following grant of coverage:

> "A. LOSS INSURED
> This Policy insures Business Interruption loss, as provided in the Business Interruption Coverage, as a direct result of physical loss or damage of the type insured:

COMPLAINT AND DEMAND FOR JURY TRIAL

SHERNOFF BIDART
ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

1. To property as described elsewhere in this Policy and not otherwise excluded by this Policy;

2. Used by the Insured;

3. While at a **location** or while in transit as provided by this Policy; and

4. During the Period of Liability as described elsewhere in this Policy" (*Id.*, p. EX02-040).

31.    The term "Business Interruption loss" is not defined in the Policy.  Only terms that are in bold in the policy are defined.

32.    The Policy states the following "Business Interruption Exclusions":

"D.    **BUSINESS INTERRUPTION EXCLUSIONS**

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Business Interruption loss.

This Policy does not insure:

1. Any loss during any idle period, including but not limited to when production, operations or services or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

    a)  Physical loss or damage not insured by this Policy.

    b)  Planned or rescheduled shutdown.

    c)  Strike or other work stoppage.

    d)  Any other reason other than physical loss or damage insured under this Policy.

2. Any increase in loss due to:

COMPLAINT AND DEMAND FOR JURY TRIAL

a) The suspension, cancellation, or lapse of any lease, contract, license or order.

b) Damages for breach of contract, or for late or non-completion of orders.

c) Fines or penalties of any nature, except as provided by the Contractual Penalties coverage in this Policy.

d) Any other consequential or remote loss.

3. Any loss resulting from physical loss or damage to merchandise or finished goods valued at the regular cash selling price or the time required for their reproduction.

4. Any loss resulting from the actual cash value portion of direct physical loss or damage by fire caused by or resulting from terrorism" (*Id.*, pp. EX02-044-45).

33.     The Business Interruption Coverage is subject to the Property Exclusions. The Property Damage Exclusions are set forth on pages 2-5 of the "All Risk" coverage form. They are broken down into three "Groups" (*Id.*, pp. EX02-023-26).

34.     Group III of the Property Damage Exclusions states:

"GROUP III: This Policy excludes:

1. Indirect or remote loss or damage

2. Interruption of business, except to the extent provided in this Policy

3. Loss or market or loss of use

4. Loss or damage or deterioration arising from any delay

5. Mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

- 9 -

6. Loss from enforcement of any law or ordinance:

   a) Regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

   b) Requiring the demolition of any property, including the cost in removing its debris;

Except as provided by the Decontamination Costs and Demolition and Increased Cost of Construction coverages in this Policy.

7. Loss or damage resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense.

8. Contamination, and any cost due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If contamination due only to the actual not suspected presence of contaminant(s) directly results from other physical damage not excluded by this Policy, then only physical damage caused by such contamination may be insured. This exclusion does not apply to radioactive contamination which is excluded elsewhere in this Policy.

9. Shrinkage, evaporation or loss of weight, unless directly resulting from other physical damage not excluded by this policy.

10. Changes in color, flavor, texture or finish, unless directly resulting from other physical damage not excluded by this Policy" (*Id.*, pp. EX02-024-26, emphasis in original).

35.    The Policy contains a "Coverage Extension" for "Communicable Diseases – Business Interruption"

"3.    **Communicable Disease – Business Interruption**

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

COMPLAINT AND DEMAND FOR JURY TRIAL

a)  An order of an authorized governmental agency regulating such presence of **communicable disease**; or

b)  A decision of an Officer of the Insured as a result of such presence of **communicable disease**.

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such described location with such presence of **communicable disease**.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy" (*Id.*, p. EX02-046, emphasis in original).

36.     The Communicable Disease – Business Interruption Exclusions are stated in the Policy as follows:

"Communicable Disease - Business Interruption Exclusions:
As respects Communicable Disease – Business Interruption, the following additional exclusions apply:

This Policy does not insure loss resulting from:

a)  The enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

b)  Loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in an sequence of loss" (*Id.*, p. EX02-046, emphasis in original).

37.     The Period of Liability for the Communicable Disease-Business Interruption Coverage is states as follows:

"The Period of Liability for this Business Interruption Coverage Extension will be:

- 11 -

COMPLAINT AND DEMAND FOR JURY TRIAL

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

The period of time:

a) Starting at the time of the order of the authorized governmental agency or the Officer of the Insured; but

b) Not to exceed the time limit shown in the Limits of Liability clause in the Declarations section.

This period of time is part of and not in addition to any Period of Liability applying to any coverage provided in the Business Interruption section" (*Id.*, p. EX02-046).

38.   The term "Communicable Disease" is defined in the Policy

"Communicable Disease means disease which is:

1.   Transmittable from human to human by direct or indirect contact with an affected individual or the individual's discharges; or

2.   Legionellosis" (*Id.*, p. EX02-063).

39.   The Declarations Page states pertaining to Sub-Limits:

"F.      SUB-LIMITS:
Unless otherwise stated below or elsewhere in this Policy, the following sub-limits of liability, including any insured Business Interruption loss, will be the maximum payable and will apply on a per **occurrence** basis" (*Id.*, p. EX02-007).

40.   The Policy defines an "**occurrence**" as follows:

"[O]ccurrence means the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by one discrete event of physical loss or damage, except as respects the following:

- 12 -

1.  terrorism: occurrence will mean the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by all acts of terrorism during a continuous period of seventy-two (72) hours.

2.  earth movement: occurrence will mean the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by all earth movement(s) during a continuous period of seventy-two (72) hours" (*Id.*, p. EX02-064).

## IV.

## FACTUAL BACKGROUND

**A.    Islands and CFBC**

41.    In 1982, Tony DeGrazier founded the first Islands on Pico Boulevard in West Los Angeles, California with a vision to deliver an "ohana"—or family—vibe. Islands was inspired by the beaches of Oahu, Hawaii and the joy of finding a flavorful burger, a hot basket of fries and a cold drink after a long day of surfing and outdoor fun. Over the years, as more locations opened, Islands focused on a simple, original, and evolving menu, while still keeping its beach-themed, casual atmosphere with efficient, attentive and friendly service that its customers have come to love.

42.    Five years after the first Islands opened, in 1987, Champagne French Bakery Café opened its doors in San Diego. It later expanded and by February 2020, it had seven stores in three counties: San Diego, Orange and Ventura. In October 2015, it changed ownership to CFBC when it was acquired by Islands.

43.    In addition to offering catering options, CFBC serves customers in a traditional, cozy and authentic French café style, serving breakfast, lunch, dinner and snacks throughout the day. It provides guests with a meal worthy of comparison to the fine, fresh ingredients of the agricultural Champagne province of Northeast France.

44.    Despite successful historical sales and customer traffic, Islands' and CFBC's in-person dining operations were prohibited by the Governmental Orders,

- 13 -

SHERNOFF BIDART
ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

1    prompting Islands and CFBC to make a business interruption claim to their insurance

2    company for the help and protection they had been promised. Some of Islands and

3    CFBC's locations were closed entirely, while others were limited to only take-out.

4    However, Affiliated FM rejected the claim violating California insurance law,

5    regulations and standards.

6

7    **B.    The COVID-19 Pandemic**

8         45.    It has been widely reported that COVID-19 has its origins in Wuhan,

9    China. The first public reports were on December 31, 2019 of an "outbreak of

10   respiratory illness."

11        46.    By January 8, 2020, the United States Centers for Disease Control and

12   Prevention ("CDC") issued warnings to American travelers going to China for a

13   "pneumonia of unknown etiology" (https://emergency.cdc.gov/han/han00424.asp, last

14   accessed August 28, 2020).

15        47.    Starting January 17, 2020, the CDC and the United States Department of

16   Homeland Security's Customs and Border Protection implemented enhanced health

17   screenings for passengers who came from or connected through Wuhan, China

18   (https://www.cdc.gov/media/releases/2020/p0117-coronavirus-screening.html, last

19   accessed August 28, 2020).

20        48.    On January 20, 2020, the W.H.O. reported the first confirmed cases outside

21   mainland China in Japan, South Korea and Thailand (https://www.nytimes.com/article/

22   coronavirus-timeline.html, last accessed August 28, 2020). The following day, on

23   January 21, 2020, the first American COVID-19 case was confirmed in the State of

24   Washington (https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-

25   travel-case.html, last accessed August 28, 2020).

26        49.    According to news reports, shortly thereafter, by January 26, 2020, the

27   CDC confirmed the first COVID-19 case in Orange County California (https://myemail.

28   constantcontact.com/CD-HEALTH-ALERT---First-Case-of-2019-Novel-Coronavirus-in-

- 14 -

1    Orange-County--Update-for-Providers.html?soid=1128423022889&aid=RPQB7yg_ORE,

2    last accessed August 28, 2020). Similarly, on January 26, 2020, the Arizona Department

3    of Health Services confirmed the first COVID-19 case (https://communityimpact.com/

4    phoenix/chandler/coronavirus/2020/04/02/timeline-how-covid-19-has-impacted-

5    arizona-since-the-first-case-was-reported/, last accessed August 28, 2020).

6        50.    On January 30, 2020, the W.H.O declared a "public health emergency of

7    international concern." The following day, on January 31, 2020, nearly all travel from

8    China into the United States was blocked.

9        51.    During February 2020, COVID-19 began spreading rapidly throughout

10    Europe, with Italy initially becoming the most impacted country. That same month, an

11    increasing number of cases were being reported in the United States, with the largest

12    concentration of cases in the Seattle area of Washington State. The first cluster of

13    COVID-19 cases was reported at a nursing home in Kirkland, Washington in late

14    February, where the first COVID-19 death in the United States was announced on

15    February 28, 2020.

16        52.    Published reports state that COVID-19 also continued to spread

17    throughout California during February 2020. In early February, several COVID-19 cases

18    were announced in Northern California. During February, the number of reported

19    COVID-19 cases in California increased. On February 26, 2020, the CDC announced the

20    first reported California COVID-19 case resulting from community spread

21    (https://www.cdc.gov/media/ releases/2020/s0226-Covid-19-spread.html, last accessed

22    August 28, 2020).

23        53.    On March 4, 2020, the first COVID-19 fatality was reported in California.

24        54.    As COVID-19 cases continued to increase in certain areas of the United

25    States, on March 4, 2020 Congress passed emergency funding of $8.3 billion to aid in the

26    immediate health response to COVID-19.

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL

1    55.    Also on March 4, 2020, Governor Newsom proclaimed a State of

2  Emergency to exist in California "as a result of the threat of COVID 19." The same day,

3  Hawaii Governor David Y. Ige proclaimed a State of Emergency in that state.

4    56.    On March 6, 2020, Hawaii reported its first COVID-19 case (https://health.

5  hawaii.gov/prepare/hawaii-reports-first-covid-19-case/, last accessed August 28, 2020).

6    57.    On March 11, 2020, Arizona Governor, Douglas A. Ducey, proclaimed a

7  State of Emergency in Arizona.

8    58.    On March 11, 2020, travel from Europe to the United States was restricted,

9  and the W.H.O. declared COVID-19 a pandemic. The term "pandemic" does not appear

10  anywhere as an excluded peril in this "All Risk" Policy.

11    59.    On March 13, 2020, the President of the United States declared a national

12  emergency.

13    60.    Yet, throughout this entire period from December 2019 until March 17,

14  2020, Islands and CFBC were allowed to continue to operate and had not suffered an

15  interruption of their thriving businesses.

16

17  C.    **The Governmental Orders in the jurisdictions where Plaintiffs operate**

18    61.    Since mid-March 2020, the jurisdictions in which Islands and CFBC

19  operate have enacted multiple governmental orders that impacted the operations of

20  restaurants. The orders can generally be described in three stages:

21          a.    Initially preventing all dine-in services;

22          b.    Re-opening dine-in services on limited scales while maintaining

23                social distancing in approximately late May 2020 even though the

24                COVID-19 pandemic had not resolved; and

25          c.    Suspending indoor dine-in services in or around early July 2020

26                while allowing limited outdoor dining.

27    62.    Notably, once in-person dining was allowed to temporarily resume,

28  Islands and CFBC experienced an increase in their business revenue. When additional

- 16 -

SHERNOFF BIDART
ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

1    orders again limited indoor dining, they experienced a reduction in their business

2    revenue.

3        63.    Islands and CFBC have complied with these mandatory Governmental

4    Orders since they were first enacted in March. These Governmental Orders have caused

5    Plaintiffs to suspend a significant portion of their operations, resulting in an immediate

6    loss of business income.

7        64.    These Governmental Orders were the predominant cause of the

8    suspension to Islands' and CFBC's operations.

9        65.    Due to the volume of governmental orders applicable to Plaintiffs'

10   operations, Plaintiffs have highlighted the most relevant orders broken down for each

11   of the three states in which they operate. Since all of CFBC's and most of Islands'

12   restaurants are located in California, Plaintiffs have identified the governmental orders

13   in California by County.

14

15       1.    <u>California</u>

16       66.    Nearly two months after the first reported COVID-19 case in the United

17   Stated, on March 15, 2020, California Governor Gavin Newsom requested restaurants to

18   operate at half capacity to allow for social distancing. The following day, he urged

19   restaurants to close their dine-in service and offer only takeout and drive thru options.

20   A few days later, on March 19, 2020, he issued an Executive Order directing all

21   California residents to stay at home except for certain essential services or activities

22   (Exhibit 3, p. EX03-001-002).

23       67.    Thereafter, additional orders were implemented throughout the state by

24   local government officials and Governor Newsom. After approximately six weeks of

25   significant closures, on or about April 28, 2020, Governor Newsom announced a four-

26   tiered system for reopening. One week later, on or about May 4, 2020, Governor

27   Newsom announced that the State would move to Stage 2 to gradually reopen some

28   lower risk locations with social distancing requirements.

COMPLAINT AND DEMAND FOR JURY TRIAL

68. Due to the increased community spread of COVID-19 in California, on or about July 1, 2020, Governor Newsom suspended all indoor dining at restaurants within counties that were on the county-monitoring list for at least three consecutive days, which at the time included 19 counties. On July 13, 2020, the State Public Health Officer and Director extended this order statewide (*Id.*, p. EX03-003-007). Some counties remain in this status, while others have resumed reduced indoor dining services (*Id.*, p. EX03-008-031).

a.        *San Diego County*

69. On March 16, 2020, among other restrictions, the Public Health Officer of the County of San Diego (SD Health Officer) closed all on-site dining for all restaurants and any other business establishments serving food (*Id.*, p. EX03-032-036). A few weeks later, on March 27, 2020, this order was extended (*Id.*, pp. EX03-037-041). Thereafter, this county followed other statewide measures.

70. When San Diego transitioned to the second phase, on or around May 22, 2020, restaurants were allowed to resume limited indoor dining services. Around June 20, 2020, San Diego restaurants were forced to implement additional, modest restrictions due to further governmental orders from the SD Health Officer, such as prohibiting new customers indoors after 10 p.m.

71. In an order dated July 21, 2020, the SD Health Officer required all restaurants not limiting their services to take-out or delivery to post and implement COVID-19 operating protocol to ensure proper social distancing and sanitation, or close their operations (*Id.*, p. EX03-042-052). The order contained additional specific requirements for restaurants, including discontinuing open seating, prohibiting standing in the restaurant, and only permitting alcohol drink sales served as part of a meal transaction (*Id.*, p. EX03-045-046).

- 18 -

72.     Presently, restaurants in San Diego are permitted to provide indoor dining with a maximum of twenty-five percent (25%) capacity or 100 people, whichever is fewer (*Id.*, p. EX03-021).

### b.     <u>Los Angeles County</u>

73.     On March 16, 2020, the Health Officer for the County of Los Angeles Department of Public Health (LA Health Officer) issued an order mandating that all restaurants cease on premise food service (*Id.*, p. EX03-053, 059).

74.     On March 19, 2020, the LA Health Officer issued another order restricting and limiting, among other things, the gathering of people (*Id.*, p. EX03-061-066). The City of Los Angeles Mayor, Eric Garcetti, issued a similar "safe at home" order where citizens were ordered to remain in their homes except for "essential activities or infrastructure," and all public and private gatherings were prohibited (*Id.*, p. EX03-067-072) This order reinforced the prior emergency restrictions, such as prohibiting restaurants from serving to dine-in customers.

75.     By late May 2020, Los Angeles restaurants were allowed to reopen for dine-in services with social distancing restrictions. One month later, on July 1, 2020, indoor, in-person dining was again prohibited in Los Angeles (*Id.*, p. EX03-073).

76.     In an order revised recently on August 12, 2020, the LA Health Officer extended the prohibition of indoor, in-person onsite dining (*Id.*, p. EX03-088, 092). As of the date of this Complaint, restaurants in Los Angeles County are unable to have any indoor dining, and have restrictions for outdoor dining (*Id.*, p. EX03-015).

### c.     <u>Orange County</u>

77.     On March 17, 2020, the Orange County Health Officer (OC Health Officer) issued an Order prohibiting all public and private gatherings as well as onsite food service at restaurants (*Id.*, p. EX03-105-110). The next day, on March 18, 2020, the OC

SHERNOFF BIDART ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

1    Health Officer issued another order closing all onsite dining, while allowing pickup,

2    delivery and drive thru services (*Id.*, p. EX03-111- EX03-112).

3        78.    When Orange County entered Stage 2 of the phased opening on or about

4    May 23, 2020, restaurants were allowed to open in-person dining services while

5    maintaining social distancing.

6        79.    Two months later, in an order dated July 14, 2020, Orange County

7    prohibited all indoor onsite dining (*Id.*, p. EX03-114).

8        80.    Presently, Orange County restaurants are prohibited from indoor dining

9    and have restrictions on outdoor dining (*Id.*, p. EX03-018-019).

10

11                    *d.    Monterey County*

12       81.    On March 17, 2020, the County of Monterey Health Department Director

13   of Health issued and order directing all residents to shelter in place (*Id.*, p. EX03-124-

14   130). As with other counties, this order prohibited onsite restaurant dining, and only

15   authorized delivery or carry out. This order was extended.

16       82.    By late May 2020, Monterey County was awaiting state approval to

17   proceed with reopening, including dine-in restaurants. It issued guidance at that time

18   so that restaurants could prepare for this reopening. By mid-June 2020, restaurants were

19   allowed to open indoor dining operations at reduced capacity, but were required to

20   implement statewide industry guidance as set forth by the California Department of

21   Public Health.

22       83.    As a result of Governor Newsom's July 13, 2020 order, restaurants in this

23   County were forced to cease indoor dining. Presently, restaurants in Monterey County

24   are not permitted to have any indoor dining, with only outdoor onsite dining take-out

25   or delivery being allowed (*Id.*, p. EX03-017-018).

26

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL

1                 *e.*     *Placer County*

2      84.     On March 19, 2020, the Placer County Health Officer issued an order

3 instructing residents to shelter in place and prohibiting onsite dining for restaurants,

4 which was set to expire on April 10, 2020 (*Id.*, p. EX03-131). This order was extended to

5 May 1, 2020 (*Id.*, p. EX03-138-150). At this time, and in an effort to reduce confusion,

6 Placer County removed local restrictions and only followed general statewide

7 restrictions requiring California residents to stay home except for essential needs.

8      85.     On or about May 12, 2020, Placer County was one of the first counties

9 statewide to obtain authorization to open the second phase. At that time, they were

10 allowed to open dine-in services with numerous restrictions (such as employee

11 temperature readings, reduced capacity, face masks, plastic barriers, and additional

12 sanitation measures) (*Id.*, p. EX03-151-169). A few weeks later, on May 28, 2020, Placer

13 County permitted restaurants to temporarily establish outdoor eating areas, including

14 expanding outdoor dining areas to cordoned off parking areas. It also relaxed parking

15 requirements because fewer people were able to eat onsite given the physical distancing

16 requirements.

17      86.     One month later, on July 11, 2020, the State Public Health Officer issued an

18 order specific to Placer County (*Id.*, p. EX03-170-172). This order required Placer

19 restaurants to close indoor seating to customers and shift operations to takeout, delivery

20 and outdoor seating effective the following day.

21      87.     As with most other counties, Placer restaurants are presently permitted to

22 have only outdoor onsite dining, take-out or delivery (*Id.*, p. EX03-019).

23

24                 *f.*     *Riverside County*

25      88.     On March 12, 2020, the Health Officer of the County of Riverside cancelled

26 all events with expected attendance above 250 people (*Id.*, p. EX03-173-174). A few days

27 later, on March 16, 2020, this order was further restricted to events in excess of 10

28 people (*Id.*, p. EX03-175-177). As for restaurants, Riverside County did not implement

- 21 -

1    an order prohibiting dine-in services before the March 19, 2020 statewide order from

2    Governor Newsom.

3         89.    On or about May 13, 2020, Riverside transitioned to the "early stage 2

4    phase", which did not allow dine-in restaurant services. On or about May 22, 2020,

5    Riverside received approval from Governor Newsom's office to enter the accelerated

6    second phase, which opened dining rooms at restaurants with modifications and

7    restrictions.

8         90.    In an order effective July 2, 2020, the State Public Health Officer issued

9    and order specific to Riverside County which prohibited restaurants from offering

10   indoor dine-in services (*Id.*, p. EX03-178-180). The restrictions in this order remain in

11   place (*Id.*, p. EX03-020).

12

13                      g.    *Sacramento County*

14        91.    On March 19, 2020, the Health Officer of the County of Sacramento

15   (Sacramento Health Officer) issued a stay at home order, permitting only operations of

16   essential businesses (*Id.*, p. EX03-181-188). It closed all dine-in restaurant services. This

17   order was extended to May 22, 2020.

18        92.    Beginning on or about May 22, 2020, Sacramento restaurants were

19   allowed to open for dine-in customers in the second phase of the tiered opening.

20        93.    On July 14, 2020, Sacramento Health Officer issued an order prohibiting

21   all indoor dining services, consistent with statewide orders at that time (Exhibit 3, p.

22   EX03-189-195). The restrictions in this order remain in place (*Id.*, p. EX03-020).

23

24                      h.    *San Bernardino County*

25        94.    On March 17, 2020, the Acting Public Health Officer for the County of San

26   Bernardino issued an order prohibiting gatherings, other than essential services (*Id.*, p.

27   EX03-199-201). As part of the order, food and beverage establishments were required to

28

- 22 -

COMPLAINT AND DEMAND FOR JURY TRIAL

1   follow statewide guidelines published the prior day by the California Department of

2   Public Health.

3        95.    Over the next two months, San Bernardino County tracked the statewide

4   mandates in place. By approximately May 22, 2020, this county implemented a plan for

5   reopening. The plan categorized restaurants as places with a medium risk level, with

6   dine-in services reopening in Stage 2b. On or about May 23, 2020, San Bernardino

7   County entered Stage 2b.

8        96.    On July 13, 2020, restaurants in San Bernardino County were forced to

9   suspend indoor dine-in services consistent with the statewide mandate. The same

10   restrictions remain in place today (*Id.*, p. EX03-021).

11

12         *i.*    *Santa Barbara County*

13        97.    On March 12, 2020, the Santa Barbara County Health Officer (Santa

14   Barbara Health Officer) and Public Health Director enacted an order declaring a local

15   health emergency, cancelling all non-essential gatherings of 250 people or more and

16   requiring social distancing for smaller events (*Id.*, p. EX03-202-203). This order was

17   scheduled to expire March 30, 2020. While that order was pending, California enacted

18   orders that impacted all California residents. Pursuant to Governor Newsom's orders,

19   restaurants in this County began offering only delivery or take-out service by March 17,

20   2020.

21        98.    On April 24, 2020, the Santa Barbara Health Officer enacted another order,

22   consistent with statewide requirements, which provided details broken down by the

23   type of business establishment (*Id.*, p. EX03-204-218). For restaurants, this order

24   reiterated that they could only prepare and offer food via delivery service, pick-up or

25   drive-thru (*Id.*, p. EX03-212). It also provided specific requirements for food

26   transportation containers, facial coverings for food workers, and social distancing (*Id.*,

27   p. EX03-212-213). This order further mandated that take-out food could not be

28   consumed anywhere in the line-of-sight of a person standing in front of the food

1    facility; required that restaurants remove, rearrange or otherwise make unavailable

2    tables, chairs or other customer seating on their premise; and prevented on-site dining,

3    whether it be indoors or outdoors (*Id.*, p. EX03-213).

4        99.    In an order dated May 21, 2020, Santa Barbara allowed restaurants to

5    resume dine-in services so long as they followed specific standards from the May 12,

6    2020 California Department of Health COVID-19 Industry Guidance: Dine In

7    Restaurants (*Id.*, p. EX03-219, 228-229).

8        100.    In an order effective July 2, 2020, the Santa Barbara Health Officer

9    suspended all dine-in restaurants services, except outdoor dining, take-out and delivery

10   (*Id.*, p. EX03-251, 252-253, 257). These restrictions remain in place today (*Id.*, p. EX03-

11   023).

12

13                    j.    *Ventura County*

14       101.    On March 17, 2020, the Ventura County Health Officer (Ventura Health

15   Officer) enacted an order, consistent with other counties, requiring that specific

16   individuals self-isolate and limiting "permanent food facilities" (which includes

17   locations operated for the purpose of preparing and serving food at the retail level) to

18   delivery service, take-out and drive-thru services (*Id.*, p. EX03-260, 261,).

19       102.    On March 31, 2020, the Ventura Health Officer extended this order to

20   April 19, 2020 and implemented specific requirements for restaurants offering delivery,

21   take-out or drive-thru options (including container requirements, consumption away

22   from the premises and six-foot social distancing) (*Id.*, p. EX03-264-265).

23       103.    On May 7, 2020, Ventura Health Officer determined that "there no longer

24   exists a need for local health orders that are more restrictive than the State Stay at Home

25   Order... and that the public health and welfare would best be served by a single set of

26   regulations where reasonable to avoid public confusion between State and local orders"

27   (*Id.*, p. EX03-268-269). Under this order, restaurants continued to be prevented from

28

COMPLAINT AND DEMAND FOR JURY TRIAL

1    offering dine-in services and were required to follow specific requirements regarding

2    containers, food consumption locations and social distancing (*Id.*, p. EX03-271-272).

3        104.    On or about May 29, 2020, Ventura County began allowing indoor dine-in

4    services at restaurants, with specific application requirements and operation standards.

5        105.    In an order dated July 2, 2020, the Ventura Health Officer prohibited

6    indoor dining at restaurants, but allowed onsite outdoor dining with restrictions,

7    including limitations on who can sit together, how long patrons could be present at the

8    restaurant, and hours of operation (*Id.*, p. EX03-278). These restrictions remain in place

9    today (*Id.*, p. EX03-028).

10

11        2.    **Arizona**

12        106.    On March 19, 2020, Arizona Governor Douglas A. Ducey ordered that all

13    restaurants in counties with confirmed COVID-19 cases prohibit access to on-site dining

14    until further notice by the close of business the following day (Exhibit 4, p. EX04-001-

15    002). This order remained in place for two months.

16        107.    On or about May 11, 2020, restaurants were permitted to resume dine-in

17    services. Islands complied and resumed dine-in operations in Arizona on or about May

18    15, 2020.

19        108.    Nearly two months later, effective July 11, 2020, Governor Ducey ordered

20    that all restaurants with indoor dining limit their capacity to less than fifty percent

21    (50%) of permitted fire code occupant loads; maintain six feet separation between all

22    parties or erect glass or plexiglass barriers; close buffets, cafeteria style, and self-serve

23    food stations; and eliminate indoor standing rooms (Exhibit 4, p. EX04-004-007).

24    Restaurants with outdoor dining were required to maintain six feet of separation

25    between parties (*Id.*, p. EX04-006). This order remains in effect and Islands has and

26    continued to comply with it.

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL

### 3.   Hawaii

1    109.    On March 20, 2020, Kirk W. Caldell, the Mayor of the City and County of
Honolulu, Hawaii, ordered that effective the following morning, all restaurants were
mandated to close until April 4, 2020 except for drive-thru, pickup and delivery services
(Exhibit 4, p. EX04-008-009). Islands complied.

110.    On March 21, 2020, Hawaii Governor David Y. Ige issued an order
mandating that all persons self-quarantine until March 26, 2020. A few days later, he
issued another order mandating social distancing measures statewide, which were later
enhanced on April 16, 2020 and remain in effect.

111.    In an order dated May 21, 2020, restaurants in Honolulu were allowed to
resume table service dining under specific restrictions, conditions and privileges
beginning on June 5, 2020 (Exhibit 4, p. EX04-011, 017-020).

112.    In August 2020, Honolulu implemented additional emergency orders and
guidance bulletins due to a resurgence of COVID-19.

113.    On August 6, 2020, Mayor Caldwell issued an order effective from August
8, 2020 until September 4, 2020 (Exhibit 4, p. EX04-021-059). Among other things, this
order mandated that all residents stay in their residence, except for essential activities;
closed all non-essential businesses; prevented onsite restaurant dining, whether indoor
or outdoor, and instead only allowed restaurants to offer delivery or carry out;
prevented gatherings (indoor and outdoor) over 10 people; prohibited all non-essential
travel (including by foot, on public transit, by bicycle, etc.); and required face coverings
(*Id.*).

114.    On August 18, 2020, Mayor Caldwell further expanded his order to
prevent all gatherings of any size (Exhibit 4, p. EX04-060-098).

115.    On August 25, 2020, Mayor Caldwell extended the stay at home order
from August 27, 2020 through September 9, 2020 (Exhibit 4, p. EX04-099-114) and on
September 8, 2020, he extended it until September 23, 2020 (Exhibit 4, p. EX04-115-130).

COMPLAINT AND DEMAND FOR JURY TRIAL

116.   The restrictions preventing onsite dining in Honolulu remain in place today and Islands has complied with them since they were implemented.

**D.   Affiliated FM denies the Business Interruption claim.**

117.   On March 27, 2020, with the assistance of their insurance broker, Plaintiffs made a claim under the Policy for their business income losses at various locations. Plaintiffs informed Affiliated FM that the Governmental Orders caused their locations to suffer business interruption losses, and, as a result, they were suffering losses of business income.

118.   The same day, Jeffrey Casillas, Vice President and the Los Angeles Operations Claims Manager for FM Global, requested contact information for the individual with whom Affiliated FM should work. Islands designated Warren Boone, the Vice President of Human Resources as their contact person.

119.   A few days later, on March 30, 2020, Grace M. Bonilla-Román[1] ("Ms. Bonilla"), a Loss Adjuster from the Dallas Operations for FM Global and Affiliated FM, sent an email to Mr. Boone requesting to arrange a time to discuss the details of the loss.

120.   The same day, at Plaintiffs request, their insurance broker, Scott Isbell of Marsh & McLennan Insurance Agency LLC, reached out to Ms. Bonilla regarding the claim. He advised her that Islands was gathering the facts of the loss, including the locations impacted.

121.   One week later, on April 6, 2020, Ms. Bonilla followed up by email. Mr. Isbell responded again, and the following day, on April 7, 2020, Ms. Bonilla sent a letter identifying the information Affiliated FM needed, including the locations impacted; copies of the governmental orders limiting, restricting or prohibiting access; and "whether there was the actual presence of the coronavirus (COVID-19) at any of the

_____

[1] Beginning April 21, 2020, Ms. Bonilla-Román's signature block changed to Grace M. Bonilla.  As such, she will be referred to in this Complaint as Ms. Bonilla.

COMPLAINT AND DEMAND FOR JURY TRIAL

SHERNOFF BIDART
ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

1   insured location(s) that resulted in the limiting, restriction or closure of these locations"

2   (Exhibit 5).

3       122.    On April 20, 2020, Islands provided a detailed, 85-page response to Ms.

4   Bonilla's April 7, 2020 letter (Exhibit 6). Before responding to her specific requests, Mr.

5   Boone corrected one portion of Ms. Bonilla's prior letter to clarify that Islands was not

6   limiting its claim under the Policy to coverage for communicable disease.

> "However, before we provide that information, we wanted to correct one
> thing that stood out to us as inaccurate in your April 7, 2020 letter.
>
> You stated that "We understand this loss is reported for a claim to be
> submitted under the Policy's ADDITIONAL COVERAGES for
> COMMUNICABLE DISEASE RESPONSE and INTERRUTOIN (sic) BY
> COMMUNICABLE DISEASE." We disagree and want to make sure you
> and Affiliated FM Insurance Company (Affiliated FM) have the correct
> information.
>
> We have not intended to limit the notice of our claim in any way to a
> particular portion of our policy or category of what you call "additional
> coverages." Rather, we have promptly attempted to provide fair notice to
> Affiliated FM that we are making a claim under the policy. We are relying
> on Affiliated FM to investigate our claim in light of our entire policy and
> all coverages for which we have timely paid all premiums.
>
> Without your assistance in the making and analysis of our claim, we are
> unable to yet determine which portion(s) of our policy apply to the facts of
> what has occurred to our business" (Exhibit 6, p. 1).

23      123.    Mr. Boone identified the impacted locations and enclosed an excel sheet

24  providing information about each location, such as the county, the governmental order

25  applicable to the location, the restaurant's status (takeout only or closed), and the dates

26  of the reduced capacity and dining room closures pursuant to the applicable

27  governmental orders (*Id.*, pp. 2, 4). He also enclosed copies of the governmental orders

28  and notices: "We would think that you [Affiliated FM] would have copies of authorized

COMPLAINT AND DEMAND FOR JURY TRIAL

1    governmental agency orders since they are publically available, but we have enclosed

2    them as well as a reference list" (*Id.*, at p. 3, 6-82).

3          124.   In response to Affiliated FM's inquiry of whether Plaintiffs had "copies of

4    any communication by an Officer of Islands Restaurant LP limiting, restricting or

5    prohibiting access to the specific location(s) due to the actual presence of the COVID-

6    19", Mr. Boone advised that "[t]here were no communications by an Officer of Islands

7    as you describe because there were not restrictive actions taken due to any actual

8    known presence of COVID-19. There were however three separate communications

9    distributed pursuant to the local and statewide orders, and we have attached those"

10   (*Id.*).

11         125.   He also explained that Plaintiffs "were not aware if there was or was not

12   an actual presence of COVID-19 in our locations" and "were expecting that our

13   insurance company would conduct an investigation of the claim, including those facts[,]

14   if it felt that information was necessary" (*Id.*, p. 2). Plaintiffs reminded Affiliated FM

15   that they "were following the local and/or statewide orders to close our restaurants to

16   in-person dining and/or all together" (*Id.*). In response to specific questions about

17   employees with communicable disease, Mr. Boone advised that two employees had

18   tested positive for COVID-19, along with specifics associated with those employees'

19   presence at two restaurants (*Id.*).

20         126.   At the end of his April 20; 2020 letter, Mr. Boone asked how long

21   Affiliated FM's investigation would take (*Id.*, p. 3).

22         127.   On April 21, 2020, Ms. Bonilla asked if Plaintiffs would agree with an

23   approach of encompassing all of Islands' locations in a single claim (Exhibit 7).

24

25         The loss notice references multiple locations in various jurisdictions that
           may have been impacted by the coronavirus. Customarily, each
26         jurisdiction would recommend that we have a separate file for each loss
27         location and communicate separately on each loss, including but not

28

COMPLAINT AND DEMAND FOR JURY TRIAL

1    limited to statutory notices and proof of loss requirements. Each of these
2    jurisdictions may have loss handling requirements that differ.

3    To streamline communication and adjustment of these COVID-19 related
4    losses, we intend to establish a single claim file (and corresponding
     ClaimID), encompassing all the locations referenced, which identifies your
5    corporate office as controlling the loss location. This will allow us to
6    communicate with you more efficiently on these losses, instead of having
     to correspond with you separately for each location. Considering the
7    volume of the losses you are reporting, we believe this approach makes
8    the most sense. This letter seeks your assent. Please let us know if you
     agree with this approach. A simple reply in the affirmative will suffice so
9    we can proceed (Exhibit 7).

10

11    128.    A few days later, on April 24, 2020, Mr. Boone advised Ms. Bonilla that

12   Plaintiffs "d[id] not agree at this time to [her] request to streamline into a 'single claim

13   file' and Claim ID/adjustment of these losses due to the many jurisdictions which

14   govern the closure of our individual restaurant locations" (Exhibit 8, p. 1). Instead, Mr.

15   Boone advised that Plaintiffs "prefer the claim to be handled without consolidation,

16   because as you say, there is significant volume to the losses we are reporting, and each

17   location had and continues to have a different calendar of impact" (Id.).

18    129.    With this letter, Plaintiffs once again took the opportunity to clarify a few

19   points with Affiliated FM. First, Plaintiffs reiterated that it was the Governmental

20   Orders that impacted their locations.

21    130.    Mr. Boone also requested in his April 24, 2020 letter that Affiliated FM

22   avoid pre-judging Plaintiffs' claims before it had done its investigation to determine the

23   nature of Plaintiffs' loss, and reminded Ms. Bonilla that Plaintiffs were "relying on

24   Affiliated FM to investigate [the] claim in light of [their] entire policy and all coverages

25   for which we have timely paid all premiums" (Id., p. 1).

26    131.    Mr. Boone concluded his April 24, 2020 letter by inquiring again about the

27   length of Affiliated FM's investigation: "Finally, we ask again, can you please let us

28   know how long you expect Affiliated FM's investigation of the claim will last?" (Id.)

- 30 -

COMPLAINT AND DEMAND FOR JURY TRIAL

1    132.    On May 1, 2020, Affiliated FM responded (Exhibit 9). It acknowledged,

2    among other things, receipt of Plaintiffs' April 20 and 24, 2020 letters, cited multiple

3    provisions of the Policy, and advised that its investigation was ongoing (*Id.*). Ms.

4    Bonilla also requested to be provided additional information and documents in an

5    attached appendix.

6    133.    As to the length of Affiliated FM's investigation, Ms. Bonilla advised that

7    it was unable to confirm how long it would last: "As previously noted, our

8    investigation and review of the information provided to date is ongoing. Therefore, we

9    are not in the position to outline our determination of policy coverage application or

10   confirm how long Affiliated FM Insurance Company's investigation will last. ... Our

11   investigation of the claim will comply with jurisdictional fair claims handling

12   requirements" (*Id.*, p. 2).

13   134.    Affiliated FM copied the Policy language and only briefly analyzed the

14   Communicable Disease coverages and the sublimits for those coverages (*Id.*, pp. 3-4).

15   135.    Ms. Bonilla's May 1, 2020 letter concluded as follows:

16

17   "[B]ased on the limited information provided at this time, the only
     coverage potentially available under our Policy for losses arising from

18   COVID-19 is found in our Communicable Disease coverages, assuming
     the conditions of those coverages are satisfied. To the extent Islands

19   Restaurants, LP believes that it has sustained physical loss or damage

20   from causes of loss other than COVID-19, please provide further
     information so that we may investigate those causes of loss" (*Id.*, p. 6).

21

22
23   136.    On May 8, 2020, Plaintiffs responded to Ms. Bonilla's May 1, 2020 letter

24   and provided responses to her additional questions in the appendix. In the letter,

     Plaintiffs advised Ms. Bonilla that they "ha[d] concerns with your [Ms. Bonilla's] letter,
25
     as it seems to ignore the impact of the governmental orders that we previously
26
     provided to you and instead claims that 'the only coverage potentially available' is the
27
     'Communicable Disease coverage.' Based on the community spread of COVID-19, the
28

- 31 -

SHERNOFF BIDART
ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

1    governmental orders that were issued for public health reasons caused each of our

2    restaurants to temporarily close or cease our dining operations" (Exhibit 10, p. 1).

3          137.    Plaintiffs explained in great detail the impact of the Governmental Orders

4    on their operations, including restricting access to the restaurants and significantly

5    reducing dining services, and described and attached research supporting the

6    community spread of COVID-19 (*Id.*, pp. EX10-001, 003-004, 011-042). After detailing

7    the research, Mr. Boone pointed out that "[y]our letter ignores all of these factors. It

8    appears that Affiliated FM is only focusing on positive test results of Islands'

9    employees. As previously explained, the governmental orders required us to shut down

10   in-person dining and significantly reduce our operations" (*Id.*, p. EX10-004). Plaintiffs

11   also explained that they had remained open while COVID-19 was present in the states

12   in which they operate until the Governmental Orders were issued.

> "Although COVID-19 was present in California and other states by late
> January 2020, all Islands Restaurants were allowed to remain open
> throughout February and through the middle of March.

> It was not until the governmental orders were issued that we experienced
> business interruption losses. Thus, a proper investigation and analysis
> would have concluded that the governmental orders were the
> predominant cause of our business interruption losses.

> Your letter completely fails to analyze coverage for the business
> interruption losses caused by the governmental orders. Please confirm
> that our Policy provides coverage for business interruption losses
> predominantly caused by the governmental orders. If Affiliated FM
> disagrees, we respectfully request that you advise us of the basis for your
> position" (Exhibit 10, pp. EX10-001-002).

25         138.    Plaintiffs also advised Affiliated FM that the Policy did not define terms

26   "physical loss or damage of" or explain how the terms differed, and asked a number of

27   questions relating to those terms (*Id.*, p. EX10-002).

28

COMPLAINT AND DEMAND FOR JURY TRIAL

SHERNOFF BIDART
ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

1    "What are the definitions that Affiliated FM is using for 'physical loss' or
2    'damage'? Why are these terms not defined in the Policy? What is the
     difference between 'physical loss' and 'damage'? Are there any
3    documents that Affiliated FM provides to insureds explaining the
4    definitions of those terms and how they differ from each other? If so,
     please send us those documents. Please provide your responses to these
5    questions in writing" (Id.).

6

7    139.    Mr. Boone's May 8, 2020 letter explained that Plaintiffs had suffered

8    physical loss or damage to insured property.  Mr. Boone also pointed out that there had

9    been no testing done at the locations, and any sublimits applied to each location

10   separately.

11   140.    On May 19, 2020, Ms. Bonilla sent a letter confirming that Affiliated FM

12   had received the May 8, 2020 letter and all of its enclosures (Exhibit 11). She promised

13   to "promptly" be in touch once "we finish our review" (Id.).

14   141.    A few weeks later, on May 29, 2020, Mr. Boone sent a follow up later as he

15   had not substantively heard back since his May 8, 2020 letter (Exhibit 12). In his letter,

16   Mr. Boone asked again when Affiliated FM would conclude its investigation.

17       "Additionally, in our April 24, 2020 letter, we asked how long you
18       expected Affiliated FM's investigation of the claim would last. In your
         May 1, 2020 response, you stated that you would 'promptly' advise us of
19       Affiliated FM's coverage determination and/or need for additional
20       documentation or information. Despite your promise, we have not
21       received a prompt response to our submission.

22       You also said on May 1, 2020 that Affiliated FM's investigation of the
23       claim would comply with the jurisdictional fair claims handling
         requirements. It is our understanding that these requirements mandate
24       insurers, such as Affiliated FM, decide claims within 40 days and
25       communicate with insureds within that time frame if additional
         information is needed. If we are incorrect, please correct us. It has now
26       been sixty-three days since our claim was reported on March 27, 2020.
27

28

COMPLAINT AND DEMAND FOR JURY TRIAL

SHERNOFF BIDART
ECHEVERRIA™
LAWYERS FOR INSURANCE POLICYHOLDERS

1   Our responses to your May 1, 2020 questions were contained in our May
2   8, 2020 letter. Since May 1, 2020, Affiliated has not asked us any additional
    questions. Our business and employees are suffering. Time is of the
3   essence for us.

4   When can we expect Affiliated FM will make its determination of
5   coverage?" (*Id.*)

6

7   142.   On June 4, 2020, Affiliated FM responded to Mr. Boone's May 8 and 29,

8   2020 letters (Exhibits 13 and 14). This letter confirmed the same position that Affiliated

9   FM had previously taken—that the only coverages available were under the

10  Communicable Disease provisions: "[W]e re-affirm our understanding that, based on

11  the information submitted to date, the only potentially available coverage for losses

12  arising from COVID-19 under the Policy is under the Communicable Disease

13  provisions, subject to the terms and conditions of those coverages" (Exhibit 13, p. 1).

14  Affiliated FM also stated that it does not consider COVID-19 to be a physical loss or

15  damage of the type insured: "Since contamination is specifically excluded, COVID-19 is

16  not physical loss or damage of the type insured" (*Id*, p. 2).

17  143.   In response to Plaintiffs' inquiries regarding the definitions of "physical

18  loss or damage of," Affiliated FM confirmed it was undefined in the Policy and stated

19  its own definition as follows:

20  "Your letter asked us to explain the definition of '*Physical Loss or Damage*'
21  as that phrase is used in your Policy. Absent an express definition of a
    word or phrase in the Policy, a word or phrase takes on its plain and
22  ordinary meaning. 'Physical loss or damage' is a distinct, demonstrable,
23  physical change to property. COVID-19 does not cause any distinct,
    demonstrable, physical change to property. AFM, therefore, does not
24  consider the presence of COVID-19 to be 'physical loss or damage' under
25  your Policy" (Exhibit 13, p. 2).

26

27

28

- 34 -

COMPLAINT AND DEMAND FOR JURY TRIAL

SHERNOFF BIDART
ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

1    144.    On June 15, 2020, Mr. Boone responded to Ms. Bonilla's June 4, 2020

2    letters, including providing additional information in response to specific questions

3    (Exhibit 15). Mr. Boone explained that the parties had a fundamental disagreement,

4    "which create[d] a difference of interpretation of the Policy provisions applicable to the

5    claims" (*Id.*, p. 1). "We believe, as explained below, that we have sustained a physical

6    loss or damage of the type insured, which means that additional coverages beyond the

7    Communicable Disease coverage are applicable to our claims. Affiliated FM disagrees

8    and thus persists in attempting to limit our claim to only the Communicable Disease

9    coverage, which you say 'do[es] not require physical loss or damage for recovery

10   thereunder'" (*Id.*, p. 1).

11   145.    Mr. Boone also reiterated that Plaintiffs had not yet heard from Affiliated

12   FM to confirm that the "Policy provides coverage for business interruption losses

13   predominately caused by the governmental orders" and "reiterated [the] request that

14   Affiliated FM advise us of the basis for its position if it disagrees" (*Id.*). He again

15   explained the impact of the Governmental Orders and that Plaintiffs' restaurants had

16   sustained physical loss or damage.

17

18   "We reiterate our prior comments that we did not close or cease dine-in
     services even though there was community spread of COVID-19.

19

20   We lost the ability to use our restaurants—some at all and others for our
     primary business of dine-in services—because of the governmental orders

21   that limited our ability to operate. You seem to acknowledge this in your
     letter when you mention that the '"shelter in place" orders issued by

22   various states and counties…were issued to mitigate the spread of the

23   COVID-19…' (Page 1)" (Exhibit 15, p. 2).

24

25   146.    Mr. Boone also explained that Plaintiffs disagreed with Affiliated FM's

26   interpretation of the "plain and ordinary meaning" of the terms "physical loss or

27   damage," particularly "physical loss" (*Id.*, pp. 2-3).

28

- 35 -

SHERNOFF BIDART
ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

1    147.   Mr. Boone cited multiple definitions from the dictionary, which

2   contradicted Affiliated FM's definition of physical loss or damage as "a distinct,

3   demonstrable, physical change to property" (*Id.*, p. 3). He explained that "[t]he terms

4   you used—'distinct' 'demonstrable' or 'physical change'—do not appear anywhere in

5   the dictionary definitions of 'physical', 'loss' or 'damage'. ... Furthermore, we believe

6   that a plain and ordinary reading of the terms 'physical loss or damage' mandates that

7   there be a difference between 'physical loss' and 'damage' because they are separated in

8   the Policy by the disjunctive word 'or'. However, your purported plain and ordinary

9   meaning does not distinguish in any way between the two terms" (*Id.*).

10    148.   Mr. Boone's June 15 letter further analyzed Affiliated FM's description of

11   "physical loss or damage":

12
13   "We do not believe that an actual physical alteration of the property is
     required to satisfy the 'physical loss or damage' requirement in our Policy.
14   Instead, we believe that a loss of use, loss of utility, loss of access and loss
     of functional purpose are sufficient to satisfy this requirement.
15

16   Even if we use your purported plain and ordinary meaning of the phrase,
17   we believe that we have met the requirement of 'physical loss or damage'.
     There is a distinct and demonstrable physical change in our restaurants—
18   people were not allowed to sit at our tables or in our bars to eat food and
19   drink beverages, which is the primary basis of our business model. We
     were forced, as a result of governmental orders, to prevent people from
20   dining in our restaurants and bars" (Exhibit 15, p. 4).

21

22    149.   As support for their claim that the Governmental Orders, rather than

23   COVID-19, was the efficient proximate cause of Plaintiffs' loss, Mr. Boone advised

24   Affiliated FM that even though COVID-19 was still present and increasingly impacting

25   the states in which Plaintiffs' restaurants are located, Plaintiffs had resumed some dine-

26   in services when the Governmental Orders were revised.

27

28

SHERNOFF BIDART
ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

- 36 -

1   "Notably, now that the governmental orders are changing and reducing
2   restrictions, we are allowed to resume some dine-in services at modified
3   capacities *even though COVID-19 is still undeniably present* in California and
    the world.

4   When we were forced to first close dine-in services on March 16, 2020, the
5   California Department of Public Health was reporting as of the evening
6   before that there were 392 positive COVID-19 cases and 6 deaths in
7   California. Nearly three months later, as of June 7, 2020, there are 131,319
    positive COVID-19 cases and 4,653 fatalities in California according to the
8   same source" (Exhibit 15, p. 4).

9
10      150.    To clarify Affiliated FM's prior correspondence attempting to implicate an
11  exclusion for loss of use, Mr. Boone explained as follows:

12      "Please note that your reliance in your recent letter on the exclusion for
13      'loss of market or loss of use' is misguided. The governmental orders, not
14      a 'loss of market or loss of use', were the proximate *cause* of our closures,
        reduced operations and resulting business interruption losses.
15      As a *result* of these governmental orders, we lost the use of dine-in
16      operations. Thus, the exclusion for 'loss of market or loss of use' is
        inapplicable to our claim because our loss of use is not the cause or peril of
17      our claim, but rather the result of the governmental orders" (*Id.*).

18
19      151.    Additionally, the June 15 letter also reiterated that Affiliated FM had not
20  done any investigation. (*Id.*, pp. 4-5.) Mr. Boone pointed out that Affiliated FM did not
21  visit, inspect, or test any of the locations, nor had it asked for any pictures or videos or
22  spoken with anyone at the restaurants. (*Id.*, at p. 5.)
23      152.    Mr. Boone also again advised that since each location suffered a separate
24  loss the sub-limits of the Communicable Disease coverage according to the terms of the
25  Policy should apply separately to each location. (*Id.*, at pp. 6-7.)
26      153.    Two weeks later, on June 29, 2020, Ms. Bonilla confirmed receipt of Mr.
27  Boone's June 15, 2020 letter and promised to "promptly" respond in writing once
28  Affiliated FM finished its review of that letter (Exhibit 16).

- 37 -
COMPLAINT AND DEMAND FOR JURY TRIAL

1    154.   Three additional weeks after the June 29, 2020 letter, on July 22, 2020,

2    Plaintiffs followed up with Affiliated FM as they had not yet substantively received a

3    response to the June 15, 2020 letter (Exhibit 17). By that time, it had been 117 days since

4    Plaintiffs' initial submission of the claims, and Affiliated FM still had not made a

5    coverage determination. Mr. Boone advised Ms. Bonilla of the adverse impact that

6    Affiliated FM's continued delays were having on Plaintiffs:

7

8        "Your continuous delay in deciding coverage for our claims is causing
         tremendous harm to Islands. We cannot pay many of our obligations until
9        you fulfill your obligation. Our banking relationships have been strained
         by your delay. Our landlords are working with us, but their patience is
10       running thin. We have relied on our insurance policy as our lifeline for
11       moments precisely like this. If there is any further delay, we fear we
         cannot sustain our business. ... [P]lease understand that your delay is
12       causing tremendous difficulty for our business and your prompt response
13       would be much appreciated" (Id., pp. 1, 2).

14

15   155.   Mr. Boone explained Plaintiffs efforts since April 24, 2020 to determine

16   when Affiliated FM would decide coverage for the claims (Id., pp. 1-2). He advised that

17   Plaintiffs' "restaurants continue to experience business interruptions as a result of the

18   governmental orders and restrictions, including California's current prohibition of

19   indoor dine-in services" (Id., p. 2). Mr. Boone also advised that a few more employees

20   had tested positive for COVID-19 (Id.).

21   156.   In an effort to once again show the impact of the governmental orders, Mr.

22   Boone concluded his letter as follows:

23       "It is clear to us that the governmental orders, rather than the virus, are
24       the efficient proximate cause of our loss, here is the breakdown of the
         three stages we have experienced since March 15, 2020:
25

26           **Stage 1:** For eleven weeks (from March 15th to May 31st), our
27           dining rooms were shut down by the governmental orders and our
             business was interrupted. With considerable effort to mitigate our
28

- 38 -

SHERNOFF BIDART
ECHEVERRIA™
LAWYERS FOR INSURANCE POLICYHOLDERS

damages, our take-out sales could not achieve much higher than 20% of our original business (usually they are 8%). Our restaurants were built on a full-service dining concept and we cannot survive on take-out only.

Stage 2: In early June, when the California governmental orders were partially lifted (dining rooms opened but social distancing remained), our operations quickly returned to nearly 70% of prior year business levels even though the coronavirus was still present in the world and California.

Stage 3: On July 3rd, CA Governor Newsom again ordered indoor dining rooms closed and we complied. Once again and ever since, our sales have plummeted and our business has been interrupted.

Thus, the governmental orders are MIRRORING our business interruption. We feel this simplification of the three stages confirms what we have been trying to tell you throughout our claim" (*Id.*, p. 2).

157.    A few days later, on July 25, 2020, Affiliated FM substantively responded to Plaintiffs' June 15, 2020 letter denying coverage entirely for nearly every location, providing only limited coverage for one location in Agoura Hills and advising that one additional location in North Long Beach may qualify for limited coverage if Plaintiffs could provide additional information. (Exhibit 18). "[W]e find no liability under the terms and conditions of the Affiliated FM Insurance Company Policy No. SS790 for the loss due to the shutdown of 61 of 63 Islands Restaurants Appendix A locations as a result of governmental order" (*Id.*, p. 8)..

158.    In the denial letter, Affiliated FM acknowledged that "[w]e [Affiliated FM] understand your [Plaintiffs'] operations were shut down to comply with orders issued by government officials due to concerns about the spread of COVID-19" (*Id.*, p. 4). Affiliated FM never conducted any efficient proximate cause analysis pertaining to the Governmental Orders.  Instead, it incorrectly claimed, that Plaintiffs had not suffered a direct physical loss or damage under the Policy.

- 39 -

"[T]he Policy requires the 'actual not suspected presence' of a communicable disease at an insured location. Based on the information received, no evidence has been provided that demonstrates the novel coronavirus, which causes COVID-19, was actually present at 61 out of the 63 reported locations. Therefore, the threshold requirement for coverage is absent for these locations…

The Policy responds to all risks of physical loss or damage, except as excluded, and subject to the Policy's terms and conditions. Therefore, except as provided by Policy extensions that specifically extend coverage for non-physical damage, you must sustain actual physical loss or damage of the type insured to property of the type insured for the Policy's coverages to respond" (Exhibit 18, pp. 2, 4).

159.    The denial letter claimed that "[t]he presence of COVID-19, even if established, would not constitute 'physical loss or damage'" (*Id.*, p. 5).

160.    Affiliated FM further stated in the denial letter that COVID-19 would be excluded as a contaminant: "Because COVID-19 is a virus, pathogen and/or disease causing or illness causing agent, it constitutes contamination which is excluded under the Policy" (*Id.*, p. 6).

161.    In order to pay the limited claim at Agoura Hills, and determine if North Long Beach was similarly entitled in its opinion to limited coverage, Affiliated FM requested additional information from Plaintiffs (*Id.*, p. 8).

162.    Pursuant to Section 2695.7(b)(1) of the Regulations, Affiliated FM was required to state in its denial letter all the factual, contractual, and legal grounds for denying the claim, thus forfeiting the right to raise additional grounds to attempt to justify its denial of Plaintiffs' claim.

163.    On August 7, 2020, Affiliated FM sent Mr. Boone another letter "re-iterat[ing] our [Affiliated FM's] coverage determination as outlined in our letter of July 25, 2020" (Exhibit 19, p. 2). Ms. Bonilla also explained that Affiliated FM "understand[s] the impact of the governmental orders on your organization; however, we disagree

- 40 -

1    with your interpretation of certain policy terms and conditions" (*Id.*, p. 1). The letter

2    also reiterated the request for information.

3        164.   On August 27, 2020, Mr. Boone responded to Affiliated FM (Exhibit 20).

4    He responded to particular positions Affiliated FM raised in an effort to justify its

5    delayed coverage decision, and advised that Plaintiffs fundamentally disagreed with

6    Affiliated FM's policy interpretation (*Id.*, pp. 1-2). He continued, "[w]e feel that we have

7    consistently expressed our position for the past four months, but Affiliated FM initially

8    set out on a path to avoid coverage and has reached a predetermined conclusion of that

9    path with its July 25, 2020 letter" (*Id.*, p. 4). Mr. Boone advised Plaintiffs were gathering

10   additional information related to the Agoura Hills and Long Beach, and provided

11   testing results for additional employees, which had been referenced in his prior letters

12   (*Id.*, pp. 4-6).

13       165.   As a result of Affiliated FM's wrongful denial of the claim, at a time when

14   the Governmental Orders required Plaintiffs to suspend their business operations,

15   Plaintiffs have been compelled to retain counsel and pursue this litigation in order to

16   obtain the benefits promised under the Policy.

17

18                              **FIRST CAUSE OF ACTION**

19       PLAINTIFFS ISLANDS RESTAURANT, LP AND CFBC, LLC FOR A FIRST

20   CAUSE OF ACTION AGAINST DEFENDANTS AFFILIATED FM INSURANCE

21   COMPANY AND DOES 1 THROUGH 50, INCLUSIVE, FOR BREACH OF THE

22   IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ALLEGE:

23       166.   Plaintiffs incorporate by reference all paragraphs above as if set forth in

24   full in this cause of action.

25       167.   Affiliated FM and Does 1 through 50, inclusive, have breached their duty

26   of good faith and fair dealing owed to Plaintiffs in the following respects:

27            a.    Unreasonably acting or failing to act in a manner that deprives

28                  Plaintiffs of the benefits of the Policy;

SHERNOFF BIDART
ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS



SHERNOFF BIDART
ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

1    b.   Unreasonably engaging in a pattern and practice of acting or failing
2          to act in a manner that deprives its insureds of the benefits of
3          policies it issues;

4    c.   Unreasonably failing to conduct a prompt, fair, balanced and
5          thorough investigation of all of the bases of Plaintiffs' claim;

6    d.   Unreasonably engaging in a pattern and practice of failing to
7          conduct a prompt, fair, balanced and thorough investigation of all
8          of the bases of claims made under policies it issues;

9    e.   Unreasonably failing to diligently search for and consider evidence
10        that supports coverage of Plaintiffs' claim;

11    f.   Unreasonably engaging in a pattern and practice of failing to
12        diligently search for and consider evidence that supports coverage
13        of claims;

14    g.   Unreasonably failing to conduct an investigation to determine the
15        efficient proximate cause (predominant cause) of Plaintiffs' loss;

16    h.   Unreasonably engaging in a pattern and practice of failing to
17        conduct an investigation to determine the efficient proximate cause
18        (predominant cause) on claims made by insureds;

19    i.   Unreasonably failing to give at least as much consideration to the
20        interests of Plaintiffs as it gives to its own interests;

21    j.   Unreasonably engaging in a pattern and practice of failing to give
22        at least as much consideration to the interests of its insureds as it
23        gives to its own interests;

24    k.   Unreasonably placing its own financial interests above the interests
25        of Plaintiffs;

26    l.   Unreasonably engaging in a pattern and practice of placing its own
27        financial interests above the interests of its insureds;

28

- 42 -

| | | |
|---|---|---|
| 1 | m. | Unreasonably failing to comply with the Regulations, including |
| 2 | | Section 2695.7(b)(1); |
| 3 | n. | Unreasonably ignoring Plaintiffs' refusal to combine all locations |
| 4 | | into a single claim; |
| 5 | o. | Unreasonably failing to apply the Policy's definitions and terms to |
| 6 | | determine whether Plaintiffs' claim was covered; and |
| 7 | p. | Unreasonably compelling Plaintiffs to institute this action to obtain |
| 8 | | benefits due under the Policy. |

168.   Plaintiffs are informed and believe, and thereon allege, that the foregoing unreasonable, malicious, oppressive and/or fraudulent misconduct was not limited to Affiliated FM and Does 1 through 50, inclusive, evaluation of this particular claim, but represents an ongoing pattern and practice, which they apply to all of their policyholders, that is specifically designed by Affiliated FM, and Does 1 through 50, inclusive, to earn illicit profits at the expense of their policyholders' rights. This ongoing pattern of conduct constitutes institutional bad faith.

169.   Affiliated FM and Does 1 through 50, inclusive, institutional bad faith constitutes reprehensible conduct because it is part of a repeated pattern of unfair practices and not an isolated occurrence. The pattern of unfair practices constitutes a conscious course of wrongful conduct that is firmly grounded in Affiliated FM and Does 1 through 50, inclusive, established company policies and practices. Plaintiffs are informed and believe and thereon allege that Affiliated FM and Does 1 through 50, inclusive, have engaged in similar wrongful conduct as to other insureds and that they have substantially increased their profits as a result of causing similar harm to others.

170.   As a proximate result of the aforementioned conduct of Affiliated FM and Does 1 through 50, inclusive, Plaintiffs have suffered, and will continue to suffer in the future, damages under the Policy, plus interest and other economic and consequential damages, for a total amount to be shown at the time of trial.

COMPLAINT AND DEMAND FOR JURY TRIAL

1    171.    As a further proximate result of the aforementioned unreasonable conduct

2    of Affiliated FM, and Does 1 through 50, inclusive, Plaintiffs were compelled to retain

3    legal counsel to obtain the benefits due under the Policy. Therefore, Affiliated FM and

4    Does 1 through 50, inclusive, are liable to Plaintiffs for the attorneys' fees reasonably

5    necessary and incurred by Plaintiffs in order to obtain the Policy benefits.

6    172.    The conduct of Affiliated FM and Does 1 through 50, inclusive, was

7    intended by them to cause injury to Plaintiffs, and/or was despicable conduct carried on

8    by them with a willful and conscious disregard of Plaintiffs' rights, subjected Plaintiffs

9    to cruel and unjust hardship in conscious disregard of its rights; and/or constituted an

10   intentional misrepresentation or concealment of a material fact known to Affiliated FM

11   and Does 1 through 50, inclusive, with the intention to deprive Plaintiffs of property or

12   legal rights or to otherwise cause injury, such as to constitute malice, oppression or

13   fraud under California Civil Code section 3294. Plaintiffs are therefore entitled to an

14   award of punitive damages in an amount appropriate to punish and set an example for

15   other similarly situated insurers.

16   173.    Affiliated FM's and Does 1 through 40's, inclusive, conduct was

17   undertaken by its corporate officers, directors or managing agents, identified herein as

18   Does 41 through 50, who were responsible for claims supervision and operations,

19   underwriting, communications, and/or decisions; and/or this conduct was authorized

20   by one or more of Affiliated FM's officers, directors or managing agents, and/or one or

21   more of Affiliated FM's officers, directors or managing agents knew of the actions and

22   adopted or approved that conduct after it occurred. This conduct was, therefore,

23   undertaken on behalf of Affiliated FM and Does 41 through 50, inclusive.

24

25

26

27

28

- 44 -

1       **SECOND CAUSE OF ACTION**

2       PLAINTIFFS ISLANDS RESTAURANT, LP AND CFBC, LLC FOR A SECOND

3   CAUSE OF ACTION AGAINST DEFENDANTS AFFILIATED FM INSURANCE

4   COMPANY AND DOES 1 THROUGH 50, INCLUSIVE, FOR BREACH OF CONTRACT

5   ALLEGE:

6       174.    Plaintiffs incorporate by reference all paragraphs above as if set forth in

7   full in this cause of action.

8       175.    Plaintiffs entered into a contract, the Policy, with Affiliated FM and Does 1

9   through 50, inclusive. Affiliated FM and Does 1 through 50, inclusive, owed duties and

10  obligations to Plaintiffs under the Policy.

11      176.    Plaintiffs did all of the significant things that the Policy required them to

12  do.

13      177.    Affiliated FM and Does 1 through 50, inclusive, denial of Plaintiffs' claim

14  is not in accordance with the terms of the Policy and California law.

15      178.    As a direct and proximate result of Affiliated FM and Does 1 through 50,

16  inclusive, conduct and breach of their contractual obligations, Plaintiffs have suffered

17  damages under the Policy in an amount to be determined according to proof at the time

18  of trial, plus pre-judgment interest pursuant to California Civil Code section 3289(b),

19  and other foreseeable and consequential damages according to proof and in amounts to

20  be determined at the time of trial.

21

22

23

24

25

26

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL

1       PRAYER FOR RELIEF

2       WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

3       AS TO THE FIRST CAUSE OF ACTION AGAINST DEFENDANTS

4    AFFILIATED FM INSURANCE COMPANY AND DOES 1 THROUGH 50,

5    INCLUSIVE, FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH

6    AND FAIR DEALING:

7           1.      For damages for failure to pay benefits owed under the Policy, plus

8    interest, in a sum to be determined at trial;

9           2.      For prejudgment interest on all damages awarded to Plaintiffs in

10   accordance with California Civil Code section 3287;

11          3.      For attorneys' fees, witness fees, and costs of litigation incurred by

12   Plaintiffs to obtain the Policy benefits in an amount to be determined at trial;

13          4.      For economic and consequential damages arising out of Affiliated FM and

14   Does 1 through 50's, inclusive, unreasonable failure to pay benefits owed under the

15   Policy;

16          5.      For punitive and exemplary damages in an amount appropriate to punish

17   or set an example of Affiliated FM and Does 1 through 50, inclusive;

18          6.      For costs of suit herein; and

19          7.      For such other relief as the Court deems just and proper.

20          AS TO THE SECOND CAUSE OF ACTION AGAINST DEFENDANTS

21   AFFILIATED FM INSURANCE COMPANY AND DOES 1 THROUGH 50,

22   INCLUSIVE, FOR BREACH OF CONTRACT:

23          1.      For economic and consequential damages, in an amount to be determined

24   according to proof at trial;

25          2.      For prejudgment interest on all damages awarded to Plaintiffs in

26   accordance with California Civil Code section 3289(b);

27          3.      For costs of suit incurred herein; and

28

SHERNOFF BIDART
ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

- 46 -

1    4.    For such other and further relief as the Court deems just and proper.

2

3    Dated: September ⁄⁄, 2020          SHERNOFF BIDART ECHEVERRIA LLP

4

5                                         By: _____

6                                              MICHAEL J. BIDART
7                                              RICARDO ECHEVERRIA
8                                              Attorneys for Plaintiffs

9

10                              **JURY DEMAND**

11    Plaintiffs hereby demand a jury trial.

12    Dated: September ⁄⁄, 2020          SHERNOFF BIDART ECHEVERRIA LLP

13

14                                         By: _____

15                                              MICHAEL J. BIDART
16                                              RICARDO ECHEVERRIA
17                                              Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

- 47 -

COMPLAINT AND DEMAND FOR JURY TRIAL



## RICARDO LARA
CALIFORNIA INSURANCE COMMISSIONER

# NOTICE

**TO:**     **All Admitted and Non-Admitted Insurance Companies, All Licensed Insurance Adjusters and Producers, and Other Licensees and Interested Parties**

**FROM:**  **Insurance Commissioner Ricardo Lara**

**DATE:**   **April 14, 2020**

**RE:**     **Requirement to Accept, Forward, Acknowledge, and Fairly Investigate All Business Interruption Insurance Claims Caused by the COVID-19 Pandemic**

---

To help combat the spread of the COVID-19 virus, various federal, state, and local government officials have issued emergency public health orders and "shelter-in-place" directives. The COVID-19 pandemic has severely curtailed activities of policyholders in both personal and commercial lines, causing significant and widespread economic loss in California.

Business Interruption insurance is an optional coverage that may be purchased as part of a comprehensive multi-peril commercial policy, business owners' policy, or on a stand-alone basis. Many small and large California businesses purchase Business Interruption insurance to protect against the loss of income and other losses caused by an interruption to the normal operations of the business.

The California Department of Insurance (Department) continues to encourage businesses to review their policies, including policy exclusions, coverage limits, and applicable deductibles, and contact their insurance companies to determine what their policies cover as each insurance policy is different and the coverage varies. However, despite the Department's on-going guidance to businesses statewide during the COVID-19 pandemic, it has received numerous complaints from businesses, public officials, and other stakeholders asserting that certain insurers, agents, brokers, and insurance company representatives are attempting to dissuade policyholders from filing a notice of claim under its Business Interruption insurance coverage, or refusing to open and investigate these claims upon receipt of a notice of claim.

Therefore, Insurance Commissioner Ricardo Lara finds it necessary to issue this Notice to ensure that all agents, brokers, insurance companies, and other licensees accept,

Notice on Requirement to Accept, Forward, Acknowledge, and Fairly Investigate All Business Interruption
Insurance Claims Caused by the COVID-19 Pandemic

Page 2
April 14, 2020

forward, acknowledge, and fairly investigate all business interruption insurance claims
submitted by businesses.

Commissioner Lara hereby notifies all agents, brokers, insurance companies, and other
Department licensees that they are required to comply with their contractual, statutory,
regulatory, and other legal obligations, including but not limited to, the obligations set
forth in the California Fair Claims Settlement Practices Regulations (Cal. Code Regs. tit.
10; sections 2695.1 et seq.) (the "Regulations") in connection with all California insurance
claims including, but not limited to, Business Interruption insurance claims, event
cancellation claims, and other related claims filed by California businesses.

The Regulations require, among other things, that all insurers, insurance agents, brokers,
insurance company representatives, and other Department licensees accept any
communication from the policyholder or its representative indicating that the policyholder
desires to make a claim against a policy that reasonably suggests that a response is
expected as a notice of claim. (Regulations, section 2695.5(b).) Upon receipt of a notice
of claim, every Department licensee is required to transmit such notice of claim to the
insurer immediately. (Regulations, section 2695.5(d).)

Upon receipt of a notice of claim, subject to certain exceptions, every insurer is required
to acknowledge the notice of claim immediately, but in no event more than 15 calendar
days after receipt of the notice of claim.  (Regulations, section 2695.5(e).)  If the
acknowledgment of a claim is not in writing, a written acknowledgment of the receipt and
date of the notice of claim must be made in the claim file of the insurer. (Regulations,
section 2695.5(e)(1).) Failure of an insurance agent or claims agent to transmit a notice
of claim to the insurer promptly will be imputed to the insurer, except where the subject
policy was issued pursuant to the California Automobile Assigned Risk Program.
(Regulations, section 2695.5(e)(1).)

Upon receipt of a notice of claim, the insurer is required to provide the policyholder with
the necessary forms, instructions, and reasonable assistance, including but not limited
to, specifying the information the policyholder must provide in connection with the proof
of claim and begin any necessary investigation of the claim.  (Regulations, section
2695.5(e)(2).)  Thereafter, every insurer is required to conduct and diligently pursue a
thorough, fair, and objective investigation of the reported claim, and is prohibited from
seeking information not reasonably required for or material to the resolution of a claim
dispute before determining whether the claim will be accepted or denied, in whole or in
part. (Regulations, section 2695.7(d).)

After conducting a thorough, fair, and objective investigation of the claim, the insurer must
accept or deny the claim, in whole or in part, immediately, but in no event more than 40
days after receipt of the proof of claim.  The amount of the claim accepted or denied by
the insurer must be clearly documented in the claim file unless the claim has been denied
in its entirety. (Regulations, section 2695.7(b).)

Notice on Requirement to Accept, Forward, Acknowledge, and Fairly Investigate All Business Interruption
Insurance Claims Caused by the COVID-19 Pandemic

Page 3
April 14, 2020

If the claim is denied in whole or in part, the insurer is required to communicate the denial
in writing to the policyholder listing all the legal and factual bases for such denial.
(Regulations, section 2695.7(b)(1).)  Where the denial of a first party claim is based on a
specific statute, applicable law or policy provision, condition, or exclusion, the written
denial must include reference to and provide an explanation of the application of the
statute, applicable law, or policy provision, condition, or exclusion to the claim.  Lastly,
every insurer that denies or rejects a third party claim, in whole or in part, or disputes
liability or damages must do so in writing.  (Regulations, section 2695.7(b)(1).)

Based on the foregoing, every insurer, insurance agent, broker, insurance company
representative, and other Department licensees is required to comply with their
contractual, statutory, regulatory, and other legal obligations in connection with all
California insurance claims, including but not limited to, Business Interruption insurance
claims, event cancellation claims, and other related claims filed by California businesses.
Additionally, no insurer, insurance agent, broker, insurance company representative, or
other Department licensee shall dissuade policyholders from filing a notice of claim under
its Business Interruption insurance coverage, or refuse to open and investigate such
claims upon receipt of a notice of claim.

# EXHIBIT 1



*Member of the FM Global Group*

270 Central Ave
Johnston, RI 02919
www.affiliatedfm.com

Thank you for placing your property insurance with AFM. We believe insurance should be straightforward and certain. That is why our proVision® 4100 policy is easy to read and navigate, while providing you broad coverage.

In addition to providing property insurance, AFM would like to help you protect your business and achieve your goals. In partnering with AFM, you have the strength of FM Global Group behind you, including a strong balance sheet and access to our market-leading loss prevention engineering products and services that are based on more than 180 years of experience as a property specialist. We are eager to work with you and your broker to choose how to best identify, prioritize and reduce future loss in a way that makes practical and affordable sense.

Our engineering services, combined with the comprehensive coverage of our proVision 4100, will give you peace of mind and allow you to focus on what matters most—making your business thrive. We are committed to maintaining a long-term, mutually beneficial relationship with you. And, it is our hope that you will take advantage of the many tools and resources we offer our clients, such as online training, onsite policy workshops and access to AFM Online, our powerful extranet that includes policy documents and data-driven risk management tools.

If you have any questions or concerns, please do not hesitate to contact your local account team.

Respectfully,

James R. Galloway
Senior Vice President, AFM

# Loss Reporting and Contact Information
# Los Angeles Operations



**AFM**™

*Member of the FM Global Group*

---

**Claims Manager:**                              Jeffrey C. Casillas
                                                 Operations Vice President – Operations Claims Manager
                                                 Affiliated FM Insurance Company
                                                 6320 Canoga Avenue, Suite 1100
                                                 Woodland Hills, CA 91367
                                                 Tel: 818-227-2250
                                                 Jeffrey.Casillas@fmglobal.com

**Property Loss Reporting Procedure:**

To ensure that you receive prompt claims service, be sure to report a loss immediately. This enables us to provide you a professional property adjuster to examine your loss. Your loss may give rise to a claim under your Affiliated FM Insurance Company policy.

**Notice of Loss:**

The notice and report of any loss under an Affiliated FM Insurance Company policy should be communicated by calling the 24-hour claims hotline: **1-877-NEW-LOSS (1) 877 639 5677**

If this first notice and report is made orally, it should be confirmed in writing including at least the same information as was provided in the oral first notice and report.

**Leaving a Message:**

When leaving a message, please include the following information:

- Name and phone number of person to contact
- A brief description of the loss

A claims adjuster will return your call promptly.

---

**Account Engineer:**                            **Tony Harford**
                                                 Affiliated FM Insurance Company
                                                 6320 Canoga Avenue, Suite 1100
                                                 Woodland Hills, CA 91367
                                                 Tel: 818-227-2200 ext. 5516
                                                 Robert.Harford@affiliatedfm.com

**Jurisdictional Services:**       For more information on our jurisdictional inspections services,
                                   please contact the Account Engineer as listed above.

**EX02-003**

 

Affiliated FM Insurance Company
P.O Box 7500
Johnston, RI 02919

## DECLARATIONS PAGE

| Policy No. | Previous Policy No. | DATE OF ISSUE |
|---|---|---|
| SS790 | SS356 | 01-Aug-2019 |
| Account No. | | |
| 1-55136 | | |

In consideration of this Policy's Provisions, Conditions, Stipulations, Exclusions and Limits of Liability, and the premium charged, Affiliated FM Insurance Company, hereinafter referred to as the "Company", does insure:

> **INSURED:**
>
> Islands Restaurants, LP and CFBC, LLC
> 5750 Fleet Street Suite 120
> Carlsbad, CA 92008
>
>
>
> (For Complete Title See Policy)

The term of this Policy is from the **1st day of August 2019 to the 1st day of August 2020 at 12:01a.m.**, Standard Time, at the Locations of property involved as provided in this Policy.

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

This Policy is made and accepted subject to the above provisions and those hereinafter stated, which are made a part of this Policy, together with such other provisions and agreements as may be added to this Policy.

In Witness, this Company has issued this Policy at its office in Woodland Hills, California this 1st day of August 2019.

Authorized Signature
SM/RI

Secretary

President

PRO DEC 4100 (04/15)
© 2017 AFM. All rights reserved.

**EX02-005**

# DECLARATIONS

## A. POLICY TERM:

01-August-2019 to 01-August-2020

## B. NAMED INSURED:

Islands Restaurants, LP and CFBC, LLC, and its wholly or majority owned subsidiaries and any interest which may now exist or hereinafter be created or acquired which are owned, controlled or operated by any one or more of those named insureds.

## C. POLICY LIMIT:

This Company's total limit of liability, including any insured Business Interruption loss, will not exceed the Policy Limit of $152,602,419 as a result of any one occurrence subject to the respective sub-limits of liability shown elsewhere in this Policy.

## D. POLICY TERRITORY:

Coverage provided by this Policy is limited to property while located within the United States of America except as follows:

### Cyber Coverage Territory

Coverage provided in Data Restoration; Data Service Provider Property Damage and Business Interruption and Owned Network Interruption is limited to anywhere in the world except Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

## E. INSURANCE PROVIDED:

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as follows:

See Attached Location Schedule.

## F. SUB-LIMITS:

Unless otherwise stated below or elsewhere in this Policy, the following sub-limits of liability, including any insured Business Interruption loss, will be the maximum payable and will apply on a per occurrence basis.

The sub-limits stated below or elsewhere in this Policy are part of and not in addition to the Policy Limit.

When a limit of liability applies to a location or property, such limit of liability will be the maximum amount payable for all loss or damage.

If the same coverage(s) apply under separate endorsements below, the single largest sub-limit will be the maximum payable and will apply on a per occurrence basis.

There shall be no liability under this Policy when "NOT COVERED" is shown as a sublimit.

| | | |
|---|---|---|
| 1. | $5,000,000 | Earth Movement annual aggregate for all coverages provided, and is the maximum amount payable for all loss or damage caused by or resulting from Earth Movement, not to exceed: |
| | $50,000 | Earth Movement annual aggregate as respects Data Service Provider, Errors and Omissions, Off-Premises Service Interruption, Unnamed Property and Supply Chain combined. |

PRO S-1 4100 (01/17)
Affiliated FM Policy No. SS790

© 2019 AFM. All rights reserved.

**EX02-007**

# DECLARATIONS

| | | |
|---|---|---|
| 2. | $5,000,000 | Flood **annual aggregate** for all coverages provided, and is the maximum amount payable for all loss or damage caused by or resulting from Flood, not to exceed: |
| | $50,000 | Flood **annual aggregate** as respects Data Service Provider, Errors and Omissions, Off-Premises Service Interruption, Unnamed Property and Supply Chain combined. |
| 3. | $50,000 | **Cyber event annual aggregate** for loss or damage to stock in process or finished goods manufactured by or for the Insured caused by or resulting from cyber event that impacts the processing, manufacturing, or testing of such property or while it is otherwise being worked on. |
| 4. | $50,000 | **Cyber event annual aggregate** as respects Data Restoration and Owned Network Interruption combined. |

## Additional Coverages

| | |
|---|---|
| $10,000,000 | Accounts Receivable |
| $500,000 | Arson or Theft Reward |
| Policy Limit | Brand Protection |
| $2,500,000 | Change of Temperature |
| $500,000 | Communicable Disease - Property Damage **annual aggregate** |
| $500,000 | Data Restoration **annual aggregate** |
| $50,000 | Data Service Provider - Property Damage **annual aggregate** |
| Policy Limit | Debris Removal |
| Policy Limit | Decontamination Costs |
| $500,000 | Deferred Payment |
| Policy Limit | Demolition and Increased Cost of Construction |
| $10,000,000 | Errors and Omissions |
| $10,000,000 | Expediting Expenses |
| $1,000,000 | **Fine Arts** not to exceed $10,000 per item for irreplaceable **Fine Arts** |
| $1,000,000 | Green Coverage not to exceed 25% of the amount of the property damage loss |
| $500,000 | Land and Water Clean Up Expense **annual aggregate** |
| $500,000 | Locks and Keys |
| $250,000 | Money and Securities |
| $10,000,000 | Newly Acquired Property |
| $2,500,000 | Off-Premises Service Interruption - Property Damage |
| $500,000 | Professional Fees |
| Policy Limit | Property Removed from a Location |
| Policy Limit | Protection and Preservation of Property - Property Damage not to exceed $250,000 for security costs |
| $100,000 | Tax Treatment |
| $500,000 | Tenants Legal Liability |
| | Terrorism Coverage and the Supplemental United States Certified Act of Terrorism Endorsement |
| $100,000 | A.   United States Certified Act of Terrorism coverage |
| $100,000 | B.   Terrorism Coverage for Locations Outside of the United States **annual aggregate** not to exceed $100,000 **annual aggregate** for Property Removed from a Location, Unnamed Property and Flood |
| $5,000,000 | Transit not to exceed $250,000 for Business Interruption |
| $10,000,000 | Unnamed Property |
| $10,000,000 | Valuable Papers and Records not to exceed $10,000 per item for irreplaceable **Valuable Papers and Records** |

## Business Interruption Coverage

| | |
|---|---|
| Policy Limit | Gross Earnings not to exceed 90 days for **ordinary payroll** |
| Policy Limit | Gross Profits for 12 months Period of Liability not to exceed 90 days for **ordinary payroll** |
| Policy Limit | Rental Income |
| $10,000,000 | Extra Expense |

# DECLARATIONS

## Business Interruption Coverage Extensions

| | |
|---|---|
| $2,500,000 | Attraction Property |
| 60 Days | Civil or Military Authority |
| $500,000 | Communicable Disease - Business Interruption annual aggregate for a 12 Month Period of Liability |
| $1,000,000 | Contractual Penalties |
| $500,000 | Crisis Management not to exceed 30 Days |
| $50,000 | Data Service Provider -.Business Interruption annual aggregate |
| 365 Days | Extended Period of Liability |
| $10,000,000 | Ingress/Egress |
| $5,000,000 | Leasehold Interest |
| $500,000 | Logistics Extra Cost |
| $2,500,000 | Off-Premises Service Interruption - Business Interruption |
| Included in Cyber Event Limit | Owned Network Interruption annual aggregate |
| Policy Limit | Protection and Preservation of Property - Business Interruption |
| Policy Limit | Research and Development |
| $5,000,000 | Soft Costs |
| $5,000,000 | Supply Chain |

## Real Estate Endorsement

| | |
|---|---|
| $250,000 | Contingent Real Property |
| $250,000 | Emergency Evacuation Expense |
| $100,000 | Innkeeper's Liability not to exceed $10,000 per Hotel Guest |
| $250,000 | Tenant Relocation Expense |

## Retail Endorsement

| | |
|---|---|
| $500,000 | Removal and Restocking Expenses |
| $500,000 | Spoilage |

## G. DEDUCTIBLE AMOUNT:

This Company will not be liable for loss or damage, including any insured Business Interruption loss, in any one occurrence until the amount of loss or damage exceeds the deductible amount shown below and then this Company will only be liable for its share of the loss or damage in excess of the deductible amount. If two or more deductibles apply to a single occurrence, then no more than the largest deductible amount will apply. However, this Policy allows for the application of separate and distinct deductibles and deductibles for specific loss or damage as shown below.

The following deductible amounts shall apply per occurrence, unless otherwise stated, for insured loss or damage under this Policy:

1. Earthquake (per location for all coverages provided):

   A. $50,000 at all locations

   Except:

   B. $100,000 at the following location:

   37. 10810 West Charleston Boulevard, Las Vegas, NV, 89135-1102

   C. At the following location:

   44. 1450 Ala Moana Boulevard Suite 4230, Honolulu, HI, 96814

# DECLARATIONS

1. Property Damage:

This Company will not be liable for loss or damage unless the amount of loss or damage exceeds 1% of the combined value of the property at the location where loss or damage occurs, in accordance with the valuation of this policy. If coverage is provided for more than one location, this deductible percentage or minimum deductible amount will be calculated for and applied separately to each location.

2. Business Interruption:

This Company will not be liable for loss or damage unless the amount of loss or damage exceeds 1% of the annual business interruption value that would have been earned at the time such loss or damage at the location where loss or damage occurs plus that proportion of the 100% business interruption value at all other locations where business interruption loss ensues, in accordance with the business interruption section of this policy. If coverage is provided for more than one location, this deductible percentage or minimum deductible amount will be applied separately to each location.

3. The above deductibles are separate and distinct, subject to a combined minimum deductible of $100,000.

D. For locations in California

1. Property Damage:

This Company will not be liable for loss or damage unless the amount of loss or damage exceeds 5% of the combined value of the property at the location where loss or damage occurs, in accordance with the valuation of this policy. If coverage is provided for more than one location, this deductible percentage or minimum deductible amount will be calculated for and applied separately to each location.

2. Business Interruption:

This Company will not be liable for loss or damage unless the amount of loss or damage exceeds 5% of the annual business interruption value that would have been earned at the time such loss or damage at the location where loss or damage occurs plus that proportion of the 100% business interruption value at all other locations where business interruption loss ensues, in accordance with the business interruption section of this policy. If coverage is provided for more than one location, this deductible percentage or minimum deductible amount will be applied separately to each location.

3. The above deductibles are separate and distinct, subject to a combined minimum deductible of $100,000.

2.    Flood (per location for all coverages provided).

A. $50,000 at all locations

Except:

B. $100,000 at the following location(s):

1. 404 Washington Boulevard, Marina Del Rey, CA, 90292-5214
4. 18621 Brookhurst Street, Fountain Valley, CA, 92708
15. 72-353 Highway 111, Palm Desert, CA, 92260
22. 29271 Agoura Road, Agoura Hills, CA, 91301
24. 21001 North Tatum Boulevard Suite 36-1160, Phoenix, AZ, 85050
26. 12320 Seal Beach Boulevard, Seal Beach, CA, 90740
32. 55 South Pine Avenue, Long Beach, CA, 90802
33. 1295 Magnolia Avenue, Corona, CA, 92879-2092
39. 139 North Barranca Street, West Covina, CA, 91791

© 2019 AFM. All rights reserved.

**EX02-010**

# DECLARATIONS

43. 7531 Carson Boulevard, Long Beach, CA, 90808
48. 10055 West McDowell Road, Avondale, AZ, 85392-4894

C. $500,000 at the following location(s):

13. 240 South Melrose Drive, Vista, CA, 92081-6616
38. 7861 Edinger Avenue, Huntington Beach, CA, 92647
44. 1450 Ala Moana Boulevard Suite 4230, Honolulu, HI, 96814

3. Wind and/or Hail (per location for all coverages provided in this policy) associated with or occurring in conjunction with a storm or weather disturbance identified by name by any meteorological authority whether or not named prior to the loss at the following location(s):

44. 1450 Ala Moana Boulevard Suite 4230, Honolulu, HI, 96814

1. Property Damage:

This Company will not be liable for loss or damage unless the amount of loss or damage exceeds 5% of the combined value of the property at the location where loss or damage occurs, in accordance with the valuation of this policy. If coverage is provided for more than one location, this deductible percentage or minimum deductible amount will be calculated for and applied separately to each location.

2. Business Interruption:

This Company will not be liable for loss or damage unless the amount of loss or damage exceeds 5% of the annual business interruption value that would have been earned at the time such loss or damage at the location where loss or damage occurs plus that proportion of the 100% business interruption value at all other locations where business interruption loss ensues, in accordance with the business interruption section of this policy. If coverage is provided for more than one location, this deductible percentage or minimum deductible amount will be applied separately to each location.

3. The above deductibles are separate and distinct, subject to a combined minimum deductible of $100,000.

4. Boiler and Machinery:

A. Property Damage: $10,000

B. Business Interruption Average Daily Value:

The business interruption deductible will be determined by multiplying the one hundred percent average daily value (ADV) by 1.

The ADV will be calculated by dividing the sum of the 100% actual annual business interruption values that would have been earned had no loss occurred at the location where the physical damage happened plus that proportion of the 100% annual business interruption value at all other locations where Business Interruption loss ensues by the number of annual working days.

5. Communicable Disease Property Damage and Business Interruption:

Qualifying Period: This Company will not be liable for loss or damage unless access is limited, restricted or prohibited in excess of 48 hours.

Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to a deductible of:

**EX02-011**

# DECLARATIONS

A.  Property Damage: $10,000

B.  Business Interruption Day Equivalent Deductible:

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2.

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

6.  Data Restoration:

Qualifying Period: 48 hours.

Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to a deductible of:

A.  Property Damage: $10,000

B.  Business Interruption Day Equivalent Deductible:

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2.

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

7.  Data Service Provider - Property Damage and Business Interruption:

Qualifying Period: 24 hours.

Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to a deductible of:

A.  Property Damage: $10,000

B.  Business Interruption Day Equivalent Deductible:

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2.

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

# DECLARATIONS

8. Off Premises Service Interruption Property Damage and Business Interruption:

Qualifying Period: This Company will not be liable for loss or damage unless the Period of Liability exceeds 24 hours.

Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to the deductible(s) that would have applied to the cause of the interruption of services, but not less than:

A. Property Damage: $10,000

B. Business Interruption Day Equivalent Deductible:

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 1.

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the location where the physical damage happened plus that proportion of the 100% annual business interruption value at all other locations where business interruption loss ensues, divided by the number of annual working days.

9. Owned Network Interruption:

Qualifying Period: 48 hours.

The Qualifying Period for the cost to temporarily protect under Item 4. b) shall be waived.

Should this time be exceeded, the insured loss will be calculated beginning from the time of loss subject to a Business Interruption Day Equivalent Deductible:

The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2.

The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the location where the loss happened plus that proportion of the 100% annual business interruption value at all other locations where business interruption loss ensues, divided by the number of annual working days.

10.   $10,000   All Other Losses.

## H. SPECIAL TERMS AND CONDITIONS:

### 1. United States Certified Act of Terrorism 2015

As respects the United States, its territories and possessions and the Commonwealth of Puerto Rico, the definition of terrorism contained in DEFINITIONS is declared null and void and it is agreed that an event defined as a Certified Act of Terrorism under the terms of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT attached to this Policy shall be considered terrorism within the terms of this policy. Notwithstanding anything contained in this Policy to the contrary, this Policy provides coverage for direct physical loss or damage to insured property and any resulting Business Interruption loss, as provided in the Policy, caused by or resulting from a Certified Act of Terrorism only to the extent coverage is provided under the terms and conditions of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT attached to this policy. Any difference in limit between loss recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT and this Policy is not recoverable under this Policy.

# DECLARATIONS

2. <u>Application of Flood and Wind and/or Hail Deductibles - PRO 149 (1/17)</u>

If an occurrence involves loss or damage caused by or resulting from both:

a. **Wind and/or hail**; and

b. **Flood**;

Then:

1) A specific wind and/or hail deductible; and

2) A specific flood deductible;

Will apply separately to each location.

Such loss or damage will be adjusted separately and will be subject to its respective deductible.

3. <u>Mortgagee/Lenders Loss Payable - PRO 66 (4/15)</u>

Subject to the GENERAL CONDITIONS, MORTGAGEE/LENDERS LOSS PAYABLE, loss, if any, under this Policy will be adjusted with and made payable to the Insured and the following, as their interest may appear:

| <u>Mortgagee/Lender and Address</u> | <u>Location/Interest</u> |
|---|---|
| American United Life Insurance Company<br>c/o Walker & Dunlop, LLC<br>P.O. Box 25996<br>Shawnee Mission, KS  66225-5996<br>Loan # 301070101 | 139 North Barranca Street, West Covina, CA, 91791 |

4. <u>Loss Payee - PRO 68 (4/15)</u>

Subject to the LOSS ADJUSTMENT AND SETTLEMENT, LOSS ADJUSTMENT AND PAYABLE, loss, if any, under this Policy will be adjusted with and made payable to or as directed by the Insured and the following, as their interest may appear:

| <u>Loss Payee and Address</u> | <u>Location/Interest</u> |
|---|---|
| Barranca I LLC | 139 North Barranca Street, West Covina, CA, 91791 |

The receipt by the designated payee will constitute a release in full of all liability with respect to such loss

# DECLARATIONS

## I. INDEX OF FORMS:

The following forms are made part of this Policy:

| Title | Form No. | Edition |
|---|---|---|
| Declarations Page | PRO DEC 4100 | (04/15) |
| Declarations | PRO S-1 4100 | (01/17) |
| All Risk Coverage | PRO AR 4100 | (01/17) |
| Real Estate Endorsement | PRO RE CRP 4100 | (01/17) |
| Retail Endorsement | PRO RT 4100 | (01/17) |
| Cyber Event Endorsement | PRO CYBER EVENT 4100 | (06/19) |
| Supplemental United States Certified Act of Terrorism Endorsement | 7312 | (1/15) |
| Arizona Amendatory Endorsement | AFM 6487 | (04/15) |
| California Amendatory Endorsement | AFM 6488 | (04/15) |
| Hawaii Amendatory Endorsement | AFM 7031 | (04/15) |
| Nevada Amendatory Endorsement | AFM 6513 | (04/15) |

PRO S-1 4100 (01/17)
Affiliated FM Policy No. SS790

© 2019 AFM. All rights reserved.

**EX02-015**

# DECLARATIONS

Location Schedule
1. 404 Washington Boulevard, Marina Del Rey, CA, 90292-5214, Index No. 001955.71
2. 3533 East Foothill Boulevard, Pasadena, CA, 91107-3119, Index No. 001403.52
3. 550 North Tustin Street, Orange, CA, 92867-7612, Index No. 001956.34
4. 18621 Brookhurst Street, Fountain Valley, CA, 92708, Index No. 001325.05
5. 4020 Barranca Parkway, Suite 1, Irvine, CA, 92604-4742
6. 3200 North Sepulveda Boulevard, Manhattan Beach, CA, 90266, Index No. 089529.21
7. 101 East Orange Grove Avenue, Burbank, CA, 91502-1829, Index No. 001954.22
8. 250 South State College Boulevard, Brea, CA, 92821-5820, Index No. 001954.20
9. 117 West Broadway, Glendale, CA, 91204
10. 12224 Carmel Mountain Road, San Diego, CA, 92128, Index No. 089826.49
11. 7637 Balboa Avenue, San Diego, CA, 92111, Index No. 000233.62
12. 3351 Nobel Drive, La Jolla, CA, 92037, Index No. 089541.56
13. 240 South Melrose Drive, Vista, CA, 92081-6616
14. 3962 Grand Avenue, Chino, CA, 91710
15. 72-353 Highway 111, Palm Desert, CA, 92260
16. 2647 Pacific Coast Highway, Torrance, CA, 90505, Index No. 076761.05
17. 26582 Towne Centre Drive, Foothill Ranch, CA, 92610
18. 889 Palomar Airport Road, Carlsbad, CA, 92011-1109, Index No. 001954.23
19. 10669 Westview Parkway, San Diego, CA, 92126
20. 2441 Fenton Parkway, San Diego, CA, 92108, Index No. 001956.37
21. 6081 Center Drive Suite 104, Los Angeles, CA, 90045, Index No. 000223.48
22. 29271 Agoura Road, Agoura Hills, CA, 91301
23. 300 East Colorado Boulevard, Suite 240, Pasadena, CA, 91101
24. 21001 North Tatum Boulevard Suite 36-1160, Phoenix, AZ, 85050
25. 2201 West Malvern Avenue, Fullerton, CA, 92833
26. 12320 Seal Beach Boulevard, Seal Beach, CA, 90740, Index No. 001863.73
27. 11425 Foothill Boulevard, Rancho Cucamonga, CA, 91730
28. 3645 Central Avenue, Riverside, CA, 92506, Index No. 076777.01
29. 24180 Valencia Boulevard, Santa Clarita, CA, 91355, Index No. 001956.40
30. 1380 Bison Avenue, Newport Beach, CA, 92660
31. 2255 Otay Lakes Road, Chula Vista, CA, 91915
32. 55 South Pine Avenue, Long Beach, CA, 90802
33. 1295 Magnolia Avenue, Corona, CA, 92879-2092
34. 11400 Porter Ranch Drive, Northridge, CA, 91326, Index No. 089569.29
35. 40497 Margarita Road, Temecula, CA, 92591-2857
36. 105 South Festival Drive, Anaheim, CA, 92808, Index No. 001954.17
37. 10810 West Charleston Boulevard, Las Vegas, NV, 89135-1102
38. 7861 Edinger Avenue, Huntington Beach, CA, 92647, Index No. 076780.83
39. 139 North Barranca Street, West Covina, CA, 91791
40. 1902 Taylor Road, Roseville, CA, 95661
41. 1588 Leucadia Boulevard, Encinitas, CA, 92024
42. 1213 Simi Town Center Way, Simi Valley, CA, 93065
43. 7531 Carson Boulevard, Long Beach, CA, 90808
44. 1450 Ala Moana Boulevard Suite 4230, Honolulu, HI, 96814
45. 2455 Iron Point Road, Folsom, CA, 95630
46. 1609 Hawthorne Boulevard, Redondo Beach, CA, 90278
47. 935 Broadbeck Drive, Thousand Oaks, CA, 91320-1273
48. 10055 West McDowell Road, Avondale, AZ, 85392-4894
49. 300 Del Monte Center, Monterey, CA, 93940
50. 5750 Fleet Street Suite 120, Carlsbad, CA, 92008
51. 3240 El Camino Real, Irvine, CA, 92602
52. 14141 Ventura Boulevard Suite 2, Sherman Oaks, CA, 91423
53. 13762 Jamboree Road, Irvine, CA, 92602-1200
54. 6600 Topanga Canyon Boulevard #1062, Canoga Park, CA, 91303, Index No. 076691.36

PRO S-1 4100 (01/17)
Affiliated FM Policy No. SS790

© 2019 AFM. All rights reserved.

**EX02-016**

# DECLARATIONS

55. 799 The Shops at Mission Viejo, Suite A, Mission Viejo, CA, 92691
56. 12751 Towne Center Drive, Suite K, Unit N-11, Cerritos, CA, 90703
57. 2501 El Camino Real, Suite 204, Carlsbad, CA, 92008
58. 4628 Barranca Pkwy, Irvine, CA, 92604
59. 162 South Rancho Santa Fe Road, Suite E10, Encinitas, CA, 92024
60. 12955 El Camino Real, San Diego, CA, 92130
61. 11925 Carmel Mountain Road Suite 801, San Diego, CA, 92128
62. 3901 Irvine Boulevard, Irvine, CA, 92602
63. 180 Promenade Way Suite L, Thousand Oaks, CA, 91362
64. 3333 Bear Street Suite 151, Costa Mesa, CA, 92626
65. 3333 Bristol Street Suite 2505, Costa Mesa, CA, 92626
66. 121 S. Hope Ave, Suite 150, Santa Barbara, CA, 93105-3158

 

# ALL RISK COVERAGE

## Table of Contents

PROPERTY INSURED ................................................................................................................ 1
    Real Property ........................................................................................................................ 1
    Personal Property ................................................................................................................. 1
PROPERTY EXCLUDED ........................................................................................................... 1
EXCLUSIONS ............................................................................................................................. 2
    Group I ................................................................................................................................. 2
    Group II ................................................................................................................................ 3
    Group III .............................................................................................................................. 4
ADDITIONAL COVERAGES ................................................................................................... 5
    Accounts Receivable ........................................................................................................... 5
    Arson or Theft Reward ........................................................................................................ 5
    Brand Protection ................................................................................................................. 6
    Change of Temperature ....................................................................................................... 6
    Communicable Disease – Property Damage ....................................................................... 6
    Data, Programs or Software ................................................................................................ 7
    Debris Removal ................................................................................................................... 8
    Decontamination Costs ....................................................................................................... 8
    Deferred Payment ................................................................................................................ 8
    Demolition and Increased Cost of Construction ................................................................. 9
    Earth Movement ................................................................................................................ 10
    Errors and Omissions ........................................................................................................ 10
    Expediting Expenses ......................................................................................................... 10
    Fine Arts and Valuable Papers and Records ..................................................................... 11
    Flood ................................................................................................................................. 11
    Green Coverage ................................................................................................................ 11
    Land and Water Clean Up Expense .................................................................................. 12
    Locks and Keys ................................................................................................................ 12
    Money and Securities ........................................................................................................ 12
    Newly Acquired Property .................................................................................................. 12

EX02-019



proVision®

Off-Premises Data Services – Property Damage.................................................................13

Off-Premises Service Interruption – Property Damage .......................................................13

Professional Fees...............................................................................................................13

Property Removed from a Location ....................................................................................14

Protection and Preservation of Property – Property Damage ............................................14

Tax Treatment ...................................................................................................................14

Tenants Legal Liability .......................................................................................................15

Terrorism...........................................................................................................................15

Transit ...............................................................................................................................16

Unnamed Property.............................................................................................................18

**BUSINESS INTERRUPTION** ..........................................................................................19

Loss Insured ......................................................................................................................19

Business Interruption Coverage .........................................................................................20

    Gross Earnings ..........................................................................................................20

    Gross Profits..............................................................................................................20

    Rental Income ...........................................................................................................21

    Extra Expense............................................................................................................22

    BI Select....................................................................................................................22

Period of Liability ..............................................................................................................22

Business Interruption Exclusions .......................................................................................23

**BUSINESS INTERRUPTION COVERAGE EXTENSIONS** ...................................................24

Attraction Property ...........................................................................................................24

Civil or Military Authority ..................................................................................................24

Communicable Disease – Business Interruption.................................................................24

Computer Systems Non-Physical Damage..........................................................................25

Contractual Penalties.........................................................................................................25

Crisis Management.............................................................................................................26

Extended Period of Liability ...............................................................................................26

Ingress/Egress...................................................................................................................27

Leasehold Interest .............................................................................................................27

Logistics Extra Cost ...........................................................................................................27

Off-Premises Data Services – Business Interruption...........................................................28

Off-Premises Service Interruption – Business Interruption..................................................29

Protection and Preservation of Property – Business Interruption........................................30

Research and Development ................................................................................................30

**EX02-020**



proVision®

Soft Costs ................................................................................................................................... 30

Supply Chain .............................................................................................................................. 30

## LOSS ADJUSTMENT AND SETTLEMENT ............................................................ 32

Abandonment ............................................................................................................................. 32

Appraisal .................................................................................................................................... 32

Collection From Others .............................................................................................................. 32

Company Option ......................................................................................................................... 32

Currency for Loss Payment ........................................................................................................ 32

Legal Action Against this Company ........................................................................................... 33

Loss Adjustment and Payable .................................................................................................... 33

Other Insurance .......................................................................................................................... 33

Requirements in Case of Loss ................................................................................................... 33

Settlement of Claims .................................................................................................................. 34

Subrogation ................................................................................................................................ 35

Valuation .................................................................................................................................... 35

## GENERAL CONDITIONS ....................................................................................... 37

Application of Policy to Date or Time Recognition .................................................................... 37

Cancellation/Non-Renewal ........................................................................................................ 37

Conformity to Statute ................................................................................................................. 37

First Named Insured ................................................................................................................... 37

Increase in Hazard ...................................................................................................................... 38

Inspections ................................................................................................................................. 38

Liberalization Clause ................................................................................................................. 38

Misrepresentation and Fraud ..................................................................................................... 38

Mortgagee/Lenders Loss Payable .............................................................................................. 38

Policy Modification .................................................................................................................... 40

Reinstatement of Limits after a Loss ......................................................................................... 40

Suspension .................................................................................................................................. 40

Transfer or Rights and Duties under this Policy ........................................................................ 40

## DEFINITIONS ........................................................................................................ 41

EX02-021

 

# ALL RISK COVERAGE

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

## A. PROPERTY INSURED

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, at or within 1,000 feet of a described location, to the extent of the interest of the Insured in such property.

1. Real Property in which the Insured has an insurable interest.

2. Personal Property:

   a) Owned by the Insured.

   b) Consisting of improvements and betterments in which the Insured has an insurable interest.

   c) Of directors, officers and employees of the Insured.

   d) Of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

   e) Of others in the Insured's custody to the extent of the Insured's legal liability for insured physical loss or damage to such Personal Property.

      This Company may defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage to such Personal Property. This Company may, without prejudice, investigate, negotiate and settle any claim or suit as this Company deems expedient.

This Policy also insures the interest of contractors and subcontractors in insured property during construction, while at or within 1,000 feet of a described location, to the extent that the Insured has agreed, prior to loss, to keep such interest insured for insured physical loss or damage to such property. Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and will not extend to any Business Interruption coverage provided in this Policy.

## B. PROPERTY EXCLUDED

This Policy excludes the following except as otherwise stated in this Policy:

1. Land, water or any substance in or on land.

2. Growing crops, standing timber or animals.

3. Bridges and tunnels intended for use by motor vehicles licensed for highway use.

4. Reservoirs, canals, dikes or dams.

5. Docks, piers or wharves which are not a structural part of a building.

6. Currency, money, notes or securities, except as provided by the Money and Securities coverage in this Policy.

7. Motor vehicles licensed for highway use or owned by directors, officers or employees of the Insured.

© 2017 AFM. All rights reserved.

**EX02-022**





8. Satellites, aircraft or watercraft, except if on land, unfueled and manufactured by the Insured.

9. Property sold by the Insured under conditional sale, trust agreement, installment payment or other deferred payment plan after delivery to the customer, except as provided by the Deferred Payment coverage in this Policy.

10. Underground mines or mine shafts or any property within such mine or shaft.

11. Property while in transit, except as otherwise provided in this Policy.

12. Electronic data, programs or software, except when they are stock in process, finished goods manufactured by the Insured, raw materials, supplies or other merchandise not manufactured by the Insured or as provided by the Data, Programs or Software coverage in this Policy.

13. Property while located **offshore**, except as provided by the Transit coverage in this Policy.

## C. EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:

**GROUP I:** This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss or damage:

1. Nuclear reaction or nuclear radiation or radioactive contamination. However:

   a) If physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination.

   b) This Policy does insure physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the **location**, provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the **location**. This coverage does not apply to any act, loss or damage excluded in Group I Item 2f of this Exclusions clause.

   This exclusion Group I Item 1 and the exceptions in Group I Item 1a and Group I Item 1b above do not apply to any act, loss or damage which also comes within the terms of exclusion Group I Item 2b of this Exclusions clause.

2. a) Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

      i)   Government or sovereign power (de jure or de facto);

      ii)  Military, naval or air forces; or

      iii) Agent or authority of any party specified in i) or ii) above.

   b) Discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

   c) Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

   d) Seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

   e) Risks of contraband, or illegal transportation or trade.

© 2017 AFM. All rights reserved.

**EX02-023**





    f) **Terrorism**, including action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except to the extent provided in the Terrorism coverage of this Policy. However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers only to the extent of the **actual cash value** of the resulting direct loss or damage by fire to insured property. This coverage exception for such resulting fire loss or damage does not apply to:

       i) Direct loss or damage by fire which results from any other applicable exclusion in the Policy, including the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

       ii) Any coverage provided in the Business Interruption section of this Policy or to any other coverages provided by this Policy.

    Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion or any other risk of physical loss or damage covered elsewhere in this Policy.

    If any act which satisfies the definition of **terrorism** also comes within the terms of Group I Item 2a of this Exclusions clause then Group I Item 2a applies in place of this Group I Item 2f exclusion.

    If any act which satisfies the definition of **terrorism** also comes within the terms of Group I Item 2b of this Exclusions clause then Group I Item 2b applies in place of this Group I Item 2f exclusion.

    If any act which satisfies the definition of **terrorism** also comes within the terms of Group I Item 2c of this Exclusions clause then Group I Item 2c applies in place of this Group I Item 2f exclusion.

    If any act excluded herein involves nuclear reaction, nuclear radiation or radioactive contamination, this Group I Item 2f exclusion applies in place of Group I Item 1 of this Exclusions clause.

3. Any dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time by:

    a) An Insured or any proprietor, partner, director, trustee, officer or employee of an Insured; or

    b) Any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.

This Policy does insure acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in b above, and done without the knowledge of the Insured. This coverage does not apply to any act excluded in Group I Item 2f of this Exclusions clause. In no event does this Policy cover loss by theft by any individual specified in a or b above.

4. Lack of incoming electricity, fuel, water, gas, steam or refrigerant; outgoing sewerage; or incoming or outgoing voice, data or video; all when caused by an event off the **location**, except as provided by the Off-Premises Data Services and Off-Premises Service Interruption coverages in this Policy. If the lack of such a service directly causes insured physical damage at the **location**, then only that resulting damage is insured.

5. **Earth movement**, except as otherwise provided in this Policy.

6. **Flood**, except as otherwise provided in this Policy.

7. Seepage or influx of water from natural underground sources.

**GROUP II:** This Policy excludes the following, however, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

© 2017 AFM. All rights reserved.

**EX02-024**





1. Wear and tear, deterioration, depletion, rust, corrosion, erosion, inherent vice or latent defect.

2. Faulty workmanship, material, construction or design.

3. Loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested or otherwise worked on.

4. Loss or damage caused by or resulting from:

    a) Changes of temperature, except damage to machinery or equipment including fire protective equipment;

    b) Changes in relative humidity,

    All whether atmospheric or not, except as provided by the Change of Temperature and Off-Premises Service Interruption coverages in this Policy.

5. Settling, cracking, shrinking, bulging or expansion of:

    a) Foundations.

    b) Walls.

    c) Floors.

    d) Pavements or roadways.

    e) Roofs.

    f) Ceilings.

6. Loss or damage to personal property in the open from rain, sleet, snow, sand or dust.

7. Theft of precious metal or stones, except when such property is used by the Insured for industrial purposes.

8. Insect, animal or vermin damage.

GROUP III: This Policy excludes:

1. Indirect or remote loss or damage.

2. Interruption of business, except to the extent provided in this Policy.

3. Loss of market or loss of use.

4. Loss or damage or deterioration arising from any delay.

5. Mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

6. Loss from enforcement of any law or ordinance:

    a) Regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

    b) Requiring the demolition of any property, including the cost in removing its debris;

 

Except as provided by the Decontamination Costs and Demolition and Increased Cost of Construction coverages in this Policy.

7.  Loss or damage resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense.

8.  **Contamination,** and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured. This exclusion does not apply to radioactive contamination which is excluded elsewhere in this Policy.

9.  Shrinkage, evaporation or loss of weight, unless directly resulting from other physical damage not excluded by this Policy.

10. Changes in color, flavor, texture or finish, unless directly resulting from other physical damage not excluded by this Policy.

# D. **ADDITIONAL COVERAGES**

The Additional Coverages below are subject to all the terms and conditions of this Policy including, but not limited to, the limits of liability, deductibles and exclusions shown in the Declarations section.

## 1. **Accounts Receivable**

This Policy covers amounts which the Insured is unable to collect as a direct result of insured physical loss or damage to accounts receivable records at a **location.**

Coverage includes:

a)  Interest charges on any loan to offset impaired collections pending repayment of sums that cannot be collected. Unearned interest charges and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted.

b)  Collection expenses in excess of normal collection costs.

c)  Other reasonable expenses incurred by the Insured in recreating records of accounts receivable.

After payment of loss by this Company, all amounts recovered by the Insured on accounts receivable for which the Insured has been indemnified will belong to and be paid to this Company by the Insured up to the total amount of loss paid by this Company. All recoveries in excess of such amounts will belong to the Insured.

Accounts Receivable Exclusions: As respects Accounts Receivable, the following additional exclusions apply:

This Policy does not cover shortage resulting from:

a)  Bookkeeping, accounting, or billing error or omission.

b)  Alteration, falsification, manipulation, concealment, destruction or disposal of records of accounts receivable committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property.





## 2. Arson or Theft Reward

This Policy covers payment of any reward offered by the Insured or on the Insured's behalf for information that leads to conviction of the perpetrator(s) of insured:

a)  Arson to; or

b)  Theft of;

Insured property.

## 3. Brand Protection

This Policy gives control of physically damaged property consisting of finished goods or merchandise manufactured by or for the Insured as follows:

a)  The Insured will have full rights to the possession and control of damaged property in the event of insured physical loss or damage to such property provided proper testing is done to show which property is physically damaged.

b)  The Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

Physically damaged property judged by the Insured to be:

   i)  Unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.

   ii) Fit for reprocessing or selling and this Company elects to take all or any part of physically damaged branded and labeled property, the Insured may at this Company's expense:

   (a)  Stamp "salvage" on the property or its containers; or

   (b)  Remove or obliterate the brands or labels,

   If doing so will not damage the property.

   The Insured must relabel the property or containers in compliance with the applicable requirements of law.

c)  Any salvage proceeds received will go to the:

   i)  Company at the time of loss settlement; or

   ii) Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.

## 4. Change of Temperature

This Policy covers spoilage of insured stock and supplies due to:

a)  Changes of temperature or changes in relative humidity,

Directly resulting from the interruption, in whole or part, of services consisting of electricity, gas, fuel, steam, water or refrigeration by reason of any accidental event, other than insured physical loss or damage, at a location.

**EX02-027**





5. **Communicable Disease – Property Damage**

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

a)  ·An order of an authorized governmental agency regulating or as result of such presence of **communicable disease**; or

b)  A decision of an Officer of the Insured as a result of such presence of **communicable disease**,

This Policy covers the reasonable and necessary costs incurred by the Insured at such **described location** for the:

a)  Cleanup, removal and disposal of such presence of **communicable disease** from insured property; and

b)  Actual costs or fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from such presence of **communicable disease** on insured property.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to such presence of **communicable disease**.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Communicable Disease - Property Damage Exclusions: As respects Communicable Disease – Property Damage, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

6. **Data, Programs or Software**

This Policy covers insured **physical loss or damage to electronic data, programs or software**, including physical loss or damage caused by the malicious introduction of a machine code or instruction, while anywhere within this Policy's Territory, including while in transit.

This coverage includes:

a)  The cost of the following reasonable and necessary actions taken by the Insured due to actual insured **physical loss or damage to electronic data, programs or software**:

   i)   To temporarily protect and preserve insured electronic data, programs or software.

   ii)  For the temporary repair of insured **physical loss or damage to electronic data, programs or software**.

   iii) To expedite the permanent repair or replacement of such damaged property.

b)  The reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured **physical loss or damage to electronic data, programs or software**. In the event that there is no physical loss or damage, the costs covered under this item will be subject to the deductible that would have applied had there been such physical loss or damage.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

This Additional Coverage excludes loss or damage to data, programs or software when they are **stock in process**, finished goods manufactured by the Insured, raw materials, supplies or other merchandise not manufactured by the Insured.

EX02-028





Data, Programs or Software Exclusions: As respects Data, Programs or Software, the following additional exclusion applies:

This Policy excludes the following but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

a) Errors or omissions in processing or copying.

b) Loss or damage to data, programs or software from errors or omissions in programming or machine instructions.

Data, Programs or Software Valuation: On property insured under this coverage, the loss amount will not exceed:

a) The cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer; or

b) The blank value of the media if not repaired, replaced or restored within two years from the date of loss.

## 7. Debris Removal

This Policy covers the reasonable and necessary costs incurred to remove debris from a location that remains as the direct result of insured physical loss or damage.

This coverage does not cover the costs of removing:

a) Contaminated uninsured property; or

b) The contaminant in or on uninsured property;

Whether or not the contamination results from insured physical loss or damage.

This coverage includes the costs of removal of contaminated insured property or the contaminant in or on insured property only if the contamination, due to the actual not suspected presence of contaminant(s), of the debris resulted directly from other physical damage not excluded by the Policy.

## 8. Decontamination Costs

If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating contamination due to the actual not suspected presence of contaminant(s), then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance. This coverage applies only to that part of insured property so contaminated due to such presence of contaminant(s) as a direct result of insured physical damage.

The Company is not liable for the costs required for removing:

a) Contaminated uninsured property; or

b) The contaminant in or on uninsured property;

Whether or not the contamination results from insured physical loss or damage.





## 9. Deferred Payment

This Policy covers the Insured's interest in personal property of the type insured that has been sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan, if such property sustains physical loss or damage insured by this Policy and only to the extent the Insured is unable to collect the unpaid balance of such interest.

This coverage applies from the time the property is delivered to the buyer until the Insured's interest in it has ceased or the policy terminates or expires, whichever is first.

Deferred Payment Exclusion: As respects Deferred Payment, the following additional exclusion applies:

This Policy excludes:

a)   Theft or conversion by the buyer of the property after the buyer has taken possession of such property.

b)   Property not within this Policy's Territory.

Deferred Payment Valuation: On property insured under this coverage, the loss amount will not exceed the lesser of the following:

a)   The total amount of unpaid installments less finance charges.

b)   The actual cash value of the property on the date of loss or damage.

c)   The cost to repair or replace with material of like size, kind and quality.

## 10. Demolition and Increased Cost of Construction

This Policy covers the costs as described herein resulting from the Insured's obligation to comply with a law or ordinance, provided that:

a)   Such law or ordinance is enforced as a direct result of insured physical loss or damage at a **location**;

b)   Such law or ordinance is in force at the time of such loss or damage; and

c)   Such **location** was not required to be in compliance with such law or ordinance prior to the happening of the insured physical loss or damage.

Coverage A:

The reasonable and necessary costs incurred by the Insured to comply with the enforcement of the minimum requirements of any law or ordinance that Regulates the demolition, construction, repair, replacement or use of buildings, structures, machinery or equipment.

As respects insured property, this Coverage A covers the reasonable and necessary costs to:

a)   Demolish any physically damaged and undamaged portions of the insured buildings, structures, machinery or equipment.

b)   Repair or rebuild the physically damaged and undamaged portions, whether or not demolition is required, of such insured buildings, structures, machinery or equipment.

EX02-030





The Company's maximum liability for this Coverage A at each location in any occurrence will not exceed the actual costs incurred in demolishing the physically damaged and undamaged portions of the insured property plus the lesser of:

a) The reasonable and necessary cost, excluding the cost of land, to rebuild on another site; or

b) The cost to rebuild on the same site.

Coverage B:

The reasonable estimated cost to repair, replace or rebuild insured property consisting of buildings, structures, machinery or equipment that the Insured is legally prohibited from repairing, replacing or rebuilding to the same height, floor area, number of units, configuration, occupancy or operating capacity, because of the enforcement of any law or ordinance that regulates the construction, repair, replacement or use of buildings, structures, machinery or equipment.

Demolition and Increased Cost of Construction Coverage B Valuation: On property covered under this Coverage B that cannot legally be repaired or replaced, the loss amount will be the difference between:

a) The actual cash value; and

b) The cost that would have been incurred to repair, replace or rebuild such lost or damaged property had such law or ordinance not been enforced at the time of loss.

Demolition and Increased Cost of Construction Exclusions: As respects Demolition and Increased Cost of Construction, the following additional exclusions apply:

This Policy does not cover:

a) Any cost incurred as a direct or indirect result of enforcement of any law or ordinance regulating any form of **contamination**.

b) Any machinery or equipment manufactured by or for the Insured, unless used by the Insured in its operation at the location suffering the physical loss or damage.

## 11. Earth Movement

This Policy covers physical loss or damage caused by or resulting from **earth movement**.

## 12. Errors and Omissions

If physical loss or damage is not payable under this Policy solely due to an error or unintentional omission:

a) In the address of a property insured by this Policy which existed at the inception date of this Policy or in any subsequent amendments to this Policy;

b) That fails to include any location:

   i) Owned; or

   ii) Occupied by the Insured; or

c) That results in cancellation of insured property under this Policy;

Then coverage applies to the extent this Policy would have provided coverage had the error or unintentional omission not been made.

 

It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

## 13. Expediting Expenses

This Policy covers the reasonable and necessary costs incurred to:

a) Temporarily repair or replace; and

b) Expedite the permanent repair or replacement of;

Insured property that has sustained insured physical loss or damage.

This coverage does not include expenses payable elsewhere in this Policy including the cost of permanent repair or replacement of damaged property.

## 14. Fine Arts and Valuable Papers and Records

This Policy covers **fine arts and valuable papers and records** while anywhere within this Policy's Territory including while in transit.

Fine Arts and Valuable Papers and Records Exclusion: As respects Fine Arts and Valuable Papers and Records, the following additional exclusion applies:

This Policy excludes:

a) Loss or damage to any **fine arts** as a result of restoring, repairing or retouching processes.

b) Errors or omissions in the processing or copying of **valuable papers and records**.

Fine Arts and Valuable Papers and Records Valuation: On property insured under this coverage, the loss amount will not exceed the lesser of the following:

a) The cost to repair or restore the article to the condition that existed immediately prior to the loss;

b) The cost to replace the article; or

c) The value designated for the article as shown in the Declarations section of this Policy or on a schedule on file with this Company.

In case of physical loss or damage to a **fine arts or valuable papers and records** article that is part of a pair or a set, this Company will pay the lesser of the full value or the amount scheduled, if any, of the value of such pair or set only if the damaged article cannot be repaired or restored to its condition before the loss and the Insured surrenders the remaining article or articles of the pair or set to this Company.

## 15. Flood

This Policy covers physical loss or damage caused by or resulting from **flood**.

## 16. Green Coverage

This Policy covers the reasonable and necessary additional costs incurred by the Insured, as a direct result of insured physical loss or damage:

EX02-032





a) . To repair or replace physically damaged insured property with material of like kind and quality which qualifies as **Green**.

b) To replace the insured physically damaged portions of insured roofing systems with vegetative roof(s), including but not limited to the addition of trees, shrubs, plants and lawns to those roof(s), which qualify as **Green**, if this Policy covers Real Property.

c) As part of **Green** reconstruction, to flush out the air in the area of the physically damaged insured property with 100 percent outside air and to provide replacement filtration media for the building's ventilation system that controls the damaged area.

d) For an accredited professional certified by a **Green Authority** to participate in the design and construction for repairing or rebuilding the physically damaged insured property as **Green**.

e) For the process of certification or recertification of the repaired or replaced insured property as **Green**.

f) For **Green** removal, disposal or recycling of the damaged insured property.

Notwithstanding any other provision in this Policy, the Insured must repair or replace the insured real and/or personal property lost, damaged or destroyed as a condition of this coverage.

Green Coverage Exclusions: As respects Green Coverage, the following additional exclusions apply:

This Policy excludes:

a) Stock, raw materials, work in process, finished goods, merchandise, **production machinery and equipment**, electronic data processing equipment not used in the functional support of the real property, molds and dies, property in the open, property of others for which the insured is legally liable, personal property of directors, officers or employees of the Insured.

b) Any property adjusted on other than repair or replacement per the Valuation clauses of this Policy.

c) Any loss recoverable elsewhere in this Policy.

## 17. Land and Water Clean Up Expense

This Policy covers the reasonable and necessary costs to remove, dispose of or clean up the actual but not the suspected presence of **contaminant(s)** from uninsured land or water or any substance in or on land, at a **location**, when such property is contaminated as a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to clean up, remove and dispose of **contamination** from such property:

a)  At any **location** insured for Personal Property only.

b) When the Insured fails to give written notice of loss to this Company within 180 days after the inception of the loss.

## 18. Locks and Keys

This Policy covers the reasonable and necessary cost incurred by the Insured to replace undamaged keys and to replace, adjust or reprogram undamaged locks to accept new keys or entry codes as a result of insured physical loss or damage.

   

**Member of the FM Global Group**

### 19. Money and Securities

This Policy covers physical loss or damage to money and securities at a **location** resulting from:

a)  Fire, explosion or sprinkler leakage.

### 20. Newly Acquired Property

This Policy covers property of the type insured that is newly acquired while located anywhere within this Policy's Territory, excluding while in transit.

This coverage terminates:

a)  When the newly acquired property is bound by this Company; or

b)  When agreement is reached that the property will not be insured under this Policy; or

c)  120 days after the date of acquisition of the property; or

d)  At the termination or expiration of this Policy;

Whichever occurs first.

### 21. Off-Premises Data Services - Property Damage

This Policy covers insured physical loss or damage to insured property at a **location** when such physical loss or damage results from the interruption of **off-premises data processing or data transmission services** by reason of any accidental event at the facilities of the provider of such services, while anywhere within this Policy's Territory, that immediately prevents in whole or in part the delivery of such provided services.
For the purposes of this Additional Coverage an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional General Conditions:

1)  The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2)  The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Off Premises Data Services - Property Damage Exclusions: As respects Off-Premises Data Services - Property Damage , the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from terrorism regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

### 22. Off-Premises Service Interruption - Property Damage

This Policy covers insured physical loss or damage at a **location** caused by or resulting from the interruption, in whole or part, of incoming electric, gas, fuel, steam, water, refrigeration, or outgoing sewerage.

EX02-034




The interruption of such services must be by reason of an accidental event, not otherwise excluded by this Policy, at the facilities of the service provider(s) while anywhere within this Policy's Territory.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional Conditions:

This Company will not be liable for deliberate act(s) by the service provider to shed load to maintain system integrity.

Off-Premises Service Interruption - Property Damage Exclusion: As respects Off-Premises Service Interruption - Property Damage the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## 23. Professional Fees

This Policy covers the reasonable and necessary expenses incurred by the Insured of:

a)  Auditors;

b)  Accountants;

c)  Architects;

d)  Engineers; or

e)  Other professionals; and

f)  The Insured's own employees,

For producing and certifying particulars or details to determine the amount of loss payable under this Policy for which this Company has accepted liability.

This coverage does not include the fees and expenses of attorneys, public adjusters, loss appraisers, loss consultants or any of their subsidiaries or related or associated entities.

## 24. Property Removed from a Location

This Policy covers insured property when removed from a **location** to avoid or prevent immediately impending insured physical loss or damage to such property. This Policy covers such property for physical loss or damage as provided at the **location** from which the property was removed.

This coverage applies for a period:

a)  Of 120 days from the date of removal; but

b)  Not beyond the termination or expiration date of this Policy.

## 25. Protection and Preservation of Property - Property Damage

This Policy covers the reasonable and necessary costs incurred for:

 

a) Actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

b) Fire department firefighting charges imposed as a result of responding to a fire in, on or exposing the insured property.

c) Restoring and recharging fire protection systems following an insured loss.

d) The water used for fighting a fire in, on or exposing the insured property.

e) Temporary security for a period of time not to exceed 30 consecutive days due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

This coverage does not cover costs incurred for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by the Terrorism coverage of this Policy.

This coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## 26. Tax Treatment

This Policy covers the increased tax liability as a direct result of insured physical loss or damage to insured property. When such tax liability is greater than the tax liability that would have been incurred had there been no such loss or damage, then this Policy will cover only the increased tax liability for the profit portion of a loss payment under this Policy involving finished stock manufactured by the Insured and/or the profit portion of the Business Interruption loss payment.

## 27. Tenants Legal Liability

This Policy covers direct physical loss or damage, caused by or resulting from **named perils**, to that part of buildings of others, including permanently attached building fixtures, leased to and occupied by the Insured at a **described location** to the extent of the Insured's legal liability for such loss or damage.

This coverage also includes the following:

a) The reasonable expenses of defending the Insured against only that part of any suit alleging the Insured's legal liability for such physical loss or damage;

b) The reasonable expenses incurred by this Company, this Company's proportionate share of costs taxed against the Insured in any such suit, and this Company's proportionate share of interest accruing after entry of judgment until this Company has paid, tendered or deposited into court its proportionate share of such judgment; and

c) The reasonable expenses, other than loss of earnings, incurred at this Company's request.

This coverage does not include:

a) That part of any settlement by the Insured to which this Company has not given its prior written consent; or

b) Any legal liability for loss or damage assumed by the Insured under any contract or agreement, whether oral or written, expressed or implied.

Additional Provisions: This Company may:

a) Investigate, negotiate and settle any claim or suit as this Company deems expedient and will not be prejudiced under this coverage for failure to settle for any amount within the Company's applicable limit of liability.

 

b) Pay, tender or deposit into court the Company's applicable limit of liability, less any expenses incurred by the Company, in full satisfaction of its liability under this coverage, and thereby terminate any further liability for any expense amount described in paragraphs a, b or c above.

Tenants Legal Liability Exclusion: As respects Tenants Legal Liability, the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## 28. Terrorism

This Policy covers physical loss or damage caused by or resulting from **terrorism** only at a **described location**.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion or any other risk of physical loss or damage covered elsewhere in this Policy.

Amounts recoverable under this coverage are excluded from coverage elsewhere in this Policy.

This coverage does not cover loss or damage which also comes within the terms of either Group I Item 2a or Group I Item 2c of the Exclusions clause of this Policy.

This coverage does not in any event cover loss or damage directly or indirectly caused by or resulting from any of the following, regardless of any other cause or event, whether or not insured under this Policy contributing concurrently or in any other sequence to the loss:

a) That involves the use, release or escape of nuclear materials or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination or that involves the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act; or

b) That is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

c) In which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials; or

d) That involves action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**.

## 29. Transit

This Policy covers the following insured personal property:

a) Owned by the Insured;

b) Of others to the extent of the Insured's interest or legal liability while in the actual or constructive custody of the Insured;

c) Shipped to others on Free on Board (FOB), Cost and Freight (C&F) or similar terms. The Insured's contingent interest in such shipments is admitted,

d) Of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery including:

 

    i)   When shipped by the Insured's direct contract service provider or by the Insured's direct contract manufacturer to the Insured or to the Insured's customer;

    ii)  When shipped by the Insured's customer to the Insured or to the Insured's contract service provider or to the Insured's contract manufacturer,

While in transit within the Policy's Territory:

a)  From the time the property leaves the original point of shipment for transit; and

b)  Continuously in the due course of transit until delivered at the destination.

c)  Coverage on export shipments not insured under ocean cargo policies does not extend beyond the time when the property is loaded on board overseas vessels or aircraft. Coverage on import shipments not insured under ocean cargo policies does not attach until after discharge from overseas vessels or aircraft.

This coverage:

a)  Insures physical loss or damage caused by or resulting from:

    i)   Unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts by the Insured or the Insured's agent, customer or consignee.

    ii)  Any unauthorized person(s) representing themselves to be the proper party(ies) to receive the property for shipment or to accept it for delivery.

b)  Covers general average and salvage charges on shipments covered while waterborne.

Additional Conditions:

a)  Permission is granted to the Insured, without prejudice to this insurance, to accept ordinary bills of lading used by carriers, including:

    i)   Released and/or undervalued bills of lading; or

    ii)  Shipping or messenger receipts.

b)  The Insured may waive subrogation against railroads under sidetrack agreements.

c)  The Insured may not enter into any special agreement with carriers releasing them from their common law or statutory liability.

d)  This coverage shall not inure directly or indirectly to the benefit of any carrier or bailee.

Transit Exclusions: As respects Transit, the following additional exclusions apply:

This Policy excludes:

a)  Property shipped by mail.

b)  Shipments by air unless made by regularly scheduled airlines.

c)  Waterborne shipments via the Panama Canal or waterborne shipments to and from:

    i)   Alaska.





      ii)  Hawaii.

      iii)  Commonwealth of Puerto Rico.

      iv)  Virgin Islands.

**d)**  Any transporting vehicle.

**e)**  Property of others, including the Insured's legal liability, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

**f)**  Property insured under any import or export ocean marine insurance.

Transit Valuation: On property insured under this coverage, the loss amount will not exceed the following:

**a)**  For property shipped to or for the account of the Insured: the actual invoice to the Insured, including such costs and charges (including the commission of the Insured as selling agent) as may have accrued and become legally due on such property.

**b)**  For property that has been sold by the Insured and shipped to or for the account of the purchaser (if covered by this Policy), the amount of the Insured's selling invoice, including prepaid or advanced freight.

**c)**  For property not under invoice:

      i)  For property of the Insured, at the valuation provisions of the Policy applying at the place from which the property is being transported; or

      ii)  For other property, the actual cash value at point of destination on the date of loss.

      Less any charges saved which would have become due and payable upon arrival at destination.

## 30. Unnamed Property

This Policy covers insured property anywhere within this Policy's Territory, excluding property while in transit.

Unnamed Property Exclusion: As respects Unnamed Property, the following additional exclusion applies:

This Policy excludes:

**a)**  **Transmission and distribution systems, except at a premises owned, leased or rented by the Insured.**

EX02-039

 

# BUSINESS INTERRUPTION

The Business Interruption loss, as provided in the Business Interruption Coverage and Business Interruption Coverage Extensions of this section, is subject to all the terms and conditions of this Policy including, but not limited to, the limits of liability, deductibles and exclusions shown in the Declarations section.

## A. LOSS INSURED

This Policy insures Business Interruption loss, as provided in the Business Interruption Coverage, as a direct result of physical loss or damage of the type insured:

1.  To property as described elsewhere in this Policy and not otherwise excluded by this Policy;

2.  Used by the Insured;

3.  While at a **location** or while in transit as provided by this Policy; and

4.  During the Period of Liability as described elsewhere in this Policy.

This Policy insures Business Interruption loss only to the extent it cannot be reduced through:

1.  The use of any property or service owned or controlled by the Insured;

2.  The use of any property or service obtainable from other sources;

3.  Working extra time or overtime; or

4.  The use of inventory;

All whether at a **location** or at any other premises. This Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the amount of loss.

In determining the amount of loss payable, this Company will consider:

1.  Any amount recovered elsewhere under this Policy for loss or damage to finished goods or merchandise at selling price as having been sold to the Insured's regular customers and credited against net sales.

2.  The experience of the business before and after and the probable experience during the Period of Liability. The probable experience will also consider any increase or decrease in demand for the Insured's goods or services during the Period of Liability, even if such increase or decrease is from the same event that caused physical loss or damage starting the Period of Liability.

3.  The continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or business operations or services.

This Policy also covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss is reduced.

 

# B. BUSINESS INTERRUPTION COVERAGE

## 1. Gross Earnings

The recoverable Gross Earnings loss is the actual loss sustained by the Insured of **Gross Earnings**, less all charges and expenses that do not necessarily continue, plus all other earnings derived from the operations of the business, excluding loss covered under Rental Income, during the Period of Liability.

**Gross Earnings** means:

The net sales value of production or business operations or services less the cost of:

a) Raw stock;

b) Materials and supplies; and

c) Merchandise sold;

Used in production or business operations or services rendered by the Insured

The recoverable Gross Earnings loss payable is limited to the extent the Insured is:

a) Wholly or partially prevented from producing goods or continuing business operations or services;

b) Unable to make up lost production within a reasonable amount of time, not limited to the period during which production is interrupted;

c) Unable to continue such operations or services during the Period of Liability; and

d) Able to demonstrate a loss of sales for the production or business operations or services prevented.

## 2. Gross Profits

The recoverable Gross Profits loss is the actual loss sustained by the Insured of the:

a) **Reduction in Sales**; and the

b) **Increased Cost of Doing Business**,

Resulting from the necessary interruption of business during the Period of Liability.

As respects Gross Profits, Business Interruption Exclusion Items 2a, 2c and 3 do not apply.

For purposes of measuring the loss:

**Gross Profits** means:

The sum produced by adding the **Net Profit** to the **Insured Fixed Charges**. If there is no **Net Profit** the amount of all **Insured Fixed Charges** less that proportion of any loss from business operations as the amount of the **Insured Fixed Charges** bears to all fixed charges.

**Increased Cost of Doing Business** means:

 

The reasonable and necessary costs incurred to avoid or diminish a reduction in sales but not to exceed the sum produced by applying the **Rate of Gross Profit** to the amount of the reduction avoided; all less any sums saved as may cease or be reduced during the Period of Liability.
**Insured Fixed Charges** means:

All fixed charges unless specifically excluded in the Declarations section.

**Net Profit** means:

The net operating profit excluding:

a)  Capital receipts and accruals; and

b)  Outlay properly chargeable to capital;

Resulting from the business of the Insured after due provision has been made for all fixed charges and any other expenses, including depreciation, but before deduction of any taxes on profits.

**Rate of Gross Profit** means:

The rate of **Gross Profit** earned on Sales during the twelve (12) full months immediately before the date of the loss or damage to the insured property.

**Reduction in Sales** means:

The amount produced by applying the **Rate of Gross Profit** to the amount by which the **Sales** during the Period of Liability fall short of the **Standard Sales**.

**Sales** means:

The money, excluding loss covered under Rental Income, paid or payable to the Insured for:

a)  Goods sold and delivered; and

b)  Services rendered;

In the conduct of the Insured's business.

**Standard Sales** means:

The **Sales** during the period of the twelve (12) months immediately before the date of the loss or damage to the insured property which corresponds with the Period of Liability.

3.  **Rental Income**

The recoverable Rental Income loss is the actual loss sustained by the Insured of the following during the Period of Liability:

a)  The fair rental value of any portion of the property occupied by the Insured;

b)  Income reasonably expected from the rentals of unoccupied or unrented portions of such property;

c)  The rental income from the rented portions of such property, according to bona fide leases, contracts or agreements, in force at the time of loss;




All less charges and expenses that do not continue.

Rental Income Exclusion: As respects Rental Income, the following additional exclusion applies:

This Policy does not insure:

a) Any loss of rental income during any period in which the insured property would not have been rented for any reason other than an insured loss.

## 4. Extra Expense

The recoverable Extra Expense loss is the reasonable and necessary extra expense incurred by the Insured of the following during the Period of Liability to:

a) Temporarily continue as close to normal the conduct of the Insured's business; and

b) Temporarily use the property or facilities of the Insured or others;

All less any value remaining at the end of the Period of Liability for property obtained in connection with the above.

If the Insured makes claim in accordance with the terms and conditions of the BI Select clause, the Period of Liability for Extra Expense coverage will be the Period of Liability applicable to the Business Interruption Coverage option selected.

Extra Expense Exclusions: As respects Extra Expense, the following additional exclusions apply:

This Policy does not insure:

a) Any loss of income.

b) Expenses that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

c) The cost of permanent repair or replacement of property that has been damaged or destroyed.

d) Any expense recoverable elsewhere in this Policy.

## 5. BI Select™

If this Policy insures Gross Earnings and Gross Profit the Insured has the option to make claim based on either:

a) Gross Earnings; or

b) Gross Profit.

If such claim involves more than one location, including interdependency at one or more locations, all such claims will be adjusted using the coverage option chosen above.

This option may be exercised any time prior to meeting the conditions set forth in the Settlement of Claims provisions in the Loss Adjustment and Settlement section of this Policy.





## C. **PERIOD OF LIABILITY**

The Period of Liability for Business Interruption Coverage and Business Interruption Coverage Extensions, unless otherwise stated elsewhere in this Policy, is as follows:

The Gross Earnings, Rental Income or Extra Expense Period of Liability is:

1. The period starting from the time of physical loss or damage of the type insured; and

2. Ending when, with due diligence and dispatch,

   a) The lost or damaged property could be repaired or replaced and made ready for production or business operations or services under the same or equivalent physical operating conditions that existed prior to the loss or damage; or

   b) The lost or damaged property under the course of construction or renovation could be repaired or replaced to the same or equivalent degree of completion that existed prior to the loss or damage. This period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened.

3. For **raw materials** or supplies, the period of time:

   a) Resulting from the inability to procure suitable **raw materials** or supplies to replace those physically lost or damaged, but

   b) For no more than the period of time for which such physically lost or damaged **raw materials** or supplies would have supplied production or business operating or servicing needs.

The Gross Profit Period of Liability is:

The period starting from the time of physical loss or damage of the type insured and ending no later than the period of time shown in the Declarations section during which the results of the business shall be directly affected by such damage.

Period of Liability Conditions:

The Period of Liability will not include any additional time:

1. Due to the Insured's inability to resume production or business operations or services regardless of the reason, including but not limited to:

   a) Making change(s) to the buildings, structures or equipment, for any reason except as provided by the Demolition and Increased Cost of Construction coverage in this Policy; or

   b) Restaffing or retraining employees. However, this item does not apply to additional time needed to train staff to use new machinery or equipment which replaces machinery or equipment that suffered insured physical loss or damage, provided that such training is completed within 90 days after the new machinery or equipment has been installed.

If two or more Periods of Liability apply such periods will not be cumulative and will not be limited by the expiration of this Policy.

## D. **BUSINESS INTERRUPTION EXCLUSIONS**

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Business Interruption loss:

This Policy does not insure:

 

1. Any loss during any idle period, including but not limited to when production, operations or services or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

   a) Physical loss or damage not insured by this Policy.

   b) Planned or rescheduled shutdown.

   c) Strike or other work stoppage.

   d) Any other reason other than physical loss or damage insured under this Policy.

2. Any increase in loss due to:

   a) The suspension, cancellation, or lapse of any lease, contract, license or order.

   b) Damages for breach of contract, or for late or non-completion of orders.

   c) Fines or penalties of any nature, except as provided by the Contractual Penalties coverage in this Policy.

   d) Any other consequential or remote loss.

3. Any loss resulting from physical loss or damage to merchandise or finished goods valued at the regular cash selling price or the time required for their reproduction.

4. Any loss resulting from the actual cash value portion of direct physical loss or damage by fire caused by or resulting from terrorism.

## E. BUSINESS INTERRUPTION COVERAGE EXTENSIONS

### 1. Attraction Property

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to a **described location** and is within one (1) statute mile of the **described location**.

Attraction Property Exclusion: As respects Attraction Property, the following additional exclusion applies:

This Policy does not insure loss resulting from:

   a) Physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to loss.

### 2. Civil or Military Authority

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **location** provided such order is the direct result of physical damage of the type insured at a **location** or within five (5) statute miles of it.

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

The Period of Liability for this Business Interruption Coverage Extension will be:

 

a) The period of time starting at the time of such order of civil or military authority, but not to exceed the number of consecutive days shown in the Declarations section of this Policy.

## 3. Communicable Disease - Business Interruption

If a described location owned, leased or rented by the Insured has the actual not suspected presence of communicable disease and access to such described location is limited, restricted or prohibited by:

a) An order of an authorized governmental agency regulating such presence of communicable disease; or

b) A decision of an Officer of the Insured as a result of such presence of communicable disease,

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such described location with such presence of communicable disease.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Communicable Disease - Business Interruption Exclusions: As respects Communicable Disease - Business Interruption, the following additional exclusions apply:

This Policy does not insure loss resulting from:

a) The enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of communicable disease.

b) Loss or damage caused by or resulting from terrorism, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

The period of time:

a) Starting at the time of the order of the authorized governmental agency or the Officer of the Insured; but

b) Not to exceed the time limit shown in the Limits of Liability clause in the Declarations section,

This period of time is part of and not in addition to any Period of Liability applying to any coverage provided in the Business Interruption section.

## 4. Computer Systems Non-Physical Damage

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from:

a) The failure of the Insured's **electronic data processing equipment or media** to operate provided that such failure is the direct result of a malicious act directed at the Named Insured; or

b) The Insured's reasonable action to temporarily protect the Insured's **electronic data processing equipment or media** against an actual or immediately impending malicious act directed at the Named Insured, provided such action is necessary to prevent failure of the Insured's **electronic data processing equipment or media** to operate.

While anywhere within this Policy's Territory.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.




The Period of Liability for this Business Interruption Coverage Extension will be:

a) The period of time starting when the Insured's **electronic data processing equipment or media** fails to operate and ending when, with due diligence and dispatch, the Insured's **electronic data processing equipment or media** could be restored to the same or equivalent operating condition that existed prior to the failure; and

b) Does not include the additional time to make changes to the Insured's **electronic data processing equipment or media**.

## 5. Contractual Penalties

This Policy covers contractual penalties incurred by the Insured during the Period of Liability due to late or non-completion of orders as a direct result of insured physical loss or damage to property of the type insured.

This extension of coverage applies provided that such contractual penalties:

a) Are written in the provisions of a contract prior to the time of such direct physical loss or damage, and

b) Will be limited to the contractual sales value of such late or non-completed orders.

## 6. Crisis Management

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **described location**, provided such order is a direct result of:

a) A violent crime, suicide, attempted suicide or armed robbery; or

b) A death or bodily injury caused by a **workplace accident**;

At that **described location**.

For the purpose of this Business Interruption Coverage Extension only, a violent crime, suicide, attempted suicide or armed robbery at a **described location** will be considered direct physical loss or damage insured by this Policy.

Crisis Management Exclusion: As respects Crisis Management, the following additional exclusion applies:

This Policy does not insure loss resulting from:

a) Physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

a) The period of time starting at the time of such order of civil or military authority, but not to exceed the number of consecutive days shown in the Declarations section of this Policy.

## 7. Extended Period of Liability

The Gross Earnings and Rental Income coverage is extended to cover the reduction in sales resulting from:

a) The interruption of business as covered by Gross Earnings or Rental Income;

b) For such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened; and





c) Commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Business Interruption Coverage Extension had not been included in this Policy.

However, this Business Interruption Coverage Extension does not apply to Gross Earnings or Rental Income loss resulting from physical loss or damage caused by or resulting from terrorism.

As respects Extended Period of Liability, Business Interruption Exclusion Item 2a does not apply.

Coverage under this Business Interruption Coverage Extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.

Coverage under this Business Interruption Coverage Extension does not apply for more than the number of consecutive days shown in the Limits of Liability clause of the Declarations section of this Policy.

## 8. Ingress/Egress

This Policy covers the Business Interruption Coverage loss incurred by the Insured due to the necessary interruption of the Insured's business when ingress to or egress from a described location(s) is physically prevented, either partially or totally, as a direct result of physical loss or damage of the type insured to property of the type insured whether or not at a described location.

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

Ingress/Egress Exclusion: As respects Ingress/Egress, the following additional exclusion applies:

This Policy does not insure loss resulting from:

a) Physical loss or damage caused by or resulting from terrorism, regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

## 9. Leasehold Interest

This Policy covers the loss incurred by the Insured of Leasehold Interest as follows:

If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.

If the lease is cancelled by the lessor pursuant to the lease agreement or by the operation of law; the Lease Interest for the first three months following the loss; and the Net Lease Interest for the remaining unexpired term of the lease. Leasehold Interests Exclusions: As respects Leasehold Interest, the following applies:

a) Business Interruption Exclusions 1, 2 and 3 do not apply and the following applies instead:

This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

b) This Policy does not insure loss directly resulting from physical loss or damage to Personal Property.

As used above, the following terms mean:

Net Lease Interest:


Member of the FM Global Group



That sum which placed at 6 percent interest rate compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).

**Lease Interest:**

The excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

## 10. Logistics Extra Cost

This Policy covers the extra cost incurred by the Insured during the Period of Liability due to disruption of the normal movement of goods or materials:

a)  Directly between **described locations**; or

b)  Directly between a **location** and the premises of a direct supplier, direct customer or direct contract service provider to the Insured;

Provided that such disruption is a direct result of physical loss or damage of the type insured to property of the type insured within the Policy's Territory.

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

The recoverable extra cost loss will be the reasonable and necessary extra costs incurred by the Insured of the following:

a)  Extra costs to temporarily continue as close to normal the movement of goods or materials.

Logistics Extra Cost Exclusions: As respects Logistics Extra Cost, the following shall apply:

This Policy does not insure any loss resulting from:

a)  Disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage and voice, data or video.

b)  Disruption caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

c)  Disruption caused by physical loss or damage to personal property of the Insured while in transit.

d)  Disruption in the movement of goods or materials between the premises of a supplier, customer or contract service provider to the Insured and the premises of another supplier, customer or contract service provider to the Insured.

e)  Costs that usually would have been incurred in conducting the business during the same period had there been no disruption of normal movement of goods or materials; or

f)  Loss of income

g)  Costs of permanent repair or replacement of property that has been damaged or destroyed.

The Period of Liability for this Business Interruption Coverage Extension will be:

The period of time:

a)  Starting at the time of physical loss or damage causing the disruption of the normal movement of goods or materials; and





b) Ending not later than when with due diligence and dispatch the normal movement of goods or materials could be resumed.

## 11. Off-Premises Data Services - Business Interruption

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at a location of **off-premises data processing or data transmission services**, when the interruption is caused by any accidental event at the facilities of the provider of such services, while anywhere within this Policy's Territory, that immediately prevents in whole or in part the delivery of such provided services. For the purposes of this Additional Coverage an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional General Conditions:

a) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

b) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Coverage provided in this Extension is excluded from coverage elsewhere in this Policy.

This Extension does not cover the Business Interruption Coverage loss incurred by the Insured covered by Computer Systems Non-Physical Damage coverage as provided in this section of this Policy.

Off-Premises Data Services - Business Interruption Exclusions: As respects Off- Premises Data Services - Business Interruption, the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

As used above, Period of Liability of **off-premises data processing or data transmission services**:

a) Is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the Period of Liability clause in this section.

b) Is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

c) Does not extend to include the interruption of operations caused by any reason other than interruption of the provided service(s).

## 12. Off-Premises Service Interruption - Business Interruption

This Policy covers Business Interruption Coverage loss incurred by the Insured during the Period of Liability caused by the interruption, in whole or part, of incoming electric, gas, fuel, steam, water, refrigeration, and outgoing sewerage services at a **location**.

The interruption of such services must be by reason of any accidental event, not otherwise excluded by this Policy, at the facilities of the service provider(s) while anywhere within this Policy's Territory.

EX02-050





This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional Conditions:

This Company will not be liable for deliberate act(s) by the supplying utility to shed load to maintain system integrity.

Off-Premises Service Interruption - Business Interruption Exclusion: As respects Off-Premises Service Interruption - Business Interruption the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

a) The period starting with the time when an interruption of specified services happens; and

b) Ending when with due diligence and dispatch the service could be wholly restored and the location receiving the service could or would have resumed normal operations under the same or equivalent physical and operating conditions. Resultant and concurrent interruptions are considered as one event.

## 13. Protection and Preservation of Property - Business Interruption

This Policy covers the Business Interruption Coverage loss incurred by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

This Business Interruption Coverage Extension does not cover loss sustained by the Insured to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by Terrorism coverage as provided in this Policy.

This Business Interruption Coverage Extension is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## 14. Research and Development

Gross Earnings and Gross Profits coverages are extended to cover the actual loss sustained by the Insured of continuing fixed charges and **ordinary payroll** directly attributable to the interruption of research and development activities that in themselves would not have produced income during the Period of Liability.

The Period of Liability for this Business Interruption Coverage Extension will be:

The period of time:

a) Starting at the time of physical loss or damage of the type insured; and

b) Ending when the property could be repaired or replaced and made ready for operations.

## 15. Soft Costs

This Policy covers **soft costs** incurred by the Insured during the Period of Liability arising out of the delay in the completion of buildings and additions under construction directly resulting from physical loss or damage of the type insured to insured property under construction at **locations**.





## 16. Supply Chain

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured at the premises of any of the following within the Policy's Territory:

a)  Direct suppliers, direct customers or direct contract service providers to the Insured;

b)  Any company under any royalty, licensing fee or commission agreement with the Insured; or

c)  Any company that is a direct or indirect supplier, customer or contract service provider of those described in a) above,

But not at the premises of entities directly or indirectly supplying to or receiving from a **location** electricity, fuel, water, steam, refrigeration, sewerage, voice, data or video.

Business Interruption Coverage loss recoverable under this Business Interruption Coverage Extension is extended to include the following Business Interruption Coverage Extensions:

a)  Civil or Military Authority

b)  Crisis Management

c)  Extended Period of Liability

d)  Ingress/Egress

e)  Off-Premises Service Interruption - Business Interruption

f)  Supply Chain

Supply Chain Exclusions: As respects Supply Chain coverage, the following additional exclusion applies:

This Policy does not insure loss resulting from:

a)  Physical loss or damage caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

EX02-052

 

# LOSS ADJUSTMENT AND SETTLEMENT

## A. ABANDONMENT

There shall be no abandonment to this Company of any property.

## B. APPRAISAL

If the Insured and this Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

1.  The Insured has fully complied with all provisions of this Policy.

2.  This Company has received a signed and sworn Proof of Loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire. If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or this Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending. The appraisers will then appraise the amount of loss, stating separately the actual cash value and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for Business Interruption loss, the amount of loss for each Business Interruption coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire. An award agreed to in writing by any two will determine the amount of loss.

The Insured and this Company will each:

1.  Pay its chosen appraiser; and

2.  Bear equally the other expenses of the appraisal and umpire.

A demand for Appraisal shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under Requirements in Case of Loss.

This Company will not be held to have waived any of its rights by any act relating to appraisal.

## C. COLLECTION FROM OTHERS

This Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

## D. COMPANY OPTION

This Company has the option to take all or any part of damaged property at the agreed or appraised value. This Company must give notice to the Insured of its intention to do so within 30 days after receipt of Proof of Loss.

## E. CURRENCY FOR LOSS PAYMENT

Losses will be adjusted and paid in the currency of the United States of America, except in Canada where losses will be paid in Canadian currency, unless directed otherwise by the First Named Insured.





## F. LEGAL ACTION AGAINST THIS COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

1. The Insured has fully complied with all the provisions of this Policy; and

2. Legal action is started within two years after inception of the loss.

If under the insurance laws of the jurisdiction in which the property is located, such two-year limitation is invalid, then any such legal action must be started within the shortest limit of time permitted by such laws.

## G. LOSS ADJUSTMENT AND PAYABLE

Loss or damage will be adjusted with the First Named Insured and payable to or as the First Named Insured directs subject to the Mortgagee/Lenders Loss Payable clause in the General Conditions section of this Policy.

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee on a Certificate of Insurance issued by this Company prior to the loss.

When named on a Certificate of Insurance issued by the Insured's broker with this Company's permission, such additional interests are added to this Policy as their interests may appear when such Certificate of Insurance is issued prior to the loss and on file with this Company. The effective date of any such interest will be the issue date of the certificate unless a later date is specified on the Certificate of Insurance. The Certificate of Insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

## H. OTHER INSURANCE

1. If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.

2. In no event will this Policy apply as contributing insurance.

3. The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this Policy without prejudice to this Policy. The existence of any such insurance will not reduce any limit or sublimit of liability in this Policy. Any other insurance that would have provided primary coverage in the absence of this Policy will not be considered excess.

4. The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy. The existence of such other insurance will not prejudice recovery under this Policy. If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only after such other insurance has been exhausted.

5. If this Policy is deemed to contribute with other insurance, the limit of liability applicable at each location, for the purposes of such contribution with other insurers, will be the latest amount described in this Policy or the latest location value on file with this Company.

## I. REQUIREMENTS IN CASE OF LOSS

The Insured will:

1. Give immediate written notice to this Company of any loss.

2. Protect the property from further loss or damage.

 

3. Promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, actual cash value, replacement value and amount of loss claimed.

4. Give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by this Company. The proof of loss must state the knowledge and belief of the Insured as to:

   a) The time and origin of the loss.

   b) The Insured's interest and that of all others in the property.

   c) The **actual cash value** and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

   d) Any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

   e) By whom and for what purpose any **location** insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

5. Include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

6. Further, the Insured, will as often as may be reasonably required:

   a) Exhibit to any person designated by the Company all that remains of any property;

   b) Submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

   c) Produce for examination at the request of the Company:

      i) All books of accounts, business records, bills, invoices and other vouchers; or

      ii) Certified copies if originals are lost;

   At such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

## J. SETTLEMENT OF CLAIMS

The amount of loss for which this Company may be liable will be paid within 30 days after:

1. Proof of loss as described in this Policy is received by this Company; and

2. When a resolution of the amount of loss is made either by:

   a) Written agreement between the Insured and this Company; or

   b) The filing with this Company of an award as provided in the Appraisal clause of this section.

In the event of insured physical loss or damage determined by this Company's representatives to be in excess of the applicable policy deductible, this Company will advance mutually agreed-upon partial payment(s), subject to the Policy's





provisions. To obtain such partial payments, the Insured will submit a signed and sworn proof of loss as described in this Policy, with adequate supporting documentation.

## K. SUBROGATION

The Insured shall cooperate in any subrogation proceedings. This Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of this Company's payment.

This Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss. No such waiver will affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by this Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

1.  Any applicable deductible; and/or

2.  Any provable uninsured loss,

Bears to the entire provable loss amount.

## L. VALUATION

Adjustment of the physical loss amount(s) under this Policy will be as of the date of loss at the place of loss, and for no more than the interest of the Insured.

1.  Adjustment of physical loss to property will be determined based on the lesser of the following unless stated otherwise below or elsewhere in this Policy:

    a)  The cost to repair.

    b)  The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

    c)  The cost to rebuild, repair or replace on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

    d)  On real property or machinery and equipment, other than stock, offered for sale on the date of the loss, the selling price.

2.  On **raw materials**, supplies and merchandise not manufactured by the Insured, the replacement cost.

3.  On **stock in process**, the value of **raw materials** and labor expended plus the proper proportion of overhead charges.

4.  On finished goods manufactured by the Insured, the regular cash selling price, less all discounts and charges to which such finished goods would have been subject had no loss happened.

5.  On exposed films, records, manuscripts and drawings that are not **valuable papers and records**, the value blank plus the cost of copying information from backup or from originals of a previous generation. These costs will not include research, engineering or any costs of restoring or recreating lost information.

6.  On property that is damaged by fire and such fire is the result of **terrorism**, the **actual cash value** of the fire damage loss. Any remaining fire damage loss shall be adjusted according to the terms and conditions of the Valuation clause(s) of the Policy and shall be subject to the limit(s) of liability for Terrorism, and if stated the limit of liability for SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S), as shown in the Limits of Liability clause in the Declarations section.

EX02-056

 

7. On personal property that is part of a pair or set, and the physically damaged personal property cannot be replaced or repaired, the reduction in value of the undamaged portion of insured personal property. If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such property to this Company.

8. On unrepairable electrical or mechanical equipment, including computer equipment, the cost to replace such equipment with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

9. On property scheduled for demolition, the increased cost of demolition, if any, directly resulting from insured loss.

10. On improvements and betterments, the unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

11. On property that is useless to the Insured, the actual cash value.

12. On property if not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company, the actual cash value.

The Insured may elect not to repair or replace the insured real or personal property under Item 1 above that is lost, damaged or destroyed. Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss. As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at a described location under this Policy. This item does not extend to Demolition and Increased Cost of Construction.

 

# GENERAL CONDITIONS

## A. APPLICATION OF POLICY TO DATE OR TIME RECOGNITION

With respect to situations caused by any **date or time recognition** problem by **electronic data processing equipment or media** (such as the so-called Year 2000 problem), this Policy applies as follows:

1. This Policy does not pay for remediation, change, correction, repair or assessment of any **date or time recognition** problem, including the Year 2000 problem, in any **electronic data processing equipment or media**, whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property. This Policy does not pay for any business interruption loss resulting from the foregoing remediation, change, correction, repair or assessment.

2. Failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not insured physical loss or damage. This Policy does not pay for any such incident or for any business interruption loss resulting from any such incident.

Subject to all of its terms and conditions, this Policy does pay for physical loss or damage not excluded by this Policy that results from a failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000. Such covered resulting physical loss or damage does not include any loss, cost or expense described in a) or b) above. If such covered resulting physical loss or damage happens, and if this Policy provides business interruption coverage, then, subject to all of its terms and conditions, this Policy also covers any insured business interruption loss directly resulting therefrom.

## B. CANCELLATION/NON-RENEWAL

This Policy may be:

1. Cancelled at any time at the request of the First Named Insured by surrendering this Policy to this Company or by giving written notice to this Company stating when such cancellation will take effect; or

2. Cancelled by this Company by giving the First Named Insured not less than:

   a) 60 days written notice of cancellation; or

   b) 10 days written notice of cancellation if the First Named Insured fails to remit, when due, payment of premium for this Policy; or

3. Non-renewed by this Company by giving the First Named Insured not less than 60 days written notice of non-renewal.

Return of any unearned premium will be calculated on the customary short rate basis if the First Named Insured cancels and on a pro-rata basis if the Company cancels this Policy. Return of any unearned premium will be made by the Company as soon as practicable.

## C. CONFORMITY TO STATUTE

Terms of this Policy that conflict with the statutes of the jurisdiction where the insured property is located, are amended to conform to such statutes.

## D. FIRST NAMED INSURED

The First Named Insured shown in the Declarations section:





1.  Is responsible for the payment of all premiums.

2.  Will be the payee for any return premiums.

3.  May authorize changes in the terms and conditions of this Policy with the consent of this Company.

## E. INCREASE IN HAZARD

This Policy will not apply to any location where there is an increase in hazard over which the Insured has control and knowledge. Any increase in hazard at one or more locations will not affect coverage at other locations where, at the time of loss or damage, the increase in hazard does not exist.

## F. INSPECTIONS

This Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property. This Company does not address life, safety or health issues.

This Company's:

1.  Right to make inspections; or

2.  Making of inspections; or

3.  Providing recommendations or other information in connection with any inspections,

Will not constitute an undertaking, on behalf of or for the benefit of the Insured or others.

This Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

When this Company is not providing jurisdictional inspections, the Owner/Operator has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their pressure equipment.

## G. LIBERALIZATION CLAUSE

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

## H. MISREPRESENTATION AND FRAUD

This entire Policy will be void if, whether before or after a loss, an Insured has:

1.  Willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

2.  Made any attempt to defraud this Company.

3.  Made any false swearing.

 

# I. MORTGAGEE/LENDERS LOSS PAYABLE

Loss or damage, if any, to specified property insured under this Policy shall be payable to each specified Lenders Loss Payable (hereinafter referred to as Lender) and specified Mortgagee as its interest may appear.

This insurance as to the interest of the Lender or Mortgagee shall not be invalidated by:

1. Any act or neglect of the debtor, mortgagor or owner (as the case may be) of the property.

2. Foreclosure, notice of sale or similar proceedings with respect to the property.

3. Change in the title or ownership of the property.

4. Change to a more hazardous occupancy.

The Lender or Mortgagee will notify this Company of any known change in ownership, occupancy or hazard and, within 10 days of written request by this Company, may pay the increased premium associated with such known change. If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

If the Insured fails to render proof of loss within the time provided in this Policy, the Lender or Mortgagee shall render proof of loss within sixty days after having knowledge of the Insured's failure in the form and manner provided by this Policy, and, further, shall be subject to the provisions of this Policy relating to Appraisal, Legal Action Against this Company, and Settlement of Claims.

If this Policy is cancelled at the request of the First Named Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

1. Sooner terminated by authorization, consent, approval, acceptance or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

2. This Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

This Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice 60 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment. If the debtor, mortgagor or owner has failed to pay any premium due under this Policy, this Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation. If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

Whenever this Company shall pay the Lender or Mortgagee for loss or damage under this Policy and shall deny payment to the debtor, mortgagor or owner, this Company shall, to the extent of such payment, be subrogated to the rights of the Lender or Mortgagee under all collateral held to secure the debt or mortgage. No subrogation shall impair the right of the Lender or Mortgagee to recover the full amount due. At its option, this Company may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest. In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to this Company, and the remaining debt or mortgage will be paid to this Company.

This Company may invoke this Policy's Suspension clause. The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel subject to the suspension. This Company will provide the Lender or Mortgagee at the last reported address a copy of the suspension notice.

All notices sent to the Lender shall be sent to its last reported address.

EX02-060





Other provision relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## J. POLICY MODIFICATION

This Policy contains all of the agreements between the Insured and the Company concerning this insurance. The Insured and the Company may request changes to this Policy. This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not:

1. Create a waiver, or change any part of this Policy; or

2. Prevent the Company from asserting any rights under the provisions of this Policy.

## K. REINSTATEMENT OF LIMITS AFTER A LOSS

Except for an **annual aggregate** limit of liability, any loss or payment of any claim will not reduce the amount payable under this Policy.

## L. SUSPENSION

Upon discovery of a dangerous condition, this Company may immediately suspend the **boiler and machinery** insurance with respect to any machine, vessel or part thereof by giving written notice to the Insured. The insurance that is suspended may be reinstated by this Company. The Insured will be allowed the return of the unearned portion of the premium resulting from the suspension of insurance.

## M. TRANSFER OF RIGHTS AND DUTIES UNDER THIS POLICY

The Insured's rights, interests and duties under this Policy may not be transferred or assigned without this Company's written consent.

 

# DEFINITIONS

**actual cash value** means the cost to repair or replace the property, on the date of the loss or damage, with material of like kind and quality, less proper deduction for obsolescence and physical depreciation.

**annual aggregate** means the Company's maximum amount payable during any policy year.

**boiler and machinery** means:

1. Direct physical loss or damage originating within:

   a) Boilers, fired or unfired pressure vessels, vacuum vessels and pressure piping, all normally subject to vacuum or internal pressure other than static pressure of contents, excluding:

      i) Waste disposal piping;

      ii) Any piping forming part of a fire protective system;

      iii) Furnaces; and

      iv) Any water piping other than:

         (a) Boiler feed water piping between the feed pump or injector and the boiler;

         (b) Boiler condensate return piping; or

         (c) Water piping forming part of a refrigerating or air conditioning system used for cooling, humidifying or space heating purposes.

   b) All mechanical, electrical, electronic or fiber optic equipment;

2. And caused by, resulting from or consisting of:

   a) Mechanical breakdown; or

   b) Electrical or electronic breakdown; or

   c) Extremes or changes of temperature; or

   d) Rupture, bursting, bulging, implosion or steam explosion.

3. **boiler and machinery** as used in this Policy does not mean:

   Physical loss or damage caused by or resulting from any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

   a) Combustion explosions, except from within combustion gas turbines; or

   b) Explosions from liquids coming in contact with molten materials; or

   c) Accidental discharge, escape, leakage, backup or overflow to the open of any material from confinement within piping, plumbing systems or tanks except from property described in Item 1a above; or

   d) Fire, or from the use of water or other means to extinguish a fire.

EX02-062




**communicable disease** means disease which is:

1. Transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

2. Legionellosis.

**contaminant** means anything that causes **contamination**.

**contamination** means any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

**date or time recognition** means the recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

**described location(s)** means the locations described in the Insurance Provided clause of the Declarations section of this Policy.

**earth movement** means any natural or man-made earth movement, including but not limited to earthquake or landslide regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion, sprinkler leakage or **flood** resulting from **earth movement** will not be considered to be loss by **earth movement** within the terms and conditions of this Policy.

**electronic data processing equipment or media** means any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether the property of the Insured or not.

**fine arts** means paintings; etchings; pictures; tapestries; rare or art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit, excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money and securities.

**flood** means flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer backup resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss. Physical loss or damage from **flood** associated with a storm or weather disturbance whether or not identified by name by any meteorological authority, is considered to be **flood** within the terms of this Policy. However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **flood** is not considered to be loss by **flood** within the terms and conditions of this Policy.

**Green** means products, materials, methods and processes certified by a **Green Authority** that conserve natural resources, reduce energy or water consumption, avoid toxic or other polluting emissions or otherwise minimize environmental impact.

**Green Authority** means an authority on **Green** buildings, products, materials, methods or processes that are certified and accepted by Leadership in Energy and Environmental Design (LEED®), Green Building Initiative Green Globes®, Energy Star Rating System or any other recognized **Green** rating system.

**irreplaceable** means an item which cannot be replaced with other of like kind and quality.

**location** means a location described in the Insurance Provided clause of the Declarations section or included as Newly Acquired Property or Unnamed Property coverages.

   

named perils means: fire, lightning, wind, hail, explosion, smoke, impact from aircraft and vehicles, objects falling from aircraft, strike, riot, civil commotion, vandalism, theft, attempted theft, sprinkler leakage or collapse of buildings.

occurrence means the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by one discrete event of physical loss or damage, except as respects the following:

1.  terrorism: occurrence will mean the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by all acts of terrorism during a continuous period of seventy-two (72) hours.

2.  earth movement: occurrence will mean the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by all earth movement(s) during a continuous period of seventy-two (72) hours.

off-premises data processing or data transmission services means the storage or processing of data performed off-premises of the Insured's property, including the transmission of voice, data or video over a single, or combination of, computer or communication networks.

offshore means away from the shore but not connected to the shore by docks, piers or any other physical connection other than pipelines.

ordinary payroll means:

1.  Wages of all employees except officers, executives, department managers, and employees under contract or similar key employees; and

2.  Includes taxes and charges dependent on the payment of those wages.

physical loss or damage to electronic data, programs or software means the destruction, distortion or corruption of electronic data, programs or software.

production machinery and equipment means any production or process machine(s) or apparatus that processes, forms, cuts, shapes, grinds or conveys raw materials, materials in process or finished goods and any associated equipment utilized in production including but not limited to electrical cabling, transformers, HVAC and any equipment or apparatus that is mounted upon or used exclusively with any one or more production or process machine(s) or apparatus.

raw materials mean materials and supplies in the state in which the Insured receives them for conversion by the Insured into finished goods.

soft costs means the expenses over and above normal expenses at locations undergoing alterations or additions to existing property and property in the course of construction limited to the following:

1.  Construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, and charges by the lenders for the extension or renewal of loans necessary.

2.  Commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of releasing and marketing of the Insured Project due to loss of tenant(s) or purchaser(s).

3.  Additional fees - for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.

4.  Carrying costs - building permits, additional interest on loans, insurance premiums and property and realty taxes.





AFM®
Member of the FM Global Group

proVision®

**stock in process** means **raw materials** or stock, which has undergone any aging, seasoning, mechanical or other process or manufacture, but which is not finished goods.

**terrorism** means:

1. Any act, involving the use or threat of: force, violence, dangerous conduct, interference with the operations of any business, government or other organization or institution, or any similar act,

2. When the effect or apparent purpose is:

   To influence or instill fear in any government (de jure or de facto) or the public, or any segment of either; or to further, or to express support for, or opposition to, any political, religious, social, ideological or similar type of objective or position.

**transmission and distribution systems** means transmission and distribution systems including but not limited to electricity, gas, fuel, steam, water, refrigeration, sewerage, voice, data and video. Such systems shall include poles, towers and fixtures, overhead conductors and devices, underground and underwater conduit, underground and underwater conductors and devices, line transformers, service meters, street lighting and signal systems.

**valuable papers and records** means inscribed, printed or written: documents; manuscripts or records including abstracts; and, books, deeds, drawings, films, maps or mortgages, all of which must be of value to the Insured. **Valuable papers and records** are not: money, securities and stamps; converted data programs or instructions used in the Insured's data processing operations; or, materials on which data is recorded.

**wind** means direct action of wind including substance driven by wind. **Wind** does not mean or include anything defined as **flood** in this Policy.

**workplace accident** means a sudden, fortuitous event that happens during working hours and arises out of work performed in the course and the scope of employment.

*© 2017 AFM. All rights reserved.*

# Real Estate Endorsement

This Endorsement is a part of this Policy and the terms and conditions of this Policy are amended as described herein. All other terms and conditions of this Policy remain unchanged.

## 1. Contingent Real Property

This Policy covers Real Property that is the contractual responsibility of the Insured's lessee to insure for physical loss or damage of the type insured. Coverage under this Policy shall apply only after the coverage provided under the lessee's policy has been exhausted. The lessee's policy will be the first policy to respond in the event of loss or damage. Upon exhaustion of coverage under the lessee's policy, this Policy will cover:

a) The difference in definitions, perils, conditions or coverages between the lessee's policy and this Policy; and

b) The difference between the limit(s) of liability stated in the lessee's policy and this Policy;

Provided that:

a) The coverage is provided under this Policy;

b) The limit(s) of liability has been exhausted under the lessee's policy; and

c) The deductible(s) applicable to such claim for loss or damage under the lessee's policy has been applied. If the deductible applied in the lessee's policy is different from the deductible that would have been applied for such loss under this Policy, then this Policy will provide for such difference in deductible.

Notwithstanding the foregoing, in the event that the lessee has not placed coverage, or has allowed a policy to lapse, be non-renewed or cancelled, then this Policy shall act as primary insurance as respects the loss or damage. In the event this Policy shall become primary insurance, each claim for loss or damage under this Policy shall be subject to the applicable deductible(s) under this Policy.

This Policy will not cover any loss due to insolvency or bankruptcy of the insurance company issuing the lessee's policy.

Any coverage provided by the lessee's policy that is not provided in this Policy does not extend to this Policy.

## 2. Emergency Evacuation Expense

This Policy covers the reasonable and necessary costs incurred by the Insured for the emergency evacuation and subsequent return of tenants or lawful occupants when the Insured's management, using reasonable discretion, or a civil authority orders the emergency evacuation of a described location as a direct result of immediately impending physical loss or damage of the type insured by this Policy.

Emergency Evacuation Expense Exclusions: As respects Emergency Evacuation Expense, the following additional exclusions apply:

This Policy excludes:

a) The cost to move personal property of tenants or lawful occupants.

b) The cost of temporary or permanent housing or lodging.

c) Loss caused by or resulting from terrorism, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

          

This coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

### 3. Innkeeper's Liability

This Policy covers personal property of the type insured of hotel guests while at a **described location**, when such personal property is not in the Insured's custody.

### 4. Tenant Relocation Expense

This Policy covers the reasonable and necessary **tenant relocation expenses** incurred by the Insured to relocate and return tenants or lawful occupants to other quarters within this Policy's Territory when rented space or living quarter(s) at a **described location** are made uninhabitable as a direct result of physical loss or damage insured by this Policy.

Tenants Relocation Expense Exclusions: As respects Tenant Relocation Expense, the following additional exclusions apply:

This Policy excludes:

a)  Loss caused by the termination of a lease or other agreement.

b)  Security deposits, rent or other payments made to the landlord or lessors of the new quarters.

c)  Down payments, purchase price, legal fees and closing costs for the purchase of new quarters.

d)  The cost of permanent housing or lodging.

e)  Loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

For purposes of this coverage, **tenant relocation expenses** means the cost to:

a)  Pack and transport personal property of the type insured of tenants or lawful occupants.

b)  Store such personal property while awaiting possession of other quarters or restoration of existing quarters.

c)  Search for new quarters.

d)  Disconnect and reconnect fixtures and equipment.

e)  Re-establish new utility services less refunds from discontinued services.

**EX02-068**

 

# Retail Endorsement

This Endorsement is a part of this Policy and the terms and conditions of this Policy are amended as described herein. All other terms and conditions of this Policy remain unchanged.

## 1. Removal and Restocking Expenses

This Policy covers the reasonable and necessary expenses incurred by the Insured for the removal and restocking of finished goods and other merchandise held for sale resulting from the recall of such property by the product's manufacturer or by an order of a governmental authority.

Coverage is limited to such expenses incurred in the first 90 consecutive days following the recall.

Removal and Restocking Exclusions: With respect to Removal and Restocking Expenses, the following additional exclusions apply:

This Policy does not cover:

a) Expenses for the recall of such property manufactured by the Insured, including products that the Insured incorporates into other products.

b) Expenses for the recall of such property recalled prior to the inception date of this Policy.

c) The cost to recall such property.

d) The cost to replace such property.

## 2. Spoilage

Change of Temperature under Additional Property Damage Coverages in the Property Damage section of this Policy is replaced with the following:

This Policy covers spoilage of insured finished goods and other merchandise held for sale due to:

a) Changes of temperature or changes in relative humidity,

Directly resulting from an accidental event at a location.

## 3. Valuation

Items 2 and 4 under the Valuation clause in the Loss Adjustment and Settlement section of this Policy are replaced with the following:

2. On raw materials and supplies, the replacement cost.

4. On finished goods and other merchandise held for sale, the regular cash selling price, less all discounts and charges to which such finished goods or other merchandise held for sale would have been subject had no loss happened.





# CYBER EVENT ENDORSEMENT

This Endorsement is a part of this Policy and the terms and conditions of this Policy are amended as described herein. All other terms and conditions of this Policy remain unchanged.

1. **Cyber Event Definition**

   The following definition is added to this Policy:

   **cyber event** means any act involving the malicious or unauthorized access to, operation of, or use of **electronic data processing equipment or media**, regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **cyber event** is not considered to be loss by **cyber event** within the terms and conditions of this Policy.

2. **Exclusions**

   PROPERTY EXCLUDED item 12. is replaced with the following:

   12. Electronic data, programs or software, except when incorporated into physical goods intended to be sold as:

      a) Finished goods manufactured by the Insured; or

      b) Other merchandise not manufactured by the Insured;

      or as provided by the Data Restoration coverage in this Policy.

   EXCLUSIONS Group I item 4. is replaced with the following:

   4. Lack of incoming electricity, fuel, water, gas, steam or refrigerant; outgoing sewerage; or incoming or outgoing voice, data or video; all when caused by an event off the **location**, except as provided by the Data Service Provider and Off-Premises Service Interruption coverages in this Policy. If the lack of such a service directly causes insured physical damage at the **location**, then only that resulting damage is insured.

3. **Additional Coverages**

   ADDITIONAL COVERAGES items 6. and 21. are replaced with the following:

   6. **Data Restoration**

      This Policy covers insured **physical loss or damage to electronic data, programs or software**, while anywhere within this Policy's Territory, including while in transit.

      With respect to **physical loss or damage to electronic data, programs or software** caused by or resulting from a **cyber event**, this coverage will apply when the time to recreate or restore such data, programs or software with due diligence and dispatch is in excess of the Qualifying Period shown in the Declarations section of this Policy.

      This coverage includes:

      a) The cost of the following reasonable and necessary actions taken by the Insured due to actual insured **physical loss or damage to electronic data, programs or software**:

         i) To temporarily protect and preserve insured electronic data, programs or software.

**EX02-071**





ii)    For the temporary repair of insured physical loss or damage to electronic data, programs or software.

iii)   To expedite the permanent repair or replacement of such damaged property.

b)   The reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured physical loss or damage to electronic data, programs or software. In the event that there is no physical loss or damage, the costs covered under this item will be subject to the deductible that would have applied had there been such physical loss or damage.

This Additional Coverage excludes loss or damage to data, programs or software when incorporated into physical goods intended to be sold as:

a)   Finished goods manufactured by the Insured, or

b)   Other merchandise not manufactured by the Insured.

Data Restoration Exclusions: As respects Data Restoration, the following additional exclusion applies:

This Policy excludes the following but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

a)   Errors or omissions in processing or copying.

b)   Loss or damage to data, programs or software from errors or omissions in programming or machine instructions.

c)   Deterioration, inherent vice, vermin or wear and tear.

The Period of Liability for this Additional Coverage Extension will be:

a)   The period of time starting from the time of insured physical loss or damage to electronic data, programs or software; and

b)   Ending when with due diligence and dispatch the electronic data, programs or software could have been recreated or restored and made ready for production or business operations or services under the same or equivalent physical operating conditions that existed prior to the physical loss or damage.

Data Restoration Valuation: On property insured under this coverage, the loss amount will not exceed:

a)   The cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer; or

b)   The blank value of the media if not repaired, replaced or restored within two years from the date of loss.

21. Data Service Provider - Property Damage

This Policy covers insured physical loss or damage to insured property at a **location** when such physical loss or damage results from the interruption of **off-premises data processing or data transmission services** by reason of any accidental event at the facilities of the provider of such services, while anywhere within this Policy's Territory, that immediately prevents in whole or in part the delivery of such provided services.

 

For the purposes of this Additional Coverage an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This coverage will apply when such interruption of **off-premises data processing or data transmission services** is in excess of the Qualifying Period shown in the Declarations section of this Policy. Such interruption is the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Conditions:

1)      The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2)      The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Data Service Provider - Property Damage Exclusions: As respects Data Service Provider - Property Damage, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## 4.   Business Interruption Coverage

BUSINESS INTERRUPTION COVERAGE EXTENSIONS items 4. and 11. are replaced with the following:

### 4.   Owned Network Interruption

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from:

a)      The failure of the Insured's **electronic data processing equipment or media** to operate provided that such failure is the direct result of a **cyber event** directed at the Named Insured; or

b)      The Insured's reasonable action to temporarily protect the Insured's **electronic data processing equipment or media** against an actual or immediately impending **cyber event** directed at the Named Insured, provided such action is necessary to prevent failure of the Insured's **electronic data processing equipment or media** to operate.

While anywhere within this Policy's Territory.

As respects item a) above, this coverage will apply when the Period of Liability below is in excess of the Qualifying Period shown in the Declarations section of this Policy.

The Period of Liability for this Business Interruption Coverage Extension will be:

a)      The period of time starting when the Insured's **electronic data processing equipment or media** fails to operate and ending when with due diligence and dispatch, the Insured's **electronic data processing equipment or media** could be restored to the same or equivalent operating condition that existed prior to the failure; and

**EX02-073**





b) Does not include the additional time to make changes to the Insured's **electronic data processing equipment or media.**

## 11. Data Service Provider - Business Interruption

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at a **location of off-premises data processing or data transmission services,** when the interruption is caused by any accidental event at the facilities of the provider of such services, while anywhere within this Policy's Territory, that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Additional Coverage an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This coverage will apply when the Period of Liability of **off-premises data processing or data transmission services** below is in excess of the Qualifying Period shown in the Declarations section of this Policy.

Additional General Conditions:

a) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

b) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Coverage provided in this Extension is excluded from coverage elsewhere in this Policy.

This Extension does not cover the Business Interruption Coverage loss incurred by the Insured covered by Owned Network Interruption coverage as provided in this section of this Policy.

Data Service Provider - Business Interruption Exclusions: As respects Data Service Provider - Business Interruption, the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

a) The period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the Period of Liability clause in this section.

b) Is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

c) Does not extend to include the interruption of operations caused by any reason other than interruption of the provided service(s).

# SUPPLEMENTAL UNITED STATES
# CERTIFIED ACT OF TERRORISM ENDORSEMENT

This Endorsement is applicable to all insured locations in the United States, its territories and possessions and the Commonwealth of Puerto Rico.

Coverage for "Certified Act of Terrorism" Under The Terrorism Risk Insurance Act of 2002, as amended.

In consideration of a premium charged of $0, this Policy, subject to the terms and conditions therein and in this Endorsement, covers direct physical loss or damage to insured property and any resulting Business Interruption loss, as provided in the Policy, caused by or resulting from a Certified Act of Terrorism as defined herein.

Notwithstanding anything contained elsewhere in this Policy, any exclusion or limitation of terrorism in this Policy and any endorsement attached to and made a part of this Policy, is hereby amended to the effect that such exclusion or limitation does not apply to a "Certified Act of Terrorism" as defined herein.
This amendment does not apply to any limit of liability for a Certified Act of Terrorism, if any, stated under any Sub-Limits clause in the Declarations section of this Policy.

With respect to any one or more Certified Act(s) of Terrorism, this Company will not pay any amounts for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act of 2002 (including subsequent action of Congress pursuant to the Act) which includes a provision stating that if the aggregate insured losses exceed $100,000,000,000 during any calendar year, neither the United States Government nor any insurer that has met its insurer deductible shall be liable for the payment of any portion of the amount of such losses that exceed $100,000,000,000. If the aggregate insured losses for all insurers exceed $100,000,000,000, your coverage may be reduced.

The coverage provided under this Endorsement for "Certified" losses caused by acts of terrorism will be partially reimbursed by the United States Government under a formula established by Federal Law.  Under this formula, the United States pays 85% (and beginning on January 1, 2016, shall then decrease by 1 percentage point per calendar year until equal to 80 percent) of covered terrorism losses exceeding a statutorily established retention by the insurer referenced in this Policy.  The premium charged for this coverage is provided above.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

The coverage provided by this Endorsement only applies to a Certified Act of Terrorism.

Reference and Application:  The following term(s) means:

Certified Act of Terrorism:

A "Certified Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002 as amended and extended in 2005, 2007 and in 2015.  The criteria contained in that Act for a "Certified Act of Terrorism" include the following:

    a.   The act resulted in aggregate losses in excess of $5,000,000; and

    b.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

7312 (1/15)                                      Page 1 of 1

**EX02-075**

 

# ARIZONA

# AMENDATORY ENDORSEMENT

With respect to any insured location in the State of Arizona this policy is amended:

**ASSIGNMENT** – This policy may not be assigned without the Company's written consent.

**CANCELLATION** – This policy may be cancelled by the named insured by mailing to the Company written notice stating when thereafter such cancellation shall be effective.

The Company may cancel this policy. However, if this policy has been in effect for 45 days or more, or if it is a renewal of a policy issued by the Company, effective immediately, the Company may cancel this policy only if one or more of the following reasons applies:

1. Nonpayment of premium;

2. Conviction of the Named Insured of a crime arising out of acts increasing the hazard insured against;

3. Acts or omissions by the Named Insured or their representative constituting fraud or material misrepresentation in obtaining this policy, in continuing this policy or in presenting a claim under this policy;

4. A substantial change in the risk assumed, except to the extent that the Company should reasonably have foreseen the change or contemplated the risk in writing the contract;

5. A substantial breach of contractual duties or conditions;

6. Loss of reinsurance applicable to the risk insured against, but only if the absence of reinsurance has resulted from termination of treaty or facultative reinsurance initiated or implemented by the reinsurer or reinsurers of the Company issuing the policy;

7. A determination by the Director of Insurance that the continuation of this policy would place the Company in violation of the insurance laws of this state, or would jeopardize the solvency of the Company; or

8. Acts or omissions by the company or the Named Insured's representative which materially increase the hazard insured against.

The Company will give the Named Insured and their agent notice of cancellation at least 45 days before the cancellation is to take effect, except 10 days of notice is required where cancellation is for nonpayment of premium.

The cancellation notice must include the reason or reasons for cancellation.

**ANNIVERSARY CANCELLATION** – The Company may cancel this policy or coverage on any anniversary date by giving the Named Insured and their agent notice at least 45 days prior to the anniversary date on which cancellation is to be effective.

**NONRENEWAL** - If the Company decides not to renew this policy, it will give the Named Insured and their agent notice of nonrenewal at least 45 days before the end of the policy period.

AFM 6487 (04/15)                                                                                    Page 1 of 2

**EX02-077**



Notice of nonrenewal is not required if the Named Insured has obtained replacement coverage or has agreed in writing to obtain replacement coverage, or if this Company or another company in the same insurance group have offered to issue a renewal policy.

**RENEWAL** – The Company will give the Named Insured written notice at least 45 days before expiration of this policy if it decides to renew this policy subject to any of the following:

1.   Premium increase;

2.   Change in deductible;

3.   Reduction in limits; or

4.   Substantial reduction in coverage.

If the Company fails to provide the 45 days of notice, the coverage provided to the Named Insured shall remain in effect until notice is given or until the effective date of replacement coverage obtained by the Named Insured, whichever occurs first.

**NOTICE** – Our notice of cancellation, nonrenewal, or renewal subject to the changes listed above will be mailed to the Named Insured by certified mail at the address shown in the policy, or to the last known address of the Named Insured.  Proof of mailing to the Named Insured at the address shown in this Policy is sufficient proof of notice.

 

# CALIFORNIA

# AMENDATORY ENDORSEMENT

With respect to any insured location in the State of California this policy is amended:

**CANCELLATION** - The Insured may cancel this policy by returning it to the Company or by giving it written notice and stating at what future date coverage is to cease.

During the first 60 days this policy is in effect, the Company may cancel it or one or more of its parts for any reason. The Company will give the Insured notice at least 30 days before the cancellation takes effect.

After this policy has been in effect 60 days, or if it is a renewal of a policy issued by the Company it may cancel only for one or more of the following reasons:

1.  The premium has not been paid when due;

2.  Discovery of fraud or material misrepresentation in obtaining this insurance, or in pursuing a claim under this policy;

3.  A judgment by a court or an administrative tribunal that the Insured has violated a law of this state or the United States involving an act that materially increases a hazard insured against;

4.  Discovery of willful or grossly negligent acts or omissions or of violations of state laws are regulations establishing safety standards, that materially increase a hazard insured against;

5.  Failure to implement reasonable loss control requirements which the Insured agreed to as a condition of the issue of this policy, or which were required in order to qualify for a particular rate or rating plan, if the failure materially increases a hazard insured against;

6.  A determination by the Insurance Commissioner that the loss of, or changes in, the Company reinsurance would threaten its financial integrity or solvency;

7.  A determination by the Insurance Commissioner that a continuation of this policy would place the Company in violation of the law or that continuation of coverage would threaten its solvency; or

8.  A change in the Insured's activities or property which results in a materially added, increased or changed hazard that is not included in the policy.

If the premium has not been paid when due or if fraud is discovered, the Company will give the Insured notice at least 10 days before the cancellation takes effect. If the Company cancels for one of the reasons described under items 3 through 8 of this condition, the Company will give the insured notice at lease 30 days before the cancellation takes effect.

The Company may cancel this policy by delivering or mailing written notice to the producer of record and to the Insured's mailing address last known to it. The notice will state the time that the cancellation is to take effect and include the reason for cancellation.

The Insured's return premium, if any, will be calculated according to the Company rules. It will be refunded to the Insured with the cancellation notice or within a reasonable time. Payment or tender of the unearned premium is not a condition of cancellation.

**NONRENEWAL AND RENEWAL WITH ALTERED TERMS** – The Company may elect not to renew or continue this policy by delivering or mailing written notice to the producer of record and to the Insured's mailing address last known to it. The notice will include the reason for the company action.



The Company will give the Insured notice at lease 60 days, but not more than 120 days, before the expiration or anniversary date.

The Company will give the Insured the same number of days notice if it offers to renew this policy subject to a reduction of limits, elimination of coverages, an increase in deductibles, or an increase of more than 25 percent in the rate upon which the premium is based.

The Company is not required to send a notice of nonrenewal if:

1.  This policy is transferred to or renewed by another insurer in its insurance group without changing policy "terms" or the rate on which the premium is based;

2.  The policy has been extended for 90 days or less after notice was given in accordance with the requirements of this condition;

3.  The Insured has obtained replacement coverage or have agreed in writing to obtain replacement coverage within 60 days of the termination of this policy;

4.  This policy was issued for a term of 60 days or less and the Insured were notified when the policy was issued that it would not be renewed;

5.  The Insured requests a change in "terms" or hazards covered within 60 days of the end of the policy period; or

6.  In accordance with the requirements of this condition, the Company has made a written offer to renew the policy with changed "terms" or at a change to the rate on which the premium is based.

**REQUIREMENTS IN CASE LOSS OCCURS** – After a covered loss, the Company shall provide, free of charge, a complete, current copy of this policy within 30 calendar days of receipt of a request from the Insured. The time period for providing this policy may be extended by the Insurance Commissioner. An Insured who does not experience a covered loss shall, upon request, be entitled to one free copy of this policy annually. The policy provided to the Insured shall include, where applicable, the policy declarations page.

 

# HAWAII

# AMENDATORY ENDORSEMENT

With respect to any insured location in the State of Hawaii this policy is amended:

## CANCELLATION

1.  This Policy may be cancelled at any time at the request of the Insured by: surrendering this Policy to the Company; or giving written notice to the Company stating when such cancellation will take effect.

2.  The Company may cancel this Policy prior to the expiration of the agreed term, or one year from the effective date of the Policy or renewal, whichever is less, only for one or more of the following reasons, by delivering to the Insured written notice of cancellation at least 30 days before the effective date of cancellation:

    a.  Nonpayment of premium;

    b.  Fraud or material misrepresentation;

    c.  Substantial increase in the risk hazard, except to the extent that the Company should have reasonably foreseen the change when entering into the contract;

    d.  Substantial breaches of contractual duties, conditions or warranties;

    e.  Violation of any local fire, health or safety statute or ordinance;

    f.  Conviction of the Insured for a crime having as one of its necessary elements, an act increasing any hazard that is insured against;

    g.  Determination by the insurance commissioner that the continuation of the policy places us in violation of chapter 431, Hawaii Revised Statutes; or

    h.  Any good faith reason with the approval of the insurance commissioner.

3.  Return of any unearned premium will be calculated:  on the customary short rate basis if the Insured cancels; or on a pro-rata basis if the Company cancels this Policy. Return of unearned premium will be made by the Company as soon as practicable.

## NONRENEWAL

1.  If the Company decides not to renew this Policy, it will mail or deliver to the Insured written notice of nonrenewal, stating the reasons for nonrenewal, at least 45 days prior to the expiration of this Policy.

2.  Any notice of nonrenewal will be mailed or delivered to the Insured's last mailing address known to the Company.  If notice is mailed, proof of mailing will be sufficient proof of notice.

                                                    

# NEVADA

# AMENDATORY ENDORSEMENT

With respect to any insured location in the State of Nevada this policy is amended:

**CANCELLATION** - If this policy has been in effect for at least 70 days or is a renewal of a policy issued by this Company, it may cancel this policy only on any anniversary date or if one or more of the following reasons apply:

1. Failure to pay a premium when due;

2. Conviction of the insured of a crime arising out of acts increasing the hazard insured against;

3. Discovery of fraud or material misrepresentation in the obtaining of this policy or in the presentation of a claim thereunder;

4. Discovery of:

    a. An act or omission; or

    b. A violation of any condition of the policy, which occurred after the first effective date of the current policy and substantially and materially increases the hazard insured against;

5. A material change in the nature or extent of the risk, occurring after the first effective date of the current policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

6. A determination by the Commissioner that continuation of the Insurer's present volume of premiums would jeopardize the insurer's solvency or be hazardous to the interests of policyholders of the insurer, its creditors or the public; or

7. A determination by the Commissioner that the continuation of this policy would violate or place the Company in violation of any provision of the code.

This Company will deliver or mail the written notice of cancellation at least 10 days before the cancellation is to take effect when the reason for cancellation is nonpayment of premium. It will deliver or mail to the Named Insured written notice of cancellation at least 30 days before the cancellation is to take effect, except when the reason for cancellation is nonpayment of premium. This Company may cancel the policy on any anniversary date by delivering or mailing written notice of cancellation at least 60 days before the policy anniversary date.

The notice must be accompanied by the written explanation of the specific reasons for the cancellation. Return of any unearned premium will be calculated: on a pro-rata basis if the Policy is cancelled. Return of unearned premium will be made by this Company as soon as practicable.

**NONRENEWAL** - If this Company decides not to renew this policy, it will deliver or mail to the Named Insured written notice of nonrenewal at least 60 days before the policy expiration date. The notice must be accompanied by a written explanation of the specific reasons for nonrenewal. Notice of nonrenewal is not required if the Insured has accepted replacement coverage of has requested or agreed to nonrenewal.

**APPRAISAL** – The appraisal agreement as found in the Appraisal clause in this policy is voluntary between the insured and this Company.

**EX02-083**

EXECUTIVE DEPARTMENT
STATE OF CALIFORNIA

EXECUTIVE ORDER N-33-20

WHEREAS on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

WHEREAS in a short period of time, COVID-19 has rapidly spread throughout California, necessitating updated and more stringent guidance from federal, state, and local public health officials; and

WHEREAS for the preservation of public health and safety throughout the entire State of California, I find it necessary for all Californians to heed the State public health directives from the Department of Public Health.

NOW, THEREFORE, I, GAVIN NEWSOM, Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8627, and 8665 do hereby issue the following Order to become effective immediately:

IT IS HEREBY ORDERED THAT:

1) To preserve the public health and safety, and to ensure the healthcare delivery system is capable of serving all, and prioritizing those of the highest risk and vulnerability, all residents are directed to immediately heed the current State public health directives, which I ordered the Department of Public Health to develop for the current statewide status of COVID-19. Those directives are consistent with the March 19, 2020, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, found at: https://covid19.ca.gov/. Those directives follow:

ORDER OF THE STATE PUBLIC HEALTH OFFICER
March 19, 2020

To protect public health, I as State Public Health Officer and Director of the California Department of Public Health order all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors, as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19. In addition, and in consultation with the Director of the Governor's Office of Emergency Services, I may designate additional sectors as critical in order to protect the health and well-being of all Californians.

Pursuant to the authority under the Health and Safety Code 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this order is to go into effect immediately and shall stay in effect until further notice.

The federal government has identified 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or

destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. I order that Californians working in these 16 critical infrastructure sectors may continue their work because of the importance of these sectors to Californians' health and well-being.

This Order is being issued to protect the public health of Californians. The California Department of Public Health looks to establish consistency across the state in order to ensure that we mitigate the impact of COVID-19. Our goal is simple, we want to bend the curve, and disrupt the spread of the virus.

The supply chain must continue, and Californians must have access to such necessities as food, prescriptions, and health care. When people need to leave their homes or places of residence, whether to obtain or perform the functions above, or to otherwise facilitate authorized necessary activities, they should at all times practice social distancing.

2) The healthcare delivery system shall prioritize services to serving those who are the sickest and shall prioritize resources, including personal protective equipment, for the providers providing direct care to them.

3) The Office of Emergency Services is directed to take necessary steps to ensure compliance with this Order.

4) This Order shall be enforceable pursuant to California law, including, but not limited to, Government Code section 8665.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

IN WITNESS WHEREOF I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 19th day of March 2020.

GAVIN NEWSOM
Governor of California

ATTEST:

ALEX PADILLA
Secretary of State



**SONIA Y. ANGELL, MD, MPH**
*State Public Health Officer & Director*

State of California—Health and Human Services Agency
# California Department of Public Health



**GAVIN NEWSOM**
*Governor*

### Statewide Public Health Officer Order,
### July 13, 2020

On March 19, 2020, I issued an order directing all individuals living in the State of California to stay at home except as needed to facilitate authorized, necessary activities or to maintain the continuity of operations of critical infrastructure sectors. I then set out California's path forward from this "Stay-at-Home" Order in California's Pandemic Resilience Roadmap. On May 7th, I announced that statewide data supported the gradual movement of the entire state into Stage 2 of the Pandemic Resilience Roadmap. On May 8th, the Governor outlined a process where counties that met specific criteria could move more quickly than other parts of the state through Stage 2 of modifying the Stay-at-Home order, including certain businesses deemed higher risk.

The statewide data has since demonstrated a significant increase in the spread of COVID-19, resulting in public health conditions that demand measures responsive to those conditions be put into place with haste. On June 28, 2020, the California Department of Public Health (CDPH) issued guidance setting forth the need to close bars and similar establishments in counties that – due to concerning levels of disease transmission, hospitalizations, or insufficient testing – had been on the County Monitoring List, which includes counties that show concerning levels of disease transmission, hospitalizations, insufficient testing, or other critical epidemiological markers, for 14 days. On July 1, 2020, CDPH issued guidance specific to counties on the County Monitoring List for three consecutive days, requiring closure of the indoor operations of various sectors, including restaurants, wineries, and certain entertainment venues, as well as all bars indoor and outdoor. Based on my judgment as the State Public Health Officer, it is now necessary to take these steps statewide, to take additional steps for counties on the County Monitoring List, and to continue to monitor and modify the process of reopening.

The current data reflect that community spread of infection is of increasing concern across the state. On July 1, 2020, there were 19 counties on the County Monitoring List. As of July 13, 2020, there are 32 counties on the list, and additional counties may soon be added as data warrants. In addition to the impact on the general population, community spread increases the likelihood of expanded transmission of COVID-19 in congregate settings such as nursing homes, homeless shelters, jails and prisons. Infection of these vulnerable populations in these settings can be catastrophic. Higher



EX03-003

levels of community spread also increase the likelihood of infection among individuals at high risk of serious outcomes from COVID-19, including the elderly and those with underlying health conditions who might live or otherwise interact with an infected individual.

The Pandemic Resilience Roadmap classifies bars, pubs, breweries, brewpubs, dine-in restaurants, wineries and tasting rooms, family entertainment centers, zoos, museums, and cardrooms as Stage 2 or Stage 3 sectors with high risk of transmission due to a number of features of the businesses and the behaviors that occur within them. Public health studies have shown that the risk of transmission is exacerbated in indoor spaces, particularly when lacking appropriate ventilation. These sectors are settings where groups convene and may mix with others for a prolonged period of time, increasing the risk of escalating the transmission rate of COVID-19. While physical distancing is critical to mitigating exposure, it is more effective at protecting an individual with brief exposures or outdoor exposures. In contrast to indoor spaces, wind and the viral dilution in outdoor spaces can help reduce viral load.

Bars, both indoor and outdoor, have additional risk factors. A bar, foundationally, is a social setting where typically not only small groups convene, but also where groups mix with other groups. Bars also have an added risk imposed by the consumption of alcohol as a primary activity offered in such venues. Alcohol consumption slows brain activity, reduces inhibition, and impairs judgment, factors which contribute to reduced compliance with recommended core personal protective measures, such as the mandatory use of face coverings and maintaining six feet of distance from people in different households, both indoors and outdoors. Louder environments and the cacophony of conversation that are typical in bar settings also require raised voices and greater projection of orally emitted viral droplets.

For counties on the County Monitoring List, the risks and impacts of disease transmission are even greater. The science suggests that for indoor operations the odds of an infected person transmitting the virus are dramatically higher compared to an open-air environment. Thus, for those counties on the list, it is necessary to close indoor operations for additional sectors which promote the closed-space mixing of populations beyond households and/or make adherence to physical distancing with face coverings difficult, including: gyms and fitness centers, places of worship, protests, offices for non-Critical Infrastructure sectors as designated on covid19.ca.gov, personal care services (including nail salons, massage parlors, and tattoo parlors), hair salons and barbershops, and malls.

EX03-004

**NOW, THEREFORE, I, as State Public Health Officer and Director of the California Department of Public Health, order all of the following:**

### Statewide Order Relative to Bars, Pubs, Brewpubs, and Breweries

1. Bars, pubs, brewpubs, and breweries, whether operating indoors or outdoors, shall be closed across the state, unless an exception below applies.

   a. Bars, pubs, brewpubs, and breweries, may operate outdoors if they are offering sit-down, outdoor, dine-in meals. Alcohol can be sold only in the same transaction as a meal. When operating outdoors, they must follow the dine-in restaurant guidance and should continue to encourage takeout and delivery service whenever possible.

   b. Bars, pubs, brewpubs, and breweries that do not provide sit-down meals themselves, but can contract with another vendor to do so, can serve dine-in meals when operating outdoors provided both businesses follow the dine-in restaurant guidance and alcohol is sold only in the same transaction as a meal.

   c. Venues that are currently authorized to provide off sale beer, wine, and spirits to be consumed off premises and do not offer sit-down, dine-in meals must follow the guidance for retail operations and offer curbside sales only.

   d. Concert, performance, or entertainment venues must remain closed until they are allowed to resume modified or full operation through a specific reopening order or guidance. Establishments that serve full meals must discontinue this type of entertainment until these types of activities are allowed to resume modified or full operation.

2. Indoor operations shall be restricted across the state as specified below:

   a. Dine-in restaurants must close indoor seating to customers. During this closure all dine-in restaurants may continue to utilize outdoor seating and must comply with the guidance for outdoor dining. Restaurants should continue to encourage takeout and delivery service whenever possible.

   b. Wineries and tasting rooms must close indoor services to customers. During this closure all wineries and tasting rooms operating outdoors must comply with the guidance for restaurants, wineries, and bars.

   c. Family entertainment centers and movie theaters must close indoor services and attractions to customers.

      1. Family entertainment centers may continue to provide outdoor services and attractions to customers, and must comply with the guidance for movie theaters and family entertainment centers.

      2.  Drive-in movie theaters may continue to operate and should follow additional applicable guidance for <u>drive-in movie theaters</u>.

  d.  Indoor attractions at zoos and museums must close to visitors.

      1.  Zoos and museums may continue to operate outdoor attractions and must follow the <u>guidance for zoos and museums</u>.

  e.  Cardrooms must close indoor services to customers and must follow the <u>guidance for cardrooms</u>.

## Order for Closure of Additional Indoor Sectors for Counties on Monitoring List

3. Counties that currently appear on CDPH's County Monitoring List and have been on the list for three consecutive days, and counties that subsequently appear for three consecutive days or more while this order remains effective, must close all indoor operations of the following types of businesses/events/activities:

  a.  Gyms and Fitness Centers
  b.  Places of Worship
  c.  Protests
  d.  Offices for <u>Non-Critical Infrastructure Sectors</u>
  e.  Personal Care Services (including nail salons, massage parlors, and tattoo parlors)
  f.  Hair salons and barbershops
  g.  Malls

## Terms of Orders

4. This order shall go into effect immediately.

5. These closures shall remain in effect until I determine it is appropriate to modify the order based on public health conditions.

6. Outdoor operations may be conducted under a tent, canopy, or other sun shelter but only as long as no more than one side is closed, allowing sufficient outdoor air movement.

7. I will continue to monitor the epidemiological data and will modify the sectors that may be open both statewide and in counties on the Monitoring List as required by the evolving public health conditions. If I determine that it is appropriate to reopen, close, or modify the operations of any additional sectors, those sectors will be posted at: https://covid19.ca.gov/roadmap-counties/.

8. My <u>guidance</u> mandating the wearing of face coverings and my <u>guidance</u> prohibiting gatherings continue to apply statewide, except as specifically permitted in other orders or guidance documents. To prevent further spread of COVID-19 to and within other

EX03-006

jurisdictions within the State, Californians should not travel significant distances and should stay close to home.

9. This order is issued pursuant to the authority under EO N-60-20, and Health and Safety Code sections 120125, 120130(c), 120135, 120140, 120145, 120150, 120175,120195 and 131080.

Sonia Y Angell, MD, MPH
State Public Health Officer & Director
California Department of Public Health

Blueprint for a Safer Economy - Coronavirus COVID-19 Response

https://covid19.ca.gov/safer-economy/



California has a blueprint for reducing COVID-19 in the state with revised criteria for loosening and tightening restrictions on activities.

## Find the status of activities in your county

County

| los angeles |

Activity

| Restaurants (dine-in) |

GET LATEST STATUS

---

### Alameda

WIDESPREAD

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

---

### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance

---

### Alpine

MINIMAL

Most indoor business operations are open with

EX03-008

modifications Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open indoors with modifications – Max 50% capacity

View industry guidance

## Amador

WIDESPREAD

Many non-essential indoor business operations are closed Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance

## Butte

WIDESPREAD

Many non-essential indoor business operations are closed Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance

## Calaveras



**SUBSTANTIAL**

Some non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open indoors with modifications
– Max 25% capacity or 100 people, whichever is fewer

View industry guidance

## Colusa

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance

## Contra Costa

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance

EX03-010

Blueprint for a Safer Economy - Coronavirus COVID-19 Response                    https://covid19.ca.gov/safer-economy/

## Del Norte



Some indoor business operations are open with
modifications Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open indoors with modifications
– Max 50% capacity or 200 people, whichever is fewer

View industry guidance

---

## El Dorado

SUBSTANTIAL

Some non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open indoors with modifications
– Max 25% capacity or 100 people, whichever is fewer

View industry guidance

---

## Fresno

WIDESPREAD

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open outdoors only with modifications

EX03-011

Blueprint for a Safer Economy - Coronavirus COVID-19 Response

https://covid19.ca.gov/safer-economy/

View industry guidance



### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance



### Restaurants (dine-in)

Can open indoors with modifications
— Max 50% capacity or 200 people, whichever is fewer

View industry guidance



**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

## Inyo

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

---

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

## Kern

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

---

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

Blueprint for a Safer Economy - Coronavirus COVID-19 Response          https://covid19.ca.gov/safer-economy/

## Kings

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance

## Lake

**SUBSTANTIAL**

Some non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open indoors with modifications
− Max 25% capacity or 100 people, whichever is fewer

View industry guidance

## Lassen

**SUBSTANTIAL**

Some non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open indoors with modifications
− Max 25% capacity or 100 people, whichever is fewer

EX03-014

Blueprint for a Safer Economy - Coronavirus COVID-19 Response

https://covid19.ca.gov/safer-economy/

View industry guidance

---

## Los Angeles

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

---

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

## Madera

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

---

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

## Marin

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

---

**Restaurants (dine-in)**

EX03-015

Blueprint for a Safer Economy - Coronavirus COVID-19 Response                    https://covid19.ca.gov/safer-economy/

Can open outdoors only with modifications

View industry guidance

---

### Mariposa



MODERATE

Some indoor business operations are open with
modifications Understand the data.

Counties can restrict further. Check your county website.

---

### Restaurants (dine-in)

Can open indoors with modifications
– Max 50% capacity or 200 people, whichever is fewer

View industry guidance



### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance



Merced

WIDESPREAD

Many non-essential indoor business operations are closed.
Understand the data.

Counties can restrict further. Check your county website.

EX03-016

Blueprint for a Safer Economy - Coronavirus COVID-19 Response          https://covid19.ca.gov/safer-economy/

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

# Modoc

MINIMAL

Most indoor business operations are open with modifications Understand the data.

Counties can restrict further. Check your county website.

---

**Restaurants (dine-in)**

Can open indoors with modifications – Max 50% capacity

View industry guidance

---

# Mono



Some indoor business operations are open with modifications Understand the data.

Counties can restrict further. Check your county website.

---

**Restaurants (dine-in)**

Can open indoors with modifications
– Max 50% capacity or 200 people, whichever is fewer

View industry guidance

---

# Monterey

WIDESPREAD

Many non-essential indoor business operations are closed
Understand the data.

EX03-017

> Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance

---

## Napa

**SUBSTANTIAL**

Some non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open indoors with modifications
— Max 25% capacity or 100 people, whichever is fewer

View industry guidance

---

## Nevada

**SUBSTANTIAL**

Some non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open indoors with modifications
— Max 25% capacity or 100 people, whichever is fewer

View industry guidance

---

## Orange

Blueprint for a Safer Economy - Coronavirus COVID-19 Response                    https://covid19.ca.gov/safer-economy/

---

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

---

### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance

---

## Placer

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

---

### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance

---

## Plumas

**MODERATE**

Some indoor business operations are open with
modifications Understand the data.

Counties can restrict further. Check your county website.

---

### Restaurants (dine-in)

Can open indoors with modifications
– Max 50% capacity or 200 people, whichever is fewer

View industry guidance

---

EX03-019

Blueprint for a Safer Economy - Coronavirus COVID-19 Response                         https://covid19.ca.gov/safer-economy/

## Riverside

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance

---

## Sacramento

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance

---

## San Benito

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance

EX03-020

Blueprint for a Safer Economy - Coronavirus COVID-19 Response       https://covid19.ca.gov/safer-economy/

## San Bernardino

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

## San Diego

**SUBSTANTIAL**

Some non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

**Restaurants (dine-in)**

Can open indoors with modifications
– Max 25% capacity or 100 people, whichever is fewer

View industry guidance

## San Francisco



**SUBSTANTIAL**

Some non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

**Restaurants (dine-in)**

Can open indoors with modifications

Blueprint for a Safer Economy - Coronavirus COVID-19 Response          https://covid19.ca.gov/safer-economy/

– Max 25% capacity or 100 people, whichever is fewer

View industry guidance

---

### San Joaquin

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

---

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

### San Luis Obispo

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

---

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

### San Mateo

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

**EX03-022**

Blueprint for a Safer Economy - Coronavirus COVID-19 Response     https://covid19.ca.gov/safer-economy/

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

## Santa Barbara

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

---

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

## Santa Clara

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

---

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

EX03-023

Blueprint for a Safer Economy - Coronavirus COVID-19 Response          https://covid19.ca.gov/safer-economy/



### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance

---



## Shasta

**MODERATE**

Some indoor business operations are open with modifications Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open indoors with modifications
– Max 50% capacity or 200 people, whichever is fewer

View industry guidance

---



### Restaurants (dine-in)

Can open indoors with modifications
– Max 25% capacity or 100 people, whichever is fewer

**EX03-024**

Blueprint for a Safer Economy - Coronavirus COVID-19 Response                https://covid19.ca.gov/safer-economy/

View industry guidance

---

### Siskiyou



MODERATE

Some indoor business operations are open with
modifications Understand the data.

Counties can restrict further. Check your county website.

---

**Restaurants (dine-in)**

Can open indoors with modifications
– Max 50% capacity or 200 people, whichever is fewer

View industry guidance

---

### Solano

WIDESPREAD

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

---

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

### Sonoma

WIDESPREAD

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

EX03-025

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

**Stanislaus**

WIDESPREAD

Many non-essential indoor business operations are closed

Understand the data

Counties can restrict further. Check your county website.

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

**Sutter**

WIDESPREAD

Many non-essential indoor business operations are closed

Understand the data

Counties can restrict further. Check your county website.

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

Blueprint for a Safer Economy - Coronavirus COVID-19 Response

https://covid19.ca.gov/safer-economy/

## Tehama

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance

## Trinity



Some indoor business operations are open with
modifications Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open indoors with modifications
– Max 50% capacity or 200 people, whichever is fewer

View industry guidance

## Tulare

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open outdoors only with modifications

EX03-027

Blueprint for a Safer Economy - Coronavirus COVID-19 Response                    https://covid19.ca.gov/safer-economy/

View industry guidance



## Tuolumne

**MODERATE**

Some indoor business operations are open with
modifications Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open indoors with modifications
– Max 50% capacity or 200 people, whichever is fewer

View industry guidance



Ventura

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

### Restaurants (dine-in)

Can open outdoors only with modifications

View industry guidance



Yolo

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

### Yuba

**WIDESPREAD**

Many non-essential indoor business operations are closed
Understand the data.

Counties can restrict further. Check your county website.

---

**Restaurants (dine-in)**

Can open outdoors only with modifications

View industry guidance

---

| County risk level | New cases | Positive tests |
|---|---|---|
| **WIDESPREAD** <br> Many non-essential indoor business operations are closed | **More than 7** <br> daily new cases (per 100k) | **More than 8%** <br> Positive tests |
| **SUBSTANTIAL** <br> Some non-essential indoor business operations are closed | **4 - 7** <br> daily new cases (per 100k) | **5 - 8%** <br> Positive tests |
| **MODERATE** <br> Some indoor business operations are open with modifications | **1 - 3.9** <br> daily new cases (per 100k) | **2 - 4.9%** <br> Positive tests |
| **MINIMAL** <br> Most indoor business operations are open with modifications | **Less than 1** <br> daily new cases (per 100k) | **Less than 2%** <br> Positive tests |

Learn more about the tiers.

EX03-029

## Understand your county's status

Every county in California is assigned to a tier based on its rate of new cases and positivity. At a minimum, counties must remain in a tier for at least 3 weeks before moving forward. Data is reviewed weekly and tiers are updated on Tuesdays. To move forward, a county must meet the next tier's criteria for two consecutive weeks. If a county's metrics worsen for two consecutive weeks, it will be assigned a more restrictive tier. Public health officials are constantly monitoring data and can step in if necessary.



**Statewide Metrics**

Widespread
Substantial
Moderate
Minimal

**10.9**
New COVID-19
Positivity Rate
per 100K

SUBMIT

Stay home Q&A
**Blueprint for a Safer Economy**
What's open
Industry guidance
Local info and alerts

**COVID-19 hotline**
**1-833-422-4255**
M-F 8AM-8PM, Sa-Su 8AM-5PM

### Why can some activities and businesses open while others have to stay closed?                   +

### With this blueprint, what businesses are allowed to open immediately statewide that were previously closed?                   +

### What happened to the County Monitoring List?                   +

### What happens if my county's case rate and positivity measures fall into two different tiers?                   +

EX03-030



# County of San Diego

NICK MACCHIONE, FACHE
AGENCY DIRECTOR

**HEALTH AND HUMAN SERVICES AGENCY**
PUBLIC HEALTH SERVICES
3851 ROSECRANS STREET, MAIL STOP P-578
SAN DIEGO, CA 92110-3134
(619) 531-5800 · FAX (619) 542-4186

WILMA J. WOOTEN, M.D.
PUBLIC HEALTH OFFICER

## *AMENDED*
## ORDER OF THE HEALTH OFFICER
## AND EMERGENCY REGULATIONS

Pursuant to California Health and Safety Code sections 101040, 120175, and 120175.5 (b) the Health Officer of the County of San Diego (Health Officer) amends the Health Officer Order dated March 12, 2020 as of 12:00 a.m. on Monday March 16, 2020. The Health Officer **ORDERS AS FOLLOWS:**

Effective 12:00 a.m. on Monday, March 16, 2020, and continuing until 11:59 p.m. on March 31, 2020, the following will be in effect for San Diego County (county):

1. All public or private "gatherings," as defined in section 20 below, are prohibited. All non-essential gatherings of any size are strongly discouraged.

2. All bars, adult entertainment establishments, and other business establishments that serve alcohol and do not serve food, shall close.

3. All restaurants and other business establishments that serve food shall close all on-site dining. All food served shall be by delivery, or through pick-up or drive thru. Social distancing shall be required for persons picking up food on premises.

4. All businesses shall enact social distancing, increased sanitation standards, and shall make every effort to use telecommuting for its workforce. All businesses shall suspend any policy or procedure requiring doctor verification for sick or other leave approval.

5. All public or private schools, colleges, and universities shall not hold classes or other school activities where students gather on the school campus. Parents of school-aged minor children shall take steps to ensure said children are not participating in activities prohibited by the Order and that social distancing requirements are practiced.

6. A strong recommendation is made that all persons who are 65 years old or older, have a chronic underlying condition, or have a compromised immune system self-quarantine themselves at home.

EX03-032

7. "Non-essential personnel," as defined in section 20 below, are prohibited from entry into any hospital or long-term care facility. All essential personnel who show any potential signs or symptoms of COVID-19 shall be strictly prohibited from entry into hospitals or long-term care facilities.

8. Hospitals and healthcare providers shall take measures to preserve resources including delaying non-emergent or elective surgeries or procedures where feasible.

9. Hospitals, healthcare providers, and commercial testing laboratories shall report all COVID-19 test results to the Public Health Officer immediately after such results are received.

10. All persons arriving in the county, from locations as found on the Centers for Disease Control and Prevention (CDC) Warning Level 3 Travel Advisory shall be subject to 14-day home quarantine, self-monitoring. This includes originating or connecting flights through these countries and includes South Korea, Japan, Italy, China and Iran, and any other country that is subsequently added to that list, which is available at: (https://wwwnc.cdc.gov/travel/notices).

11. A strong recommendation is made for persons exhibiting symptoms of COVID-19 to self-isolate themselves in their place of residence unless seeking medical treatment.

12. This Order is issued as a result of the World Health Organization's declaration of a worldwide pandemic of COVID-19 disease, also known as "novel coronavirus," which has infected at least 179,165 individuals worldwide in 155 countries and is implicated in over 7,000 worldwide deaths.

13. This Order is issued based on the increasing transmission of COVID-19 in California and the significant risk of widespread introduction and transmission of COVID-19 into the county.

14. This Order is issued based on scientific evidence regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, as well as best practices as currently known and available to protect vulnerable members of the public from avoidable risk of serious illness or death resulting from exposure to COVID-19. The age, condition, and health of a significant portion of the population of the county places it at risk for serious health complications, including death, from COVID-19. Although most individuals who contract COVID-19 do not become seriously ill, persons with mild symptoms and asymptomatic persons with COVID-19 may place other vulnerable members of the public—such as older adults, and those with underlying health conditions—at significant risk.

15. This Order will reduce the likelihood that many individuals will be exposed to COVID-19, and will thereby slow the spread of COVID-19 in the county. By reducing the spread of

EX03-033

COVID-19, this Order will help preserve critical and limited healthcare capacity in the county.

16. This Order is issued in accordance with, and incorporates by reference: 1) the Declaration of Local Health Emergency issued by the Health Officer on February 14, 2020; 2) the Proclamation of Local Emergency issued by the County Director of Emergency Services on February 14, 2020; 3) the action of the County Board of Supervisors to ratify and continue both the local health emergency and local emergency on February 19, 2020; 4) the Proclamation of a State of Emergency issued by Governor of the State of California on March 4, 2020: 5) Executive Order N-25-20 issued by the Governor of the State of California on March 12, 2020 which orders that "All residents are to heed any orders and guidance of state and local health officials, including but not limited to the imposition of social distancing measures, to control COVID-19; and 6) Proclamation 9984 regarding COVID-19 issued by the President of the United States on March 11, 2020; and the Health Officer Order dated on March 12, 2020.

17. This Order is issued to prevent circumstances often present in gatherings that may exacerbate the spread of COVID-19, such as: 1) the increased likelihood that gatherings will attract people from a broad geographic area; 2) the prolonged time period in which large numbers of people are in close proximity; 3) the difficulty in tracing exposure when large numbers of people attend a single event; and 4) the inability to ensure that attendees follow adequate hygienic practices.

18. This Order comes after the release of substantial guidance from the Health Officer, the California Department of Public Health, the CDC, and other public health officials throughout the United States and around the world. On March 11, 2020, the California Department of Public Health recommended the cancellation or postponement of large gatherings.

19. This Order comes after the CDC issued: "Interim Additional Guidance for Infection Prevention and Control for Patients with Suspected or Confirmed COVID-19 in Nursing Homes."

20. For the purposes of this Order:
    a. "Gathering" is any event or convening that brings together 50 or more people in a single room or single space at the same time, such as an auditorium, stadium, arena, theater, church, casino, large conference room, meeting hall, cafeteria, or any other indoor or outdoor space.
    b. "Long term care facility" is a facility serving adults that require assistance with activities of daily living, including a skilled nursing facility, and that is licensed by the California Department of Community Care and Licensing, or the California Department of Public Health.
    c. "Non-essential personnel" are employees, contractors, or members of the public who do not perform treatment, maintenance, support, or administrative tasks deemed essential to the healthcare mission of the long-term care facility or hospital.

Page 3 of 5
ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

EX03-034

Non-essential personnel do not include first responders, nor State, federal, or local officials, investigators, or medical personnel carrying out lawful duties. Entry of visitors at long-term care facilities are allowed upon the approval of the facility's director, or designee, for the purpose of allowing family and friends to visit a resident in an end of life situation, or to allow parents or guardians to visit a child who is a patient, and where appropriate precautions by the facility that follow federal, State, and local public health guidance regarding COVID-19 are followed.

    d. "Social Distancing" is maintaining a six-foot separation from all persons except for family members.

    e. This Order does not prohibit:

        i. Operations at airports, public transportation or other spaces where 50 or more persons may be in transit but able to practice social distancing. It also does not include essential businesses where many people are present but are able to practice social distancing.

        ii. Emergency shelters, homeless shelters, or other similar essential gatherings that are for the protection of public health and safety and where appropriate precautions are taken that follow federal, State, and local public health guidance regarding COVID-19.

21. Gatherings of less than 50 people are strongly encouraged maintain social distancing pursuant to Department of Public Health guidelines.

22. Pursuant to Health and Safety Code section 120175.5 (b) all governmental entities in the county shall take necessary measures within the governmental entity's control to ensure compliance with this Order and to disseminate this Order to venues or locations within the entity's jurisdiction where a large gathering may occur.

23. Violation of this Order is subject to fine, imprisonment, or both. (California Health and Safety Code section 120295.)

24. To the extent necessary, this Order may be enforced by the Sheriff or chiefs of police pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029.

25. This Order shall be reevaluated and extended if appropriate on or before March 31, 2020.

**IS SO ORDERED:**

Date: March 16, 2020

                                 Wilma J. Wooten, M.D., M.P.H.
                                 Public Health Officer
                                 County of San Diego

EX03-035

## EMERGENCY REGULATIONS

As Director of Emergency Services for the County of San Diego, I am authorized to promulgate regulations for the protection of life and property pursuant to Government Code Section 8634 and San Diego County Code section 31.103.  The following shall be in effect for the duration of the Amended Health Officer Order issued above which is incorporated in its entirety by reference:

> The Amended Health Officer Order shall be promulgated as a regulation for the protection of life and property.

Any person who violates or who refuses or willfully neglects to obey this regulation is subject to fine, imprisonment, or both.  (Government Code section 8665.)

Date:  March 16, 2020

_____
Helen Robbins-Meyer
Chief Administrative Officer
Director of Emergency Services
County of San Diego

EX03-036



# County of San Diego

**NICK MACCHIONE, FACHE**
AGENCY DIRECTOR

**HEALTH AND HUMAN SERVICES AGENCY**
PUBLIC HEALTH SERVICES
3851 ROSECRANS STREET, MAIL STOP P-578
SAN DIEGO, CA 92110-3134
(619) 531-5800 • FAX (619) 542-4186

**WILMA J. WOOTEN, M.D.**
PUBLIC HEALTH OFFICER

## ORDER OF THE HEALTH OFFICER
## AND EMERGENCY REGULATIONS
### (Effective March 29, 2020)

Pursuant to California Health and Safety Code sections 101040, 120175, and 120175.5 (b) the Health Officer of the County of San Diego (Health Officer) **ORDERS AS FOLLOWS:**

Effective 12:00 a.m. on Sunday, March 29, 2020, and continuing until further notice, the following will be in effect for San Diego County (county):

1. Executive Order N-33-20 issued by the Governor of the State of California ("Executive Order") (available at: https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf ) ordered all individuals living in the State of California to stay home or at their place of residence, except as needed to maintain continuity of operations of sectors designated in the document available at: https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf) as updated by the State Public Health Officer . In conformance with, and where not superseded by the Executive Order, this Order additionally specifies and orders as follows:
   a. All public or private "gatherings," as defined in section 2 below, are prohibited.
   b. All bars, adult entertainment establishments, and other business establishments that serve alcohol and do not serve food shall be and remain closed.
   c. All restaurants and other business establishments that serve food shall close all on-site dining. All food served shall be by delivery, or through pick-up or drive thru. Social distancing shall be required for persons picking up food on site.
   d. All gyms and fitness centers shall be and remain closed.
   e. All businesses shall enact social distancing, increased sanitation standards, and shall make every effort to use telecommuting for its workforce. All businesses shall suspend any policy or procedure requiring doctor verification for sick or other leave approval.
   f. Government entities shall enforce social distancing requirements at all beaches and parks; if a government entity is unable to enforce social distancing at a beach or park, it shall be closed to the public.
   g. All public or private schools, colleges, and universities shall not hold classes or other school activities where students gather on the school campus. Parents of school-aged minor children shall take steps to ensure said children are not participating in

EX03-037

activities prohibited by this Order, or the Executive Order, and that social distancing requirements are practiced.

h. Daycare and childcare facilities shall operate under the following conditions: i) childcare must be carried out in stable groups of 10 or fewer ("stable" means that the same 10 or fewer children are in the same group each day); ii) children shall not change from one group to another; iii) if more than one group of children is cared for at one facility, each group shall be in a separate room; iv) groups shall not mix with each other; and v) childcare providers shall remain solely with one group of children.

i. A strong recommendation is made that all persons who are 65 years old or older, have a chronic underlying condition, or have a compromised immune system self-quarantine themselves at home.

j. "Non-essential personnel," as defined in section 2(c) below, are prohibited from entry into any hospital or long-term care facility. All essential personnel who show any potential signs or symptoms of COVID-19 shall be strictly prohibited from entry into hospitals or long-term care facilities.

k. Hospitals and healthcare providers shall take measures to preserve and prioritize resources including delaying non-emergent or elective surgeries or procedures where feasible.

l. Hospitals, healthcare providers, and commercial testing laboratories shall report all COVID-19 test results to the Public Health Officer immediately after such results are received.

m. All persons arriving in the county from international locations identified on the Centers for Disease Control and Prevention (CDC) Warning Level 2 or 3 Travel Advisory (available at: https://wwwnc.cdc.gov/travel/notices) shall be subject to 14-day home quarantine, self-monitoring.

n. A strong recommendation is made for persons exhibiting mild to moderate symptoms of COVID-19 to self-isolate themselves in their place of residence unless seeking medical treatment. A guide to symptoms is found here: https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html .

2. For purposes of this Order:

a. "Gathering" is any event or convening that brings together 10 or more people in a single room or single space at the same time, such as an auditorium, stadium, arena, theater, church, casino, conference room, meeting hall, cafeteria, or any other indoor or outdoor space. A gathering does not include:

    i. Operations at airports, public transportation or other spaces where 10 or more persons may be in transit but able to practice social distancing.

    ii. Operations at businesses included in the designated sectors referenced in section 1 above, where many people are present but are able to practice social distancing. Nor does it prohibit said businesses from having 10 or more employees in the same room when able to practice social distancing.

b. "Long term care facility" is a facility serving adults that require assistance with activities of daily living, including a skilled nursing facility, and that is licensed by the California Department of Community Care and Licensing, or the California Department of Public Health.

EX03-038

    c. "Non-essential personnel" for the purpose of section 1(j) above, are employees, contractors, or members of the public who do not perform treatment, maintenance, support, or administrative tasks deemed essential to the healthcare mission of the long-term care facility or hospital. Non-essential personnel do not include first responders, nor State, federal, or local officials, investigators, or medical personnel carrying out lawful duties. Entry of visitors to hospitals and long-term care facilities are allowed upon the approval of the facility's director, or designee, for the purpose of allowing family and friends to visit a resident such as in an end of life situation, to allow parents or guardians to visit a child who is a patient, or any other circumstances deemed appropriate by the facility director, or designee, and where appropriate precautions by the facility that follow federal, State, and local public health guidance regarding COVID-19 are followed.

    d. "Social distancing" is maintaining a six-foot separation from all persons except for household members and medical providers with the appropriate personal protection equipment.

3. This Order is issued as a result of the World Health Organization's declaration of a worldwide pandemic of COVID-19 disease, also known as "novel coronavirus."

4. This Order is issued based on scientific evidence regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, as well as best practices as currently known and available to protect vulnerable members of the public from avoidable risk of serious illness or death resulting from exposure to COVID-19. The age, condition, and health of a significant portion of the population of the county places it at risk for serious health complications, including death, from COVID-19. Although most individuals who contract COVID-19 do not become seriously ill, persons with mild symptoms and asymptomatic persons with COVID-19 may place other vulnerable members of the public— such as older adults, and those with underlying health conditions—at significant risk.

5. The actions required by this Order are necessary to reduce the number of individuals who will be exposed to COVID-19, and will thereby slow the spread of COVID-19 in the county. By reducing the spread of COVID-19, this Order will help preserve critical and limited healthcare capacity in the county and will save lives.

6. This Order is issued in accordance with, and incorporates by reference: a) the Declaration of Local Health Emergency issued by the Health Officer on February 14, 2020; b) the Proclamation of Local Emergency issued by the County Director of Emergency Services on February 14, 2020; c) the action of the County Board of Supervisors to ratify and continue both the local health emergency and local emergency on February 19, 2020; d) the Proclamation of a State of Emergency issued by the Governor of the State of California on March 4, 2020; e) Executive Order N-25-20 issued by the Governor of the State of California on March 12, 2020 which orders that "All residents are to heed any orders and guidance of state and local health officials, including but not limited to the imposition of social distancing measures, to control COVID-19"; f) Proclamation 9984 regarding COVID-19 issued by the

EX03-039

President of the United States on March 11, 2020; and g) Executive Order N-33-20 issued by the Governor of the State of California on March 19, 2020.

7.  This Order is issued to prevent circumstances often present in gatherings that may exacerbate the spread of COVID-19, such as: 1) the increased likelihood that gatherings will attract people from a broad geographic area; 2) the prolonged time period in which large numbers of people are in close proximity; 3) the difficulty in tracing exposure when large numbers of people attend a single event or are at a single location; and 4) the inability to ensure that such persons follow adequate hygienic practices.

8.  This Order comes after the release of substantial guidance from the Health Officer, the California Department of Public Health, the CDC, and other public health officials throughout the United States and around the world.

9.  This Order comes after the CDC issued: "Interim Additional Guidance for Infection Prevention and Control for Patients with Suspected or Confirmed COVID-19 in Nursing Homes."

10. Pursuant to Health and Safety Code section 120175.5 (b) all governmental entities in the county shall take necessary measures within the governmental entity's control to ensure compliance with this Order and to disseminate this Order to venues or locations within the entity's jurisdiction where gatherings may occur.

11. Violation of this Order is subject to fine, imprisonment, or both. (California Health and Safety Code section 120295.)

12. To the extent necessary, this Order may be enforced by the Sheriff or chiefs of police pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029.

13. Once this Order takes effect it shall supersede the Amended Order of the Health Officer and Emergency Regulations dated March 16, 2020 and subsequent addenda.

**IS SO ORDERED:**

Date: March 27, 2020

Wilma J. Wooten, M.D., M.P.H.
Public Health Officer
County of San Diego

EX03-040

## EMERGENCY REGULATIONS

As Director of Emergency Services for the County of San Diego, I am authorized to promulgate regulations for the protection of life and property pursuant to Government Code Section 8634 and San Diego County Code section 31.103. The following shall be in effect for the duration of the Health Officer Order issued above which is incorporated in its entirety by reference:

> The Health Officer Order shall be promulgated as a regulation for the protection of life and property.

Any person who violates or who refuses or willfully neglects to obey this regulation is subject to fine, imprisonment, or both. (Government Code section 8665.)

Date: March 27, 2020

Helen Robbins-Meyer
Chief Administrative Officer
Director of Emergency Services
County of San Diego

EX03-041



# County of San Diego

**HEALTH AND HUMAN SERVICES AGENCY**
PUBLIC HEALTH SERVICES

## ORDER OF THE HEALTH OFFICER
## AND EMERGENCY REGULATIONS
(Effective July 21, 2020)

Pursuant to California Health and Safety Code sections 101040, 120175, and 120175.5 (b) the Health Officer of the County of San Diego (Health Officer) **ORDERS AS FOLLOWS:**

Effective 12:00 a.m. on Tuesday, July 21, 2020 and continuing until further notice, the following will be in effect for San Diego County (county):

1. All persons are to remain in their homes or at their place of residence, except for employees or customers traveling to and from essential businesses, reopened businesses, or essential activities as defined in section 22, below, or to participate in individual or family outdoor activity as allowed by this Order.

2. All public or private "gatherings," as defined in section 22 below, are prohibited.

3. All businesses not meeting the definition of essential business or reopened business in section 22 below are referred to in this Order as "non-essential businesses" and shall be and remain closed for the duration of this Order. All essential businesses and reopened businesses must comply with the requirements of this Order. Notwithstanding the foregoing, any business may remain open if its employees and owners can provide its services from home, including by telecommuting, without direct contact with the public.

4. All public, charter and private schools shall not hold classes on the school campus, and shall conduct distance learning only as required by COVID-19 an Reopening In-Person Learning Framework for K-12 Schools in California, 2020-2021 School Year issued by the California Department of Health Services on July 17, 2020 availalble at {https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-

EX03-042

19/Schools%20Reopening%20Recommendations.pdf}.  Colleges and Universities shall not hold classes or other school activities where students gather on the school campus, except for research-related activities in colleges and universities and where necessary to train students who will serve as essential workers.

5. Child daycare and child care providers shall operate in compliance with the measures set forth in State COVID-19 Updated Guidance: Child Care Programs and Providers and shall prepare and post a Safe Reopening Plan pursuant to section 11, below.

6. "Non-essential personnel," as defined in section 22 below, are prohibited from entry into any hospital or long-term care facility.  All essential personnel who are COVID-19 positive or show any potential signs or symptoms of COVID-19 are strictly prohibited from entry into hospitals or long-term care facilities. Notwithstanding the foregoing, individuals requiring medical care for COVID-19 or related conditions may be admitted to hospitals or other medical facilities if the hospital or medical facility is appropriate for treating COVID-19 and has adequate precautions in place to protect its patients, medical personnel and staff.

7. Hospitals and <u>healthcare providers,</u> including dentists shall:
   a. Take measures to preserve and prioritize resources; and,
   b. May authorize and perform non-emergent or elective surgeries or procedures based on their determination of clinical need and supply capacity, and where consistent with State guidance.
   c. Nothing in this Order shall prevent physicians and other healthcare providers from conducting routine preventive care provided it conforms to any applicable State guidance.
   d. Nothing in this Order shall prevent dentists or dental hygienists from conducting routine preventive care provided it conforms to any applicable State guidance.

8. Hospitals, healthcare providers, pharmacies and commercial testing laboratories shall report all COVID-19 test results to the Public Health Officer immediately after such results are received.

9. All persons two years of age or older who are present in the county shall have possession of a face covering when they leave their home or place of residence and shall wear the face covering as described and required in California Department of Public Health Face Covering Guidance issued on June 18, 2020, (available at:

EX03-043

https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Guidance-for-Face-Coverings_06-18-2020.pdf).

10. All essential businesses that allow members of the public to enter a facility must prepare and post a "Social Distancing and Sanitation Protocol" on the form available at: https://www.sandiegocounty .gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/covid19/SOCIAL_DISTANCING_AND_SANITATION_PROTOCOL_04022020_V1.pdf ), or on a form required by another governmental entity requiring substantially similar information, for each of their facilities open to the public in the county. The Social Distancing and Sanitation Protocol must be posted at or near the entrance of the relevant facility, and shall be easily viewable by the public and employees. A copy of the Social Distancing and Sanitation Protocol must also be provided to each employee performing work at the facility. All essential businesses shall implement the Social Distancing and Sanitation Protocol and provide evidence of its implementation to any authority enforcing this Order upon demand. The Social Distancing and Sanitation Protocol must ensure all required measures are implemented and must identify and require measures necessary to implement social distancing are implemented at each facility that will ensure social distancing and sanitation at that particular facility. If the measures identified and implemented are not effective in maintaining proper social distancing and sanitation, the business shall promptly modify its Social Distancing and Sanitation Protocols to ensure proper social distancing and sanitation. Any business that fails to successfully implement social distancing and sanitation may be required to close.

11. All reopened businesses, with the exception of restaurants, bars, wineries, distilleries and breweries which do not limit services to take-out or delivery, must prepare and post a "Safe Reopening Plan" on the form available at:https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/covid19/Community_Sector_Support/BusinessesandEmployers/SafeReopeningPlanTemplate.pdf for each of their facilities in the county. Restaurants bars, wineries, distilleries and breweries which do not limit services to take-out or delivery, must prepare and post a "COVID-19 Restaurant Operating Protocol" on the form available at https://www.sandiegocounty.gov/content/dam/sdc/deh/fhd/food/pdf/covid19sdrestaurantoperatingprotocol_en.pdf for each restaurant in the county. The Safe Reopening Plan or COVID-19 Restaurant Operating Protocol must be posted at or near the entrance of the relevant facility, and shall be easily viewable by the public and employees. A copy of the Safe Reopening Plan or COVID-19 Restaurant Operating Protocol must also be provided to each employee performing work at the facility. All reopened businesses shall implement the Safe Reopening

Page 3 of 11
ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

EX03-044

Plan or COVID-19 Restaurant Operating Protocol and provide evidence of its implementation to any authority enforcing this Order upon demand. The Safe Reopening Plan or COVID-19 Restaurant Operating Protocol must ensure all required measures are implemented. If the measures identified and implemented are not effective in maintaining proper social distancing and sanitation, the business shall promptly modify its Safe Reopening Plan or COVID-19 Restaurant Operating Protocol to ensure proper social distancing and sanitation. Any business that fails to comply with its Safe Reopening Plan or COVID-19 Restaurant Operating Protocol shall immediately close.

12. When the State of California has issued an <u>industry guidance</u>, or any subsequent amendments thereto, with mandatory and/or suggested measures to be implemented by a particular type of business or industry, a reopened business must include in its Safe Reopening Plan all of the industry guidance mandatory measures, including, but not limited to, all of the requirements and guidance set forth in the Statewide Public Health Officer Order, issued by the California Department of Health Services on July 13, 2020, all portions of which are operative in San Diego County effective immediately, and available at {https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%20Dimming%20Entire%20State%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.pdf}. The reopened business shall include all suggested measures necessary to maintain proper sanitation, employee screening, social distancing and facial coverings. Any mandatory measures required by this Order must also be included in the Safe Reopening Plan.

13. All brewpubs, breweries, bars and pubs shall close unless they comply with section 14c, below, in which case they shall comply with all other requirements in this section and section 14 below. All other restaurants, bars, wineries, distilleries and breweries shall close indoor service in conformance with the requirements set forth in the Statewide Public Health Officer Order, issued by the California Department of Health Services on July 13, 2020, all portions of which are operative in San Diego County effective immediately, and available at {https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%20Dimming%20Entire%20State%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.pdf}, and shall be closed from 10:00 p.m. until 5:00 a.m. every day. Guests already in the facility at 10:00 p.m. may remain in the facility until 11:00 p.m. Only staff needed to close, open or clean shall be in the facility between the hours of 11:00 p.m. and 5:00 a.m.

14. All restaurants, bars, wineries and breweries shall also be required to ensure their customers comply with all of the following measures and shall immediately close if they are not able to

do so:

    a. No food or beverages shall be served to or consumed by a customer who is not seated at a table designated by the restaurant for dining.

    b. The bar area of a restaurant may be used only for table service of meals.

    c. Alcoholic drinks shall only be served as part of a meal and must be sold and served in the same transaction as the meal. All meals shall be served by a food operator permitted by the San Diego County Department of Environmental Health. This restriction shall not be applicable to outdoor service of wine at a winery or spirits at a distillery.

    d. Customers shall not stand in the restaurant, bar, winery, distillery or brewery except in the reception area while waiting for a table or to pick up take-out food. If customers cannot be socially distanced in the reception area they shall wait in their cars or outside of the restaurant in a line with six feet between each customer.

    e. Discontinue open seating. All members of the party must be present before seating and the host must bring the entire party to the table at one time. The customers allowed at a table are limited to members of a single household or customers who have asked to be seated together at the time a table is requested.

    f. Discontinue seating customers and/or groups at bar counters, sushi preparation bars, etc. where they cannot maintain at least six feet of distance from employee work areas/stations. Install physical barriers or partitions in areas where maintaining a physical distance of six feet is difficult.

    g. Customers are not required to wear face coverings while at a table with members of the same household. Customers at a table with non-household members are not required to wear face coverings when eating and drinking. Customers are required to wear face coverings at all other times in conformance with paragraph 9, above.

    h. Tables designated for dining shall be six feet apart, or separated by barriers or partitions that extend above the heads of customers while seated. Customer shall not be allowed to bring additional chairs to the table that interfere with the six foot separation.

    i. Self-serve food or drink options, such as buffets, salad bars, and drink stations are not allowed.

    j. Shared entertainment items such as board games, arcade games and vending machines are prohibited and customers shall not have access to game and entertainment areas such as pool tables or darts.

    k. Dance floors shall be closed and live performances such as musical or dance acts shall be discontinued.

    l. Any customer that refuses to comply with this section shall be subject to enforcement per Health and Safety Code section 120295.

Page 5 of 11

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

EX03-046

15. Places of Worship – Religious services and cultural ceremonial activities (including wedding ceremonies but not receptions) may be conducted in conformance with the State Guidance pursuant to sections 11 and 12, above. Given the high risk of this activity, vulnerable members of the population (over 65 years old, compromised immune system or underlying condition) are strongly encouraged to participate through streaming or some other form of remote technology. Outdoor services and cultural ceremonial activities may be conducted provided all persons practice social distancing as defined in section 22e, below.

16. Each essential business and reopened business shall:
    a. Require all employees/on-site contractors (hereinafter referred to as employees) to have possession of face coverings and wear them as described in section 9 above when in the business facility; and,
    b. Shall conduct temperature screening of all employees and prohibit entry to the workplace of employees with a temperature of 100 degrees or more, employees exhibiting COVID-19 <u>symptoms as described by the Centers for Disease Control and Prevention,</u> or employees who have recently been exposed to a person who has tested positive for COVID-19 (either directly or through a breach of Personal Protective Equipment in the case of healthcare workers/first responders).

17. Outdoor Recreation
    a. Each public park and recreation area or facility, shall operate in compliance with the measures set forth in the <u>State COVID-19</u> Industry Guidance: Campgrounds, RV Parks and Outdoor Recreation. The operator of the park shall prepare a Safe Reopening Plan pursuant to section 11, above, indicating how the park or recreation facility will implement the required measures. Any park or recreation area/facility at which the Protocol requirements cannot be effectively implemented may be required to close.
    b. Outdoor recreation instruction and day camps that comply with the State COVID-19 Industry Guidance: Day Camps, may be conducted in park and recreation areas/facilities.
    c. Swimming pools owned or operated by a Homeowners' Association, Condominium or Apartment complex may be open provided the owner or operator completes and posts a Safe Reopening Plan that shows conformance with the requirements of this Order and with the swimming pool/aquatic venues requirements of the State COVID-19 Industry Guidance on Fitness Facilities.

18. All essential businesses and reopened businesses that remain in operation in accordance with

the Order shall make every effort to use telecommuting for their workforces.

19. A strong recommendation is made that all persons who are 65 years old or older, have a chronic underlying condition, or have a compromised immune system self-quarantine themselves at home or other suitable location.

20. All persons arriving in the county from international locations identified on the Centers for Disease Control and Prevention (CDC) Warning Level 2 or 3 Travel Advisory (available at: https://wwwnc.cdc.gov/travel/notices) shall be subject to 14-day home or other suitable location quarantine and self-monitoring.

21. Persons who have been diagnosed with COVID-19, or who are likely to have COVID-19, shall comply with the Order of the Health Officer titled: "Isolation of All Persons with or Likely to have COVID-19", or as subsequently amended. Persons who have a close contact with a person who either has COVID-19, or is likely to have COVID-19, shall comply with the Order of the Health Officer titled: "Quarantine of Persons Exposed to COVID-19," or as subsequently amended.      Both      orders      are      available      at: https://www.sandiegocounty.gov/content/sdc/hhsa/programs/phs/community_epidemiology/d c/2019-nCoV/health-order.html. If a more specific isolation or quarantine order is issued to a person, that order shall be followed.

22. For purposes of this Order:
    a. "Essential business" is any business or activity (or a business/activity that employs/utilizes workers) designated by the State Public Health Officer as "Essential Critical Infrastructure Workers" set forth in: https://covid19.ca.gov/img/Essential CriticalInfrastructureWorkers.pdf) as that list may be updated from time-to-time, and referenced in Executive Order N-33-20 issued by the Governor of the State of California. For the purposes of this Order, the following businesses in the Food and Agriculture Sector are considered "groceries" or "other retail that sells food and beverages": grocery stores, corner stores and convenience stores, liquor stores that sell food, farmer's markets, food banks, farm and produce stands, supermarkets, big box stores that sell groceries and essentials, or similar business that sell food so long as the store has a current permit related to the sale of food and/or beverages from the San Diego County Department of Environmental Health.
    b. "Gathering" is any event or convening that brings together more than one person in a single room or single indoor or outdoor space at the same time. A gathering does not include:

Page 7 of 11
ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

EX03-048

      i. A gathering consisting only of members of a single family or household.

     ii. Operations at airports, public transportation or other spaces where persons in transit are able to practice social distancing.

    iii. Operations at essential businesses as defined in section 22a above and reopened businesses as defined in 22f below and where the other requirements set forth in this Order are followed.

c. "Long term care facility" is a facility serving adults that require assistance with activities of daily living, including a skilled nursing facility, and that is licensed by the California Department of Community Care and Licensing, or the California Department of Public Health.

d. "Non-essential personnel" are employees, contractors, or members of the public who do not perform treatment, maintenance, support, or administrative tasks deemed essential to the healthcare mission of the long-term care facility or hospital. Non-essential personnel do not include first responders, nor State, federal, or local officials, investigators, or medical personnel carrying out lawful duties. Non-essential personnel do not include visitors to hospitals and long-term care facilities who are granted entry by the facility's director, or designee, because they are family or friends who are visiting a resident in an end of life or similar situation, are parents or guardians visiting a child who is a patient, or because of any other circumstances deemed appropriate by the facility director, or designee, and where appropriate precautions by the facility that follow federal, State, and local public health guidance regarding COVID-19 are followed.

e. "Social distancing" is maintaining a six-foot separation from all persons except for household members, first responders and medical providers or employees conducting temperature screenings.

f. "Reopened business" is a business that is not an essential business as stated in section 22a above, and has reopened in conformance with the State of California's Resilience Roadmap (available at: https://covid19.ca.gov/roadmap-counties/) and the Statewide Public Health Officer Order, issued by the California Department of Health Services on July13, 2020, all portions of which are operative  in San Diego County effective immediately,                           and                            available                           at {https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%20Dimming%20Entire%20State%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.pdf}.    A reopened business may open when the State has posted the applicable COVID-19 INDUSTRY GUIDANCE, the Public Health Officer has posted an acknowledgement of the reopened status on the County of San Diego Coronavirus website and the business has

Page 8 of 11

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

EX03-049

complied with the requirements of this Order.

23. Hotels and lodging establishments may be open for all guests, including tourists and leisure guests, provided they comply with the State COVID-19 Industry Guidance: Hotels, Lodging and Short Term Rentals and complete and post a Safe Reopening Plan pursuant to section 11, above.

24. This Order is issued as a result of the World Health Organization's declaration of a worldwide pandemic of COVID-19 disease, also known as "novel coronavirus."

25. This Order is issued based on scientific evidence regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, as well as best practices as currently known and available to protect vulnerable members of the public from avoidable risk of serious illness or death resulting from exposure to COVID-19. The age, condition, and health of a significant portion of the population of the county places it at risk for serious health complications, including death, from COVID-19. Although most individuals who contract COVID-19 do not become seriously ill, persons with mild symptoms and asymptomatic persons with COVID-19 may place other vulnerable members of the public— such as older adults, and those with underlying health conditions—at significant risk.

26. The actions required by this Order are necessary to reduce the number of individuals who will be exposed to COVID-19, and will thereby slow the spread of COVID-19 in the county. By reducing the spread of COVID-19, this Order will help preserve critical and limited healthcare capacity in the county and will save lives.

27. This Order is issued in accordance with, and incorporates by reference: a) the Declaration of Local Health Emergency issued by the Health Officer on February 14, 2020; b) the Proclamation of Local Emergency issued by the County Director of Emergency Services on February 14, 2020; c) the action of the County Board of Supervisors to ratify and continue both the local health emergency and local emergency on February 19, 2020; d) the Proclamation of a State of Emergency issued by the Governor of the State of California on March 4, 2020; e) Executive Order N-25-20 issued by the Governor of the State of California on March 12, 2020 which orders that "All residents are to heed any orders and guidance of state and local health officials, including but not limited to the imposition of social distancing measures, to control COVID-19"; f) Proclamation 9984 regarding COVID-19 issued by the President of the United States on March 11, 2020; g) Executive Order N-33-20 issued by the Governor of the State of California on March 19, 2020; h) the "Interim Additional Guidance

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

EX03-050

for Infection Prevention and Control for Patients with Suspected or Confirmed COVID-19 in Nursing Homes" issued by the CDC; i) COVID-19 guidance issued by the California Department of Public Health on including, but not limited to the Face Coverings Guidance issued on April 1, 2020; and j) the State of California's "Resilience Roadmap."

28. This Order is issued to prevent circumstances often present in gatherings that may exacerbate the spread of COVID-19, such as: 1) the increased likelihood that gatherings will attract people from a broad geographic area; 2) the prolonged time period in which large numbers of people are in close proximity; 3) the difficulty in tracing exposure when large numbers of people attend a single event or are at a single location; and 4) the inability to ensure that such persons follow adequate hygienic practices.

29. This Order is issued to provide additional opportunities for recreational activities while also requiring additional protections from the spread of COVID-19 to the public who are taking advantage of these opportunities for recreational activities.  And providing additional protections for employees of essential businesses or reopened business and their customers/clients by increasing facial covering requirements and health checks and temperature screening.

30. This Order is issued to protect the public health as businesses are allowed to reopen by requiring businesses to implement procedures necessary to ensure their employees and customers comply with social distancing, sanitation and screening practices.

31. This Order comes after the release of substantial guidance from the Health Officer, the California Department of Public Health, the CDC, and other public health officials throughout the United States and around the world.

32. The statement of facts and circumstances set forth as justification for each Guidance issued by the California Department of Health Services that is referenced in this Order are hereby accepted and incorporated by reference into this Order.

33. Pursuant to Health and Safety Code section 120175.5 (b) all governmental entities in the county shall take necessary measures within the governmental entity's control to ensure compliance with this Order and to disseminate this Order to venues or locations within the entity's jurisdiction where gatherings may occur.

EX03-051

34. Violation of this Order is subject to fine, imprisonment, or both. (California Health and Safety Code section 120295.)

35. To the extent necessary, this Order may be enforced by the Sheriff or chiefs of police pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029.

36. Once this Order takes effect it shall supersede the Order of the Health Officer and Emergency Regulations dated July 14, 2020.

**IT IS SO ORDERED:**

Date: July 20 2020

Wilma J. Wooten, M.D., M.P.H.
Public Health Officer
County of San Diego

---

## EMERGENCY REGULATIONS

As Director of Emergency Services for the County of San Diego, I am authorized to promulgate regulations for the protection of life and property pursuant to Government Code Section 8634 and San Diego County Code section 31.103. The following shall be in effect for the duration of the Health Officer Order issued above which is incorporated in its entirety by reference:

The Health Officer Order shall be promulgated as a regulation for the protection of life and property.

Any person who violates or who refuses or willfully neglects to obey this regulation is subject to fine, imprisonment, or both. (Government Code section 8665.)

Date: July 20, 2020

Helen Robbins-Meyer
Chief Administrative Officer
Director of Emergency Services
County of San Diego

Page 11 of 11
ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

EX03-052

COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH
ORDER OF THE HEALTH OFFICER



## HEALTH OFFICER ORDER FOR THE CONTROL OF COVID-19
Temporary Prohibition of Group Events and Gatherings
Required Social Distancing Measures
Closure of Certain Businesses
Date Order Issued: March 16, 2020

**Please read this Order carefully. Violation of or failure to comply with this Order is a crime punishable by fine, imprisonment, or both. (California Health and Safety Code § 120295; Los Angeles County Code § 11.02.080.)**

**SUMMARY OF THE ORDER:** During a State of Emergency, California law empowers the County of Los Angeles Health Officer (Health Officer) to take measures necessary to protect the public from the spread of the Novel Coronavirus (COVID-19) within the County of Los Angeles. In accordance with the Centers for Disease Control's (CDC) Interim Guidance for Large Events and Mass Gatherings (March 15, 2020); the California Department of Public Health's Mass Gathering Guidance (March 11, 2020); Governor Newsom's Guidance Regarding Bars and Restaurants (March 15, 2020); and Mayor Eric Garcetti's Emergency Public Order – New City Measures to Address COVID-19 (March 15, 2020), the Health Officer is ordering significant protective measures to stem or slow the spread of COVID-19 within the greater Los Angeles community.

Because of the rapid spread of COVID-19 and the need to protect the most vulnerable members of our community, this Order prohibits all indoor public and private gatherings and all outdoor public and private events within a confined space, where at least 50 people are expected to be in attendance at the same time. This Order applies within the County of Los Angeles Public Health Jurisdiction, beginning March 16, 2020 and continues through March 31, 2020, subject to the terms and conditions more particularly set forth below.

For all gatherings that are not prohibited, the Health Officer orders the event and gathering holders and venues to implement the following infection control precautions: (1) enforce social distancing within the confined space by requiring attendees to be separated by six (6) feet; (2) provide access to hand washing facilities with soap and water or hand sanitizer that contains at least 60 percent alcohol; (3) post a sign in a conspicuous place at the public entry to the venue instructing members of the public to not attend if they are experiencing symptoms of respiratory illness, including fever or cough; and (4) adhere to communicable disease control recommendations provided by the Los Angeles County Department of Public Health.

Further, this Health Officer Order, in accordance Mayor Eric Garcetti's Emergency Public Order – New City Measures to Address COVID-19, requires all permanent food facilities to limit their services to only preparing and offering food to customers via delivery service, via pick up for take-out dining only, or via drive thru.

This Order immediately requires closing the following types of businesses:

      (1) Bars and Nightclubs that do not serve food.

      (2) Gyms and Fitness Centers.

      (3) Movie Theaters, Live Performance Theaters, Bowling Alleys, and Arcades.

The County Health Officer will continue to monitor COVID-19 disease spread, State and CDC recommendations, and the impact of the required measures, and as needed, may revisit, extend, expand, or otherwise modify this Order to protect the public's health.

HOA.102820213.1
Health Officer Order for the Control of COVID-19: Temporary Prohibition of Group Events and Gatherings, Required Social Distancing Measures, and Closure of Certain Businesses
Page 1 of 5                                                                                                                3/16/20

EX03-053

COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH
ORDER OF THE HEALTH OFFICER



**UNDER THE AUTHORITY OF THE CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, THE COUNTY OF LOS ANGELES HEALTH OFFICER ORDERS:**

1. Effective March 16, 2020 and continuing through March 31, 2020, all public and private group events and mass gatherings, as defined below, of 50 or more people are prohibited anywhere within the Los Angeles County Public Health Jurisdiction.

2. For public and private events and gatherings attended by between 10-49 members of the public, held in a confined or enclosed space, and not prohibited by this Order, the organizer of the event and the owner, manager, or operator of the venue holding the event or gathering shall:

   a. Enforce social distancing measures by requiring attendees who remain at the event for over 10 minutes to be separated by at least six (6) feet from other attendees during the entirety of the event or gathering. Persons who attend the event or gathering as a group, e.g., a group of family members or household contacts, may sit or remain together, but groups of attendees must be separated by a distance of at least six (6) feet.

   b. Provide access to hand washing facilities with soap and water or with hand sanitizer that contains at least 60 percent alcohol.

   c. Post a sign in a conspicuous place at all public entries to the venue that instructs members of the public to not attend if they are experiencing symptoms of respiratory illness, including fever or cough.

   d. Adhere to communicable disease control recommendations provided by the Los Angeles County Department of Public Health, including guidance for cleaning and disinfecting the site. See guidance posted at www.publichealth.lacounty.gov/media/Coronavirus/.

3. Effective immediately, and in accordance with Governor Newsom's Guidance and Mayor Garcetti's New City Measures to Address COVID-19, all permanent food facilities, as defined by Health and Safety Code § 113849, may only prepare and offer food that is provided to customers via delivery service, via pick-up for takeout dining, and via drive-thru. Bars and night clubs that offer food to consumers may remain open only for purposes of continuing to prepare and offer food to consumers via delivery service, via pick-up, or drive-thru. Permanent food facilities that provide and offer food to consumers for pick up must require patrons or groups of patrons who are ordering food and beverages to be and remain at least six (6) feet apart from each other while inside the facility.

4. Further, the Health Officer orders the immediate closure of the following types of businesses:

   a. Bars and Nightclubs that do not serve food.

   b. Movie theaters, live performance venues, bowling alleys, and arcades.

   c. Gyms and fitness centers.

   d. Wineries, Breweries, and Tap Rooms that provide tastings.

5. This Order does not supersede any stricter limitation imposed by a local public entity within the Los Angeles County Public Health Jurisdiction.

*REASONS FOR THE ORDER*

6. This Order is based upon scientific evidence and best practices, as currently known and available, to protect members of the public from avoidable risk of serious illness and death resulting from the spread of COVID-19, as well as to protect the healthcare system from a surge of cases into its emergency rooms and hospitals. The Order supports the California Department of Public Health and the CDC's efforts to institute necessary social distancing measures to reduce community transmission of COVID-19.

HOA.102820213.1
Health Officer Order for the Control of COVID-19: Temporary Prohibition of Group Events and Gatherings, Required Social Distancing Measures, and Closure of Certain Businesses
Page 2 of 5                                                                                                              3/16/20

EX03-054

COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH
ORDER OF THE HEALTH OFFICER



7. Existing community transmission of COVID-19 in Los Angeles County presents a substantial and significant risk of harm to the health of residents. Currently, there is no vaccine available to protect against and no specific treatment for COVID-19. As of March 16, 2020, there have been at least 94 cases of COVID-19 and 1 death reported in Los Angeles County.

8. The virus that causes COVID-19 can be spread easily through person-to-person contact. This risk of transmission is increased when people are in close proximity. All group events and gatherings pose an increased risk for transmission of COVID-19 and thus, are a substantial risk to public health. Circumstances associated with Group Events and Mass Gatherings, smaller events and gatherings, and the public's presence in businesses where it is usual for patrons to have extended close contact, that are likely to exacerbate the spread of COVID-19 include, without limitation: (a) the increased likelihood that these events, gatherings, and businesses will attract people from a geographic area with known COVID-19 community transmission, (b) the prolonged time period during which large numbers of people are in close proximity, (c) the difficulty in tracing and controlling additional exposures when large numbers of people attend a single event, and (d) the inability to ensure both that attendees are not infected with COVID-19 and will follow adequate hygienic and social distancing practices.

9. In the absence of a specific immunization or treatment for COVID-19, social distancing is the only and most readily available tool to prevent this disease. Increasing social distancing and limiting gatherings are proven ways to slow transmission of communicable diseases. Accordingly, to reduce the community transmission of COVID-19, the Health Officer has ordered the temporary prohibition of all Group Events and Mass Gatherings, as defined in Sections 10, 11 and 12, and is also requiring the closure of certain businesses where it is usual practice for patrons to remain in close proximity.

## DEFINITIONS

10. For purposes of this Order, Group Events and Mass Gatherings are any gathering, assembly, event, or convening that brings together or is likely to bring together 50 or more persons at the same time in an indoor or outdoor confined or enclosed space, for any purpose including a business, cultural, religious, athletic, entertainment, social, or other special event. These types of Group Events and Mass Gatherings are likely to result in situations where people will be within six (6) feet of each other for an extended period of time (greater than 10 minutes).

11. Group Events and Mass Gatherings include, without limitation: (a) any convention, arena, or meeting space with fixed seating or other set-up where seating is placed adjacent to each other in rows; (b) any space where event attendees stand in close proximity to each other, such as a concert or other performance that includes "standing room only" sections; (c) an admission or concession line/queue; and (d) a confined or closed outdoor space: (i) that is enclosed by a fence, physical barrier, or other structure and (ii) where people are within six (6) feet of one another for more than ten (10) minutes. Specific examples include, but are not limited to, conventions, conferences, training activities, concerts, and athletic events.

12. This Order is intended to deter the spread of COVID-19 by preventing people from being in unnecessary close contact. Certain activities are essential to the functioning of the County and the well-being of our residents and must continue. Accordingly, the requirements in this Order do not apply to the following sites or situations where residents must obtain or participate in essential governmental, educational, or other essential services (those that meet basic human needs): (a) attendance at regular school classes, work, or essential governmental services; (b) places where people are in transit or waiting for transit including airports or bus or train stations or terminals; (c) grocery stores and retail stores; (d) congregate living situations, including dormitories; or (e) hospitals and healthcare facilities.

HOA.102820213.1
Health Officer Order for the Control of COVID-19: Temporary Prohibition of Group Events and Gatherings, Required Social Distancing Measures, and Closure of Certain Businesses
Page 3 of 5                                                                                      3/16/20

EX03-055

COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH
ORDER OF THE HEALTH OFFICER



   a. This Order does not prohibit use of enclosed spaces where 50 or more people may be present at different times during the day, as long as 50 or more people are not present in the space at the same time.

   b. This Order does not apply to specific permanent food facilities:

      i. Cafeterias, commissaries, and retail food facilities located within hospitals, nursing homes, governmental buildings that provide essential services to the public, or within other licensed health care facilities.

      ii. Grocery stores and pharmacies.

      iii. Charitable or governmental organization providing meals to the indigent population.

      iv. Concessionaires or food services within any airport within the Los Angeles County Public Health jurisdiction.

_ADDITIONAL TERMS_

13. This Order does not, in any way, restrict: (a) first responder access to the site(s) named in this Order during an emergency or (b) local, state or federal officers, investigators, or medical or law enforcement personnel from carrying out their lawful duties at the site(s) named in this Order.

14. The entities subject to this Order that are not required to close may otherwise remain open for business and perform essential functions and operations during the duration of this Order.

15. The County shall promptly provide copies of this Order by: (a) posting it on the Los Angeles Department of Public Health's website (www.publichealth.lacounty.gov), (b) posting it at the Kenneth Hahn Hall of Administration located at 500 West Temple Street, Los Angeles, CA 90012, (c) providing it to any member of the public requesting a copy, (d) issuing a press release to publicize the Order throughout the county, and (e) by serving via email on large facilities known to the County's Health Officer that are likely to be subject to this Order (but service via email is not required for compliance).

   a. The owner, manager, or operator of any facility that is likely to be impacted by this Order is strongly encouraged to post a copy of this Order onsite and to provide a copy to any member of the public requesting a copy.

   b. Because guidance may change, the owner, manager, or operator of any facility that is subject to this Order is ordered to consult the Los Angeles County Department of Public Health's website (www.publichealth.lacounty.gov) daily to identify any modifications to the Order and is required to comply with any updates until the Order is terminated.

16. If any subsection, sentence, clause, phrase, or word of this Order or any application of it to any person, structure, gathering, or circumstance is held to be invalid or unconstitutional by a decision of a court of competent jurisdiction, then such decision will not affect the validity of the remaining portions or applications of this Order.

17. This Order is issued in accordance with, and incorporates by reference, the March 4, 2020 Proclamation of a State of Emergency issued by Governor Gavin Newsom and the March 4, 2020 declarations of a local and public health emergency issued by the Los Angeles County Board of Supervisors and Los Angeles County Health Officer, respectively, and as they may be supplemented.

HOA.102820213.1
Health Officer Order for the Control of COVID-19: Temporary Prohibition of Group Events and Gatherings, Required Social Distancing Measures, and Closure of Certain Businesses
Page 4 of 5                                                                                                3/16/20

EX03-056

COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH
ORDER OF THE HEALTH OFFICER



18. To protect the public's health, the Health Officer may take additional action(s) for failure to
comply with this Order. Violation of this Order is a misdemeanor punishable by imprisonment,
fine or both under California Health and Section Code Section 120295 *et seq*. Further, pursuant
to Sections 26602 and 41601 of the California Government Code and Section 101029 of the
California Health and Safety Code, the Health Officer requests that the Sheriff and the Chiefs of
Police in all cities located in the Los Angeles County Public Health Jurisdiction ensure
compliance with and enforcement of this Order.

**IT IS SO ORDERED:**

Date: _____

_____

Muntu Davis, MD, MPH

Health Officer, County of Los Angeles

HOA.102820213.1
Health Officer Order for the Control of COVID-19: Temporary Prohibition of Group Events and Gatherings, Required Social Distancing Measures,
and Closure of Certain Businesses
Page 5 of 5                                                                                                                3/16/20

EX03-057



ERIC GARCETTI
MAYOR

## Public Order Under City of Los Angeles Emergency Authority

Issue Date: March 15, 2020

Subject:      New City Measures to Address COVID-19

On March 4, 2020, I declared a local emergency in relation to the arrival of the COVID-19 virus in our community, and on March 12, 2020, I ordered a number of measures to be taken across the City to protect members of the public and City workers from an undue risk of contracting the COVID-19 virus. Our precautions over the past weeks and what we do over the next few days and weeks will determine how well we weather this emergency.

On March 11, 2020, the World Health Organization characterized COVID-19 as a pandemic. The Centers for Disease Control and Prevention advises us that COVID-19 spreads easily from person to person and has issued guidelines recommending that the public adopt policies and routines to enable social distancing wherever possible.

Here in the City of Los Angeles, we must redouble our efforts to maintain hand hygiene, respiratory etiquette, and social distancing. It is absolutely critical that we as a City do everything we can to slow the pace of community spread and avoid unnecessary strain on our medical system. To aid in our efforts, under the emergency authorities vested in my office under the laws of the City of Los Angeles, today I am ordering that a series of temporary restrictions be placed on certain establishments throughout our City in which large numbers of people tend to gather and remain in close proximity. By virtue of authority vested in me as Mayor of the City of Los Angeles pursuant to the provisions of the Los Angeles Administrative Code, Chapter 3, Section 8.29 to promulgate, issue, and enforce rules, regulations, orders, and directives, I hereby declare the following orders to be necessary for the protection of life and property and I hereby order, effective at 11:59 p.m. tonight, until March 31, 2020 at 12:00 p.m., that:

1.      All bars and nightclubs in the City of Los Angeles that do not serve food shall be closed to the public.

2.      Any bars or nightclubs in the City of Los Angeles that serve food may remain open only for purposes of continuing to prepare and offer food to customers via delivery service or to be picked up.  Dine-in food service is prohibited.

3.      All restaurants and retail food facilities in the City of Los Angeles shall be prohibited from serving food for consumption on premises.  Restaurants and retail food facilities may continue to operate for purposes of preparing and offering food to customers via delivery service, to be picked up or for drive-thru.  For those establishments offering food pick-up options, proprietors are directed to establish social distancing practices for those patrons in the queue for pick-up.

4.      The following are exempt from this Order:

   A. Cafeterias, commissaries, and restaurants located within hospitals, nursing homes, or similar facilities
   B. Grocery stores
   C. Pharmacies
   D. Food banks
   E. Los Angeles World Airports concessionaires

5.      Trucks and other vehicles engaged in the delivery of grocery items to grocery stores, when such items are to be made available for sale to the public, are hereby exempt from having to comply with any City rules and regulations that limit the hours for such deliveries, including, without limitation, Los Angeles Municipal Code Section 12.22 A.23(b)(3) and Los Angeles Municipal Code Section 114.03.

6.      All movie theaters, live performance venues, bowling alleys and arcades shall be closed to the public.

7.      All gyms and fitness centers shall be closed to the public.

Any violation of the above prohibitions may be referred to the Office of the City Attorney for prosecution under Los Angeles Administrative Code Section 8.77, which provides for fines not to exceed $1,000 or imprisonment not to exceed six months.  Each individual officer should use their discretion in enforcing this order and always keep the intent of the order in mind.

In addition, I hereby issue guidance to the leaders of the City's houses of worship and urge them, in the strongest possible terms, to limit gatherings on their premises and to explore and implement ways to practice their respective faiths while observing social distancing practices.

Finally, I hereby order that no landlord shall evict a residential tenant in the City of Los Angeles during this local emergency period if the tenant is able to show an inability to pay rent due to circumstances related to the COVID-19 pandemic.  These

circumstances include loss of income due to a COVID-19 related workplace closure, child care expenditures due to school closures, health care expenses related to being ill with COVID-19 or caring for a member of the tenant's household who is ill with COVID-19, or reasonable expenditures that stem from government-ordered emergency measures. Nothing in this subsection shall be construed to mean that the tenant will not still be obligated to pay lawfully charged rent. Tenants will have up to six months following the expiration of the local emergency period to repay any back due rent. Tenants may use the protections afforded in this subsection as an affirmative defense in an unlawful detainer action. This subsection shall remain in effect during the pendency of the local emergency period.

This order may be extended prior to March 31, 2020.

## SAFER AT HOME ORDER FOR CONTROL OF COVID-19

Temporary Prohibition of Events and Gatherings of 10 Persons or More
Closure of Non-Essential Businesses and Areas
Date Order Issued: March 19, 2020

**Please read this Order carefully. Violation of or failure to comply with this Order is a crime punishable by fine, imprisonment, or both. (California Health and Safety Code § 120295; Los Angeles County Code § 11.02.080.)**

**SUMMARY OF THE ORDER:** This Health Officer Order amends and supplements the Order of the County of Los Angeles Health Officer (Health Officer) issued on March 16, 2020, to control the spread of the Novel Coronavirus (COVID-19) within the County of Los Angeles. The purpose of this Order is to further restrict and limit the gathering of persons and require the closure of malls, shopping centers, children's playgrounds, and non-essential retail businesses in an effort to stem or slow the spread of COVID-19 within the greater Los Angeles community.

Because of the continued rapid spread of COVID-19 and the need to protect the most vulnerable members of our community, this Order prohibits all indoor public and private gatherings and all outdoor public and private events within a confined space, where at least 10 people are expected to be in attendance at the same time. This Order applies within the County of Los Angeles Public Health Jurisdiction, beginning at 11:59 p.m. on March 19, 2020 and continues through April 19, 2020, subject to the terms and conditions more particularly set forth below.

For all gatherings that are not prohibited and for all Essential Businesses, the Health Officer orders those persons attending an event or gathering and the venues holding the event or gathering implement the following infection control precautions: (1) practice social distancing within the confined space by requiring attendees to be separated by six (6) feet, to the extent feasible; (2) provide access to hand washing facilities with soap and water or hand sanitizer that contains at least 60 percent alcohol; (3) post a sign in a conspicuous place at the public entry to the venue instructing members of the public to not attend if they are experiencing symptoms of respiratory illness, including fever or cough; and (4) adhere to communicable disease control recommendations provided by the Los Angeles County Department of Public Health. As a point of clarity, this Order does not prohibit any individual or family from outdoor activities such as hiking, walking, shopping at Essential Businesses, including grocery stores and restaurants offering delivery, drive thru or carry out service, so long as all persons practice social distancing to the extent practicable.

Further, this Health Officer Order, requires all indoor malls, shopping centers, playgrounds and non-essential businesses to close. This Order applies to all cities in Los Angeles County except the cities of Pasadena and Long Beach. This Order does not supersede any stricter limitation imposed by a local public entity.

The County Health Officer will continue to monitor the rate of COVID-19 disease spread, State and CDC recommendations, and the impact of the required measures, and as needed, may revisit, extend, expand, or otherwise modify this Order to protect the public's health.

**UNDER THE AUTHORITY OF THE CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, THE COUNTY OF LOS ANGELES HEALTH OFFICER ORDERS:**

1. Effective 11:59 p.m. on March 19, 2020 and continuing through April 19, 2020, all public and private group events and gatherings, as defined below, of 10 or more people are prohibited anywhere within the Los Angeles County Public Health Jurisdiction.

Safer at Home Order for Control of COVID-19: Temporary Prohibition of Events and Gatherings of 10 Persons or More
Closure of Non-Essential Businesses and Areas
Page 1 of 6                                                                                                  3/19/2020

EX03-061

COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH
ORDER OF THE HEALTH OFFICER



2. For public and private gatherings attended by between 2-9 persons, held in a confined or enclosed space, and not prohibited by this Order, the organizer or the owner, manager, or operator of the venue holding the gathering shall:

   a. Enforce social distancing measures by requiring attendees who remain at the event or gathering for over 5 minutes to be separated by at least six (6) feet from other attendees during the entirety of the event or gathering. Persons who attend the event or gathering as a group, e.g., a group of family members or household contacts, may sit or remain together, but groups of attendees must be separated by a distance of at least six (6) feet.

   b. Provide access to hand washing facilities with soap and water or with hand sanitizer that contains at least 60 percent alcohol.

   c. Post a sign in a conspicuous place at all public entries to the venue that instructs members of the public to not enter or attend if they are experiencing symptoms of respiratory illness, including fever or cough.

   d. Adhere to communicable disease control recommendations provided by the Los Angeles County Department of Public Health, including guidance for cleaning and disinfecting the site. See guidance posted at www.publichealth.lacounty.gov/media/Coronavirus/.

3. The Health Officer orders the immediate closure of the following types of commercial properties and businesses:

   a. Non-Essential Retail Businesses.

   b. Indoor Malls and Indoor Shopping Centers, including all stores therein regardless whether they are Essential or Non-Essential Retail Businesses. As an exception, Essential Businesses that are part of an Indoor Mall or Indoor Shopping Center, that are accessible to the public from the exterior of the Indoor Mall or Shopping Center may remain open. The interior of the Indoor Mall or Indoor Shopping Center shall remain closed to the public.

   c. Owners and operators of Outdoor Malls and Shopping Centers shall enforce social distancing measures among their visitors as provided in Section 2 a-d.

   d. Indoor or Outdoor Playgrounds for Children, except for those located within childcare centers.

4. This Order does not supersede any stricter limitation imposed by a local public entity within the Los Angeles County Public Health Jurisdiction.

5. This Order shall be exempt, for a 24-hour period following the effective date above, to allow employees and business owners to access to their workplaces to gather belongings, so long as social distancing requirements are followed. Such workplaces shall remain closed to the public in accordance with this Order.

## *REASONS FOR THE ORDER*

6. This Order is based upon scientific evidence and best practices, as currently known and available, to protect members of the public from avoidable risk of serious illness and death resulting from the spread of COVID-19, as well as to protect the healthcare system from a surge of cases into its emergency rooms and hospitals. The Order supports the CDC's efforts to institute more stringent and necessary social distancing measures to reduce community transmission of COVID-19.

7. Existing community transmission of COVID-19 in Los Angeles County presents a substantial and significant risk of harm to the health of residents. Currently, there is no vaccine available to protect against and no specific treatment for COVID-19. As of March 19, 2020, there have been at least 231 cases of COVID-19 and 2 deaths reported in Los Angeles County. There remains a

Safer at Home Order for Control of COVID-19: Temporary Prohibition of Events and Gatherings of 10 Persons or More
Closure of Non-Essential Businesses and Areas
Page 2 of 6                                                                                                    3/19/2020

EX03-062

COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH
ORDER OF THE HEALTH OFFICER



strong likelihood of a significant and increasing number of suspected cases of community transmission.

8. The virus that causes COVID-19 can be spread easily through person-to-person contact. This risk of transmission is increased when people are in close proximity. All gatherings pose an increased risk for community transmission of COVID-19 and thus, are a substantial risk to public health. As such, places where people gather, such as Indoor and Outdoor Malls, Shopping Centers, Children's Playgrounds, and Non-Essential Retail Businesses, provide significant opportunities for patrons or groups of patrons to have close contact with each other. Thus, the reasons that persons gathering at these locations are likely to exacerbate the spread of COVID-19 include, without limitation: (a) that these gatherings and businesses will attract people from throughout the county when there is widespread COVID-19 community transmission, (b) the prolonged time period during which many people are in close proximity at these locations, (c) the difficulty in tracing and controlling additional exposures when large numbers of people visit a Mall, Shopping Center, Playground or Non-Essential Retail Business, and (d) the visitor may be unknowingly infected with COVID-19 and may not follow adequate hygienic and social distancing practices.

9. In the absence of a specific immunization or treatment for COVID-19, social distancing is the only and most readily available tool to prevent this disease. Increasing social distancing and limiting events and gatherings slow transmission of communicable diseases. Accordingly, to reduce the community transmission of COVID-19, the Health Officer has ordered the temporary prohibition of all Events and Gatherings, as defined in Section 10, the closure of Indoor Malls and Shopping Centers as defined in Section 11, and is also requiring the closure of certain businesses, as described in Section 12.

## DEFINITIONS

10. For purposes of this Order, Events and Gatherings are any gathering, assembly, event, or convening that brings together or is likely to bring together 10 or more persons at the same time in an indoor or outdoor confined or enclosed space for greater than 5 minutes, for any purpose including a business, cultural, athletic, entertainment, social, or other special event.

11. For purposes of this Order, Indoor Malls and Shopping Centers are defined for as either:

A building with seven (7) or more "sales or retail establishments" or

A series of buildings on a common site, either under common ownership or common control or developed together, with seven (7) or more "sales or retail establishments."

12. Non-Essential Retail Businesses are retail establishments that provide goods or services to the public that do not come within the definition of Essential Businesses set forth in Paragraph 13 of this Order.

13. For purposes of this Order, Essential Businesses are defined as the following:

(a) Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruit and vegetables, pet supply, water, fresh meats, fish, and poultry, and any other household consumer products (such as cleaning or personal care products). This includes stores that sell groceries and sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences;

(b) Food cultivation, including farming, livestock, and fishing;

Safer at Home Order for Control of COVID-19: Temporary Prohibition of Events and Gatherings of 10 Persons or More
Closure of Non-Essential Businesses and Areas
Page 3 of 6                                                                                                    3/19/2020

EX03-063

COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH
ORDER OF THE HEALTH OFFICER



(c) Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals;

(d) Newspapers, television, radio, magazine, podcast and other media services;

(e) Gas stations, and auto-supply, auto-repair, car dealerships and related facilities;

(f) Banks, credit unions, and related financial institutions;

(g) Hardware stores, nurseries; building supplies;

(h) Plumbers, electricians, exterminators, custodial/janitorial workers, handyman services, funeral home workers and morticians, moving services, HVAC installers, carpenters, vegetation services, tree maintenance, landscapers, gardeners, property managers, private security personnel and other service providers who provide services to maintain the safety, sanitation, and essential operation to properties and other Essential Businesses;

(i) Businesses providing mailing and shipping services, including post office boxes;

(j) Educational institutions (including public and private K-12 schools, colleges, and universities) for purposes of facilitating distance learning or performing essential functions, provided that social distancing of 6-feet per person is maintaining to the greatest extent possible;

(k) Laundromats, dry cleaners, laundry service providers, personal grooming services;

(l) Restaurants and other food facilities that prepare and serve food, but only for delivery, drive thru or carry out;

(m) Businesses that supply office or computer products needed by people who work from home;

(n) Businesses that supply other Essential Businesses with the support or supplies necessary to operate;

(o) Businesses that ship, truck, provide logistical support or deliver groceries, food, goods or services directly to residences, Essential Businesses, Healthcare Operations, Essential Infrastructure;

(p) Airlines, taxis, and other private transportation providers providing transportation services necessary for activities of daily living and other purposes expressly authorized in this Order;

(q) Businesses that provide parts and service for Essential Infrastructure;

(r) Home-based care for seniors, adults, disabled persons, or children;

(s) Residential facilities and shelters for seniors, adults, disabled persons, and children;

(t) Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities, and the permitting, inspection, construction, transfer and recording of ownership, of housing and anything incidental thereto;

(u) Military/Defense Contractors/FFRDC (Federally Funded Research and Development Centers). For purposes of this Order, essential personnel may leave their residence to provide any service or perform any work deemed essential for national security including, but not limited to defense, intelligence and aerospace development and manufacturing for the Department of Defense, the Intelligence Community, and NASA and other federal government, and or United States Government departments and agencies. Essential

Safer at Home Order for Control of COVID-19: Temporary Prohibition of Events and Gatherings of 10 Persons or More
Closure of Non-Essential Businesses and Areas
Page 4 of 6                                                                                                    3/19/2020

EX03-064

COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH
ORDER OF THE HEALTH OFFICER



personnel include prime, sub-primes, and supplier contractor employees, at both the prime contract level and any supplier levels at any tier, working on federal United States Government contracts such as contracts rated under the Defense Priorities and Allocations System (DPAS) and contracts for national intelligence and national security requirements.;

(v) Childcare facilities providing services that enable employees exempted in this Order to work as permitted. To the extent possible, childcare facilities must operate under the following mandatory conditions: (1) Childcare must be carried out in stable groups of 12 or fewer ("stable" means the same 12 or fewer children are in the same group each day); (2) Children shall not change from one group to another; (3) If more than one group of children is cared for at once facility, each group shall be in a separate room. Groups shall not mix with each other; (4) Childcare providers shall remain solely with one group of children.

(w) Hotels, motels, shared rental units and similar facilities.

14. This Order is intended to deter the spread of COVID-19 by preventing people from being in unnecessary close contact. Certain activities are essential to the functioning of the County and the well-being of our residents and must continue.

15. The limitations on events and gatherings contained in this Order do not apply to the following sites or situations where residents must obtain or participate in governmental or other essential services (those that meet basic human needs): (a) attendance at regular school classes, work at Essential Businesses, and essential governmental services, such as access to court, social and administrative services; (b) places where people are in transit or waiting for transit including airports or bus or train stations or terminals; (c) congregate living situations, including dormitories; or (d) hospitals and healthcare facilities.

a. This Order does not prohibit use of enclosed spaces where 10 or more people may be present at different times during the day, as long as 10 or more people are not present in the space at the same time.

b. This Order does not apply to the following essential infrastructure or operations:

i. Healthcare Operations (hospitals, clinics, laboratories, dentists, pharmacies, pharmaceutical and biotechnology companies, other licensed healthcare facilities, healthcare suppliers, home healthcare service providers, mental health providers, cannabis dispensaries with a medicinal cannabis license, medical or scientific research companies, or any related and/or ancillary healthcare services, manufacturers, distributors and servicers of medical devices, diagnostics, and equipment, veterinary care, and all healthcare provided to animals. This exemption shall be broadly construed to avoid any impact to the delivery of healthcare, broadly defined. Healthcare Operations does not include fitness and exercise gyms and similar exercise or training facilities.

ii. Essential Infrastructure, including but not limited to, public health, public works construction, construction of housing (in particular affordable housing or housing for individuals experience homelessness), airport operations, port operations, water, sewer, gas, electrical, oil refining, road and highways, public transportation, solid waste collection and removal, internet and telecommunications systems (including the provision of essential global, national, local infrastructure for computing services, business infrastructure, communications, and web-based services), and manufacturing and distribution companies deemed essential as part of the Essential Infrastructure supply chain, provided that they carry out those services or that work in compliance with social distancing requirements, to the extent practicable.

Safer at Home Order for Control of COVID-19: Temporary Prohibition of Events and Gatherings of 10 Persons or More
Closure of Non-Essential Businesses and Areas
Page 5 of 6                                                                                                                3/19/2020

EX03-065

COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH
ORDER OF THE HEALTH OFFICER



### ADDITIONAL TERMS

16. This Order does not, in any way, restrict: (a) first responder access to the site(s) named in this Order during an emergency or (b) local, state or federal officers, investigators, or medical or law enforcement personnel from carrying out their lawful duties at the site(s) named in this Order.

17. The entities subject to this Order that are not required to close may otherwise remain open for business and perform essential functions and operations during the duration of this Order.

18. The County shall promptly provide copies of this Order by: (a) posting it on the Los Angeles Department of Public Health's website (www.publichealth.lacounty.gov), (b) posting it at the Kenneth Hahn Hall of Administration located at 500 West Temple Street, Los Angeles, CA 90012, (c) providing it to any member of the public requesting a copy, (d) issuing a press release to publicize the Order throughout the county, and (e) by serving via email on large facilities known to the County's Health Officer that are likely to be subject to this Order (but service via email is not required for compliance).

    a. The owner, manager, or operator of any facility that is likely to be impacted by this Order is strongly encouraged to post a copy of this Order onsite and to provide a copy to any member of the public requesting a copy.

    b. Because guidance may change, the owner, manager, or operator of any facility that is subject to this Order is ordered to consult the Los Angeles County Department of Public Health's website (www.publichealth.lacounty.gov) daily to identify any modifications to the Order and is required to comply with any updates until the Order is terminated.

19. If any subsection, sentence, clause, phrase, or word of this Order or any application of it to any person, structure, gathering, or circumstance is held to be invalid or unconstitutional by a decision of a court of competent jurisdiction, then such decision will not affect the validity of the remaining portions or applications of this Order.

20. This Order incorporates by reference, the March 4, 2020 Proclamation of a State of Emergency issued by Governor Gavin Newsom and the March 4, 2020 declarations of a local and public health emergency issued by the Los Angeles County Board of Supervisors and Los Angeles County Health Officer, respectively, and as they may be supplemented.

21. To protect the public's health, the Health Officer may take additional action(s) for failure to comply with this Order. Violation of this Order is a misdemeanor punishable by imprisonment, fine or both under California Health and Section Code Section 120295 *et seq*. Further, pursuant to Sections 26602 and 41601 of the California Government Code and Section 101029 of the California Health and Safety Code, the Health Officer requests that the Sheriff and the Chiefs of Police in all cities located in the Los Angeles County Public Health Jurisdiction ensure compliance with and enforcement of this Order.

**IT IS SO ORDERED:**

Date: _MARCH 19, 2020_

Muntu Davis, MD, MPH

Health Officer, County of Los Angeles

Safer at Home Order for Control of COVID-19: Temporary Prohibition of Events and Gatherings of 10 Persons or More
Closure of Non-Essential Businesses and Areas
Page 6 of 6                                                                                                  3/19/2020

EX03-066



ERIC GARCETTI
MAYOR

## Public Order Under City of Los Angeles Emergency Authority

**Issue Date:   March 19, 2020**

**Subject:       SAFER AT HOME**

The novel coronavirus pandemic is a global emergency that is unprecedented in modern history.  Profoundly impacting our daily lives, it has inspired Angelenos to respond with courage, compassion, wisdom and resolve to overcome this crisis and help each other.

In a short period of time and at an unprecedented scale, residents in every community have embraced urgent social distancing best practices and aggressive hygienic precaution, not just to protect themselves, but to protect others. Angelenos understand with exceptional clarity that there is only one way to get through this difficult moment: together.

The City's recent emergency orders — curtailing large public gatherings; temporarily closing many government facilities; closing theaters, bars and entertainment venues; prohibiting restaurants from serving to dine-in customers while permitting take-out, delivery and drive-thru; and a moratorium on evictions of residential and commercial tenants — have been followed with a willing and generous spirit.

While we have previously taken strong action, now the City must adopt additional emergency measures to further limit the spread of COVID-19.

With this virus, we are safer at home.

Wherever feasible, City residents must isolate themselves in their residences, subject to certain exceptions provided below.

Under the provisions of Section 231(i) of the Los Angeles City Charter and Chapter 3, Section 8.27 of the Los Angeles Administrative Code, I hereby declare the following

EX03-067

orders to be necessary for the protection of life and property in the City of Los Angeles, effective on Thursday, March 19, 2020 at 11:59 PM:

1.      ·  Subject only to the exceptions outlined in this Paragraph and Paragraph 5 below, all persons living within the City of Los Angeles are hereby ordered to remain in their homes.  Residents of the City of Los Angeles who are experiencing homelessness are exempt from this requirement.  The City is working, along with partner government agencies and non-governmental organizations, to make more emergency shelters available for the unhoused residents of our City.  City of Los Angeles officials and contracted partners responsible for homelessness outreach shall make every reasonable effort to persuade such residents to accept, if offered, temporary housing or shelter, as the Health Officer of the County of Los Angeles recommends that sheltering individuals will assist in reducing the spread of the virus and will protect the individual from potential exposure by allowing the individual access to sanitation tools.  People at high risk of severe illness from COVID-19 and people who are sick·are urged to stay in their residence to the extent possible except as necessary to seek medical care.

2.      Subject only to the exceptions outlined in this Paragraph and Paragraph 5 below, all businesses within the City of Los Angeles are ordered to cease operations that require in-person attendance by workers at a workplace (including, without limitation, indoor malls and indoor shopping centers, including all stores except for those stores considered essential activities or infrastructure under this Order which are directly accessible to the public from the exterior of the mall or shopping center - the interior of the indoor mall or indoor shopping center shall remain closed to the public).  To the extent that business operations may be maintained by telecommuting or other remote means, while allowing all individuals to maintain shelter in their residences, this order shall not apply to limit such business activities.

3.      All public and private gatherings of any number of people occurring outside a residence are prohibited, except as to those exempted activities described in this Paragraph and Paragraph 5.  This provision does not apply to gatherings within a single household or living unit.

4.      All travel, including, without limitation, travel on foot, bicycle, scooter, motorcycle, automobile, or public transit is prohibited, subject to the exceptions in Paragraph 5.

5.      Exceptions.  People may lawfully leave their residence while this Order is in effect only to engage in the following activities:

(i) First 24 hour allowance. This Order shall not apply, for a 24-hour period following the effective date above, to allow employees and business owners to access to their workplaces to gather belongings or address other administrative needs, so long as social distancing requirements are followed. Such workplaces shall remain closed to the public in accordance with this Order.

(ii) <u>Essential Activities</u>.  To engage in certain essential activities, including, without limitation, visiting a health or veterinary care professional, obtaining medical supplies or medication, obtaining grocery items (including, without limitation, canned food, dry goods, fresh fruits and vegetables, pet supplies, fresh or frozen meats, fish, and poultry, any other household consumer products and products necessary to maintain the safety and sanitation of residences and other buildings) for their household or to deliver to others, or for legally mandated government purposes.  In addition, any travel related to (a) providing care for minors, the elderly, dependents, persons with disabilities, or other vulnerable persons; (b) returning to one's place of residence from outside the City; (c) travelling to one's place of residence located outside the City; (d) compliance with an order of law enforcement or court shall be exempt from this Order; or (e) legally mandated government purposes.  Persons engaging in these essential activities shall maintain reasonable social distancing practices.  This includes maintaining a distance of at least six-feet away from others, frequently washing hands with soap and water for at least twenty seconds or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

(iii) <u>Outdoor Activities</u>.  To engage in outdoor activity and recreation, provided that the individuals comply with social distancing requirements, including, without limitation, walking, hiking, running, cycling; use of scooters, roller skates, skateboards, or other personal mobility devices; or travel in a vehicle with household members to a location where it is possible to walk, hike, run or ride a bike, or operate personal mobility devices, while maintaining social distancing practices. Indoor and outdoor playgrounds for children, except those located within childcare centers, shall be closed for all purposes.

(iv) <u>Work in Support of Essential Activities</u>.  To perform work providing essential products and services or to otherwise carry out activities specifically permitted in this Order.

(v) To care for or support a friend, family member, or pet in another household.

(vi) <u>Emergency Personnel</u>.  All first responders, gang and crisis intervention workers, public health workers, emergency management personnel, emergency dispatchers, law enforcement personnel, and related contractors and others working for emergency services providers are categorically exempt from this Order.

(vii) <u>Essential Activities Exempt</u>.  Certain business operations and activities are exempt from the provisions of this Order, on the grounds that they provide services that are recognized to be critical to the health and well-being of the City.  These include:
        (a)     All healthcare operations, including hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, medical and scientific research, laboratories, healthcare suppliers, home healthcare services providers, veterinary care providers, mental and behavioral health providers, substance use

providers, physical therapists and chiropractors, cannabis dispensaries, or any related and/or ancillary healthcare services, manufacturers and suppliers. Healthcare operations does not include fitness and exercise gyms and similar facilities.

(b)    Grocery stores, water retailers, certified farmers' markets, farm and produce stands, supermarkets, convenience stores, warehouse stores, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruits and vegetables, pet supply, fresh or frozen meats, fish, and poultry, any other household consumer products (such as construction supplies, cleaning and personal care products). This includes stores that sell groceries and sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences.

(c)    Food cultivation, including farming, livestock, and fishing.

(d)    Organizations and businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals (including gang prevention and intervention, domestic violence, and homeless services agencies).

(e)    Newspapers, television, radio, magazine, podcast and other media services.

(f)    Gas service stations, auto supply, mobile auto repair operations, auto repair shops (including, without limitation, auto repair shops that operate adjacent to or otherwise in connection with an used or retail auto dealership), bicycle repair shops and related facilities.

(g)    Banks, credit unions, financial institutions and insurance companies.

(h)    Hardware and building supply stores, and nurseries.

(i)    Plumbers, electricians, exterminators, custodial/janitorial workers, handyman services, funeral home workers and morticians, moving services, HVAC installers, carpenters, landscapers, gardeners, property managers, private security personnel and other service providers who provide services to maintain the safety, sanitation, and essential operation to properties and other essential activities discussed in this subsection.

(j)    Businesses providing mailing and shipping services, including post office boxes.

(k)    Educational institutions -- including public and private K-12 schools, colleges, and universities -- for purposes of facilitating distance learning or performing essential functions provided that social distancing of six-feet per person is maintained to the greatest extent possible.

(l)    Laundromats, dry cleaners, and laundry service providers.

(m)    Restaurants and retail food facilities that prepare and offer food to customers, but only via delivery service, to be picked up, or drive-thru.  For those establishments offering food pick-up options, proprietors are directed to establish social distancing practices for those patrons in the queue for pick-up.  This includes maintaining a distance of at least six-feet away from others.  Schools and other entities that typically provide free food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students

or members of the public on a pick-up and carry out basis only.  Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or any other gathering site. Cafeterias, commissaries, and restaurants located within hospitals, nursing homes, or similar facilities are also exempt from this Order.  Social distancing shall be maintained at a distance of at least six-feet away from others

(n)     Businesses that supply products needed for people to work from home.

(o)     Businesses that supply other essential businesses with the support, services, or supplies necessary to operate, provided that strict social distancing is maintained.  This section includes, without limitation, utility companies.

(p)     Individuals and businesses that ship or deliver groceries, food, beverages or goods directly to residences or businesses, including rail and trucking.

(q)     Airlines, taxis, ride sharing services, and other private transportation services providing transportation services necessary for essential activities and other purposes expressly authorized in this Order.

(r)     Home-based care for disabled persons, seniors, adults, or children.

(s)     Residential facilities and shelters for homeless residents, disabled persons, seniors, adults, children and animals.

(t)     Professional services, such as legal, payroll or accounting services, when necessary to assist in compliance with legally mandated activities.

(u)     Childcare facilities providing services that enable employees exempted in this Order to work as permitted.  To the extent possible, childcare facilities must operate under the following mandatory conditions:

(1) Childcare must be carried out in stable groups of 12 or fewer ("stable" means that the same 12 or fewer children are in the same group each day).

(2) Children shall not change from one group to another.

(3) If more than one group of children is cared for at one facility, each group shall be in a separate room.  Groups shall not mix with each other.

(4) Childcare providers shall remain solely with one group of children.

(v)     Hotels, motels, shared rental units and similar facilities.

(w)     Military/Defense Contractors/FFRDC (Federally Funded Research and Development Centers).  For purposes of this Order, essential personnel may leave their residence to provide any service or perform any work deemed essential for national security including, without limitation, defense, intelligence, and aerospace development and manufacturing for the Department of Defense, the Intelligence Community, and NASA and other federal government, and or United States Government departments and agencies.  Essential personnel include prime, sub-prime, and supplier contractor employees, at both the prime contract level and any supplier level at any tier, working on federal United States Government contracts, such as contracts for national intelligence and national security requirements.

(viii)   <u>Government Employees</u>.  This Order does not apply to employees of government agencies working within the course and scope of their public service employment.  Employees of the City of Los Angeles shall follow any current or future directives issued by the Mayor.

(ix)   <u>Essential Infrastructure</u>.  Individuals may leave their residences to provide any services or goods or perform any work necessary to to build, operate, maintain or manufacture essential infrastructure, including without limitation construction of commercial, office and institutional buildings, residential buildings and housing; airport operations, food supply, concessions, and construction; port operations and construction; water, sewer, gas, electrical, oil extraction and refining; roads and highways, public transportation and rail; solid waste collection and removal; flood control and watershed protection; internet and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services); and manufacturing and distribution companies deemed essential to the supply chains of the industries referenced in this Paragraph, provided that they carry out those services and that work in compliance with social distancing practices as prescribed by the Centers for Disease Control and Prevention and the Los Angeles County Department of Public Health, to the extent possible.

6.     To the extent that this Order is in conflict with earlier Orders, this Order shall supersede the others.

7.     Failure to comply with this Order shall constitute a misdemeanor subject to fines and imprisonment.  I hereby urge the Los Angeles Police Department and the City Attorney to vigorously enforce this Order via Sections 8.77 and 8.78 of the Los Angeles Administrative Code.

8     If any subsection, sentence, clause, phrase, or word of this Order or any application of it to any person, structure, or circumstance is held to be invalid or unconstitutional by a decision of a court of competent jurisdiction, then such decision shall not affect the validity of the remaining portions or applications of this Order.

This order shall be in place until April 19, 2020, and it may be extended prior to that time.

LISTING OF DEPARTMENT OF PUBLIC HEALTH PRESS RELEASES   http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail...



313 N. Figueroa Street, Room 806 · Los Angeles, CA 90012 · (213) 240-8144 · media@ph.lacounty.gov
Facebook.com/LAPublicHealth · Twitter.com/LAPublicHealth

For Immediate Release:
**July 01, 2020**

## Revised Health Officer Order Requires Closure of Indoor On- Site Dining and Other Indoor Activities - 35 New Deaths and 2,002 New Cases of Confirmed COVID-19 in Los Angeles County

The Los Angeles County Health Officer Order will be modified today to align with Gov. Gavin Newsom's directives and require the closure of:

- Indoor, in-person dining at restaurants

- Indoor museums, indoor children's museums, and indoor operations at zoos and aquariums

- Cardrooms and satellite wagering facilities
  Also, the Health Officer Order requires businesses with three or more known cases of COVID-19 within the workplace over the span of 14 days, to report the outbreak to the Los Angeles County Department of Public Health (Public Health). Employers who have one known case within the workplace must have a protocol that requires that person to self-isolate at home and anyone exposed to self-quarantine.

Bars remain closed and all events and gatherings unless specifically allowed by this Order remain prohibited. Additionally, face coverings and gloves must be worn at fitness facilities at all times.

Los Angeles County continues to see steep increases in community spread of COVID-19. There are 1,889 people currently hospitalized, 27% of these people are confirmed cases in the ICU and 18% are confirmed cases on ventilators. This is the largest number of people hospitalized since early May.

There are 2,002 new cases of COVID-19. This is the fourth consecutive day of new cases over 2,000. And today's number is missing lab reports from one of the larger labs.

"We are thinking every day of the many families who have lost loved ones to COVID-19. Our hearts go out to you, and we are so sorry for your loss," said Barbara Ferrer, PhD, MPH, MEd, Director of Public Health. "I know these closures are frustrating and it is heartbreaking to think we are losing ground. These immediate actions give us a chance to regain control over the increased spread. With steep increases in cases and hospitalizations, it is important to act now to prevent as many future cases, hospitalizations and deaths as we can."

In addition to the 2,002 new cases, Public Health has confirmed 35 new deaths of COVID-19. Twenty-one people who died were over the age of 65 years old, six people who died were between the ages of 41 and 65 years old, and four people who died are between the ages of 18 and 40 years old. Twenty-nine people had underlying health conditions including 20 people over the age of 65 years old, five people between the ages of 41 to 65 years old and four people between the ages of 18 to 40 years old. Two deaths were reported by the City of Long Beach and two deaths were reported by the City of Pasadena.

To date, Public Health has identified 105,507 positive cases of COVID-19 across all areas of LA County, and a total of 3,402 deaths. Ninety-three percent of people who died had underlying health conditions. Of those who died, information about race and ethnicity is available for 3,158 people (99 percent of the cases reported by Public Health); 43% of deaths occurred among Latino/Latinx

EX03-073

residents, 27% among White residents, 17% among Asian residents, 11% among African American/Black residents, less than 1% among Native Hawaiian/Pacific Islander residents and 1% among residents identifying with other races. Upon further investigation, 24 cases and two deaths reported earlier were not LA County residents. Testing results are available for nearly 1,120,000 individuals, with 9% of people testing positive.

Everyone should always wear a face covering securely over your nose and mouth and keep six feet apart from others not in your household when out in public. Businesses must continue to follow Public Health directives. Public Health reminds everyone that you remain safer at home.

Earlier this week a Health Officer Order was issued that closes LA County beaches from July 3 through July 6 at 5:00 a.m. to prevent crowded situations that could result in more spread of COVID-19. All public beaches, piers, public beach parking lots, beach bike paths that traverse that sanded portion of the beach, and beach access points will be temporarily closed to the public. The Order also prohibits fireworks displays.

The Reopening Protocols, COVID-19 Surveillance Interactive Dashboard, Roadmap to Recovery, Recovery Dashboard, and additional things you can do to protect yourself, your family and your community are on the Public Health website, www.publichealth.lacounty.gov.

*Please note: During July 4 through July 5, Public Health will make improvements to the data processing systems which will result in no new data being reported on those days. This pause in reporting will not affect the collection of this data or outbreak investigations.*

Please see additional information below:

**Laboratory Confirmed Cases -- 105507 Total Cases***

- Los Angeles County (excl. LB and Pas) -- 100059
- Long Beach -- 4120
- Pasadena -- 1328

**Deaths 3402**

- Los Angeles County (excl. LB and Pas) 3179
- Long Beach 132
- Pasadena 91

**Age Group (Los Angeles County Cases Only-excl LB and Pas)**

- 0 to 17 -- 7303
- 18 to 40 --41991
- 41 to 65 --36652
- over 65 --13560
- Under Investigation --553

**Gender (Los Angeles County Cases Only-excl LB and Pas)**

- Female 49457
- Male 50071
- Other 12
- Under Investigation 519

**Race/Ethnicity (Los Angeles County Cases Only-excl LB and Pas)**

EX03-074

LISTING OF DEPARTMENT OF PUBLIC HEALTH PRESS RELEASES    http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail...

- American Indian/Alaska Native 82

- Asian 3861

- Black 2904

- Hispanic/Latino 30342

- Native Hawaiian/Pacific Islander 367

- White 8343

- Other 17296

- Under Investigation 36864

**Hospitalization**

- Hospitalized (Ever) 8378

**Deaths Race/Ethnicity (Los Angeles County Cases Only-excl LB and Pas)**

- American Indian/Alaska Native 9

- Asian 523

- Black 358

- Hispanic/Latino 1370

- Native Hawaiian/Pacific Islander 9

- White 867

- Other 22

- Under Investigation 21

**CITY / COMMUNITY (Rate\*\*)**

- City of Agoura Hills 61 ( 292 )

- City of Alhambra 457 ( 527 )

- City of Arcadia 173 ( 300 )

- City of Artesia 106 ( 631 )

- City of Avalon 6 ( 155 )

- City of Azusa 461 ( 921 )

- City of Baldwin Park 929 ( 1210 )

- City of Bell 672 ( 1850 )

- City of Bell Gardens 715 ( 1660 )

- City of Bellflower 881 ( 1133 )

- City of Beverly Hills 243 ( 704 )

EX03-075

LISTING OF DEPARTMENT OF PUBLIC HEALTH PRESS RELEASES    http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail...

- City of Bradbury 6 ( 561 )

- City of Burbank 586 ( 547 )

- City of Calabasas 130 ( 534 )

- City of Carson 673 ( 717 )

- City of Cerritos 230 ( 459 )

- City of Claremont 108 ( 296 )

- City of Commerce* 203 ( 1553 )

- City of Compton 1490 ( 1491 )

- City of Covina 440 ( 897 )

- City of Cudahy 463 ( 1902 )

- City of Culver City 214 ( 537 )

- City of Diamond Bar 179 ( 311 )

- City of Downey 1637 ( 1433 )

- City of Duarte 199 ( 904 )

- City of El Monte 1555 ( 1326 )

- City of El Segundo 57 ( 340 )

- City of Gardena 520 ( 848 )

- City of Glendale 1455 ( 705 )

- City of Glendora 341 ( 646 )

- City of Hawaiian Gardens 183 ( 1247 )

- City of Hawthorne 743 ( 837 )

- City of Hermosa Beach 77 ( 391 )

- City of Hidden Hills 4 ( 212 )

- City of Huntington Park 1196 ( 2011 )

- City of Industry 13 ( 2975 )

- City of Inglewood 1060 ( 933 )

- City of Irwindale 14 ( 960 )

- City of La Canada Flintridge 79 ( 382 )

- City of La Habra Heights 15 ( 275 )

- City of La Mirada 329 ( 663 )

- City of La Puente 458 ( 1125 )
- City of La Verne 127 ( 382 )
- City of Lakewood 457 ( 569 )
- City of Lancaster* 1128 ( 698 )
- City of Lawndale 202 ( 601 )
- City of Lomita 84 ( 405 )
- City of Lynwood* 1347 ( 1870 )
- City of Malibu 52 ( 401 )
- City of Manhattan Beach 137 ( 381 )
- City of Maywood 629 ( 2243 )
- City of Monrovia 301 ( 776 )
- City of Montebello 939 ( 1459 )
- City of Monterey Park 335 ( 538 )
- City of Norwalk 1192 ( 1108 )
- City of Palmdale 1302 ( 819 )
- City of Palos Verdes Estates 52 ( 385 )
- City of Paramount 869 ( 1551 )
- City of Pico Rivera 975 ( 1517 )
- City of Pomona 1548 ( 993 )
- City of Rancho Palos Verdes 140 ( 328 )
- City of Redondo Beach 217 ( 316 )
- City of Rolling Hills 2 ( 103 )
- City of Rolling Hills Estates 24 ( 296 )
- City of Rosemead 262 ( 473 )
- City of San Dimas 155 ( 449 )
- City of San Fernando 303 ( 1231 )
- City of San Gabriel 245 ( 598 )
- City of San Marino 30 ( 226 )
- City of Santa Clarita 1207 ( 548 )
- City of Santa Fe Springs 168 ( 915 )

- City of Santa Monica 414 ( 448 )
- City of Sierra Madre 30 ( 273 )
- City of Signal Hill 101 ( 856 )
- City of South El Monte 283 ( 1355 )
- City of South Gate 1756 ( 1789 )
- City of South Pasadena 162 ( 622 )
- City of Temple City 247 ( 678 )
- City of Torrance 594 ( 398 )
- City of Vernon 14 ( 6699 )
- City of Walnut 101 ( 331 )
- City of West Covina 1000 ( 924 )
- City of West Hollywood 271 ( 733 )
- City of Westlake Village 8 ( 96 )
- City of Whittier 737 ( 843 )
- Los Angeles 45746 ( 1131 )
- Los Angeles - Adams-Normandie 103 ( 1256 )
- Los Angeles - Alsace 151 ( 1213 )
- Los Angeles - Angeles National Forest 2 ( 5000 )
- Los Angeles - Angelino Heights 24 ( 959 )
- Los Angeles - Arleta 498 ( 1449 )
- Los Angeles - Atwater Village 84 ( 573 )
- Los Angeles - Baldwin Hills 281 ( 903 )
- Los Angeles - Bel Air 48 ( 569 )
- Los Angeles - Beverly Crest 56 ( 447 )
- Los Angeles - Beverlywood 60 ( 455 )
- Los Angeles - Boyle Heights* 1768 ( 2035 )
- Los Angeles - Brentwood 119 ( 384 )
- Los Angeles - Brookside 1 ( 172 )
- Los Angeles - Cadillac-Corning 49 ( 688 )
- Los Angeles - Canoga Park 814 ( 1247 )

EX03-078

LISTING OF DEPARTMENT OF PUBLIC HEALTH PRESS RELEASES   http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail...

- Los Angeles - Carthay 128 ( 891 )
- Los Angeles - Central 994 ( 2549 )
- Los Angeles - Century City 54 ( 422 )
- Los Angeles - Century Palms/Cove 606 ( 1795 )
- Los Angeles - Chatsworth 289 ( 780 )
- Los Angeles - Cheviot Hills 31 ( 338 )
- Los Angeles - Chinatown 40 ( 499 )
- Los Angeles - Cloverdale/Cochran 132 ( 907 )
- Los Angeles - Country Club Park 147 ( 970 )
- Los Angeles - Crenshaw District 126 ( 911 )
- Los Angeles - Crestview 123 ( 1082 )
- Los Angeles - Del Rey 136 ( 454 )
- Los Angeles - Downtown* 314 ( 1142 )
- Los Angeles - Eagle Rock 323 ( 816 )
- Los Angeles - East Hollywood 337 ( 1151 )
- Los Angeles - Echo Park 86 ( 603 )
- Los Angeles - El Sereno 440 ( 1052 )
- Los Angeles - Elysian Park 26 ( 455 )
- Los Angeles - Elysian Valley 119 ( 1170 )
- Los Angeles - Encino 216 ( 478 )
- Los Angeles - Exposition 34 ( 1022 )
- Los Angeles - Exposition Park 504 ( 1122 )
- Los Angeles - Faircrest Heights 10 ( 278 )
- Los Angeles - Figueroa Park Square 104 ( 1193 )
- Los Angeles - Florence-Firestone 952 ( 2007 )
- Los Angeles - Glassell Park 306 ( 968 )
- Los Angeles - Gramercy Place 104 ( 966 )
- Los Angeles - Granada Hills 540 ( 928 )
- Los Angeles - Green Meadows 354 ( 1646 )
- Los Angeles - Hancock Park 130 ( 763 )

LISTING OF DEPARTMENT OF PUBLIC HEALTH PRESS RELEASES    http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail...

- Los Angeles - Harbor City 201 ( 691 )
- Los Angeles - Harbor Gateway 311 ( 713 )
- Los Angeles - Harbor Pines 9 ( 374 )
- Los Angeles - Harvard Heights 235 ( 1303 )
- Los Angeles - Harvard Park 604 ( 1592 )
- Los Angeles - Highland Park 474 ( 980 )
- Los Angeles - Historic Filipinotown 220 ( 1586 )
- Los Angeles - Hollywood 477 ( 699 )
- Los Angeles - Hollywood Hills 124 ( 421 )
- Los Angeles - Hyde Park 282 ( 988 )
- Los Angeles - Jefferson Park 99 ( 1226 )
- Los Angeles - Koreatown 500 ( 967 )
- Los Angeles - Lafayette Square 35 ( 768 )
- Los Angeles - Lake Balboa 352 ( 834 )
- Los Angeles - Lakeview Terrace 248 ( 1888 )
- Los Angeles - Leimert Park 111 ( 729 )
- Los Angeles - Lincoln Heights 500 ( 1534 )
- Los Angeles - Little Armenia 256 ( 3190 )
- Los Angeles - Little Bangladesh 242 ( 854 )
- Los Angeles - Little Tokyo 37 ( 1181 )
- Los Angeles - Longwood 51 ( 1185 )
- Los Angeles - Los Feliz 83 ( 384 )
- Los Angeles - Manchester Square 51 ( 597 )
- Los Angeles - Mandeville Canyon 3 ( 96 )
- Los Angeles - Mar Vista 130 ( 306 )
- Los Angeles - Marina Peninsula 20 ( 459 )
- Los Angeles - Melrose 915 ( 1178 )
- Los Angeles - Mid-city 164 ( 1091 )
- Los Angeles - Miracle Mile 69 ( 384 )
- Los Angeles - Mission Hills 285 ( 1181 )

LISTING OF DEPARTMENT OF PUBLIC HEALTH PRESS RELEASES   http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail...

- Los Angeles - Mt. Washington 189 ( 783 )
- Los Angeles - North Hills 780 ( 1267 )
- Los Angeles - North Hollywood 1275 ( 842 )
- Los Angeles - Northridge 587 ( 841 )
- Los Angeles - Pacific Palisades 73 ( 343 )
- Los Angeles - Pacoima 1316 ( 1710 )
- Los Angeles - Palisades Highlands 9 ( 234 )
- Los Angeles - Palms 290 ( 661 )
- Los Angeles - Panorama City 1256 ( 1669 )
- Los Angeles - Park La Brea 39 ( 287 )
- Los Angeles - Pico-Union 948 ( 2266 )
- Los Angeles - Playa Del Rey 6 ( 188 )
- Los Angeles - Playa Vista 47 ( 429 )
- Los Angeles - Porter Ranch 146 ( 410 )
- Los Angeles - Rancho Park 28 ( 427 )
- Los Angeles - Regent Square 16 ( 576 )
- Los Angeles - Reseda 969 ( 1265 )
- Los Angeles - Reseda Ranch 40 ( 863 )
- Los Angeles - Reynier Village 22 ( 520 )
- Los Angeles - San Pedro* 1186 ( 1520 )
- Los Angeles - Shadow Hills 20 ( 450 )
- Los Angeles - Sherman Oaks 400 ( 458 )
- Los Angeles - Silverlake 302 ( 685 )
- Los Angeles - South Carthay 51 ( 481 )
- Los Angeles - South Park 878 ( 2313 )
- Los Angeles - St Elmo Village 65 ( 1418 )
- Los Angeles - Studio City 112 ( 499 )
- Los Angeles - Sun Valley 546 ( 1040 )
- Los Angeles - Sunland 226 ( 1107 )
- Los Angeles - Sycamore Square 1 ( 155 )

LISTING OF DEPARTMENT OF PUBLIC HEALTH PRESS RELEASES    http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail...

- Los Angeles - Sylmar* 1321 ( 1603 )

- Los Angeles - Tarzana 350 ( 1134 )

- Los Angeles - Temple-Beaudry 575 ( 1456 )

- Los Angeles - Thai Town 63 ( 642 )

- Los Angeles - Toluca Lake 34 ( 391 )

- Los Angeles - Toluca Terrace 8 ( 613 )

- Los Angeles - Toluca Woods 4 ( 215 )

- Los Angeles - Tujunga 187 ( 672 )

- Los Angeles - University Hills 20 ( 583 )

- Los Angeles - University Park 362 ( 1318 )

- Los Angeles - Valley Glen 225 ( 750 )

- Los Angeles - Valley Village 303 ( 1226 )

- Los Angeles - Van Nuys 1230 ( 1320 )

- Los Angeles - Venice 94 ( 277 )

- Los Angeles - Vermont Knolls 352 ( 2047 )

- Los Angeles - Vermont Square 164 ( 2142 )

- Los Angeles - Vermont Vista 807 ( 1959 )

- Los Angeles - Vernon Central 1347 ( 2590 )

- Los Angeles - Victoria Park 89 ( 1060 )

- Los Angeles - View Heights 14 ( 379 )

- Los Angeles - Watts 724 ( 1697 )

- Los Angeles - Wellington Square 49 ( 997 )

- Los Angeles - West Adams 419 ( 1516 )

- Los Angeles - West Hills 227 ( 560 )

- Los Angeles - West Los Angeles 200 ( 531 )

- Los Angeles - West Vernon 981 ( 1829 )

- Los Angeles - Westchester 170 ( 329 )

- Los Angeles - Westlake 1390 ( 2342 )

- Los Angeles - Westwood 136 ( 251 )

- Los Angeles - Wholesale District* 1196 ( 3310 )

LISTING OF DEPARTMENT OF PUBLIC HEALTH PRESS RELEASES   http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail...

- Los Angeles - Wilmington 604 ( 1069 )
- Los Angeles - Wilshire Center 477 ( 951 )
- Los Angeles - Winnetka 496 ( 958 )
- Los Angeles - Woodland Hills 308 ( 453 )
- Unincorporated - Acton 25 ( 314 )
- Unincorporated - Agua Dulce 13 ( 313 )
- Unincorporated - Altadena 240 ( 550 )
- Unincorporated - Anaverde 4 ( 265 )
- Unincorporated - Angeles National Forest 2 ( 161 )
- Unincorporated - Arcadia 24 ( 301 )
- Unincorporated - Athens-Westmont 512 ( 1206 )
- Unincorporated - Athens Village 72 ( 1470 )
- Unincorporated - Avocado Heights 77 ( 1137 )
- Unincorporated - Azusa 154 ( 967 )
- Unincorporated - Bassett 245 ( 1654 )
- Unincorporated - Bouquet Canyon 1 ( 93 )
- Unincorporated - Bradbury 3 ( 2778 )
- Unincorporated - Canyon Country 47 ( 608 )
- Unincorporated - Castaic* 1791 ( 6587 )
- Unincorporated - Cerritos 0 ( 0 )
- Unincorporated - Charter Oak 0 ( 0 )
- Unincorporated - Claremont 0 ( 0 )
- Unincorporated - Covina 135 ( 803 )
- Unincorporated - Covina (Charter Oak) 97 ( 738 )
- Unincorporated - Del Aire 29 ( 660 )
- Unincorporated - Del Rey 1 ( 314 )
- Unincorporated - Del Sur 3 ( 124 )
- Unincorporated - Desert View Highlands 8 ( 321 )
- Unincorporated - Duarte 37 ( 836 )
- Unincorporated - East Covina 0 ( 0 )

- Unincorporated - East La Mirada 35 ( 661 )
- Unincorporated - East Lancaster 0 ( 0 )
- Unincorporated - East Los Angeles 2542 ( 2029 )
- Unincorporated - East Pasadena 5 ( 78 )
- Unincorporated - East Rancho Dominguez 195 ( 1274 )
- Unincorporated - East Whittier 33 ( 622 )
- Unincorporated - El Camino Village 74 ( 842 )
- Unincorporated - El Monte 1 ( 690 )
- Unincorporated - Elizabeth Lake 4 ( 241 )
- Unincorporated - Florence-Firestone 1394 ( 2154 )
- Unincorporated - Franklin Canyon 0 ( 0 )
- Unincorporated - Glendora 3 ( 455 )
- Unincorporated - Hacienda Heights 363 ( 649 )
- Unincorporated - Harbor Gateway 0 ( 0 )
- Unincorporated - Hawthorne 14 ( 557 )
- Unincorporated - Hi Vista 1 ( 91 )
- Unincorporated - Kagel/Lopez Canyons 9 ( 637 )
- Unincorporated - La Crescenta-Montrose 57 ( 288 )
- Unincorporated - La Habra Heights 0 ( 0 )
- Unincorporated - La Rambla 61 ( 2940 )
- Unincorporated - La Verne 7 ( 343 )
- Unincorporated - Ladera Heights 32 ( 453 )
- Unincorporated - Lake Hughes 1 ( 150 )
- Unincorporated - Lake Los Angeles 60 ( 462 )
- Unincorporated - Lake Manor 5 ( 304 )
- Unincorporated - Lakewood 0 ( 0 )
- Unincorporated - Lennox 218 ( 967 )
- Unincorporated - Leona Valley 10 ( 571 )
- Unincorporated - Littlerock 24 ( 597 )
- Unincorporated - Littlerock/Juniper Hills 2 ( 154 )

LISTING OF DEPARTMENT OF PUBLIC HEALTH PRESS RELEASES    http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail...

- Unincorporated - Littlerock/Pearblossom 35 ( 981 )
- Unincorporated - Llano 1 ( 114 )
- Unincorporated - Marina del Rey 20 ( 213 )
- Unincorporated - Miracle Mile 0 ( 0 )
- Unincorporated - Monrovia 37 ( 953 )
- Unincorporated - Newhall 3 ( 1364 )
- Unincorporated - North Lancaster 7 ( 584 )
- Unincorporated - North Whittier 54 ( 646 )
- Unincorporated - Northeast San Gabriel 102 ( 424 )
- Unincorporated - Palmdale 6 ( 713 )
- Unincorporated - Palos Verdes Peninsula 0 ( 0 )
- Unincorporated - Pearblossom/Llano 9 ( 460 )
- Unincorporated - Pellissier Village 5 ( 808 )
- Unincorporated - Placerita Canyon 0 ( 0 )
- Unincorporated - Pomona 7 ( 361 )
- Unincorporated - Quartz Hill 62 ( 480 )
- Unincorporated - Rancho Dominguez 30 ( 1127 )
- Unincorporated - Roosevelt 3 ( 322 )
- Unincorporated - Rosewood 9 ( 700 )
- Unincorporated - Rosewood/East Gardena 5 ( 419 )
- Unincorporated - Rosewood/West Rancho Dominguez 39 ( 1160 )
- Unincorporated - Rowland Heights 273 ( 535 )
- Unincorporated - San Clemente Island 0 ( 0 )
- Unincorporated - San Francisquito Canyon/Bouquet Canyon 0 ( 0 )
- Unincorporated - San Jose Hills 206 ( 1019 )
- Unincorporated - San Pasqual 4 ( 197 )
- Unincorporated - Sand Canyon 0 ( 0 )
- Unincorporated - Santa Catalina Island 3 ( 1124 )
- Unincorporated - Santa Monica Mountains* 49 ( 263 )
- Unincorporated - Saugus 6 ( 3871 )

EX03-085

LISTING OF DEPARTMENT OF PUBLIC HEALTH PRESS RELEASES   http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail...

- Unincorporated - Saugus/Canyon Country 0 ( 0 )
- Unincorporated - South Antelope Valley 1 ( 220 )
- Unincorporated - South El Monte 18 ( 1003 )
- Unincorporated - South San Gabriel 87 ( 983 )
- Unincorporated - South Whittier 498 ( 841 )
- Unincorporated - Southeast Antelope Valley 7 ( 896 )
- Unincorporated - Stevenson Ranch 66 ( 315 )
- Unincorporated - Sun Village 53 ( 878 )
- Unincorporated - Sunrise Village 16 ( 1235 )
- Unincorporated - Twin Lakes/Oat Mountain 8 ( 483 )
- Unincorporated - Val Verde 29 ( 876 )
- Unincorporated - Valencia 13 ( 423 )
- Unincorporated - Valinda 250 ( 1070 )
- Unincorporated - View Park/Windsor Hills 66 ( 567 )
- Unincorporated - Walnut Park 288 ( 1784 )
- Unincorporated - West Antelope Valley 3 ( 199 )
- Unincorporated - West Carson 168 ( 761 )
- Unincorporated - West Chatsworth 0 ( 0 )
- Unincorporated - West LA 25 ( 2626 )
- Unincorporated - West Puente Valley 133 ( 1352 )
- Unincorporated - West Rancho Dominguez 12 ( 883 )
- Unincorporated - West Whittier/Los Nietos 366 ( 1359 )
- Unincorporated - Westfield/Academy Hills 2 ( 154 )
- Unincorporated - Westhills 3 ( 358 )
- Unincorporated - White Fence Farms 20 ( 543 )
- Unincorporated - Whittier 22 ( 581 )
- Unincorporated - Whittier Narrows 0 ( 0 )
- Unincorporated - Willowbrook 585 ( 1676 )
- Unincorporated - Wiseburn 43 ( 713 )
- - Under Investigation 2S24

These numbers are subject to change based on further investigation. Twenty-four cases and two death previously reported were not

EX03-086

LISTING OF DEPARTMENT OF PUBLIC HEALTH PRESS RELEASES   http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail...

in Public Health's jurisdiction. * Means that case numbers include cases associated with correctional facility outbreaks located in the city/community. **Rate is crude and is per 100,000. This represents the number of cases per 100,000 people and allows for the proportional comparison of cities of different sizes.

Always check with trusted sources for the latest accurate information about novel coronavirus:

- Los Angeles County Department of Public Health http://publichealth.lacounty.gov/media/Coronavirus/

- California Department of Public Health https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx

- Centers for Disease Control and Prevention (CDC) https://www.cdc.gov/coronavirus/2019- ncov/index.html Spanish https://www.cdc.gov/coronavirus/2019-ncov/index-sp.html

- World Health Organization https://www.who.int/health-topics/coronavirus

- LA County residents can also call 2-1-1

The Department of Public Health is committed to promoting health equity and ensuring optimal health and well-being for all 10 million residents of Los Angeles County. Through a variety of programs, community partnerships and services, Public Health oversees environmental health, disease control, and community and family health. Nationally accredited by the Public Health Accreditation Board, the Los Angeles County Department of Public Health comprises nearly 4,500 employees and has an annual budget of $1.2 billion. To learn more about Los Angeles County Public Health, please visit www.publichealth.lacounty.gov, and follow LA County Public Health on social media at twitter.com/lacounty.gov, and follow LA County Public Health on social media at twitter.com/lapublichealth, facebook.com/lapublichealth, instagram.com/lapublichealth and youtube.com/lapublichealth.

#####

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



## REOPENING SAFER AT WORK AND IN THE COMMUNITY
## FOR CONTROL OF COVID-19
MOVING THE COUNTY OF LOS ANGELES INTO
STAGE 3 OF CALIFORNIA'S PANDEMIC
RESILIENCE ROADMAP
Revised Order Issued: August 12, 2020

---

**Recent Update**
8/12/20—Updated to do the following:
- Clarify when elementary schools may seek a waiver to conduct in-person instruction in elementary schools for grades TK-6.
- Update operations for childcare facilities to specify childcare must be carried out in stable groups of 12 or fewer children in the same group each day, instead of 10.
- Align with new guidance for Institutes of Higher Education.
- Updated revision dates on last page, "Appendices at a Glance."

---

**Please read this Order carefully. Violation of or failure to comply**
**with this Order is a crime punishable by fine, imprisonment, or both.**
**(California Health and Safety Code §120295; Los Angeles County Code § 11.02.080.)**

**SUMMARY OF THE ORDER:** This Revised County of Los Angeles Health Officer Order (Order) supersedes all prior Safer At Home orders (Prior Orders) issued by the County of Los Angeles Health Officer (Health Officer). This Order is issued to comply with State Executive Orders N-33-20 and N-60-20 issued by Governor Gavin Newsom, and the accompanying orders of the State Public Health Officer issued on March 19, May 7, July 13, and July 17, 2020.

This Order's intent is to continue to ensure that County residents remain in their residences as much as practicable, to limit close contact with others outside their household in both indoor and outdoor spaces. All persons who can telework or work from home should continue to do so as much as possible during this pandemic. Further, gatherings of people who are not part of a single household or living unit are prohibited within the County of Los Angeles Public Health Jurisdiction, except for the limited purposes expressly permitted by this Order. This Order allows persons to engage in all permitted activities, as defined by the Order, but requires that persons practice Social (Physical) Distancing, at all times while out in public and wear a cloth face covering over both the nose and mouth when in or likely to be in contact with others, to lower the risks of person-to-person contact for themselves and others.

This Order is issued to align the County of Los Angeles (County) with State Executive Orders and State Health Officer Orders. This Order will be revised in the future to reflect the State Executive Orders and State Public Health Officer Orders and guidance that progressively designate sectors, businesses, establishments, or activities that may reopen with certain modifications, based on health and safety needs and at a pace designed to protect health and safety, and that may also progressively close specific activities and business sectors based on increases in daily reported COVID-19 cases, hospitalizations, and the testing positivity rates. Should local COVID-19 conditions warrant, the Health

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 1 of 17

EX03-088

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



Officer may, after consultation with the Board of Supervisors, issue Orders that are more restrictive than those of the State Public Health Officer. Changes from the previous Order are highlighted.

This Order is effective within the County of Los Angeles Public Health Jurisdiction, defined as all cities and unincorporated areas within the County of Los Angeles, with the exception of the cities of Long Beach and Pasadena that must follow their respective City Health Officer orders and guidance. This Order is effective immediately and will continue until further notice.

<div align="center">

**UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND
SAFETY CODE SECTIONS 101040, 101085, AND 120175,
THE COUNTY OF LOS ANGELES HEALTH OFFICER ORDERS:**

</div>

1. This Order supersedes the Health Officer's Prior Orders. In order to immediately address the serious recent regression of COVID-19 Indicators within the County of Los Angeles, which show troubling and substantial increases in new daily reported COVID-19 cases, hospitalizations, and the testing positivity rate, this Order requires the immediate temporary closure of specific activities and business sectors. This Order aligns the County with both the Governor's July 13, 2020, announcement requiring the closure of specific activities and business sectors and the State Public Health Officer's phased reopening approach guided by the California Pandemic Resilience Roadmap. The Health Officer will continue to assess the phased reopening allowed by the State Public Health Officer and this Order on an ongoing basis and determine, after consultation with the Board of Supervisors, whether this Order needs to be modified if the public health risk associated with COVID-19 increases in the future.

2. This Order's intent is to continue to ensure that County residents remain in their residences as much as practicable, to limit close contact with others outside their household in both indoor and outdoor spaces. All persons who can telework or work from home should continue to do so as much as possible during this pandemic. Sustained Social (Physical) Distancing and infection control measures will continue slowing the spread of COVID-19 and diminishing its impact on the delivery of critical healthcare services. All provisions of this Order must be interpreted to effectuate that intent. Failure to comply with any of the Order's provisions constitutes an imminent threat and menace to public health, and a public nuisance, and is punishable by fine, imprisonment or both.

3. All persons living within the County of Los Angeles Public Health Jurisdiction should remain in their residences whenever practicable.
   a) Nothing in this Order prohibits members of a single household or living unit from engaging in permitted activities together. But gatherings of people who are *not* part of a single household or living unit are prohibited within the County of Los Angeles Public Health Jurisdiction, except for the limited purposes expressly permitted by this Order.

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 2 of 17

EX03-089

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



b) People leaving their residences must strictly comply with the Social (Physical) Distancing requirements stated in this Order and specified in guidance or protocols established by the County Department of Public Health. This Order, beginning June 19, 2020, requires all persons wear a cloth face covering over both the nose and mouth whenever they leave their place of residence and are or can be in contact with or walking near or past others who are non-household members in both public and private places, whether indoors or outdoors. This includes wearing a cloth face covering when patronizing a business. Wearing a cloth face covering reduces the risk of transmission to others from people who do not have symptoms and do not know they are infected. The use of face coverings is commonly referred to as "source control."

c) Persons and businesses within the County of Los Angeles Public Health Jurisdiction are required to follow the COVID-19 infection control protocols and guidance provided by the County Department of Public Health. In instances where the County has not provided a specific guidance or protocol, specific guidance or protocols established by the State Public Health Officer shall control.

    i. In the event that an owner, manager, or operator of any business knows of three (3) or more cases of COVID-19 among their employees within a span of 14 days the employer must report this outbreak to the Department of Public Health at (888) 397-3993 or (213) 240-7821.

    ii. In the event that an owner, manager, or operator of any business is informed that one or more employees of the business has tested positive for, or has symptoms consistent with COVID-19 (case), the employer must have a protocol to require the case(s) to isolate themselves at home and require the immediate self-quarantine of all employees that had a workplace exposure to the case(s).

d) Pursuant to the State of California's action[1] and the United States District Court Central District of California's order,[2] jurisdictions within the County of Los Angeles Public Health Jurisdiction are expected to comply with the provision of hotel and motel rooms for vulnerable people experiencing homelessness through Project Roomkey, which slows the spread of COVID-19 and retains capacity of the healthcare system.

4. All people residing within the County of Los Angeles Public Health Jurisdiction who are age 65 or older and all people of any age who have active or unstable pre-existing health conditions, should remain in their residences as much as possible during the pandemic. People in these categories should leave their residences only when necessary to seek medical care, exercise or obtain food or other necessities. The Health Officer strongly recommends that all employers offer telework or other accommodations to persons who are age 65 or older and all people of any age who have an active or unstable pre-existing health conditions.

[1] Office of Governor Gavin Newsom, Action re: Project Roomkey, 4/3/2020, https://www.gov.ca.gov/2020/04/03/at-newly-converted-motel-governor-newsom-launches-project-roomkey-a-first-in-the-nation-initiative-to-secure-hotel-motel-rooms-to-protect-homeless-individuals-from-covid-19/; 2020-21 May Revision to the Governor's Budget, Project Roomkey, pg. 78-79
[2] Order re: Preliminary Injunction (Case No. LA CV 20-02291-DDC-KES), LA Alliance for Human Rights et al v. City of Los Angeles et al, States District Court Central District of California, 5/15/2020.

Reopening Safer at Work and In the Community for Control of COVID-19:               Page 3 of 17
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

EX03-090

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



5. All government agencies working in the course and scope of their public service employment are Essential Government Functions.

   a) All government employees are essential, including but not limited to, health care providers and emergency responders including employees who serve in the following areas: law enforcement; emergency services and management; first responders; fire; search and rescue; juvenile detention; corrections; healthcare services and operations; public health; laboratory or medical testing; mental health; community health; public works; executive management employees serving in these fields; all employees assigned to serve in or support the foregoing fields; and all employees whose services are otherwise needed to assist in a declared emergency.

   b) While all government employees are essential, the employees identified here, and others called to serve in their Disaster Service Worker capacity, must be available to serve the public or assist in response or continuity of operations efforts during this health crisis to the maximum extent allowed under the law.

   c) This Order does not, in any way, restrict (a) first responder access to the site(s) named in this Order during an emergency or (b) local, state or federal officers, investigators, or medical or law enforcement personnel from carrying out their lawful duties at the site(s) named in this Order.

   d) All persons who perform Essential Governmental Functions are categorically exempt from this Order while performing such governmental functions or services. Each governmental entity shall identify and designate appropriate employees, volunteers, or contractors to continue providing and carrying out any Essential Governmental Functions. All Essential Governmental Functions should be performed in compliance with Social (Physical) Distancing Protocol, to the extent possible.

6. This Order does not supersede any stricter limitation imposed by a local public entity within the County of Los Angeles Public Health Jurisdiction.

7. The Health Officer orders the closure of the following types of higher-risk businesses, recreational sites, commercial properties, and activities, where more frequent and prolonged person-to-person contacts are likely to occur:

   a) Lounges and nightclubs;

   b) Bars, breweries, tasting rooms, craft distilleries, and wineries that possess a valid low risk restaurant public health permit issued by the County of Los Angeles.

   c) Brewpubs, craft distilleries and breweries and wineries, with premises set aside for beer and/or wine tasting, that are exempt from the definition of a food facility by California Health and Safety Code Section 113789(c)(5), and do not hold a health permit for preparing and serving food on site.

   d) Public entertainment venues: movie theaters, live performance theaters, concert venues, theme parks, and festivals;

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 4 of 17

EX03-091

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



e) Family entertainment centers such as bowling alleys, arcades, miniature golf, and batting cages;

f) All restaurants, but only for indoor, in-person onsite dining until further notice;

g) Cardrooms, satellite wagering facilities, and racetrack onsite wagering facilities until further notice;

h) Indoor and outdoor playgrounds for children, except those located within a school or childcare center;

i) Indoor portions and exhibits of museums, zoos and aquariums are closed to the public until further notice;

j) Hot tubs, steam rooms and saunas not located on a residential property;

k) All events and gatherings, unless specifically allowed by this Order.

8. All Essential Businesses, unless specific modifications are required by this Order, may remain open to the public and conduct normal business operations, provided that they implement and maintain the Social (Physical) Distancing Protocol defined in Paragraph 20 and attached to this Order as **Appendix A**. An Essential Business' owner, manager, or operator must prepare and post a Social (Physical) Distancing Protocol for each facility or office located within the County of Los Angeles Public Health Jurisdiction and must ensure that the Essential Business meets all other requirements of the Social (Physical) Distancing Protocol.

9. Lower-Risk Businesses are businesses that are not specified in Paragraph 7 of this Order, and not defined as an Essential Business in Paragraph 18 of this Order. There are five categories of Lower-Risk Businesses that may reopen under this Order: (1) retailers ("Lower-Risk Retail Businesses"), (2) manufacturing and logistics sector businesses that supply Lower-Risk Retail Businesses, (3) Non-Essential office-based businesses (although telework is strongly encouraged), (4) Indoor Malls and Shopping Centers, and (5) hair salons and barbershops. These five categories of Lower-Risk Businesses may reopen subject to the following conditions:

a) For any Lower-Risk Retail Business that sells goods and services, the owner, manager, or operator must, for each facility located within the County of Los Angeles Public Health Jurisdiction, prior to reopening, prepare, implement and post the Reopening Protocols for Retail Establishments: Opening for In Person Shopping, attached to this Order as **Appendix B**.

b) For any non-retail Lower-Risk Business, that is a manufacturing and logistics sector business that supplies Lower-Risk Retail Businesses, the owner, manager, or operator must, prior to reopening, prepare, implement and post the required Los Angeles County Department of Public Health Reopening Protocol, applicable to the business type or location, attached to this Order as **Appendix C**.

c) For any Non-Essential office-based business, all indoor portions and operations must cease in-person operations until further notice. Non-essential office-based businesses whose operations require employees to work from an

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 5 of 17

EX03-092

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



office worksite, and that this Order does not identify as an Essential Business, Healthcare Operation, or Essential Infrastructure, may operate via telework and for Minimum Basic Operations only. Essential Businesses, Healthcare Operations, or Essential Infrastructure whose operations require that employees operate from an office worksite, must require employees to telework to the extent feasible and any in-person operations must be in accordance with the required Los Angeles County Department of Public Health Reopening Protocol Office-Based Worksites, attached to this Order as **Appendix D**.

d) For Indoor Malls and Shopping Centers, defined as: A building with (7) or more sales or retail establishments with adjoining indoor space, all indoor portions and operations must close to the public until further notice. Businesses located entirely within the interior of an Indoor Mall or Shopping Center that are not temporarily closed pursuant to Paragraph 7 of this Order, may offer goods and services via outdoor curb-side pick-up. Businesses or activities that are part of an Indoor Mall or Shopping Center and that are not closed pursuant to Paragraph 7 of this Order, but that are accessible by the public from the exterior of the Indoor Mall or Shopping Center may remain open to the public. The owner or operator of the Indoor Mall or Shopping Center must, prior to reopening, prepare, implement and post the required Los Angeles County Department of Public Health Protocols for Shopping Center Operators, attached to this Order as **Appendix E**.

e) Hair salons and barbershops, may be open for outdoor operations only. The indoor portions of hair salons and barbershops must be closed to the public until further notice. The owner, manager, or operator must, prior to reopening, prepare, implement and post the Reopening Protocols for Hair Salons and Barbershops, attached to this Order as **Appendix H**.

9.5. The State Public Health Officer has provided guidance for certain sectors, businesses and activities in Stage 3 of the California Pandemic Resilience Roadmap to conditionally reopen with workplace and operational modifications. The Health Officer, after considering local epidemiological data and after consultation with the Board of Supervisors, approves the reopening of the following specific sectors, businesses and activities subject to the following conditions:

a) Music, film and television production. Operations for music, film and television production may resume on June 12, 2020. The owner, manager, or operator of music, film and television production must, prior to reopening, prepare, implement and post the required Los Angeles County Department of Public Health Reopening Protocol for Music, Film and Television Production, attached to this Order as **Appendix J**, as well as abide by applicable industry-generated protocols.

b) Day camps. Day camps may reopen on June 12, 2020. Day camp owners and operators must implement and post the required Los Angeles County Department of Public Health Reopening Protocol for Day Camps, attached to this Order as **Appendix K**.

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 6 of 17

EX03-093

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



c) Fitness facilities. Fitness facilities, including private gymnasiums, may be open for outdoor operations only. The indoor portions of Fitness facilities are closed to the public until further notice. The owner, manager, or operator of fitness facilities must, prior to reopening, prepare, implement and post the required Los Angeles County Department of Public Health Reopening Protocol for Gyms and Fitness Establishments, attached to this Order as **Appendix L**.

d) Outdoor portions of museums, galleries, botanical gardens, and outdoor facilities at zoos, aquariums, and other similar exhibition spaces (collectively, "Museums") may remain open to the public. The indoor portions of Museums are closed to the public until further notice. The owner, manager, or operator of Museums and exhibition spaces must, prior to reopening, prepare, implement and post the required Los Angeles County Department of Public Health Reopening Protocol for Museums, Galleries, Zoos, and Aquariums, attached to this Order as **Appendix M**.

e) Professional sports without audiences. Professional sports teams and franchises may restart operations and competitions without audiences on June 12, 2020. The owner, manager, or operator of professional sports teams and franchises must, prior to reopening, prepare, implement and post the required Los Angeles County Department of Public Health Protocol for Professional Sports Leagues and Facilities Opening for Training Sessions and Spectator-Free Events, attached to this Order as **Appendix N**, as well as abide by applicable industry-generate protocols.

f) Campgrounds, RV Parks and associated outdoor activities. Campgrounds and recreational vehicle parks may reopen on June 12, 2020. The owner, manager, or operator of campgrounds and RV Parks must, prior to reopening, prepare, implement and post the required Los Angeles County Department of Public Health Reopening Protocol for Campgrounds, RV parks and Cabin Rental Units, attached to this Order as **Appendix O**.

g) Schools (K-12) and School Districts. The State Public Health Officer requires all public and private schools (K-12) and school districts within the County of Los Angeles to remain closed to in-person learning until the County of Los Angeles has been off of the State's County Monitoring List for 14 consecutive days. Schools (K-12) and School Districts may conduct distance learning only. Elementary schools may seek a waiver, when recommended by the State Public Health Officer or as permitted by the County Health Officer. Schools (K-12) and School Districts that are permitted to reopen for in-person learning must follow the Reopening Protocols for K-12 Schools and the Protocol for COVID-19 Exposure Management Plan in K-12 Schools, attached to this Order as **Appendices T1 & T2**.

h) Personal Care Establishments. These establishments include nail salons, tanning salons, esthetician, skin care, and cosmetology services; electrology, body art professionals, tattoo parlors, and piercing shops; and massage therapy (in non-healthcare settings), and may be open for outdoor operations only. The indoor portions of personal care establishments are closed to the public until further notice. The owner, manager or operator of a personal care

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 7 of 17

EX03-094

---

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



establishment must, prior to reopening, prepare, implement and post the required Los Angeles County Department of Public Health Reopening Protocol for Personal Care Establishments, attached to this Order as **Appendix R**.

i) Institutes of Higher Education. Colleges and universities in Los Angeles County will not be able to resume all in-person academic instruction, at this time. Institutions may continue to offer in person training and instruction for essential workforce for required activities that cannot be accomplished through virtual learning. All other academic instruction must continue to be done via distance-learning as specified in the County's Protocols for Institutes of Higher Education attached to this Order as **Appendix U**. Faculty and other staff may come to campus for the purpose of providing distance learning, and other activities related to the purposes above, as well as maintaining minimum basic operations. The institution must comply with all relevant portions of the County's Protocols for Institutes of Higher Education to maximize safety for all employees, also noted in Appendix U.

## REASONS FOR THE ORDER

10. This Order is based upon the following determinations: evidence of continued community transmission of COVID-19 within the County; continued uncertainty regarding the degree of undetected asymptomatic transmission; scientific evidence and best practices regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically; evidence that a significant portion of the County population is at risk for serious health complications, including hospitalizations and death from COVID-19, due to age or pre-existing health conditions; and further evidence that other County residents, including younger and otherwise healthy people, are also at risk for serious negative health outcomes and for transmitting the virus to others. The Order's intent is to protect the public from the avoidable risk of serious illness and death resulting from the spread of COVID-19.

11. Existing community transmission of COVID-19 in Los Angeles County continues to present a substantial and significant risk of harm to residents' health. There is still no vaccine available yet to protect against COVID-19, and no treatment for it. As of August 11, 2020, there have been at least 211,808 cases of COVID-19 and 5,057 deaths reported in Los Angeles County. There remains a strong likelihood of a significant and increasing number of cases of community transmission. Making the community transmission problem worse, some individuals who contract the virus causing COVID-19 have no symptoms or have only mild symptoms, and so are unaware that they carry the virus and are transmitting it to others. Further, evidence shows that the virus can, at times, survive for several hours on surfaces and can be indirectly transmitted between individuals. Because even people without symptoms can transmit the virus, and because evidence shows the infection is easily spread, preventing, limiting, and placing conditions on various types of gatherings and other direct and indirect interpersonal interactions have been proven to reduce the risk of transmitting the virus.

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 8 of 17

EX03-095

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



12. Evidence suggests that until recently the restrictions and requirements imposed by Prior Orders slowed the rate of increase in community transmission and hospitalizations by limiting interactions among people, consistent with the efficacy of similar measures in other parts of the country and world. Unfortunately, the daily number of new cases has significantly increased and hospitals within the County are admitting an increasing number of patients diagnosed with COVID-19, including patients with severe illness in their intensive care units. Further, the hospitals are at risk of being overwhelmed or exceeding capacity. Moreover, because there is not yet a vaccine or proven therapeutic drug, the public health emergency and attendant risks to the public's health by COVID-19 still predominate.

13. In line with the State Public Health Officer, the Health Officer is monitoring several key indicators (COVID-19 Indicators) within the County. The recent regression of some of these COVID-19 Indicators – specifically related to hospital utilization and capacity – makes it appropriate, at this time, to reimpose certain restrictions that are intended to limit person-to-person contact and slow the current rates of community transmission. Activities and business operations that are permitted must be conducted in accordance with the required Social (Physical) Distancing, reopening protocols, and other infection control protocols ordered by the Health Officer.

14. The Health Officer will continue monitoring COVID-19 Indicators to assess the impact of easing restrictions and re-opening sectors. Those Indicators include, but are not limited to:

   a. The number of new hospitalizations and deaths.

   b. The capacity of hospitals and the healthcare system in the County, including acute care beds, Intensive Care Unit beds, and ventilators to provide care for existing COVID-19 patients and other patients, and capacity to surge with an increase of COVID-19 cases.

   c. The supply of personal protective equipment (PPE) available for hospital staff, nursing home staff and other healthcare providers and personnel who need PPE to safely respond to and treat COVID-19 patients and other patients.

   d. The ability and capacity to quickly and accurately test persons to determine whether individuals are COVID-19 positive, especially those in vulnerable populations or high-risk settings or occupations, and to identify and assess outbreaks.

   e. The ability to conduct case investigation and contact tracing for the volume of future cases and associated contacts, isolating confirmed cases and quarantining persons who have had contact with confirmed cases.

**DEFINITIONS AND EXEMPTIONS**

15. The following activities are permitted under this Order:

   a. Engaging in activities or performing tasks important to the health and safety of family or household members (including pets), such as, visiting a health or veterinary care professional, obtaining medical supplies or medication, visiting a

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 9 of 17

EX03-096

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



physician or child's pediatrician for routine care, such as, well-child visits and vaccinations;

b. Obtaining necessary services and supplies for family or household members, or delivering the same, such as, obtaining grocery items or necessary supplies from Essential Businesses for one's household or for delivery to others;

c. Performing work for or accessing businesses that are open, or to carry out Minimum Basic Operations for businesses that are closed or operating remotely.

d. Obtaining or accessing services from Essential Governmental Functions, such as, accessing court, social and administrative services, or complying with an order of law enforcement or court;

e. Caring for minors, the elderly, dependents, persons with disabilities, or other vulnerable persons;

f. Obtaining in-person behavioral health or substance use disorder support in therapeutic small group meetings, such as Alcoholics Anonymous or Narcotics Anonymous, provided that the gathering is limited to 10 people or fewer and Social (Physical) Distancing is practiced.

g. Obtaining in-person faith-based counselling services where the service cannot reasonably be practiced remotely, provided that the gathering is limited to 10 people or fewer and Social (Physical) Distancing is practiced.

h. Attending in-person faith-based services, provided that the faith-based service is held outdoors. There is no maximum attendance for faith-based services that are held outdoors, provided that the attendees have enough space to observe strict Social (Physical) Distancing, including a minimum of six feet between attendees from different households, and are wearing cloth face coverings. Faith-based organizations holding in-person outdoor services, must follow the Department of Public Health Places of Worship Protocols, attached to this Order as **Appendix F.**

i. Engaging in outdoor recreation activity, in compliance with Social (Physical) Distancing requirements and subject to the following limitations:

   i. Outdoor recreation activity at parks, trails, piers, and beaches, and other open spaces must comply with any access or use restrictions separately established by the Health Officer, government, or other entity that manages the area to reduce crowding and the risk of COVID-19 transmission.

   ii. Use of shared outdoor facilities for recreational activities, including but not limited to golf courses, tennis and pickleball courts, shooting and archery ranges, equestrian centers, model airplane areas, community gardens, and bike parks, must comply with any access or use restrictions separately established by the Health Officer, government, or other entity that manages the area to reduce crowding and the risk of COVID-19 transmission.

   iii. Local public entities may elect to temporarily close certain streets or areas to automobile traffic, to allow for increased space for persons to engage in recreational activity permitted by and in compliance with Social (Physical) Distancing requirements specified in this Order.

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 10 of 17

EX03-097

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



     iv.  Swimming pools and splash pads in any non-residential setting may reopen on June 12, 2020, with the owner, manager, or operator of the swimming pool or splash pad implementing and posting the required Los Angeles County Department of Public Health Protocol for Swimming Pools. All hot tubs, saunas, and steam rooms located on non-residential property remain closed.

     v.  For-hire fishing, guided fishing, or small-group chartered boat trips may resume operating on June 12, 2020, with the owner, manager, or operator of the charter business implementing the required Los Angeles County Department of Public Health Protocol for Chartered Boats.

  j.  Participating in a Vehicle-Based Parade. The host of the Vehicle-Based Parade must comply with all local ordinances, traffic control requirements, and state and local laws. Further, the host of Vehicle-Based Parades must comply with the Los Angeles County Department of Public Health Vehicle-Based Parade Protocol, attached to this Order as **Appendix G**.

  k.  Participating in an in-person protest as long as the protest is held outdoors. Outdoor protests are permitted without a limit on attendees. Persons participating in a protest must wear a cloth face covering and maintain physical distancing of six (6) feet between persons or groups of persons from different households at all times, as well as observe the Department of Public Health Protocol for Public Demonstrations.

16. Individuals may  work for, train for, volunteer at, or obtain services at Healthcare Operations: hospitals, clinics, laboratories, dentists, optometrists, pharmacies, physical therapists, rehabilitation and physical wellness programs, chiropractors, pharmaceutical and biotechnology companies, other licensed healthcare facilities, healthcare suppliers, home healthcare service providers, mental or behavioral health providers, alcohol and drug treatment providers, cannabis dispensaries with a medicinal cannabis license and all other required state and local licenses, medical or scientific research companies, or any related and/or ancillary healthcare services, manufacturers, distributors and servicers of medical devices, diagnostics, and equipment, veterinary care, and other animal healthcare. This exemption shall be construed to avoid any impact to the delivery of healthcare, broadly defined.

17. Individuals may provide any service, train for, or perform any work necessary to the operation and maintenance of Essential Infrastructure, which is defined as, public health operations, public works construction, airport operations, port operations, food supply, water, sewer, gas, electrical, oil extraction and refining, roads and highways, public transportation, solid waste collection, removal and processing, flood control and watershed protection, cemeteries, mortuaries, crematoriums, and internet and telecommunications systems (including the provision of essential global, national, local infrastructure for computing services, business infrastructure, communications, and web-based services), and manufacturing and distribution companies deemed essential as part of the Essential Infrastructure supply chain, provided that they carry out those services or that work. In providing these services, training for, or performing

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 11 of 17

EX03-098

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



this work, individuals must comply with Social (Physical) Distancing requirements to the extent practicable.

18. For purposes of this Order, Essential Businesses are:

   a. Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, warehouse stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruit and vegetables, pet supply, water, fresh meats, fish, and poultry, and any other household consumer products (such as cleaning or personal care products). This includes stores that sell groceries and other non-grocery products, such as products necessary to maintaining the safety, sanitation, and essential operation of residences. This does not include businesses that sell only prepackaged non-potentially hazardous food which is incidental to the primary retail business;

   b. Food processors, confectioners, food packagers, food testing labs that are not open to the public, and food cultivation, including farming, livestock, and fishing;

   c. Organizations and businesses that provide food, shelter, social services, and other necessities of life for economically disadvantaged or otherwise needy individuals (including gang prevention and intervention, domestic violence, and homeless service agencies);

   d. Newspapers, television news, radio, magazine, podcast and journalism activities, including taped, digitally recorded or online-streamed content of any sort that is produced by one or more members of a single household, within the household's residence and without the physical presence of any non-member of the household.

   e. Gas stations, auto-supply, mobile auto repair operations, auto repair shops (including, without limitation, auto repair shops adjacent to or otherwise in connection with a retail or used auto dealership), and bicycle repair shops and related facilities;

   f. Banks, credit unions, financial institutions and insurance companies;

   g. Hardware stores, nurseries; building supply stores;

   h. Plumbers, electricians, exterminators, custodial/janitorial workers, handyman services, funeral homes and morticians, moving services, HVAC installers, carpenters, vegetation services, tree maintenance, landscapers, gardeners, property managers, private security personnel and other service providers who provide services to maintain the safety, sanitation, and essential operation to properties and other Essential Businesses;

   i. Businesses providing mailing and shipping services, including post office boxes;

   j. Educational institutions (including public and private K-12 schools, colleges, and universities);

   k. Laundromats, dry cleaners, and laundry service providers;

   l. Restaurants and other food facilities that prepare and serve food, but only for delivery, drive thru, carry out, and outdoor onsite table dining. Indoor dining is not

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 12 of 17

EX03-099

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



permitted. Restaurants with a moderate risk or high risk restaurant permit issued by the County of Los Angeles Department of Public Health and other food facilities that provide in-person outdoor dining must follow the revised Department of Public Health Protocols for Restaurants, attached to this Order as **Appendix I.** Cafeterias, commissaries, and restaurants located within hospitals, nursing homes, or other licensed health care facilities may provide dine-in service, as long as Social (Physical) Distancing is practiced;

m. Businesses that supply office or computer products needed by people who work from home;

n. Businesses that supply other Essential Businesses with the support or supplies necessary to operate;

o. Non-manufacturing, transportation or distribution businesses that ship, truck, transport, or provide logistical support to deliver groceries, food, goods or services directly to residences, Essential Businesses, Healthcare Operations, and Essential Infrastructure. This exemption shall not be used as a basis for engaging in sales to the general public from retail storefronts;

p. Airlines, taxis, ride sharing services and other private transportation providers providing transportation services necessary for activities of daily living and other purposes expressly authorized in this Order;

q. Businesses that manufacture parts and provide necessary service for Essential Infrastructure;

r. Home-based care for seniors, adults, disabled persons, or children;

s. Residential facilities and shelters for homeless residents, disabled persons, seniors, adults, children and animals;

t. Professional services, such as legal, payroll or accounting services, when necessary to assist in compliance with legally mandated activities, and the permitting, inspection, construction, transfer and recording of ownership of housing, including residential and commercial real estate and anything incidental thereto, provided that appointments and other residential viewings must only occur virtually or, if a virtual viewing is not feasible, by appointment with no more than two visitors at a time residing within the same household or living unit and one individual showing the unit (except that in-person visits are not allowed when the occupant is still residing in the residence);

u. Childcare facilities. To the extent possible, childcare facilities must operate under the following conditions: (1) Childcare must be carried out in stable groups of 12 or fewer ("stable" means the same twelve (12) or fewer children are in the same group each day); (2) Children shall not change from one group to another; (3) If more than one group of children is cared for at one facility, each group shall be in a separate room. Groups shall not mix with each other; (4) Childcare providers shall remain solely with one group of children;

v. Hotels, motels, shared rental units and similar facilities. Beginning June 12, 2020, these may reopen for tourism and individual travel, in adherence with the required

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 13 of 17

EX03-100

COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH
ORDER OF THE HEALTH OFFICER



Los Angeles County Department of Public Health Reopening Protocol for Hotels, Lodging and Short-Term Rentals, attached to this Order as **Appendix P**;

w. Construction, which includes the operation, inspection, and maintenance of construction sites and construction projects for construction of commercial, office and institutional buildings, residential and housing construction; and

x. Manufacturers and retailers of fabric or cloth that is made into personal protective equipment, such as, face coverings.

19. For purposes of this Order, "Social (Physical) Distancing" means: (1) Maintaining at least six (6) feet of physical distance from individuals who are not members of the same household; (2) Frequently washing hands with soap and water for at least 20 seconds, or using hand sanitizer that contains at least 60% alcohol; (3) Wearing a cloth face covering when whenever an individual leaves their home or place of residence, and when an individual is or can be in contact with or walking by or past others who are non-household members in both public and private places, whether indoors or outdoors. Wearing a cloth face covering over both the nose and mouth reduces the risk of transmission to others from people who do not have symptoms and do not know they are infected; and (4) Avoiding all physical interaction outside the household when sick with a fever or cough, except for necessary medical care.

20. For purposes of this Order, the "Social (Physical) Distancing Protocol" that must be implemented and posted must demonstrate how the following infection control measures are being implemented and achieved, as applicable:

a. Limiting the number of people who may enter into the facility at any one time to ensure that people in the facility can easily maintain a minimum six (6) foot physical distance from others, at all times, except as required to complete a business activity or transaction. Members of a single household or living unit may stand or move together but must be separated from others by a physical distance of at least six (6) feet.

b. Where lines may form at a facility, marking six (6) foot increments at a minimum, establishing where individuals should stand to maintain adequate Social (Physical) Distancing, whether inside or outside the facility.

c. Providing hand sanitizer, soap and water, or effective disinfectant at or near the entrance of the facility and in other appropriate areas for use by the public and employees, and in locations where there is high-frequency employee interaction with members of the public (e.g., cashiers). Restrooms normally open to the public shall remain open to the public.

d. Posting a sign in a conspicuous place at all public entries that instructs the public not to enter if they are experiencing symptoms of respiratory illness, including fever or cough, to wear face coverings, and to maintain Social (Physical) Distancing from one another.

e. Providing for the regular disinfection of high-touch surfaces, and disinfection of all payment portals, pens, and styluses after each use. All businesses are encouraged to also offer touchless payment mechanisms, if feasible.

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 14 of 17

EX03-101

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



   f.  Providing face coverings to employees and contracted workers whose duties require close contact with other employees and/or the public. Those who have been instructed by their medical provider that they should not wear a face covering should wear a face shield with a drape on the bottom edge, to be in compliance with State directives, as long as their condition permits it. A drape that is form fitting under the chin is preferred. Masks with one-way valves should not be used.

   g.  Requiring that members of the public who enter the facility wear a face-covering over both the nose and mouth, which reduces the risk of "asymptomatic" or "pre-symptomatic" transmission to workers and others, during their time in the facility.

   h.  Adhering to communicable disease control protocols provided by the Los Angeles County Department of Public Health, including requirements for cleaning and disinfecting the site. See protocols posted at www.publichealth.lacounty.gov/media/Coronavirus/

21. Operators of businesses that are required to cease in-person operations may conduct Minimum Basic Operations, which means:
   a.  The minimum necessary activities to maintain and protect the value of the business's inventory and facilities; ensure security, safety, and sanitation; and process payroll and employee benefits;

   b.  The minimum necessary activities to facilitate the business's owners, employees, and contractors being able to continue to work remotely from their residences, and to ensure that the business can deliver its services remotely.

## ADDITIONAL TERMS

22. The County shall promptly provide copies of this Order by: (a) posting it on the Los Angeles Department of Public Health's website (www.publichealth.lacounty.gov), (b) posting it at the Kenneth Hahn Hall of Administration located at 500 West Temple Street, Los Angeles, CA 90012, (c) providing it to any member of the public requesting a copy, and (d) issuing a press release to publicize the Order throughout the County.

   a.  The owner, manager, or operator of any facility that is likely to be impacted by this Order is strongly encouraged to post a copy of this Order onsite and to provide a copy to any member of the public requesting a copy.

   b.  Because guidance may change, the owner, manager, or operator of any facility that is subject to this Order is ordered to consult the Los Angeles County Department of Public Health's website (www.publichealth.lacounty.gov) daily to identify any modifications to the Order and is required to comply with any updates until the Order is terminated.

23. If any subsection, sentence, clause, phrase, or word of this Order or any application of it to any person, structure, gathering, or circumstance is held to be invalid or unconstitutional by a decision of a court of competent jurisdiction, then such decision will not affect the validity of the remaining portions or applications of this Order.

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 15 of 17

EX03-102

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



24. This Order incorporates by reference, the March 4, 2020 Proclamation of a State of Emergency issued by Governor Gavin Newsom and the March 4, 2020 declarations of a local and public health emergency issued by the Los Angeles County Board of Supervisors and Los Angeles County Health Officer, respectively, and as they may be supplemented.

25. This Order is issued to align the County with the phased reopening approach of the California's Pandemic Resilience Roadmap. This Order will be revised in the future as the State Public Health Officer progressively designates sectors, businesses, establishments, or activities for reopening with required modifications or closure at a pace designed to protect health and safety. Should local COVID-19 conditions warrant, the Health Officer may, after consultation with the Board of Supervisors, issue orders that are more restrictive than the guidance and orders issued by the State Public Health Officer.

26. This Order is consistent with the provisions in the Governor's Executive Order N-60-20 and the State Public Health Officer's May 7, 2020 Order, that local health jurisdictions may implement or continue more restrictive public health measures in the jurisdiction if the local health officer believes conditions in that jurisdiction warrant them. Where a conflict exists between this Order and any state public health order related to controlling the spread of COVID-19 during this pandemic, the most restrictive provision controls. Consistent with California Health and Safety Code section 131080, except where the State Health Officer may issue an order expressly directed at this Order or a provision of this Order and based upon a finding that a provision of this Order constitutes a menace to the public health, any more restrictive measures in this Order may continue to apply and control in the County of Los Angeles Public Health Jurisdiction.

27. Pursuant to Sections 26602 and 41601 of the California Government Code and Section 101029 of the California Health and Safety Code, the Health Officer requests that the Sheriff and all chiefs of police in all cities located in the Los Angeles County Public Health Jurisdiction ensure compliance with and enforcement of this Order. The violation of any provision of this Order constitutes an imminent threat and menace to public health, constitutes a public nuisance, and is punishable by fine, imprisonment or both.

28. This Order shall become effective immediately on August 12, 2020 and will continue to be until it is revised, rescinded, superseded, or amended in writing by the Health Officer.

**IT IS SO ORDERED:**

*Muntu Davis MD, MPH*                                8/12/2020
_____          _____
**Muntu Davis, M.D., M.P.H.**                       **Date**
Health Officer,
County of Los Angeles

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 16 of 17

EX03-103

**COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH**
**ORDER OF THE HEALTH OFFICER**



## Appendices At-A-Glance

All DPH protocol is available at:
http://www.publichealth.lacounty.gov/media/Coronavirus/

**Appendix A:** Protocol for Social Distancing [Revised 7/3/2020]

**Appendix B:** Protocols for Retail Establishments Opening for In-person Shopping [Revised 7/18/2020]

**Appendix C:** Reopening Protocol for Warehousing, Manufacturing and Logistic Establishments [Revised 7/18/2020]

**Appendix D:** Protocols for Office Worksites [Revised 8/7/2020]

**Appendix E:** Protocols for Shopping Center Operators [Revised 7/17/2020]

**Appendix F:** Protocol for Places of Worship [Revised 7/17/2020]

**Appendix G:** Protocol for Vehicle-Based Parades [Revised 5/25/2020]

**Appendix H:** Reopening Protocol for Hair Salons and Barbershops [Revised 7/29/2020]

**Appendix I:** Protocol for Restaurants [Revised 7/18/2020]

**Appendix J:** Reopening Protocol for Music, Film, and Television Production [Revised 7/29/2020]

**Appendix K:** Reopening Protocol for Day Camps [Dated 7/31/2020]

**Appendix L:** Reopening Protocol for Gyms and Fitness Establishments [Revised 7/17/2020]

**Appendix M:** Reopening Protocol for Museums, Galleries, Zoos, and Aquariums [Revised 7/17/2020]

**Appendix N:** Protocol for Professional Sports Leagues and Facilities Opening for Training Sessions and Spectator-Free Events [Revised 7/17/2020]

**Appendix O:** Reopening Protocol for Campgrounds, RV parks and Cabin Rental Units [Revised 7/17/2020]

**Appendix P:** Reopening Protocol for Hotels, Lodging, and Short-Term Rentals [Revised 7/17/2020]

**Appendix Q:** [Rescinded 7/1/2020]

**Appendix R:** Reopening Protocol for Personal Care Establishments [Revised 7/29/2020]

**Appendix S:** [Rescinded 6/28/2020]

**Appendix T1:** Reopening Protocols for K-12 Schools [To be updated on 8/12/2020]

**Appendix T2:** Protocol for COVID-19 Exposure Management Plan in K-12 Schools [Revised 7/27/2020]

**Appendix U:** Reopening Protocol for Institutes of Higher Education [To be updated on 8/12/2020]

Reopening Safer at Work and in the Community for Control of COVID-19:
Moving the County of Los Angeles into Stage 3 of California's Pandemic Resilience Roadmap
Revised 8/12/2020

Page 17 of 17

EX03-104

**ORANGE COUNTY OPERATIONAL AREA**
**EMERGENCY OPERATIONS CENTER**

FOR IMMEDIATE RELEASE

Molly Nichelson
EOC Public Information Officer
714-628-7062

**PRESS RELEASE # 007**
Date:  3-17-20      Time:  14:26 hours

# County Health Officer Issues Order
# to Slow Spread of COVID-19

County Health Officer Dr. Nichole Quick issued a Health Officer's Order today to protect the health and wellbeing of Orange County, CA residents.

"We are taking these mitigation steps in line with a directive issued by Governor Newsom to help slow the spread of COVID-19," said Dr. Nichole Quick, County Health Officer. "We recognize community members may experience anxiety related to the social disruption caused by COVID-19, and want to encourage residents to reach out to loved ones using appropriate methods like telephone, video messaging, email and text."

Please see the attached order for further details.

As this is a rapidly evolving situation, this Order may be revised and/or extended at any time.

For general information about COVID-19, please call the OC Health Care Agency's (H.CA) Health Referral Line at (800) 564-8448, visit http://www.ochealthinfo.com/novelcoronavirus, or follow the HCA on Facebook (@ochealthinfo) and Twitter (@ochealth).

For any further questions, please call the County of Orange Public Information Hotline at (714) 628-7085.

Release authorized by: _Jessica Witt_ Title: _DES / CEO_

Email or Faxed/time: _14:51_

Media Station: _____

Sent by: _____ Date/Time: _3/17/20  14:51_

EX03-105

### ORDER OF THE LOCAL HEALTH OFFICER

Pursuant to California Health and Safety Code sections 101040, 120175, and 120175.5 (b), the Orange County Health Officer ORDERS AS FOLLOWS:

Effective immediately and continuing until 11:59 p.m. on March 31, 2020, the following will be in effect in Orange County:

1. All public and private gatherings of any number of people, including at places of work, occurring outside a single household or living unit are prohibited. However, nothing in this Order prohibits the gathering of members of a household or living unit.

   a. This prohibition applies to all professional, social, and community gatherings, regardless of their sponsor, that are not engaged in Essential Activities, as defined below. Gatherings that involve Essential Activities should only be conducted when they cannot not be postponed or achieved without gathering, meaning that some other means of communication cannot be used to perform the Essential Activity. For gatherings involving Essential Activities, maintaining a six-foot separation of Social Distancing between persons, except family members, is recommended to the greatest extent possible.

   b. "Essential Activities" include:

      i. All services needed to ensure the continuing operation of the government agencies and provide for the health, safety and welfare of the public.

      ii. Healthcare operations (e.g. hospitals) and essential infrastructure;

      iii. First responders, emergency management personnel, emergency dispatchers, court personnel, and law enforcement personnel.

      iv. Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries and also sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences;

      v. Food cultivation, including farming, livestock, and fishing;

vi. Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals;

vii. Newspapers, television, radio, and other media services;

viii. Gas stations and auto-supply, auto-repair, and related facilities;

ix. Banks and related financial institutions;

x. Hardware stores;

xi. Plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences;

xii. Businesses providing mailing and shipping services, including post office boxes;

xiii. Educational institutions – including public and private K-12 schools, colleges, and universities – for purposes of facilitating distance learning or performing essential functions, provided that Social Distancing of six-feet per person is maintained to the greatest extent possible;

xiv. Laundromats, dry cleaners, and laundry service providers;

xv. Restaurants and other facilities that prepare and serve food, but only for delivery or carry out. Schools and other entities that typically provide free food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;

xvi. Businesses that supply products needed for people to work from home;

xvii. Businesses that supply other essential businesses with the support or supplies necessary to operate;

xviii.  Businesses that ship or deliver groceries, food, goods or services directly to residences;

xix.  Airlines, taxis, and other private transportation providers providing transportation services;

xx.  Home-based care for seniors, adults, or children;

xxi.  Residential facilities and shelters for seniors, adults, and children;

xxii.  Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities;

xxiii.  Childcare facilities providing services that enable employees exempted in this Order to work as permitted. To the extent possible, childcare facilities must operate under the following mandatory conditions:

   1.  Childcare must be carried out in stable groups.

   2.  Children shall not change from one group to another.

   3.  If more than one group of children is cared for at one facility, each group shall be in a separate room. Groups shall not mix with each other.

   4.  Childcare providers shall remain solely with one group of children.

c.  "Social Distancing" is maintaining a six-foot separation from all persons except for family members.

2.  All bars and other establishments that serve alcohol, and do not serve food, shall close consistent with guidance provided by the California Department of Public Health for Retail Food, Beverage, and Other Related Service Venues.

3.  All restaurants and other business establishments that serve food shall close all on-site dining consistent with guidance provided by the California Department of Public Health for Retail Food, Beverage, and Other Related Service Venues. All food served shall be by delivery, or through pick-up or drive-thru. Social Distancing shall be required for persons picking up food on site.

   a.  "Social Distancing" is maintaining a six-foot separation from all persons except for family members.

4. A strong recommendation is made that all persons who are 65 years and older, or have a serious chronic medical condition (like heart disease, lung disease, and diabetes), or have a compromised immune system remain at home consistent with guidance provided by the California Department of Public Health on Self-Isolation for Older Adults and Those Who Have Elevated Risk.

5. A strong recommendation is made for persons exhibiting mild to moderate symptoms of COVID-19 to self-isolate themselves in their place of residence unless seeking medical care.

6. All businesses shall enact Social Distancing, increased sanitation standards, and shall make every effort to use telecommuting for its workforce. All businesses shall suspend any policy or procedure requiring doctor verification for sick or other leave approval.

   a. "Social Distancing" is maintaining a six-foot separation from all persons except for family members.

7. A strong recommendation is made that all residents are to heed any orders and guidance of state and local health officials related to COVID-19.

8. This Order is necessary to protect and preserve the public health from, and prevent, the increasing transmission of COVID-19 in California and the significant risk of widespread introduction and transmission of COVID-19 into the County.

9. Pursuant to Health and Safety Code section 120175.5 (b) all governmental entities in the County shall take necessary measures within the governmental entity's control to ensure compliance with this Order and to disseminate this Order to venues or locations within the entity's jurisdiction where a large gathering may occur.

10. Violation of this Order is subject to fine, imprisonment, or both. (California Health and Safety Code section 120295.)

11. To the extent necessary, this Order may be enforced by the Sheriff or chiefs of police pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029.

As this is a rapidly evolving situation, this Order may be revised and/or extended at any time.

**IT IS SO ORDERED:**

Date: March 17, 2020

Dr. Nichole Quick
Orange County Health Officer

## EMERGENCY REGULATIONS

As Director of Emergency Services for the County of Orange, I am authorized to promulgate regulations for the protection of life and property pursuant to Government Code Section 8634 and Orange County Codified Ordinance Section 3-1-6(b)(1). The following shall be in effect for the duration of the Orange County Health Officer Order issued above which is incorporated in its entirety by reference:

The Orange County Health Officer Order shall be promulgated as a regulation for the protection of life and property.

Any person who violates or who refuses or willfully neglects to obey this regulation is subject to fine, imprisonment, or both. (Government Code section 8665.)

Date: March 17, 2020

Frank Kim
Chief Executive Officer, County of Orange

EX03-110

Orange County, California - Novel Coronavirus - County Order       https://www.ochealthinfo.com/phs/about/cpidasmt/cpi/dip/prevention/co...





## DISEASES INDEX - A-Z

» Disease Information & Prevention Home
» Communicable Disease Control Home
» Diseases Index - A-Z
» Disease Prevention
» Foodborne Illness FAQ

### COMMUNICABLE DISEASE TRENDING TOPICS
⊕

| | |
|---|---|
| Advisories and Newsletters | Candida auris |
| Flu Shot | Hepatitis A |
| Measles | Novel Coronavirus |
| Zika Virus | |









## MY OC   Login | Register »

# COVID-19, County Health Officer's Orders

Select Language
Powered by Google Translate

### County Health Officer's Order
### Issued - 3/18/2020

Pursuant to California Health and Safety Code sections 101040, 120175, and 120175.5 (b), the Orange County Health Officer ORDERS AS FOLLOWS:

1. In light of new written, changing state guidance, this Order revises the prior order issued by the Orange County Health Officer on March 17, 2020. The March 17, 2020, order is no longer in effect as of the effective date and time of this Order.

2. Except as provided herein, nothing in this document prohibits businesses or other entities from operating within Orange County. Businesses and entities should operate in accordance with social distancing guidelines issued by the California Department of Public Health.

3. Effective immediately, and continuing until 11:59 p.m., on March 31, 2020, public or private Gatherings, defined by the California Department of Public Health are prohibited. See, CDPH Guidance for the Prevention of COVID-19 Transmission for Gatherings, dated March 16, 2020, available at https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/cdph-guidance-gatherings-covid19-transmission-prevention-03-16-2020.pdf

   Nothing in this Order prohibits the gathering of members of a household, family, or living unit, or the utilization of caregivers.

4. This Order does not prohibit activities such as attendance at regular school classes, going to work, or performing essential services. In accordance with state guidance, certain activities are essential to the functioning of our County and must continue. Hence, with respect to the prohibition on Gatherings, this Order does not apply to essential public transportation, airport travel, shopping at a store, mall, or farmers' market, or charitable food pantries and distributions, or to congregate living situations, including dormitories and homeless encampments. See, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Guidance.aspx

5. In accordance with written guidance issued on March 16, 2020 by the California Department of Public Health, relating to Retail Food, Beverage, and Other Related Service Venues, (1) all bars and other business establishments that serve alcohol and do not serve food shall close; and (2) all movie theatres, gyms, and health clubs shall close. Food and beverage establishments, food trucks, grocery stores and charitable food distribution sites, and certified farmers' markets are required to follow guidance released from the California Department of Public Health on March 16, 2020. All food served shall be by delivery, or through pick-up or drive-through. For purposes of food delivery and pick-up, social distancing, defined as maintaining a six- foot separation per person for non-family members, shall be required.

6. In accordance with Interim Guidance for Businesses and Employers issued by the Centers for Disease Control and Prevention, employers shall not require a healthcare provider's note for employees who are sick with acute respiratory illness to validate their illness or to return to work, as healthcare provider offices and medical facilities may be extremely busy and not able to provide such documentation in a timely way.

#### Guidance

7. A strong recommendation is made that all persons who are 65 years and older, or have a serious chronic medical condition (like heart disease, lung disease, and diabetes), or have a compromised immune system remain at home consistent with guidance provided by the California Department of Public Health on Self-Isolation for Older Adults and Those Who Have Elevated Risk.

8. A strong recommendation is made for persons exhibiting mild to moderate symptoms of COVID-19 to self-isolate themselves in their place of residence unless seeking medical care.

9. A strong recommendation is made that all businesses enact social distancing, increased sanitation standards, and make every effort to use telecommuting for its workforce.

10. A strong recommendation is made that all residents are to heed any orders and guidance of state and local health officials related to COVID-19.

#### General Provisions

11. This Order and Guidance is necessary to protect and preserve the public health from, and prevent, the increasing transmission of COVID-19 in California and the significant risk of widespread introduction and transmission of COVID-19 into the County.

EX03-111

12. Pursuant to Health and Safety Code section 120175.5 (b) all governmental entities in the County shall take necessary measures within the governmental entity's control to ensure compliance with this Order and to disseminate this Order to venues or locations within the entity's jurisdiction where a large gathering may occur.

13. This Order and Guidance shall not supersede any conflicting or more restrictive orders issued by the State of California or Federal governments. If any portion of this Order or the application thereof to any person or circumstance is held to be invalid the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.
As this is a rapidly evolving situation, this Order and Guidance may be revised and/or extended at any time.

**IT IS SO ORDERED:**

Date: March 18, 2020
Dr. Nichole Quick
Orange County Health Officer

### EMERGENCY REGULATIONS

As Director of Emergency Services for the County of Orange, I am authorized to promulgate regulations for the protection of life and property pursuant to Government Code Section 8634 and Orange County Codified Ordinance Section 3-1-6(b)(1). The following shall be in effect for the duration of the Orange County Health Officer Order issued above which is incorporated in its entirety by reference:

The Orange County Health Officer Order shall be promulgated as a regulation for the protection of life and property.

Any person who violates or who refuses or willfully neglects to obey this regulation is subject to fine, imprisonment, or both. (Government Code section 8665.)

Date: March 18, 2020
Frank Kim
County Executive Officer County of Orange



**Navigation**
OC Home
About the County
Departments
Business
How Do I

County Directory Assistance
855.886.5400

**Quick Links**
Acceptable Use
Accessibility
Contact the County
Disclaimer
Sitemap

**Resources**
Chambers of Commerce
Federal Government
General Information
Orange County Cities
Related Government Agencies
State Government
Visitor Bureaus

**Social Media and Applications**

*The OC™*

*Making Orange County a safe, healthy, and fulfilling place to live, work, and play, today and for generations to come, by providing outstanding, cost-effective regional public services.*

EX03-112



CLAYTON CHAU, MD PhD
DIRECTOR/ACTING COUNTY HEALTH
OFFICER

LILLY SIMMERING
ASSISTANT DIRECTOR

405 W. 5TH STREET, 7TH FLOOR
SANTA ANA, CA 92701
www.ochealthinfo.com

## COUNTY HEALTH OFFICER

### AMENDED ORDERS AND STRONG RECOMMENDATIONS
### OF THE COUNTY OF ORANGE HEALTH OFFICER
REVISED July 14, 2020

In light of the recent increased COVID-19 transmission and hospitalization rate in Orange County, the placement of Orange County on the California Department of Public Health (CDPH) County Monitoring List, and further CDPH directives applicable to the County of Orange, these **AMENDED ORDERS AND STRONG RECOMMENDATIONS** revise the prior AMENDED ORDERS AND STRONG RECOMMENDATIONS, issued by the Orange County Acting Health Officer on July 3, 2020. The July 3, 2020 Amended Orders and Strong Recommendations are no longer in effect as of the effective date and time of these AMENDED ORDERS AND STRONG RECOMMENDATIONS.

Pursuant to California Health and Safety Code sections 101030, 101040, 101470, 120175, and 120130, the County of Orange Acting Health Officer ORDERS AND STRONGLY RECOMMENDS as follows:

### ORDERS

Effective immediately, and continuing until further notice, the following shall be in effect in unincorporated and incorporated territories of Orange County, California:

1. **Closure of Bars, Pubs, Breweries, and Brewpubs.** All bar, pub, brewery, and brewpub establishments that do not offer sit-down, dine-in meals shall close until further notice by County Health Officer based on his assessment and evaluation of local epidemiological indicators.

   Bars, pubs, breweries, and brewpubs that offer sit-down, dine-in meals shall close their indoor operation but may continue their outdoor operation. Alcohol can only be sold in the same transaction as a meal. They shall also follow the State outdoor dine-in guidance (found at https://files.covid19.ca.gov/pdf/guidance-outdoor-restaurants.pdf) and shall continue to encourage takeout and delivery service whenever possible.

   Bars, pubs, breweries, and brewpubs that do not offer sit-down, dine-in meals themselves, but contract with another vendor to provide that service, shall close their indoor operation but may continue their outdoor operation if the dine-in vendor follows the outdoor dine-in guidance (found at https://files.covid19.ca.gov/pdf/guidance-outdoor-restaurants.pdf) and the bar, pub, brewery, and brewpub establishment sells alcohol only in the same transaction as a meal.

EX03-113

If the outdoor operation is conducted under a canopy or tent, the canopy or tent may be closed only on one side.

Venues that are currently authorized to provide sale of beer, wine, and spirits to be consumed off premises and do not offer sit-down, dine-in meals shall follow the guidance for retail operations (found at https://files.covid19.ca.gov/pdf/guidance-retail.pdf) and offer curbside sales only, until the CDPH and/or County Health Officer allow additional retail activity.

Producers of beer, wine, and spirits shall follow the guidance for manufacturing operations (found at https://files.covid19.ca.gov/pdf/guidance-manufacturing.pdf).

This Order #1 does not authorize the reopening of concert, performance, or entertainment venues. Those types of establishments shall remain closed until they are allowed to resume modified or full operation through a specific reopening order or guidance by CDPH and/or County Health Officer.

2. **Closure of Specific Sectors and Activities.** The indoor operations for the following sectors shall close until further notice by the County Health Officer based on his assessment and evaluation of local epidemiological indicators:

   - Dine-in restaurants
   - Wineries and tasting rooms
   - Movie theaters
   - Family entertainment centers (for example: bowling alleys, miniature golf, batting cages and arcades)
   - Zoos and museums
   - Cardrooms
   - Fitness centers
   - Worship services
   - Indoor protests
   - Offices for non-essential sectors (essential sectors are listed at https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf)
   - Personal care services, like nail salons, body waxing and tattoo parlors
   - Hair salons and barbershops
   - Malls

This Order #2 does not apply to outdoor or pick-up operations of the above-listed sectors. If the outdoor operation is conducted under a canopy or tent, the canopy or tent may be closed only on one side. The outdoor establishment/business operation shall be in accordance with its respective industry or sector guidance including appropriate physical distancing and face coverings practices. For specific industry or sector guidance, see the following link: https://covid19.ca.gov/industry-guidance/#top.

Amended Order and Strong Recommendations of the County of Orange Health Officer
July 14, 2020
Page 3 of 11

3. **Self-isolation of Persons with COVID-19**. All Orange County residents and visitors who have been diagnosed with or are likely to have COVID-19, as defined below, shall immediately isolate themselves in their home or another residence under the following criteria, as applicable:

    a) Individuals with COVID-19 symptoms shall isolate themselves until: (i) at least 3 days (72 hours) after they have recovered, meaning their fever has resolved without use of fever-reducing medications and their respiratory symptoms (e.g., cough, shortness of breath) have improved; AND (ii) at least 10 days has elapsed from when their symptoms first appeared.

    b) Individuals who have a positive COVID-19 PCR laboratory test result and are without COVID-19 symptoms shall isolate themselves for 10 days from the date when the specimen for the positive COVID-19 PRC laboratory test result was obtained.

Unless one of the criteria, above, applies, i.e. 1.a) or 1.b), the individual may not leave his or her place of isolation except to receive necessary medical care.

A person is considered to be diagnosed with or likely to have COVID-19, if the person has:

    a) Received a positive COVID-19 PCR laboratory test result; and/or

    b) Been informed by a physician that he or she is likely to have COVID-19 and/or;

    c) Signs and symptoms that are consistent with COVID-19 (i.e., new onset of fever, cough, shortness of breath or trouble breathing).

If a more specific isolation order is issued by the County of Orange Health Officer for any county resident, that order shall be followed instead of this order.

This self-isolation order DOES NOT in any way restrict access by first responders to an isolation site during an emergency.

4. **Self-Quarantine of Persons Exposed to COVID-19**. All Orange County residents and visitors who know that they have been in close contact, as defined below, with a person diagnosed with or likely to have COVID-19 shall take the following actions:

    a) Quarantine themselves in their home or another residence until 14 days from the last date that they were in close contact with a person that has been diagnosed with or likely to have COVID-19.

Amended Order and Strong Recommendations of the County of Orange Health Officer
July 14, 2020
Page 4 of 11

Exposed persons shall self-quarantine themselves for the entire 14-day COVID-19 incubation period, the typical time between exposure and when symptoms and signs of the disease may develop. They may not leave their place of quarantine except to receive necessary medical care or to obtain such other goods or services necessary for their basic subsistence.

Close contact refers to any person who has been within 6 feet of an infectious COVID-19 person for 15 minutes or more. A person who is diagnosed with or likely to have COVID-19 is considered infectious from 48 hours before his or her symptoms first appeared until the person is no longer required to be isolated.

If a more specific quarantine order is issued by the County of Orange Health Officer for any county resident, that order shall be followed instead of this order.

This self-quarantine order DOES NOT in any way restrict access by first responders to a quarantine site during an emergency.

This self-quarantine SHALL NOT APPLY to health care providers and emergency responders, as defined by the U.S. Department of Labor (see Question 56 and 57, respectively, available at https://www.dol.gov/agencies/whd/pandemic/ffcra-questions).

5.  **Checklist and Attestation Posting Requirements for Businesses, Industries, and Entities Allowed to Reopen in Orange County**. All businesses, industries, and entities listed on the State's https://covid19.ca.gov/industry-guidance/#top that reopen in Orange County as part of the various Stages of the State's Resilience Roadmap shall post their corresponding industry-specific checklist at a location visible to the public at the public entrance of each property.

    In addition to the foregoing industry-specific checklist, all businesses, industries, and entities shall post a separate document at a location visible to the public at the public entrance of each property that specifically includes an attestation by the business, industry, or entity owner and/or operator that it has:

    a)  Performed a detailed risk assessment and implemented a site-specific protection plan;

    b)  Trained employees on how to limit the spread of COVID-19, including how to screen themselves for symptoms and stay home if they have them;

    c)  Implemented individual control measures and screenings;

    d)  Implemented disinfecting protocols; and

    e)  Implemented physical distancing guidelines.

EX03-116

Amended Order and Strong Recommendations of the County of Orange Health Officer
July 14, 2020
Page 5 of 11

Pursuant to CDPH guidance for variance counties, certain sectors of the economy may re-open only with the approval of the County Health Officer following a review of local epidemiological data by the County Health Officer. Please refer to https://covid19.ca.gov/industry-guidance/#top. For these sectors, please do not submit to the County Health Officer any documents for review and approval. Instead, please refer to https://www.ochealthinfo.com/about/admin/pubs/press for current information as to which sectors have been authorized by the County Health Officer to re-open.

As specified above, certain sectors shall not re-open their indoor operations until further notice by the County Health Officer based on his assessment and evaluation of local epidemiological indicators. See Order # 1 and 2, above. Furthermore, bars, breweries, pubs, and brewpubs shall operate only in accordance with Order # 1, above.

6. **Wear a Cloth Face-Covering**. To help prevent the spread of droplets containing COVID-19, all County residents and visitors shall wear face coverings in certain high-risk situations, as required by the *Guidance for the Use of Face Coverings* issued by California Department of Public Health on June 18, 2020. The Guidance is attached as Exhibit A and also available at https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/C OVID-19/Guidance-for-Face-Coverings_06-18-2020.pdf. Please refer to Exhibit A for a list of high-risk situations wherein County residents and visitors shall wear a face covering, and for a list of individuals who are exempt from wearing a face covering.

## STRONG RECOMMENDATIONS

Effective immediately, and continuing until further notice, the following shall be in effect in unincorporated and incorporated territories in Orange County, California:

1. **Maintain Six Feet of Physical Distancing.** All Orange County residents and visitors should maintain at least 6 feet of physical distance from another person who is not a family/household member or live in the same living unit, when (i) in a public place; (ii) visiting a retail, commercial or other place of business; or (iii) at work.

2. **For Vulnerable Population.** All Orange County residents who are 65 years old or older; have serious underlying medical conditions (for example, chronic lung disease, moderate to severe asthma, serious heart conditions, severe obesity, diabetes, chronic kidney disease undergoing dialysis, liver disease); or have a compromised immune system should remain at home consistent with guidance provided by the California Department of Public Health (CDPH) available at https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-

Amended Order and Strong Recommendations of the County of Orange Health Officer
July 14, 2020
Page 6 of 11

19/PublicHealthGuidanceSelfIsolationforOlderAdultsandThoseWhoHaveElevatedRis
k.aspx.

3. **Other Recommendations.** All Orange County residents should avoid contact with people who are sick; not gather in groups; stay out of crowded places; avoid mass gatherings; wash hands frequently; wash face coverings frequently; cover coughs and sneezes; and clean and disinfect frequently touched surfaces daily, including tables, doorknobs, light switches, countertops, handles, desks, phones, keyboards, toilets, faucets, and sinks.

## GENERAL PROVISIONS

1. These Amended Orders and Strong Recommendations shall not supersede any conflicting or more restrictive orders issued by the State of California or federal government. If any portion of these Amended Orders and Strong Recommendations or the application thereof to any person or circumstance is held to be invalid, the remainder of the Amended Orders and Strong Recommendations, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of these Amended Orders and Strong Recommendations are severable.

2. The orders contained in these Amended Orders and Strong Recommendations may be enforced by the Orange County Sheriff or Chiefs of Police pursuant to California Health and Safety Code section 101029, and California Government Code sections 26602 and 41601. A violation of a health order is subject to fine, imprisonment, or both (California Health and Safety Code section 120295).

## REASONS FOR THE ORDERS AND STRONG RECOMMENDATIONS

1. On February 26, 2020, the County of Orange Health Officer declared a Local Health Emergency based on an imminent and proximate threat to public health from the introduction of a novel coronavirus disease (COVID-19) in Orange County.

2. On February 26, 2020, the Chairwoman of the Board of Supervisors, acting as the Chair of Emergency Management Council, proclaimed a Local Emergency in that the imminent and proximate threat to public health from the introduction of COVID-19 created conditions of extreme peril to the safety of persons and property within the territorial limits of Orange County.

3. On March 2, 2020, the Orange County Board of Supervisors adopted Resolutions No. 20-011 and No. 20-012 ratifying the Local Health Emergency and Local Emergency, referenced above.

4. On March 4, 2020, the Governor of the State of California declared a State of Emergency to exist in California as a result of the threat of COVID-19.

Amended Order and Strong Recommendations of the County of Orange Health Officer
July 14, 2020
Page 7 of 11

5. There is currently no vaccine to prevent COVID-19. According to the Centers for
Disease Control and Prevention (CDC), the best way to prevent COVID-19 is to
avoid being exposed to the novel corona virus. According to the CDC, the novel
corona virus is thought to spread mainly from person-to-person due to the following:
(1) between people who are in close contact with one another (within about 6 feet);
(2) through respiratory droplets produced when an infected person coughs, sneezes or
talks; (3) these droplets can land in the mouths or noses of people who are nearby or
possibly be inhaled into the lungs; (4) some recent studies have suggested that
COVID-19 may be spread by people who are not showing symptoms. See
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

6. According to the CDC everyone should (1) wash their hands often with soap and
water for at least 20 seconds (or use hand sanitizer that contains at least 60% alcohol
when soap and water is not readily available) especially after having been in contact
in a public place, or after blowing their nose, coughing, or sneezing; (2) avoid contact
with people who are sick, stay at least 6 feet from other people, not gather in groups,
stay out of crowded places, and avoid mass gatherings; (3) cover their mouth and
nose with a cloth face cover when around others when they are out in public; (4)
cover coughs and sneezes; and (5) clean and disinfect frequently touched surfaces
daily, including tables, doorknobs, light switches, countertops, handles, desks,
phones, keyboards, toilets, faucets, and sinks. See
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

7. The CDC recommends that everyone wear cloth face coverings when leaving their
homes, regardless of whether they have fever or symptoms of COVID-19. This is
because of evidence that people with COVID-19 can spread the disease, even when
they don't have any symptoms. Cloth face coverings should not be placed on young
children under age 2, anyone who has trouble breathing, or is unconscious,
incapacitated, or otherwise unable to remove the mask without assistance. See
https://www.cdc.gov/coronavirus/2019-ncov/downloads/cloth-face-coverings-
information.pdf.

8. The CDPH also issued a Guidance for the Use of Face Coverings on June 18, 2020,
available at
https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/C
OVID-19/Guidance-for-Face-Coverings_06-18-2020.pdf. . The Guidance requires
people in California to wear face coverings in certain enumerated high-risk situations,
and provides a number of exemptions, as well as providing a description of what is a
face covering.

9. According to the CDC, COVID-19 is a new disease and there is limited information
regarding risk factors for severe disease. Based on currently available information and
clinical expertise, older adults (65 years older and older), people who live in a nursing
home or long-term care facility, and people of any age who have serious underlying
medical conditions might be at higher risk for severe illness from COVID-19. See
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-
higher-risk.html. According to the CDC, this at higher risk population should stay

EX03-119

Amended Order and Strong Recommendations of the County of Orange Health Officer
July 14, 2020
Page 8 of 11

home (if possible) and practice social distancing of at least 6 feet both in and outside the home. See https://www.cdc.gov/coronavirus/2019-ncov/downloads/COVID19-What-You-Can-Do-High-Risk.pdf. See also https://www.cid.ca.gov/Programs/CID/DCDC/Pages/COVID-19/PublicHealthGuidanceSelfIsolationforOlderAdultsandThoseWhoHaveElevatedRisk.aspx.

10. The orders and the strong recommendations contained herein are based on the fact that there is currently no vaccine to protect against COVID-19, and no proven therapeutic treatment for it; scientific evidence regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, as well as best practices as currently known and available to protect the older adults (65 years older and older), people who live in a nursing home or long-term care facility, and people of any age who have serious underlying medical conditions from avoidable risk of serious illness or death resulting from exposure to COVID-19.

11. As of July 13, 2020, there are 25,255 reported COVID-19 cases and 424 COVID-19 related deaths in Orange County (see https://occovid19.ochealthinfo.com/coronavirus-in-oc); as of July 13, 2020, there are 329,162 reported COVID-19 cases and 7,040 COVID-19 related deaths in State of California (see https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx#COVID-19%20by%20the%20Numbers); there remains a strong likelihood of a significant and increasing number of cases of community transmission; some individuals who contract the novel coronavirus have no symptoms or have only mild symptoms, and so are unaware that they carry virus and are transmitting it to others; evidence shows that the novel coronavirus can survive for hours or even days on surfaces and can be indirectly transmitted between individuals.

12. The age, condition, and health of a significant portion of Orange County population place them at risk for serious health complications, including hospitalization and death, from COVID-19. Younger and otherwise healthy people are also at risk for serious negative health outcomes and for transmitting the novel coronavirus to others.

13. Orange County was placed on the County Monitoring List on June 29, 2020. See https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CountyMonitoringDataStep2.aspx.

14. In accordance with the CDPH *Guidance on Closure of Sectors in Response to COVID-19* (available at https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Guidance-on-Closure-of-Sectors-in-Response-to-COVID-19.aspx), community spread of COVID-19 infection is of increasing concern across the State, and in particular for those counties on the County Monitoring List. Beyond the impact on the general population, community spread increases the likelihood of expanded transmission of

COVID-19 in congregate settings such as nursing homes, homeless shelters, jails and
prisons. Infection of vulnerable populations in these settings can be catastrophic, both
in terms of high rates of morbidity and mortality of individual residents, as well as
through the high demand such infections would place on the hospital delivery system.
Higher levels of community spread also increase the likelihood of infection among
individuals at high risk of serious outcomes from COVID-19, including the elderly
and those with underlying health conditions who might live or otherwise interact with
an infected individual. California's Pandemic Resiliency Roadmap for reopening is a
risk-based framework that guides state and local governments on a path to re-opening
industries under strict workplace modifications. Those sector operations listed under
Orders #1 and #2, above, are all high risk of transmission due to a number of features
of the businesses and the behaviors that occur within them. These sectors,
foundationally, are settings where groups convene and may mix with others for
prolonged periods without appropriate protective equipment, such as a face covering.
For example, it is difficult to consistently wear a face covering in a restaurant.
Additionally, physical movement within the establishment, duration of time spent in
the establishment, and the degree of social mixing among individuals and groups
outside one's household are all significant in these sectors, which substantially
elevates the risk of transmission even where face coverings can be worn. The risk is
particularly high in indoor settings. Reinstituting indoor closures among these sectors
is not only important because of data from counties on the monitoring list, but
because the science of disease transmission and from recent studies have shown that
the transmissions is greater in indoor settings due to the release of infectious particles
into the air when someone speaks, coughs, sneezes, or sings, which is exacerbated in
indoor spaces particularly when lacking appropriate ventilation. Furthermore, in some
of these sectors centered on eating and drinking, compliance with face coverings is
not possible for the full duration of time someone spends in these establishments.
Additionally, the workforce of these sectors face higher exposure to diseases
transmission because of the environment in which they work. A recent study
published by the Centers for Disease Control and Prevention, for example,
demonstrates clearly the effect of a single asymptomatic carrier in a restaurant
environment. The study shows that approximately 50 percent of the people at the
infected person's table become sick over seven (7) days, 75 percent of the people on
the adjacent table that is downwind in the interior ventilation system become infected,
and even two of seven people on the upwind table become infected. (See Lu, J., Gu,
J., Li, K., Xu, C., Su, W., Lai, Z....Yang, Z. (2020). COVID-19 Outbreak Associated
with Air Conditioning in Restaurant, Guangzhou, China, 2020. Emerging Infectious
Diseases, 26(7), 1628-1631. https://dx.doi.org/10.3201/eid2607.200764). Physical
distancing also protects an individual with brief exposures or outdoor exposures.
When distanced, there is not enough time to achieve the infectious viral load when
standing six (6) feet apart or where wind and the infinite outdoor space for viral
dilution reduces viral load. (See Nishiura et al. (2020). Closed environments facilitate
secondary transmission of coronavirus disease 2019 (COVID-19).
https://www.medrxiv.org/content/10.1101/2020.02.28.20029272v2). A study, which
still needs to be peer-reviewed, suggests that the odds an infected person transmitting

the virus in a closed environment was 18.7 times greater compared to an open-air environment. Alcohol consumption slows brain activity, reduces inhibition, and impairs judgment, factors which contribute to reduced compliance with recommended core personal protective measures, such as the mandatory use of face coverings and maintaining six feet of distance from people outside of one's own household, making outdoor operations for brewpubs, breweries, bars, and pubs challenging, further creating opportunities for virus transmission and thus need for closure. Additionally, there is a growing body of evidence tracing large COVID-19 outbreaks in both urban and rural states, to indoor and outdoor operations of bars. In the setting of an increasing body of evidence demonstrating that transmission is decreased when activities are conducted outside, and risk for exposure is increased when mixing beyond those with whom one lives, in an effort to mitigate to potential spread of COVID 19, the state is requiring that settings where patrons gather to be served or participate in the businesses' primary activity be moved outdoors.

15. The orders and strong recommendations contained herein are necessary preventive measures to control and reduce the spread of COVID-19 in Orange County, help preserve critical and limited healthcare capacity in Orange County, and thereby save the lives of Orange County residents.

16. The California Health and Safety Code section 120175 requires the County of Orange Health Officer knowing or having reason to believe that any case of a communicable disease exists or has recently existed within the County to take measures as may be necessary to prevent the spread of the disease or occurrence of additional cases.

17. The California Health and Safety Code sections 101030 and 101470 require the county health officer to enforce and observe in the unincorporated territory of the county and within the city boundaries located with a county all of the following: (a) Orders and ordinances of the board of supervisors, pertaining to the public health and sanitary matters; (b) Orders, including quarantine and other regulations, prescribed by the department; and (c) Statutes relating to public health.

18. The California Health and Safety Code section 101040 authorizes the County of Orange Health Officer to take any preventive measure that may be necessary to protect and preserve the public health from any public health hazard during any "state of war emergency," "state of emergency," or "local emergency," as defined by Section 8558 of the Government Code, within his or her jurisdiction. "Preventive measure" means abatement, correction, removal or any other protective step that may be taken against any public health hazard that is caused by a disaster and affects the public health.

19. The California Health and Safety Code section 120130 (d) authorizes the County Health Officer to require strict or modified isolation, or quarantine, for any case of contagious, infectious, or communicable disease, when such action is necessary for the protection of the public health.



## COUNTY OF MONTEREY
# HEALTH DEPARTMENT

Elsa Jimenez, Director of Health

|  | Clinic Services |  |
|---|---|---|
| Administration | Emergency Medical Services | Public Health |
| Behavioral Health | Environmental Health/Animal Services | Public Administrator/Public Guardian |

*Nationally Accredited for Providing Quality Health Services*

---

### ORDER OF THE HEALTH OFFICER
### OF THE COUNTY OF MONTEREY DIRECTING
### ALL INDIVIDUALS LIVING IN THE COUNTY TO SHELTER AT THEIR PLACE OF RESIDENCE EXCEPT THAT THEY MAY LEAVE TO PROVIDE OR RECEIVE CERTAIN ESSENTIAL SERVICES OR ENGAGE IN CERTAIN ESSENTIAL ACTIVITIES, AND WORK FOR ESSENTIAL BUSINESSES AND GOVERNMENTAL SERVICES; EXEMPTING INDIVIDUALS EXPERIENCING HOMELESSNESS FROM THE SHELTER IN PLACE ORDER BUT URGING THEM TO FIND SHELTER AND GOVERNMENT AGENCIES TO PROVIDE IT; DIRECTING ALL BUSINESSES AND GOVERNMENTAL AGENCIES TO CEASE NON-ESSENTIAL OPERATIONS AT PHYSICAL LOCATIONS IN THE COUNTY; PROHIBITING ALL NON-ESSENTIAL GATHERINGS OF ANY NUMBER OF INDIVIDUALS; AND ORDERING CESSATION OF ALL NON-ESSENTIAL TRAVEL

### DATE OF ORDER: <u>MARCH 17, 2020</u>

**Please read this Order carefully. Violation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both. (California Health and Safety Code § 120295, *et seq.*)**

UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, THE HEALTH OFFICER OF THE COUNTY OF MONTEREY ("HEALTH OFFICER") ORDERS:

1. The intent of this Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the maximum extent possible. When people need to leave their places of residence, whether to obtain or perform vital services, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times reasonably possible comply with Social Distancing Requirements as defined in Section 10 below. All provisions of this Order should be interpreted to effectuate this intent. Failure to comply with any of the provisions of this Order constitutes an imminent threat to public health.

2. All individuals currently living within the County of Monterey (the "County") are ordered to shelter at their place of residence. To the extent individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain social distancing of at least six feet from any other person when they are outside their residence. All persons may leave their residences only for Essential Activities,

Essential Governmental Functions, or to operate Essential Businesses, all as defined in Section 10. Individuals experiencing homelessness are exempt from this Section, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to utilize Social Distancing Requirements in their operation).

3. All businesses with a facility in the County, except Essential Businesses as defined below in Section 10, are required to cease all activities at facilities located within the County except Minimum Basic Operations, as defined in Section 10. For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home). All Essential Businesses are strongly encouraged to remain open. To the greatest extent feasible, Essential Businesses shall comply with Social Distancing Requirements as defined in Section 10 below, including, but not limited to, when any customers are standing in line. For the purposes of this Order, businesses as used in this paragraph include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function they perform, or its corporate or entity structure.

4. All public and private gatherings of any number of people occurring outside a household or living unit are prohibited, except for the limited purposes as expressly permitted in Section 10. Nothing in this Order prohibits the gathering of members of a household or living unit.

5. All travel, including, but not limited to, travel on foot, bicycle, scooter, motorcycle, automobile, or public transit, except Essential Travel and Essential Activities as defined below in Section 10, is prohibited. People must use public transit only for purposes of performing Essential Activities or to travel to and from work to operate Essential Businesses or maintain Essential Governmental Functions. People riding on public transit must comply with Social Distancing Requirements as defined in Section 10 below, to the greatest extent feasible. This Order allows travel into or out of the County to perform Essential Activities, operate Essential Businesses, or maintain Essential Governmental Functions.

6. This Order is issued based on evidence of the occurrence of COVID-19 within the County and throughout counties to the north and south of the County, scientific evidence and best practices regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, and evidence that the age, condition, and health of a significant portion of the population of the County places it at risk for serious health complications, including death, from COVID-19. Due to the occurrence of the COVID-19 virus in the County, the potential for it to spread rapidly through the community, and the World Health Organization declaring COVID-19 to be a pandemic world-wide, there is a public health emergency throughout the County. Making the problem worse, some individuals who contract the COVID-19 virus have no symptoms or have mild symptoms, which means they may not be aware they carry the virus. Because even people without symptoms can transmit the disease, and because evidence shows the disease is easily spread, gatherings can result in preventable transmission of the virus. The scientific evidence shows that at this stage of the emergency, it is essential to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed. One proven way to slow the transmission is to limit interactions among people to the greatest extent practicable. By reducing the spread of the

COVID-19 virus, this Order helps preserve critical and limited healthcare capacity in the County.

7. This Order also is issued in light of the existence of 13 cases of COVID-19 in the County of Santa Cruz, which has issued a similar order on March 16, 2020, 3 in San Benito County, and 2 in San Luis Obispo County, as well as at least 258 confirmed cases and at least three deaths in the seven Bay Area jurisdictions having issued a similar order also on March 16, 2020, including a significant and increasing number of suspected cases of community transmission and likely further significant increases in transmission. Widespread testing for COVID-19 is not yet available but is expected to increase in the coming days. This Order is necessary to slow the rate of spread and the Health Officer will re-evaluate it as further data becomes available.

8. This Order is issued in accordance with, and incorporates by reference, the March 4, 2020 Proclamation of a State of Emergency issued by Governor Gavin Newsom, the March 6, 2020 Proclamation by the County Administrative Officer Declaring the Existence of a Local Emergency in the County, the March 10, 2020 Resolution of the Board of Supervisors of the County Ratifying and Extending the Declaration of a Local Emergency, and the March 13, 2020 declaration of national emergency by the President of the United States.

9. This Order comes after the release of substantial guidance from the County Health Officer, the Centers for Disease Control and Prevention, the California Department of Public Health, and other public health officials throughout the United States and around the world, including a variety of prior orders to combat the spread and harms of COVID-19. The Health Officer will continue to assess the quickly evolving situation and may modify or extend this Order, or issue additional Orders, related to COVID-19.

10. <u>Definitions and Exemptions</u>.

    a. For purposes of this Order, individuals may leave their residence only to perform any of the following "Essential Activities." But people at high risk of severe illness from COVID-19 and people who are sick are urged to stay in their residence to the extent possible except as necessary to seek medical care.

        i. To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, obtaining medical supplies or medication, visiting a health care professional, or obtaining supplies they need to work from home.

        ii. To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example only and without limitation, canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products, and products necessary to maintain the safety, sanitation, and essential operation of residences.

     iii. To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements as defined in this Section, such as, by way of example and without limitation, walking, hiking, or running.

     iv. To perform work providing essential products and services at an Essential Business or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations.

     v. To care for a family member or pet in another household.

b. For purposes of this Order, individuals may leave their residence to work for or obtain services at any "Healthcare Operations" including hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other healthcare facilities, healthcare suppliers, home healthcare services providers, mental health providers, or any related and/or ancillary healthcare services. "Healthcare Operations" also includes veterinary care and all healthcare services provided to animals. This exemption shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. "Healthcare Operations" does not include fitness and exercise gyms and similar facilities.

c. For purposes of this Order, individuals may leave their residence to provide any services or perform any work necessary to the operations and maintenance of "Essential Infrastructure," including, but not limited to, public works construction, construction of housing (in particular affordable housing or housing for individuals experiencing homelessness), airport operations, water, sewer, gas, electrical, oil and gas production and refining including associated businesses and activities, roads and highways, public transportation, solid waste collection and removal, internet, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services), provided that they carry out those services or that work in compliance with Social Distancing Requirements as defined this Section, to the extent possible.

d. For purposes of this Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, and law enforcement personnel, and others who need to perform "Essential Governmental Functions or Services," as such may be determined by the governmental entity performing those functions or providing such services, are categorically exempt from this Order. Further, nothing in this Order shall prohibit any individual from performing or accessing Essential Governmental Functions or Services. Each governmental entity shall identify and designate appropriate employees or contractors to continue providing and carrying out any Essential Governmental Functions or Services. All Essential Governmental Functions or Services shall be performed in compliance with Social Distancing Requirements as defined in this Section, to the extent possible.

e. For the purposes of this Order, "Essential Businesses" means:

     i. Healthcare Operations and Essential Infrastructure;

     ii. Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned or frozen food, dry goods, beverages, fresh fruits and vegetables, pet supply, fresh meats,

fish, and poultry, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries and also sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences;

iii. Any form of cultivation of products for personal consumption or use, including farming, ranching, livestock, and fishing, and associated activities, including, but not limited to, activities or businesses associated with planting, growing, harvesting, processing, cooling, storing, packaging, and transporting such products, or the wholesale or retail sale of such products, provided that, to the extent possible, such businesses comply with Social Distancing Requirements and otherwise provide for the health and safety of their employees;

iv. Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged, compromised or otherwise needy individuals;

v. Newspapers, television, radio, and other media services;

vi. Gas stations and auto-supply, auto-repair, and related facilities;

vii. Banks and related financial institutions;

viii. Hardware stores;

ix. Plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses;

x. Businesses providing mailing and shipping services, including post office boxes;

xi. Educational institutions—including public and private K-12 schools, colleges, and universities—for purposes of facilitating distance learning or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible;

xii. Laundromats, drycleaners, and laundry service providers;

xiii. Restaurants and other facilities that prepare and serve food, but only for delivery or carry out. Schools and other entities that typically provide free food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and take-away basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;

xiv. Businesses that supply products needed for people to work from home;

xv. Businesses that supply other essential businesses with the support or supplies necessary to operate;

xvi. Businesses that ship or deliver groceries, food, goods or services directly to residences;

xvii. Airlines, taxis, and other private transportation providers providing transportation services necessary for Essential Activities and other purposes expressly authorized in this Order;

xviii. Home-based care for seniors, adults, or children;

xix. Residential facilities and shelters for seniors, adults, and children;

xx. Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities;

    xxi.  Childcare facilities providing services that enable employees exempted in this Order to work as permitted. To the extent possible, childcare facilities must operate under the following mandatory conditions:

        1.  Childcare must be carried out in stable groups of 12 or fewer ("stable" means that the same 12 or fewer children are in the same group each day).

        2.  Children shall not change from one group to another.

        3.  If more than one group of children is cared for at one facility, each group shall be in a separate room. Groups shall not mix with each other.

        4.  Childcare providers shall remain solely with one group of children.

    xxii.  Hotels, motels, bed and breakfast establishments, and other businesses that provide transient occupancy for visitors to the County, provided that such business require their patrons to shelter in place as otherwise required by this Order.

    xxiii.  On-going commercial construction (meaning commercial construction that actually commenced, and was not just permitted, prior to the effective date of this Order), provided that such activity implements Social Distancing Requirements to the extend feasible and otherwise provides for the health and safety of their employees.

f.  For the purposes of this Order, "Minimum Basic Operations" include the following, provided that employees comply with Social Distancing Requirements as defined this Section, to the extent possible, while carrying out such operations:

    i.  The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.

    ii.  The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

g.  For the purposes of this Order, "Essential Travel" includes travel within or without the County, or between the various counties, for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in this Section below.

    i.  Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions or Services, Essential Businesses, or Minimum Basic Operations.

    ii.  Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

    iii.  Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

    iv.  Travel to return to a place of residence from outside the jurisdiction.

    v.  Travel required by law enforcement or court order.

    vi.  Travel required for non-residents to return to their place of residence outside the County. Individuals are strongly encouraged to verify that their transportation out of the County remains available and functional prior to commencing such travel.

    vii.  Travel engaged in interstate commerce and otherwise subject to the provisions of the Commerce Clause of the United States Constitution.

    h.  For purposes of this Order, residences include hotels, motels, shared rental units and similar facilities.

    i.  For purposes of this Order, "Social Distancing Requirements" includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

11. Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order. The violation of any provision of this Order constitutes an imminent threat to public health.

12. This Order shall become effective at 12:01 a.m. on March 18, 2020 and will continue to be in effect until 11:59 p.m. on April 7, 2020, or until it is extended, rescinded, superseded, or amended in writing by the Health Officer.

13. Copies of this Order shall promptly be: (1) made available at the County Government Center at 168 W. Alisal Street, Salinas, CA 93901, (2) posted on the County website (www.co.monterey.ca.us), the County Health Department website (www.co.monterey.ca.us/government/departments-a-h/health), and such other websites as the County may determine; (3) distributed to the electronic and print press, and (4) provided to any member of the public requesting a copy of this Order.

14. If any provision of this Order to the application thereof to any person or circumstance is held to be invalid, the reminder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

**IT IS SO ORDERED:**

Edward Moreno, M.D.                    Dated: March 17, 2020
Health Officer of the County of Monterey

EX03-130



COUNTY
OF
**Placer**
HEALTH & HUMAN SERVICES
PUBLIC HEALTH

### DIRECTIVE OF THE PLACER COUNTY HEALTH OFFICER INSTRUCTING INDIVIDUALS TO SHELTER AT THEIR PLACE OF RESIDENCE AND RESTRICTING NON-ESSENTIAL ACTIVITIES IN RESPONSE TO COVID-19 OUTBREAK

**DATE OF DIRECTIVE: March 19, 2020**

**Please read this Directive carefully. Your compliance with this Directive is necessary to slow the spread of Coronavirus Disease (COVID-19).**

**Purpose of Directive:**
The intent of this Directive is to slow the spread of COVID-19 in Placer County by having people shelter in place (another way of saying stay home) at their residence, while enabling essential services to continue. When people need to leave their place of residence to obtain or perform vital services or to conduct activities necessary for continuity of social and commercial life, they should maintain a distance of six feet from other persons. Failure to comply with the provisions of this Directive constitutes a threat to public health.

**Reasons for Directive:**
This Directive is issued based on increasing occurrence of cases of COVID-19 within Placer County, scientific evidence regarding COVID-19, and best practices regarding the most effective approaches to slow the transmission of communicable diseases generally, and COVID-19 specifically. There is also evidence that the older age and health conditions of many Placer County residents places them at risk for serious health complications, including death, from COVID-19. Due to the outbreak of the virus that causes COVID-19, there is a public health emergency throughout the United States, California, and Placer County.

COVID-19 is difficult to contain because some individuals who contract the virus have mild symptoms (or possibly even no symptoms), which means they may not be aware they carry the virus. Because evidence shows the disease is easily spread, gatherings can result in preventable transmission of the virus. The scientific evidence shows that at this stage of the emergency, it is essential to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed. One proven way to slow the transmission is to limit interactions among people as much as possible. By reducing the spread of the COVID-19 virus, this Directive helps preserve critical and limited health care capacity in Placer County.

Directive of the Placer Health Officer to Shelter in Place                    Page 1

As of 2 p.m. on March 19, 2020, there are 9 confirmed cases of COVID-19 in Placer County, including one individual who died of the disease. There are significant numbers of confirmed cases and deaths in surrounding counties, including 47 cases in Sacramento County. At least 11 of the confirmed cases in Sacramento County are directly linked to cases in Placer County. Widespread testing for COVID-19 is not yet available, but is expected to increase in the coming days. As more people are tested, more cases will certainly be identified. This Directive is necessary to slow the rate of spread and the Health Officer will re-evaluate the Directive as further data becomes available.

This Directive comes after the release of substantial guidance from the Placer County Health Officer, the Centers for Disease Control and Prevention (CDC), the California Department of Public Health, and other public health officials throughout the United States and around the world, including a variety of prior guidance and orders to combat the spread and harms of COVID-19. The Health Officer will continue to assess the quickly evolving situation and may modify or extend this Directive, or issue additional Directives, related to COVID-19.

**Authority for Directive:**
The Health Officer of Placer County is issuing this Directive under the authority granted by the California Health and Safety Code, Sections 101040, 101085, and 120175.

**Details of Directive:**
1. All individuals currently living within Placer County, including its incorporated cities and town, and the entire unincorporated area, are directed to shelter at their place of residence. This means stay home.
   a. In addition to homes and apartments, residences include hotels, motels, shared rental units, and similar facilities.
   b. If a residence includes spaces shared with other households, such as a common patio, laundry room, or lobby, persons should stay at least six feet from any other person when using these spaces.
   c. Individuals experiencing homelessness are exempt from this section of the Directive, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available while maintaining six feet of spacing between persons.

2. All persons may leave their residences only to perform Essential Activities, to receive or perform Essential Governmental Functions, or to operate Essential Businesses, as defined below.

3. People at high risk of severe illness from COVID-19 and people who are sick should stay in their residence and limit their activity to seeking medical care.

4.  All public and private gatherings of any number of people who are not part of a single household or living unit should be avoided unless essential for the health, safety, or welfare of those present.

5.  All businesses with a facility in the County, except Essential Businesses as defined below, are required to cease activities at facilities located within the County except Minimum Basic Operations, as defined below. Businesses may continue operations consisting exclusively of employees or contractors working from home. All Essential Businesses are strongly encouraged to remain open. Essential Businesses shall comply with the requirement for six-foot spacing between persons, including, but not limited to, when any customers are standing in line.

6.  All travel, including, but not limited to, travel on foot, bicycle, scooter, motorcycle, automobile, or public transit, except Essential Travel and Essential Activities as defined below, is prohibited. People may use public transit only for purposes of performing Essential Activities or to travel to and from work to operate Essential Businesses or maintain Essential Governmental Functions. People riding on public transit must maintain six feet of space between persons, to the greatest extent feasible. This Directive allows travel into or out of the County to perform Essential Activities, operate Essential Businesses, or maintain Essential Governmental Functions.

**Definition of Essential Activities:**
Essential Activities include:

1.  Maintaining the **health and safety** of oneself and their family or household members (including pets). This includes, but is not limited to, obtaining medical supplies or medication, visiting a health care professional, or obtaining supplies needed to work from home.

2.  Obtaining **necessary services or supplies** for oneself and their family or household members, or delivering those services or supplies to others. This includes, but is not limited to, obtaining canned food, dry goods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, other household consumer products, and products necessary to maintain the safety, sanitation, and essential operation of residences.

3.  Engaging in **outdoor activity**, such as walking, hiking, or running, provided six feet of spacing is maintained between people who are not members of the same household.

4.  Performing **work providing essential products and services at an Essential Business** or to otherwise carry out activities specifically permitted in this Directive, including Minimum Basic Operations.

5.  **Caring for a family member** or pet in another household.

**Definition of Essential Businesses:**
Essential Businesses include:

1. Health Care Operations and Essential Infrastructure, as defined below;
2. Blood donation and related activities;
3. Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries and also sell other non-grocery products, and products necessary to maintain the safety, sanitation, and essential operation of residences;
4. Any form of agricultural production and processing, including the cultivation of products for personal consumption or use through farming, ranching, livestock, and fishing, as well as business activities that support production and processing by providing essential agricultural supplies and services, including but not limited to, transportation, manufacturing, chemicals, equipment, and services such as cooling, storing, packaging, and distribution of such products for wholesale or retail sale.
5. Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals;
6. Newspapers, television, radio, and other media services;
7. Gas stations and auto-supply, auto-repair, and related facilities;
8. Banks and related financial institutions;
9. Hardware stores;
10. Plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintain the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses;
11. Businesses providing mailing and shipping services, including post office boxes;
12. Educational institutions—including public and private K-12 schools, colleges, and universities—for purposes of facilitating distance learning or performing essential functions, provided that social distancing of six feet per person is maintained;
13. Laundromats, dry cleaners, and laundry service providers;
14. Restaurants and other facilities that prepare and serve food, but only for delivery or carry out. Schools and other entities that typically provide free food services to students or members of the public may continue to do so under this Directive on the condition that the food is provided to students or members of the public on a pick-up and take-away basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;
15. Businesses that supply products needed for people to work from home;

EX03-134

16. Businesses that supply other essential businesses with the support or supplies necessary to operate;
17. Businesses that ship or deliver groceries, food, goods or services directly to residences;
18. Airlines, taxis, and other private transportation providers providing transportation services necessary for Essential Activities and other purposes expressly authorized in this Directive;
19. Home-based care for seniors, adults, or children;
20. Residential facilities and shelters for seniors, adults, and children;
21. Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities;
22. Childcare facilities providing services that enable employees exempted in this Directive to work in Essential Activities, Essential Governmental Functions, Essential Businesses, or Minimum Basic Operations as permitted. Childcare facilities must operate under the following mandatory conditions:
    a. Childcare must be carried out in stable groups of 12 or fewer (stable means that the same children are in the same group each day).
    b. Children shall not change from one group to another.
    c. If more than one group of children is cared for at one facility, each group shall be in a separate room. Groups shall not mix with each other.
    d. Childcare providers shall remain solely with one group of children.
    e. Persons should remain six feet apart whenever feasible.

For the purposes of this Directive, businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service they provide, the function they perform, or their corporate or entity structure.

**Definition of Minimum Basic Operations:**
Minimum Basic Operations include the following, provided that employees comply with six-foot spacing between persons while carrying out such operations:
1. The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.
2. The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

**Definition of Health Care Operations:**
Health Care Operations include hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other health care facilities, health care suppliers, home health care services providers, mental health providers, public health, or any related and/or ancillary health care services. Health Care Operations also includes veterinary care and all health care services provided to animals. Health Care Operations do not include fitness and exercise gyms and similar facilities.

**Definition of Essential Infrastructure**:
Essential Infrastructure includes, but is not limited to, public works construction, construction of housing (in particular affordable housing or housing for individuals experiencing homelessness), airport operations, water, sewer, gas, electrical, oil refining, roads and highways, public transportation, solid waste collection and removal, internet, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services), provided that they carry out those services or that work while maintaining six feet of distance between persons whenever feasible.

**Definition of Essential Governmental Functions**:
Essential Government Functions are defined by the governmental entity performing those functions. Each governmental entity shall identify and designate appropriate employees or contractors to continue providing and carrying out any Essential Governmental Functions. All Essential Governmental Functions shall be performed in compliance with six-foot social distancing requirements whenever feasible. All first responders, emergency management personnel, emergency dispatchers, court personnel, and law enforcement personnel, and others who need to perform essential services are categorically exempt from this Directive. In addition, all Brown Act meetings of the governing body of all public agencies within Placer County are deemed Essential Government Functions and are categorically exempt from this Directive. Governing bodies should consider implementation of remote attendance measures when feasible in light of waived Brown Act requirements as a result of the Governor's Executive Order.

**Definition of Essential Travel:**
Essential Travel includes travel for any of the following purposes, and must comply with six-foot spacing between persons:
1. Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses, or Minimum Basic Operations.
2. Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.
3. Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.
4. Travel to return to a place of residence from outside the jurisdiction.
5. Travel required by law enforcement or court order.
6. Travel required for non-residents to return to their place of residence outside the County. Individuals are strongly encouraged to verify that their transportation out of the County remains available and functional prior to commencing such travel.

EX03-136

This Directive goes into effect at 12:01 a.m. on March 20, 2020 and will continue to be in effect until 11:59 p.m. on April 10, 2020, or until it is extended, rescinded, superseded, or amended in writing by the Health Officer.

Copies of this Directive shall promptly be: (1) posted at the County Administrative Center located at 175 Fulweiler Avenue, Auburn, CA 95603; (2) posted on the County's website (www.placer.ca.gov/coronavirus/Guidance); and (3) provided to any member of the public requesting a copy of this Directive by calling Placer County Public Health at (530) 886-5310.

**IT IS SO DIRECTED:**
Aimee Sisson, MD, MPH Dated: March 19, 2020
Placer County Health Officer

Directive of the Placer Health Officer to Shelter in Place                    Page 7



COUNTY
OF **Placer**®

HEALTH & HUMAN SERVICES
PUBLIC HEALTH

**AMENDED** ORDER OF THE PLACER COUNTY HEALTH OFFICER INSTRUCTING
INDIVIDUALS TO CONTINUE TO SHELTER AT THEIR PLACE OF RESIDENCE, RESTRICTING
AND CLARIFYING NON-ESSENTIAL ACTIVITIES, REVISING AND CLARIFYING ESSENTIAL
BUSINESS ACTIVITIES, AND REQUIRING ESSENTIAL BUSINESSES TO IMPLEMENT PHYSICAL
DISTANCING PROTOCOLS IN RESPONSE TO COVID-19 OUTBREAK

DATE OF ORDER: <u>April 16, 2020</u>

**Please read this Order carefully. Your compliance with this Order is necessary to
slow the spread of Coronavirus Disease (COVID-19).**

**Purpose of Order:**
The intent of this Order is to slow the spread of COVID-19 in Placer County by having
people shelter in their place of residence (another way of saying stay home), while
enabling essential services to continue. When people need to leave their places of
residence to obtain or perform vital services or to conduct activities necessary for
continuity of social and commercial life, they should maintain a distance of six feet
from other persons. All individuals, businesses, and government agencies in Placer
County are required to follow this Order. Failure to comply with the provisions of this
Order constitutes a threat to public health and may be punished by fine,
imprisonment, or both.

This Order replaces the March 19, 2020 Directive of the Health Officer to stay at
home and the April 10, 2020 Order to Shelter in Place. It clarifies, strengthens, and
extends the terms of the previous Directive to reduce person-to-person contact and
increase physical distancing in order to further slow transmission of COVID-19. Where
a conflict exists between this Order and any state public health order related to the
COVID-19 pandemic, the most restrictive provision applies.

**Reasons for Order:**
This Order is issued based on increasing occurrence of cases of COVID-19 within
Placer County, scientific evidence regarding COVID-19, and best practices
regarding the most effective approaches to slow the transmission of communicable
diseases generally, and COVID-19 specifically. There is also evidence that the
health condition and older age of many Placer County residents places them at risk
for serious health complications, including death, from COVID-19. Due to the
outbreak of the virus that causes COVID-19, there is a public health emergency
throughout the United States, California, and Placer County.

EX03-138

COVID-19 is difficult to contain because many individuals who contract the virus have mild symptoms or no symptoms, which means they may not be aware they carry the virus. Because evidence shows the disease is easily spread, gatherings can result in preventable transmission of the virus. The scientific evidence shows that at this stage of the emergency, it remains essential to continue to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed. One proven way to slow the transmission is to limit physical interactions among people as much as possible. Extending and strengthening the restrictions in the previous Directive is necessary to further reduce the spread of COVID-19. Clarifying the restrictions in the previous Directive will increase compliance by reducing confusion. By reducing the spread of COVID-19, this Order helps preserve critical and limited health care capacity in Placer County.

As of 10 a.m. on April 16, 2020, there are 130 confirmed cases of COVID-19 in Placer County, including 8 individuals who died of the disease. There are significant numbers of confirmed cases and deaths in surrounding counties, including 879 cases and 32 deaths in Sacramento County. This public health emergency has substantially worsened since the Directive was issued on March 19, with a significant increase in the number of positive cases, hospitalizations, and deaths in Placer County and the greater Sacramento region. This Order is necessary to slow the rate of spread and the Health Officer will re-evaluate the Order as further data becomes available.

This Order comes after the release of substantial guidance from the County Health Officer, the Centers for Disease Control and Prevention (CDC), the California Department of Public Health, and other public health officials throughout the United States and around the world, including a variety of prior guidance and orders to combat the spread and harms of COVID-19. The Health Officer will continue to assess the quickly evolving situation and may modify or extend this Order, or issue additional Orders, related to COVID-19.

**Authority for Order:**
The Health Officer of Placer County is issuing this Order under the authority granted by the California Health and Safety Code, Sections 101040, 101085, 120175, and 120175.5.

**Details of Order:**
1. All individuals currently living within Placer County, including its incorporated cities and town, and the entire unincorporated area, are directed to shelter at their place of residence. This means stay home.
    a. In addition to homes and apartments, residences include hotels, motels, shared rental units, and similar facilities.

    b. If a residence includes spaces shared with other households, such as a common patio, laundry room, or lobby, persons should stay at least six feet from any other person when using these spaces.

    c. Individuals experiencing homelessness are exempt from this section of the Order, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available while maintaining six feet of spacing between persons.

2. All persons may leave their residences only to perform Essential Activities, to receive or perform Essential Governmental Functions, or to operate Essential Businesses, as defined below.

3. People at high risk of severe illness from COVID-19 and people who are sick should stay in their residence and limit their activity to seeking medical care.

4. All public and private gatherings of any number of people not part of a single household or living unit are prohibited, except for the limited purposes listed in this Order.

5. All businesses with a facility in the County, except Essential Businesses as defined below, are required to cease activities at facilities located within the County except Minimum Basic Operations, as defined below. Businesses may continue operations consisting exclusively of owners, employees, volunteers, or contractors working from home. All Essential Businesses are strongly encouraged to remain open, but to maximize the number of employees working remotely. Essential Businesses may only assign an employee to work outside the home if the employee cannot perform their job duties from home. All Essential Businesses shall prepare, post, and implement a Physical Distancing Protocol at each of their operating facilities. Businesses that include an Essential Business component alongside non-essential components must scale down their operations to the Essential Business component only.

6. All travel, including, but not limited to, travel on foot, bicycle, scooter, motorcycle, automobile, or public transit, except Essential Travel as defined below, is prohibited. People may use public transit only for purposes of performing Essential Activities or to travel to and from work to operate Essential Businesses or maintain Essential Governmental Functions. People riding on public transit must maintain six feet of space between others, to the greatest extent feasible. This Order allows travel into or out of the County to perform Essential Activities, operate Essential Businesses, maintain Essential Governmental Functions, or perform Minimal Basic Operations at non-essential businesses.

7. All individuals shall maintain good hand hygiene and respiratory etiquette, along with physical distancing. This includes the following:

EX03-140

a. Maintaining at least 6 feet of physical distance from others not in their household, except to the limited extent necessary to provide care; to carry out the work of Essential Businesses, Essential Government Functions, or provide for Minimum Basic Operations; or as otherwise expressly provided in this Order.

b. Frequently washing hands with soap and water for at least 20 seconds, or using hand sanitizer containing at least 60% alcohol;

c. Covering coughs and sneezes with a tissue or fabric, or into the sleeve or elbow;

d. Consider wearing a face covering when outside their residence and it is not possible to maintain 6 feet of physical distance from others; and

e. Avoiding all physical interaction outside the household when sick with a fever or cough.

**Definition of Essential Activities:**

Essential Activities include:

1. Maintaining the **health and safe**ty of oneself and their family or household members (including pets). This includes, but is not limited to, obtaining medical supplies or medication, or visiting Health Care Operations.

2. Obtaining **necessary services or supplies** for oneself and their family or household members, or delivering those services or supplies to others. This includes, but is not limited to, obtaining canned food, dry goods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, other household consumer products, and products necessary to maintain the safety, sanitation, and essential operation of residences.

3. Engaging in **outdoor recreation activity**, such as walking, hiking, bicycling, or running, provided six feet of spacing is maintained between people who are not members of the same household and with the following limitations:

   a. Outdoor recreation activity at parks, beaches, and other open spaces must conform with any restrictions of access and use established by the Health Officer, government, or other entity that manages such an area to reduce crowding and risk of transmission of COVID-19.

   b. Use of recreational areas with high-touch equipment or that encourage gathering, is prohibited outside of residences. These include, but are not limited to, playgrounds, outdoor gym equipment, picnic areas, ~~dog parks,~~ and barbeque areas. All such areas shall be closed to the public by signage and/or physical barriers. Dog parks may remain open if seating areas are closed, hand sanitizer is provided at the entrance/exit (or users bring their own hand sanitizer), and users bring their own water and waste bags.

   c. Use of shared facilities for recreational activities outside of residences is prohibited. These include, but are not limited to, ~~golf courses, tennis, pickleball, basketball, and volleyball courts,~~ climbing walls, pools, and spas ~~shooting and archery ranges, and disc golf~~. These areas shall be

EX03-141

closed for recreational use by signage and/or physical barriers. Golf courses and outdoor shooting and archery ranges may remain open if they follow guidance provided by the Health Officer available at: placer.ca.gov/coronavirus/guidance. Disc golf courses may remain open if no contact is made with baskets. Tennis, pickleball, basketball, and volleyball courts may remain open for use by members of the same household only.

d. Sports or activities that involve the use of shared equipment, such as balls, may only be engaged in by members of the same household.

4. Performing **work providing essential products and services at an Essential Business** or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations.

5. **Caring for a family member** or pet in another household.

6. **To attend a funeral** with no more than 10 individuals present.

7. **To move residences,** but only if it is not possible to defer an already planned move, the move is necessary for health and safety reasons, or the move is necessary to remain housed, or retain employment.

**Definition of Essential Businesses:**
Essential Businesses include:

1. Health Care Operations and Essential Infrastructure, as defined below;

2. Blood donation and related activities;

3. Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of unprepared food, canned food, dry goods, non-alcoholic beverages, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, as well as hygienic products and household consumer products necessary for personal hygiene or the habitability, sanitation, and operation of residences. This includes stores that sell multiple categories of products provided that they sell a significant amount of essential products identified above, such as liquor stores that also sell a significant amount of food.

4. Agriculture, food, and beverage cultivation, processing, and distribution, including, but not limited to, farming, ranching, fishing, milk and cheese production, winemaking, and brewing of beer and cider, in order to preserve inventory and production and for personal consumption and use, and wholesale or retail sale of such products. On-site consumption at wineries and breweries is not allowed under this Order.

5. Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals;

6. Newspapers, television, radio, and other media services;

7. Gas stations and auto-supply, auto-repair, and related facilities, including automotive dealerships, but only for the purpose of providing auto-supply

EX03-142

and auto-repair services, and not for car sales or car washes. Online purchases of automobiles is allowed if they are delivered to a residence or Essential Business;

8. Bicycle repair and supply shops;

9. Banks and related financial institutions;

10. Service providers that enable residential transactions such as rentals, leases, and home sales, including, but not limited to, real estate agents, escrow agents, notaries, and title companies, provided that appointments and residential viewings occur only virtually. If a virtual viewing is not feasible, viewings may occur by appointment with no more than two visitors who reside in the same household and one individual showing the unit at a time, and only if the unit is vacant, or the occupant has provided express written consent for the showing, and aside from walking no surfaces are touched during the showing;

11. Hardware stores;

12. Plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the habitability, sanitation, and operation of residences and Essential Businesses. This does not include cosmetic or other purposes;

13. Arborists, landscapers, gardeners, and similar service professionals, provided physical distancing practices are maintained throughout service and payment, any shared equipment is cleaned between users, and crew members who are not members of the same household do not travel in the same vehicle; ~~but only to the extent necessary to maintain the habitability, sanitation, and operation of residences and Essential Businesses or the safety of residents, employees, or the public, and not for cosmetic purposes. Routine maintenance such as lawn mowing is cosmetic and therefore non-essential under this Order;~~

14. Businesses providing mailing and shipping services, including post office boxes;

15. Educational institutions—including public and private K-12 schools, colleges, and universities—for purposes of facilitating distance learning or performing essential functions, provided that social distancing of six feet per person is maintained to the greatest extent possible;

16. Laundromats, dry cleaners, and laundry service providers;

17. Restaurants and other facilities that prepare and serve food, but only for delivery or carry out. Schools and other entities that typically provide free food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and take-away basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;

EX03-143

18. Funeral home providers, mortuaries, cemeteries, and crematoriums, to the extent necessary for the transport, preparation, or processing of bodies or remains;

19. Businesses that supply other Essential Businesses with the support or supplies necessary to operate, but only to the extent that they support or supply these Essential Businesses. This exemption shall not be used as a basis for engaging in sales to the general public from retail storefronts;

20. Businesses that have the primary function of shipping or delivering groceries, food, or other goods directly to residences or businesses. This exemption shall not be used to allow for manufacturing or assembly of non-essential products or for other functions besides those necessary to the delivery operation;

21. Firearm and ammunition retailers;

22. Airlines, taxis, rental car companies, rideshare services, and other private transportation providers providing transportation services necessary for Essential Activities and other purposes expressly authorized in this Order;

23. Home-based care for seniors, adults, or children;

24. Residential facilities and shelters for seniors, adults, and children;

25. Professional services, such as legal, notary, or accounting services, when necessary to assist in compliance with legally mandated activities;

26. Services to assist individuals in finding employment with Essential Businesses;

27. Moving services that facilitate residential or commercial moves that are permitted under this Order;

28. Childcare facilities providing services that enable owners, employees, volunteers, and contractors for Essential Businesses or Essential Governmental Functions to work as permitted. Children of owners, employees, volunteers, and contractors who are not exempt under this Order may not attend childcare facilities. Childcare facilities must operate under the following conditions:

    a. Childcare must be carried out in stable groups of 12 or fewer (stable means that the same children are in the same group each day).

    b. Children shall not change from one group to another.

    c. If more than one group of children is cared for at one facility, each group shall be in a separate room. Groups shall not mix with each other.

    d. Childcare providers shall remain solely with one group of children.

    e. Persons should remain six feet apart whenever feasible.

29. Long-term rentals for periods of one month or longer for existing rentals and for rentals accommodating moves permitted by this Order.  Short-term rental units (as defined in County Code) are not permitted to operate for commercial purposes and may continue to operate only for the following limited purposes:

    a. To provide COVID-19 mitigation and containment measures (for example, isolation and quarantine or the housing of displaced or homeless persons )

Order of the Placer Health Officer to Shelter in Place                                    Page 7

b. To provide housing for owners, employees, volunteers, and contractors of Essential Businesses, individuals providing Essential Infrastructure services, and persons performing Essential Governmental Functions.

For the purposes of this Order, a business includes any for-profit, non-profit, or educational entity, whether a corporate entity, organization, partnership or sole proprietorship, regardless of the nature of the service it provides, the function it performs, or its corporate or entity structure.

All Essential Businesses must prepare and post a Physical Distancing Protocol no later than 11:59 p.m. on April 13 for each of their facilities in the County frequented by the public or employees. The Physical Distancing Protocol must follow the format of the form in Appendix A of this Order. The Protocol must be posted at or near the entrance of the relevant facility, and shall be easily viewable by the public and employees. A copy of the Protocol must also be provided to each employee, volunteer, and contractor performing work at the facility. All Essential Businesses shall implement their Protocol and provide evidence of implementation upon request to any authority enforcing this Order. The Protocol must explain how the business is achieving the following, as applicable:

1. Limiting the number of people who can enter into the facility at any one time to ensure that people in the facility can easily maintain a minimum 6-foot distance from one another at all times, except as required to complete the Essential Business activity;
2. Where lines may form at a facility, marking 6-foot increments at a minimum, establishing were individuals should stand to maintain adequate physical distancing;
3. Providing soap and water, hand sanitizer, or effective disinfectant at or near the entrance of the facility and in other appropriate areas for use by customers and employees, and in locations where there is high-frequency employee interaction with members of the public, such as at check-out;
4. Providing for payment systems that do not require contact, or if this is not feasible, providing for disinfection of all payment portals, pens, and styluses after each use;
5. Regularly disinfecting other high-touch surfaces;
6. Posting a sign at the entrance of the facility informing all employees and customers that they should not enter if they have a cough or fever, should stay at least 6 feet away from others, should cough or sneeze into their sleeve, should not shake hands, and should not engage in any unnecessary physical contact; and
7. Any additional physical distancing measures being implemented.

**Definition of Minimum Basic Operations:**
Minimum Basic Operations include the following, provided that employees comply with six-foot spacing between persons while carrying out such operations whenever feasible:

EX03-145

1. The minimum necessary activities to maintain and protect the value of the business's inventory, ensure security, safety, and sanitation, process payroll and employee benefits, or for related functions.
2. The minimum necessary activities to facilitate owners, employees, and contractors of the business being able to continue to work remotely from their residences and to ensure that the business can deliver its service remotely.

**Definition of Health Care Operations:**
Health Care Operations include hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other healthcare facilities, health care suppliers, home health care services providers, mental health providers, public health, or any related and/or ancillary health care services. Health Care Operations also include veterinary care and all health care services provided to animals. Health Care Operations does not include fitness and exercise gyms and similar facilities, nor does it include barbering, the beauty industry, and grooming of pets for cosmetic purposes.

**Definition of Essential Infrastructure:**
Essential Infrastructure includes, but is not limited to, public works construction; construction of housing (in particular affordable housing or housing for individuals experiencing homelessness); construction of commercial buildings already underway at the time of this Order; construction and maintenance of hospitals, medical service buildings, and educational facilities; emergency repair construction; airport operations; water, sewer, gas, and electrical operations; oil refining; operation and maintenance of roads and highways; public transportation; solid waste collection and removal; and the operations and maintenance of internet and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services); provided that they carry out those services or that work while maintaining six feet of distance between persons whenever feasible.

**Definition of Essential Governmental Functions:**
Essential Government Functions are defined by the governmental entity performing those functions. Each governmental entity shall identify and designate appropriate employees or contractors to continue providing and carrying out any Essential Governmental Functions. All Essential Governmental Functions shall be performed in compliance with six-foot social distancing requirements whenever feasible. All first responders, emergency management personnel, emergency dispatchers, court personnel, and law enforcement personnel, and others who need to perform essential services are categorically exempt from this Order to the extent they are performing those Essential Government Functions. In addition, all Brown Act meetings of the legislative body, as defined in the Brown Act, of all public agencies within Placer County are deemed Essential Governmental Functions and are

Order of the Placer Health Officer to Shelter in Place                    Page 9

EX03-146

categorically exempt from this Order. Legislative bodies should consider implementation of remote attendance measures when feasible in light of waived Brown Act requirements as a result of the Governor's Executive Orders.

**Definition of Essential Travel:**
Essential Travel includes travel for any of the following purposes, and must comply with six-foot spacing between persons:

1. Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses, or Minimum Basic Operations.
2. Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.
3. Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.
4. Travel to return to a place of residence from outside the County.
5. Travel required by law enforcement or court order.
6. Travel required for non-residents to return to their place of residence outside the County. Individuals are strongly encouraged to verify that their transportation out of the County remains available and functional prior to commencing such travel.
7. Travel to manage after-death arrangements and burial.
8. Travel to arrange for shelter or avoid homelessness.
9. Travel to avoid domestic violence or child abuse or neglect.
10. Travel for parental custody arrangements.
11. Travel to a place to temporarily reside in a residence or other facility to avoid exposing others to COVID-19, such as to a hotel or other facility provided by a governmental authority for such a purpose.

This Order goes into effect at 11:59 p.m. on April 16, 2020 and will continue to be in effect until 11:59 p.m. on May 1, 2020, or until it is extended, rescinded, superseded, or amended in writing by the Health Officer.

Copies of this Order shall promptly be: (1) posted at the County Administrative Center located at 175 Fulweiler Avenue, Auburn, CA 95603; (2) posted on the County's website (www.placer.ca.gov/coronavirus/Guidance); and (3) provided to any member of the public requesting a copy of this Order by calling Placer County Public Health at (530) 886-5310.

**IT IS SO ORDERED:**

Aimee Sisson, MD, MPH                    Dated: April 16, 2020
Placer County Health Officer

Attachments: Appendix A – Physical Distancing Protocol

Order of the Placer Health Officer to Shelter in Place                    Page 10

# Appendix A: **Physical Distancing Protocol**

Business Name:

Facility Address:

Approximate gross square footage of space open to the public:                    ft²

**Businesses must implement all applicable measures listed below and be prepared to explain why any measure that is not implemented is not applicable to the business.**

*When completing this form, mark all checkboxes applicable to the facility.*

---

## Signage

☐ Place a sign at each public entrance of the facility to inform all employees and customers that they should: avoid entering the facility if they have a cough or fever; maintain a minimum six-foot distance from one another; sneeze and cough into a cloth or tissue or, if not available, into one's elbow; not shake hands or engage in any unnecessary physical contact, and wear a face covering.

☐ Post a copy of this Physical Distancing Protocol at each public entrance to the facility.

---

## Measures to Protect Employee Health

☐ Everyone who can carry out their work duties from home has been directed to do so.

☐ All employees have been told not to come to work if sick.

☐ Symptom checks are being conducted before employees may enter the work space.

☐ All desks or individual work stations are separated by at least six feet.

☐ Break rooms, bathrooms, and other common areas are being disinfected frequently, on the following schedule:

    ☐ Break rooms:

    ☐ Bathrooms:

    ☐ Other:

☐ Disinfectant and related supplies are available to all employees at the following location(s):

☐ Hand sanitizer effective against COVID-19 is available to all employees at the following location(s):

□ Soap and water are available to all employees at the following location(s):

□ Encourage employees and customers to wear a face covering that covers the nose and mouth at all times when in the facility. Provide such face coverings to employees if needed.

□ Copies of this Protocol have been distributed to all employees.

□ Optional—Describe other measures:

## Measures to Prevent Crowds from Gathering

□ Limit the number of customers in the facility at any one time to [insert maximum number here], which allows for customers and employees to easily maintain at least six-foot distance from one onother at all practicable times.

□ Post an employee at the door to ensure that the maximum number of customers in the facility set forth above is not exceeded.

□ Placing per-person limits on goods that are selling out quickly to reduce crowds and lines. Explain:

□ Optional—Describe other measures:

## Measures to Keep People at Least Six Feet Apart

□ Placing signs outside the store reminding people to be at least six feet apart, including when in line.

□ Placing tape or other markings at least six feet apart in customer line areos inside the facility and on sidewalks at public entrances with signs directing customers to use the markings to mointain distance.

□ Separate order areas from delivery areas to prevent customers from gathering.

□ All employees have been instructed to maintain at least six feet distance from customers and from each other, except employees may momentarily come closer when necessary to accept payment, deliver goods or services, or as otherwise necessary.

□ Optional—Describe other measures:

## Measures to Prevent Unnecessary Contact

☐ Preventing people from self-serving any items that are food-related.

    ☐ Lids for cups and food-bar type items are provided by staff and not available for self-service.

    ☐ Bulk-item food bins are not available for customer self-service use.

☐ Not permitting customers to bring their own bags, mugs, or other reusable items.

☐ Providing for contactless payment systems or, if not feasible, sanitizing payment systems regularly. Describe:

☐ Optional—Describe other measures (e.g., providing senior-only hours):

## Measures to Increase Sanitization

☐ Disinfecting wipes that are effective against COVID-19 are available near shopping carts and shopping baskets.

☐ Employee(s) assigned to disinfect carts and baskets regularly.

☐ Hand sanitizer, soap and water, or effective disinfectant is available to the public at or near the entrance of the facility, at checkout counters, and anywhere else inside the store or immediately outside where people have direct interactions.

☐ Disinfecting all payment portals, pens, and styluses after each use.

☐ Disinfecting all high-contact surfaces frequently.

☐ Optional—Describe other measures:

\* Any additional measures not included here should be listed on separate pages, which the business should attach to this document.

**You may contact the following person with any questions or comments about this Protocol:**
CONTACT NAME:                                              CONTACT PHONE:

For more information on COVID-19 visit: **placer.ca.gov/coronavirus**

EX03-150

CDPH COVID-19 VARIANCE ATTESTATION FORM

# VARIANCE TO STAGE 2 OF CALIFORNIA'S ROADMAP TO MODIFY THE STAY-AT-HOME ORDER



COVID-19 COUNTY VARIANCE ATTESTATION FORM

## FOR PLACER COUNTY

**Background**

On March 4, 2020 Governor Newsom proclaimed a State of Emergency as a result of the threat of COVID-19, and on March 12, 2020, through Executive Order N-25-20, he directed all residents to heed any orders and guidance of state and local public health officials. Subsequently, on March 19, 2020, Governor Newsom issued Executive Order N-33-20 directing all residents to heed the State Public Health Officer's Stay-at-Home order which requires all residents to stay at home except for work in critical infrastructure sectors or otherwise to facilitate authorized necessary activities. On April 14th, the State presented the Pandemic Roadmap, a four-stage plan for modifying the Stay-at-Home order, and, on May 4th, announced that entry into Stage 2 of the plan would be imminent.

Given the size and diversity of California, it is not surprising that the impact of COVID-19 has differed across the state. While some counties are still in the initial stabilization phase (Stage 1) of the pandemic response, there are a number of less affected counties. Provided these counties are able to demonstrate an ability to protect the public and essential workers, they may be in a position to adopt aspects of Stage 2 of California's roadmap at a faster pace than the state as a whole. As directed by the Governor in Executive Order N-60-20, this guidance provides information on the criteria and procedures that counties will need to meet in order to move more quickly than other parts of the state through Stage 2 of modifying the Stay-at-Home order. It is recommended that counties consult with cities and other stakeholders as they consider moving through Stage 2.

**Local Variance**

A county that has met certain criteria in containing COVID-19 may consider increasing the pace at which they advance through Stage 2, but not into Stage 3, of California's roadmap to modify the Stay-at-Home order. Counties are encouraged to first review this document in full to consider if a variance from the state's roadmap is appropriate for the county's specific circumstances. If a county decides to pursue a variance, the local public health officer must:

1. Notify the California Department of Public Health (CDPH) and engage in a phone consultation regarding the county's intent to seek a variance.

2. Certify through submission of a written attestation to CDPH that the county has met the readiness criteria (outlined below) designed to mitigate the spread of COVID-19. Attestations should be submitted by the local public health officer, and accompanied by a letter of support from the County Board of Supervisors, as well as a letter of support from the local hospitals or health care systems. In the event that the county does not have a hospital or health care system within its jurisdiction, a letter of support from the

CDPH COVID-19 VARIANCE ATTESTATION FORM

relevant regional health system(s) is also acceptable. The full submission must be signed by the local public health officer.

All county attestations, and submitted plans for moving through Stage 2 as outlined below, will be posted publicly on CDPH's website.

While not required, CDPH recommends as a best practice the development of a county COVID-19 containment plan by the local public health officer in conjunction with the hospitals and health systems in the jurisdiction, as well as input from a broad range of county stakeholders, including the County Board of Supervisors.

In addition to pre-submission phone consultations, CDPH is available to provide technical assistance to counties as they develop their attestations and COVID-19 containment plans. Please email Jake Hanson at Jake.Hanson@cdph.ca.gov to set up a time with our technical assistance team.

**County Name:** Placer County

**County Contact:** Dr. Aimee Sisson, Health Officer

**Public Phone Number:** 530-886-5310

**Readiness for Variance**

The county's documentation of its readiness to increase the pace through Stage 2 must clearly indicate its preparedness according to the criteria below. This will ensure that individuals who are at heightened risk, including for example the elderly and those residing in long-term care and locally controlled custody facilities, continue to be protected as a county progresses through California's roadmap to modify the Stay-at-Home order, and that risk is minimized for the population at large.

As part of the attestation, counties must provide specifics regarding their movement through Stage 2 (e.g., which sectors, in what sequence, at what pace), as well as clearly indicate how their plans differ from the state's order.

It is critical that any county that submits an attestation continue to collect and monitor data to demonstrate that the variances are not having a negative impact on individuals or healthcare systems. Counties must also attest that they have identified triggers and have a clear plan and approach if conditions worsen for modifying the pace of advancing through stage 2, including reinstituting restrictions, in advance of any state action. Counties must also submit their plan for how they anticipate moving through Stage 2 (e.g., which sectors will be opened, order of opening etc.).

EX03-152

**Readiness Criteria**

To establish readiness for an increased pace through Stage 2 of California's roadmap to modify the Stay-at-Home order, a county must attest to the following readiness criteria and provide the requested information as outlined below:

- **Epidemiologic stability of COVID-19.** A determination must be made by the county that the prevalence of COVID-19 cases is low enough to be swiftly contained by an epidemiological response. Given the anticipated increase in cases as a result of modifications, this is a foundational parameter that must be met to safely increase the county's progression through Stage 2. The county must attest to:
  - o No more than 1 COVID-19 case per 10,000 in the past 14 days prior to attestation submission date.

*Placer County has approximately 400,000 residents, so it must have no more than 40 cases in the past 14 days to meet this requirement. There have been 27 cases reported in Placer County in the previous 14 days. Therefore, the County meets this requirement.*

  - o No COVID-19 death in the past 14 days prior to attestation submission date.

*Placer County meets this requirement because there has not been a COVID-19 death reported since April 16, 2020.*

- **Protection of Stage 1 essential workers.** A determination must be made by the county that there is clear guidance and the necessary resources to ensure the safety of Stage 1 essential critical infrastructure workers. The county must attest to:
  - o Guidance for employers and essential critical infrastructure workplaces on how to structure the physical environment to protect essential workers. Please provide copies of the guidance(s).

*Placer County acted in March and April to develop and distribute guidance including protocols to protect Stage 1 essential workers. On March 19, the Placer County Health Officer released a <u>directive</u> that stressed the importance of essential businesses adhering to physical distancing. On April 10, the Health Officer released a <u>public health order</u> that made development, posting, and implementation of a <u>physical distancing protocol</u> mandatory for essential businesses that were open in Stage 1. The protocol is checklist-based and reviews staying home when sick, wearing face coverings, maintaining 6-foot spacing, and increasing sanitation measures. Employers were required to provide a copy of their completed protocol to all employees. Additional physical distancing plans were developed and shared for <u>golf courses</u> and <u>outdoor shooting/archery ranges</u> in mid-April. When the Health Officer order to shelter in place expired on May 1, Stage 1 businesses were encouraged to continue to follow the protocols as guidance. Placer County continues to meet regularly with local agencies, stakeholders and community partners to review guidance and develop public outreach strategies to ensure all employers and employees are aware of published guidance, including <u>newly-released</u> CDPH and Cal/OSHA guidance for Stage 1 businesses.*

3

CDPH COVID-19 VARIANCE ATTESTATION FORM

> o   Availability of supplies (disinfectant, essential protective gear) to protect essential workers.  Please describe how this availability is assessed.

*Placer County works with our Procurement staff to publish a <u>current list</u> of suppliers and services for essential workers, including PPE and disinfectant. This list is updated regularly as suppliers are added or removed based on their communication with Procurement about availability.*

- **Testing capacity**. A determination must be made by the county that there is testing capacity to detect active infection that meets the state's most current testing criteria (available on CDPH website). The county must attest to:

> o   Minimum daily testing volume to test 1.5 per 1,000 residents, which can be met through a combination of testing of symptomatic individuals and targeted surveillance. Please provide the plan and the county's average daily testing volume for the past week. If the county does not believe a testing volume of 1.5 per 1,000 residents is merited, please provide justification for this.

*Placer County has approximately 400,000 residents, so it must have a minimum daily testing volume of 600 tests to meet this requirement. The highest volume of tests run per day in the 2 weeks prior to attestation submission has been 294 (with an average of 143 tests per day over 14 days). However, testing capacity in Placer County exceeds the required 600 tests per day. Testing volume has not matched testing capacity because the shelter in place order has kept the numbers of symptomatic persons needing testing low. As CDPH's testing criteria have expanded to include mildly symptomatic and asymptomatic persons, Placer County has encouraged providers to test more widely, encouraged residents to seek testing, and is implementing surveillance testing for vulnerable populations.*

*We estimate Placer County's testing capacity as follows:*
- *OptumServe test sites in Roseville and North Tahoe: 264 tests/day*
- *Sutter health system: 150 tests/day*
- *Kaiser Permanente health system: 250 tests/day*
- *Ambulatory care sites using commercial laboratories: at least 100 tests/day*

*The County plans to increase testing volume in the coming weeks, in part by implementing a targeted surveillance program in skilled nursing facilities. The surveillance program has a goal of testing approximately 10-20% of residents and staff in every skilled nursing facility each week.*

*As demonstrated by testing capacity and its plans to increase testing volume, Placer County will be able to meet our community's needs during Stage 2 of reopening.*

4

EX03-154

CDPH COVID-19 VARIANCE ATTESTATION FORM

o   Testing availability for at least 75% of residents, as measured by a specimen collection site (including established health care providers) within 30 minutes driving time in urban areas, and 60 minutes in rural areas. Please provide a listing of all specimen collection sites in the county, whether there are any geographic areas that do not meet the criteria, and plans for filling these gaps. If the county depends on sites in adjacent counties, please list these sites as well.

*Placer County has approximately 400,000 residents, so 75% of residents equates to 300,000 people in Placer County. With new OptumServe sites placed strategically in populous South Placer (Roseville) and East Placer (Kings Beach), and another site coordinated with neighboring Nevada County to ensure Mid-Placer residents are served (Grass Valley), in addition to specimen collection being conducted by health care providers throughout the County, most residents are within a 30-60 minute drive of a specimen collection site. All geographic areas meet this criterion.*

*Sites in Placer County:*
- *OptumServe Kings Beach Site – North Tahoe Event Center; OptumServe Roseville site - @the Grounds*
- *Numerous health care providers, including but not limited to: Auburn Medical Group (Auburn); Chapa-De Indian Health (Auburn); Kaiser Permanente (Roseville); Rocklin Family Practice and Sports Medicine (Rocklin); Stallant Health (Weimar); Sutter Health (Roseville, Auburn); Turnure Medical Group (Rocklin); Western Sierra Medical Clinic (Auburn, Kings Beach)*

*Sites in adjacent counties:*
- *Verily drive-through testing site (Sacramento County); OptumServe Grass Valley site (Nevada County); additional OptumServe sites in Yolo, Yuba, and El Dorado counties are within approximately 30 miles of many residents.*

*In addition, residents throughout Placer can collect their own specimens and mail them in using LabCorp's Pixel At-Home Kit.*

- **Containment capacity.** A determination must be made by the county that it has adequate infrastructure, processes, and workforce to reliably detect and safely isolate new cases, as well as follow up with individuals who have been in contact with positive cases. The county must attest to:
  o   Sufficient contact tracing. For counties that have no cases, there should be at least 15 staff per 100,000 county population trained and available for contact tracing; for counties with small populations, there must be at least one staff person trained and available. Please describe the county's contact tracing plan, including workforce capacity, and why it is sufficient to meet anticipated surge.

*Placer County has approximately 400,000 residents, so it must have at least 60 staff to meet the requirement of 15 staff per 100,000 county population for sufficient contact tracing. The County has implemented a plan to expand from its current team of 15 contact tracing staff to at least 60 trained staff over the next*

5

CDPH COVID-19 VARIANCE ATTESTATION FORM

*one to two weeks. We will continue to utilize our existing 15 COVID-19 trained and experienced Epidemiology, Communicable Disease, and Public Health Nursing staff in the Public Health Division who have been conducting containment activities since early March 2020. Beginning May 11, we will train 10 additional Public Health staff, 15 Health and Human Services Department staff, and 15 staff from other County departments on how to follow up with individuals who have been in contact with positive cases using a combination of materials developed by Placer County as well as an online contact tracing academy developed by the State of California in collaboration with UCSF and UCLA. In addition to training redirected County staff, we will request approximately 30 COVID-19-trained employees from the State once they become available and our caseload requires additional staffing. Taken together, these steps will provide a team of 85 trained contact tracers and investigators. Finally, we will recruit and hire part-time staff from the community as needed to ensure our continued ability to quickly detect and safely isolate new cases and follow up with their contacts. This staffing model provides us with the flexibility to scale staffing up or down as needed, sustain contact tracing, and meet the anticipated surge. Placer County will continue to implement and improve existing contact tracing protocols and processes, and will utilize enhanced contact tracing tools provided by the State as soon as they are made available.*

> o   Availability of temporary housing units to shelter at least 15% of county residents experiencing homelessness in case of an outbreak among this population requiring isolation and quarantine of affected individuals. Please describe the county's plans to support individuals, including those experiencing homelessness, who are not able to properly isolate in a home setting by providing them with temporary housing (including access to a private bathroom), for the duration of the necessary isolation or quarantine period.

*Placer County has sufficient temporary housing units to shelter more than 15% of its residents experiencing homelessness and requiring isolation and quarantine. Our last homeless count in January 2020 counted 744 individuals; fifteen percent of this total would be 112 persons. With two motel/hotel contracts, eight beds in our county-owned Interim Care Program facility and 12 OES/FEMA trailers, we have more than 137 beds available to shelter homeless individuals for this purpose. In addition, we are finalizing an agreement to use up to 60 college dorm rooms if needed. Finally, we have the ability to use 10 additional beds at one of our leased motel facilities, contract with a motel in Auburn for up to 15 rooms, contract with a retreat center in Applegate for 37 rooms, and contract with a resort in Tahoe City for five more rooms. The great majority of these rooms have access to a private bathroom. Taken together, we have the ability to increase our capacity to serve this population to over 200 beds, significantly more than the required 112 beds.*

EX03-156

- **Hospital capacity**. A determination must be made by the county that hospital capacity, including ICU beds and ventilators, and adequate PPE is available to handle standard health care capacity, current COVID-19 cases, as well as a potential surge due to COVID-19. If the county does not have a hospital within its jurisdiction, the county will need to address how regional hospital and health care systems may be impacted by this request and demonstrate that adequate hospital capacity exists in those systems. The county must attest to:
  - County (or regional) hospital capacity to accommodate a minimum surge of 35% due to COVID-19 cases in addition to providing usual care for non-COVID- 19 patients. Please describe how this surge would be accomplished, including surge census by hospital, addressing both physical and workforce capacity.

*Placer County's three hospitals (Sutter Auburn Faith Hospital, Sutter Roseville Medical Center, and Kaiser Permanente Roseville Medical Center) have substantial capacity, including ICU beds, ventilators, and adequate PPE available to handle standard health care capacity, current COVID-19 cases, and potential surge due to COVID-19.*

*All three hospitals have increased surge capacity well above the defined level of 35%. Sutter Roseville Medical Center's surge plan supports a phased-in expansion from a baseline capacity of 272 beds (including 56 critical care beds) to 448 beds (including 150 critical care beds). Sutter Auburn Faith's baseline bed capacity is 60 (including 4 critical care beds), and its surge plan relies on transferring patients within the region, including to Sutter Roseville Medical Center. Kaiser Permanente Roseville Medical Center's multistage surge plan enables expansion from a baseline of 176 beds (including 30 critical care beds) to a total of 520 beds (including 116 critical care beds). Robust plans are in place to increase capacity and capability, including increased volumes of staff trained to respond to a likely COVID-19 surge event. All staff have received COVID-19 training. Surge locations and space allocation have been defined with staged lateral expansion inclusive of accommodating a significant influx of patients requiring intensive care. Supply planning has been executed with identification of required equipment; that equipment is prepared and secured, ready for use at each surge location.*

  - County (or regional) hospital facilities have a robust plan to protect the hospital workforce, both clinical and nonclinical, with PPE. Please describe the process by which this is assessed.

*All three Placer County hospitals have robust plans to protect their workforce with PPE. Their PPE supply is stable with the ability to requisition additional supplies regionally within the respective systems. Weekly, Placer County conducts scheduled check-in teleconferences with hospital executives to track PPE availability, facility status, and provide COVID-19 updates and technical assistance. Hospitals, like all health care facilities and first responder agencies, may submit resource requests to the Medical and Health Operational Area Coordinator (MHOAC) for PPE. Such requests are an*

EX03-157

*indication that a hospital may have a disruption in the PPE procurement supply chain and result in additional outreach by Placer County. Placer County maintains close relationships with hospital emergency preparedness coordinators, in part through the Placer County Health Care Coalition.*

**Vulnerable populations.** A determination must be made by the county that the proposed variance maintains protections for vulnerable populations, particularly those in long-term care settings. The county must attest to:

- o Skilled nursing facilities (SNF) have >14 day supply of PPE on hand for staff, with established process for ongoing procurement from non-state supply chains. Please list the names and contacts of all SNFs in the county along with a description of the system the county has to track PPE availability across SNFs..

*Each of Placer County's 10 skilled nursing facilities (SNF) have at least a 14-day supply of PPE on hand for staff, and established processes for ongoing procurement from non-state supply chains. SNFs in Placer County and their designated contact persons include:*

- *Auburn Oaks Care Center (Ethan Flake)*
- *Auburn Ravine Terrace (Sharon Trudeau)*
- *Lincoln Meadows Care Center (Kevin Hadfield)*
- *Oakridge Healthcare Center (Jason Pollock)*
- *Pine Creek Care Center (Todd Pratt)*
- *Rock Creek Care Center (Ryan Nakao)*
- *Roseville Care Center (Jeff Jamieson)*
- *Roseville Point Health & Wellness Center (Jorin Larson)*
- *Westview Healthcare Center (Matt Taylor)*
- *Siena Skilled Nursing and Rehabilitation Center (Eric VanWalleghem)*

*Placer County conducts scheduled check-in teleconferences weekly with SNFs to track PPE availability, facility status, and provide COVID-19 updates and technical assistance. An infection prevention subject matter expert from the California Department of Public Health's (CDPH) Healthcare-Associated Infections Program participates in these calls. CDPH conducts a daily survey of SNFs statewide and shares the results with local health departments. Placer County Public Health regularly monitors the survey results to determine if any facilities in Placer are reporting PPE shortages. The SNFs, like all healthcare facilities and first responder agencies, may submit resource requests for PPE to the MHOAC. Such a request is an indication that a SNF may have a disruption in the PPE procurement supply chain, and results in additional outreach. Finally, when a SNF has a positive COVID-19 case, Placer County inquires whether or not the SNF has sufficient PPE to keep its staff and patients safe, and provides support accordingly.*

EX03-158

CDPH COVID-19 VARIANCE ATTESTATION FORM

- **Sectors and timelines.** Please provide details on the county's plan to move through Stage 2. This should include which sectors and spaces will be opened, in what sequence, on what timeline. Please specifically indicate where the plan differs from the state's order. Please note that this variance should not include sectors that are part of Stage 3.

*On May 8, early Stage 2 retail (curbside and delivery only), manufacturing, and related logistics were allowed to resume in Placer County per the statewide stay-at-home order. Following attestation, businesses within later Stage 2 will be permitted to reopen as early as May 12 (or upon posting of this attestation on the CDPH website, whichever occurs later) if they have implemented appropriate guidance. These later Stage 2 businesses include:*

- *Destination retail, including shopping malls and swap meets.*
- *Personal services, limited to: car washes, pet grooming, tanning facilities, and landscape gardening.*
- *Office-based businesses (telework remains strongly encouraged)*
- *Dine-in restaurants (other facility amenities, like bars or gaming areas, are not permitted)*
- *Childcare facilities*
- *Outdoor museums and open gallery spaces*

*Schools are not currently planned for reopening as part of later Stage 2.*

*Placer County staff will work through our existing community networks to share this plan with Stage 2 businesses that are reopening. Reopening of Stage 2 businesses is contingent upon their readiness to implement and comply with sector-specific guidance. No Stage 3 sectors or businesses will be allowed to reopen under this variance.*

EX03-159

*Our community partners will continue to inform the County as we develop and disseminate additional sector-specific guidance to enable safe Stage 2 reopening. Stage 2 guidance is subject to updates by Placer County, CDPH, and other local, state and federal agencies. The latest guidance will always be available at www.placer.ca.gov/reopen. Initial guidance is as follows:*

| | |
|---|---|
| Destination retail, including shopping malls and swap meets | Follow CDPH and Cal/OSHA guidance for retailers; prepare a plan, and post the checklist for retailers. |
| Personal services, limited to: car washes, pet grooming, tanning facilities, and landscape gardening | Follow *interim Placer County guidance*; prepare a plan, and post the interim checklist. |
| Outdoor museums and open gallery spaces | Follow *interim Placer County guidance*; prepare a plan, and post the interim checklist. |
| Office-based businesses (telework remains strongly encouraged) | Follow CDPH and Cal/OSHA guidance for businesses operating in office workspaces; prepare a plan, and post the checklist for office workspaces |
| Dine-in restaurants (other facility amenities, like bars or gaming areas, are not permitted) | Follow *interim Placer County guidance* for restaurants; prepare a plan and post the interim checklist. |
| Childcare | Follow CDSS guidance. |
| Schools | Schools are not currently planned for reopening within Stage 2. |

*Supportive materials for businesses such as signage, posters, and a resource list to help businesses make necessary modifications and encourage safe practices are also posted at www.placer.ca.gov/reopen.*

*Placer County staff will enlist regional economic development stakeholders (cities, Economic Development Directors, and Chambers of Commerce) to educate Placer businesses regarding the importance of vigilant adherence to public health protocols to prevent falling back into closure. We have been meeting with these parties weekly since the crisis began, and they share our commitment to reopen responsibly to protect the health and well-being of Placer communities.*

*In addition to the sector-specific guidance outlined above, the following guidance remains in place for ALL Placer County residents throughout Stage 2:*

- *Anyone who is feeling ill should stay home.*
- *Vulnerable (high risk) individuals are encouraged to stay at home.*

EX03-160

CDPH COVID-19 VARIANCE ATTESTATION FORM

- *Individuals are strongly encouraged to wear a face covering when in public, if maintaining six feet of physical distance from others is not possible.*
- *When in public, maximize physical distance from others (at least six feet).*
- *Maintain good hygiene practices by washing hands, using hand sanitizer, cleaning frequently touched surfaces, and covering coughs and sneezes.*
- *Gathering with others who are not part of your household is not allowed.*
- *Non-essential travel is not allowed.*

- **Triggers for adjusting modifications.** Please share the county metrics that would serve as triggers for either slowing the pace through Stage 2 or tightening modifications, including the frequency of measurement and the specific actions triggered by metric changes. Please include your plan for how the county will inform the state of emerging concerns and how it will implement early containment measures.

*With reopening and more Placer residents coming into close contact with one another, we expect that cases of COVID-19 will increase, along with hospitalizations, and even deaths. A major goal of sheltering in place has been to "flatten the curve" and avoid overwhelming the health care system, and this will remain the focus of ongoing monitoring as Placer gradually reopens. Placer Public Health will review data daily to determine if it is necessary to return to the previous reopening Stage in order to avoid overwhelming the health care system. We will be proactive, not reactive, in tightening mitigation measures such that a return to the previous Stage will be implemented when one or more of the following indicators are met, thereby demonstrating a trajectory that could result in the health care system being overwhelmed:*

- *Epidemiologic indicators: Doubling time of cases less than 5 days for 5 consecutive days*
- *Health care indicators: Increasing number of new health care worker infections for 5 consecutive days; Less than 7-day supply of PPE for health care workers; Hospital census above 135% baseline capacity*
- *Public health indicators: Unable to elicit contacts for 20% or more of cases; 10% or more of symptomatic contacts fail to get tested or get tested more than 48 hours after symptom onset; Insufficient voluntary isolation facilities for non-hospitalized COVID-19 cases who can't safely remain at home (due to space constraints, vulnerable household members, or otherwise).*

*The Health Officer will notify the CDPH Duty Officer of emerging concerns within 24 hours. The final decision to return to a previous Stage will be made by the Placer County Health Officer after consultation with CDPH.*

11

EX03-161

CDPH COVID-19 VARIANCE ATTESTATION FORM

- **Your plan for moving through Stage 2**. Please provide details on your plan for county to move through opening sectors and spaces that are part of the State's plan for Stage
2. A reminder, that this variance only covers those areas that are part of Stage 2, up to, but not including Stage 3. For additional details on sectors and spaces included in Stage 2, please go to the <u>California Coronavirus (COVID-19) Response County variance web page</u>

### *See Sectors and Timelines above.*

**COVID-19 Containment Plan**

While not mandatory, CDPH strongly recommends that counties requesting a variance to increase the pace through Stage 2 create a county COVID-19 containment plan as noted above. While not exhaustive, the following areas and questions are important to address in any containment plan.

### *TO BE COMPLETED IN THE FUTURE ONCE REVIEWED WITH STAKEHOLDERS.*

Testing

- Is there a plan to increase testing to the recommended daily capacity of 2 per 1000 residents?
- Is the average percentage of positive tests over the past 7 days <7% and stable or declining?
- Have specimen collection locations been identified that ensure access for all residents?
- Have contracts/relationships been established with specimen processing labs?
- Is there a plan for community surveillance?

Contact Tracing

- How many staff are currently trained and available to do contact tracing?
- Are these staff reflective of community racial, ethnic and linguistic diversity?
- Is there a plan to expand contact tracing staff to the recommended levels to occommodate a three-fold increase in COVID-19 cases, presuming that each case has ten close contacts?
- Is there a plan for supportive isolation for low income individuals who may not have a safe way to isolate or who may have significant economic challenges as a result of isolation?

Protecting the Vulnerable

- How many congregate core facilities, of what types, are in the county?
- How many correctional facilities, of what size, are in the county?
- How many homelessness shelters are in the county and what is their capacity?
- What is the COVID-19 case rate at each of these facilities?
- Do facilities have the ability to safely isolate COVID-19 positive individuals?
- Do facilities have the ability to safety quarantine individuals who have been exposed?
- Is there sufficient testing capacity to conduct a thorough outbreak investigation at each of these facilities?

12

CDPH COVID-19 VARIANCE ATTESTATION FORM

- Do long-term care facilities have sufficient PPE for staff, and do these facilities have access to suppliers for ongoing PPE needs?
- Do these facilities (particularly skilled nursing facilities) have access to staffing agencies if and when staff shortages related to COVID-19 occur?

Acute Care Surge

- Is there daily tracking of hospital capacity including COVID-19 cases, hospital census, ICU census, ventilator availability, staffing and surge capacity?
- Are hospitals relying on county MHOAC for PPE, or are supply chains sufficient?
- Are hospitals testing all patients prior to admission to the hospital?
- Do hospitals have a plan for tracking and addressing occupational exposure?

Essential Workers

- How many essential workplaces are in the county?
- What guidance have you provided to your essential workplaces to ensure employees and customers are safe in accordance with state/county guidance for modifications?
- Do essential workplaces have access to key supplies like hand sanitizer, disinfectant and cleaning supplies, as well as relevant protective equipment?
- Is there a testing plan for essential workers who are sick or symptomatic?
- Is there a plan for supportive quarantine/isolation for essential workers?

Special Considerations

- Are there industries in the county that deserve special consideration in terms of mitigating the risk of COVID-19 transmission, e.g. agriculture or manufacturing?
- Are there industries in the county that make it more feasible for the county to increase the pace through stage 2, e.g. technology companies or other companies that have a high percentage of workers who can telework?

Community Engagement

- Has the county engage with its cities?
- Which key county stakeholders should be a part of formulating and implementing the proposed variance plan?
- Have virtual community forums been held to solicit input into the variance plan?
- Is community engagement reflective of the racial, ethnic, and linguistic diversity of the community?

Relationship to Surrounding Counties

- Are surrounding counties experiencing increasing, decreasing or stable case rates?
- Are surrounding counties also planning to increase the pace through Stage 2 of California's roadmap to modify the Stay-at-Home order, and if so, on what timeline? How are you coordinating with these counties?
- How will increased regional and state travel impact the county's ability to test, isolate, and contact trace?

13

COUNTY COVID-19 VARIANCE ATTESTATION FORM

In addition to your county's COVID-19 VARIANCE ATTESTATION FORM, please include:

- ☒ Letter of support from the County Board of Supervisors
- ☒ Letter of support from the local hospitals or health care systems. In the event that the county does not have a hospital or health care system within its jurisdiction, a letter of support from the relevant regional health system(s) is also acceptable.
- ☒ County Plan for moving through Stage 2

All documents should be emailed to Jake Hanson at Jake.Hanson@cdph.ca.gov


I, **Aimee Sisson, MD, MPH**, hereby attest that I am duly authorized to sign and act on behalf of **Placer County**. I certify that **Placer County** has met the readiness criteria outlined by CDPH designed to mitigate the spread of COVID-19 and that the information provided is true, accurate and complete to the best of my knowledge. If a local COVID-19 Containment Plan is submitted for **Placer County**, I certify that it was developed with input from the County Board of Supervisors/City Council, hospitals, health systems, and a broad range of stakeholders in the jurisdiction. I acknowledge that I remain responsible for implementing the local COVID-19 Containment Plan and that CDPH, by providing technical guidance, is in no way assuming liability for its contents.


I understand and consent that the California Department of Public Health (CDPH) will post this information on the CDPH website and is public record.


Printed Name **Aimee Sisson, MD, MPH**

Signature _____

Position/Title **Health Officer and Public Health Director** .

Date **May 11, 2020**

14

# County of Placer

## Board of Supervisors

175 FULWEILER AVENUE
AUBURN, CALIFORNIA 95603
530-889-4010 • FAX: 530-889-4009
PLACER CO. TOLL FREE # 800-488-4308

BONNIE GORE
District 1
  ROBERT M. WEYGANDT
  District 2
    JIM HOLMES
    District 3
      KIRK UHLER
      District 4
        CINDY GUSTAFSON
        District 5



May 11, 2020

Sonia Y. Angell, MD, MPH
Director and State Public Health Officer
California Department of Public Health
Post Office Box 997377, MS 0500
Sacramento, CA 95899-7377

RE: Placer County—Support of Stage 2 (Roadmap) Variance

Dear Dr. Angell:

The Placer County Board of Supervisors met today to discuss Placer County pursuing a variance to Stage 2 of California's Roadmap to Modify the Stay-at-Home Order. Such a variance would allow Placer County to increase the pace at which it advances through Stage 2 of the Roadmap. Upon review of the Placer County Health Officer's Variance Attestation Form, our Board strongly supports allowing Stage 2 businesses to proceed with all aspects of Stage 2 (with the exception of schools) as soon as they have finished developing and implementing their site-specific protection plans in accordance with State and County guidelines for their respective sectors.

At today's meeting, the Board listened to a presentation from Dr. Aimee Sisson, our Placer County Health Officer, fully describing the County's readiness to move fully into Stage 2 and heard public comment on her presentation. We also reviewed the letters of support written by our two local hospital systems, Sutter Health and Kaiser Permanente.

All of the evidence presented supports our determination that Placer County is prepared to safely undertake all of the businesses and activities set forth in its Stage 2 plan, and is fully prepared to address in a timely manner any increase in infection or hospitalization rates that may result. As described in the Attestation, this includes reinstating restrictions, if necessary, and recommended by our Health Officer.

In conclusion, our Board has determined that Placer County meets the minimum readiness standards and fully supports Dr. Sisson's Variance Attestation.

Sincerely,

Bonnie Gore, Chair
Placer County Supervisor, District 1

Cc: Placer County Board of Supervisors
    Todd Leopold, Placer County Executive Officer
    Karin Schwab, Placer County Counsel
    Dr. Aimee Sisson, Placer County Health Officer
    Jeff Brown, Director of Health & Human Services

EX03-165

 **KAISER PERMANENTE.**

Kaiser Foundation Hospital - Roseville
1600 Eureka Road
Roseville, California 95661

May 8, 2020

Aimee Sisson
Placer County Public Health
11484B Avenue
Auburn, CA 95601

RE:    Kaiser Foundation Hospital – Roseville [License # 550001681]
       Notification of Capacity

To Whom It May Concern,

       Kaiser Permanente Foundational Hospital – Roseville has been requested on behalf of Placer County to provide a letter of support regarding advancement stage two of California's Roadmap to Modify the Stay-at-Home-Order.

       The organization is in full support of the advancement to Stage 2. The organization is prepared to increased surge capacity above the defined level of 35%. Robust planning has been in place within the organization to facilitate capacity and capability, this includes consideration, planning, and training of increased volumes of staff including physicians, nursing, and ancillary support services to accommodate a surge situation. Surge locations and space allocation has been defined with staged lateral expansion inclusive of accommodating a significant influx of patients requiring intensive care. Supply planning has been executed with identification of required equipment and is prepared and secured, ready for use at each surge location. Oxygen delivery equipment has been increased with average ventilator usage at approximately 15-20% with a total supply of 93 ventilators. Personal protective equipment (PPE) supply is stable at 20 days on-hand supply with the ability to requisition additional supplies regionally within Kaiser Permanente. All members of the workforce have received training regarding precautions.

       At this time, our organization has aligned capacity and capability to meet the demands of a surge event.

Sincerely,

Jordan Herget
Senior Vice President/Area Manager



May 8, 2020


Aimee Sisson, MD, MPH
Public Health Officer
11484 B Avenue
Auburn, CA  95603

Dr. Sisson,

In response to your request, Sutter Health's integrated health delivery system:

- Is prepared to accommodate a surge of 35% due to COVID-19 cases in addition to providing care to non COVID-19 patients as outlined in the surge plan submitted to the State of California, and

- Has adequate PPE to protect our employees and clinicians.

We understand that Placer County will use this letter to support their application for a variance to move through the stages to re-open.

Sincerely,

Stephen H. Lockhart, MD, PhD
Chief Medical Officer, Sutter Health

EX03-167



# *Plan for moving through*
# STAGE 2

On May 8, early Stage 2 retail (curbside and delivery only), manufacturing, and related logistics were allowed to resume in Placer County per the statewide stay-at-home order. Following attestation, businesses within later Stage 2 will be permitted to reopen as early as May 12 (or upon posting of this attestation on the CDPH website, whichever occurs later) if they have implemented appropriate guidance. These later Stage 2 businesses include:

- Destination retail, including shopping malls and swap meets
- Personal services, limited to: car washes, pet grooming, tanning facilities, and landscape gardening
- Office-based businesses (telework remains strongly encouraged)
- Dine-in restaurants (other facility amenities, like bars or gaming areas, are not permitted)
- Childcare facilities
- Outdoor museums and open gallery spaces

Schools are not currently planned for reopening as part of later Stage 2.

Placer County staff will work through our existing community networks to share this plan with Stage 2 businesses that are reopening. Reopening of Stage 2 businesses is contingent upon their readiness to implement and comply with sector-specific guidance. No Stage 3 sectors or businesses will be allowed to reopen under this variance.

Our community partners will continue to inform the County as we develop and disseminate additional sector-specific guidance to enable safe Stage 2 reopening. Stage 2 guidance is subject to updates by Placer County, CDPH, and other local, state and federal agencies. The latest guidance will always be available at www.placer.ca.gov/reopen. Initial guidance is as follows:

| | |
|---|---|
| Destination retail, including shopping malls and swap meets | Follow CDPH and Cal/OSHA guidance for retailers; prepare a plan, and post the checklist for retailers. |
| Personal services, limited to: car washes, pet grooming, tanning facilities, and landscape gardening | Follow interim Placer County guidance; prepare a plan, and post the interim checklist. |
| Outdoor museums and open gallery spaces | Follow interim Placer County guidance; prepare a plan, and post the interim checklist. |
| Office-based businesses (telework remains strongly encouraged) | Follow CDPH and Cal/OSHA guidance for businesses operating in office workspaces; prepare a plan, and post the checklist for office workspaces. |
| Dine-in restaurants (other facility amenities, like bars or gaming areas, are not permitted) | Follow interim Placer County guidance; prepare a plan, and post the interim checklist. |
| Childcare | Follow CDSS guidance. |
| Schools | Schools are not currently planned for reopening within Stage 2. |

EX03-168



## *Plan for moving through*
# STAGE 2

Supportive materials for businesses such as signage, posters, and a resource list to help businesses make necessary modifications and encourage safe practices are also posted at www.placer.ca.gov/reopen.

Placer County staff will enlist regional economic development stakeholders (cities, Economic Development Directors, and Chambers of Commerce) to educate Placer businesses regarding the importance of vigilant adherence to public health protocols to prevent falling back into closure. We have been meeting with these parties weekly since the crisis began, and they share our commitment to reopen responsibly to protect the health and well-being of Placer communities.

In addition to the sector-specific guidance outlined above, the following guidance remains in place for ALL Placer County residents throughout Stage 2:

- Anyone who is feeling ill should stay home.
- Vulnerable (high risk) individuals are encouraged to stay at home.
- Individuals are strongly encouraged to wear a face covering when in public, if maintaining six feet of physical distance from others is not possible.
- When in public, maximize physical distance from others (at least six feet).
- Maintain good hygiene practices by washing hands, using hand sanitizer, cleaning frequently touched surfaces, and covering coughs and sneezes.
- Gathering with others who are not part of your household is not allowed.
- Non-essential travel is not allowed.



EX03-169



State of California—Health and Human Services Agency
# California Department of Public Health



SONIA Y. ANGELL, MD, MPH
*State Public Health Officer & Director*

GAVIN NEWSOM
*Governor*

### Amended State Public Health Officer Order for Placer County,
### July 11, 2020

On March 19, 2020, I issued an order directing all individuals living in the State of California to stay at home except as needed to facilitate authorized, necessary activities or to maintain the continuity of operations of critical infrastructure sectors. (See https://covid19.ca.gov/stay-home-except-for-essential-needs/.) I then set out California's path forward from this "Stay-at-Home" Order in California's Pandemic Resilience Roadmap, https://www.gov.ca.gov/wpcontent/uploads/2020/05/5.4.20-Update-on-Californias-PandemicRoadmap.pdf. That Roadmap identifies four stages of the pandemic: safety and preparation (Stage 1), reopening of lower-risk workplaces and other spaces (Stage 2), reopening of higher-risk workplaces and other spaces (Stage 3), and finally an easing of final restrictions leading to the end of the Stay-at-Home Order (Stage 4). On May 7th, I announced that statewide data supported the gradual movement of the entire state into Stage 2 of the Pandemic Resilience Roadmap, https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%205-7-2020.pdf.  On May 8th, the Governor outlined a process where counties who met specific criteria could move more quickly than other parts of the state through Stage 2 of modifying the Stay-at-Home order, including certain businesses deemed higher-risk.

The current data reflect that community spread of infection is of increasing concern across the state, and most particularly in those counties on the County Monitoring List. In addition to the impact on the general population, community spread increases the likelihood of expanded transmission of COVID-19 in congregate settings such as nursing homes, homeless shelters, jails and prisons. Infection of these vulnerable populations in these settings can be catastrophic. Higher levels of community spread also increase the likelihood of infection among individuals at high risk of serious outcomes from COVID-19, including the elderly and those with underlying health conditions. For those counties that have been on the County Monitoring List for three consecutive days or more, the risk is high enough that actions must be taken to protect the public.

The Pandemic Resilience Roadmap classifies bars, pubs, breweries, brewpubs, dine-in restaurants, wineries and tasting rooms, family entertainment centers, zoos, museums, and cardrooms as Stage 2 or Stage 3 sectors with high risk of transmission due to a number of features of the businesses and the behaviors that occur within them. Public health studies have shown that the risk of transmission is exacerbated in indoor spaces, particularly when lacking appropriate ventilation. The sectors specified above, operating

---



indoors, operate at the highest risk of all sectors allowed to reopen to date. These sectors are settings where groups convene and may mix with others for a prolonged period of time, increasing the risk of escalating the transmission rate of COVID-19. While physical distancing is critical to mitigating exposure, it is intended to protect an individual with brief exposures or outdoor exposures. In contrast to indoor spaces, wind and the viral dilution in outdoor spaces can help reduce viral load.

Bars, both indoor and outdoor, have additional risk factors. A bar, foundationally, is a social setting where typically not only small groups convene, but also where groups mix with other groups. Bars also have an added risk imposed by the consumption of alcohol as the primary activity offered in such venues. Alcohol consumption slows brain activity, reduces inhibition, and impairs judgment, factors which contribute to reduced compliance with recommended core personal protective measures, such as the mandatory use of face coverings and maintaining six feet of distance from people in different households, both indoors and outdoors. Louder environments and the cacophony of conversation that are typical in bar settings also require raised voices and greater projection of orally emitted viral droplets.

In summary, while these businesses represent a valued part of the fabric of our state, the characteristics of these types of establishments contribute to an environment with substantially increased risks for COVID-19 transmission. For those counties that have been on the County Monitoring List for three consecutive days or more, it is necessary to place restrictions on these sectors to protect the public.

NOW, THEREFORE, I, as State Public Health Officer and Director of the California Department of Public Health, order:

1. Placer County shall close bars, pubs, brewpubs, and breweries, whether operating indoors or outdoors.

2. Placer County shall restrict indoor operations as specified below:

    a. Dine-in restaurants must close indoor seating to customers. During this closure all dine-in restaurants may continue to utilize outdoor seating and must comply with the <u>guidance for dine-in restaurants</u>. Restaurants should continue to encourage takeout and delivery service whenever possible.

    b. Wineries and tasting rooms must close indoor services to customers. During this closure all wineries and tasting rooms must comply with the <u>guidance for restaurants, wineries, and bars</u>.

    c. Family entertainment centers and movie theaters must close indoor services and attractions to customers.

        1. Family entertainment centers may continue to provide outdoor services to customers, and must comply with the <u>movie theaters and family entertainment centers</u>.

2. Drive-in movie theaters may continue to operate and should follow additional applicable guidance for retailers of <u>Drive-In Movie Theaters</u>.

d. Indoor attractions at zoos and museums must close to visitors.

1. Zoos and museums may continue to operate outdoor attractions and must follow the <u>guidance for zoos, museums</u>.

e. Cardrooms must close indoor services to customers and must follow the <u>guidance for cardrooms</u>.

3. These closures shall remain in effect in Placer County until I direct otherwise, which will be no earlier than August 1, 2020 at 11:59 p.m.

4. This order supersedes any orders issued by Placer County on or after June 28, 2020, for the purpose of closing bars, pubs, breweries, and brewpubs.

5. My May 7, 2020 Order permitting other Stage 2 sectors to open statewide, and all subsequent orders and directives adding or removing additional sectors to the list of those permitted to open statewide, continue to apply to Placer County. All of my other Orders, Guidance, and Directives, including but not limited to my guidance mandating the wearing of face coverings, https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Guidance-for-Face-Coverings_06-18-2020.pdf, and my guidance prohibiting all gatherings, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CDPHGuidanceforthePreventionofCOVID19TransmissionforGatherings.aspx, continue to apply to Placer County.

6. Pursuant to the authority under EO N-60-20, and Health and Safety Code sections 120125, 120130(c), 120135, 120140, 120145, 120150, 120175,120195 and 131080, this order is to go into effect Sunday, July 12, 2020 at 12:01 a.m. and shall stay in effect until further notice.

Sonia Y Angell, MD, MPH
State Public Health Officer & Director
California Department of Public Health

EX03-172

<u>ORDER OF THE HEALTH OFFICER OF THE COUNTY OF RIVERSIDE</u>

<u>CANCELLING ALL EVENTS WITH EXPECTED ATTENDANCE ABOVE 250 INDIVIDUALS</u>

DATE OF ORDER: <u>MARCH 12, 2020</u>

Please read this Order carefully. Violation of or failure to comply with this Order is a crime punishable by fine, imprisonment, or both. (California Health and Safety Code § 120295; County Ordinances 533 and 556.)

UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, TITLE 17 CALIFORNIA CODE OF REGULATIONS SECTION 2501, AND RIVERSIDE COUNTY CODE SECTION 533.6, THE HEALTH OFFICER OF THE COUNTY OF RIVERSIDE ("HEALTH OFFICER") ORDERS:

1.  All events within the jurisdiction of the Public Health Officer of the County of Riverside with an expected attendance of at least <u>250</u> individuals taking place between March 12, 2020 and April 30, 2020 inclusive are hereby ordered <u>cancelled</u>, regardless of venue.

2.  This Order does not apply to courts of law, primary and secondary school classes, congregate living settings, public transportation, airport travel, or necessary shopping at stores or malls.

3.  This Order is issued as a result of the worldwide pandemic of COVID-19 disease, also known as "novel coronavirus," which has infected at least 128,000 individuals worldwide in 116 countries and is implicated in over 4,700 worldwide deaths, including eight cases in Riverside County residents.

4.  This Order is issued based on evidence of increasing transmission of COVID-19 both within the County of Riverside and worldwide, scientific evidence regarding the most effective approach to slow transmission of communicable diseases generally and COVID-19 specifically, as well as best practices as currently known and available to protect the public from the risk of spread of or exposure to COVID-19.

5.  This Order recognizes that many of the events in the County, both large and small, attract attendees from many regions and countries, including several disproportionately afflicted by the worldwide COVID-19 pandemic.

6.  This Order is intended to reduce the likelihood of exposure to COVID-19, thereby slowing the spread of COVID-19 in communities worldwide. As the population at an event increases, the difficulty and magnitude of tracing individuals who may have been exposed to a case prevent at that event rises exponentially, increasing the likelihood that such events will impair efforts at mitigating the spread of the illness.

7.  This Order is issued in accordance with, and incorporates by reference, the: March 4, 2020 Proclamation of a State Emergency issued by Governor Gavin Newsom; the March 8, 2020 Declaration of Local Health Emergency based on an imminent and proximate threat to public health from the introduction of novel COVID-19 in Riverside County; the March 10, 2020 Resolution of the Board of Supervisors of the County of Riverside proclaiming the existence of a Local Emergency in the County of Riverside regarding COVID-19; the March 10, 2020 Resolution of the Board of Supervisors of the County of Riverside ratifying and extending the Declaration of Local Health Emergency due to COVID-19; and the guidance issued on March 11, 2020 by the California Department of Public Health regarding large gatherings of 250 people or more.

8. This Order comes after the release of substantial guidance from the County Public Health Officer, the Centers for Disease Control and Prevention, and other public health officials through the United States and around the world recommending the cancellation of mass gatherings involving more than one thousand (1,000) or more persons in a single space at the same time.

9. This Order is made in accordance with all applicable State and Federal laws, including but not limited to: Health and Safety Code sections 101030, et seq.; Health and Safety Code sections 120100, et seq.; and Title 17 of the California Code of Regulations section 2501.

10. To the extent necessary, pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all Chiefs of Police in the County ensure compliance with and enforcement of this Order.

11. Copies of this Order shall promptly be: (1) made available at the County of Riverside Health Administration office located at 4065 County Circle Drive, Riverside, CA 92503; (2) posted on the County of Riverside Public Health Department's website (rivcoph.org); and (3) provided to any member of the public requesting a copy of this Order.

**IT IS SO ORDERED:**

Dated: March 12, 2020

Dr. Cameron Kaiser, MD, MPH, FAAFP
Public Health Officer
County of Riverside

Approved as to form and legality:

Dated: March 12, 2020

Gregory P. Priamos
County Counsel
County of Riverside

EX03-174

**ORDER OF THE HEALTH OFFICER OF THE COUNTY OF RIVERSIDE**

**CANCELLING ALL GATHERINGS WITH EXPECTED PRESENCE ABOVE 10 INDIVIDUALS**

**DATE OF ORDER: MARCH 16, 2020**

Please read this Order carefully. Violation of or failure to comply with this Order is a crime punishable by fine, imprisonment, or both. (California Health and Safety Code § 120295; County Ordinances 533 and 556.)

UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, TITLE 17 CALIFORNIA CODE OF REGULATIONS SECTION 2501, AND RIVERSIDE COUNTY CODE SECTION 533.6, THE HEALTH OFFICER OF THE COUNTY OF RIVERSIDE ("HEALTH OFFICER") ORDERS:

1. All gatherings within the jurisdiction of the Public Health Officer of the County of Riverside with an expected presence of at least **10** individuals taking place between March 16, 2020 and April 30, 2020 inclusive are hereby **prohibited**, regardless of venue. If a venue is subdivided into multiple spaces separated by physical walls or sufficient airspace, the limit per subdivision of space is 10. This order supersedes the Order of March 12, 2020 regarding mass gatherings.

2. It is further ordered that even for gatherings below this size, if a minimum social distance of six feet between attendees cannot be maintained in the venue or a subdivision thereof, the gathering is **prohibited**.

3. This Order does not apply to courts of law, medical providers, public utilities, critical county, city, and special district operations, critical school operations such as nutrition programs, continuity of business operations, logistics/distribution centers, congregate living settings, daycare and childcare, shelters, public transportation, airport travel, or necessary shopping at fuel stations, stores or malls. However, these settings are instructed to observe all applicable state and federal guidelines for infection control.

4. To the extent possible, daycare and childcare facilities must operate under the following mandatory conditions: A. Childcare must be carried out in stable groups of 12 or fewer ("stable" means that the same 12 or fewer children are in the same group each day). B. Children shall not change from one group to another. C. If more than one group of children is cared for at one facility, each group shall be in a separate room. Groups shall not mix with each other. D. Childcare providers shall remain solely with one group of children.

5. This Order is issued as a result of the worldwide pandemic of COVID-19 disease, also known as "novel coronavirus," which has infected at least 128,000 individuals worldwide in 116 countries and is implicated in over 4,700 worldwide deaths, including fifteen (15) cases in Riverside County.

6. This Order is issued based on evidence of increasing transmission of COVID-19 both within the County of Riverside and worldwide, scientific evidence regarding the most effective approach to slow transmission of communicable diseases generally and COVID-19 specifically, as well as best practices as currently known and available to protect the public from the risk of spread of or exposure to COVID-19.

7. This Order is intended to reduce the likelihood of exposure to COVID-19, thereby slowing the spread of COVID-19 in communities worldwide. As the presence of individuals increases, the difficulty and magnitude of tracing individuals who may have been exposed to a case rises

exponentially, increasing the likelihood that such gatherings will impair efforts at mitigating the spread of the illness.

8. This Order is issued in accordance with, and incorporates by reference, the: March 4, 2020 Proclamation of a State Emergency issued by Governor Gavin Newsom; the March 8, 2020 Declaration of Local Health Emergency based on an imminent and proximate threat to public health from the introduction of novel COVID-19 in Riverside County; the March 10, 2020 Resolution of the Board of Supervisors of the County of Riverside proclaiming the existence of a Local Emergency in the County of Riverside regarding COVID-19; the March 10, 2020 Resolution of the Board of Supervisors of the County of Riverside ratifying and extending the Declaration of Local Health Emergency due to COVID-19; the guidance issued on March 11, 2020 by the California Department of Public Health regarding large gatherings of 250 people or more; and the guidance issued on March 15, 2020 by the Governor of California.

9. This Order comes after the release of substantial guidance from the Centers for Disease Control and Prevention, the California Department of Public Health, and other public health officials through the United States and around the world recommending the cancellation of gatherings involving more than ten (10) or more persons in a single space at the same time.

10. This Order is made in accordance with all applicable State and Federal laws, including but not limited to: Health and Safety Code sections 101030, et seq.; Health and Safety Code sections 120100, et seq.; and Title 17 of the California Code of Regulations section 2501.

11. To the extent necessary, pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all Chiefs of Police in the County ensure compliance with and enforcement of this Order.

12. Copies of this Order shall promptly be: (1) made available at the County of Riverside Health Administration office located at 4065 County Circle Drive, Riverside, CA 92503; (2) posted on the County of Riverside Public Health Department's website (rivcoph.org); and (3) provided to any member of the public requesting a copy of this Order.

**IT IS SO ORDERED:**

Dated: March 16, 2020

Dr. Cameron Kaiser, MD, MPH, FAAFP
Public Health Officer
County of Riverside

Approved as to form and legality:

Dated: March 16, 2020

Gregory P. Priamos
County Counsel
County of Riverside

EX03-177



State of California—Health and Human Services Agency
# California Department of Public Health



SONIA Y. ANGELL, MD, MPH
*State Public Health Officer & Director*

GAVIN NEWSOM
*Governor*

**State Public Health Officer Order for Riverside County,**
**July 2, 2020**

On March 19, 2020, I issued an order directing all individuals living in the State of California to stay at home except as needed to facilitate authorized, necessary activities or to maintain the continuity of operations of critical infrastructure sectors. (See https://covid19.ca.gov/stay-home-except-for-essential-needs/.) I then set out California's path forward from this "Stay-at-Home" Order in California's Pandemic Resilience Roadmap, https://www.gov.ca.gov/wpcontent/uploads/2020/05/5.4.20-Update-on-Californias-PandemicRoadmap.pdf. That Roadmap identifies four stages of the pandemic: safety and preparation (Stage 1), reopening of lower-risk workplaces and other spaces (Stage 2), reopening of higher-risk workplaces and other spaces (Stage 3), and finally an easing of final restrictions leading to the end of the Stay-at-Home Order (Stage 4). On May 7th, I announced that statewide data supported the gradual movement of the entire state into Stage 2 of the Pandemic Resilience Roadmap, https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%205-7-2020.pdf.  On May 8th, the Governor outlined a process where counties who met specific criteria could move more quickly than other parts of the state through Stage 2 of modifying the Stay-at-Home order, including certain businesses deemed higher-risk.

The current data reflect that community spread of infection is of increasing concern across the state, and most particularly in those counties on the County Monitoring List. In addition to the impact on the general population, community spread increases the likelihood of expanded transmission of COVID-19 in congregate settings such as nursing homes, homeless shelters, jails and prisons. Infection of these vulnerable populations in these settings can be catastrophic. Higher levels of community spread also increase the likelihood of infection among individuals at high risk of serious outcomes from COVID-19, including the elderly and those with underlying health conditions. For those counties that have been on the County Monitoring List for three consecutive days or more, the risk is high enough that actions must be taken to protect the public.

The Pandemic Resilience Roadmap classifies bars, pubs, breweries, brewpubs, dine-in restaurants, wineries and tasting rooms, family entertainment centers, zoos, museums, and cardrooms as Stage 2 or Stage 3 sectors with high risk of transmission due to a number of features of the businesses and the behaviors that occur within them. Public health studies have shown that the risk of transmission is exacerbated in indoor spaces, particularly when lacking appropriate ventilation. The sectors specified above, operating



EX03-178

indoors, operate at the highest risk of all sectors allowed to reopen to date. These sectors are settings where groups convene and may mix with others for a prolonged period of time, increasing the risk of escalating the transmission rate of COVID-19. While physical distancing is critical to mitigating exposure, it is intended to protect an individual with brief exposures or outdoor exposures. In contrast to indoor spaces, wind and the viral dilution in outdoor spaces can help reduce viral load.

Bars, both indoor and outdoor, have additional risk factors. A bar, foundationally, is a social setting where typically not only small groups convene, but also where groups mix with other groups. Bars also have an added risk imposed by the consumption of alcohol as the primary activity offered in such venues. Alcohol consumption slows brain activity, reduces inhibition, and impairs judgment, factors which contribute to reduced compliance with recommended core personal protective measures, such as the mandatory use of face coverings and maintaining six feet of distance from people in different households, both indoors and outdoors. Louder environments and the cacophony of conversation that are typical in bar settings also require raised voices and greater projection of orally emitted viral droplets.

In summary, while these businesses represent a valued part of the fabric of our state, the characteristics of these types of establishments contribute to an environment with substantially increased risks for COVID-19 transmission. For those counties that have been on the County Monitoring List for three consecutive days or more, it is necessary to place restrictions on these sectors to protect the public.

NOW, THEREFORE, I, as State Public Health Officer and Director of the California Department of Public Health, order:

1. Riverside County shall close bars, pubs, brewpubs, and breweries, whether operating indoors or outdoors.

2. Riverside County shall restrict indoor operations as specified below:

     a. Dine-in restaurants must close indoor seating to customers. During this closure all dine-in restaurants may continue to utilize outdoor seating and must comply with the guidance for dine-in restaurants. Restaurants should continue to encourage takeout and delivery service whenever possible.

     b. Wineries and tasting rooms must close indoor services to customers. During this closure all wineries and tasting rooms must comply with the guidance for restaurants, wineries, and bars.

     c. Family entertainment centers and movie theaters must close indoor services and attractions to customers.

          1. Family entertainment centers may continue to provide outdoor services to customers, and must comply with the movie theaters and family entertainment centers.

   2. Drive-in movie theaters may continue to operate and should follow additional applicable guidance for retailers for <u>Drive-In Movie Theaters</u>.
 d. Indoor attractions at zoos and museums must close to visitors.
   1. Zoos and museums may continue to operate outdoor attractions and must follow the <u>guidance for zoos, museums</u>.
 e. Cardrooms must close indoor services to customers and must follow the <u>guidance for cardrooms</u>.

3. These closures shall remain in effect in Riverside County until I direct otherwise, which will be no earlier than July 22, 2020.

4. This order supersedes any orders issued by Riverside County on or after June 28, 2020, for the purpose of closing bars, pubs, breweries, and brewpubs.

5. My May 7, 2020 Order permitting other Stage 2 sectors to open statewide, and all subsequent orders and directives adding or removing additional sectors to the list of those permitted to open statewide, continue to apply to Riverside County. All of my other Orders, Guidance, and Directives, including but not limited to my guidance mandating the wearing of face coverings, https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID -19/Guidance-for-Face-Coverings_06-18-2020.pdf, and my guidance prohibiting all gatherings, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CDPHGuidanceforthePreventionofCOVID19TransmissionforGatherings.aspx, continue to apply to Riverside County.

6. Pursuant to the authority under EO N-60-20, and Health and Safety Code sections 120125, 120130(c), 120135, 120140, 120145, 120150, 120175,120195 and 131080, this order is to go into effect immediately and shall stay in effect until further notice.


Sonia Y Angell, MD, MPH
State Public Health Officer & Director
California Department of Public Health



**ORDER OF THE HEALTH OFFICER OF THE
COUNTY OF SACRAMENTO DIRECTING
ALL INDIVIDUALS LIVING IN THE COUNTY TO STAY AT HOME OR AT
THEIR PLACE OF RESIDENCE EXCEPT THAT THEY MAY LEAVE TO
PROVIDE OR RECEIVE CERTAIN ESSENTIAL SERVICES OR ENGAGE
IN CERTAIN ESSENTIAL ACTIVITIES AND WORK FOR ESSENTIAL
BUSINESSES AND GOVERNMENTAL SERVICES; EXEMPTING
INDIVIDUALS EXPERIENCING HOMELESSNESS FROM THIS ORDER
BUT URGING THEM TO FIND SHELTER AND GOVERNMENT AGENCIES
TO PROVIDE IT; DIRECTING ALL BUSINESSES AND GOVERNMENTAL
AGENCIES TO CEASE NON-ESSENTIAL OPERATIONS AT PHYSICAL
LOCATIONS IN THE COUNTY; PROHIBITING ALL NON-ESSENTIAL
GATHERINGS OF ANY NUMBER OF INDIVIDUALS; AND ORDERING
CESSATION OF ALL NON-ESSENTIAL TRAVEL**

**DATE OF ORDER: <u>MARCH 19, 2020</u>**

UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, THE HEALTH OFFICER OF THE COUNTY OF SACRAMENTO ("HEALTH OFFICER") ORDERS:

1.    The intent of this Order is to ensure that the maximum number of people self-isolate in their homes or places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the maximum extent possible. When people need to leave their homes or places of residence, whether to obtain or perform vital services, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times as reasonably possible comply with Social Distancing Requirements as defined in Section 10 of this Order. All provisions of this Order should be interpreted to effectuate this intent. Failure to comply with any of the provisions of this Order constitutes an imminent threat to public health.

2.    All individuals currently living within the County of Sacramento (the "County") are ordered to stay at home or place of residence. To the extent individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain social distancing of at least six feet from any other person when they are outside their residence. All persons may leave their residences only for Essential Activities, Essential Governmental Functions, or to operate Essential Businesses, all as defined in Section 10. Individuals experiencing homelessness are exempt from this Section, but are strongly urged to obtain

Order of the County Health Officer to Stay
at Home or Place of Residence

EX03-181

shelter. Persons experiencing homelessness that are unable to locate shelter should refrain from being in encampments of more than 10 people, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to utilize Social Distancing Requirements in their operation).

3.  This Order is issued based on evidence of increasing occurrence of COVID-19 within the County and throughout Northern California, scientific evidence and best practices regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, and evidence that the age, condition, and health of a significant portion of the population of the County places it at risk for serious health complications, including death, from COVID-19. Due to the outbreak of the COVID-19 virus in the general public, which is now a pandemic according to the World Health Organization, there is a public health emergency throughout the County. Making the problem worse, some individuals who contract the COVID-19 virus have no symptoms or have mild symptoms, which means they may not be aware they carry the virus. Because even people without symptoms can transmit the disease, and because evidence shows the disease is easily spread, gatherings can result in preventable transmission of the virus. The scientific evidence shows that at this stage of the emergency, it is essential to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed. One proven way to slow the transmission is to limit interactions among people to the greatest extent practicable.  By reducing the spread of the COVID-19 virus, this Order helps preserve critical and limited healthcare capacity in the County.

4.  All businesses with a facility in the County, except Essential Businesses as defined in Section 10, are required to cease all activities at facilities located within the County except Minimum Basic Operations, as defined in Section 10. For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home). All Essential Businesses are strongly encouraged to remain open. To the greatest extent feasible, Essential Businesses shall comply with Social Distancing Requirements as defined in Section 10 below, including, but not limited to, when any customers are standing in line.

5.  All public and private gatherings of any number of people occurring outside a household or living unit are prohibited, except for the limited purposes as expressly permitted in Section 10. All bars, wineries and brew-pubs should be closed, all in-dining at restaurants should cease, with the exception of home delivery and takeout, and all gyms, bingo halls, and card rooms should close.  Nothing in this Order prohibits the gathering of members of a household or living unit.

6.  All travel, including, but not limited to, travel on foot, bicycle, scooter, motorcycle, automobile, or public transit, except Essential Travel and Essential Activities as defined in Section 10, is prohibited. People must use public transit only for purposes of performing Essential Activities or to travel

Order of the County Health Officer to Stay
at Home or Place of Residence

EX03-182

to and from work to operate Essential Businesses or maintain Essential Governmental Functions. People riding on public transit must comply with Social Distancing Requirements as defined in Section 10, to the greatest extent feasible. This Order allows travel into or out of the County to perform Essential Activities, operate Essential Businesses, or maintain Essential Governmental Functions.

7.  This Order also is issued in light of the existence, as of March 18, 2020, of 45 cases of COVID-19 in the County, including a significant and increasing number of suspected cases of community transmission and likely further significant increases in transmission. This Order is necessary to slow the rate of spread and the Health Officer will re-evaluate it as further data becomes available.

8.  This Order is issued in accordance with, and incorporates by reference, the March 4, 2020 Proclamation of a State of Emergency issued by Governor Gavin Newsom, the Declarations of Local Health Emergency issued by the Health Officer on March 6, 2020, the March 10, 2020 Resolution of the Board of Supervisors of the County of Sacramento Ratifying the Declarations of Local Health Emergency and Local Emergency, and Governor Newsom's March 12, 2020 Executive Order N-25-20.

9.  This Order comes after the release of substantial guidance from the County Health Officer, the Centers for Disease Control and Prevention, the California Department of Public Health, and other public health officials throughout the United States and around the world, including a variety of prior orders to combat the spread and harms of COVID-19. The Health Officer will continue to assess the quickly evolving situation and may modify or extend this Order, or issue additional Orders, related to COVID-19.

10. Definitions and Exemptions.

   a.  For purposes of this Order, individuals may leave their residence only to perform any of the following "Essential Activities." But people at high risk of severe illness from COVID-19 and people who are sick are urged to stay at home or place of residence to the extent possible except as necessary to seek medical care.
      i.  To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, obtaining medical supplies or medication, visiting a health care professional, or obtaining supplies they need to work from home.
      ii. To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example only and without limitation, canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products, and products necessary to

Order of the County Health Officer to Stay
at Home or Place of Residence

EX03-183

maintain the safety, sanitation, and essential operation of residences.

iii. To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements as defined in this Section, such as, by way of example and without limitation, walking, hiking, biking, running or equestrian activities.

iv. To perform work providing essential products and services at an Essential Business or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations.

v. To care for a family member or pet in another household.

vi. To attend private gatherings of not more than six nonrelatives in a home or place of residence. Participants should practice Social Distancing Requirements at all times at such gatherings.

b. For purposes of this Order, individuals may leave their residence to work for or obtain services at any "Healthcare Operations" including, but not limited to, hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other healthcare facilities, healthcare suppliers, home healthcare services providers, mental health providers, or any related and/or ancillary healthcare services. "Healthcare Operations" also includes veterinary care and all healthcare services provided to animals. This exemption shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. "Healthcare Operations" does not include fitness and exercise gyms and similar facilities.

c. For purposes of this Order, individuals may leave their residence to provide any services or perform any work necessary to the operations and maintenance of "Essential Infrastructure," including, but not limited to, construction, airport operations, water, sewer, flood control, gas, electrical, oil refining, roads and highways, public transportation, solid waste collection, processing and removal, internet, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services), provided that they carry out those services or that work in compliance with Social Distancing Requirements as defined in this Section, to the extent possible.

d. For purposes of this Order, all first responders, emergency management personnel, public health staff, emergency dispatchers, court personnel, and law enforcement personnel, and others who need to perform essential services are categorically exempt from this Order.

e. Nothing in this Order shall prohibit any individual from performing or accessing "Essential Governmental Functions," as determined by the governmental entity performing those functions. Each governmental entity shall identify and designate appropriate employees or contractors

to continue providing and carrying out any Essential Governmental Functions. All Essential Governmental Functions shall be performed in compliance with Social Distancing Requirements as defined in this Section, to the extent possible.

f. For the purposes of this Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function they perform, or its corporate or entity structure.

g. For the purposes of this Order, "Essential Businesses" means:
 i. Healthcare Operations and Essential Infrastructure;
 ii. Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries and also sell other non- grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences;
 iii. Agriculture, food, and beverage cultivation, processing, and distribution, including but not limited to, farming, ranching, fishing, dairies, creameries, wineries and breweries in order to preserve inventory and production (not for retail business);
 iv. Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals;
 v. Newspapers, television, radio, and other media services;
 vi. Gas stations and auto-supply, sales and auto-repair, and related facilities;
 vii. Banks and related financial institutions;
 viii. Hardware stores;
 ix. Plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses;
 x. Businesses providing mailing and shipping services, including post office boxes;
 xi. Educational institutions—including public and private K-12 schools, colleges, and universities—for purposes of facilitating distance learning or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible;
 xii. Laundromats, drycleaners, and laundry service providers;
 xiii. Restaurants and other facilities that prepare and serve food, but only for delivery or carry out. Schools and other entities that typically provide free food services to students or members of the public may continue to do so under this Order on the

Order of the County Health Officer to Stay
at Home or Place of Residence

EX03-185

condition that the food is provided to students or members of the public on a pick-up and take-away basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;

xiv.    Businesses that supply products needed for people to work from home;

xv.    Businesses that supply other essential businesses with the support or supplies necessary to operate;

xvi.    Businesses that ship or deliver groceries, food, goods or services directly to residences;

xvii.    Airlines, taxis, and other private transportation providers providing transportation services necessary for Essential Activities and other purposes expressly authorized in this Order;

xviii.    Home-based care for seniors, adults, or children;

xix.    Residential facilities and shelters for seniors, adults, and children;

xx.    Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities;

xxi.    Childcare facilities providing services that enable employees exempted in this Order to work as permitted. To the extent possible, childcare facilities must operate under the following mandatory conditions:

1.    Childcare must be carried out in stable groups of 12 or fewer ("stable" means that the same 12 or fewer children are in the same group each day).

2.    Children shall not change from one group to another.

3.    If more than one group of children is cared for at one facility, each group shall be in a separate room. Groups shall not mix with each other.

4.    Childcare providers shall remain solely with one group of children.

h.    For the purposes of this Order, "Minimum Basic Operations" include the following, provided that employees comply with Social Distancing Requirements as defined in this Section, to the extent possible, while carrying out such operations:

i.    The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.

ii.    The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

i.    For the purposes of this Order, "Essential Travel" includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in this Section below.

Order of the County Health Officer to Stay
at Home or Place of Residence

EX03-186

     i.    Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses, or Minimum Basic Operations.

     ii.   Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

     iii.  Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

     iv.  Travel to return to a place of residence from outside the jurisdiction.

     v.   Travel required by law enforcement or court order.

     vi.  Travel required for non-residents to return to their place of residence outside the County. Individuals are strongly encouraged to verify that their transportation out of the County remains available and functional prior to commencing such travel.

  j.    For purposes of this Order, residences include hotels, motels, shared rental units and similar facilities.

  k.    For purposes of this Order, "Social Distancing Requirements" includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

11.   Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order. The violation of any provision of this Order constitutes an imminent threat to public health.

12.   This Order shall become effective at 11:59 p.m. on March 19, 2020, and will continue to be in effect until 11:59 p.m. on April 7, 2020, or until it is extended, rescinded, superseded, or amended in writing by the Health Officer.

13.   Copies of this Order shall promptly be: (1) made available at the County Administration Building at 700 H Street, Sacramento 95814, First Floor; (2) posted on the Sacramento County COVID 19 website (saccounty.net/COVID-19) and County Health Department's website (COVID19.saccounty.net); and (3) provided to any member of the public requesting a copy of this Order.

14.   If any provision of this Order to the application thereof to any person or circumstance is held to be invalid, the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

Order of the County Health Officer to Stay
at Home or Place of Residence

EX03-187



**ORDER OF THE HEALTH OFFICER OF THE COUNTY OF SACRAMENTO
DIRECTING ALL INDIVIDUALS LIVING IN THE COUNTY TO CONTINUE
TO STAY AT HOME OR AT THEIR PLACE OF RESIDENCE AND DIRECTING
CLOSURE OF CERTAIN INDOOR OPERATIONS**

## DATE OF ORDER: July 14, 2020

UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE
SECTIONS 101040, 101085, 120175, AND 120220, THE HEALTH OFFICER OF
THE COUNTY OF SACRAMENTO ("HEALTH OFFICER") HEREBY ORDERS AS
FOLLOWS:

1. This order supersedes the July 2, 2020 Order of the Public Health Officer
   directing all individuals to stay at home ("prior Stay At Home"). This
   Order **shall become effective at 3:00 pm on July 14, 2020** and will
   continue to be in effect until it is rescinded or amended in writing by the
   Health Officer.

2. On June 24th, Sacramento County was placed on the county monitoring
   List after exceeding 10% increase in hospitalization for more than 3
   consecutive days. The most recent data shows that Sacramento has
   exceeded the thresholds for case rate at 139.8 per 100,000 population,
   and for availability of Intensive Care Unit beds at 16.0%. The County
   monitoring Data Chart can be found at
   https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-
   19/COVID19CountyDataTable.aspx

3. Community spread of infection is of increasing concern in Sacramento
   County. Over one thousand cases were identified during both Week 26
   (ending 6/27) and Week 27 (ending 7/4), accounting for over 40% of the
   total cases in the County, and far exceeding the initial peak of 205 cases
   reported in the week ending April 4, 2020. Moreover, the number of
   hospitalized cases has increased to a higher level than ever before in the
   pandemic (150 cases on July 10, as compared to 77 cases hospitalized
   on the previous high on April 4). Young adults aged 18 to 49 years
   constitute 70% of current cases. Private gatherings have been identified

EX03-189

as a significant contributing factor to the increase in transmission. Given current rates of transmission and increase in hospitalization in Sacramento County, there is a need to reduce non-essential gatherings where mixing and disease spread occur.

4. On July 13, 2020, the California Governor announced closure of indoor operations in certain sectors in the State. This "Order" aligns with the Governor's announcement and the State Health Officer Order https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%20Dimming%20Entire%20State%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.pdf

5. In alignment with the State Health Officer Order, the following INDOOR operations are prohibited until further notice:

   a. Dine-in restaurants.
   b. Movie theaters
   c. Family Entertainment Centers (e.g. bowling alleys, miniature golf, batting cages and arcades)
   d. Zoos and museums (indoors)
   e. Cardrooms
   f. Winery and tasting rooms (indoors)
   g. Bars, brewpubs, breweries, and pubs (both indoors and outdoors)
   h. Gyms and fitness centers
   i. Places of worship
   j. Indoor protests
   k. Offices for non-critical infrastructure sectors
   l. Personal care services
   m. Hair salons and barbershops
   n. Indoor malls

   Outdoor operations may be conducted under a tent, canopy or other sun shelter. Bars, pubs, brewpubs and breweries may operate outdoors if they are offering sit-down, outdoor meals.

6. On June 18, 2020, the California Department of Public Health issued new mandate, which requires people to wear face coverings whenever indoors with certain exceptions. Guidance on this requirement is here: https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Guidance-for-Face-Coverings_06-18-2020.pdf. A growing body of scientific research has shown that people with no or few symptoms of COVID-19 can still spread the disease and that the use of face coverings, combined with physical distancing and frequent hand

EX03-190

washing, will reduce the spread of COVID-19. As part of this Order the Sacramento County Health Officer continues to align the County face covering order with the State mandate.

7. CDC guidance for those experiencing homelessness outside of shelters should continue to be followed. To maintain public health and safety, local governments should allow people who are living unsheltered, in cars, RV's, and trailers, or in encampments on public property to remain where they are, unless the people living in those locations are provided with a) real-time access to individual rooms or housing units for households, with appropriate accommodations including for disabilities, and b) a clear plan to safely transport those households.

Do not cite persons experiencing homelessness for using cars, RV's, and trailers as shelter during community spread of COVID-19. Do not remove property from people experiencing homelessness, which includes their shelter (e.g., tents, vehicles, or other living structures), hygiene equipment, food supplies, water, and personal items. Items that people who are living unsheltered designate as trash and request to be removed can be disposed of, as can detritus which has spoiled.

Clearing encampments causes people to disperse throughout the community and break connections with service providers, increasing the potential for infectious disease spread.

Exceptions are encampments that pose an imminent and significant public safety hazard or adversely impact critical infrastructure as designated by local, state, or federal law, regulations, or orders.

8. As part of this Order, all activities previously allowed under Stage 1 and Stage 2 as listed in Appendix B of this Order are explicitly still allowed in Sacramento County following guidance on Social Distancing Protocols in Appendix A.

9. This Order will take effect at **3:00 pm on July 14, 2020** and will be in effect until it is rescinded, superseded, or amended in writing by the Health Officer for Sacramento County.

10. **Copies of Order.** Copies of this Order shall promptly be: (1) made available at the County Administration Building at 700 H Street, Sacramento 95814, First Floor; (2) posted on the Sacramento County COVID-19 website and County Health Department's website and (3) provided to any member of the public requesting a copy of this Order.

Order of the Health Officer, July 14, 2020                                    3

EX03-191

11. **Severability.**  If any provision of this Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect.  To this end, the provisions of this Order are severable.

**IT IS SO ORDERED:**


Olivia Kasirye, MD, MS                                      Dated: July 14, 2020
Health Officer of the County of Sacramento

Order of the Health Officer, July 14, 2020                                4

EX03-192

**Appendix A:    Social Distancing Protocol**

Business name:  Click or tap here to enter text.

Facility Address:  Click or tap here to enter text.

Approximate gross square footage of space open to the public: Click or tap here to enter text.

**Businesses must implement all applicable measures listed below, and be prepared to explain why any measure that is not implemented is inapplicable to the business.**

*Signage:*

☐Signage at each public entrance of the facility to inform all employees and customers that they should: avoid entering the facility if they have a cough or fever; maintain a minimum six-foot distance from one another; sneeze and cough into a cloth or tissue or, if not available, into one's elbow; not shake hands or engage in any unnecessary physical contact, and WEAR A MASK.

☐Signage posting a copy of the Social Distancing Protocol at each public entrance to the facility.

*Measures To Protect Employee Health (check all that apply to the facility):*

☐ Everyone who can carry out their work duties from home has been directed to do so.

☐ All employees have been told not to come to work if sick.

☐ Symptom checks are being conducted before employees may enter the work space.

☐ All desks or individual work stations are separated by at least six feet.

☐ Break rooms, bathrooms, and other common areas are being disinfected frequently, on the following schedule:
        ☐ Break rooms:
        ☐ Bathrooms:
        ☐ Other (Click or tap here to enter text.): Click or tap here to enter text.

EX03-193

☐ Disinfectant and related supplies are available to all employees at the following location(s): Click or tap here to enter text.

☐ Hand sanitizer effective against COVID-19 is available to all employees at the following location(s): Click or tap here to enter text.

☐ Soap and water are available to all employees at the following location(s): Click or tap here to enter text.

☐ Copies of this Protocol have been distributed to all employees.

☐ Optional—Describe other measures: Click or tap here to enter text.

## *Measures To Prevent Crowds From Gathering (check all that apply to the facility):*

☐ Limit the number of customers in the store at any one time to Click or tap here to enter text.[insert maximum number here], which allows for customers and employees to easily maintain at least six-foot distance from one another at all practicable times.

☐ Post an employee at the door to ensure that the maximum number of customers in the facility set forth above is not exceeded.

☐ Placing per-person limits on goods that are selling out quickly to reduce crowds and lines. Explain: Click or tap here to enter text.

☐ Optional—Describe other measures: Click or tap here to enter text.

## *Measures To Keep People At Least Six Feet Apart (check all that apply to the facility)*

☐ Placing signs outside the store reminding people to be at least six feet apart, including when in line.

☐ Placing tape or other markings at least six feet apart in customer line areas inside the store and on sidewalks at public entrances with signs directing customers to use the markings to maintain distance.

☐ Separate order areas from delivery areas to prevent customers from gathering.

☐ All employees have been instructed to maintain at least six feet distance from customers and from each other, except employees may momentarily

Order of the Health Officer, July 14, 2020                                    6

come closer when necessary to accept payment, deliver goods or services, or as otherwise necessary.

☐ Optional—Describe other measures: Click or tap here to enter text.

### *Measures To Prevent Unnecessary Contact (check all that apply to the facility):*

☐ Preventing people from self-serving any items that are food-related.

☐ Lids for cups and food-bar type items are provided by staff; not to customers to grab.

☐ Bulk-item food bins are not available for customer self-service use.

☐ Providing for contactless payment systems or, if not feasible, sanitizing payment systems regularly.  Describe: Click or tap here to enter text.

☐ Optional—Describe other measures (e.g. providing senior-only hours): Click or tap here to enter text.

### *Measures To Increase Sanitization (check all that apply to the facility):*

☐ Disinfecting wipes that are effective against COVID-19 are available near shopping carts and shopping baskets.

☐ Employee(s) assigned to disinfect carts and baskets regularly.

☐ Hand sanitizer, soap and water, or effective disinfectant is available to the public at or near the entrance of the facility, at checkout counters, and anywhere else inside the store or immediately outside where people have direct interactions.

☐ Disinfecting all payment portals, pens, and styluses after each use.

☐ Disinfecting all high-contact surfaces frequently.

☐ Optional—Describe other measures: Click or tap here to enter text.

 * Any additional measures not included here should be listed on separate pages, which the business should attach to this document.

Order of the Health Officer, July 14, 2020                                                    7

**Appendix B:     Listing of Allowable Activities**

**Note:**      **\*All activities are allowable only with strict social distancing
and other requirements**

Transportation:          --Resume full public transportation\*

Hospitality:              --OUTDOOR Restaurants, take-out/delivery ONLY

                          --Hotels, Lodging, and Short-Term Rentals\*

                          --Campgrounds, RV Parks, and Outdoor Recreation\*

Personal Care:           --Pet grooming\*

Retail:                  --Micro enterprises retail\*

                         --General Retail\*

                         --Car washes\*

Private Enterprise:      --Agricultural food and beverage cultivation, process
                         and distribution open for retail by appointment only\*

Professional Services:  --Plumbers, electricians, exterminators\*

                         --Arborists, landscapers, gardeners\*

Gyms, Fitness Studios: --outdoor only

Child/Daycare:           --Child Care, Day Care and Family daycare\*

Religious/Cultural:      --Drive-through religious services\* or outdoor

Order of the Health Officer, July 14, 2020                              9

351 N. Mountain View Ave., San Bernardino, CA 92415 | Phone: 909.387.9146 | Fax: 909.387.6228


## SAN BERNARDINO
# COUNTY

**Public Health**

Trudy Raymundo
*Director*

Corwin Porter
*Assistant Director*

Maxwell Ohikhuare, M.D.
*Health Officer*

Erin Gustafson, M.D., MPH
*Acting Health Officer*

## ORDER OF THE HEALTH OFFICER OF THE COUNTY OF SAN BERNARDINO

### CANCELLING ALL GATHERINGS

### DATE OF ORDER: MARCH 17, 2020

Please read this Order carefully. Violation of or failure to comply with this Order is a crime punishable by fine, imprisonment, or both. (California Health and Safety Code § 120295; County Code Section 31.0101 Et. Seq.)

UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, TITLE 17 CALIFORNIA CODE OF REGULATIONS SECTION 2501, AND SAN BERNARDINO COUNTY CODE SECTION 31.0101 ET. SEQ., THE HEALTH OFFICER OF THE COUNTY OF SAN BERNARDINO ("HEALTH OFFICER") ORDERS:

1. This Order revokes and replaces the Order originally issued on March 12, 2020. That order is no longer in effect as of the effective date and time of this Order.

2. Effective as of 12:01 a.m. on March 18, 2020 and continuing until 11:59 p.m. on April 6, 2020, public or private Gatherings, as defined in this Order, are hereby prohibited in the County. A "gathering" is any event or convening that brings together people in a single room or single space at the same time, such as an auditorium, stadium, arena, large conference room, meeting hall, cafeteria, or any other indoor or outdoor space. Nothing in this Order prohibits the gathering of members of a household or living unit.

3. This Order does not apply to activities such as attendance at regular school classes, work, or essential services. Certain activities are essential to the functioning of our state and must continue. Hence, this Order does not apply to essential public transportation, airport travel, grocery stores or charitable food distribution, certified farmers' markets, and shopping at a store or mall. This Order also does not apply to congregate living situations, including dormitories and homeless encampments.

4. All bars, adult entertainment establishments, and other business establishments that serve alcohol and do not serve food, shall close. All movie theatres, gyms, and health clubs shall close. Food and beverage establishments are required to follow guidance released from the California Department of Public Health on March 16, 2020 (www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-

BOARD OF SUPERVISORS

ROBERT A. LOVINGOOD       JANICE RUTHERFORD       DAWN ROWE       CURT HAGMAN       JOSIE GONZALES
First District       Second District       Third District       Chairman, Fourth District       Vice Chair, Fifth District

EX03-199

19/Coronavirus%20Disease%202019%20and%20Food%20Beverage%20Other%20Services%20-%20AOL.pdf).

5.  The Health Officer strongly cautions that persons aged 65 years and older and person of any age with certain underlying health conditions are at increased risk should they contract COVID-19, and are encouraged to self-quarantine.

6.  This Order is issued as a result of the worldwide epidemic of COVID-19 disease, also known as "novel coronavirus," which has infected at least 118,000 individuals worldwide in 115 countries and is implicated in over 4,200 worldwide deaths.

7.  This Order is issued based on evidence of increasing transmission of COVID-19 within the County, in the state of California, and worldwide, scientific evidence regarding the most effective approach to slow transmission of communicable diseases generally and COVID-19 specifically, as well as best practices as currently known and available to protect the public from the risk of spread of or exposure to COVID-19.

8.  This Order is intended to reduce the likelihood of exposure to COVID-19, thereby slowing the spread of COVID-19 in communities worldwide. This Order will help to reduce the number of Californians who contract COVID-19 before an effective treatment or vaccine is available; protect those most likely to experience severe symptoms, such as older Californians and those with underlying chronic conditions; preserve and protect our healthcare delivery system; and minimize the social and economic impacts of COVID-19 over the long run.

9.  This Order is issued in accordance with, and incorporates by reference, the: March 4, 2020 Proclamation of a State Emergency issued by Governor Gavin Newsom; the March 10, 2020 Declaration of Local Health Emergency based on an imminent and proximate threat to public health from the introduction of novel COVID-19 in San Bernardino County; the March 10, 2020 Resolution of the Board of Supervisors of the County of San Bernardino proclaiming the existence of a Local Emergency in the County of San Bernardino regarding COVID-19; and the March 10, 2020 Resolution of the Board of Supervisors of the County of San Bernardino ratifying and extending the Declaration of Local Health Emergency due to COVID-19.

10. This Order comes after the release of guidance from the California Department of Public Health (CDPH) to cancel all gatherings to fight the spread of COVID-19 (www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/cdph-guidance-gatherings-covid19-transmission-prevention-03-16-2020.pdf).

11. This Order is made in accordance with all applicable State and Federal laws, including but not limited to: Health and Safety Code sections 101030, et seq.; Health and Safety Code sections 120100, et seq.; and Title 17 of the California Code of Regulations section 2501.

12. This Order shall not supersede any conflicting or more restrictive orders issued by the State of California or Federal governments, including any requirements regarding child care. If any portion of this Order or the application thereof to any person or circumstance is held to be invalid the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

13. To the extent necessary, pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, this order is enforceable by the Sheriff and all Chiefs of Police in the County. The violation of any provision of this Order constitutes an imminent threat to public health.

Copies of this Order shall promptly be: (1) made available at the County of San Bernardino Health Administration office located at 351 N. Mountain View Ave., #303, San Bernardino, CA 92415; (2) posted on the County of San Bernardino Public Health Department's website (wp.sbcounty.gov/dph); and (3) provided to any member of the public requesting a copy of this Order.

**IT IS SO ORDERED:**

Dr. Erin Gustafson, MD, MPH
Acting Public Health Officer
County of San Bernardino

Dated: March 17, 2020

Approved as to form and legality:

Adam Ebright
County Counsel
County of San Bernardino

Dated: March 17, 2020

EX03-201

**DECLARATION OF A LOCAL HEALTH EMERGENCY**
**BY THE COUNTY HEALTH OFFICER AND PUBLIC HEALTH DIRECTOR**
**FOR THE CORONAVIRUS (COVID-19)**
**AND**
**TO ISSUE HEALTH ORDERS AS APPROPRIATE AND NEEDED**

**WHEREAS,** Section 101040 of the California Health and Safety Code authorizes the local health officer to take any preventative measure that may be necessary to protect and preserve public health from any public hazard during an emergency; and

**WHEREAS,** Section 101080 of the California Health and Safety Code authorizes the local health officer to declare a local health emergency in the health officer's jurisdiction, or areas thereof, whenever the health officer reasonably determines there is an imminent and proximate threat of the introduction of any contagious, infectious, or communicable disease, chemical agent, noncommunicable biologic agent, toxin, or radioactive agent; and

**WHEREAS,** a novel coronavirus, COVID-19, causes infectious disease and was first detected in Wuhan City, Hubei Province, China in December 2019. Symptoms of COVID-19 include fever, cough, and shortness of breath; outcomes have ranged from mild to severe illness, and in some cases death. The Centers for Disease Control and Prevention considers the virus to be a very serious public health threat; and

**WHEREAS,** on March 4, 2020, Governor Newsom declared a state of emergency for conditions caused by COVID-19; and on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic; and

**WHEREAS,** on March 11, 2020, Governor Newsom and California Public Health state officials recommended that non-essential gatherings should be postponed or cancelled across the state at least until the end of March, in order to implement social distancing guidelines intended to protect all individuals, particularly those who are at higher risk for severe illness for COVID-19; and

**WHEREAS,** as of March 12, 2020 there were 198 confirmed COVID-19 cases in California of which 24 cases are from repatriation flights and 4 deaths; and

**WHEREAS,** the local health officer finds that based on the foregoing and out of abundance of caution, there is an imminent and proximate threat of the introduction of COVID-19 in the County of Santa Barbara and a need to protect those most at risk.

**NOW, THEREFORE, THE LOCAL HEALTH OFFICER HEREBY DECLARES** that a local health emergency exists in the County of Santa Barbara due to an imminent and proximate threat to the public health, within the meaning of Section 101080 of the Health and Safety Code, by the introduction of COVID-19 in the County of Santa Barbara.

EX03-202

**FURTHER, IT IS HEREBY ORDERED THAT:**

1. Effective immediately until March 30, 2020, consistent with the Governor's social distancing guidance, the Health Officer is mandating cancellation or postponement of nonessential gatherings of 250 or more people, and small gatherings shall include six (6) foot distancing between participants particularly those at high risk for severe illness of COVID-19.

2. This order applies in the incorporated and unincorporated areas of Santa Barbara County.

3. Example of essential events this health order does not apply to: regular school classes, work, essential services, congregant living situations including dormitories and homeless encampments, essential public transportation, airport travel, shopping at a store or mall, operations of federal or state courts, and public meetings of local legislative bodies, including but not limited to: the Board of Supervisors, City Councils, School Districts, and other local agencies. Specific guidance can be found in the attached document and at PublicHealthSBC.org.

IT IS FURTHER DECLARED AND ORDERED that during the existence of said local health emergency, the powers, functions, and duties of the Health Officer shall be those prescribed by state law, including but not limited to the provisions of 101085 of the Health and Safety Code, and by pertinent ordinances and resolutions of this County.

IT IS FURTHER DECLARED, pursuant to California Health and Safety Code Section 101080 the local health emergency shall not remain in effect for a period in excess of seven (7) days unless it has been ratified by the Board of Supervisors and upon termination of the State Emergency, shall be reviewed by the Board of Supervisors, at least every 30 days until the local health emergency is terminated.

This Declaration may be signed in counterparts.

_____     3/12/2020
Henning Ansorg, MD                   Date
Santa Barbara County Health Officer

_____     3/12/2020
Van Do-Reynoso, MPH, PhD             Date
Santa Barbara County Public Health Director

EX03-203

HEALTH OFFICER ORDER NO. 2020-8
COUNTY OF SANTA BARBARA

FOR THE CONTROL OF COVID-19
STAY WELL AT HOME ORDER
ESSENTIAL BUSINESSES WITHIN SANTA BARBARA COUNTY

## Health Officer Order No. 2020-8 Supersedes and Replaces Health Officer Order No. 2020-7.1

### Effective Date: April 24, 2020, 5:00pm PDT

**Please read this Order carefully.** Violation of or failure to comply with this Order may constitute a misdemeanor punishable by fine of up to $1,000, imprisonment, or both. (Health and Safety Code §§ 101029, 120295 et seq.) Violators are also subject to civil enforcement actions including fines or civil penalties per violation per day, injunctive relief, and attorneys' fees and costs.

WHEREAS, on March 4, 2020, Governor Newsom declared a state of emergency for conditions caused by a novel coronavirus, COVID-19, and on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic, and on March 12, 2020, the County of Santa Barbara declared a local emergency and a local health emergency in relation COVID-19 in the community; and

WHEREAS, in the County of Santa Barbara as well as throughout California and the nation, there are insufficient quantities of critical healthcare infrastructure, including hospital beds, ventilators and workers, capable of adequately treating mass numbers of patients at a single time – should the virus spread unchecked; and

WHEREAS, in direct response to the lack of healthcare infrastructure, governments across the nation are taking actions to slow the spread of COVID-19 in order to "flatten the curve" of infection and reduce the numbers of individuals infected at any one time by minimizing situations where the virus can spread; and

WHEREAS, in furtherance of this effort, on March 19, 2020, Governor Newsom issued Executive Order N-33-20, which is attached hereto as Attachment F and incorporated by this reference, requiring all persons residing in the State to remain in their homes or places of residence, except as needed to maintain the continuity of operations for critical infrastructure (the "State Stay-at-Home Order"); and

WHEREAS, also on March 19, 2020, the State Public Health Officer ordered all individuals living in the State of California to stay home or at their place of residence, except as needed to maintain continuity of operations for the federal critical infrastructure sectors, which was updated on March 28, 2020, attached hereto as Attachment G and incorporated by this reference; and

EX03-204

WHEREAS, on March 20, 2020, the State Public Health Officer designated a list of Essential Critical Infrastructure Workers, to help state, local, tribal, and industry partners as they work to protect communities, while ensuring continuity of functions critical to protect public health and safety, which was updated on March 22, 2020, attached hereto as Attachment H and incorporated by this reference; and

WHEREAS, the County Health Officer intends to clarify specific jobs and functions within the Essential Critical Infrastructure Workers list for the County of Santa Barbara; and

WHEREAS, the County Health Officer finds: (1) the County has received repeated reports that some business described herein refuse to comply with the State Stay-at-Home Order; (2) the reported activities are inconsistent with the State Stay-at-Home Order; (3) clarification for these businesses is required to prevent the potential increased spread of COVID-19 which would add strain to the County of Santa Barbara health care system; (4) without the clarifications and restrictions described herein some businesses are likely to continue to impair efforts at mitigating the spread of the illness both within the County and statewide; and (5) distinctions made in this Order are to minimize the spread of COVID-19 that could occur through proximity and duration of contact between individuals.

WHEREAS, the intent of this Order is to provide clarity to businesses in the County of Santa Barbara regarding operations under the State Stay-at-Home Order and to slow the spread of COVID-19 to the maximum extent possible. All provisions of this Order should be interpreted to effectuate this intent.

**ACCORDINGLY, UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, TITLE 17 CALIFORNIA CODE OF REGULATIONS SECTION 2501, THE HEALTH OFFICER OF THE COUNTY OF SANTA BARBARA ORDERS:**

1. This Order 2020-8 is effective 5:00 p.m. (PDT) April 24, 2020 and continuing until 5:00 p.m. (PDT), on May 31, 2020 or until it is extended, rescinded, superseded, or amended in writing by the County of Santa Barbara Health Officer ("Health Officer"). This Order applies in the incorporated and unincorporated areas of Santa Barbara County ("County").

2. **Social Distancing Protocol.** All Essential Businesses shall implement social distancing protocol, except when closer contact is required for fire, law enforcement, first responders, childcare, adult or senior care, care to individuals with special needs, and patient care. Social distancing is: 1) maintaining at least a six-foot distance from all individuals who are not part of the same household or living unit; and 2) not gathering in groups.

All Essential Businesses must prepare and post a "Social Distancing Protocol", Attachment E, for each of their facilities in the County frequented by the public or employees. The Social Distancing Protocol must be posted at or near the entrance of the relevant facility and shall be easily viewable by the public and employees. A copy of the Social Distancing Protocol must also be provided to each employee performing work at the facility. All Essential Businesses shall implement the Social

Distancing Protocol, and shall designate a specific on-duty employee to monitor and enforce compliance with the Social Distancing Protocol at all times the business is open to the public. Essential Businesses shall provide evidence of its implementation to any authority enforcing this Order upon demand.

Completion and posting of the Social Distancing Protocol, Attachment E, is required for compliance with this Order. The Social Distancing Protocol must explain how the essential business is achieving the following:

 a. Limiting the number of persons who can enter into the facility and work areas at any one time to ensure that persons in the facility and work areas can easily maintain a minimum six-foot distance from one another at all times;

 b. Where lines may form at a facility, marking increments of six feet, at a minimum, establishing where individuals must stand to maintain adequate social distancing;

 c. Providing hand sanitizer, soap and water, or other effective disinfectant at or near the entrance of the facility and in other appropriate areas for use by the public and employees and in locations where there is high-frequency employee interaction with the public (e.g., cashiers);

 d. Providing for contactless payment systems, or if not feasible to do so disinfect payment systems for the next customer by disinfecting all payment portals, keypads, pens, and styluses after each use;

 e. Regularly cleaning and disinfecting other high-touch surfaces;

 f. Posting a sign at the entrance of the facility and work area informing the public and employees that they should avoid entering the facility if they have a cough or fever; maintain a minimum six-foot distance from one another; sneeze and cough into their elbow; and not shake hands or engage in unnecessary physical contact; and

 g. Any additional social distancing measures being implemented.

3. Unless otherwise ordered by the Health Officer, people may leave their residences: (a) to obtain or perform essential services (such as grocery shopping, medical visits, or to work in essential businesses); or, (b) for outdoor recreation. People who leave their residences for any of these approved reasons still must comply with social distancing requirements at all times.

4. **Essential businesses that may remain open with social distancing** are listed in Attachment A, as attached hereto and incorporated by this reference. This list may be amended from time to time, as required for our region's response to COVID-19.

EX03-206

5. **Essential businesses that may remain open with modified operations and social distancing** are listed in Attachment B, as attached hereto and incorporated by this reference. This list may be amended from time to time, as required for our region's response to COVID-19.

6. **Businesses that must close physical locations** are listed in Attachment C, as attached hereto and incorporated by this reference. Businesses listed in Attachment C may continue to provide services so long as those services can be provided remotely and without individuals physical present at the business location. Maintenance to prevent property damage of the businesses listed in Attachment C is allowed. This list may be amended from time to time, as required for our region's response to COVID-19.

This Health Officer Order No. 2020-8 supersedes and replaces Health Officer Order No. 2020-7 issued April 5, 2020, and amended Health Officer Order No. 2020-7.1 issued April 10, 2020.

This Order is issued as a result of the worldwide pandemic of COVID-19 which has infected at least 2,701,695 individuals worldwide, in 210 countries and territories, including 440 cases, and five fatalities in the County, and is implicated in over 189,298 worldwide deaths.

This Order is issued based on evidence of increasing transmission of COVID-19 both within the County and worldwide, scientific evidence regarding the most effective approach to slow transmission of communicable diseases generally and COVID-19 specifically, as well as best practices as currently known and available to protect the public from the risk of spread of or exposure to COVID-19.

This Order is issued because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time.

This Order is intended to reduce the likelihood of exposure to COVID-19, thereby slowing the spread of COVID-19 in communities worldwide. As the presence of individuals increases, the difficulty and magnitude of tracing individuals who may have been exposed to a case rises exponentially.

This Order is issued in accordance with, and incorporates by reference: the March 4, 2020 Proclamation of a State Emergency issued by Governor Gavin Newsom; the March 12, 2020 Declaration of Local Health Emergency and Proclamation of Emergency based on an imminent and proximate threat to public health from the introduction of novel COVID-19 in the County; the March 17, 2020 Resolution of the Board of Supervisors ratifying the County Declaration of Local Health Emergency and Proclamation of Emergency regarding COVID-19; the guidance issued on March 11, 2020 by the California Department of Public Health regarding large gatherings of 250 people or more; Governor Gavin Newsom's Executive Order N-25-20 of March 12, 2020 preparing the State to commandeer hotels and other places of temporary residence, medical facilities, and other facilities that are suitable as places of temporary residence or medical facilities

as necessary for quarantining, isolating or treating individuals who test positive for COVID-19 or who have had a high-risk exposure and are thought to be in the incubation period; the March 13, 2020 Presidential Declaration of a National Emergency due to the national impacts of COVID-19; the guidance issued on March 15, 2020 by the Centers for Disease Control and Prevention, the California Department of Public Health, and other public health officials through the United States and around the world recommending the cancellation of gatherings involving more than fifty (50) or more persons in a single space at the same time; the March 16, 2020 order of the State Public Health Officer prohibiting all gatherings with expected presence above ten (10) individuals; and Governor Newsom's Executive Order N-33-20 of March 19, 2020 ordering all persons to stay at home to protect the health and well-being of all Californians and to establish consistency across the state in order to slow the spread of COVID-19; the March 22, 2020, Presidential Declaration of a Major Disaster in California beginning on January 20, 2020 under Federal Emergency Management Agency (FEMA) Incident 4482-DR-CA.

This Order is made in accordance with all applicable State and Federal laws, including but not limited to: Health and Safety Code sections 101040 and 120175; Health and Safety Code sections 101030 et seq., 120100 et seq.; and Title 17 of the California Code of Regulations section 2501.

If any provision of this Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

The violation of any provision of this Order constitutes a threat to public health. Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code sections 101029 and 120295, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order.

Copies of this Order shall promptly be: (1) made available at the County Public Health Department; (2) posted on the County Public Health Department's website (publichealthsbc.org); and (3) provided to any member of the public requesting a copy of this Order.

IT IS SO ORDERED:

Henning Ansorg, M.D.
Health Officer
Santa Barbara County Public Health Department

*Health Officer Order No. 2020-8, County of Santa Barbara*
*Stay Well at Home Order, Page 5 of 5*

EX03-208

## ATTACHMENT A

### HEALTH OFFICER ORDER NO. 2020-8
### COUNTY OF SANTA BARBARA

### FOR THE CONTROL OF COVID-19
### STAY WELL AT HOME ORDER
### ESSENTIAL BUSINESSES WITHIN SANTA BARBARA COUNTY

## Essential Businesses
## that May Remain Open with Social Distancing

1. Agriculture and related businesses and industries
2. Airlines
3. Alarm and security companies
4. Animal boarding, pet supply, grooming, rehabilitation and veterinary services, necessary for the health of the animal
5. Auto repair, parts and service
6. Banks and other financial services
7. Blood donation centers
8. Businesses that supply supplies or items required to work from home.
9. Cemeteries/mortuaries funeral parlor and internment services
10. Community gardens for food production
11. Convenience stores
12. Distribution and delivery of essential consumer or business goods
13. Domestic violence shelters
14. Drug stores
15. Dry cleaners and laundromats
16. Electricians
17. Essential Government services
18. Exterminators
19. Faith-based services:
    a. May be provided through streaming or other technology; or
    b. If provided in person all of the following protocols are followed:
        i. all activity must occur outdoors;
        ii. all persons attending the activity must be inside a motor vehicle occupied only by persons from the same household or living unit, not exceeding five persons;
        iii. all motor vehicles at the gathering must maintain at least a minimum distance of six feet from all other vehicles
        iv. all persons must remain in the vehicle in which they arrived at all times

*Health Officer Order 2020-8, County of Santa Barbara*
*Attachment A*

during the event;

    v.  no restroom facilities shall be made available to persons at the facility during the event; and

    vi.  no tangible items of any kind, including food products, may be transferred to persons in the motor vehicles.

  c.  Notwithstanding the above, one or more persons, not exceeding five, may enter nearby buildings as necessary to put on the presentation.

19. Farmer's markets, produce stands

20. Food and goods delivery services

21. Food banks and other organizations that provide assistance to the disadvantaged

22. **Food preparation facilities:** Food facility workers may not work while ill. "Food facility" or "food facilities" means all licensed food facilities, as defined by Section 113789 of the Health and Safety Code. No food facility worker or volunteer may work or volunteer in a food facility with symptoms of COVID-19.

  a.  The symptoms requiring exclusion from a food facility as defined by the Santa Barbara County Health Officer are found in Attachment A.

  b.  Food facility workers or volunteers who have had symptoms of COVID-19 as defined by the Santa Barbara County Health Officer (Attachment A) shall return to work only when they have been free of symptoms for at least 72 hours without medication AND at least seven (7) days have elapsed since the onset of symptoms.

  c.  The Health Officer recommends food facility operators actively screen all workers and/or volunteers, including those from outside services (such as HVAC, plumbing, or electrical contractors) for COVID-19 symptoms upon each individual's arrival at the food facility. Individuals who exhibit symptoms consistent with COVID-19 as defined by the Santa Barbara County Health Officer in Attachment D shall be immediately excluded from the facility.

23. Gas stations

24. Grocery stores

25. Hardware stores

26. Healthcare providers-doctors, dentists, mental health professionals, nurses, hospice and those who provide administrative support to such facilities

27. Home-based healthcare

28. Home repair and maintenance (plumbers, electricians, pool service, repairs)

29. Homeless service providers, shelters

30. Hospitals, clinics, and medical offices

31. Information technology support (e.g., providers, repair shops)

32. Liquor stores

33. Mailing and shipping services

34. Manufacturing of essential consumer and business goods

35. Media

36. Moving companies (to move individuals, families, belongings to new residence)

37. Online wholesale or retail sales
38. **Outdoor activities**: provided persons comply with social distancing requirements, such as, by way of example, visiting or walking through botanical gardens, golfing, tennis, pickle-ball, walking, hiking, running, bicycling, pleasure driving, and working around their places of residence, including gardening.
39. **Public and Private Golf Courses:**  to provide accommodations for persons who wish to golf as a form of outdoor activity, public and private golf courses may operate provided they strictly enforce social distancing requirements and enforce the following additional protocols:
    a. Only single occupant motorized carts are allowed and each cart must be sanitized before next use;
    b. No more than four golfers are allowed per group and each group must be stable (i.e., persons may not substitute in or out of the group);
    c. A distance of at least 30 feet shall be maintained between groups of golfers at all times;
    d. All ball washers shall be covered and flag pins shall be removed and the cup on each green shall be inverted or otherwise installed to eliminate high-frequency touch services on the greens and tees;
    e. Persons may use a driving range provided that range balls are properly sanitized before distribution to customers (stand-alone golf driving ranges may also operate);
    f. Practice putting greens shall remain closed;
    g. The "Pro Shop" or similar facility designed for the sale of golf-related equipment and supplies shall remain closed; and
    h. The snack shop(s) and restaurant(s) shall remain closed for in-room dining, and may only offer food to consumers via delivery service, pick-up, or drive-thru as described in the guidelines for Food Facilities and Restaurant Restrictions referenced in Attachment B, item 7.
40. Pharmacies
41. Professional services (legal, insurance, title, accounting, mortgage brokers, payroll, and others as needed to assist with legally mandated or essential services)
42. Property management
43. Public transit, buses
44. Railroads
45. Ranching and related businesses and industries
46. Re-entry or rehabilitation facilities
47. Residential care facilities
48. Solid waste facilities and haulers
49. Storage facilities
50. Trucking and moving services
51. Utility providers: water, power, gas, cable, internet, cell service
52. Wholesale food facilities

*Health Officer Order 2020-8, County of Santa Barbara*
*Attachment A*

# ATTACHMENT B

### HEALTH OFFICER ORDER NO. 2020-8
### COUNTY OF SANTA BARBARA

### FOR THE CONTROL OF COVID-19
### STAY WELL AT HOME ORDER
### ESSENTIAL BUSINESSES WITHIN SANTA BARBARA COUNTY

## Essential businesses that may remain open with modified operations and social distancing

1. Auto Dealerships (no test drives accompanied by sales persons; phone, online, and delivery when possible)

2. Bicycle repair shops for drop off or pick up only

3. Cannabis retailers for take out only

4. Car washes that are drive through or self-serve only; no mobile car washes

5. Childcare facilities (childcare and licensing are overseen by Community Care Licensing and must follow the procedures outlined here https://www.cdss.ca.gov/Portals/9/CCLD/PINs/2020/CCP/PIN_20-04-CCP.pdf)

6. Construction, architecture, engineering services related to housing, care facilities, and essential infrastructure may continue (workplace safety plans shall be in place, including those for disease transmission prevention)

7. **Food Facilities and Restaurant Restrictions:** All licensed food facilities, as defined by Section 113789 of the Health and Safety Code, (referred to as "food facility" or "food facilities") may only prepare and offer food that is provided to customers via delivery service, via pick-up for takeout dining, and via drive-thru. Restaurants, bars, nightclubs, and coffee shops that offer food to consumers may remain open only for purposes of continuing to prepare and offer food to consumers via delivery service, pick-up, or drive-thru.

   a. **Procedures for take-out restaurants and entities.** Licensed food facilities that are allowed to prepare and offer food via delivery service, pick-up, or drive-thru must comply with the following procedures:

      i. **Containers required.** All food must be completely contained in a suitable container before being transferred to a customer. For example, ice cream cones are not allowed; ice cream scoops in a covered container are allowed. A slice of pizza on a paper plate is not allowed; a slice of pizza in a covered box or securely wrapped in aluminum foil is allowed.

      ii. **Facial covers required.** "Facial covers" means a cloth cover that fully covers the tip and nostrils of the nose and the mouth. All food workers shall wear protective facial covering while engaged in food preparation, serving, and kitchen maintenance activities. Facial

covers shall be provided by the employer and shall be maintained in a clean and sanitary manner.

   iii. **Must consume food away from premises.** The exception for take-out food activities is designed to enable persons who are confined to their places of residence to obtain prepared food to take back to their places of residence for consumption. The take-out food shall not be consumed anywhere within the line-of-sight of a person standing in front of the facility that sold the food. No on-site dining, whether inside or outside (including shared patios, courtyards, or food courts) is permitted. Facilities shall remove, rearrange, or otherwise make unavailable for use all tables, chairs, or other customer seating, or dining fixtures on their premises.

   b. **Six-foot spacing must be maintained.** Licensed food facilities that provide and offer food to consumers for pick up must require patrons who are ordering food and beverages to be and remain at least six (6) feet apart from each other while inside the facility. All persons waiting in line or otherwise congregating outside a food facility selling food via take-out, delivery, or drive-thru shall maintain a distance of at least six feet from all other persons. Food facilities shall be responsible for assuring that the six-foot social distancing requirement is observed at all times.

   c. **Violators subject to permit suspension.** Food facilities not adhering to the State's Stay-at-Home Order or this Order may be subject to immediate permit suspension and mandatory closure for the duration of this Order, including extensions of this Order.

8. Gun Shops (shooting range closed)

9. Hotels and motels, bed and breakfasts, agricultural homestays and short-term rentals for occupancy related to essential business, not vacation or leisure

10. Housekeeping, janitorial, and sanitation services for essential businesses or for medical necessity

11. Landscape services for vector and weed abatement, not beautification

12. Smoke and tobacco shops that do not sell cannabis for take out service only; no on-site smoking lounges of any type may operate, whether indoors or outdoors

13. Real estate sales and marketing for closings and telephonic activities; no open houses

14. Rideshare, taxis, Uber, Lyft (may transport non-symptomatic riders only; must provide social distancing of six or more feet including while in the vehicle; must follow recommended cleaning/precautions for sanitizing following each ride)

15. **Schools**: public and private (distance learning, administration only)

# ATTACHMENT C

### HEALTH OFFICER ORDER NO. 2020-8
### COUNTY OF SANTA BARBARA

### FOR THE CONTROL OF COVID-19
### STAY WELL AT HOME ORDER
### ESSENTIAL BUSINESSES WITHIN SANTA BARBARA COUNTY

## Businesses that Must Close Physical Locations

1.  Amphitheaters, concert halls, performing arts centers
2.  Amusement parks
3.  Aquatic centers
4.  Arcades
5.  Archery ranges, shooting ranges
6.  Arenas
7.  Art galleries
8.  Athletic supply and sporting goods
9.  Banquet halls
10. Barbers, hair salons, and hairstylists
11. Bars that do not serve food
12. Body piercing parlors and body art facilities
13. Bookstores
14. Bowling alleys
15. Campground and RV parks, except that persons who certify that their RV is their primary residence may be permitted to stay in the RV park. All persons residing in an RV shall comply with all State and County Health Orders otherwise applicable to residents
16. Casinos and cardrooms
17. Climbing gyms
18. Clothing stores
19. Craft stores
20. Dance halls or studios, dances
21. Day spas and massage parlors, except those required for medical necessity
22. Fairs, public exhibitions
23. Fitness centers, gyms, tennis clubs except those at private single-family residences for use of the residents of the private single-family residence only
24. Health clubs, yoga centers, martial arts studios
25. Historical sites
26. Libraries

*Health Officer Order 2020-8, County of Santa Barbara*
*Attachment C*

27. Live performance venues
28. Model homes
29. Movie theaters, drive-in theaters
30. Museums
31. Music events, concerts
32. Nail salons, manicurist, and pedicurist, except those required for medical necessity, such as treatment for diabetes, or persons taking prescribed blood thinners
33. Nightclubs that do not serve food
34. Pawn Shops
35. Pool and billiards lounges
36. Private social clubs
37. **Swimming pools, spas, hot tubs, splash pads, saunas, and steam rooms, except:**
    a. Those located at a single-family residence, which shall be used only by members of the household residing at the single-family residence
    b. Medical or therapy pools that provide medically, prescribed, medically necessary supervised therapy. Therapy sessions should employ social distancing standards of at least six feet at all times possible
38. Raceways
39. Recreation Centers
40. Recyclers, including electronics recyclers
41. Rodeos, public equestrian events
42. Roller skating rinks, roller derby
43. Second hand, thrift, and antiques stores
44. Sports stadiums and facilities
45. Swap meet and flea markets
46. Tattoo parlors, tattoo businesses, tattoo artists
47. Trampoline and bounce houses
48. Trophy shops, trophy businesses
49. Water parks
50. **Wineries, breweries, and tap rooms, except for:**
    a. Venues that as of March 16, 2020 were authorized to provide off sale beer and wine to be consumed off premises; or
    b. Venues that include meals provided by a full kitchen should follow Sections for Food Facilities and Restaurant Requirements and food preparation facilities.
51. Zoos

ATTACHMENT D

**HEALTH OFFICER ORDER NO. 2020-8**
**COUNTY OF SANTA BARBARA**

**FOR THE CONTROL OF COVID-19**
**STAY WELL AT HOME ORDER**
**ESSENTIAL BUSINESSES WITHIN SANTA BARBARA COUNTY**

# COVID-19 SELF-EVALUATION

The County Health Officer has defined COVID-19 symptoms as follows:

Mild to Moderate Symptoms Related to or
Other Respiratory Illness such as:

Sore Throat

Runny Nose

Fever

Chills

Not Feeling Well

Sneezing

Coughing

Gastro-Intestinal symptoms such as:

Soft Stool

Stomach Cramps

New loss of smell and/or taste

## ATTACHMENT E

### Social Distancing Protocol

Business name: _____ Facility Address: _____

Approximate gross square footage of space open to the public: _____

**Essential Businesses must implement all applicable measures listed below, and be prepared to explain why any measure that is not implemented is inapplicable to the essential business.**

### *Signage:*

☐ Signage at each public entrance of the facility to inform all employees and public that they should: avoid entering the facility if they have a cough or fever; maintain a minimum six-foot distance from one another; sneeze and cough into a cloth or tissue or, if not available, into one's elbow; and not shake hands or engage in any unnecessary physical contact.

☐ Signage posting a copy of the Social Distancing Protocol at each public entrance to the facility.

### *Measures To Protect Employee Health (check all that apply to the facility):*

☐ Everyone who can carry out their work duties from home has been directed to do so.

☐ All employees have been told not to come to work if sick.

☐ All desks or individual work stations are separated by at least six feet.

☐ Break rooms, bathrooms, and other common areas are being disinfected frequently, on the following schedule:

    ☐ Break rooms: _____

    ☐ Bathrooms: _____

    ☐ Other: _____

☐ Disinfectant and related supplies are available to all employees at the following location(s):

    ☐ Hand sanitizer effective against COVID-19 is available to all employees at the following location(s): _____

    ☐ Soap and water are available to all employees at the following location(s): _____

    ☐ Copies of this Protocol have been distributed to all employees.

    ☐ Optional—Describe other measures: _____

### *Measures To Prevent Crowds From Gathering (check all that apply to the facility):*

☐ Limit the number of public in the store at any one time to _____, which allows for public and employees to easily maintain at least six-foot distance from one another at all practicable times.

☐ Post an employee at the door to ensure that the maximum number of persons in the facility set forth above is not exceeded.

☐ Placing per-person limits on goods that are selling out quickly to reduce crowds and lines. Explain: _____

☐ Optional—Describe other measures: _____

*Health Officer Order 2020-8, County of Santa Barbara*
*Attachment E*

EX03-217

***Measures To Keep People At Least Six Feet Apart (check all that apply to the facility)***

☐   Placing signs outside the store reminding people to be at least six feet apart, including in line.

☐   Placing tape or other markings at least six feet apart in customer line areas inside the store and on sidewalks at public entrances with signs directing customers to use the markings to maintain distance.

☐   Separate order areas from delivery areas to prevent persons from gathering.

☐   All employees have been instructed to maintain at least six feet distance from the public and from each other, except employees may momentarily come closer when necessary to accept payment, deliver goods or services, or as otherwise necessary.

☐   Optional—Describe other measures: _____

***Measures To Prevent Unnecessary Contact (check all that apply to the facility):***

☐   Preventing people from self-serving any items that are food-related.

　　☐ Lids for cups and food-bar type items are provided by staff; not to customers to grab.

　　☐ Bulk-item food bins are not available for self-service use.

☐   Not permitting customers to bring their own bags, mugs, or other reusable items from home.

☐   Providing for contactless payment systems or, if not feasible, sanitizing payment systems regularly. Describe: _____

☐   Optional—Describe other measures (e.g. providing senior-only hours): _____

***Measures To Increase Sanitization (check all that apply to the facility):***

☐   Disinfecting wipes that are effective against COVID-19 are available near shopping carts and shopping baskets.

☐   Employee(s) assigned to disinfect carts and baskets regularly.

☐   Hand sanitizer, soap and water, or effective disinfectant is available to the public at or near the entrance of the facility, at checkout counters, and anywhere else inside the store or immediately outside where people have direct interactions.

☐   Disinfecting all payment portals, keypads, pens, and styluses after each use.

☐   Disinfecting all high-contact surfaces frequently.

☐   Optional—Describe other measures: _____

\* Any additional measures not included here should be listed on separate pages, which the business should attach to this document.

**You may contact the following person with any questions or comments about this protocol:**

**Name:** _____   **Phone number:** _____

*Health Officer Order 2020-8, County of Santa Barbara*
*Attachment E*

**EX03-218**

HEALTH OFFICER ORDER NO. 2020-8.2
COUNTY OF SANTA BARBARA

FOR THE CONTROL OF COVID-19
STAY WELL AT HOME ORDER
DEFINED ESSENTIAL BUSINESSES <u>AND DEFINED LOWER-RISK BUSINESSES</u>
WITHIN SANTA BARBARA COUNTY

## <u>Health Officer Order No. 2020-8.2</u>
## <u>Supersedes and Replaces Health Officer Order No. 2020-8.1</u>

**Effective Date: May 21, 2020, 9:00am PDT**

(The underlined language is changed from HO 2020-8.1)

**Please read this Order carefully.** Violation of or failure to comply with this Order may constitute a misdemeanor punishable by fine of up to $1,000, imprisonment, or both. (Health and Safety Code §§ 101029, 120295 et seq.) Violators are also subject to civil enforcement actions including fines or civil penalties per violation per day, injunctive relief, and attorneys' fees and costs.

WHEREAS, on March 4, 2020, Governor Newsom declared a state of emergency for conditions caused by a novel coronavirus, COVID-19, and on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic, and on March 12, 2020, the County of Santa Barbara declared a local emergency and a local health emergency in relation COVID-19 in the community; and

WHEREAS, in the County of Santa Barbara as well as throughout California and the nation, there are insufficient quantities of critical healthcare infrastructure, including hospital beds, ventilators and workers, capable of adequately treating mass numbers of patients at a single time – should the virus spread unchecked; and

WHEREAS, in direct response to the lack of healthcare infrastructure, governments across the nation are taking actions to slow the spread of COVID-19 in order to "flatten the curve" of infection and reduce the numbers of individuals infected at any one time by minimizing situations where the virus can spread; and

WHEREAS, in furtherance of this effort, on March 19, 2020, Governor Newsom issued Executive Order N-33-20, which is attached hereto as Attachment F and incorporated by this reference, requiring all persons residing in the State to remain in their homes or places of residence, except as needed to maintain the continuity of operations for critical infrastructure (the "State Stay-at-Home Order"); and

WHEREAS, also on March 19, 2020, the State Public Health Officer ordered all individuals living in the State of California to stay home or at their place of residence, except as needed to maintain continuity of operations for the federal critical infrastructure sectors, which was updated on March 28, 2020, attached hereto as Attachment G and incorporated by this reference; and

EX03-219

WHEREAS, on March 20, 2020, the State Public Health Officer designated a list of Essential Critical Infrastructure Workers, to help state, local, tribal, and industry partners as they work to protect communities, while ensuring continuity of functions critical to protect public health and safety, which was updated on March 22, 2020, attached hereto as Attachment H and incorporated by this reference; and

WHEREAS, on May 4, 2020, Governor Newsom issued Executive Order N-60-20, which is attached hereto as Attachment I and incorporated by this reference, to allow reopening of lower-risk businesses and spaces ("Stage Two Resilience Roadmap") and to allow a County to pursue a variance to move further into the stage upon notification and certification through submission of a written attestation to the California Department of Public Health (CDPH); and

WHEREAS, on May 20, 2020, the CDPH approved and posted to the State's website the County of Santa Barbara's Variance Attestation allowing the County to move further into the Stage Two Resilience Roadmap to include dine-in restaurants and retail; and

WHEREAS, the County Health Officer intends to define and specify jobs and functions within the Essential Critical Infrastructure Workers, and to further implement the Stage Two Resilience Roadmap, for the County of Santa Barbara; and

WHEREAS, the County Health Officer finds: (1) the County has received repeated reports that some businesses described herein refuse to comply with the State Stay-at-Home Order; (2) the reported activities are inconsistent with the State Stay-at-Home Order and/or the Stage Two Resilience Roadmap; (3) guidance for these businesses is required to prevent the potential increased spread of COVID-19 which would add strain to the County of Santa Barbara health care system; (4) without the guidance and restrictions described herein some businesses are likely to continue to impair efforts at mitigating the spread of the illness both within the County and statewide; and (5) distinctions made in this Order are to minimize the spread of COVID-19 that could occur through proximity and duration of contact between individuals.

WHEREAS, the intent of this Order is to order businesses in the County of Santa Barbara regarding operations under the State Stay-at-Home Order and the Stage Two Resilience Roadmap, and to slow the spread of COVID-19 to the maximum extent possible. All provisions of this Order should be interpreted to effectuate this intent.

ACCORDINGLY, UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, TITLE 17 CALIFORNIA CODE OF REGULATIONS SECTION 2501, THE HEALTH OFFICER OF THE COUNTY OF SANTA BARBARA ORDERS:

1. This Order 2020-8.2 is effective 9:00 a.m. (PDT) May 21, 2020 and continuing until 5:00 p.m. (PDT), on June 30, 2020 or until it is extended, rescinded, superseded, or amended in writing by the County of Santa Barbara Health Officer ("Health Officer"). This Order applies in the incorporated and unincorporated areas of Santa Barbara County ("County").

2.  **Social Distancing Protocol.** All defined essential businesses and defined lower-risk businesses shall implement social distancing protocol, except when closer contact is required for fire, law enforcement, first responders, childcare, adult or senior care, care to individuals with special needs, and patient care. Social distancing is: 1) maintaining at least a six-foot distance from all individuals who are not part of the same household or living unit; and 2) not gathering in groups.

All defined essential businesses and defined lower-risk businesses must prepare and post a "Social Distancing Protocol", Attachment E, for each of their facilities in the County frequented by the public or employees. The Social Distancing Protocol must be posted at or near the entrance of the relevant facility and shall be easily viewable by the public and employees. A copy of the Social Distancing Protocol must also be provided to each employee performing work at the facility. All defined essential businesses and defined lower-risk businesses shall implement the Social Distancing Protocol, and shall designate a specific on-duty employee to monitor and enforce compliance with the Social Distancing Protocol at all times the business is open to the public. Defined essential businesses and defined lower-risk businesses shall provide evidence of its implementation to any authority enforcing this Order upon demand.

Completion and posting of the Social Distancing Protocol, Attachment E, is required for compliance with this Order. The Social Distancing Protocol must explain how the defined essential business or defined lower-risk business is achieving the following:

a.  Limiting the number of persons who can enter into the facility and work areas at any one time to ensure that persons in the facility and work areas can easily maintain a minimum six-foot distance from one another at all times;

b.  Where lines may form at a facility, marking increments of six feet, at a minimum, establishing where individuals must stand to maintain adequate social distancing;

c.  Providing hand sanitizer, soap and water, or other effective disinfectant at or near the entrance of the facility and in other appropriate areas for use by the public and employees and in locations where there is high-frequency employee interaction with the public (e.g., cashiers);

d.  Providing for contactless payment systems, or if not feasible to do so disinfect payment systems for the next customer by disinfecting all payment portals, keypads, pens, and styluses after each use;

e.  Regularly cleaning and disinfecting other high-touch surfaces;

f.  Posting a sign at the entrance of the facility and work area informing the public and employees that they should avoid entering the facility if they have a cough or fever; maintain a minimum six-foot distance from one another;

sneeze and cough into their elbow; and not shake hands or engage in unnecessary physical contact; and

g. Any additional social distancing measures being implemented.

3. Unless otherwise ordered by the Health Officer, people may leave their residences: (a) to obtain or perform essential services (such as grocery shopping, medical visits, or to work in defined essential businesses); (b) for outdoor recreation; or, (c) to obtain goods or services, or to perform work for, defined lower-risk businesses. People who leave their residences for any of these approved reasons still must comply with social distancing requirements at all times.

4. **Defined essential businesses that may remain open with social distancing** are listed in Attachment A, as attached hereto and incorporated by this reference. These defined essential businesses may be open now, but must self-certify in accordance with Section 6 below no later than June 5, 2020. This list may be amended from time to time, as required for our region's response to COVID-19.

5. **Defined essential businesses and defined lower-risk businesses that may open or remain open with modified operations and social distancing** are listed in Attachment B, as attached hereto and incorporated by this reference. These defined essential businesses and defined lower-risk businesses may continue to operate with curbside pickup or delivery only, or may open more fully upon self-certification. This list may be amended from time to time, as required for our region's response to COVID-19.

6. Self-Certification Required: Defined essential businesses and defined lower-risk businesses are required to review State and local guidance. Local guidance is available at https://recovery.sbc.org/reopen-your-business. To self-certify, defined essential businesses and defined lower-risk businesses must perform a detailed risk assessment; implement a COVID-19 prevention plan and keep the plan on-site; complete an industry specific checklist; complete an attestation and self-certify that the site can operate safely; and post the self-certification at the location.

7. **Businesses that must close physical locations** are listed in Attachment C, as attached hereto and incorporated by this reference. Businesses listed in Attachment C may continue to provide services so long as those services can be provided remotely and without individuals physical present at the business location. Maintenance to prevent property damage of the businesses listed in Attachment C is allowed. This list may be amended from time to time, as required for our region's response to COVID-19.

This Health Officer Order No. 2020-8.2 supersedes and replaces Health Officer Order No. 2020-8.1 that was effective May 8, 2020.

This Order is issued as a result of the worldwide pandemic of COVID-19 which has infected at least 4,996,634 individuals worldwide, in 212 countries and territories,

EX03-222

including 1,520 cases, and 11 deaths in the County, and is implicated in over 338,120 worldwide deaths.

This Order is issued based on evidence of increasing transmission of COVID-19 both within the County and worldwide, scientific evidence regarding the most effective approach to slow transmission of communicable diseases generally and COVID-19 specifically, as well as best practices as currently known and available to protect the public from the risk of spread of or exposure to COVID-19.

This Order is issued because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time.

This Order is intended to reduce the likelihood of exposure to COVID-19, thereby slowing the spread of COVID-19 in communities worldwide. As the presence of individuals increases, the difficulty and magnitude of tracing individuals who may have been exposed to a case rises exponentially.

This Order is issued in accordance with, and incorporates by reference: the March 4, 2020 Proclamation of a State Emergency issued by Governor Gavin Newsom; the March 12, 2020 Declaration of Local Health Emergency and Proclamation of Emergency based on an imminent and proximate threat to public health from the introduction of novel COVID-19 in the County; the March 17, 2020 Resolution of the Board of Supervisors ratifying the County Declaration of Local Health Emergency and Proclamation of Emergency regarding COVID-19; the guidance issued on March 11, 2020 by the California Department of Public Health regarding large gatherings of 250 people or more; Governor Gavin Newsom's Executive Order N-25-20 of March 12, 2020 preparing the State to commandeer hotels and other places of temporary residence, medical facilities, and other facilities that are suitable as places of temporary residence or medical facilities as necessary for quarantining, isolating or treating individuals who test positive for COVID-19 or who have had a high-risk exposure and are thought to be in the incubation period; the March 13, 2020 Presidential Declaration of a National Emergency due to the national impacts of COVID-19; the guidance issued on March 15, 2020 by the Centers for Disease Control and Prevention, the California Department of Public Health, and other public health officials through the United States and around the world recommending the cancellation of gatherings involving more than fifty (50) or more persons in a single space at the same time; the March 16, 2020 order of the State Public Health Officer prohibiting all gatherings with expected presence above ten (10) individuals; Governor Newsom's Executive Order N-33-20 of March 19, 2020 ordering all persons to stay at home to protect the health and well-being of all Californians and to establish consistency across the state in order to slow the spread of COVID-19; the March 22, 2020, Presidential Declaration of a Major Disaster in California beginning on January 20, 2020 under Federal Emergency Management Agency (FEMA) Incident DR-4482-CA; and, Governor Newsom's Executive Order N-60-20 of May 4, 2020 to allow reopening of lower-risk businesses and spaces ("Stage Two"), and then to allow reopening of higher-risk businesses and spaces ("Stage Three"), and directing the Public Health Officer to establish criteria and procedures to determine whether and how particular local jurisdictions may implement public health measures that depart from the statewide directives of the State Public Health Officer.

This Order is made in accordance with all applicable State and Federal laws, including but not limited to: Health and Safety Code sections 101040 and 120175; Health and Safety Code sections 101030 et seq., 120100 et seq.; and Title 17 of the California Code of Regulations section 2501.

If any provision of this Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

The violation of any provision of this Order constitutes a threat to public health. Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code sections 101029 and 120295, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order.

Copies of this Order shall promptly be: (1) made available at the County Public Health Department; (2) posted on the County Public Health Department's website (publichealthsbc.org); and (3) provided to any member of the public requesting a copy of this Order.

IT IS SO ORDERED:

Henning Ansorg, M.D.
Health Officer
Santa Barbara County Public Health Department

## ATTACHMENT A

### HEALTH OFFICER ORDER NO. 2020-8.2
### COUNTY OF SANTA BARBARA

## Defined Essential Businesses
## that May Remain Open with Social Distancing

<u>These defined essential businesses may be open now, but must self-certify in accordance with Section 6 below no later than June 5, 2020.</u>

1.   Agriculture and related businesses and industries
2.   Airlines
3.   Alarm and security companies
4.   Animal boarding, pet supply, grooming, rehabilitation and veterinary services, necessary for the health of the animal
5.   Auto repair, parts and service
6.   Banks and other financial services
7.   Blood donation centers
8.   Businesses that supply supplies or items required to work from home.
9.   Cemeteries/mortuaries funeral parlor and internment services
10.  Community gardens for food production
11.  Convenience stores
12.  Distribution and delivery of essential consumer or business goods
13.  Domestic violence shelters
14.  Drug stores
15.  Dry cleaners and laundromats
16.  Electricians
17.  Essential Government services
18.  Exterminators
19.  Farmer's markets, produce stands
20.  Faith-based services:
     a. May be provided through streaming or other technology; or
     b. If provided in person all of the following protocols are followed:
        i.   all activity must occur outdoors;
        ii.  all persons attending the activity must be inside a motor vehicle occupied only by persons from the same household or living unit, not exceeding five persons;
        iii. all motor vehicles at the gathering must maintain at least a minimum distance of six feet from all other vehicles
        iv.  all persons must remain in the vehicle in which they arrived at all times

*Health Officer Order 2020-8.2, County of Santa Barbara*
*Attachment A*

during the event;

    v. no restroom facilities shall be made available to persons at the facility during the event; and

    vi. no tangible items of any kind, including food products, may be transferred to persons in the motor vehicles.

  c. Notwithstanding the above, one or more persons, not exceeding five, may enter nearby buildings as necessary to put on the presentation.

  d. May operate offices for administrative support to the faith-based services similar to Section 26 in this Attachment A.

21. Food and goods delivery services

22. Food banks and other organizations that provide assistance to the disadvantaged

23. **Food preparation facilities**: Food facility workers may not work while ill. "Food facility" or "food facilities" means all licensed food facilities, as defined by Section 113789 of the Health and Safety Code. No food facility worker or volunteer may work or volunteer in a food facility with symptoms of COVID-19.

  a. The symptoms requiring exclusion from a food facility as defined by the Santa Barbara County Health Officer are found in Attachment A.

  b. Food facility workers or volunteers who have had symptoms of COVID-19 as defined by the Santa Barbara County Health Officer (Attachment A) shall return to work only when they have been free of symptoms for at least 72 hours without medication AND at least ten (10) days have elapsed since the onset of symptoms.

  c. The Health Officer recommends food facility operators actively screen all workers and/or volunteers, including those from outside services (such as HVAC, plumbing, or electrical contractors) for COVID-19 symptoms upon each individual's arrival at the food facility. Individuals who exhibit symptoms consistent with COVID-19 as defined by the Santa Barbara County Health Officer in Attachment D shall be immediately excluded from the facility.

24. Gas stations

25. Grocery stores

26. Hardware stores

27. Healthcare providers-doctors, dentists, mental health professionals, nurses, hospice and those who provide administrative support to such facilities

28. Home-based healthcare

29. Home repair and maintenance (plumbers, electricians, pool service, repairs)

30. Homeless service providers, shelters

31. Hospitals, clinics, and medical offices

32. Information technology support (e.g., providers, repair shops)

33. Liquor stores

34. Mailing and shipping services

35. Manufacturing of essential consumer and business goods

36. Media

37.    Moving companies (to move individuals, families, belongings to new residence)
38.    Online wholesale or retail sales
39.    **Outdoor activities:** provided persons comply with social distancing requirements, such as, for example, visiting or walking through botanical gardens, walking, hiking, running, bicycling, pleasure driving, and working around their places of residence, including gardening.
40.    Pharmacies
41.    Professional services (legal, insurance, title, accounting, mortgage brokers, payroll, and others as needed to assist with legally mandated or essential services)
42.    Property management
43.    Public transit, buses
44.    Railroads
45.    Ranching and related businesses and industries
46.    Re-entry or rehabilitation facilities
47.    Residential care facilities
48.    Solid waste facilities and haulers
49.    Storage facilities
50.    Trucking and moving services
51.    Utility providers: water, power, gas, cable, internet, cell service
52.    Wholesale food facilities

# ATTACHMENT B

## HEALTH OFFICER ORDER NO. 2020-8.2
## COUNTY OF SANTA BARBARA

## Defined essential businesses and defined lower-risk businesses that may remain open with modified operations and social distancing, or open more fully with self-certification

These defined essential businesses and defined lower-risk businesses may continue to operate with curbside pickup or delivery only, or may open more fully upon self-certification.

1. Antique stores
2. Auto dealerships, and test drives accompanied by sales persons are allowed with social distancing; phone, online, and delivery when possible.
3. Archery ranges, shooting ranges
4. Bookstores
5. Bicycle repair shops
6. Campground and RV parks to provide accommodations for persons who wish to engage in outdoor activity, public and private camp grounds may operate provided they strictly enforce social distancing requirements
7. Cannabis retailers
8. Car washes
9. Childcare facilities which are overseen by State Department of Social Services, Community Care Licensing and must follow Provider Information Notices available at https://cdss.ca.gov/inforesources/child-care-licensing
10. Clothing stores
11. Craft stores
12. Construction, architecture, engineering services related to housing, care facilities, and essential infrastructure may continue (workplace safety plans shall be in place, including those for disease transmission prevention).
13. Drive-in theaters
14. Florists
15. Food Facilities and Restaurants: Take-Out, Delivery Only:
    a. All licensed food facilities, as defined by Section 113789 of the Health and Safety Code, (referred to as "food facility" or "food facilities") may prepare and offer food that is provided to customers via delivery service, via pick-up for takeout dining, and via drive-thru.
    b. **Procedures for take-out restaurants and entities.** Licensed food facilities that opt to prepare and offer food via delivery service, pick-up, or drive-thru must comply with the following procedures:
        i. **Containers required.** All food must be completely contained in a suitable container before being transferred to a customer. For example,

EX03-228

ice cream cones are not allowed; ice cream scoops in a covered container are allowed. A slice of pizza on a paper plate is not allowed; a slice of pizza in a covered box or securely wrapped in aluminum foil is allowed.

ii. **Facial covers required.** "Facial covers" means a cloth cover that fully covers the tip and nostrils of the nose and the mouth. All food workers shall wear protective facial covering while engaged in food preparation, serving, and kitchen maintenance activities. Facial covers shall be provided by the employer and shall be maintained in a clean and sanitary manner.

iii. **Must consume food away from premises.** The exception for take-out food activities is designed to enable persons who are confined to their places of residence to obtain prepared food to take back to their places of residence for consumption. The take-out food shall not be consumed anywhere within the line-of-sight of a person standing in front of the facility that sold the food. No on-site dining, whether inside or outside (including shared patios, courtyards, or food courts) is permitted. Facilities shall remove, rearrange, or otherwise make unavailable for use all tables, chairs, or other customer seating, or dining fixtures on their premises.

c. **Six-foot spacing must be maintained.** Licensed food facilities that provide and offer food to consumers for pick up must require patrons who are ordering food and beverages to be and remain at least six (6) feet apart from each other while inside the facility. All persons waiting in line or otherwise congregating outside a food facility selling food via take-out, delivery, or drive- thru shall maintain a distance of at least six feet from all other persons. Food facilities shall be responsible for assuring that the six-foot social distancing requirement is observed at all times.

d. **Violators subject to permit suspension.** Food facilities not adhering to this Order may be subject to immediate permit suspension and mandatory closure for the duration of this Order, including extensions of this Order.

16. <u>Food Facility and Restaurants: Dine-In:</u>

    a. <u>All licensed food facilities, as defined by Section 1133789 of the Health and Safety Code, (referred to as food facility or food facilities) may only prepare or offer food dine-in services in conformance with the requirements and standards specified in California Department of Health COVID-19 Industry Guidance: Dine in Restaurants dated May 12, 2020, attached hereto as Attachment J and incorporated by this reference.</u>

    b. <u>**Attestation and self-certification:** A food facility or food facilities may offer dine-in service only after completing the self-certification described in Section 6 of this Order.</u>

    c. <u>**Violators subject to permit suspension.** Food facilities not adhering to the this Order may be subject to immediate permit suspension and mandatory closure for the duration of this Order, including extensions of this Order.</u>

17. **Golf Courses, Public and Private:** to provide accommodations for persons who wish to golf as a form of outdoor activity, public and private golf courses may

operate provided they strictly enforce social distancing requirements and enforce the following additional protocols:

   a. Only single occupant motorized carts are allowed and each cart must be sanitized before next use;

   b. No more than four golfers are allowed per group and each group must be stable (i.e., persons may not substitute in or out of the group);

   c. A distance of at least 30 feet shall be maintained between groups of golfers at all times;

   d. All ball washers shall be covered and flag pins shall be removed and the cup on each green shall be inverted or otherwise installed to eliminate high-frequency touch services on the greens and tees;

   e. Persons may use a driving range provided that range balls are properly sanitized before distribution to customers (stand-alone golf driving ranges may also operate);

   f. Practice putting greens shall remain closed;

   g. The "Pro Shop" or similar facility designed for the sale of golf-related equipment and supplies can be opened upon self-certification; and

   h. The snack shop(s) and restaurant(s) can be opened for in-room dining, in accordance with Food Facilities and Restaurant Restrictions referenced in this Attachment B, Section 16.

18. Gun Shops and shooting range

19. Home and furnishing stores

20. Hotels and motels, bed and breakfasts, agricultural homestays and short-term rentals for occupancy related to defined essential business, not vacation or leisure.

21. Housekeeping, janitorial, and sanitation services

22. Jewelry stores

23. Landscape services

24. Music stores

25. Pawn Shops

26. Second hand and thrift stores

27. Shoe stores

28. Sporting goods stores

29. **Swimming Pools and Spas Outdoors Only:**

   a. Regardless of the size or volume of a pool, public pools and spas located outdoors, including those in a home owner's association (HOA), apartment complex, hotel, motel, country or private club, county or city pool, and gym or fitness club may allow individuals of a single living unit at one time (one household at a time), limited to six individuals from the single living unit, to swim, or to use the deck area and pool restrooms and showers.

   b. Notwithstanding the one living unit per pool restriction described above, pools with clearly delineated lanes for swimming laps may allow one swimmer in

each lane; lap swimmers must observe social distancing of at least 6 feet from individuals from other households at all times, and lounging on deck or in the pool enclosure shall not be permitted when individuals from more than one living unit are using the lap pool. Lanes for swimming shall be of standard width and be clearly marked by approved means.

c. A community center, gym, or fitness club with a pool or spa must keep all other areas closed in compliance with this Order.

d. Medical or therapy pools that provide medically prescribed, medically necessary supervised therapy may continue to operate. Therapy sessions should employ social distancing standards of at least six feet at all times possible.

e. Public and semi-public pools and spas located indoors must remain closed.

f. Deck or pool enclosure furniture including tables, chairs, benches and chaise lounges shall be removed, roped off, or otherwise rendered unusable by pool users.

g. The pool operator shall comply with the Social Distancing Protocols required in this Order, and shall arrange for frequent cleaning and disinfection of high-touch surfaces at the pool, including handrails, grab rails, gate latches, locks, and restroom and shower fixtures.

h. Pools and spas located at a single-family residence, which shall be used only by members of the household residing at the single-family residence, may remain open.

i. Splash pads, saunas and steam rooms shall remain closed, except for those located at a single-family residence and used only by members of the household residing at the single-family residence.

30. Smoke and tobacco shops; and on-site smoking lounges

31. Real estate sales and marketing: Upon self-certification, limited open houses with individual groups of no more than 5 from the same living unit and the realtor inside at one time

32. Rideshare, taxis, Uber, Lyft may transport non-symptomatic riders only; must provide social distancing of six or more feet including while in the vehicle; must follow recommended cleaning/precautions for sanitizing following each ride.

33. Recyclers, including electronics recyclers

34. Schools: public and private distance learning and/or administration only.

a. Graduations may be provided through streaming or other technology; or

b. Outdoor graduations may be provided in person if all of the following protocols are followed:

i. All activity must occur outdoors. Inside ceremonies are prohibited;

ii. All persons attending the activity must be inside a motor vehicle occupied only by persons from the same household or living unit, not exceeding five persons;

iii. All motor vehicles at the gathering must maintain at least a minimum distance of six feet from all other vehicles;

    iv. All persons must remain in the vehicle in which they arrived at all times during the event;

    v. No restroom facilities shall be made available to persons at the facility during the event; and

    vi. No tangible items of any kind, including food products, may be transferred to persons in the motor vehicles.

  c. Notwithstanding the above, one or more persons, not exceeding five, may enter nearby buildings as necessary to put on the presentation.

  d. Protection against COVID-19:

    i. Vulnerable individuals shall not attend.

    ii. Individuals with symptoms of COVID-19 as described in Attachment D of this Order, as well as individuals who should self-isolate due to exposure to a COVID-19 case or a positive COVID-19 test, shall not attend.

    iii. Nothing shall be handed out such as diplomas, awards, medals, programs.

    iv. Sharing or exchanging materials of any kind must not occur for example throwing graduation caps, "sign-in" practices, gifts, flowers.

35. <u>Swap meet and flea markets</u>

36. **Tennis and/or pickleball Outdoors Only**: to provide accommodations for persons who wish to play tennis and/or pickleball as a form of outdoor activity, public and private tennis and pickleball courts may operate, provided that individuals strictly follow social distancing requirements and the following additional protocols:

  a. Only outdoor courts may operate.

  b. <u>Clubhouses, pro shops, lounge areas, spectator seating, and other parts of the club or courts are allowed to operate upon self-certification.</u>

  c. Types of play allowed:

    i. Singles play (two individuals on the court at one time) may be played with people from the same household or living unit or with people from different households.

    ii. Doubles play (four individuals on the court at one time) shall only be played with individuals residing in the same household or living unit. Individuals residing in separate households are restricted to singles play only.

  d. Protection against COVID-19:

    i. Individuals with symptoms of COVID-19 as described in Attachment D of this Order, as well as individuals who should self-isolate due to exposure to a COVID-19 case or a positive COVID-19 test, shall not play.

    ii. Wash hands or use an alcohol-based hand sanitizer (consisting of at least 60% alcohol) before and after play.

    iii. Disinfect equipment and shared surfaces (such as gate or enclosure handles, racquets, ball containers, water bottles) before and after play. Do not share racquets or any other equipment such as wristbands, grips, hats or towels.

     iv. Players from different households should provide their own tennis or pickleball balls, and should avoid touching or handling tennis or pickleball balls brought or touched by players from other households.

    e. Congregating in or around the courts is not allowed. Players shall arrive and depart from the courts promptly. Benches, tables and chairs located at the courts must be removed or otherwise made unavailable for use.

    f. On-site consumption of food is allowed. Drinking fountains shall be closed or made unavailable for use. Players may supply their own drinking water for use during play.

    g. Players shall maintain the required minimum 6 feet of physical distancing between players at all times.

37.   Toy stores

38.   Trophy shops and trophy businesses

# ATTACHMENT C

## HEALTH OFFICER ORDER NO. 2020-8.2
## COUNTY OF SANTA BARBARA

# Businesses that Must Close Physical Locations

1. Amphitheaters, concert halls, performing arts centers
2. Amusement parks
3. Arcades
4. Arenas
5. Art galleries
6. Banquet halls
7. Barbers, hair salons, and hairstylists
8. Bars that do not serve food
9. Body piercing parlors and body art facilities
10. Bowling alleys
11. Casinos and cardrooms
12. Climbing gyms
13. Dance halls or studios, dances
14. Day spas and massage parlors, except those required for medical necessity
15. Fairs, public exhibitions
16. <u>Fitness centers, gyms, community centers</u>
17. Health clubs, yoga centers, martial arts studios
18. Historical sites
19. Libraries
20. Live performance venues
21. <u>Movie theaters</u>
22. Museums
23. Music events, concerts
24. Nail salons, manicurist, and pedicurist, except those required for medical necessity, such as treatment for diabetes, or persons taking prescribed blood thinners
25. Nightclubs that do not serve food
26. Pool and billiards lounges
27. Private social clubs
28. Raceways
29. Recreation Centers
30. Rodeos, public equestrian events
31. Roller skating rinks, roller derby

32. Sports stadiums and facilities
33. Tattoo parlors, tattoo businesses, tattoo artists
34. Trampoline and bounce houses
35. Water parks and aquatic centers, unless able to meet requirements described in Attachment B, section 24 swimming pools. Diving boards, slides, flumes, splashpads, or other water attractions must remain closed.
36. **Wineries, breweries, and tap rooms, except for:**
    a. Venues that as of March 16, 2020 were authorized to provide off sale beer and wine to be consumed off premises; or
    b. Venues that include meals provided by a full kitchen should follow Sections for Food Facilities and Restaurant Requirements and food preparation facilities.
37. Zoos

ATTACHMENT D

~ HEALTH OFFICER ORDER NO. 2020-8.2
COUNTY OF SANTA BARBARA

# COVID-19 SELF-EVALUATION

The County Health Officer has defined COVID-19 symptoms as follows:

Mild to Moderate Symptoms Related to or
Other Respiratory Illness such as:

Sore Throat

Runny Nose

Fever

Chills

Not Feeling Well

Sneezing

Coughing

Gastro-Intestinal symptoms such as:

Soft Stool

Stomach Cramps

Loss of smell and/or taste

EX03-236

# ATTACHMENT E

## Social Distancing Protocol

**Businesses need to complete Social Distancing Protocol or similar COVID- 19 protection plan described in CDPH industry guidance and checklists required by the state for all businesses prior to reopening.**

Business name: _____ Facility Address: _____

Approximate gross square footage of space open to the public: _____

**Defined essential businesses <u>and defined lower-risk businesses</u> must implement all applicable measures listed below, and be prepared to explain why any measure that is not implemented is inapplicable to the defined essential business or defined lower-risk business.**

### *Signage:*

☐ Signage at each public entrance of the facility to inform all employees and public that they should: avoid entering the facility if they have a cough or fever; maintain a minimum six-foot distance from one another; sneeze and cough into a cloth or tissue or, if not available, into one's elbow; and not shake hands or engage in any unnecessary physical contact.

☐ Signage posting a copy of the Social Distancing Protocol at each public entrance to the facility.

### *Measures To Protect Employee Health (check all that apply to the facility):*

☐ Everyone who can carry out their work duties from home has been directed to do so.

☐ All employees have been told not to come to work if sick.

☐ All desks or individual work stations are separated by at least six feet.

☐ Break rooms, bathrooms, and other common areas are being disinfected frequently, on the following schedule:

    ☐ Break rooms: _____

    ☐ Bathrooms: _____

    ☐ Other: _____

☐ Disinfectant and related supplies are available to all employees at the following location(s):

    ☐ Hand sanitizer effective against COVID-19 is available to all employees at the following location(s): _____

    ☐ Soap and water are available to all employees at the following location(s): _____

    ☐ Copies of this Protocol have been distributed to all employees.

    ☐ Optional—Describe other measures: _____

### *Measures To Prevent Crowds From Gathering (check all that apply to the facility):*

☐ Limit the number of public in the store at any one time to _____, which allows for public and employees to easily maintain at least six-foot distance from one another at all practicable times.

☐ Post an employee at the door to ensure that the maximum number of persons in the facility set forth above is not exceeded.

*Health Officer Order 2020-8.2, County of Santa Barbara*
*Attachment E*

☐ Placing per-person limits on goods that are selling out quickly to reduce crowds and lines. Explain: _____

☐ Optional—Describe other measures: _____

### Measures To Keep People At Least Six Feet Apart (check all that apply to the facility)

☐ Placing signs outside the store reminding people to be at least six feet apart, including when in line.

☐ Placing tape or other markings at least six feet apart in customer line areas inside the store and on sidewalks at public entrances with signs directing customers to use the markings to maintain distance.

☐ Separate order areas from delivery areas to prevent persons from gathering.

☐ All employees have been instructed to maintain at least six feet distance from the public and from each other, except employees may momentarily come closer when necessary to accept payment, deliver goods or services, or as otherwise necessary.

☐ Optional—Describe other measures: _____

### Measures To Prevent Unnecessary Contact (check all that apply to the facility):

☐ Preventing people from self-serving any items that are food-related.

   ☐ Lids for cups and food-bar type items are provided by staff; not to customers to grab.

   ☐ Bulk-item food bins are not available for self-service use.

☐ Not permitting customers to bring their own bags, mugs, or other reusable items from home.

☐ Providing for contactless payment systems or, if not feasible, sanitizing payment systems regularly. Describe: _____

☐ Optional—Describe other measures (e.g. providing senior-only hours): _____

### Measures To Increase Sanitization (check all that apply to the facility):

☐ Disinfecting wipes that are effective against COVID-19 are available near shopping carts and shopping baskets.

☐ Employee(s) assigned to disinfect carts and baskets regularly.

☐ Hand sanitizer, soap and water, or effective disinfectant is available to the public at or near the entrance of the facility, at checkout counters, and anywhere else inside the store or immediately outside where people have direct interactions.

☐ Disinfecting all payment portals, keypads, pens, and styluses after each use.

☐ Disinfecting all high-contact surfaces frequently.

☐ Optional—Describe other measures: _____

Any additional measures not included here should be listed on separate pages, which the business should attach to this document.

You may contact the following person with any questions or comments about this protocol:

Name: _____   Phone number: _____

*Health Officer Order 2020-8.2, County of Santa Barbara*
*Attachment E*

EX03-238

ATTACHMENT J
HEALTH OFFICER ORDER NO. 2020-8.2
DINE-IN RESTAURANT GUIDE



# COVID-19 INDUSTRY GUIDANCE: Dine-In Restaurants

May 12, 2020

covid19.ca.gov

# OVERVIEW

On March 19, 2020, the State Public Health Officer and Director of the California Department of Public Health issued an order requiring most Californians to stay at home to disrupt the spread of COVID-19 among the population.

The impact of COVID-19 on the health of Californians is not yet fully known. Reported illness ranges from very mild (some people have no symptoms) to severe illness that may result in death. Certain groups, including people aged 65 or older and those with serious underlying medical conditions, such as heart or lung disease or diabetes, are at higher risk of hospitalization and serious complications. Transmission is most likely when people are in close contact with an infected person, even if that person does not have any symptoms or has not yet developed symptoms.

Precise information about the number and rates of COVID-19 by industry or occupational groups, including among critical infrastructure workers, is not available at this time. There have been multiple outbreaks in a range of workplaces, indicating that workers are at risk of acquiring or transmitting COVID-19 infection. Examples of these workplaces include long-term care facilities, prisons, food production, warehouses, meat processing plants, and grocery stores.

As stay-at-home orders are modified, it is essential that all possible steps be taken to ensure the safety of workers and the public.

Key prevention practices include:
- ✓ physical distancing to the maximum extent possible,
- ✓ use of face coverings by employees (where respiratory protection is not required) and customers/clients,
- ✓ frequent handwashing and regular cleaning and disinfection,
- ✓ training employees on these and other elements of the COVID-19 prevention plan.

In addition, it will be critical to have in place appropriate processes to identify new cases of illness in workplaces and, when they are identified, to intervene quickly and work with public health authorities to halt the spread of the virus.

# PURPOSE

This document provides guidance for dine-in restaurants, brewpubs, craft distilleries, breweries, bars, pubs, and wineries to support a safe, clean environment for workers and customers. The guidance is not intended to revoke or repeal any employee rights, either statutory, regulatory or collectively bargained, and is not exhaustive, as it does not include county health orders, nor is it a substitute for any existing safety and health-related regulatory requirements such as those of Cal/OSHA.[1] Stay current on changes to public health guidance and state/local orders as the COVID-19 situation continues. Cal/OSHA has more comprehensive guidance on their Cal/OSHA Interim General Guidelines on Protecting Workers from COVID-19 webpage. The U.S. Food and Drug Administration has guidance for restaurants and the CDC has additional requirements in their guidance for businesses and employers.

- Brewpubs, breweries, bars, pubs, craft distilleries, and wineries should remain closed until those establishments are allowed to resume modified or full operation **unless they are offering sit-down, dine-in meals. Alcohol can only be sold in the same transaction as a meal.**

- Dine-in restaurants, brewpubs, breweries, bars, pubs, craft distilleries, and wineries that provide sit-down meals should follow the restaurant guidance below and should continue to **encourage takeout and delivery service whenever possible.**

- Brewpubs, breweries, bars, pubs, craft distilleries, and wineries that do not provide sit-down meals themselves, but can contract with another vendor to do so, can serve dine-in meals provided both businesses follow the guidance below and alcohol is only sold in the same transaction as a meal.

- Venues that are currently authorized to provide off sale beer, wine, and spirits to be consumed off premises and do not offer sit-down, dine-in meals should follow the guidance for retail operations and offer curbside sales only, until local and/or statewide rules allow additional retail activity.

- Producers of beer, wine, and spirits should follow the guidance for manufacturing operations.

- This guidance is not intended for concert, performance, or entertainment venues. Those types of establishments should remain closed until they are allowed to resume modified or full operation through a specific reopening order or guidance. Establishments that serve full meals must discontinue this type of entertainment until these types of activities are allowed to resume modified or full operation.

3

EX03-241



# Workplace Specific Plan

- Establish a written, worksite-specific COVID-19 prevention plan at every location, perform a comprehensive risk assessment of all work areas, and designate a person at each establishment to implement the plan.

- Identify contact information for the local health department where the restaurant is located for communicating information about COVID-19 outbreaks among employees or customers.

- Train and communicate with employees and employee representatives on the plan.

- Regularly evaluate the establishment for compliance with the plan and document and correct deficiencies identified.

- Investigate any COVID-19 illness and determine if any work-related factors could have contributed to risk of infection. Update the plan as needed to prevent further cases.

- Identify close contacts (within six feet for 15 minutes or more) of an infected employee and take steps to isolate COVID-19 positive employee(s) and close contacts.

- Adhere to the guidelines below. Failure to do so could result in workplace illnesses that may cause operations to be temporarily closed or limited.



# Topics for Employee Training

- Information on COVID-19, how to prevent it from spreading, and which underlying health conditions may make individuals more susceptible to contracting the virus.

- Self-screening at home, including temperature and/or symptom checks using CDC guidelines.

- The importance of not coming to work if employees have a frequent cough, fever, difficulty breathing, chills, muscle pain, headache, sore throat, recent loss of taste or smell, or if they or someone they live with have been diagnosed with COVID-19.

- To seek medical attention if their symptoms become severe, including persistent pain or pressure in the chest, confusion, or bluish lips or face. Updates and further details are available on CDC's webpage.

4

EX03-242

- The importance of frequent handwashing with soap and water, including scrubbing with soap for 20 seconds (or using hand sanitizer with at least 60% ethanol or 70% isopropanol when employees cannot get to a sink or handwashing station, per CDC guidelines).

- The importance of physical distancing, both at work and off work time (see Physical Distancing section below).

- Proper use of face coverings, including:

  o Face coverings do not protect the wearer and are not personal protective equipment (PPE).

  o Face coverings can help protect people near the wearer, but do not replace the need for physical distancing and frequent handwashing.

  o Employees should wash or sanitize hands before and after using or adjusting face coverings.

  o Avoid touching the eyes, nose, and mouth.

  o Face coverings should be washed after each shift.

- Information on employer or government-sponsored leave benefits the employee may be entitled to receive that would make it financially easier to stay at home. See additional information on government programs supporting sick leave and worker's compensation for COVID-19, including employee's sick leave rights under the Families First Coronavirus Response Act and the Governor's Executive Order N-51-20, and employee's rights to workers' compensation benefits and presumption of the work-relatedness of COVID-19 pursuant to the Governor's Executive order N-62-20.



# Individual Control Measures and Screening

- Provide temperature and/or symptom screenings for all workers at the beginning of their shift and any vendors, contractors, or other workers entering the establishment. Make sure the temperature/symptom screener avoids close contact with workers to the extent possible. Both screeners and employees should wear face coverings for the screening.

- If requiring self-screening at home, which is an appropriate alternative to providing it at the establishment, ensure that screening was performed prior to the worker leaving the home for their shift and follows CDC guidelines, as described in the Topics for Employee Training section above.

5

EX03-243

- Encourage workers who are sick or exhibiting symptoms of COVID-19 to stay home.

- Employers should provide and ensure workers use all required protective equipment, including face coverings and gloves where necessary.

- Employers should consider where disposable glove use may be helpful to supplement frequent handwashing or use of hand sanitizer; examples are for workers who are screening others for symptoms or handling commonly touched items. Workers should wear gloves when handling items contaminated by body fluids.

- Face coverings are strongly recommended when employees are in the vicinity of others. Workers should have face coverings available and wear them when at work, in offices, or in a vehicle during work-related travel with others. Face coverings must not be shared.

- Establishments must take reasonable measures, including posting signage in strategic and highly-visible locations, to remind the public that they should use face coverings and practice physical distancing while waiting for service and take-out.

- Servers, bussers, and other workers moving items used by customers (dirty cups, plates, napkins, etc.) or handling trash bags should use disposable gloves (and wash hands before putting them on and after removing them) and provide aprons and change frequently.

- Dishwashers should use equipment to protect the eyes, nose, and mouth from contaminant splash using a combination of face coverings, protective glasses, and/or face shields. Dishwashers must be provided impermeable aprons and change frequently. Reusable protective equipment such as shields and glasses should be properly disinfected between uses.

 ## Cleaning and Disinfecting Protocols

- Perform thorough cleaning in high traffic areas, such as customer waiting areas and lobbies, break rooms, lunch areas and areas of ingress and egress including host stands, entry ways, stairways, stairwells, escalators, handrails, and elevator controls. Frequently disinfect commonly used surfaces including doors, door handles, crash bars, light switches, waiting area chairs, credit card terminals, ATM PIN pads, receipt trays, bus tubs, serving trays, water pitcher handles, phones, toilets, and handwashing facilities.

6

- Frequently clean items touched by patrons, especially those that might attract contact from children including candy and toy vending machines, decorative fish tanks, display cases, decorative fountains, etc.

- Clean touchable surfaces between shifts or between users, whichever is more frequent, including but not limited to working surfaces, phones, registers, touchpads/touchscreens, tablets, timeclocks, appliances, kitchen and bar utensils and implements, oven doors, grill and range knobs, carts and trolleys, keys, etc.

- Avoid sharing audio equipment, phones, tablets, laptops, desks, pens, and other work supplies wherever possible. Never share PPE.

- Discontinue shared use of audio headsets and other equipment between employees unless the equipment can be properly disinfected after use. Consult equipment manufacturers to determine appropriate disinfection steps, particularly for soft, porous surfaces such as foam earmuffs.

- Provide time for workers to implement cleaning practices during their shift. Cleaning assignments should be assigned during working hours as part of the employees' job duties.

- Procure options for third-party cleaning companies to assist with the increased cleaning demand, as needed.

- Equip spaces such as dining rooms, bar areas, host stands, and kitchens with proper sanitation products, including hand sanitizer and sanitizing wipes to all staff directly assisting customers.

- Ensure that sanitary facilities stay operational and stocked at all times and provide additional soap, paper towels, and hand sanitizer when needed.

- When choosing cleaning chemicals, employers should use products approved for use against COVID-19 on the Environmental Protection Agency (EPA)-approved list and follow product instructions. Use disinfectants labeled to be effective against emerging viral pathogens, diluted household bleach solutions (5 tablespoons per gallon of water), or alcohol solutions with at least 70% alcohol that are appropriate for the surface. Provide employees training on manufacturer's directions and Cal/OSHA requirements for safe use. Workers using cleaners or disinfectants should wear gloves as required by the product instructions.

- Restaurants should increase fresh air circulation by opening windows or doors, if possible to do so.

- Consider installing portable high-efficiency air cleaners, upgrading the building's air filters to the highest efficiency possible, and making other modifications to increase the quantity of outside air and ventilation in all working areas.

7

EX03-245

- Provide disposable menus to guests and make menus available digitally so that customers can view on a personal electronic device, if possible. If disposable menus cannot be provided, properly disinfect menus before and after customer use. Consider options for customers to order ahead of time.

- Discontinue pre-setting tables with napkins, cutlery, glassware, food ware, etc. These should be supplied individually to customers as needed. Do not leave card stands, flyers, napkin holders, or other items on tables.

- Suspend use of shared food items such as condiment bottles, salt and pepper shakers, etc. and provide these foods in single serve containers, if possible. Where this is not possible, shared items such as condiment bottles, shakers, etc., should be supplied as needed to customers and disinfected after each use.

- Pre-roll utensils in napkins prior to use by customers. Employees must wash hands before pre-rolling utensils in napkins. The pre-roll should then be stored in a clean container. After customers are seated, the pre-roll should be put on the table by an employee who recently washed their hands.

- Reusable customer items including utensils, food ware, breadbaskets, etc., must be properly washed, rinsed, and sanitized. Cleaned flatware, stemware, dishware, etc., must be properly stored away from customers and personnel until ready for use. Use disposable items if proper cleaning of reusable items is infeasible.

- Takeout containers must be filled by customers and available only upon request.

- Dirty linens used at dining tables such as tablecloths and napkins should be removed after each customer use and transported from dining areas in sealed bags. Employees should wear gloves when handling dirty linens.

- Thoroughly clean each customer dining location after every use. This will include disinfecting tables, chairs, booster seats, highchairs, booths, etc. and allowing adequate time for proper disinfection, following product instructions. Many EPA-approved disinfectants require minimal contact time (seconds to one minute) against human coronavirus.

- Close areas where customers may congregate or touch food or food ware items that other guests may use. Provide these items to guests individually and discard or clean and disinfect after each use, as appropriate. This includes but is not limited to:

    o Self-service areas with condiment caddies, utensil caddies, napkins, lids, straws, water pitchers, to-go containers, etc.

8

- o Self-service machines including ice, soda, frozen yogurt dispensers, etc.

- o Self-service food areas such as buffets, salsa bars, salad bars, etc.

- Discontinue tableside food preparation and presentation such as food item selection carts and conveyor belts, guacamole preparation, etc.

- Do not leave out after-meal mints, candies, snacks, or toothpicks for customers. Offer them with the check or provide only on request.

- Install hand sanitizer dispensers, touchless if possible, at guest and employee entrances and contact areas such as driveways, reception areas, in dining rooms, near elevator landings, etc.

- Discontinue use of shared entertainment items such as board games, pool tables, arcade games, vending machines, etc. Close game and entertainment areas where customers may share items such as bowling alleys, etc.

- Continue to follow existing codes regarding requirements for sanitizing (rather than disinfecting) food contact surfaces.



# Physical Distancing Guidelines

- Prioritize outdoor seating and curbside pickup to minimize cross flow of customers in enclosed environments. Restaurants can expand their outdoor seating, and alcohol offerings in those areas, if they comply with local laws and regulations.

- Provide takeout, delivery, and drive through options for customers when possible.

- Encourage reservations to allow for time to disinfect restaurant areas and provide guidance via digital platforms if possible to customers for physical distancing while at the restaurant.

- Consider allowing dine-in customers to order ahead of time to limit the amount of time spent in the establishment.

- Ask customers to wait in their cars or away from the establishment while waiting to be seated. If possible, alert patrons through their mobile phones when their table is ready to avoid touching and use of "buzzers."

- Implement measures to ensure physical distancing of at least six feet between workers and customers. This can include use of physical partitions or visual cues (e.g., floor markings or signs to indicate to where employees and/or guests should stand).

9

- Install physical barriers or partitions at cash registers, bars, host stands, and other areas where maintaining physical distance of six feet is difficult.

- Any area where guests or employees queue should also be clearly marked for appropriate physical distancing. This includes check-stands and terminals, deli counters and lines, restrooms, elevator lobbies, host stands and waiting areas, valet drop off and pickup, and any other area where customers congregate.

- Physical distancing protocols should be used in any office areas, kitchens, pantries, walk-in freezers, or other high-density, high-traffic employee areas. Face coverings are required where employees cannot maintain physical distancing including in kitchens, storage areas, etc.

- Employee pre-shift meetings and trainings should be conducted virtually or in areas that allow for appropriate physical distancing between employees. Food, beverages, food ware, etc., should not be shared.

- Stagger employee breaks, in compliance with wage and hour regulations, to maintain physical distancing protocols.

- Consider offering workers who request modified duties options that minimize their contact with customers and other employees (e.g., managing inventory rather than working as a cashier or managing administrative needs through telework.

- Reconfigure office spaces, lobbies, beverage bars, kitchens and workstations, host stand areas, and other spaces wherever possible to allow for at least six feet of distance between people dining, working, and passing through areas for entry and exit.

- Remove tables and chairs from dining areas so that six feet of physical distance can be maintained for customers and employees. If tables, chairs, booths, etc., cannot be moved, use visual cues to show that they are not available for use or install Plexiglas or other types of impermeable physical barriers to minimize exposure between customers.

- Bar areas should remain closed to customers.

- Discontinue seating of customers where customers cannot maintain six feet of distance from employee work and food and drink preparation areas.

- Adjust maximum occupancy rules inside the establishment based on its size to limit the number of people inside and/or use impermeable barriers between service tables to protect customers from each other and employees. For outdoor seating, maintain physical distancing standards outlined above.

- Limit the number of patrons at a single table to a household unit or patrons who have asked to be seated together. People in the same

10

EX03-248

party seated at the same table do not have to be six feet apart. All members of the party must be present before seating and hosts must bring the entire party to the table at one time.

- Limit the number of employees serving individual parties, in compliance with wage and hour regulations.

- Face coverings are strongly encouraged for all employees, however, they are required for any employee (e.g., server, manager, busser, food runner, etc.) who must be within six feet of customers. All restaurant workers should minimize the amount of time spent within six feet of guests.

- Close breakrooms, use barriers, or increase distance between tables/chairs to separate workers and discourage congregating during breaks. Where possible, create outdoor break areas with shade covers and seating that ensures physical distancing.

- Reconfigure kitchens to maintain physical distancing in those areas where practical and if not practical staggers shifts if possible to do work ahead of time.

- Discourage food preparation employees from changing or entering others' work stations during shifts.

- Discourage employees from congregating in high traffic areas such as bathrooms, hallways, bar areas, reservation and credit card terminals, etc.

- Establish directional hallways and passageways for foot traffic, if possible, to eliminate employees from passing by one another.

- Require employees to avoid handshakes and similar greetings that break physical distance.

- Eliminate person-to-person contact for delivery of goods whenever possible. Designate drop-off locations to receive deliveries away from high traffic areas. Maintain physical distance of at least six feet with delivery drivers.

- Guests should enter through doors that are propped open or automated, if possible. Hand sanitizer should be available for guests who must touch door handles.

- Implement peak period queueing procedures, including a host to remind guests to queue with at least six feet of distance between parties outside or in waiting areas.

- Employees should not open the doors of cars or taxis.

- Takeout food items should be made available using contactless pick-up and delivery protocols.

11



- Avoid touching others' pens and clipboards. If possible, install transfer-aiding materials, such as shelving and bulletin boards, to reduce person-to-person hand-offs.

# Considerations for Restaurants

- Display a set of clearly visible rules for customers and restaurant personnel at the restaurant entrance(s) that are to be o condition of entry. The rules could include instructions to use hand sanitizer, maintain physical distance from other customers, avoid unnecessary touching of restaurant surfaces, contact information for the local health department, and changes to restaurant services. Whenever possible, the rules should be available digitally, include pictograms, and included on/with menus.

- Guests and visitors should be screened for symptoms upon arrival, asked to use hand sanitizer, and to bring and wear a face covering when not eating or drinking. Appropriate signage should also be prominently displayed outlining proper face covering usage and current physical distancing practices in use at all entrances and throughout the property.

- Licensed restaurants may sell "to-go" alcoholic beverages, prepared drinks, and pre-mixed cocktails provided they are sold and delivered to customers in conjunction with the sale and delivery of a meal/meals.

---

[1]Additional requirements must be considered for vulnerable populations. Dine-in restaurants, breweries, brewpubs, craft distilleries, and wineries that provide meals must comply with all Cal/OSHA standards and be prepared to adhere to its guidance as well as guidance from the Centers for Disease Control and Prevention (CDC) and the California Department of Public Health (CDPH). Additionally, employers should be prepared to alter their operations as those guidelines change.



covid19.ca.gov

HEALTH OFFICER ORDER NO. 2020-12.3
COUNTY OF SANTA BARBARA

FOR THE CONTROL OF COVID-19
PHASED REOPENING WITHIN SANTA BARBARA COUNTY

Health Officer Order No. 2020-12.3 Supersedes and Replaces Health Officer Order
No. 2020-12.2

Effective Date: July 2, 2020, 5:00 p.m. PDT

(Changes are underlined.)

Please read this Order carefully. Violation of or failure to comply with this Order may
constitute a misdemeanor punishable by fine of up to $1,000, imprisonment, or both.
(Health and Safety Code §§ 101029, 120295 et seq.) Violators are also subject to civil
enforcement actions including fines or civil penalties per violation per day, injunctive relief,
and attorneys' fees and costs.

This Health Officer Order No. 2020-12.3 supersedes and replaces Health Officer Order
No. 2020-12.2 that was effective July 1, 2020. Nothing in this Health Officer Order No.
2020-12.3 supersedes State Executive Orders or State Heath Officer Orders. COVID-19
industry specific guidance provided by the California Department of Public Health is
available at: https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Guidance.aspx#

Summary: This Health Officer Order orders the closure of all brewpubs, breweries,
bars, and pubs, both indoors and outdoors. Certain additional industries that are
listed in Attachment A must cease indoor operations, but may continue to operate
outdoors if they are able to and must follow industry-specific State guidance
including the use of face coverings and social distancing. Businesses that must
stay closed and are not allowed to reopen physical locations at this time are listed
in the Attachment A. This Order reaffirms the reopening of some, but not all,
Businesses (as defined) within the County of Santa Barbara. Businesses allowed
to reopen must comply with requirements to protect against COVID-19 and social
distancing.

WHEREAS, on March 4, 2020, Governor Newsom declared a state of emergency for
conditions caused by a novel coronavirus, COVID-19, and on March 11, 2020, the World
Health Organization declared COVID-19 a global pandemic, and on March 12, 2020, the
County of Santa Barbara declared a local emergency and a local health emergency in
relation COVID-19 in the community; and

WHEREAS, in the County of Santa Barbara as well as throughout California and the
nation, there are insufficient quantities of critical healthcare infrastructure, including
hospital beds, ventilators and workers, capable of adequately treating mass numbers of
patients at a single time – should the virus spread unchecked; and

WHEREAS, in direct response to the lack of healthcare infrastructure, governments
across the nation are taking actions to slow the spread of COVID-19 in order to "flatten

EX03-251

the curve" of infection and reduce the numbers of individuals infected at any one time by minimizing situations where the virus can spread; and

WHEREAS, in furtherance of this effort, on March 19, 2020, Governor Newsom issued Executive Order N-33-20 requiring all persons residing in the State to remain in their homes or places of residence, except as needed to maintain the continuity of operations for critical infrastructure (the "State Stay-at-Home Order"); and
WHEREAS, also on March 19, 2020, the State Public Health Officer ordered all individuals living in the State of California to stay home or at their place of residence, except as needed to maintain continuity of operations for the federal critical infrastructure sectors, which was updated on March 28, 2020; and

WHEREAS, on March 20, 2020, the State Public Health Officer designated a list of Essential Critical Infrastructure Workers, to help state, local, tribal, and industry partners as they work to protect communities, while ensuring continuity of functions critical to protect public health and safety, which was updated on March 22, 2020; and

WHEREAS, on May 4, 2020, Governor Newsom issued Executive Order N-60-20 to allow reopening of lower-risk businesses and spaces ("Stage Two"), and then to allow reopening of higher-risk businesses and spaces ("Stage Three") and to allow a County to pursue a variance to move further into the stages upon notification and certification of a written attestation to the California Department of Public Health (CDPH); and

WHEREAS on May 7, 2020, the State Public Health Officer ordered that upon certification a County may move through the stages of reopening at their own pace as long as the sectors are given guidance from the State about reopening requirements; and

WHEREAS, on May 20, 2020, the CDPH approved and posted to the State's website the County of Santa Barbara's Variance Attestation allowing the County to move through the stages; and

WHEREAS, the CDPH issued guidance regarding various businesses and activities including for places of worship and providers of religious services and cultural ceremonies, hair salons and barbershops, schools and school-based programs; childcare; day camps; casinos operated by sovereign tribal nations; music, film and television production; professional sports without live audiences; campgrounds, RV Parks and outdoor recreation; hotels; cardrooms, satellite wagering facilities and racetracks; family entertainment centers; restaurants, bars and wineries; fitness facilities, museums, zoos, aquariums and galleries; extended personal care services; and

WHEREAS, on July 1, 2020, CDPH instructed counties which have been on State's County Monitoring list for more than three consecutive days to immediately close all bars, breweries, pubs and brewpubs, as well as indoor operations of Businesses for specified industries and sectors. As of July 1, 2020, the County of Santa Barbara has been on the State's County Monitoring list for 16 days. Therefore, this Order is closing indoor and outdoor bars, breweries, brewpubs and pubs, as well as the indoor Businesses for specified industries and sectors. These Businesses have been found to promote the mixing of populations beyond households. The activities within these Businesses make

adherence to social distancing and consistently wearing a face covering difficult, all of which lead to an increase in community spread of COVID-19; and

WHEREAS, the County Health Officer finds: (1) the County has received repeated reports that some businesses have refused to comply with the State Stay-at-Home Order and State guidance; (2) the reported activities are inconsistent with the State Stay-at-Home Order and/or Stage Two or Stage Three of the California Resilience Roadmap; (3) guidance for businesses is required to prevent the potential increased spread of COVID-19 which would add strain to the County of Santa Barbara health care system; (4) without the guidance and restrictions described herein some businesses are likely to continue to impair efforts at mitigating the spread of the illness both within the County and statewide; and (5) distinctions made in this Order are to minimize the spread of COVID-19 that could occur through proximity and duration of contact between individuals; and

WHEREAS, the intent of this Order is to order businesses in the County of Santa Barbara regarding operations under the State Stay-at-Home Order and the Stage Two and Stage Three of the California Resilience Roadmap, and to slow the spread of COVID-19 to the maximum extent possible. All provisions of this Order should be interpreted to effectuate this intent.

**ACCORDINGLY, UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, TITLE 17 CALIFORNIA CODE OF REGULATIONS SECTION 2501, THE HEALTH OFFICER OF THE COUNTY OF SANTA BARBARA ORDERS:**

1. This Order 2020-12.3 is effective 5:00 p.m. (PDT) July 2, 2020 and continuing until 5:00 p.m. (PDT), on July 26, 2020 or until it is extended, rescinded, superseded, or amended in writing by the County of Santa Barbara Health Officer ("Health Officer"). This Order applies in the incorporated and unincorporated areas of Santa Barbara County ("County").

2. "Business" or "Businesses" for the purpose of this Health Officer Order is defined to mean any institution, establishment, public or private agency, for-profit, non-profit, or educational entity, whether an organization, corporate entity, partnership, or sole proprietorship.

3. All Businesses except those listed in Attachment A, as attached hereto and incorporated by this reference, may remain open or open, upon completion of, and in accordance with all of the following:
   a. Perform a detailed risk assessment including reviewing State and local guidance relevant to the Business and create a site-specific protection plan;
   b. Train employees about how to limit the spread of COVID-19 including how to screen themselves for COVID-19 symptoms and when to stay home. COVID-19 symptoms are described in Attachment B;
   c. Set up individual control measures and screenings;
   d. Put disinfection protocols in place;

EX03-253

      e. Observe "Face Covering" orders in effect from the local health officer and/or the California Department of Public Health;

      f. Complete the RISE attestation, including its social distancing protocol, and self-certification process at: https://recoverysbc.org/reopen-your-business/. (if a Business does not have access to the internet it can call 833-688-5551); and

      g. Post the self-certification at the Business location.

4. **Emergency Food Permit.** Wineries and tasting rooms that serve alcoholic beverages but that do not have an on-site permitted food facility and would like to serve food:

      a. Must obtain an Emergency Food Permit issued by the Santa Barbara County Health Department to temporarily serve food.

      b. A winery or tasting room in possession of an Emergency Food Permit issued by the Santa Barbara County Health Department may continue to temporarily serve food at their discretion, unless otherwise suspended, revoked, or terminated. (All brewpubs, breweries, bars, and pubs, both indoors and outdoors may not operate at this time regardless of an emergency food permit.)

      c. A winery or tasting room in possession of an Emergency Food Permit issued by the Santa Barbara County Health Department may cease operations of food service at their discretion, but in doing so may be subject to closure of the physical location.

5. Businesses that must keep physical locations closed are listed in Attachment A, as attached hereto and incorporated by this reference. Businesses listed in Attachment A may continue to provide services so long as those services can be provided remotely and without individuals physical present at the Business location, unless an exception applies. Maintenance to prevent property damage of the Businesses listed in Attachment A is allowed. This list may be amended from time to time, as required for our region's response to COVID-19.

**IN ADDITION TO THE ABOVE ORDER THE HEALTH OFFICER STRONGLY RECOMMENDS** that retailers designate specific hours of operation for their stores to accommodate populations at high risk of developing severe COVID-19 disease, such as persons over the age of 65 years.

This Order is issued as a result of the worldwide pandemic of COVID-19 which has infected at least 10,857,346 individuals worldwide, in 213 countries and territories, including 3,164 cases, and 29 deaths in the County, and is implicated in over 520,127 worldwide deaths.

This Order is issued based on evidence of continued community-based transmission of COVID-19 both within the County and worldwide, scientific evidence regarding the most effective approach to slow transmission of communicable diseases generally and COVID-19 specifically, as well as best practices as currently known and available to protect the public from the risk of spread of or exposure to COVID-19.

This Order is issued because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time.

This Order is intended to reduce the likelihood of exposure to COVID-19, thereby slowing the spread of COVID-19 in communities worldwide. As the presence of individuals increases, the difficulty and magnitude of tracing individuals who may have been exposed to a case rises exponentially.

This Order is issued in accordance with, and incorporates by reference: the March 4, 2020 Proclamation of a State Emergency issued by Governor Gavin Newsom; the March 12, 2020 Declaration of Local Health Emergency and Proclamation of Emergency based on an imminent and proximate threat to public health from the introduction of novel COVID-19 in the County; the March 17, 2020 Resolution of the Board of Supervisors ratifying the County Declaration of Local Health Emergency and Proclamation of Emergency regarding COVID-19; the guidance issued on March 11, 2020 by the California Department of Public Health regarding large gatherings of 250 people or more; Governor Gavin Newsom's Executive Order N-25-20 of March 12, 2020 preparing the State to commandeer hotels and other places of temporary residence, medical facilities, and other facilities that are suitable as places of temporary residence or medical facilities as necessary for quarantining, isolating or treating individuals who test positive for COVID-19 or who have had a high-risk exposure and are thought to be in the incubation period; the March 13, 2020 Presidential Declaration of a National Emergency due to the national impacts of COVID-19; the guidance issued on March 15, 2020 by the Centers for Disease Control and Prevention, the California Department of Public Health, and other public health officials through the United States and around the world recommending the cancellation of gatherings involving more than fifty (50) or more persons in a single space at the same time; the March 16, 2020 order of the State Public Health Officer prohibiting all gatherings with expected presence above ten (10) individuals; Governor Newsom's Executive Order N-33-20 of March 19, 2020 ordering all persons to stay at home to protect the health and well-being of all Californians and to establish consistency across the state in order to slow the spread of COVID-19; the March 22, 2020, Presidential Declaration of a Major Disaster in California beginning on January 20, 2020 under Federal Emergency Management Agency (FEMA) Incident DR-4482-CA; and, Governor Newsom's Executive Order N-60-20 of May 4, 2020 to allow reopening of lower-risk businesses and spaces ("Stage Two"), and then to allow reopening of higher-risk businesses and spaces ("Stage Three"), and directing the Public Health Officer to establish criteria and procedures to determine whether and how particular local jurisdictions may implement public health measures that depart from the statewide directives of the State Public Health Officer.

This Order is made in accordance with all applicable State and Federal laws, including but not limited to: Health and Safety Code sections 101040 and 120175; Health and Safety Code sections 101030 et seq., 120100 et seq.; and Title 17 of the California Code of Regulations section 2501.

If any provision of this Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall

EX03-255

not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

The violation of any provision of this Order constitutes a threat to public health. Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code sections 101029 and 120295, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order. Per Health and Safety Code section 101029, "the sheriff of each county, or city and county, may enforce within the county, or the city and county, all orders of the local health officer issued for the purpose of preventing the spread of any contagious, infectious, or communicable disease. Every peace officer of every political subdivision of the county, or city and county, may enforce within the area subject to his or her jurisdiction all orders of the local health officer issued for the purpose of preventing the spread of any contagious, infectious, or communicable disease. This section is not a limitation on the authority of peace officers or public officers to enforce orders of the local health officer. When deciding whether to request this assistance in enforcement of its orders, the local health officer may consider whether it would be necessary to advise the enforcement agency of any measures that should be taken to prevent infection of the enforcement officers."

Copies of this Order shall promptly be: (1) made available at the County Public Health Department; (2) posted on the County Public Health Department's website (publichealthsbc.org); and (3) provided to any member of the public requesting a copy of this Order.

IT IS SO ORDERED:

Henning Ansorg, M.D.
Health Officer
Santa Barbara County Public Health Department

# ATTACHMENT A

## HEALTH OFFICER ORDER NO. 2020-12.3
## COUNTY OF SANTA BARBARA

## Businesses that Must Keep Physical Locations Closed

1. Amphitheaters, concert halls and venues, performing arts centers
2. Amusement and theme parks
3. Arenas
4. Banquet halls
5. Brewpubs, breweries, bars, and pubs, including bars located at permitted food facilities, both indoors and outdoors
6. Cardrooms, except outdoor operations
7. Climbing gyms
8. Community centers
9. Conference and convention centers
10. Dance halls, dances
11. Dine-in Restaurants, except outdoor dining, take-out and delivery
12. Fairs, festivals, public exhibitions
13. Family Entertainment Centers (for example: bowling alleys, miniature golf, batting cages and arcades) except outdoor operations
14. In-person higher education including technical schools, colleges, universities, adult education, and trade schools (distance learning is permitted)
15. Live performance venues, live theatre, and live performances
16. Lounges
17. Movie theatres, except outdoor operations
18. Museums, except outdoor exhibits and operations
19. Music events, concerts
20. Nightclubs including private social clubs
21. Indoor paintball, laser tag, or air soft facilities
22. Parties and Receptions. Wedding ceremonies (religious or non-religious) are permitted so long as the June 12, 2020 CDPH guidance for Places of Worship and Providers of Religious Services available at https://covid19.ca.gov/pdf/guidance-places-of-worship.pdf./ is followed including (a) indoor venues are limited to 25% of capacity or 100 people whichever is fewer, or (2) outdoor venues are limited by the natural limits that permit social distancing of six feet between people from different households. Receptions for weddings are not allowed.
23. Playgrounds
24. Raceways
25. Rodeos, public equestrian events
26. Roller derby

27. Skating rinks, such as ice and roller (except these facilities may operate on a reservation or appointment-only basis for individual physical fitness activities or skills training following the guidance provided for gyms and fitness centers. No open (public) skating, group practices or team / club events are allowed.)
28. Saunas and steam rooms
29. Organized sports (except professional sports without a live audience)
30. Sports stadiums and facilities (except as necessary for professional sporting events without live audiences)
31. Trampoline and bounce houses
32. Wineries and tasting rooms, except outdoor operations
33. Zoos, except outdoor exhibits and operations

ATTACHMENT B

**HEALTH OFFICER ORDER NO. 2020-12.3**
**COUNTY OF SANTA BARBARA**

# COVID-19 SELF-EVALUATION

The County Health Officer has defined COVID-19 symptoms as follows:

Mild to Moderate Symptoms Related to or
Other Respiratory Illness such as:

Sore Throat

Runny Nose

Fever

Chills

Not Feeling Well

Sneezing

Coughing

Gastro-Intestinal symptoms such as:

Soft Stool

Stomach Cramps

New loss of smell and/or taste

**HEALTH OFFICER ORDER FOR THE CONTROL OF COVID-19
DIRECTING VULNERABLE INDIVIDUALS LIVING IN
THE COUNTY TO SHELTER AT THEIR PLACE OF RESIDENCE,
RESTRICTIONS OF CERTAIN BUSINESSES, AMONG OTHER ORDERS
DATE OF ORDER: <u>MARCH 17, 2020</u>**

**Please read this Order carefully. Violation of or failure to comply with this Order is a
misdemeanor punishable by fine, imprisonment, or both, pursuant to Health and Safety
Code section 120295 et seq.**

**WHEREAS,** the intent of this Order is to strengthen the steps the County of Ventura has already
taken to protect our residents and particularly the most vulnerable in our population from
COVID-19; and

**WHEREAS,** on March 15, 2020 Governor Gavin Newsom announced that California is taking
additional measures to protect those most at risk of serious, life-threatening complications from
COVID-19, including urging those most vulnerable to COVID-19 to socially isolate at home,
such as people age 65 and older and those with underlying medical conditions that make them
more susceptible to serious illness from the coronavirus; and

**WHEREAS,** the intent of this Order is to ensure that specified individuals self-isolate in their
places of residence to the maximum extent feasible to slow the spread of COVID-19 to the
maximum extent possible, and all provisions of this Order should be interpreted to effectuate this
intent; and

**WHEREAS,** social isolation is considered useful as a tool to control the spread of pandemic
viral infections; and

**WHEREAS,** social isolation is the shared responsibility of all individuals in the County; and

**WHEREAS,** this Order is issued based on evidence of increasing occurrence of COVID-19
within the County and scientific evidence that the age, condition, and health of a significant
portion of the population of the County places it at risk for serious health complications,
including death, from COVID-19; and

**WHEREAS,** the scientific evidence shows that at this stage of the emergency, it is essential to
slow virus transmission as much as possible to protect the most vulnerable and to prevent the
health care system from being overwhelmed and that one proven way to slow the transmission is
to limit interactions among people to the greatest extent practicable;

**WHEREAS,** by reducing the spread of the COVID-19 virus, this Order also helps preserve
critical and limited healthcare capacity in the County; and

**WHEREAS,** this Order comes after the release of substantial guidance from the Centers for
Disease Control and Prevention, the California Department of Public Health, and other public

health officials throughout the United States and around the world, including a variety of prior orders to combat the spread and harms of COVID-19;

**NOW, THEREFORE,** PURSUANT TO SECTIONS 101040, 101085 AND 120175 OF THE HEALTH AND SAFETY CODE, IT IS HEREBY ORDERED AS FOLLOWS:

1. All individuals currently living within Ventura County, equal to or older than 75 years of age, or equal to or older than 70 years of age with an active or unstable comorbidity, are ordered to shelter at their place of residence from March 18, 2020 to April 1, 2020. To the extent such individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain physical distancing of at least six feet from any other person. Exceptions shall only exist as necessary to seek medical care, nutrition, or to perform essential work in healthcare or government.

2. All permanent food facilities, as defined by Health and Safety Code § 113849, may only prepare and offer food that is provided to customers via delivery service, via pick-up for takeout dining, and via drive-thru. Bars and nightclubs that offer food to consumers may remain open only for purposes of continuing to prepare and offer food to consumers via delivery service, via pick-up, or via drive-thru. Permanent food facilities that provide and offer food to consumers for pick up must require patrons or groups of patrons who are ordering food and beverages to be and remain at least six (6) feet apart from each other while inside the facility.

3. The following types of businesses are ordered to close (March 18, 2020 to April 1, 2020):
   a. Bars and nightclubs that do not serve food.
   b. Movie theaters, live performance venues, bowling alleys, and arcades.
   c. Gyms, and fitness centers, and aquatic centers.
   d. Wineries, breweries, and tap rooms that provide tastings.

4. This Order is issued in accordance with, and incorporates by reference, the March 4, 2020 Proclamation of a State of Emergency issued by Governor Newsom, the March 12, 2020 Declaration of Local Health Emergency issued by the Health Officer, the March 17, 2020 Resolution of the Board of Supervisors of the County of Ventura Proclaiming a Local Emergency and Ratifying and Extending the Declaration of a Local Health Emergency, the March 12, 2020 State of California Executive Order N-25-20, and the March 16, 2020 California Department of Public Health guidance on Retail Food, Beverage, and Other Related Service Venues.

5. The violation of any provision of this Order constitutes a threat to public health. Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order.

6. This Order shall become effective at 12:01 a.m. on March 18, 2020 and will continue to be in effect until 11:59 p.m. on April 1, 2020, or until it is extended, rescinded, superseded, or amended in writing by the Health Officer.

7. The Health Officer will continue to assess the quickly evolving situation and may issue additional Orders related to COVID-19.

8. Copies of this Order shall promptly be: (1) made available at the County of Ventura Public Health Office at 2240 East Gonzalez Road, ste. 210, Oxnard, California 93036; (2) posted on the County Public Health Department website (available at www.vchca.org/ph); and (3) provided to any member of the public requesting a copy of this Order.

9. If any provision of this Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the reminder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

**IT IS SO ORDERED:**

Robert Levin, M.D.
Ventura County Health Officer

Dated: March 17, 2020

# STAY WELL AT HOME

## ORDER OF THE VENTURA COUNTY HEALTH OFFICER

### ORDER EXTENDING THE HEALTH OFFICER'S ORDER DATED MARCH 17, 2020, AND IMPOSING ADDITIONAL LIMITATIONS ON ACTIVITIES AND BUSINESSES

### DATE OF ORDER:  <u>MARCH 31, 2020</u>

**Please read this Order carefully.  This Order extends the expiration date of the Health Officer's March 17, 2020, Order to April 19, 2020, and imposes additional limitations on the activities of persons and entities.  The Health Officer's March 20, 2020, Order remains in place, except where inconsistent with more restrictive limitations set out in this Order.**

**Pursuant to Health and Safety Code section 120295 et seq., violation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both.**

PURSUANT TO SECTIONS 101040, 101085 AND 120175 OF THE HEALTH AND SAFETY CODE, THE HEALTH OFFICER OF VENTURA COUNTY HEREBY ORDERS AS FOLLOWS:

1.  <u>Intent.</u>  The intent of this Order is to (a) extend the duration of the Health Officer's Order dated March 17, 2020, to April 19, 2020; (b) keep the Health Officer's March 20, 2020, Order in place except that any more restrictive limitations in this Order shall control; (c) impose new and additional limitations on the activities of persons and entities that are more restrictive than the existing orders; and (d) clarify that a violation of the Health Officer's Orders by a business may subject the business to liability under the state's unfair competition law as well as other civil and criminal penalties.

    The main intent of all Orders, including this Order, is to limit the spread of COVID-19 to the maximum extent possible by keeping all persons in their places of residence to the maximum extent possible.  Failure to comply with any of the provisions of these Orders constitutes an imminent threat to public health.

2.  <u>March 17, 2020, and March 20, 2020, Orders.</u>  This Order supplements and extends the Orders dated March 17, 2020, and March 20, 2020, both of which shall remain in full force and effect, except where inconsistent with more restrictive limitations set out in this Order, for the duration of this Order.

3.  <u>Procedures for take-out restaurants and entities.</u>  Licensed, permanent food facilities that have been allowed under the current Orders to prepare and offer food via delivery service, pick-up or drive-thru must comply with the following procedures:

1

    a. <u>Containers required.</u> All food must be completely contained in a suitable container before being transferred to a customer. For example, ice cream cones are not allowed; ice cream scoops in a covered container are allowed.

    b. <u>Must consume food away from premises.</u> The exception for take-out food activities is designed to enable persons who are confined to their places of residence to obtain prepared food to take back to their places of residence for consumption. The take-out food shall not be consumed anywhere within the line-of-sight of a person standing in front of the facility that sold the food.

    c. <u>Six-foot spacing must be maintained.</u> All persons waiting in line or otherwise congregating outside a food facility selling food via take-out, delivery or drive-thru shall maintain a distance of at least six feet from all other persons. Current Orders already require that all persons inside the facility must maintain a distance of at least six feet from other persons.

4. <u>Essential Businesses must limit activities to essential goods and services.</u> The March 20, 2020, Order required all businesses, except Essential Businesses, to close. The primary purpose for this exception is to provide support for persons required to stay at home or work from home. In some cases, business types were deemed essential because they supported the maintenance of Essential Infrastructure, Essential Governmental Functions or Services, or Healthcare Operations. However, it is determined that the activities of businesses deemed to be Essential Businesses should be limited to the provision of those goods and services essential to the overall intent of the Health Officer's Orders. Therefore:

    a. Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, convenience stores and other establishments that sell food, beverages, pet supplies or household products (such as cleaning and personal care products) necessary to the safe, sanitary and essential operation of places of residence, that are open to the public, shall not sell any goods other than those described in this subsection (a). The sale of items not listed herein, such as clothing, jewelry, sporting goods, furniture, etc., is prohibited.

    b. Only businesses whose primary business is the sale of food, beverages, pet supplies or household products (such as cleaning and personal care products) qualify as an Essential Business under subdivision (a) above. For example, a tobacco or vape store that sells a minimal amount of snacks and water as a side business does not qualify as a grocery store, convenience store or similar establishment. Items, the sale of which constitutes less than 33 percent of a business's gross sales over the last six months, are deemed to be minimal.

    c. Automobile dealerships may remain open only to operate repair shops and/or auto parts supply stores. Showroom facilities shall be closed, and on-premise sales activities shall cease.

5. <u>Swimming pools and hot tubs to close.</u> The following facilities shall be closed to all persons: All swimming pools, spas, hot tubs, saunas, steam rooms and similar facilities, except those located at a single-family residence, which shall be used only by members of the household residing at the single-family residence.

2

6. <u>Campgrounds and RV parks to close.</u> All public and private campgrounds and recreational vehicle (RV) parks are to close, except that persons who certify that their RV is their primary residence may be permitted to stay in the RV park. All persons residing in an RV shall comply with all Orders otherwise applicable to residents.

7. <u>Admittance to long-term care facilities.</u> Long-Term Care Facilities may not refuse to admit any person who has been diagnosed with or treated for COVID-19 after that person has been discharged from a health care facility and approved for admittance to a Long-Term Care Facility by the Ventura County Public Health Department.

   a.  For purposes of this section, "Long-Term Care Facility" means a long-term care facility, skilled nursing facility, intermediate care facility, congregate living health facility, nursing facility, hospice facility, residential care facility for the elderly, residential facility, or community care facility as defined in Health and Safety Code sections 1250, 1502, 1503.5 and 1569, and regulations promulgated thereunder, as they may be amended from time to time.

8. <u>Door-to-door solicitations must cease.</u> Door-to-door solicitations, whether for purposes of sales of goods or services, charitable contributions, signature-gathering or any other commercial or noncommercial purpose, do not constitute Essential Activities or Essential Businesses pursuant to the Order dated March 20, 2020, and, if currently occurring, are occurring in violation of that Order and shall immediately cease.

9. <u>Retail food and beverage facilities.</u> The Public Health Officer recognizes the authority of the Ventura County Environmental Health Division as stated in "Coronavirus COVID-19 Guidance for Food Facilities," and strongly advises all food and beverage facilities to comply with the guidance.

10. <u>Definition of businesses.</u> The terms "business" and "businesses" as used in this Order and the Orders dated March 17, 2020, and March 20, 2020, include any for-profit, non-profit or educational entities (including sole proprietorships, corporations, firms, partnerships, limited liability companies, joint stock companies, associations and other organizations of persons), regardless of the nature of their services or the functions they perform.

11. <u>Violation may constitute unfair competition.</u> Any person that, after notice, operates, manages, maintains or occupies, or continues to operate, manage, maintain or occupy, any business in violation of this Order, the Order dated March 17, 2020, or the Order dated March 20, 2020, may, in addition or in the alternative to any other civil and criminal penalties allowed by law, be subject to liability under the Unfair Competition Law (chapter 5 of part 2 of division 7 of the Business and Professions Code, commencing at section 17200), and subject to civil penalties and other relief as provided therein, for each act or practice in violation of the Orders, or any of them.

3

12. <u>Compliance.</u> The violation of any provision of this Order constitutes a threat to public health. Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order.

13. <u>Effective date and time.</u> This Order shall become effective and operative at 11:59 p.m. on March 31, 2020, and will continue to be in effect until 11:59 p.m. on April 19, 2020, or until it is extended, rescinded, superseded or amended in writing by the Health Officer.

14. <u>Continuing assessment.</u> The Health Officer will continue to assess the quickly evolving situation regarding the spread of COVID-19, may issue additional orders related to COVID-19 and will review this Order within two weeks of its effective date.

15. <u>Copies of Order.</u> Copies of this Order shall promptly be: (1) made available at the County of Ventura Public Health Office, 2240 East Gonzalez Road, Suite 210, Oxnard, California, 93036; (2) posted on the County Public Health Department website (available at www.vchca.org/ph); and (3) provided to any member of the public requesting a copy of this Order.

16. <u>Severability.</u> If any provision of this Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

**IT IS SO ORDERED:**

_Robert Levin signature_

Robert Levin, M.D.
Ventura County Health Officer

Dated: March _31_, 2020

4

EX03-267

**STAY WELL VC**
Safely Reopening Ventura County

**ORDER OF THE VENTURA COUNTY HEALTH OFFICER SUPPLEMENTING THE STATE PUBLIC HEALTH OFFICER'S ORDER DATED MARCH 19, 2020, TO ADDRESS THE UNIQUE NEEDS OF VENTURA COUNTY IN RESPONSE TO THE COVID-19 PANDEMIC**

**DATE OF THIS ORDER: MAY 7, 2020**

**WHEREAS** on March 4, 2020, Governor Gavin Newsom proclaimed a State of Emergency to exist in the State of California as a result of the threat of COVID-19; and

**WHEREAS** on March 12, 2020, the County of Ventura Health Officer ("County Health Officer") issued a Declaration of Local Health Emergency pursuant to Health and Safety Code section 101080, finding that there existed an imminent and proximate threat of the spread of COVID-19 in Ventura County ("County"), and said Declaration was ratified by the County of Ventura Board of Supervisors on March 12, 2020; and

**WHEREAS** on March 17, 2020, the County Health Officer issued an order directing that all individuals past a certain age remain in their places of residence, limiting the operation of food facilities, and closing specified businesses that serve large gatherings; and

**WHEREAS** on March 19, 2020, the State Public Health Officer issued an order requiring that all individuals living in the State of California stay at home except as needed to maintain continuity of operations of critical infrastructure sectors as defined ("State Stay at Home Order"); and

**WHEREAS** the County Health Officer is required by Health and Safety Code section 101030 to enforce and observe all orders of the State Public Health Officer and all statutes relating to public health; and

**WHEREAS** State law permits local health officers to issue public health orders that are more restrictive, but not less restrictive, than an order issued by the State Public Health Officer, the County Health Officer, based on his evaluation of the unique needs and circumstances existing within the County, issued additional health orders on March 20, March 31, April 9, April 18 and April 20, 2020; and

1

EX03-268

**WHEREAS** the County Health Officer has determined that there no longer exists a need for local health orders that are more restrictive than the State Stay at Home Order with respect to many activities of individuals and businesses, and that the public health and welfare would best be served by a single set of regulations where reasonable to avoid public confusion between State and local orders; and

**WHEREAS** the State of California has identified businesses on its website at https://covid19.ca.gov/roadmap/ that are able to reopen under the statewide order; and

**WHEREAS** the County Health Officer has determined that some elements of his current order are not addressed by the State Stay at Home Order, and that the public health would be served by supplementing the State Stay at Home Order as set forth below;

**NOW, THEREFORE**, I, Dr. Robert Levin, the County Health Officer, pursuant to Health and Safety Code sections 101040, 101085 and 120175, hereby issue the following order ("Local Order") to be effective immediately:

**IT IS HEREBY ORDERED THAT**:

1. **Commercial laboratory test results.** All commercial laboratories that test persons in the County for the presence of COVID-19 must report all test results (whether positive or negative) to the Ventura County Public Health Department laboratory within eight hours of receiving the test results.

2. **Special rule for persons 70 years of age or older.** All persons currently living in the County equal to or older than 75 years of age, or equal to or older than 70 years of age with an active or unstable comorbidity, are ordered to stay in their place of residence and must at all times follow Social Distancing Requirements to the greatest extent feasible. Such persons may leave their places of residence only as necessary to seek medical care or exercise or nutrition or to perform essential work in furtherance of Healthcare Operations or Essential Governmental Functions or Services.

   a. For purposes of this section, "Healthcare Operations" means and includes hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other licensed healthcare facilities, healthcare suppliers, home healthcare services providers, mental health providers, chiropractors, acupuncturists or any related and/or ancillary healthcare services, including blood donation centers, and veterinarians and all other healthcare services provided to

2

animals. "Healthcare Operation" does not include fitness and exercise gyms, aquatic centers and similar facilities.

b. For purposes of this section, "Essential Governmental Functions or Services" means government functions or services performed by first responders, emergency management personnel, emergency dispatchers, court personnel, law enforcement personnel, and others who perform essential governmental functions or services as such may be determined by the governmental entity performing those functions or services.

3.   **Admittance to Long-Term Care Facilities.** Long-Term Care Facilities may not refuse to admit any person who has been diagnosed with or treated for COVID-19 after that person has been discharged from a health care facility and approved for admittance to a Long-Term Care Facility by the Ventura County Public Health Department.

a. For purposes of this Local Order, "Long-Term Care Facility" means a long-term care facility, skilled nursing facility, intermediate care facility, congregate living health facility, nursing facility, hospice facility, residential care facility for the elderly, residential facility, or community care facility as defined in Health and Safety Code sections 1250, 1502, 1503.5 and 1569, and regulations promulgated thereunder, as they may be amended from time to time.

4.   **Hospitals and Long-Term Care Facilities.** The County Health Officer recognizes the authority of the guidance documents "Hospital Holding Unit Guidance for COVID-19" and "Long-Term Care Facility Guidance for Preventing and Managing COVID-19" (the current versions of which are available at www.vcemergency.com) and strongly advises all hospitals and Long-Term Care Facilities to comply with the guidance.

5.   **All businesses must establish, implement and enforce COVID-19 prevention plans**. All businesses must establish, implement and enforce a site-specific prevention plan in accordance with the State of California COVID-19 industry Guidance and associated checklist found at https://covid19.ca.gov/roadmap/. Prior to reopening, all businesses must register and attest to their preparedness for safely reopening at vcreopen.com. Businesses that were operating under the previous order must also register and attest to their adherence to state guidelines within ten days at vcreopen.com.

As a condition of operation, each business must post a written notice explaining how it will comply with Social Distancing Requirements in conspicuous places

3

EX03-270

where it can easily be seen by employees and patrons of the business facility. The written posting shall identify by name and telephone number the County Covid Compliance Hotline where compliance related questions or complaints may be reported by employees and patrons.

Further, all businesses, as a condition of operation, shall admit without delay any officer, employee or agent of the County of Ventura or local city to their business facilities for the purposes of inspection for monitoring and compliance. The failure to cooperate with such inspectors, or repeated and confirmed violations of COVID-19 prevention requirements, may lead to issuance of a business-specific closure order by the County Health Officer.

6.   **Social Distancing Requirements defined.** "Social Distancing Requirements" means and includes maintaining at least a six-foot physical distance from other persons, washing hands with soap and water for at least 20 seconds or using hand sanitizer as frequently as possible, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces and not shaking hands.

7.   **Food facilities.** Under the State Stay at Home Order, all permanent food facilities, as defined by Health and Safety Code section 113849, may only prepare and offer food that is provided to customers via delivery service, via pick-up for takeout dining, and via drive-thru. This Local Order, in addition, requires that permanent food facilities that prepare and offer food via delivery service, pick-up or drive-thru must comply with the following procedures:

a.  Containers required. All food must be completely contained in a suitable container before being transferred to a customer. For example, ice cream cones are not allowed; ice cream scoops in a covered container are allowed.

b.  Must consume food away from premises. The exception for take-out food activities is designed to enable persons who are confined to their places of residence to obtain prepared food to take back to their places of residence for consumption. The take-out food shall not be consumed anywhere within the line-of-sight of a person standing in front of the facility that sold the food.

c.  Six-foot spacing must be maintained. All persons waiting in line or otherwise congregating outside a food facility selling food via take-out, delivery or drive-thru

4

shall maintain a distance of at least six feet from all other persons.

8.    **Primary retail business must be critical infrastructure to be fully open**. Only retail businesses whose primary line of business qualifies as critical infrastructure under the State Stay at Home Order may be fully open to the public, e.g., businesses whose primary business is the sale of food, beverages, pet supplies, household cleaning products, etc. Items the sale of which constitute less than 33 percent of a business's gross sales over the last six months are considered to be less than primary. For example, a tobacco or vape store that sells a minimal amount of snacks and water as a side business does not qualify as a grocery store, convenience store or similar establishment that can be fully open to the public under the current State Stay at Home Order.

9.    **Businesses and activities that must remain closed even if allowed by State Stay at Home Order.** The State Stay at Home Order does not expressly address every type of business activity. To avoid confusion, this Local Order prohibits the following businesses and activities, whether or not allowed by the State Stay at Home Order:

a. All swimming pools, spas, hot tubs, saunas, steam rooms and similar facilities, except those located at a single-family residence, which shall be used only by members of a household residing at the single-family residence.

b. All public and private campgrounds and recreational vehicle (RV) parks, except that persons who certify that their RV is their primary residence may be permitted to stay in the RV park. All persons residing in an RV shall comply with all orders otherwise applicable to residents.

10.    **List of activities ordered to cease.** The following activities are deemed non-essential and harmful to public health, and therefore are prohibited whether or not allowed by the State Stay at Home Order:

a. Door-to-Door Solicitations. Door-to-door solicitations, whether for purposes of sales of goods or services, charitable contributions, signature-gathering or any other commercial or noncommercial purpose.

11.    **Essential activities allowed.** The State Stay at Home Order implicitly allows for persons to leave their places of residence to engage in essential activities, but does not expressly address that issue. The State Public Health Officer has issued guidance, primarily in the form of posted answers to "Frequently Asked

5

EX03-272

Questions," which are frequently amended or otherwise changed. For the sake of clarity and guidance to persons residing in the County, this section of the Local Order sets forth those activities that the County Health Officer deems to be essential and allowed. However, to the extent any activity described herein conflicts with and is more permissive than the State Stay at Home Order as it is currently written or as it may be amended, the State Stay at Home Order shall take precedence and shall be enforced.

a. Persons may leave their places of residence only to perform one of the following essential activities:

(1) To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including pets), such as, by way of example, obtaining medical supplies or medication, visiting a health care professional or obtaining supplies needed to work from a place of residence.

(2) To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example, canned food, dry goods, fresh fruits and vegetables, pet supplies, fresh meats, fish and poultry, and any other household consumer products, and products necessary to maintain the safety, sanitation and essential operation of places of residence.

(3) To engage in funeral services, provided the following restrictions are observed:

(i) For indoor services, where the body of the deceased is present for viewing or in a closed casket, members of the deceased's household and the relatives of the deceased within the second degree (including in-laws) may gather for the activity provided that Social Distancing Requirements are followed and that no more than five persons gather inside the facility at a single time. Stable groups of five persons (i.e., persons may not substitute in or out of the group) may rotate within the facility providing protocols are implemented to sanitize the facilities between each group visit.
(ii) For graveside services, members of the deceased's household and the relatives of the deceased within the second degree (including

6

EX03-273

in-laws) may gather for the activity provided that Social Distancing Requirements are followed and that no more than 10 persons gather.

(4) To engage in a wedding ceremony, provided that Social Distancing Requirements are followed to the greatest extent feasible and that no more than 10 persons (who need not be from the same household or living unit), in addition to the couple to be married and the officiant, gather in a stable group.

(5) To attend a gathering of any size to observe or participate in live or virtual presentations to the gathering, such as faith-based services, concerts, plays, political speeches, movies and similar activities, provided that all of the following protocols are followed:

> (i) all activity must occur outdoors;
> (ii) all persons attending the activity must be inside a motor vehicle occupied only by persons from the same household or living unit;
> (iii) all motor vehicles at the gathering must maintain a distance of six feet from all other vehicles:
> (iv) the motor vehicle windows must be closed at all times during the event;
> (v) all persons must remain in the vehicle in which they arrived at all times during the event;
> (vi) no restroom facilities shall be made available to persons at the facility during the event;
> (vii) no tangible items of any kind, including food products, may be transferred to persons in the motor vehicles;
> (viii) notwithstanding the above, one or more persons, not exceeding five, may enter nearby buildings as necessary to putting on the presentation; and
> (ix) all Social Distancing Requirements shall be complied with to the greatest extent feasible.

(6) To engage in outdoor activity, provided the persons comply with Social Distancing Requirements, such as, by way of example, golfing, tennis, pickle-ball, walking, hiking, running, bicycling, pleasure driving and working around their places of residence, including gardening.

> (i) To provide accommodations for persons who wish to golf as a

7

EX03-274

form of outdoor activity, public and private golf courses may operate provided they strictly enforce Social Distancing Requirements and enforce the following additional protocols:

(a) Motorized carts are not allowed;
(b) No more than four golfers (who need not be from the same household or living unit), are allowed per group and each group must be stable (i.e., persons may not substitute in or out of the group);
(c) A distance of at least 30 feet shall be maintained between groups of golfers at all times;
(d) All ball washers shall be covered and flag pins shall be removed and the cup on each green shall be inverted or otherwise installed to eliminate high-frequency touch surfaces on the greens and tees;
(e) Persons may use a driving range provided that range balls are properly sanitized before distribution to customers (stand-alone golf driving ranges may also operate);
(f) Practice putting greens shall remain closed;
(g) The "Pro Shop" or similar facility designed for the sale of golf-related equipment and supplies shall remain closed; and
(h) The snack shop(s) and restaurant(s) shall remain closed.

(7)  To otherwise carry out activities specifically permitted in this Local Order.

(8)  To care for a family member or pet in another household.

(9)  To prepare and present a live-stream or other virtual communication by an organization or association to its members, including worship services. Staff of organizations or associations (who need not be of the same household or living unit), including faith-based organizations, may gather in a single space at the same time solely for the purpose of preparing and presenting live-stream or other virtual communications provided that the number of such staff is the fewest necessary to prepare and present those communications, but in no event in excess of 10 persons, and that Social Distancing Requirements are followed.

12.   **Compliance.** The violation of any provision of this Local Order or the State Stay at Home Order constitutes a threat to public health and a public nuisance per se. In

8

addition, pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the County Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Local Order.

13. **Violation may constitute unfair competition.** Any person that, after notice, operates, manages, maintains or occupies or continues to operate, manage, maintain or occupy, any business in violation of this Local Order or the State Stay at Home Order may, in addition or in the alternative to any other civil and criminal penalties allowed by law, be subject to liability under the Unfair Competition Law (chapter 5 of part 2 of division 7 of the Business and Professions Code, commencing at section 17200), and subject to civil penalties and other relief as provided therein, for each act or practice in violation of this Local Order, the State Stay at Home Order, any predecessor order, or any of them.

14. **More restrictive provisions of local and State orders enforceable.** This Local Order is issued to supplement the State Stay at Home Order, which establishes minimum requirements for individuals and businesses, as well as the Governor's March 19, 2020 Executive Order N-33-20 directing California residents to follow the State Stay at Home Order. This Local Order adopts in certain respects more stringent restrictions addressing the particular facts and circumstances in this County, which are necessary to control the public health emergency as it is evolving within the County and the south coast region. Where a conflict exists between this Local Order and any State public health order, including the State Stay at Home Order, the more restrictive provision controls.

15. **Applicable to entire County.** This Local Order applies to all persons in the cities and the entire unincorporated area of the County.

16. **Effective date and time; repeal of prior order.** This Local Order shall become effective and operative at 11:59 p.m. on May 7, 2020, and will continue to be in effect until 11:59 p.m. on May 31, 2020, or until it is extended, rescinded, superseded or amended in writing by the County Health Officer. The County Health Officer order dated April 20, 2020, is hereby repealed and replaced with this Local Order, except that all prior violations of previous orders remain prosecutable, criminally or civilly. All prior closure or cease and desist orders directed at specified persons or businesses shall remain in force, but shall be reviewed by enforcement staff and rescinded if appropriate.

17. **Copies of Local Order.** Copies of this Local Order shall promptly be: (1) made

9

available at the County of Ventura Public Health Office, 2240 East Gonzalez Road, Suite 210, Oxnard, California, 93036; (2) posted on the Ventura County Public Health Department website (available at www.vchca.org/ph); and (3) provided to any member of the public requesting a copy of this Local Order.

18.   **Severability.** If any provision of this Local Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the remainder of the Local Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Local Order are severable.

**IT IS SO ORDERED:**


_Robert Levin MD_
Robert Levin, M.D.
Ventura County Health Officer

Dated: May __7__, 2020


Pursuant to Health and Safety Code section 120295 et seq., violation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both.

10

EX03-277

**ORDER OF THE VENTURA COUNTY HEALTH OFFICER**

**CLOSING ALL BARS AND LIMITING RESTAURANTS AND OTHER
SPECIFIED BUSINESSES TO OUTDOORS ONLY**

**Effective Date of Order:  July 2, 2020 at 10:00 P.M.**

AS DIRECTED BY THE CALIFORNIA DEPARTMENT OF PUBLIC HEALTH AND
UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE
SECTIONS 101030, 101040, 101085, AND 120175, TITLE 17 CALIFORNIA CODE OF
REGULATIONS SECTION 2501, ARTICLE XI OF THE CALIFORNIA
CONSTITUTION, AND CALIFORNIA GOVERNMENT CODE SECTIONS 8610,
8630, 8634, AND 8665, THE VENTURA COUNTY HEALTH OFFICER ("HEALTH
OFFICER") HEREBY ORDERS:

1. **Bars must close.**  All Bars shall be closed to the public until those establishments
are allowed to resume operation pursuant to state guidance and local permission.  For
purposes of this Order, "Bar" means a business that is licensed to sell alcoholic beverages
for consumption on its premises, including but not limited to bars, pubs, brewpubs,
breweries, wineries, wine tasting rooms, and distilleries, but is not permitted as a restaurant
by the Ventura County Environmental Health Division (EHD).

2. **Restaurants may not allow indoor dining.**  "Restaurants" shall not allow indoor
dining service until Restaurants are allowed to resume indoor dining operations pursuant
to state guidance and local permission.  For purposes of this Order, "Restaurant" means a
business that is permitted as a restaurant by the Ventura County EHD, even if it also
possesses a license to sell alcoholic beverages for consumption on its premises.

   Outdoor dining allowed with restrictions. Outdoor dining is allowed on Restaurant
premises subject to full compliance with all relevant portions of the guidance set forth in
the California Department of Public Health Guidance on Dine-In Restaurants.  In addition,
the following local rules which are more restrictive than the state guidance shall be
followed:

   (a) only members of the same household may sit together at a single table,
   (b) the maximum time a patron may dine on the premises is 1 and ½ hours, and
   (c) Restaurants must be closed to on-premise dining between 10:00 p.m. and 5:00
   a.m.

Restaurants should continue to encourage takeout and delivery service whenever possible.

3. **Movie theatres, family entertainment centers, zoos, museums and cardrooms
may not operate indoors.**  Pursuant to state orders, movie theatres, family entertainment
centers, zoos, museums and cardrooms may not operate indoors.  Persons should check

1

EX03-278

current state and local heath orders to determine whether such business may operate outdoors, and if so, what restrictions apply in the form of state guidance, frequently asked questions or otherwise.

**4.      Compliance.** The violation of any provision of this Order, the County's FAQ's or the State Stay at Home Order constitutes a threat to public health and a public nuisance per se. Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the County Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order.

**5.      Violation may constitute unfair competition.** Any person that, after notice, operates, manages, maintains or occupies or continues to operate, manage, maintain or occupy, any business in violation of this Order or the State Stay at Home Order may, in addition or in the alternative to any other civil and criminal penalties allowed by law, be subject to liability under the Unfair Competition Law (chapter 5 of part 2 of division 7 of the Business and Professions Code, commencing at section 17200), and subject to civil penalties and other relief as provided therein, for each act or practice in violation of this Order, the State Stay at Home Order, any predecessor order, or any of them.

**6.      Applicable to entire County.** This Order applies to all persons in the cities and the entire unincorporated area of the County.

**7.      Effective date and time.** This Order shall become effective and operative at 10:00 p.m. on July 2, 2020, and will continue to be in effect until rescinded, superseded or amended in writing by the Health Officer. All prior orders remain in effect.

**8.      Copies of Order.** Copies of this Order shall promptly be: (1) made available at the County of Ventura Public Health Office, 2240 East Gonzalez Road, Suite 210, Oxnard, California, 93036; (2) posted on the Ventura County Public Health Department website (available at www.vchca.org/ph); and (3) provided to any member of the public requesting a copy of this Order.

**9.      Severability.** If any provision of this Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

**IT IS SO ORDERED:**

_Robert Levin MD_
Robert Levin, M.D.

2

EX03-279

GOVERNOR DOUGLAS A. DUCEY

# STATE OF ARIZONA
## ★
# EXECUTIVE ORDER

**Executive Order 2020-09**

## LIMITING THE OPERATIONS OF CERTAIN BUSINESSES TO SLOW THE SPREAD OF COVID-19

WHEREAS, both the state of Arizona and the federal government have declared a public health emergency to address the 2019 novel Coronavirus (COVID-19); AND

WHEREAS, the President of the United States has declared a national emergency due to both the health and economic implications of the COVID-19 virus; AND

WHEREAS, the disease caused by COVID-19 is contagious and can be fatal, resulting in the World Health Organization declaring it a global pandemic; AND

WHEREAS, the State of Arizona has experienced community spread of COVID 19 in multiple counties as it continues to spread across the country and the state, posing an increasing threat to public health and having a devastating impact on the economy; AND

WHEREAS, on March 16, 2020, the United States Centers for Disease Control and Prevention issued updated guidance recommending that individuals avoid social gatherings of more than 10 people and use drive-thru, pickup, or delivery options at restaurants and bars to slow the spread of the disease; AND

WHEREAS, the time has come for further measures to protect public health and safety, protect our most vulnerable citizens, and mitigate the strain on our health care providers by slowing the spread of COVID-19; AND

WHEREAS, in taking such critical measures to protect public health there will be direct economic consequences for businesses across the state of Arizona that provide employment for many Arizonans, including bars and restaurants; AND

WHEREAS, Arizona is committed to both mitigating the economic harm of COVID-19 and ensuring the safety of those in our state.

EX04-001

NOW, THEREFORE, I, Douglas A. Ducey, Governor of the State of Arizona, by virtue of the authority vested in me by the Constitution and laws of this state, hereby order as follows.

1. Beginning at close of business on Friday, March 20, 2020, all of the following establishments located in counties of the State with confirmed cases of COVID-19 shall close access to the public until further notice:

   a. Bars

   b. Movie theaters

   c. Indoor gyms and fitness clubs

2. Beginning at close of business on Friday, March 20, 2020, all restaurants in counties of the State with confirmed cases of COVID-19 shall close access to on-site dining until further notice. Restaurants may continue serving the public through pick up, delivery, and drive thru operations.

3. Beginning at 5:00 p.m. on Friday, March 20, 2020, in counties of the State with confirmed cases of COVID-19, the Arizona Department of Liquor Licenses and Control and any Arizona Peace Officer Standards and Training Board certified law enforcement officer shall not enforce provisions of the series 12 liquor license that prohibit the sale by restaurants of beer, wine and spirituous liquor off-premises subject to the following provisions:

   a. Any sale of beer, wine and spirituous liquor shall be in sealed containers.

   b. Title 4 licensees shall ensure that sales of beer, wine and spirituous liquor for consumption off premises is only for consumption for individuals over the age of 21 as for other sale of alcoholic beverages both on and off-premises and that all other title 4 laws are followed.

   c. In the event that the Arizona Department of Liquor Licenses and Control determines that a title 4 licensee has otherwise violated title 4 by selling to a minor or not providing alcohol in a sealed container, the Department may take enforcement action against the title 4 licensee.

4. The Arizona Department of Liquor Licenses and Control shall post guidance to title 4 licensees on its website to assist in compliance with this order.

5. The Department of Liquor Licenses and Control shall not enforce any restriction on manufacturers, wholesalers or retailers to buy back unopened products from restaurants, bars and clubs.

6. Cafeterias at nursing homes, hospitals, and similar facilities as well as soup kitchens that provide meals to the needy are not subject to these restrictions and may continue normal operations while taking precautions to ensure social distancing and appropriate hygiene according to Centers for Disease Control and Prevention standards.

7. This order shall remain in place until further notice, and shall be reconsidered for repeal or revision every two weeks following issuance.



IN WITNESS WHEREOF, I have hereunto set my hand and caused to be affixed the Great Seal of the State of Arizona.

**GOVERNOR**

DONE at the Capitol in Phoenix on this nineteenth day of March in the Year Two Thousand and Twenty and of the Independence of the United States of America the Two Hundred and Forty-Fourth.

ATTEST:

Secretary of State

EX04-003

GOVERNOR DOUGLAS A. DUCEY

# STATE OF ARIZONA
★
# EXECUTIVE ORDER

### Executive Order 2020-47

### Reducing the Risk, Slowing the Spread
### *Limiting Indoor Dining*

**WHEREAS,** on March 11, 2020, pursuant to A.R.S. §§ 26-303 and 36-787, I, as Governor of the State of Arizona, issued a declaration of a Public-Health State of Emergency due to the necessity to prepare for, prevent, respond to, and mitigate the spread of COVID-19; and

**WHEREAS,** on March 30, 2020, the Director of the Arizona Department of Health Services (ADHS), based on an epidemiological assessment of Arizona specific data and in alignment with the Centers for Disease Control and Prevention (CDC) guidance, recommended the State implement enhanced mitigation strategies which are continuing; and

**WHEREAS,** on May 12, 2020, Executive Order 2020-36, *Stay Healthy, Return Smarter, Return Stronger,* was issued outlining requirements for businesses to assist in mitigating the spread of COVID-19 as they reopened and mandated that businesses adopt policies consistent with guidance from the CDC and the ADHS; and

**WHEREAS,** on June 17, 2020, in response to rising case numbers, Executive Order 2020-40, *Contain the Spread,* was issued employing the Arizona National Guard to assist with contact tracing and providing the ability for local jurisdictions to establish directives regarding face coverings in public places; and

**WHEREAS,** on June 29, 2020, due to rising numbers of cases, the Arizona Department of Health Services activated the State's Crisis Standards of Care at the request of healthcare administrators to prepare for and respond to the increasing number of COVID 19 cases in Arizona's hospital system; and

**WHEREAS,** there has not been sufficient time for mask mandates, limitations on groups and other measures to have a demonstrable effect on containing the spread, and additional measures are essential and necessary to ensure expedited and efficient containment; and

**WHEREAS,** recommendations in the Arizona State Report issued by the White House Coronavirus Task Force on July 5, 2020, for actions to be taken to limit the spread of COVID-19 include encouraging outdoor dining and limiting indoor dining to less than 50%; and

WHEREAS, as of July 9, 2020, there have been 112,671 diagnosed cases of COVID-19 in Arizona including 2,038 deaths, with the State continuing to see an increase in the number of cases in every county and an increase in hospitalizations in each region of the State; and

WHEREAS, the increased case numbers and hospitalizations also necessitate the need for an increased focus on precautionary measures by both businesses and individuals; and

WHEREAS, data has shown that community spread continues to grow at an exponential pace and is greatest among the demographic of 20-44 year olds; and

WHEREAS, essential medical and other health resources, including intensive care unit and in-patient facilities, are limited, nearing capacity, and otherwise being exhausted; and

WHEREAS, patients are required to be transferred to medical facilities throughout Arizona to accommodate the surge of COVID-19 cases; and

WHEREAS, pursuant to A.R.S. § 36-136(A)(6), the Director of the Department of Health Services has authority to "Exercise general supervision over all matters relating to sanitation and health throughout this state...[and] may enter, examine and survey any...public eating room and restaurant,...in which the director has reason to believe there exists a violation of any health law or rule of this state that the director has the duty to administer"; and

WHEREAS, pursuant to A.R.S. § 36-136(H), the Director of the Department of Health Services "may define and prescribe emergency measures for detecting, reporting, preventing and controlling communicable or infectious diseases or conditions if the director has reasonable cause to believe that a serious threat to public health and welfare exists"; and

WHEREAS, A.R.S. § 36-186 proscribes the powers and duties of the directors of county public health departments which includes enforcing and observing the rules and "laws of the state pertaining to the preservation of public health"; and

WHEREAS, A.R.S. § 36-186 requires the directors of the county health departments to "enforce any law or ordinance enacted or adopted by the respective jurisdiction relating to public health, including laws and ordinances that relate to public businesses"; and

WHEREAS, A.R.S. § 26-303(E)(2) authorizes all agencies of the state government to be utilized in all activities, including enforcement activities, designed to prevent and alleviate damages, including the impact on health resources and to otherwise save lives, due to COVID 19;

WHEREAS, pursuant to A.R.S. § 36-602, restaurants that fail to maintain sanitary conditions are a public nuisance dangerous to the public health and action may be taken to abate the nuisance by the county health inspectors pursuant to A.R.S. § 36-183.06; and

WHEREAS, it is immediately necessary based on guidance from the Director of the Department of Health Services and other healthcare professionals both in our state and at the federal level to

impose additional measures that protect public health and safety and decrease the strain on our health care providers by containing the spread of COVID-19.

NOW, THEREFORE, I, Douglas A. Ducey, Governor of the State of Arizona, by virtue of the authority vested in me by the Constitution and laws of the State, including but not limited to A.R.S. §§ 26-303 and 36-787, and after consultation with the Director of the Arizona Department of Health Services, do hereby order:

1. Every restaurant with indoor seating in the State of Arizona shall operate at less than 50 percent of the permitted fire code occupant load. Restaurants shall ensure at least six (6) feet of separation between parties or groups at different tables, booths or bar tops, unless the tables are separated by glass or plexiglass. Restaurant staff shall not be counted against the occupancy limit.

2. Every restaurant establishment with outdoor dining areas shall ensure at least six (6) feet of physical distance between tables, benches or other areas for patrons to sit while dining or waiting to be seated.

3. Restaurants shall eliminate any indoor standing room where patrons can congregate and are encouraged to use reservation systems to limit capacity and congregating of patrons.

4. For purposes of this Executive Order, facilities with retractable roofs or garage type windows or doors that open up to the outdoors shall be considered indoor facilities, whether the roof or windows are opened or closed.

5. All buffets, cafeteria style and self-serve food bars at restaurants shall be closed.

6. For purposes of this order, the term "restaurant" is defined as an establishment regularly open for the serving of food to guests for compensation and that has kitchen facilities connected with the restaurant for keeping, cooking and preparing foods required for ordinary food service.

7. This Executive Order supersedes provisions of Executive Orders 2020-34, paragraph 2 and is in addition to requirements of businesses in Executive Orders 2020-36 and 2020-40. All other existing orders regarding precautionary measures required of businesses remain in effect.

8. In addition to penalties and enforcement provided by A.R.S. §§ 26-316 and 26-317, failure to comply with this order and any other guidance issued by the Arizona Department of Health Services related to precautions to mitigate the spread of COVID-19 shall constitute a public nuisance dangerous to the public health pursuant to A.R.S. § 36-601(A) and action is authorized and shall be taken to abate the nuisance by the county health inspectors pursuant to A.R.S. § 36-183.06 or other law enforcement or state agencies as mandated by the Director of the Arizona Department of Health Services, including the immediate closure of such facility, pursuant to A.R.S. § 26-303(E)(2).

9. If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable.

10. This order shall take effect at 10:00 p.m. on Saturday, July 11, 2020 and shall remain in place until further notice and shall be reconsidered for repeal or revision every two weeks following issuance.

IN WITNESS WHEREOF, I have hereunto set my hand and caused to be affixed the Great Seal of the State of Arizona.



**GOVERNOR**

**DONE** at the Capitol in Phoenix on this ninth day of July in the Year Two Thousand Twenty and of the Independence of the United States of America the Two Hundred and Forty-Fifth.

**ATTEST:**

**Secretary of State**

EX04-007



## OFFICE OF THE MAYOR
## CITY AND COUNTY OF HONOLULU
530 SOUTH KING STREET, ROOM 300 · HONOLULU, HAWAII 96813
PHONE: (808) 768-4141 · FAX: (808) 768-4242 · INTERNET: www.honolulu.gov

KIRK W. CALDWELL
MAYOR

ROY K. AMEMIYA, JR.
MANAGING DIRECTOR

GEORGETTE T. DEEMER
DEPUTY MANAGING DIRECTOR

March 20, 2020

**OFFICE OF THE MAYOR**
**CITY AND COUNTY OF HONOLULU**
**EMERGENCY ORDER NO. 2020-01**
**(COVID-19 [Novel Coronavirus])**

By the authority vested in me as Mayor of the City and County of Honolulu (the **"City"**) pursuant to Revised Charter of the City and County of Honolulu 1973 (2000 ed.), as amended; the Revised Ordinances of the City and County of Honolulu 1990, as amended; the Hawai'i Revised Statutes, as amended (**"Haw. Rev. Stat."**), the Constitution and laws of the State of Hawai'i, I, KIRK W. CALDELL, hereby issue the following orders related to the Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]), dated March 18, 2020 (the **"Orders"**).

The virus that causes Coronavirus 2019 Disease (**"COVID-19"**) is easily transmitted, especially in group settings, and it is essential that the spread of COVID-19 be slowed to protect the ability of public and private health care providers to handle the influx of new patients and to safeguard public health and safety. The intent of these Orders is to encourage the maximum number of people to practice social distancing and slow the spread of COVID-19, consistent and in compliance with all current guidance of the U.S. Department of Health and Human Services, Centers for Disease Control and Prevention (**"CDC"**), while enabling essential activities, business, and government functions to continue.

Pursuant to Haw. Rev. Stat. § 127A-25 and the Rules of the Mayor City and County of Honolulu, dated March 20, 2020 (**"Mayor's Rules"**) promulgated under that section, the Orders shall have the force and effect of law. The Orders are in accordance with and incorporate by reference the Proclamation COVID-19 [Novel Coronavirus] that I issued on March 4, 2020; the Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued on March 18, 2020, and Hawai'i Governor David Y. Ige's Proclamation dated March 4, 2020, and Supplemental Proclamation dated March 16, 2020. .

Violation of any of the Orders is punishable as a misdemeanor, with fines of up to $5,000, up to a year in jail, or both. Haw. Rev. Stat. § 127A-29; Mayor's Rules.

## I.   ORDERS

**Order 1:**  Effective Friday, March 20, 2020 at 8:30 a.m., all Bars and Nightclubs are mandated to close for 15 calendar days (until April 4, 2020 at 8:30 a.m.).

**Order 2:**  Effective Friday, March 20, 2020 at 8:30 a.m., except solely for drive–thru, pickup, or delivery service, all Restaurants are mandated to close for 15 calendar days (until April 4, 2020 at 8:30 a.m.).

**Order 3:**  Effective Friday, March 20, 2020 at 8:30 a.m., all public gatherings and events within the City shall be in accordance with and follow the current CDC guidance related to social gatherings until April 30, 2020.

## II.   DEFINITIONS

As used in this Order:

**"Bar"** means an establishment that is primarily engaged in the serving of alcoholic beverages for consumption by guests on the premises regardless of whether food is served, including but not limited to taverns, cocktail lounges, karaoke rooms/areas, and cabarets, and including outdoor areas of such establishments.

**"Nightclub"** means an establishment in which live entertainment is provided or facilities for dancing by patrons either by live entertainment or recorded music may be provided, regardless of whether alcoholic beverages are served.

**"Restaurant"** means an eating establishment, including but not limited to, coffee shops, cafeterias, sandwich stands, and the like, which offer for sale food to the public, guests, or employees for consumption within the establishment.  The term "Restaurant" includes a bar area within a Restaurant and outdoor areas of a Restaurant.  The term "Restaurant" does *not* include cafeterias, lunchrooms, or dining facilities located within "healthcare facilities" as that term is defined under Haw. Rev. Stat. § 321-15.2 and similar facilities, provided that consumption of food within the cafeteria, lunchroom, or dining facility located within the healthcare facility is restricted to employees of the healthcare facility, patients of the healthcare facility, and no more than two (2) authorized visitors of the patient of the healthcare facility that have been appropriately screened by the healthcare facility in compliance with all of the facility's protocols related to infectious disease control measures and processes.

## III.   GENERAL

     **A.**    <u>**Duration.**</u>  This Order shall take effect on Friday, March 20, 2020, at 8:30 a.m. and shall continue in force and effect for the period stated in each Order, unless altered by subsequent orders, or as provided under Haw. Rev. Stat. ch. 127A.

**B.**     **Enforcement.**  All law enforcement of the State of Hawaiʻi and City shall ensure compliance with and enforce these Orders in accordance with Haw. Rev. Stat. § 127A-29 and Mayor's Rules.

**C.**     **Promulgation/posting.**  These Orders were outlined in the Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) issued on March 18, 2020, and these Orders shall be posted on the City website as soon as practicable in one or more appropriate places, and shall remain posted while in effect.

**D.**     **Severability.**  If any provision of the Orders or their application to any person or circumstance is held to be invalid, the remainder of the Orders, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of the Orders are severable.


KIRK W. CALDWELL
Mayor
City and County of Honolulu

Date:   March 20, 2020
Time:   10:15 am


APPROVED:


PAUL S. AOKI
Acting Corporation Counsel
City and County of Honolulu

EX04-010

OFFICE OF THE MAYOR
CITY AND COUNTY OF HONOLULU
530 SOUTH KING STREET, ROOM 300 • HONOLULU, HAWAII 96813
PHONE: (808) 768-4141 • FAX: (808) 768-4242 • INTERNET: www.honolulu.gov

KIRK W. CALDWELL
MAYOR

ROY K. AMEMIYA, JR.
MANAGING DIRECTOR

GEORGETTE T. DEEMER
DEPUTY MANAGING DIRECTOR

May 21, 2020

**OFFICE OF THE MAYOR**
**CITY AND COUNTY OF HONOLULU**
**EMERGENCY ORDER NO. 2020-13**
**(COVID-19 [Novel Coronavirus])**

**SECOND AMENDMENT TO HO'OULU i HONOLULU 2.0**

By the authority vested in me as Mayor of the City and County of Honolulu (the **"City"**) pursuant to Revised Charter of the City and County of Honolulu 1973 (2017 Edition), as amended; the Revised Ordinances of the City and County of Honolulu 1990, as amended; the Hawai'i Revised Statutes, as amended (**"Haw. Rev. Stat."**); the Constitution and laws of the State of Hawai'i; I, KIRK W. CALDWELL, hereby issue this second amendment to Emergency Order No. 2020-11, Ho'oulu i Honolulu 2.0, as first amended on May 15, 2020 by Emergency Order No. 2020-12 (the **"Order"**), to further address the emergency declared in the Proclamation COVID-19 [Novel Coronavirus] that I issued on March 4, 2020, Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued on March 18, 2020, and the Second Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued May 6, 2020.

The Order is hereby amended by replacing Exhibit A of the Order with the updated Exhibit A attached hereto. This amendment is made to account for the reopening of restaurants and the reopening of in-person spiritual services, as provided in Exhibit A attached hereto. Except as expressly modified by this amendment, the Order remains in full force and effect.

This Order shall be posted on the City website as soon as practicable in one or more appropriate places, and shall remain posted while in effect.

KIRK W. CALDWELL
Mayor
City and County of Honolulu

Date: May 21, 2020
Time: 1:30 PM

APPROVED:

PAUL S. AOKI
Acting Corporation Counsel
City and County of Honolulu

## EXHIBIT A

### Designated Businesses and Operations

1.   Public and private golf courses within the City operating in accordance with the guidelines set forth in the Professional Golfers' Association/Aloha Section's "Procedures for Reintroduction to the Game and Business of Golf" as may be updated/amended and to the extent reasonably practicable. (Approved by GOV/HI-EMA 4/29/20);

2.   Certain real estate services. All real property sales and management activities must be accomplished by remote/electronic means whenever possible. Whenever such services cannot be reasonably be accomplished by remote/electronic means, and subject to the following restrictions and conditions, the services shall constitute a Designated Business and Operation:

   a.   Restrictions:

      i.   In-person meetings with clients or customers are prohibited, except when necessary for viewing a property or signing documents required by law that may not be signed remotely / electronically.

      ii.   Transportation to/from properties shall be in separate vehicles.

      iii.   There shall be no (a) open houses for the general public to view a property; (b) real estate agent caravans; or (c) brokers' open events.

      iv.   Property viewings, inspections, appraisals, etc. must be by appointment only and limited to no more than three (3) individuals at one time and meeting Social Distancing Requirements of the Stay at Home Order at all times. Prospective renters/buyers must be pre-qualified by remote means in order to make a viewing appointment.

      v.   No real estate activities relating to short term rentals (lodgings that provide guest accommodations for less than 30 days, other than hotels and motels) may be conducted.

   b.   Permitted real estate activities:

      i.   Residential rental property management (excluding short term rentals).

      ii.   Satisfaction of, and compliance with current/pending contract contingencies and other legally mandated activities, such as:
         - Property inspection
         - Inventory
         - Termite inspection
         - Appraisal
         - Survey
         - Removal of items from property
         - Repairs/Cleaning

- Signing
- Final walk through
- Key transfer

    c. Fulfilling listing agreement/property management obligations:

- Pre-listing property viewing / analysis for Comparative Market Analysis (CMA) 86 pricing
- Photography / scanning
- Virtual recording for virtual tours and virtual open houses (to post on property websites, etc.)
- Inspection of vacant listings to ensure safety, maintenance, upkeep, etc.
- Viewings by appointment, only to prequalified buyers/applicants limited to no more than three (3) individuals at one time (including agents).

(Approved by GOV/HI-EMA 4/29/20);

3.    New and used car and truck dealerships - sales and leasing activities (with restrictions). Licensed new and used car and truck dealerships operating on an appointment-only basis and limiting appointments as necessary to ensure compliance with Social Distancing Requirements. No test driving with sales agents is permitted. (Approved by GOV/HI-EMA 4/29/20);

4.    Automated service providers. Service providers that do not require human interaction between the service provider and the customer, including, but not limited to, fully automated car washes; provided that the service provider implements sanitation measures consistent with CDC guidelines - https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html (Approved by GOV/HI-EMA 4/29/20);

5.    Mobile service providers. Businesses that provide services on a mobile basis in which no human interaction between the service provider and the customer, including, but not limited to, mobile pet grooming and car washing/detailing businesses; provided that the service provider implements sanitation measures consistent with CDC guidelines - https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html (Approved by GOV/HI-EMA 4/29/20);

6.    Educational services provided on a one-on-one basis that can be conducted in compliance with Social Distancing Requirements. Businesses that provide services such as private tutoring, music lessons, etc., one a one-on-one basis (e.g., one teacher and one student) that are able to comply with Social Distancing Requirements at all times and implementing sanitation measures consistent with CDC guidelines - https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html. (Approved by GOV/HI-EMA 4/29/20);

7.    Floral businesses (with restrictions). Floral businesses to the extent all orders are taken remotely (via telephone, fax, email, etc.), and fulfilled either by delivery or pick-up outside of the business facility in compliance with Social Distancing Requirements. (Approved by GOV/HI-EMA 4/29/20);

EX04-013

8. Retail and repair service businesses, starting on May 15, 2020, provided all of the following:

    a. Occupancy is limited at all times to no more than one (1) person per 200 square feet of the gross operation area (which equates to approximately 50 percent of the maximum occupancy load).

    b. Social Distancing Requirements (as defined in Section II.K.) are adhered to at all times.

    c. The City's "COVID-19 Guidance for Businesses" is followed to the greatest extent possible – https://www.oneoahu.org/business-guidance.

    d. Fitting rooms (if any) must remain closed.

    e. Within shopping malls, the following must remain closed:

        • Food-court dining areas (except for delivery or carry out)
        • Play areas
        • Entertainment areas
        • Common areas (except to access and depart from a retail or repair service business)
        • Arcades
        • Game rooms

(Approved by GOV/HI-EMA 5/5/20):

9. Outdoor sport fields and courts only for one-on-one sports or exercise where compliance with the six (6) feet of physical distance requirement is possible. Starting May 15, 2020, public and private outdoor sport fields and courts may reopen under the following conditions:

    a. Only outdoor one-on-one sports and exercise activities in which it is both possible and reasonable for individuals to maintain six (6) feet of physical distance between each other at all times are permitted. Examples include, but are not limited to, singles tennis, singles pickle ball, yoga, and tai chi. Excluded, are activities such as one-on-one or team basketball, in which it is neither possible nor reasonable to play while maintaining six (6) feet of physical distance.

    b. Participants must comply with all applicable Social Distancing Requirements, including the requirement of participants to maintain physical distance of six (6) feet from one another at all times. However, participants shall not be required to wear face coverings while actively participating in an activity authorized under this section.

    c. For outdoor group exercise allowed under this section, the maximum number of participants is ten (10).

3

d.  Participants of an activity allowed under this section shall (1) travel to the outdoor sport field or court; (2) participate in the activity; and (3) then depart from the field or court. There shall be no social gatherings at the sport field or court complex.

e.  To the extent consistent with this section, and to the extent reasonably practicable, the facility operators and participants shall follow established and reputable guidelines for the return to their activity during the COVID-19 pandemic (if any). For example, for tennis, the guidelines issued by the United States Tennis Association's "Playing Tennis Safely: Player Tips and Recommendations" (available at https://www.usta.com/en/home/stay-current/national/usta-statement-on-safety-of-playing-tennis-during-the-covid-19-v.html) should be followed to the extent they are consistent with this section and to the extent reasonably practicable.

f.  Participants waiting to use a facility open under this section shall abide by all applicable Social Distancing Requirements, including maintaining physical distance of six (6) feet from one another at all times. Facilities to open under this section are encouraged, but not required, to implement a reservation system to eliminate or reduce waiting times.

g.  Nothing in this section requires a public or private sports field, court, or similar facility to open.

h.  Commercial activities that are not authorized by permit — including, but not limited to — private or group exercise classes that assess a fee such as fitness classes, boot camps, beach yoga, dance classes, etc., are still not permitted in public parks.

(Approved by GOV/HI-EMA 5/13/20);

10.  Drive-in services.  Starting on May 15, 2020, drive-in services (e.g., spiritual/religious services) may be conducted provided all of the following:

a.  All persons attending the service must drive up in an enclosed vehicle and remain in that same vehicle during the entire service.

b.  Vehicle windows, sunroofs and convertible tops must remain closed during the entire service, unless the vehicle is parked more than six (6) feet away from any other vehicle.

c.  Each vehicle may only be occupied by members of the same household or living unit.

d.  All City, state, and federal laws related to vehicle operation must be followed.

4

      e.     Organizers and employees of the services must follow current City, State, and CDC guidelines.

      f.     Generally, no food, beverages, equipment, or materials of any kind may be distributed or collected during the service. However, organizers may use unattended drop-boxes, or distribute preordered food, beverages, equipment, or materials consistent with CDC guidelines and this Order. Attendees of the service must remain in their vehicles at all times, except to use the restroom while complying with Social Distancing Requirements (including wearing a face covering and maintaining six (6) feet of physical distance between others). Where restroom facilities are provided, the organizers must ensure the availability of handwashing stations or sanitizer, and the routine maintenance and cleaning of the facilities consistent with CDC guidance.

(Approved by GOV/HI-EMA 5/13/20)

11.    **Beaches.** Starting May 16, 2020, the beach closures in Governor David Y. Ige's Seventh Supplemental Proclamation, and any subsequent proclamation, are not applicable to the City. In addition to those activities already allowed (e.g., ocean access and exercise), beaches or sand bars within the City may also be utilized with the following restrictions:

      a.     All groups are limited to members of the same household or living unit.

      b.     No group can exceed ten (10) persons.

      c.     All persons using the beach, who are not part of members of the same household or living unit, shall comply with Social Distancing Requirements, provided that a caregiver may accompany a dependent.

      d.     The beach or sand area may only be used one-half hour before sunrise to one-half hour after sunset, unless the person is engaged in shore fishing or permitted outdoor exercise.

      e.     All other State of Hawaii or City restrictions related to COVID-19 must be followed, including, but not limited to, any applicable quarantine restrictions.

This section is subject to specific beach closures as designated by the City (including any of its departments) and the State of Hawai'i Department of Land and Natural Resources.

APPROVED:

_David Y. Ige_
Governor of Hawai'i
or
Major General Kenneth Hara
Director, HI-EMA

(Approved by GOV/HI-EMA 5/15/20)

5

EX04-016

12. In-person spiritual services. Starting May 23, 2020, in-person spiritual services may be conducted provided all of the following are implemented:

    a.   All persons present at the service must maintain six (6) feet of physical distance between others, except members of the same household or living unit. Organizers are encouraged to limit the number of persons attending their in-person spiritual services to ensure this physical distancing requirement is met.

    b.   Organizers and employees are strongly encouraged to develop and implement appropriate COVID-19 mitigation plans and procedures for their respective in-person services, which should include, but are not limited to, addressing the following issues:

        i.    Usage of face coverings.
        ii.   Safeguards for higher risk populations consistent with CDC guidance, available at https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Higher-Risk.
        iii.  Persons who are sick.
        iv.  Personal hygiene.
        v.   Usage of hand sanitizer and sanitizing products.
        vi.  Cleaning and disinfection.
        vii.  Online and remote access and/or drive-in services.
        viii. Signage.
        ix.  Limiting community sharing of worship materials and other frequently touched items.

    c.   Organizers and employees of in-person spiritual services must follow to the greatest extent possible current COVID-19 related: City guidelines; State of Hawaii guidelines' CDC guidelines (available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/index.html), and their respective spiritual organizations' guidelines.

(Approved by GOV/HI-EMA 5/21/20):

13. Restaurants. This section applies to restaurants only. Bars and nightclubs remain closed. Starting June 5, 2020, restaurants in the City may resume table service dining under the following requirements, conditions, and privileges:

    a.   General.
        i.    Continued compliance with all State of Hawai'i and City regulatory and legal standards for operating a food services business.
        ii.   Compliance with Social Distancing Requirements (as modified by this "Restaurants" section).
        iii.  Development, posting, and implementation of written protocols ("COVID-19 Mitigation Plan") consistent with this section; Centers for Disease Control and Prevention ("CDC") guidance (available here: https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html), as updated or superseded; and, to the extent

6

practicable, the National Restaurant Association's Reopening Guidance (available at https://restaurant.org/Downloads/PDFs/business/COVID19-Reopen-Guidance.pdf) .

b.     Operations.
  i.     Face coverings (as defined in Order 5).
    - Employees - Cooks and kitchen staff that do not interact with the public are encouraged, but not required, to wear face coverings during their shifts.  All other restaurant employees must wear face coverings during their shift.
    - Customers - Customers must wear face coverings when entering and leaving the restaurant facility, but may remove the face coverings while seated.
  ii.    Group dining is limited to a maximum of ten (10) individuals per group.
  iii.   Seating shall be arranged so that six (6) feet of separation is maintained between dining groups.
  iv.    Condiments shall be by request in single-use disposable packets, or reusable condiment containers that are sanitized between parties.
  v.     Tables and chairs must be fully sanitized after each group (or individual customer) leaves the restaurant.
  vi.    When non-disposable dishware and utensils are used, they must be sanitized after each use consistent with Hawaii Department of Health guidance and regulations, and "best practices" of the U.S. Food & Drug Adminstration ("FDA") (available here: https://www.fda.gov/food/food-safety-during-emergencies/best-practices-re-opening-retail-food-establishments-during-covid-19-pandemic), as updated or superseded.
  vii.   Provide disposable menus or menu boards, or sanitize reusable menus after each use.
  viii.  Hourly touch-point sanitization (workstations, equipment, screens, door knobs, restrooms, etc.) required.
  ix.    No self-service buffets or drink stations

c.     Hygiene.
  i.     Employer must provide hand washing capability or sanitizer for employees and customers.
  ii.    An adequate supply of soap, disinfectant, hand sanitizer, and paper towels must be available at all times.
  iii.   Frequent hand washing/sanitizing by employees is required.

d.     Staffing.
  i.     Provide training for employees regarding these requirements and each restaurant's respective COVID-19 Mitigation Plan (as defined in subsection a.iii above).
  ii.    Conduct pre-shift screening, maintain staff screening log.
  iii.   No employee displaying symptoms of COVID-19 should provide services to customers. Symptomatic or ill employees should not report to work.

7

    iv.    No person should work within 72 hours of exhibiting a fever or other COVID-19 symptoms, and follow the CDC's "What To Do If You Are Sick" guidance, available at https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html.

    v.    Employer must establish a plan for employees getting ill and a return-to-work plan following CDC guidance, which can be found online at: https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html.

  e.    Cleaning and Disinfecting.

    i.    Cleaning and disinfecting must be conducted in compliance with CDC guidance.

    ii.    When an active employee is identified as being COVID-19 positive by testing, cleaning and disinfecting must be performed as soon after the confirmation of a positive test as practical consistent with CDC guidance.

    iii.    CDC guidance can be found online at: https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html

  f.    Encouraged practices. Restaurants are encouraged to do the following:

    i.    Have customers enter and exit through different entries using one-way traffic, where possible.

    ii.    Start or continue entryway, curbside, and home delivery.

    iii.    Encourage making reservations, preordering for dine-in service, and ordering for contactless pickup and delivery either by telephone or other remote means.

    iv.    Implement cashless and receiptless transactions.

  g.    Pilot sidewalk/outdoor dining privilege. From the effective date of this section, through the termination of Mayor's COVID-19-related Emergency Proclamation (as supplemented), restaurants abutting City property may use City Property for dining and take-out operations under the following conditions:

    i.    The restaurant must be on the ground floor and abut paved City property

    ii.    Upon 24-hour's notice, the restaurant must vacate City property for regular maintenance by City (e.g. steam cleaning).

    iii.    The restaurant are responsible for own equipment, furniture, and supplies, which must be stored elsewhere during closed hours.

    iv.    The utilized City property may only be used by the restaurant during its business normal hours, but shall not be used between the hours of 11:00 p.m. and 7:00 a.m.

    v.    The restaurant is responsible for compliance with any additional requirements relating to its Hawaii Department of Health Food Establishment Permit.

    vi.    Liquor sales, if any, on the utilized City property must be authorized under the restaurant's liquor license and applicable law.

    vii.    No additional signage is permitted within the utilized City property.

8

viii. Dining services must be consistent with the requirements of this section 11, including Social Distancing Requirements and physical spacing of tables and customers.

ix. Furniture must be located at least six (6) feet from any vehicular ramp, driveway or street intersection.

x. No live or amplified music is allowed on the utilized City property.

xi. Furniture shall not be placed over planter strips and tree wells

xii. Furniture shall be outside an eight (8)-foot radius around bus stops and a five (5)-foot radius around fire hydrants.

xiii. All fire lanes shall be open and accessible at all times.

xiv. The restaurant is responsible for rubbish collection.

xv. Restaurants must cease operations completely when Mayor's COVID-19-related Emergency Proclamation (as supplemented) is no longer in effect.

xvi. Violations of these requirements will result in forfeiture of this privilege.

xvii. Sidewalk/outdoor dining under this section may include parklets (i.e., use of abutting parking/street spaces converted to dining space), subject to pedestrian clearance, traffic, and safety issues as determined by the City through the department(s) having authority over those issues.

xviii. Where sidewalks are present on all or part of the utilized City property, the restaurant must ensure a clear right of way of at least 36 inches at all times, (although 48 inches is recommended).

xix. For restaurants abutting "pedestrian malls", as more specifically defined in Section 29-1.1, et seq. of the Revised Ordinances of the City and County of Honolulu 1990 (as amended), the following additional requirements apply:
- A clear 20-foot wide right of way to accommodate delivery and emergency vehicles must be maintained at all times
- Operation cannot exceed mall hours
- No liquor service is allowed
- All rubbish must be removed nightly
- If the ground of the City property utilized consists of pavers, the restaurant must take precautions to prevent and address food, liquid, and grease spills

xx. For restaurants abutting a City park or playground, use of the City Property is limited to seven (7) feet from property line, and no more than one row of tables.

xxi. Activities permitted under this section may begin upon acceptance by the City of a completed liability form and proof of insurance.

(Approved by GOV/HI-EMA 5/21/20).

9



# OFFICE OF THE MAYOR
# CITY AND COUNTY OF HONOLULU

530 SOUTH KING STREET, ROOM 300 · HONOLULU, HAWAII 96813
PHONE: (808) 768-4141 · FAX: (808) 768-4242 · INTERNET: www.honolulu.gov

KIRK CALDWELL
MAYOR

ROY K. AMEMIYA, JR.
MANAGING DIRECTOR

GEORGETTE T. DEEMER
DEPUTY MANAGING DIRECTOR

August 6, 2020

**OFFICE OF THE MAYOR**
**CITY AND COUNTY OF HONOLULU**
**EMERGENCY ORDER NO. 2020-23**
**(COVID-19 [Novel Coronavirus])**

**ACT WITH CARE – DO NOT GATHER**

## AUTHORITY

By the authority vested in me as Mayor of the City and County of Honolulu (the **"City"**) pursuant to Revised Charter of the City and County of Honolulu 1973 (2017 Edition), as amended; the Revised Ordinances of the City and County of Honolulu 1990, as amended; the Hawai'i Revised Statutes, as amended (**"Haw. Rev. Stat."**); the Constitution and laws of the State of Hawai'i (the **"State"**); I, KIRK W. CALDWELL, hereby issue this order, Act With Care – Do Not Gather (**"Order"**), to further address the emergency declared in the Proclamation COVID-19 [Novel Coronavirus] that I issued on March 4, 2020, Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued on March 18, 2020, the Second Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued May 6, 2020 Third Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued June 20, 2020, and the Fifth Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) I issued August 6, 2020.

## OVERVIEW

The virus that causes Coronavirus 2019 Disease (**"COVID-19"**) is easily transmitted, especially in group settings, and it is essential that the spread of COVID-19 be slowed to protect the ability of public and private health care providers to handle the influx of new patients and to safeguard public health and safety. This Order addresses these ongoing concerns.

Towards the start of the COVID-19 pandemic, the City issued a Stay at Home / Work from Home Order (Emergency Order 2020-2) (**"Stay at Home Order"**) that generally required individuals to shelter in place at their residence, with limited exceptions (for essential businesses and certain activities). The Stay at Home Order (as amended) along with the State's coordinated

**EX04-021**

efforts accomplished the City's goals of slowing the spread of COVID-19 and provide the City additional time to prepare for the pandemic, while the virus spread quickly throughout the world. Through successive orders, the City then began the gradual process of reopening certain Designated Businesses and Operations, and allowing individuals to engage in more activities outside of their residence (with spread mitigations measures), in an attempt to bring back the economy and a sense of normalcy, while limiting the spread of COVID-19.

This Order builds upon the framework of the Stay at Home Order. Section I sets forth the "Orders" which mandate what is and what is not permitted within the City at this time. Section II provides definitions of the capitalized terms contained in the Orders and the exemptions to the Orders, including Designated Businesses and Operations, which represent the businesses and operations that were allowed to operate after the initial strict Stay at Home Order proved successful. "Designated Businesses and Operations" are defined as the businesses and operations listed in Exhibit A of this Order (along with their respective mitigations measures). Section III outlines the basis for the Order, and Section IV explains the Order's intent for interpretation purposes, and Section V contains general provisions relating to the Order's effect on prior orders, duration, enforcement, posting, and severability of the Order.

At present time, there is a resurgence of COVID-19 within the City due to large gatherings in uncontrolled environments. To protect the public health and for the long-term benefit of the economy, the City must take measures through this Order, including slowing the reopening process and limiting certain activities and businesses again to reduce the spread of COVID-19.

This Order is **effective at 12:00 a.m. on August 8, 2020**, and will continue through **September 4, 2020**, subject to the limited exceptions and under the terms and conditions more particularly set forth below.

Pursuant to Haw. Rev. Stat. § 127A-25 and the Rules of the Mayor City and County of Honolulu, dated March 20, 2020 (**"Mayor's Rules"**) promulgated under that section, each of the orders contained in this Order (**"the Orders"**) shall have the force and effect of law. The Orders are in accordance with and incorporate by reference all of my prior COVID-19 related emergency proclamations; and Hawai'i Governor David Y. Ige's COVID-19-related emergency proclamations.

Violation of any of the Orders is punishable as a misdemeanor, with fines of up to $5,000, up to a year in jail, or both. Haw. Rev. Stat. § 127A-29; Mayor's Rules.

## I.   ORDERS

**Order 1:** All individuals currently living within the City are ordered to stay at their place of residence. To the extent individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain physical distancing of at least six (6) feet from any other person when they are outside their residence and comply with Social Distancing Requirements (as defined in Section II.K). All persons may leave their residences only for Essential Activities, Essential Governmental Functions, or to operate or visit Essential Businesses or Designated Businesses and Operations, as those terms are defined in Section II. Individuals experiencing homelessness are exempt from this section, but are strongly urged to obtain shelter, and

**EX04-022**

governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to use COVID-19 risk mitigation practices in their operation).

**Order 2:** All businesses with a facility in the City, except Essential Businesses (as defined in Section II.F.) and Designated Businesses and Operations (as defined in Section II.G.), are required to cease all activities within such facilities, except Minimum Basic Operations (as defined in Section II.H.). For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home). All Essential Businesses and Designated Businesses and Operations are strongly encouraged to remain open. To the extent applicable and to the greatest extent feasible, Essential Businesses and Designated Businesses and Operations shall comply with Social Distancing Requirements, including the six-foot physical distancing requirement for both employees and members of the public (including customers standing in line inside and outside of the facility).

**Order 3:** Gatherings.

A.   *Outdoor* social gatherings of up to ten (10) individuals (regardless of household or living unit affiliation) are permitted. Physical distancing of at least six (6) feet between members of different households/living units within a gathering (of up to ten (10) individuals) must be maintained. Also, face coverings must be worn in accordance with Order 5. There shall be no mingling between separate outdoor social gatherings. Outdoor social gatherings involving over 10 individuals are prohibited.

B.   *Indoor* social gatherings of up to ten (10) individuals are permitted. Physical distancing of at least six (6) feet between members of different households/living units within a gathering (of up to ten (10) individuals) must be maintained. Also, face coverings must be worn in accordance with Order 5. Indoor social gatherings involving over 10 individuals are prohibited.

C.   All other public and private gatherings are prohibited, except as permitted in Section II. Nothing in this Order prohibits the gathering of members of a household or living unit on their property (including shared common areas).

**Order 4:** All travel, including, but not limited to, travel on foot, bicycle, scooter, motorcycle, automobile, or public transit, except Essential Travel and Essential Activities (as defined in Section II), is prohibited. People must use public transit only for purposes of performing Essential Activities; or to travel to and from Essential Businesses, or Designated Businesses and Operations; or maintain Essential Governmental Functions. People riding on public transit must comply with Social Distancing Requirements, as applicable and to the greatest extent feasible. This Order allows travel into or out of the City to perform Essential Activities, operate or visit Essential Businesses, operate or visit Designated Businesses and Operations, or maintain Essential Governmental Functions.

3

**Order 5:** Non-Medical Grade Face Coverings.

All individuals within the City shall wear face coverings while outdoors in public spaces when maintaining a physical distance of six (6) feet from persons who are not members of the same household or living unit is not feasible.

All individuals within the City shall wear face coverings while indoors in public spaces, including, but not limited to, enclosed common areas of commercial and residential buildings.

All employees who work at businesses or perform services at Essential Businesses, as provided in Section II.F. of this Order, and Designated Businesses and Operations, as provided in Section II.G. of this Order, and City departments shall wear non-medical grade face coverings over their noses and mouths when engaged and interacting with customers, visitors, and other employees of the Essential Business, Designated Business and Operation, or City department at issue.

All customers and visitors of businesses and organizations defined as Essential Businesses, as provided in Section II.F. of this Order, and Designated Businesses and Operations, as provided in Section II.G. of this Order, and City departments shall wear non-medical grade face coverings over their noses and mouths to provide additional protection for employees and customers of Essential Businesses, Designated Businesses and Operations, and City department at issue.

All passengers and users of public modes of transportation (TheBus and TheHandi-Van) shall wear non-medical grade face coverings over their noses and mouths when on board.

An owner or operator of an Essential Business under this Order, Section II.F. or Designated Business and Operation under this Order, Section II.G., or City department *may* refuse admission or service to any individual who fails to wear face coverings.

Face coverings under this Order may not be worn only under the following circumstances:

- Within banks, financial institutions, or using automated teller machines where the inability to verify the identity of the customer or visitor of the bank, financial institution or automated teller machine poses a security risk;

- By individuals with medical conditions or disabilities where the wearing of a face covering may pose a health or safety risk to the individual;

- By individuals engaging in physical activity outdoors where physical distancing can be maintained (e.g., walking, jogging, hiking, etc.);

- By children under the age of 5;

- By first responders (Honolulu Police Department, Honolulu Fire Department, Honolulu Emergency Services Department) to the extent that wearing non-medical grade face coverings may impair or impede the safety of the first responder in the performance of his/her duty;

- By children in childcare, educational, and similar facilities consistent with the latest guidance from the Centers for Disease Control and Prevention ("**CDC**") for such facilities;

4

- As allowed by another provision of this Order.

The wearing of face coverings under this Order is intended to complement, not serve as a substitute, for physical distancing and cleanliness.

Definition:  "Non-medical grade face covering" or "face covering" as used in this Order, means a tightly woven fabric without holes that is secured to the head with either ties or straps, or simply wrapped and tied around the wearer's nose and mouth.  It can be made of a variety of fabrics such as cotton, silk, or linen and may be factory-made, sewn by hand, or made from household items such handkerchiefs, scarfs, or shirts.

Recommendation:  This Order requires non-medical grade face coverings to be worn in certain circumstances.  Individuals who are unable to wear a non-medical grade face covering due to medical conditions or disabilities where the wearing of a face covering may pose a health or safety risk to the person are encouraged to wear a face shield instead.

Any seller of non-medical grade face coverings or materials or supplies to make or manufacture such face coverings shall abide by Haw. Rev. Stat. § 127A-30.

**Order 6:**  Closure of City and State Parks

City and County of Honolulu parks and botanical gardens (**"City Parks"**) and State of Hawai'i parks within the City (**"State Parks"**), are closed for use except as set forth below:

A.    Individuals may travel through City and State Parks to engage in and return from ocean activities such as surfing, solo paddling, swimming, and other activities allowed by law.

B.    Individuals may travel through City and State Parks to use comfort stations and showers which shall remain open.

C.    Shooting and archery ranges may remain open as determined by the City's Department of Parks and Recreation.

D.    To the extent applicable, fishing is permitted, but no group of two (2) or more individuals may engage in fishing and gathering.

E.    Individuals may travel through City Parks to drop off election ballots at drop boxes.

**II.    DEFINITIONS AND EXEMPTIONS**

A.    For purposes of this Order, individuals may leave their residence only to perform any of the following **"Essential Activities."**  However, people at high risk of severe illness from COVID-19 and people who are sick are urged to stay in their residence to the extent possible, except as necessary to seek medical care.

1.    To engage in activities or perform tasks essential to their health and safety,

5

**EX04-025**

or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, obtaining medical supplies or medication, visiting a health care professional, or obtaining supplies needed to work from home.

2. To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example only and without limitation, canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products, and products necessary to maintain the safety, sanitation, and essential operation of residences.

3. To engage in outdoor activity in locations as allowed by law, including this Order.

4. To perform work providing products and services at an Essential Business, Designated Business or Operation, or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations.

5. To care for a family member or pet in another household.

6. To obtain services, goods, or supplies from, or engage in activities at, Essential Businesses (as defined in Section II.F) and Designated Businesses and Operations (as defined in Section II.G.).

7. To visit graveyards, mausoleums, and similar sites consistent with the restrictions placed on gatherings in this Order.

B. For purposes of this Order, individuals may leave their residence to work for or obtain services at any **"Healthcare Operations"** including hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other healthcare facilities, healthcare suppliers, home healthcare services providers, mental health providers, or any related and/or ancillary healthcare services, organizations collecting blood, platelets, plasma, and other necessary materials, licensed medical marijuana dispensaries and licensed medical marijuana production centers, eye care centers, including those that sell glasses and contact lenses. "Healthcare Operations" also includes veterinary care and all healthcare services provided to animals. Further, "Healthcare Operations" includes prepaid health care plan contractors as that term is defined under Haw. Rev. Stat. ch. 393, and other employer-sponsored health and welfare benefit plans, and/or individual or group health insurance plans that provides healthcare insurance benefits for payment or reimbursement for healthcare services provided by Healthcare Operations. This exemption shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. "Healthcare Operations" does not include fitness and exercise gyms and similar facilities.

C. For purposes of this Order, individuals may leave their residence to provide any

6

EX04-026

services or perform any work necessary to the operations and maintenance of **"Essential Infrastructure,"** including, but not limited to, public works construction, construction of housing (in particular affordable housing or housing for individuals experiencing homelessness), airport operations, water, sewer, gas, electrical, oil refining, roads and highways, public transportation, solid waste collection and removal, internet, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services), provided that they carry out those services or that work in compliance with Social Distancing Requirements to the extent applicable and reasonably possible. This Order shall be construed and applied in compliance and consistent with the United States Department of Homeland Security, Cybersecurity & Infrastructure Security Agency Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, updated March 28, 2020 (and any subsequent updates and guidance memoranda thereto).

D.     For purposes of this Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, and law enforcement personnel, jails and prisons personnel are categorically exempt from this Order while performing their job-related duties. Further, nothing in this Order shall prohibit any individual from performing or accessing "Essential Governmental Functions." **"Essential Government Functions"** means all services needed to ensure the continuing operation of the government agencies and provide for the health, safety and welfare of the public. All Essential Governmental Functions shall be performed in compliance with Social Distancing Requirements to the extent applicable and reasonably possible.

E.     For the purposes of this Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function they perform, or its corporate or entity structure.

F.     For the purposes of this Order, **"Essential Businesses"** means:

    1.     Healthcare Operations and Essential Infrastructure;

    2.     Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries and also sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences;

    3.     Food cultivation, including farming, livestock, and fishing;

    4.     Businesses that provide food, shelter, and social services, and other

7

**EX04-027**

necessities of life for economically disadvantaged or otherwise needy individuals;

5.    Newspapers, television, radio, and other media services;

6.    Gas stations and auto and bicycle supply, auto and bicycle repair, towing services, and related facilities;

7.    Banks and related financial institutions. This provision shall be construed and applied in compliance and consistent with the United States Department of Homeland Security, Cybersecurity & Infrastructure Security Agency Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, dated March 19, 2020 (and any subsequent guidance memoranda thereto), and the United States Department of the Treasury Memorandum for Financial Services Sector Essential Critical Infrastructure Workers, dated March 22, 2020 (and any subsequent guidance memoranda thereto);

8.    Hardware stores;

9.    Plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, Essential Businesses, or Designated Businesses or Operations;

10.   Businesses providing mailing and shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods or services to residences and end users or through commercial channels, and including post office boxes;

11.   Educational institutions—including public and private K-12 schools, colleges, and universities—for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible;

12.   Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

13.   Restaurants and other facilities that prepare and serve food, but only for delivery or carry out.

    a.    Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only, provided that social distancing of six-feet per person is maintained to the greatest extent possible. Schools and other entities that

8

**EX04-028**

provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;

b.    Cafeterias, lunchrooms, or dining facilities providing food and beverage services located within "healthcare facilities" as that term is defined under Haw. Rev. Stat. § 321-15.2 and similar facilities, may continue to do so under this order, provided that consumption within the cafeteria, lunchroom, or dining facility located within the healthcare facility is restricted to employees of the healthcare facility; patients of the healthcare facility; and no more than two (2) authorized visitors of the patient of the healthcare facility that have been appropriately screened by the healthcare facility in compliance with all of the facility's protocols related to infectious disease control measures and processes.;

14.    Businesses that supply products needed for people to work from home;

15.    Businesses that supply other Essential Businesses or Designated Businesses and Operations with the support or supplies necessary to operate;

16.    Airlines, taxis, and other private transportation providers, vehicle rental services, paratransit, and other private, public, and commercial transportation and logistics providers providing transportation services necessary for Essential Activities and other purposes expressly authorized in this Order;

17.    Home-based care for seniors, adults, or children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including care givers such as nannies who may travel to the child's home to provide care, and other in-home services, including meal delivery;

18.    Residential facilities and shelters for seniors, adults, and children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

19.    Professional services, such as legal or accounting services, insurance services, other than real estate service provider (addressed separately via Section II.G.), when necessary to assist in compliance with legally mandated activities;

20.    Childcare facilities providing services that enable employees exempted in this Order to work or engage in activities as permitted.  Childcare facilities must operate in accordance with State of Hawai'i Department of Human Services requirements.

9

**EX04-029**

21. Businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, kennels, and adoption facilities, provided they must comply with Social Distancing Requirements to the extent applicable and reasonably possible;

22. Hotels and motels, to the extent used for lodging; and service providers to hotels and motels that provide services that are necessary to maintaining the safety, sanitation, and essential operations of the hotel and/or motel, provided that they must comply with Social Distancing Requirements to the extent applicable and reasonably possible;

23. Funeral, mortuary, cremation, burial, cemetery, and related professional services, provided that each death-related event (funeral, etc.) is: (a) limited to 10 individuals maximum (with members from different households/living units maintaining physical distance of at least six (6) feet between each other at all times); (b) face coverings are worn consistent with Order 5; and (c) there is compliance with all other applicable Social Distancing Requirements;

24. Critical trades.  Building and construction tradesmen and tradeswomen, and other trades, including but not limited to, plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operations of residences, Essential Activities, Essential Businesses, or Designated Businesses and Operations provided that they must comply with Social Distancing Requirements to the extent applicable and reasonably possible;

25. Critical labor union functions that are essential activities that include the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses or Designated Businesses and Operations, provided that these checks should be done by telephone or remotely;

26. Licensed private detectives and agencies and guards and agencies as those terms are defined under Haw. Rev. Stat. ch. 463;

27. Fabric Sellers/Suppliers, under the following conditions:

    a. The business is primarily engaged in selling fabric and related supplies ("Fabric Store(s)");

    b. Only two customers are allowed in the Fabric Store at a time, and the Fabric Store has implemented effective procedures to prevent any line from forming outside (appointment-only system, etc.);

10

**EX04-030**

    c.      All orders from the Fabric Store, other than those to be made in person pursuant to sub-section II.F.27.b. (above), are facilitated exclusively online, or by other remote means;

    d.      Orders from the Fabric Store, other than those to be made in person pursuant to sub-section II.F.27.b. (above), are fulfilled by no-contact delivery; a business providing mailing and shipping and delivery services to residences and end users or through commercial channels; or by curbside pick-up consistent with Social Distancing Requirements to the extent applicable and reasonably possible;

    e.      In-person and pick-up orders from the Fabric Store are solely for the purpose of obtaining materials necessary to make masks; and

    f.      The physical presence of workers at the Fabric Store is limited to the greatest extent feasible, and such workers must comply with Social Distancing Requirements.

G.    For the purposes of this Order, **"Designated Businesses and Operations"** are listed and defined in the attached Exhibit A.

H.    For the purposes of this Order, **"Minimum Basic Operations"** include the following, provided that employees comply with Social Distancing Requirements to the extent applicable and reasonably possible, while carrying out such operations:

    1.      The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.

    2.      The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

    3.      The minimum necessary activities to prepare for the re-opening of Designated Businesses and Operations.

I.    For the purposes of this Order, **"Essential Travel"** includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements to the extent applicable and reasonably possible.

    1.      Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses, Designated Businesses and Operations, or Minimum Basic Operations.

    2.      Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

**EX04-031**

3.    Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

4.    Travel to return to a place of residence from outside the jurisdiction.

5.    Travel required by law enforcement or court order.

6.    Travel required for non-residents to return to their place of residence outside the City. Individuals are strongly encouraged to verify that their transportation out of the City remains available and functional prior to commencing such travel.

J.    For purposes of this order, residences include hotels, motels, shared rental units, and similar facilities.

K.    For purposes of this order **"Social Distancing Requirements"** include the following:

1.    High risk populations. Elderly and others at high risk for COVID-19 are urged to stay in their residences to the extent possible, except as necessary to seek medical care.

2.    Persons who are sick. Persons who are sick or have a fever or cough or are exhibiting symptoms such as shortness of breath or difficulty breathing, chills, repeated shaking with chills, muscle pain, headache, sore throat, or new loss of taste or smell, are urged to stay in their residences to the extent possible, except as necessary to seek medical care.

3.    Personal hygiene. Persons are encouraged to wash their hands with soap and water for at least twenty seconds as frequently as possible or use hand sanitizer, cover coughs and sneezes (into the sleeve or elbow, not hands), regularly clean high-touch surfaces, and avoid unnecessary contact with others (shaking hands, etc.).

4.    Six-foot distances. All persons shall maintain a minimum of six-feet of physical separation from all other persons. Essential Businesses and Designated Businesses and Operations (to the degree applicable) shall designate with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance. Employees shall monitor and enforce the six-foot distancing requirement set forth in this Order, whether outside waiting lines or as customers move about inside a facility. Checkout operations shall be modified, to the extent reasonably feasible, to provide this separation or to provide a transparent shield or barrier between customers and checkout clerks.

5.    Limited Customer Occupancy. Each Essential Business and Designated Business and Operation facility shall determine the maximum number of

12

**EX04-032**

customers that may be accommodated while maintaining the specified separation distance and limiting the number of customers in the facility or at the operation to that maximum number at any time, to the extent there is no conflict with any existing law or order.

6.   Face Coverings.  All persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order.

7.   Hand sanitizer and sanitizing products.  Essential Businesses and Designated Businesses and Operations (to the degree applicable) shall make hand sanitizer and sanitizing products readily available for employees and customers. Employees handling items from customers, such as cash or credit cards, shall frequently utilize hand sanitizers.

8.   Disinfection.  Essential Businesses and Designated Businesses and Operations (to the degree applicable) shall regularly disinfect all high-touch surfaces.

9.   Safeguards for high risk populations.  Essential Businesses and Designated Businesses and Operations (to the degree applicable) are urged to implement processes to safeguard elderly and high risk customers.

10.   Online and remote access.  Essential Businesses and Designated Businesses and Operations (to the degree applicable) shall post online whether a facility is open and how best to reach the facility and continue services by phone or remotely. Essential Businesses and Designated Businesses and Operations (to the degree applicable) shall encourage their customers to do their business remotely by phone or online to the extent possible.

11.   Pickup at store or delivery.  Essential Businesses and Designated Businesses and Operations (to the degree applicable) shall provide for, if feasible, online ordering and purchase of goods and customer pickup of orders at a location outside the facility or shall provide for delivery to customer locations.

12.   Signage.  Essential Businesses and Designated Businesses and Operations (to the degree applicable) shall post a sign at the entrance of the facility informing all employees and customers that they must comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order; avoid entering the business or operation if they have a cough or fever or otherwise do not feel well; maintain a six-foot distance from one another; and not shake hands or engage in unnecessary physical contact.

## III.   BASIS FOR THE ORDER

This Order is issued based on evidence of COVID-19 within the City, as reported by the Centers for Disease Control and Prevention (CDC), the State Department of Health, and guidance from

13

EX04-033

the City's medical advisory experts, scientific evidence and best practices regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, and evidence that the age, condition, and health of a significant portion of the population of the City places it at risk for serious health complications, including death, from COVID-19. Due to the outbreak of the COVID-19 virus in the general public, which is a pandemic according to the World Health Organization, there is a public health emergency throughout the City. In addition, some individuals who contract the COVID-19 virus have no symptoms or have mild symptoms, which means they may not be aware they carry the virus. Because even people without symptoms can transmit the virus, and because evidence shows that it is easily spread, gatherings can result in preventable transmission of the virus.

The scientific evidence shows that at this stage of the emergency, it is essential to continue to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed, while also restoring the local economy. One proven way to slow the transmission is to limit interactions among people to the greatest extent practicable. This Order helps preserve critical and limited healthcare capacity in the City while taking steps to revive the economy and begin to recover as a community.

This Order also is issued in light of the existence of 2,394 COVID-19 cases (and 20 deaths) in the City, as well as at least 2,763 total confirmed COVID 19 cases (and 27 deaths) in the State of Hawai'i, as of August 5, 2020.

IV.   INTENT

The intent of this Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible to continue to slow the spread of COVID-19 to the maximum extent possible, while also enabling essential services and the reopening of designated businesses and operations with modifications to re-establish continuity of social and commercial life. When people need to leave their places of residence, whether to obtain or perform vital services, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they shall, as applicable and at all times reasonably possible, comply with Social Distancing Requirements as defined in Section II.K. The intent is also to ensure that when people within the City interact with one another they maintain six (6) feet of physical distance from others, and wear face coverings (especially when indoors). All provisions of this Order should be interpreted to effectuate this intent.

V.   GENERAL

A.   **Superseding Order.** Emergency Order Nos. 2020-01 through 2020-22 issued by the Office of the Mayor City and County of Honolulu related to the COVID-19 pandemic) are hereby rescinded (to the extent they have not been already) and are superseded by this Order. Section 5 of the Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) issued on March 18, 2020, is hereby superseded to the limited extent necessary to carry out this Order.

B.   **Duration.** This Order shall take effect at 12:00 a.m. on August 8, 2020, and shall continue in force and effect through September 4, 2020, or until it is extended,

EX04-034

rescinded, superseded, or amended by a subsequent order, or as otherwise
provided under Haw. Rev. Stat. ch. 127A.

C.     **Enforcement.** All law enforcement of the State of Hawai'i and City shall ensure
compliance with and enforce these Orders in accordance with Haw. Rev. Stat. §
127A-29 and Mayor's Rules.

D.     **Promulgation/posting.** This Order shall be posted on the City website as soon as
practicable in one or more appropriate places, and shall remain posted while in
effect.

E.     **Severability.** If any provision of the Orders or their application to any person or
circumstance is held to be invalid, the remainder of the Orders, including the
application of such part or provision to other persons or circumstances, shall not
be affected and shall continue in full force and effect. To this end, the provisions
of the Orders are severable.

KIRK W. CALDWELL
Mayor
City and County of Honolulu

Date:  Aug. 6, 2020

Time:  4:00 PM

APPROVED:

PAUL S. AOKI
Acting Corporation Counsel
City and County of Honolulu

APPROVED:

DAVID Y. IGE
Governor

15

**EX04-035**

## EXHIBIT A

### Designated Businesses and Operations

1.  Beaches. Consistent with Governor David Y. Ige's COVID-19 related proclamations and approval of this Order, all beaches and sand bars within the City are closed except:

    a.  To transit across or through beaches to access the ocean waters for outdoor exercise purposes, such as surfing, solo paddling, and swimming. No person shall otherwise walk, run, sit, stand, lie down, lounge, sunbathe, or loiter on any state beach or sand bar in Hawai'i.

    b.  The beach or sand area may only be used from sunrise to sunset, unless the person is engaged in shore fishing or permitted outdoor exercise.

    c.  All other State or City restrictions related to COVID-19 must be followed, including, but not limited to, any applicable quarantine restrictions.

2.  Public and private golf courses within the City operating in accordance with the Phase 1 guidelines set forth in the Professional Golfers' Association/Aloha Section's "Procedures for Reintroduction to the Game and Business of Golf" as may be updated/amended and to the extent reasonably practicable.;

3.  Certain real estate services (*effective June 5, 2020*). All real property sales and management activities should be accomplished by remote/electronic means whenever possible. Starting June 5, 2020, whenever in-person real property sales and management activities are warranted, and subject to the following restrictions and conditions, the services shall constitute a Designated Business and Operation:

    a.  Restrictions:
        i.  Any open house, brokers' open, meeting with client(s), property viewings, inspections, appraisals, or similar events shall be limited in number of attendees in accordance with Order 3 of this Order, and comply with Social Distancing Requirements to the extent applicable and reasonably possible, except that all persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order.

    b.  Permitted real estate activities:
        i.  Residential rental property management.
        ii. Satisfaction of, and compliance with current/pending contract contingencies and other legally mandated activities, such as:
            • Property inspection
            • Inventory
            • Termite inspection
            • Appraisal
            • Survey

**EX04-036**

- Removal of items from property
- Repairs/Cleaning
- Signing
- Final walk through
- Key transfer

c. Fulfilling listing agreement/property management obligations such as:
  i. Pre-listing property viewing / analysis for Comparative Market Analysis (CMA) 86 pricing
  ii. Photography / scanning
  iii. Virtual recording for virtual tours and virtual open houses (to post on property websites, etc.)
  iv. Inspection of vacant listings to ensure safety, maintenance, upkeep, etc.
  v. Viewings, limited in accordance with Order 3 of this Order (regarding gatherings).;

4. New and used car and truck dealerships - sales and leasing activities (with restrictions). Licensed new and used car and truck dealerships provided they first develop and implement appropriate COVID-19 mitigation plans and procedures consistent with City, State, and CDC guidelines, including, but not limited to: measures to ensure compliance with Social Distancing Requirements to the extent applicable and reasonably possible, except that all persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order; and limitations on gatherings consistent with Order 3 of this Order.;

5. Automated service providers. Service providers that do not require human interaction between the service provider and the customer, including, but not limited to, fully automated car washes; provided that the service provider implements sanitation measures consistent with CDC guidelines - https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html.;

6. Mobile service providers. Businesses that provide services on a mobile basis in which no human interaction between the service provider and the customer, including, but not limited to, mobile pet grooming and car washing/detailing businesses; provided that the service provider implements sanitation measures consistent with CDC guidelines - https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html;

7. Educational services provided on a one-on-one basis that can be conducted in compliance with Social Distancing Requirements. Businesses that provide services such as private tutoring, music lessons, etc., one a one-on-one basis (e.g., one teacher and one student) that are able to comply with Social Distancing Requirements at all times and implementing sanitation measures consistent with CDC guidelines - https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html.;

8. Retail and service businesses provided all of the following:

EX04-037

a.   Each retail and service business must set and maintain an occupancy limit for their facilities that allows employees, customers, and visitors to maintain at least six-feet of physical distance from one another at all times, and which complies with other applicable law. Alternatively, such businesses may continue to limit occupancy to no more than one (1) person per 200 square feet of the gross operation area (which equates to approximately 50 percent of the maximum occupancy load).

b.   Social Distancing Requirements (as defined in Section II.K.) are adhered to at all times to the extent applicable and reasonably practicable, except that all persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order.

c.   The City's "COVID-19 Guidance for Businesses" (https://www.oneoahu.org/business-guidance) and applicable guidance from the CDC (available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html) are followed to the greatest extent possible.

d.   If fitting rooms are made available, precautions must be taken to mitigate the spread of COVID-19, including frequent sanitizing of frequently touched surfaces, quarantining tried on merchandise for at least 24 hours, and ensuring appropriate physical distancing can be maintained in the fitting room area.

e.   Within shopping malls, the following requirements and conditions apply:
   • The operators of food-court dining areas shall either comply with applicable sections of the "Restaurants" section contained in this Exhibit A (physical distancing of tables, limiting groups, etc.) to the extent reasonably practicable, or keep the area closed.
   • The operators of play areas, entertainment areas, arcades, and game rooms within a shopping mall may operate subject to relevant provisions of this Order. For example, indoor arcades may operate to the extent they are able to comply with the section entitled "indoor attractions," provided that the operation of the specific "indoor attraction", e.g., arcades, is not prohibited; and, common areas may be utilized consistent with restrictions on "gatherings" under Order 3 of the Order.;

9.   RESERVED. Outdoor sport fields, courts, open areas, and pools for individual or small group activities which includes public and private outdoor sport fields, courts, open areas, pools, and similar facilities (**"Outdoor Facilities"**) were previously allowed to open and operate. However, due to ongoing and heightened public health concerns linked to gatherings and the spread of COVID-19, effective immediately and until further notice, the above-cited must close and may not operate within the City.

10.   Drive-in services. Starting on May 15, 2020, drive-in services (e.g., spiritual/religious services) may be conducted provided all of the following:

3

EX04-038

a.  All persons attending the service must drive up in an enclosed vehicle and remain in that same vehicle during the entire service.

b.  Vehicle windows, sunroofs and convertible tops must remain closed during the entire service, unless the vehicle is parked more than six (6) feet away from any other vehicle.

c.  Each vehicle may only be occupied by members of the same household or living unit.

d.  All City, state, and federal laws related to vehicle operation must be followed.

e.  Organizers and employees of the services must follow current City, State, and CDC guidelines.

f.  Generally, no food, beverages, equipment, or materials of any kind may be distributed or collected during the service. However, organizers may use unattended drop-boxes, or distribute <u>preordered</u> food, beverages, equipment, or materials consistent with CDC guidelines and this Order. Attendees of the service must remain in their vehicles at all times, except to use the restroom while complying with Social Distancing Requirements (including wearing a face covering and maintaining six (6) feet of physical distance between others). Where restroom facilities are provided, the organizers must ensure the availability of handwashing stations or sanitizer, and the routine maintenance and cleaning of the facilities consistent with CDC guidance.;

11.  In-person spiritual services. In-person spiritual services may be conducted provided all of the following are implemented:

a.  All persons present at the service must maintain six (6) feet of physical distance between others, except members of the same household or living unit. Organizers are encouraged to limit the number of persons attending their in-person spiritual services to ensure this physical distancing requirement is met.

b.  Organizers and employees are strongly encouraged to develop and implement appropriate COVID-19 mitigation plans and procedures for their respective in-person services, which should include, but are not limited to, addressing the following issues:
 i.  Usage of face coverings.
 ii.  Safeguards for higher risk populations consistent with CDC guidance, available at https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Higher-Risk.
 iii.  Persons who are sick.
 iv.  Personal hygiene.
 v.  Usage of hand sanitizer and sanitizing products.
 vi.  Cleaning and disinfection.
 vii.  Online and remote access and/or drive-in services.

4

      viii.     Signage.

      ix.     Limiting community sharing of worship materials and other frequently touched items.

      x.     Prohibiting, or limiting and mitigating, activities that involve singing (or similar activities that increase the presence and propulsion of respiratory droplets in the air), as such activities may significantly increase the risk of spreading COVID-19.

   c.     Organizers and employees of in-person spiritual services must follow to the greatest extent possible current COVID-19 related: City guidelines; State of Hawaii guidelines' CDC guidelines (available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/index.html), and their respective spiritual organizations' guidelines.;

12.    Restaurants. This section applies to restaurants only. For purposes of this section, a "Restaurant" means a place which is regularly and in a bona fide manner used and kept open for the serving of meals to patrons for compensation and which has suitable kitchen facilities connected therewith, containing the necessary equipment and supplies for cooking an assortment of foods which may be required for ordinary meals. Additionally, to be considered a "Restaurant" under this section, at least thirty percent (30%) of the establishment's gross revenue must derive from the sale of foods. Restaurants in the City may provide seated table service dining under the following requirements, conditions, and privileges:

   a.     General.

      i.     Continued compliance with all State of Hawai'i and City regulatory and legal standards for operating a food services business.

      ii.     Compliance with Social Distancing Requirements (as modified by this "Restaurants" section).

      iii.     Development, posting, and implementation of written protocols ("COVID-19 Mitigation Plan") consistent with this section; Centers for Disease Control and Prevention ("CDC") guidance (available here: https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html), as updated or superseded; and, to the extent practicable, the National Restaurant Association's Reopening Guidance (available at https://restaurant.org/Downloads/PDFs/business/COVID19-Reopen-Guidance.pdf) .

   b.     Operations.

      i.     Face coverings (as defined in Order 5).

          ○     Employees - All restaurant employees must wear face coverings during their shifts, consistent with Order 5 of the Order.

          •     Customers - Customers must wear face coverings when entering and leaving the restaurant facility, consistent with Order 5 of the Order. Customers may remove the face coverings while seated,

5

but they are encouraged to wear face coverings when not actively eating or drinking.

ii.   Group dining is limited to a maximum of ten (10) individuals per group.

iii.  Seating shall be arranged so that six (6) feet of separation is maintained between dining groups.  No standing bar/dining areas are allowed.

iv.   Prohibit groups within the restaurant from intermingling.

v.    Condiments shall be by request in single-use disposable packets, or reusable condiment containers that are sanitized between parties.

vi.   Tables and chairs must be fully sanitized after each group (or individual customer) leaves the restaurant.

vii.  When non-disposable dishware and utensils are used, they must be sanitized after each use consistent with Hawaii Department of Health guidance and regulations, and "best practices" of the U.S. Food & Drug Administration ("FDA") (available here: https://www.fda.gov/food/food-safety-during-emergencies/best-practices-re-opening-retail-food-establishments-during-covid-19-pandemic), as updated or superseded.

viii. Provide disposable menus or menu boards, or sanitize reusable menus after each use.

ix.   Hourly touch-point sanitization (workstations, equipment, screens, door knobs, restrooms, etc.) required.

x.    No self-service buffets or drink stations.

xi.   Generally, singing and playing wind instruments are prohibited.  However, singing and/or playing wind instruments may be performed *outdoors* provided all of the following:

- Any person(s) singing and/or playing a wind instrument shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument. Members of the same performing group singing and/or playing a wind instrument may be closer than ten (10) feet together while performing.

- To the extent reasonable and practicable, a physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument from any other person(s), but not including members of the same performing group.

Singing and/or playing wind instruments may be performed *indoors* provided all of the following:

- Any person(s) singing and/or playing a wind instrument shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument. Members of the same performing group singing and/or playing a wind instrument may be closer than ten (10) feet together while performing.

- A physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or

6

**EX04-041**

                playing a wind instrument from any other person(s), but not including members of the same performing group.

- For purposes of subsection b.xi. "performing group" means persons who are compensated for singing and/or playing a wind instrument.

xii.    Additional restrictions for restaurants holding a liquor license. For restaurants operating under this section that hold a liquor license issued by the Liquor Commission of the City and County of Honolulu, State of Hawaii, (including Class 2, 5, 6, 10, 11, 12, 13, 14, 15, 16, 17, or 18 liquor licenses), the following restrictions and penalties also apply:

- Hours for on premises consumption. Licensees (operating restaurants under this section) shall cease the sale, service, and consumption of liquor at or before 10:00 p.m. The start time for the sale, service, and consumption of liquor shall remain the same, based upon the class of license.

c.    Hygiene.

i.    Employer must provide hand washing capability or sanitizer for employees and customers.

ii.    An adequate supply of soap, disinfectant, hand sanitizer, and paper towels must be available at all times.

iii.    Frequent hand washing/sanitizing by employees is required.

d.    Staffing.

i.    Provide training for employees regarding these requirements and each restaurant's respective COVID-19 Mitigation Plan (as defined in subsection a.iii above).

ii.    Conduct pre-shift screening, maintain staff screening log.

iii.    No employee displaying symptoms of COVID-19 should provide services to customers. Symptomatic or ill employees should not report to work.

iv.    No person should work within 72 hours of exhibiting a fever or other COVID-19 symptoms, and follow the CDC's "What To Do If You Are Sick" guidance, available at https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html.

v.    Employer must establish a plan for employees getting ill and a return-to-work plan following CDC guidance, which can be found online at: https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html.

e.    Cleaning and Disinfecting.

i.    Cleaning and disinfecting must be conducted in compliance with CDC guidance.

7

**EX04-042**

ii.      When an active employee is identified as being COVID-19 positive by testing, cleaning and disinfecting must be performed as soon after the confirmation of a positive test as practical consistent with CDC guidance.

iii.     CDC guidance can be found online at: https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html

f.    Encouraged practices.  Restaurants are encouraged to do the following:

i.      Have customers enter and exit through different entries using one-way traffic, where possible.

ii.     Start or continue entryway, curbside, and home delivery.

iii.    Encourage making reservations, preordering for dine-in service, and ordering for contactless pickup and delivery either by telephone or other remote means.

iv.     Implement cashless and receiptless transactions.

g.   Pilot sidewalk/outdoor dining privilege.  From the effective date of this section, through the termination of Mayor's COVID-19-related Emergency Proclamation (as supplemented or extended), restaurants abutting City property may use City Property for dining and take-out operations under the following conditions:

i.      The restaurant must be on the ground floor and abut paved City property

ii.     Upon 24-hour's notice, the restaurant must vacate City property for regular maintenance by City (e.g. steam cleaning).

iii.    The restaurant are responsible for own equipment, furniture, and supplies, which must be stored elsewhere during closed hours.

iv.     The utilized City property may only be used by the restaurant during its business normal hours, but shall not be used between the hours of 11:00 p.m. and 7:00 a.m.

v.      The restaurant is responsible for compliance with any additional requirements relating to its Hawaii Department of Health Food Establishment Permit.

vi.     Liquor sales, if any, on the utilized City property must be authorized under the restaurant's liquor license and applicable law.

vii.    No additional signage is permitted within the utilized City property.

viii.   Dining services must be consistent with the requirements of this section, including Social Distancing Requirements and physical spacing of tables and customers.

ix.     Furniture must be located at least six (6) feet from any vehicular ramp, driveway or street intersection.

x.      No live or amplified music is allowed on the utilized City property.

xi.     Furniture shall not be placed over planter strips and tree wells

xii.    Furniture shall be outside an eight (8)-foot radius around bus stops and a five (5)-foot radius around fire hydrants.

xiii.   All fire lanes shall be open and accessible at all times.

xiv.    The restaurant is responsible for rubbish collection.

8

**EX04-043**

xv.        Restaurants must cease operations completely when Mayor's COVID-19-related Emergency Proclamation (as supplemented) is no longer in effect.

xvi.        Violations of these requirements will result in forfeiture of this privilege.

xvii.        Sidewalk/outdoor dining under this section may include parklets (i.e., use of abutting parking/street spaces converted to dining space), subject to pedestrian clearance, traffic, and safety issues as determined by the City through the department(s) having authority over those issues.

xviii.        Where sidewalks are present on all or part of the utilized City property, the restaurant must ensure a clear right of way of at least 36 inches at all times, (although 48 inches is recommended).

xix.        For restaurants abutting "pedestrian malls", as more specifically defined in Section 29-1.1, et seq. of the Revised Ordinances of the City and County of Honolulu 1990 (as amended), the following additional requirements apply:

- A clear 20-foot wide right of way to accommodate delivery and emergency vehicles must be maintained at all times
- Operation cannot exceed mall hours
- No liquor service is allowed
- All rubbish must be removed nightly
- If the ground of the City property utilized consists of pavers, the restaurant must take precautions to prevent and address food, liquid, and grease spills

xx.        For restaurants abutting a City park or playground, use of the City Property is limited to seven (7) feet from property line, and no more than one row of tables.

xxi.        Activities permitted under this section may begin upon acceptance by the City of a completed liability form and proof of insurance.;

h.        Enforcement. Any Restaurant in violation of any provision under this "Restaurant" section shall be subject to (1) immediate closure for 24 hours by the Honolulu Police Department to provide an opportunity to cure the violation and provide staff training to protect the public health; and (2) the penalties generally authorized by this Order. Any Restaurant holding a liquor license issued by the Honolulu Liquor Commission in violation of any provision of this "Restaurant" section shall also be subject to (1) immediate closure for 24 hours by the Honolulu Police Department and/or the Honolulu Liquor Commission to provide an opportunity to cure the violation and provide staff training to protect the public health; and (2) the penalties enforceable pursuant to the Rules of the Liquor Commission of the City and County of Honolulu, State of Hawaii, and the Liquor Laws of Hawaii under Hawaii Revised Statutes Chapter 281, which may include a reprimand, fine, suspension, and/or revocation of the liquor license.

13.        Outdoor attractions with limitations. Public and private <u>outdoor</u> attractions such as zoos, sea life attractions, water parks, recreational/commercial boating vessels (to the extent permitted under the State's COVID-19-related proclamations/orders and other applicable law), campgrounds, outdoor markets (including People's Open Markets), shooting

9

EX04-044

ranges, archery ranges, and similar outdoor facilities (**"Outdoor Attraction(s)"**) <u>may</u> reopen under the following conditions:

    a.      Groups are limited to ten (10) individuals, and where multiple groups are present, operators must implement measures to ensure that they maintain six (6) feet of physical distance between each other at all times (i.e., no mingling between groups).

    b.      To the greatest extent reasonably practicable, physical distancing of at least six (6) feet between members of different households/living units should be maintained; and face coverings should be worn at all times.

    c.      Operators must implement measures to ensure that participants and groups waiting to use a facility or an activity open under this section maintain physical distance of six (6) feet from one another at all times.  Outdoor Attractions to open under this section are encouraged, but not required, to implement a reservation system to eliminate or reduce waiting times.

    d.      Indoor portions of the facility must remain closed, unless such portion is authorized under another section of this Order and complies with any restrictions imposed (e.g., retail and services businesses, etc.).

    e.      Individuals must comply with any lawful requirements imposed by the Outdoor Attraction operator.

    f.      To the extent consistent with this section, and to the extent reasonably practicable: (1) the facility operators and participants shall follow applicable guidance from the CDC (available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html); and (2) established and reputable COVID-19-related guidelines for the facility and the activity at issue.

    g.      Nothing in this section requires a public or private Outdoor Attraction to open.;

14.    Personal service providers.  This section applies to barbers, beauty operators (including cosmetologists, hairdressers, estheticians, and nail technicians/nail salon workers), electrologists, tattoo/permanent makeup artists, massage therapists (non-health care setting), tanning service providers, tailors/seamstresses, pet-trainers, and other similar one on one personal service providers (collectively **"Personal Service Providers"**). Starting May 29, 2020, Personal Service Providers in the City may resume operations under the following requirements and conditions:

    a.      General.

        i.      Compliance with all State of Hawai'i and City statutory and regulatory requirements and standards for the service provided by the Personal Service Provider. (E.g., barbers must comply with Haw. Rev. Stat. ch. 438 and Haw. Admin. R. § 16-73-1 et seq.; beauty operators must comply with Haw. Rev. Stat. ch. 439 and Haw. Admin. R. § 16-78-1 et seq.; and both barbers and beauty operators must comply with the Rules Relating to Safety Guidelines for Barbers and Beauty Operators, attached as Exhibit 1

to the Governor of the State of Hawaii's Eighth Supplementary Proclamation Related to the COVID-19 Emergency, issued on May 18, 2020 and available at https://governor.hawaii.gov/wp-content/uploads/2020/05/2005088-ATG_Eighth-Supplementary-Proclamation-for-COVID-19-distribution-signed.pdf. Massage therapists must comply with Haw. Rev. Stat. ch. 452 and Haw. Admin. R. § 16-84-1 et seq.). All Personal Service Providers are encouraged to visit https://cca.hawaii.gov/pvl/hrs/ to determine if they are regulated under Hawaii law.

ii.   Compliance with applicable CDC guidelines (available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html.

iii.   Compliance with standards and guidelines issued by industry-specific associations or similar organizations of the respective Personal Service Provider's operations, to the extent reasonably practicable.

iv.   Compliance with the City's "COVID-19 Guidance for Businesses" to the greatest extent possible. https://www.oneoahu.org/business-guidance.

b.   Specific Requirements. Personal Services Providers must:

i.   Arrange seating in the establishment so that customers are separated from other customers by six (6) feet between booths/stations or have physical barriers between them.

ii.   Ensure Social Distancing Requirements are adhered to at all times to the degree applicable and to extent reasonably practicable, except that all persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order. Notwithstanding this requirement, customers may temporarily remove the face covering when necessary to complete the personal service at issue, and individuals who cannot wear a face covering due to a medical or health condition, and individuals under five (5) years of age are exempted from the requirement to wear a face covering.

iii.   Implement additional mitigation measures when strict physical distancing of at least six (6) feet is not feasible for a specific task. Such measures include, but are not limited to, the use of physical barriers, additional PPE (e.g., plastic face shields/masks), and minimization of such personal services, enhanced cleaning, and increased ventilation of the area with outside air.

iv.   Ensure that all equipment that comes into direct contact with customers/clients and all furniture in service areas (such as chairs, capes, and the shampooing area in a barber shop or salon) is completely cleaned and disinfected between each customer/client in accordance with CDC guidelines and applicable law.

v.   Implement screening measures to screen service providers and customers/clients for signs and symptoms of COVID-19 before arriving at the service provider location. If a service provider or client/customer answers "yes" to Questions 1-3, they should not provide or receive

**EX04-046**

services at the Personal Service Provider's facility. Personal Service Providers may provide services to those clients/customers who answer "yes" to Questions 4 and 5.

1) Do you now, or have you had in the past fourteen (14) days:
   - A cough or sore throat?
   - Fever or do you feel feverish?
   - Shortness of breath?
   - Loss of taste or smell?
2) Have you been out of the State in the last fourteen (14) days?
3) Have you had close personal/physical contact with or cared for someone diagnosed with or tested positive for COVID-19?

\* \* \* \* \*

4) If you answered "yes" to Question 3, are you a health care worker?
5) If you answered "yes" to Question 4, are you cleared to work at your healthcare facility?

c. Prior to reopening, all Personal Service Providers are encouraged to develop, post and implement written protocols ("**COVID-19 Mitigation Plan**") consistent with this section; Centers for Disease Control and Prevention ("CDC") guidance (available here: https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html, as updated or superseded; and, to the extent practicable, with standards and guidelines issued by industry-specific associations or similar organizations. The plan should include policies regarding the following control measures: PPE utilization; on-location physical distancing; hygiene; sanitation; self-screening and symptom monitoring; incident reporting; and location disinfection procedures.

d. Handwashing stations and/or disinfectants must be available to personal service providers and customers/clients throughout the workplace and frequently replenished.

e. No waiting areas are allowed.

f. No beverage service shall be provided.

g. When making personal service appointments, Personal Service Providers should advise customers/clients of new requirements, which may include, but are not limited to:

   i. Customer/client must self-screen for signs and symptoms of COVID-19 before arriving at the service provider location.

   ii. Customers/clients should not plan on bringing other guests with them, unless they are bringing children younger than 16 for an appointment.

   iii. Customers/clients should advise Personal Service Providers via call, email or text that they have arrived at the location for the appointment, and are waiting for instructions to enter.

12

**EX04-047**

iv.   Customers/clients should put on a face covering prior to leaving the vehicle, and they should be prepared to wash their hands for at least 20 seconds or use sanitizer prior to starting their service.

v.   Payments for service should be through credit or debit cards or a touchless system to reduce the handling of cash.

h.   For walk-in appointments, the Personal Service Provider should post a notice on the front door or window regarding access to the facility. The notice should include the phone number that the guest should call to determine availability of services. If service is available at the time, the walk-up guest will need to answer questions regarding COVID-19 exposure and current health, and put on a face covering before entering the location.

i.   Personal Service Providers are encouraged to follow additional best practices:

i.   Reducing the number of customers/clients serviced at one time. E.g., using only 50% of the available work stations.

ii.   Operators must implement measures to ensure that participants and groups waiting to use a facility or an activity open under this section maintain physical distance of six (6) feet from one another at all times.

iii.   Cashless and receiptless transactions.

iv.   Customers/clients entering and exiting through different entries using one-way traffic, where possible.

v.   Reserved hours for operation limited to high-risk populations.

vi.   A manager or shop owner should be on site during business hours at all times.

vii.   Advising customers to limit the number of items they bring into the premises.;

15.   Business offices. This section applies to business offices, whether for-profit, non-profit, or educational entities, regardless of the nature of the business or service, the function it performs, or its corporate or entity structure, that were not previously authorized to utilize their offices under the City's COVID-19-related emergency orders. Starting June 5, 2020, business offices may reopen under the following requirements and conditions:

a.   General.

i.   Compliance with all City, State, and federal statutory and regulatory requirements.

ii.   Compliance with all appropriate CDC guidelines – https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html

iii.   Compliance with any standards and guidelines issued by industry-specific associations or similar organizations of the respective business.

iv.   Compliance with the City's "COVID-19 Guidance for Businesses" – https://www.oneoahu.org/business-guidance.

v.   Compliance with the State's COVID-19 guidelines including, but not limited to:

13

**EX04-048**

1) https://health.hawaii.gov/coronavirusdisease2019/what-you-can-do/how-to-prevent-the-spread-of-covid-19/.

2) https://health.hawaii.gov/coronavirusdisease2019/files/2020/04/What-To-Do-If-You-Have-Been-Tested-For-COVID19_040120.pdf

3) https://health.hawaii.gov/coronavirusdisease2019/files/2020/05/What-to-Do-if-a-Person-at-Your-Worksite-has-COVID-19.pdf

b. Specific Requirements.

i. The business shall ensure and promote compliance with the Social Distancing Requirements to the greatest extent applicable and reasonably possible, except that all persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order.

ii. All occupied desks, cubicles and open workspaces, and furniture used for sitting or standing must be spaced at least six (6) feet apart to the extent reasonably practical.

iii. The business shall ensure cleaning and disinfecting of its facility in compliance with CDC guidelines – https://www.cdc.gov/coronavirus/2019-ncov/community/clean-disinfect/index.html.

iv. The business shall develop, post, and implement policies based on guidance from the CDC, Department of Labor, Occupational Safety and Health Administration (**"OSHA"**) and the Hawai'i Department of Health (**"HDOH"**) to limit and mitigate the spread of COVID-19, including, but not limited to, the following:

1) Promoting healthy hygiene practices.

2) Improving and intensifying cleaning and disinfection practices.

3) Improving ventilation and circulation of outside air to the extent practicable.

4) Monitoring for sickness.

5) Ensuring physical distancing at locations and times where employees, clients, or guests may congregate.

6) Providing necessary personal protective equipment.

7) Allowing for and encouraging employees to work remotely to the extent practicable.

8) Providing employees at higher risk for severe illness from COVID-19 (based on CDC guidance) with special accommodations, at the employee's request, to avoid contact with, and mitigate the risk of, the employee's exposure to co-workers and others in connection with the business, to the maximum extent possible.

9) Providing plans to return to work in phases to the extent practicable.

10) If someone at work tests positive for COVID-19 – https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html;

14

**EX04-049**

16. Education and care facilities. This section applies to all private education, adult care, and special needs care facilities ("**Education/Care Facilities**"). State-regulated education and care facilities are not included, but may reopen as allowed by the State and/or the Department of Education. A business falling within the definition of an Essential Business (e.g., "childcare" under Section II.F.20 of the Order) and this section, may operate under either. Starting June 19, 2020, Education/Care Facilities may reopen under the following requirements and conditions:

    a.    General.

        i.    Compliance with all City, State, and federal statutory and regulatory requirements.

        ii.    Compliance with all applicable CDC guidelines to the extent they do not conflict with this Order (available at https://www.cdc.gov/coronavirus/2019-ncov/community/index.html), (e.g., guidelines for schools (K-12), colleges/universities, youth programs, and workplaces).

        iii.    Compliance with any standards and guidelines issued by industry/education-specific associations or similar organizations of the respective Education/Care Facility at issue, to the extent they do not conflict with this Order.

        iv.    Compliance with the City's "COVID-19 Guidance for Businesses" – https://www.oneoahu.org/business-guidance, to the extent applicable.

        v.    Compliance with the State's COVID-19 guidelines (to the extent applicable) including, but not limited to:

            1)    https://health.hawaii.gov/coronavirusdisease2019/what-you-can-do/how-to-prevent-the-spread-of-covid-19/.

            2)    https://health.hawaii.gov/coronavirusdisease2019/files/2020/04/What-To-Do-If-You-Have-Been-Tested-For-COVID19_040120.pdf

            3)    https://health.hawaii.gov/coronavirusdisease2019/files/2020/05/What-to-Do-if-a-Person-at-Your-Worksite-has-COVID-19.pdf

    b.    Specific Requirements.

        i.    Physical distancing, face coverings, and groups.

            1)    For Education/Care Facilities providing services to individuals with special needs, pre-elementary- and elementary-aged individuals:

                •    Ensure physical distancing of at least six (6) feet between individuals to the extent reasonably practicable given the age and capability of the individuals and the activities at issue.

                •    Require face coverings for instructors/service providers consistent with CDC guidelines, if any exist.

                •    Require face coverings consistent with CDC guidelines, if any exist, for students/clients/customers to the extent

EX04-050

reasonably practicable given the age and tolerance of the individuals and the activity at issue.

- Maintain stable groups (cohorts) of ten (10) or fewer students/clients/customers each day, with the same instructors/service providers, to the extent reasonably practicable.

2) For all other Education/Care Facilities:

- Ensure physical distancing of at least six (6) feet between individuals at all times to the extent reasonably practicable.
- Require face coverings for instructors/service providers consistent with CDC guidelines, if any exist.
- Require face coverings consistent with CDC guidelines, if any exist, for students/clients/customers.

ii. Activities such as singing, the playing of wind instruments, and other similar activities that increase the presence and propulsion of respiratory droplets in the air are discouraged; however, such activities are permitted provided the following mitigation measures are taken:

If the activity takes place *outdoors*:

- Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc. Members of the same performing group singing and/or playing a wind instrument, etc. may be closer than ten (10) feet together while performing, provided the group consists of less than ten (10) persons.
- To the extent reasonable and practicable, a physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

If the activity takes place *indoors*:

- Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc. Members of the same performing group singing and/or playing a wind instrument, etc. may be closer than ten (10) feet together while performing, provided the group consists of less than ten (10) persons.
- A physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

16

**EX04-051**

   iii.    The Education/Care Facility shall ensure and promote compliance with the Social Distancing Requirements (that are not specifically addressed in this section) to the extent applicable and reasonably possible.

   iv.    All occupied desks, cubicles and open workspaces, and furniture used for sitting or standing must be spaced at least six (6) feet apart to the extent reasonably practicable.

   v.    The Education/Care Facility shall ensure cleaning and disinfecting of its facility in compliance with CDC guidelines – https://www.cdc.gov/coronavirus/2019-ncov/community/clean-disinfect/index.html.

   vi.    The Education/Care Facilities shall develop, post, and implement policies based on guidance from the CDC, Department of Labor, OSHA and the HDOH to limit and mitigate the spread of COVID-19, including, but not limited to, the following:

      1)    Promoting healthy hygiene practices.

      2)    Improving and intensifying cleaning and disinfection practices.

      3)    Improving ventilation and circulation of outside air to the extent practicable.

      4)    Monitoring for sickness.

      5)    Ensuring physical distancing at locations and times where individuals may congregate.

      6)    Providing necessary personal protective equipment.

      7)    Allowing for and encouraging individuals to work or conduct the activity at issue remotely to the extent practicable.

      8)    Providing those at higher risk for severe illness from COVID-19 (based on CDC guidance) with special accommodations, at their request, to avoid contact with, and mitigate the risk of, the individual's exposure to others in connection with the business, operation, or facility to the extent applicable and reasonably possible.

      9)    Providing plans to return to work or the activities at issue in phases to the extent practicable.

     10)    If someone at work tests positive for COVID-19 – https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html;

17.    Indoor attractions such as bowling alleys, arcades, mini golf, and other similar indoor entertainment facilities/operations (**"Indoor Attractions"**) were previously allowed to operate. However, due to ongoing and heightened public health concerns linked to gatherings and the spread of COVID-19, effective immediately and until further notice, bowling alleys, arcades, mini golf, and other similar indoor entertainment facilities/operations must close and may not operate within the City.

Museums, art galleries, movie theaters, and other similar indoor entertainment facilities/operations may continue to operate under the following requirements and conditions:

**EX04-052**

a.   General.

    i.   Compliance with all City, State, and federal statutory and regulatory requirements.

    ii.   Compliance with all applicable CDC guidelines to the extent they do not conflict with this Order (available at https://www.cdc.gov/coronavirus/2019-ncov/community/index.html).

    iii.   Compliance with any standards and guidelines issued by industry/activity-specific associations or similar organizations of the respective Indoor Attraction at issue, to the extent they do not conflict with this Order.

    iv.   Compliance with the City's "COVID-19 Guidance for Businesses" – https://www.oneoahu.org/business-guidance, to the extent applicable.

    v.   Compliance with the State's COVID-19 guidelines (to the extent applicable) including, but not limited to:

        1)   https://health.hawaii.gov/coronavirusdisease2019/what-you-can-do/how-to-prevent-the-spread-of-covid-19/.

        2)   https://health.hawaii.gov/coronavirusdisease2019/files/2020/04/What-To-Do-If-You-Have-Been-Tested-For-COVID19_040120.pdf

        3)   https://health.hawaii.gov/coronavirusdisease2019/files/2020/05/What-to-Do-if-a-Person-at-Your-Worksite-has-COVID-19.pdf

b.   Specific Requirements.

    i.   Groups are limited to ten (10) individuals maximum, and where multiple groups are present, operators must implement measures to ensure that they maintain six (6) feet of physical distance between each other at all times (i.e., no mingling between groups).

    ii.   To the extent practicable, physical distancing of at least six (6) feet between members of different households/living units should be maintained; and face coverings must be worn at all times. (E.g., face coverings generally must be worn in a movie theatre facility; however, individuals may remove the face covering while seated to eat and drink, or if one of the exemptions to face covering requirements in Order 5 of the Order).

    iii.   Operators must implement measures to ensure that individuals and groups waiting to use a facility or an activity open under this section maintain physical distance of six (6) feet from one another at all times. Indoor Attractions to open under this section are encouraged, but not required, to implement a reservation system to eliminate or reduce waiting times.

    iv.   Activities such as singing, the playing of wind instruments, and other similar activities that increase the presence and propulsion of respiratory droplets in the air are discouraged; however, such activities are permitted provided the following mitigation measures are taken:

    If the activity takes place *outdoors*:

    • Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other

**EX04-053**

person(s) while singing and/or playing a wind instrument, etc. Members of the same performing group singing and/or playing a wind instrument, etc. may be closer than ten (10) feet together while performing, provided the group consists of less than ten (10) persons.

- To the extent reasonable and practicable, a physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

If the activity takes place *indoors*:

- Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc. Members of the same performing group singing and/or playing a wind instrument, etc. may be closer than ten (10) feet together while performing, provided the group consists of less than ten (10) persons.
- A physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

v.     Individuals must comply with any lawful requirements imposed by the Indoor Attraction operator.

vi.    Nothing in this section requires a public or private Indoor Attraction to open.

vii.   Indoor Attraction operators shall develop, post, and implement policies based on guidance from the CDC, Department of Labor, OSHA and the HDOH to limit and mitigate the spread of COVID-19, including, but not limited to, the following:

1)  Promoting healthy hygiene practices.
2)  Improving and intensifying cleaning and disinfection practices.
3)  Improving ventilation and circulation of outside air to the extent practicable.
4)  Monitoring for sickness.
5)  Ensuring physical distancing at locations and times where individuals may congregate.
6)  Providing necessary personal protective equipment.
7)  Allowing for and encouraging individuals to work or conduct the activity at issue remotely to the extent practicable.
8)  Providing those at higher risk for severe illness from COVID-19 (based on CDC guidance) with special accommodations, at their request, to avoid contact with, and mitigate the risk of, the individual's exposure to others in connection with the business, operation, or facility to the extent applicable and reasonably possible.

19

EX04-054

        9)      Providing plans to return to work or the activities at issue in phases to the extent practicable.

        10)    If someone at work tests positive for COVID-19 – https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html;

18.    RESERVED.;

19.    RESERVED. Outdoor organized team sports (phase 2) which applies to outdoor team sports such as baseball, soccer, football, outdoor volleyball, outdoor basketball, and similar outdoor team sports (**"Sports Program(s)"**) were previously allowed to operate. However, due to ongoing and heightened public health concerns linked to gatherings and the spread of COVID-19, effective immediately and until further notice, the above-cited must close and may not operate within the City.

20.    Fitness facilities. This section includes fitness centers, gyms, spas, yoga, barre, spin, dance studios, hula hālau, and other similar types of facilities (**"Fitness Facilities"**). Starting June 19, 2020, Fitness Facilities in the City may resume operations under the following requirements and conditions, except that all group classes (i.e., three (3) or more persons) in Fitness Facilities are prohibited:

    a.    General.

        i.    Compliance with all appropriate City, State, and federal statutory and regulatory requirements.

        ii.    Development, posting, and implementation of written protocols (**"COVID-19 Mitigation Plan"**) consistent with City, State, industry-specific associations or organizations of the respective facility (e.g., USA Gymnastics), and CDC guidance to mitigate the spread of COVID-19 including, but not limited to, the following:

            1)    https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html

            2)    https://www.oneoahu.org/business-guidance.

    b.    Specific Requirements. Fitness Facility operators must:

        i.    Not conduct or allow group classes (i.e., three (3) or more persons) to be performed within the Fitness Facility. One-to-one personal training in compliance with the "personal service providers" section of this Order and online classes are permitted.

        ii.    Limit occupancy to no more than fifty percent (50%) of the maximum occupant load of the Fitness Facility and of any rooms or areas within the facility with a maximum occupant load. However, pools must be closed.

        iii.    Ensure that occupants maintain a minimum of six (6) feet of physical distance between each other at all times. If equipment cannot be arranged

EX04-055

to facilitate six (6) feet of physical distancing, it must be blocked from being used.

iv.  If no maximum occupant load exists, operators must limit occupancy to ensure occupants are able to maintain six (6) feet of physical distance between each other at all times.

v.  Limit locker room access and the number of persons who use amenities of the facilities (e.g., sauna, etc.) at any one time to ensure physical distancing of six (6) feet can be maintained.

vi.  Keep childcare areas and self-service food and drink stations closed.

vii.  Keep water fountains closed, except for those designed to refill water bottles in a contact-free manner.

viii.  Limit training for close contact activities (wrestling, mixed martial arts, etc.) to skill-building drills and conditioning in which physical distancing of six (6) feet or more between individuals may generally be maintained.

ix.  Post signs to encourage physical distancing and disinfecting throughout the facility.

x.  Position staff to monitor physical distancing and disinfecting requirements.

xi.  Provide handwashing stations or hand sanitizer (at least 60% alcohol content) throughout the facility for use by employees/clients/guest.

xii.  Ensure Social Distancing Requirements are adhered to at all times to the degree applicable and to the extent reasonably practicable, except that all persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order.

xiii.  Any occupied desks, cubicles and open workspaces, and furniture used for sitting or standing must be spaced at least six (6) feet apart.

xiv.  Ensure frequent cleaning and disinfecting of equipment, restrooms, locker rooms, and other high touch/high usage areas of the facility in accordance with CDC guidelines available at: https://www.cdc.gov/coronavirus/2019-ncov/community/clean-disinfect/index.html.

xv.  The business shall develop, post, and implement policies based on guidance from the CDC, Department of Labor, Occupational Safety and Health Administration ("OSHA") and the Hawai'i Department of Health ("HDOH") to limit and mitigate the spread of COVID-19, including, but not limited to, the following:

    1)  Providing training for employees of each facilities' COVID-19 Mitigation Plan.

    2)  Establishing a plan for employees who may get ill as well as a return-to-work plan in accordance with City, State, and CDC guidelines which are available at:

        a.  https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html.

21

       b.      https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html

       c.      https://health.hawaii.gov/coronavirusdisease2019/what-you-can-do/how-to-prevent-the-spread-of-covid-19/

            i.     https://health.hawaii.gov/coronavirusdisease2019/files/2020/04/What-To-Do-If-You-Have-Been-Tested-For-COVID19_040120.pdf

           ii.    https://health.hawaii.gov/coronavirusdisease2019/files/2020/05/What-to-Do-if-a-Person-at-Your-Worksite-has-COVID-19.pdf

3)    Creating safeguards for higher risk populations consistent with CDC guidance available at: https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Higher-Risk.

4)    Limitations on one-to-one personal training, and compliance with the personal service providers section of this Order (to the extent applicable).

5)    RESERVED.

6)    Promoting healthy hygiene practices.

7)    Improving and intensifying cleaning and disinfection practices.

8)    Improving ventilation and circulation of outside air to the extent practicable.

9)    Monitoring for sickness.

10)    Ensuring physical distancing at locations and times where employees, clients, or guests may congregate.

11)    Providing necessary personal protective equipment.

12)    Allowing for and encouraging employees to work remotely to the extent practicable.

13)    Providing employees at higher risk for severe illness from COVID-19 (based on CDC guidance) with special accommodations, at the employee's request, to avoid contact with, and mitigate the risk of, the employee's exposure to co-workers and others in connection with the business, to the maximum extent possible.

14)    Providing plans to return to work in phases to the extent practicable.

c.    Encouraged Practices.

    i.    Consider appointment-based usage of the Fitness Facility to limit the number of persons in the facility.

    ii.    Consider utilizing touchless forms of client/guest check-in.

    iii.    Consider offering virtual fitness classes whenever possible, especially for higher risk populations.

EX04-057

       iv.          Strongly encourage clients/guests to bring their own filled water bottles with them to the facility.;

21.     Film and television production. Starting June 5, 2020, all local, national, and international film production, television production, streaming production, and similar production may operate in the City based on the guidelines and recommendations for production cast and crew members available at: https://www.honolulu.gov/rep/site/oed/oed_docs/Guidelines_and_Best_Practices_for_fil ming_on_the_Island_of_Oahu_during_the_time_of_COVID_060320.pdf. Compliance with the Order and the COVID-19 related proclamations issued by the State is required, including all travel quarantine requirements as modified by the guidelines and recommendations available at: https://www.honolulu.gov/rep/site/oed/oed_docs/Modified_Quarantine_Procedures-Honolulu-060320.pdf.;

22.     RESERVED. Due to ongoing and heightened public health concerns linked to gatherings and the spread of COVID-19, effective immediately and until further notice, bars may not operate within the City. For purposes of this section, "bars" means an establishment holding a Class 5, 6, 10, 11, 12, 13, 14, 15, 16, 17, or 18 liquor license as defined by the Rules of the Liquor Commission of the City and County of Honolulu, State of Hawaii and establishments that are primarily engaged in the serving of alcoholic beverages for consumption by guests on the premises regardless of whether food is served, including but not limited to taverns, cocktail lounges, karaoke rooms/areas, and cabarets, and including outdoor areas of such establishments.

Bars impermissibly operating shall be subject to immediate closure by the Honolulu Police Department and subject to penalties authorized by this Order. Liquor licensees impermissibly operating bars shall also be subject to immediate closure by the Honolulu Liquor Commission and be subject to penalties enforceable pursuant to the Rules of the Liquor Commission of the City and County of Honolulu, State of Hawaii, and the Liquor Laws of Hawaii under Hawaii Revised Statutes Chapter 281, which may include a reprimand, fine, suspension, and/or revocation of the liquor license.;

23.     Singing, and/or playing a wind instrument, and similar activities. Activities such as singing, the playing of wind instruments, and other similar activities that increase the presence and propulsion of respiratory droplets in the air (which are not addressed in another section) ("singing and/or playing a wind instrument, etc.") are discouraged at gatherings and events. However, such activities are permitted provided they are performed at a gathering/business/operation authorized under the Order, and the following mitigation measures are taken:

     a.      If the activity takes place *outdoors*:

          i.       Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc. Members of the same performing group singing and/or playing a wind instrument,

etc. may be closer than ten (10) feet together while performing, provided the group consists of less than ten (10) persons.

    ii.    To the extent reasonable and practicable, a physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

b.    If the activity takes place *indoors*:

    i.    Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc. Members of the same performing group singing and/or playing a wind instrument, etc. may be closer than ten (10) feet together while performing, provided the group consists of less than ten (10) persons.

    ii.    A physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

24

**EX04-059**

**OFFICE OF THE MAYOR**
**CITY AND COUNTY OF HONOLULU**
530 SOUTH KING STREET, ROOM 300 · HONOLULU, HAWAII 96813
PHONE: (808) 768-4141 · FAX: (808) 768-4242 · INTERNET: www.honolulu.gov

KIRK CALDWELL
MAYOR

ROY K. AMEMIYA, JR.
MANAGING DIRECTOR

GEORGETTE T. DEEMER
DEPUTY MANAGING DIRECTOR



August 18, 2020

**OFFICE OF THE MAYOR**
**CITY AND COUNTY OF HONOLULU**
**EMERGENCY ORDER NO. 2020-24**
**(COVID-19 [Novel Coronavirus])**

**ACT NOW HONOLULU – NO SOCIAL GATHERINGS**

### AUTHORITY

By the authority vested in me as Mayor of the City and County of Honolulu (the "City") pursuant to Revised Charter of the City and County of Honolulu 1973 (2017 Edition), as amended; the Revised Ordinances of the City and County of Honolulu 1990, as amended; the Hawai'i Revised Statutes, as amended ("**Haw. Rev. Stat.**"); the Constitution and laws of the State of Hawai'i (the "**State**"); I, KIRK W. CALDWELL, hereby issue this order, Act Now Honolulu – No Social Gatherings ("**Order**"), to further address the emergency declared in the Proclamation COVID-19 [Novel Coronavirus] that I issued on March 4, 2020, Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued on March 18, 2020, the Second Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued May 6, 2020 Third Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued June 20, 2020, and the Fifth Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) I issued August 6, 2020.

### OVERVIEW

The virus that causes Coronavirus 2019 Disease ("**COVID-19**") is easily transmitted, especially in group settings, and it is essential that the spread of COVID-19 be slowed to protect the ability of public and private health care providers to handle the influx of new patients and to safeguard public health and safety. This Order addresses these ongoing concerns.

Towards the start of the COVID-19 pandemic, the City issued a Stay at Home / Work from Home Order (Emergency Order 2020-2) ("**Stay at Home Order**") that generally required individuals to shelter in place at their residence, with limited exceptions (for essential businesses

**EX04-060**

and certain activities). The Stay at Home Order (as amended) along with the State's coordinated efforts accomplished the City's goals of slowing the spread of COVID-19 and provide the City additional time to prepare for the pandemic, while the virus spread quickly throughout the world. Through successive orders, the City then began the gradual process of reopening certain Designated Businesses and Operations, and allowing individuals to engage in more activities outside of their residence (with spread mitigations measures), in an attempt to bring back the economy and a sense of normalcy, while limiting the spread of COVID-19.

This Order builds upon the framework of the Stay at Home Order. Section I sets forth the "Orders" which mandate what is and what is not permitted within the City at this time. Section II provides definitions of the capitalized terms contained in the Orders and the exemptions to the Orders, including Designated Businesses and Operations, which represent the businesses and operations that were allowed to operate after the initial strict Stay at Home Order proved successful. "Designated Businesses and Operations" are defined as the businesses and operations listed in Exhibit A of this Order (along with their respective mitigations measures). Section III outlines the basis for the Order, and Section IV explains the Order's intent for interpretation purposes, and Section V contains general provisions relating to the Order's effect on prior orders, duration, enforcement, posting, and severability of the Order.

At present time, there is a resurgence of COVID-19 within the City due to large gatherings in uncontrolled environments. To protect the public health and for the long-term benefit of the economy, the City must take measures through this Order, including slowing the reopening process and limiting certain activities and businesses again to reduce the spread of COVID-19.

This Order is effective at 12:00 a.m. on August 20, 2020, and will continue through September 16, 2020, subject to the limited exceptions and under the terms and conditions more particularly set forth below.

Pursuant to Haw. Rev. Stat. § 127A-25 and the Rules of the Mayor City and County of Honolulu, dated March 20, 2020 ("Mayor's Rules") promulgated under that section, each of the orders contained in this Order ("the Orders") shall have the force and effect of law. The Orders are in accordance with and incorporate by reference all of my prior COVID-19 related emergency proclamations; and Hawai'i Governor David Y. Ige's COVID-19-related emergency proclamations.

Violation of any of the Orders is punishable as a misdemeanor, with fines of up to $5,000, up to a year in jail, or both. Haw. Rev. Stat. § 127A-29; Mayor's Rules.

I.    ORDERS

Order 1:  All individuals currently living within the City are ordered to stay at their place of residence and work from home. To the extent individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain physical distancing of at least six (6) feet from any other person when they are outside their residence and comply with Social Distancing Requirements (as defined in Section II.K). All persons may leave their residences only for Essential Activities, Essential Governmental Functions, or to operate or visit Essential Businesses or Designated Businesses and Operations, as those terms are defined in Section II.

2

Individuals experiencing homelessness are exempt from this section, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to use COVID-19 risk mitigation practices in their operation).

**Order 2:** All businesses with a facility in the City, except Essential Businesses (as defined in Section II.F.) and Designated Businesses and Operations (as defined in Section II.G.), are required to cease all activities within such facilities, except Minimum Basic Operations (as defined in Section II.H.). For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home). All Essential Businesses and Designated Businesses and Operations are strongly encouraged to remain open. To the extent applicable and to the greatest extent feasible, Essential Businesses and Designated Businesses and Operations shall comply with Social Distancing Requirements, including the six-foot physical distancing requirement for both employees and members of the public (including customers standing in line inside and outside of the facility).

**Order 3:** Gatherings.

    A.    Indoor and outdoor social gatherings of any type and any number of people are prohibited. For purposes of this Order, a "social gathering" is a gathering or event that brings together persons from multiple households or living units at the same time for a discrete, shared or group experience in a single room, space, or place such as a private home, park, auditorium, stadium, arena, conference room, lunch room, meeting hall, or other indoor or outdoor space.

    B.    This limitation on social gatherings does not apply to gatherings/events/activities that are permitted under Section II and in Exhibit A. Nothing in this Order prohibits the gathering of members of a household or living unit on their property (including shared common areas).

**Order 4:** All travel, including, but not limited to, travel on foot, bicycle, scooter, motorcycle, automobile, or public transit, except Essential Travel and Essential Activities (as defined in Section II), is prohibited. People must use public transit only for purposes of performing Essential Activities; or to travel to and from Essential Businesses, or Designated Businesses and Operations; or maintain Essential Governmental Functions. People riding on public transit must comply with Social Distancing Requirements, as applicable and to the greatest extent feasible. This Order allows travel into or out of the City to perform Essential Activities, operate or visit Essential Businesses, operate or visit Designated Businesses and Operations, or maintain Essential Governmental Functions.

**Order 5:** Non-Medical Grade Face Coverings.

All individuals within the City shall wear face coverings while outdoors in public spaces when maintaining a physical distance of six (6) feet from persons who are not members of the same household or living unit is not feasible.

EX04-062

All individuals within the City shall wear face coverings while indoors in public spaces, including, but not limited to, enclosed common areas of commercial and residential buildings.

All employees who work at businesses or perform services at Essential Businesses, as provided in Section II.F. of this Order, and Designated Businesses and Operations, as provided in Section II.G. of this Order, and City departments shall wear non-medical grade face coverings over their noses and mouths when engaged and interacting with customers, visitors, and other employees of the Essential Business, Designated Business and Operation, or City department at issue.

All customers and visitors of businesses and organizations defined as Essential Businesses, as provided in Section II.F. of this Order, and Designated Businesses and Operations, as provided in Section II.G. of this Order, and City departments shall wear non-medical grade face coverings over their noses and mouths to provide additional protection for employees and customers of Essential Businesses, Designated Businesses and Operations, and City department at issue.

All passengers and users of public modes of transportation (TheBus and TheHandi-Van) shall wear non-medical grade face coverings over their noses and mouths when on board.

An owner or operator of an Essential Business under this Order, Section II.F. or Designated Business and Operation under this Order, Section II.G., or City department *may* refuse admission or service to any individual who fails to wear face coverings.

Face coverings under this Order may not be worn only under the following circumstances:

- Within banks, financial institutions, or using automated teller machines where the inability to verify the identity of the customer or visitor of the bank, financial institution or automated teller machine poses a security risk;

- By individuals with medical conditions or disabilities where the wearing of a face covering may pose a health or safety risk to the individual;

- By individuals engaging in physical activity outdoors where physical distancing can be maintained (e.g., walking, jogging, hiking, etc.);

- By children under the age of 5;

- By first responders (Honolulu Police Department, Honolulu Fire Department, Honolulu Emergency Services Department) to the extent that wearing non-medical grade face coverings may impair or impede the safety of the first responder in the performance of his/her duty;

- By children in childcare, educational, and similar facilities consistent with the latest guidance from the Centers for Disease Control and Prevention ("CDC") for such facilities;

- As allowed by another provision of this Order.

The wearing of face coverings under this Order is intended to complement, not serve as a substitute, for physical distancing and cleanliness.

4

EX04-063

Definition: "Non-medical grade face covering" or "face covering" as used in this Order, means a tightly woven fabric without holes that is secured to the head with either ties or straps, or simply wrapped and tied around the wearer's nose and mouth. It can be made of a variety of fabrics such as cotton, silk, or linen and may be factory-made, sewn by hand, or made from household items such handkerchiefs, scarfs, or shirts.

Recommendation: This Order requires non-medical grade face coverings to be worn in certain circumstances. Individuals who are unable to wear a non-medical grade face covering due to medical conditions or disabilities where the wearing of a face covering may pose a health or safety risk to the person are encouraged to wear a face shield instead.

Any seller of non-medical grade face coverings or materials or supplies to make or manufacture such face coverings shall abide by Haw. Rev. Stat. § 127A-30.

Order 6:  Closure of City and State Parks

City and County of Honolulu parks and botanical gardens ("City Parks") and State of Hawai'i parks within the City ("State Parks"), are closed for use except as set forth below:

      A.      Individuals may travel through City and State Parks to engage in and return from ocean activities such as surfing, solo paddling, swimming, and other activities allowed by law.

      B.      Individuals may travel through City and State Parks to use comfort stations and showers which shall remain open.

      C.      Shooting and archery ranges may remain open as determined by the City's Department of Parks and Recreation.

      D.      To the extent applicable, fishing is permitted, but no group of two (2) or more individuals may engage in fishing and gathering.

      E.      Individuals may travel through City Parks to drop off election ballots at drop boxes.

II.      **DEFINITIONS AND EXEMPTIONS**

      A.      For purposes of this Order, individuals may leave their residence only to perform any of the following "Essential Activities." However, people at high risk of severe illness from COVID-19 and people who are sick are urged to stay in their residence to the extent possible, except as necessary to seek medical care.

            1.      To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, obtaining medical supplies or medication, visiting a health care professional, or obtaining supplies needed to work from home.

5

**EX04-064**

2.   To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example only and without limitation, canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products, and products necessary to maintain the safety, sanitation, and essential operation of residences.

3.   To engage in outdoor activity in locations as required or allowed by law, including this Order.

4.   To perform work providing products and services at an Essential Business, Designated Business or Operation, or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations.

5.   To care for a family member or pet in another household.

6.   To obtain services, goods, or supplies from, or engage in activities at, Essential Businesses (as defined in Section II.F) and Designated Businesses and Operations (as defined in Section II.G.).

7.   To visit graveyards, mausoleums, and similar sites consistent with the restrictions placed on gatherings in this Order.

B.   For purposes of this Order, individuals may leave their residence to work for or obtain services at any **"Healthcare Operations"** including hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other healthcare facilities, healthcare suppliers, home healthcare services providers, mental health providers, or any related and/or ancillary healthcare services, organizations collecting blood, platelets, plasma, and other necessary materials, licensed medical marijuana dispensaries and licensed medical marijuana production centers, eye care centers, including those that sell glasses and contact lenses. "Healthcare Operations" also includes veterinary care and all healthcare services provided to animals. Further, "Healthcare Operations" includes prepaid health care plan contractors as that term is defined under Haw. Rev. Stat. ch. 393, and other employer-sponsored health and welfare benefit plans, and/or individual or group health insurance plans that provides healthcare insurance benefits for payment or reimbursement for healthcare services provided by Healthcare Operations. This exemption shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. "Healthcare Operations" does not include fitness and exercise gyms and similar facilities.

C.   For purposes of this Order, individuals may leave their residence to provide any services or perform any work necessary to the operations and maintenance of **"Essential Infrastructure,"** including, but not limited to, public works construction, construction of housing (in particular affordable housing or housing for individuals experiencing homelessness), airport operations, water, sewer, gas,

6

**EX04-065**

electrical, oil refining, roads and highways, public transportation, solid waste collection and removal, internet, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services), provided that they carry out those services or that work in compliance with Social Distancing Requirements to the extent applicable and reasonably possible. This Order shall be construed and applied in compliance and consistent with the United States Department of Homeland Security, Cybersecurity & Infrastructure Security Agency Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, updated March 28, 2020 (and any subsequent updates and guidance memoranda thereto).

D.      For purposes of this Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, and law enforcement personnel, jails and prisons personnel are categorically exempt from this Order while performing their job-related duties. Further, nothing in this Order shall prohibit any individual from performing or accessing "Essential Governmental Functions." **"Essential Government Functions"** means all services needed to ensure the continuing operation of the government agencies and provide for the health, safety and welfare of the public. All Essential Governmental Functions shall be performed in compliance with Social Distancing Requirements to the extent applicable and reasonably possible.

E.      For the purposes of this Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function they perform, or its corporate or entity structure.

F.      For the purposes of this Order, **"Essential Businesses"** means:

  1.      Healthcare Operations and Essential Infrastructure;

  2.      Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries and also sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences;

  3.      Food cultivation, including farming, livestock, and fishing;

  4.      Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals;

  5.      Newspapers, television, radio, and other media services;

7

**EX04-066**

6.      Gas stations and auto and bicycle supply, auto and bicycle repair, towing services, and related facilities;

7.      Banks and related financial institutions.  This provision shall be construed and applied in compliance and consistent with the United States Department of Homeland Security, Cybersecurity & Infrastructure Security Agency Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, dated March 19, 2020 (and any subsequent guidance memoranda thereto), and the United States Department of the Treasury Memorandum for Financial Services Sector Essential Critical Infrastructure Workers, dated March 22, 2020 (and any subsequent guidance memoranda thereto);

8.      Hardware stores;

9.      Plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, Essential Businesses, or Designated Businesses or Operations;

10.      Businesses providing mailing and shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods or services to residences and end users or through commercial channels, and including post office boxes;

11.      Educational institutions—including public and private K-12 schools, colleges, and universities—for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible;

12.      Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

13.      Restaurants and other facilities that prepare and serve food, but only for delivery or carry out.

         a.      Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only, provided that social distancing of six-feet per person is maintained to the greatest extent possible.  Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;

8

**EX04-067**

b.   Cafeterias, lunchrooms, or dining facilities providing food and beverage services located within "healthcare facilities" as that term is defined under Haw. Rev. Stat. § 321-15.2 and similar facilities, may continue to do so under this order, provided that consumption within the cafeteria, lunchroom, or dining facility located within the healthcare facility is restricted to employees of the healthcare facility; patients of the healthcare facility; and no more than two (2) authorized visitors of the patient of the healthcare facility that have been appropriately screened by the healthcare facility in compliance with all of the facility's protocols related to infectious disease control measures and processes.;

14.   Businesses that supply products needed for people to work from home;

15.   Businesses that supply other Essential Businesses or Designated Businesses and Operations with the support or supplies necessary to operate;

16.   Airlines, taxis, and other private transportation providers, vehicle rental services, paratransit, and other private, public, and commercial transportation and logistics providers providing transportation services necessary for Essential Activities and other purposes expressly authorized in this Order;

17.   Home-based care for seniors, adults, or children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including care givers such as nannies who may travel to the child's home to provide care, and other in-home services, including meal delivery;

18.   Residential facilities and shelters for seniors, adults, and children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

19.   Professional services, such as legal or accounting services, insurance services, other than real estate service provider (addressed separately via Section II.G.), when necessary to assist in compliance with legally mandated activities;

20.   Childcare facilities providing services that enable employees exempted in this Order to work or engage in activities as permitted. Childcare facilities must operate in accordance with State of Hawai'i Department of Human Services requirements.

21.   Businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, kennels, and adoption facilities, provided they must comply with Social Distancing Requirements to the extent applicable and reasonably possible;

9

**EX04-068**

22. Hotels and motels, to the extent used for lodging; and service providers to hotels and motels that provide services that are necessary to maintaining the safety, sanitation, and essential operations of the hotel and/or motel, provided that they must comply with Social Distancing Requirements to the extent applicable and reasonably possible;

23. Funeral, mortuary, cremation, burial, cemetery, and related professional services, provided that each death-related event (funeral, etc.) is: (a) limited to 10 individuals maximum (with members from different households/living units maintaining physical distance of at least six (6) feet between each other at all times); (b) face coverings are worn consistent with Order 5; and (c) there is compliance with all other applicable Social Distancing Requirements;

24. Critical trades. Building and construction tradesmen and tradeswomen, and other trades, including but not limited to, plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operations of residences, Essential Activities, Essential Businesses, or Designated Businesses and Operations provided that they must comply with Social Distancing Requirements to the extent applicable and reasonably possible;

25. Critical labor union functions that are essential activities that include the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses or Designated Businesses and Operations, provided that these checks should be done by telephone or remotely;

26. Licensed private detectives and agencies and guards and agencies as those terms are defined under Haw. Rev. Stat. ch. 463;

27. Fabric Sellers/Suppliers, under the following conditions:

    a. The business is primarily engaged in selling fabric and related supplies ("Fabric Store(s)");

    b. Only two customers are allowed in the Fabric Store at a time, and the Fabric Store has implemented effective procedures to prevent any line from forming outside (appointment-only system, etc.);

    c. All orders from the Fabric Store, other than those to be made in person pursuant to sub-section II.F.27.b. (above), are facilitated exclusively online, or by other remote means;

10

EX04-069

    d.      Orders from the Fabric Store, other than those to be made in person pursuant to sub-section II.F.27.b. (above), are fulfilled by no-contact delivery; a business providing mailing and shipping and delivery services to residences and end users or through commercial channels; or by curbside pick-up consistent with Social Distancing Requirements to the extent applicable and reasonably possible;

    e.      In-person and pick-up orders from the Fabric Store are solely for the purpose of obtaining materials necessary to make masks; and

    f.      The physical presence of workers at the Fabric Store is limited to the greatest extent feasible, and such workers must comply with Social Distancing Requirements.

G.    For the purposes of this Order, **"Designated Businesses and Operations"** are listed and defined in the attached Exhibit A.

H.    For the purposes of this Order, **"Minimum Basic Operations"** include the following, provided that employees comply with Social Distancing Requirements to the extent applicable and reasonably possible, while carrying out such operations:

    1.      The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.

    2.      The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

    3.      The minimum necessary activities to prepare for the re-opening of Designated Businesses and Operations.

I.    For the purposes of this Order, **"Essential Travel"** includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements to the extent applicable and reasonably possible.

    1.      Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses, Designated Businesses and Operations, or Minimum Basic Operations.

    2.      Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

    3.      Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

**EX04-070**

4.   Travel to return to a place of residence from outside the jurisdiction.

5.   Travel required by law enforcement or court order.

6.   Travel required for non-residents to return to their place of residence outside the City. Individuals are strongly encouraged to verify that their transportation out of the City remains available and functional prior to commencing such travel.

J.   For purposes of this order, residences include hotels, motels, shared rental units, and similar facilities.

K.   For purposes of this order "Social Distancing Requirements" include the following:

1.   High risk populations. Elderly and others at high risk for COVID-19 are urged to stay in their residences to the extent possible, except as necessary to seek medical care.

2.   Persons who are sick. Persons who are sick or have a fever or cough or are exhibiting symptoms such as shortness of breath or difficulty breathing, chills, repeated shaking with chills, muscle pain, headache, sore throat, or new loss of taste or smell, are urged to stay in their residences to the extent possible, except as necessary to seek medical care.

3.   Personal hygiene. Persons are encouraged to wash their hands with soap and water for at least twenty seconds as frequently as possible or use hand sanitizer, cover coughs and sneezes (into the sleeve or elbow, not hands), regularly clean high-touch surfaces, and avoid unnecessary contact with others (shaking hands, etc.).

4.   Six-foot distances. All persons shall maintain a minimum of six-feet of physical separation from all other persons. Essential Businesses and Designated Businesses and Operations (to the degree applicable) shall designate with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance. Employees shall monitor and enforce the six-foot distancing requirement set forth in this Order, whether outside waiting lines or as customers move about inside a facility. Checkout operations shall be modified, to the extent reasonably feasible, to provide this separation or to provide a transparent shield or barrier between customers and checkout clerks.

5.   Limited Customer Occupancy. Each Essential Business and Designated Business and Operation facility shall determine the maximum number of customers that may be accommodated while maintaining the specified separation distance and limiting the number of customers in the facility or at the operation to that maximum number at any time, to the extent there is no conflict with any existing law or order.

12

**EX04-071**

6. Face Coverings. All persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order.

7. Hand sanitizer and sanitizing products. Essential Businesses and Designated Businesses and Operations (to the degree applicable) shall make hand sanitizer and sanitizing products readily available for employees and customers. Employees handling items from customers, such as cash or credit cards, shall frequently utilize hand sanitizers.

8. Disinfection. Essential Businesses and Designated Businesses and Operations (to the degree applicable) shall regularly disinfect all high-touch surfaces.

9. Safeguards for high risk populations. Essential Businesses and Designated Businesses and Operations (to the degree applicable) are urged to implement processes to safeguard elderly and high risk customers.

10. Online and remote access. Essential Businesses and Designated Businesses and Operations (to the degree applicable) shall post online whether a facility is open and how best to reach the facility and continue services by phone or remotely. Essential Businesses and Designated Businesses and Operations (to the degree applicable) shall encourage their customers to do their business remotely by phone or online to the extent possible.

11. Pickup at store or delivery. Essential Businesses and Designated Businesses and Operations (to the degree applicable) shall provide for, if feasible, online ordering and purchase of goods and customer pickup of orders at a location outside the facility or shall provide for delivery to customer locations.

12. Signage. Essential Businesses and Designated Businesses and Operations (to the degree applicable) shall post a sign at the entrance of the facility informing all employees and customers that they must comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order; avoid entering the business or operation if they have a cough or fever or otherwise do not feel well; maintain a six-foot distance from one another; and not shake hands or engage in unnecessary physical contact.

## III.   BASIS FOR THE ORDER

This Order is issued based on evidence of COVID-19 within the City, as reported by the Centers for Disease Control and Prevention (CDC), the State Department of Health, and guidance from the City's medical advisory experts, scientific evidence and best practices regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, and evidence that the age, condition, and health of a significant portion of the population of the City places it at risk for serious health complications, including death, from COVID-19. Due to the outbreak of the COVID-19 virus in the general public, which is a

13

pandemic according to the World Health Organization, there is a public health emergency throughout the City. In addition, some individuals who contract the COVID-19 virus have no symptoms or have mild symptoms, which means they may not be aware they carry the virus. Because even people without symptoms can transmit the virus, and because evidence shows that it is easily spread, gatherings can result in preventable transmission of the virus.

The scientific evidence shows that at this stage of the emergency, it is essential to continue to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed, while also restoring the local economy. One proven way to slow the transmission is to limit interactions among people to the greatest extent practicable. This Order helps preserve critical and limited healthcare capacity in the City while taking steps to revive the economy and begin to recover as a community.

This Order also is issued in light of the existence in the City of 4,754 total COVID-19 cases, a record high 3,220 of which are active cases, 249 COVID-19 related hospitalizations, and 33 COVID-19 related deaths, as of August 17, 2020.

### IV.   INTENT

The intent of this Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible to continue to slow the spread of COVID-19 to the maximum extent possible, while also enabling essential services and the reopening of designated businesses and operations with modifications to re-establish continuity of social and commercial life. When people need to leave their places of residence, whether to obtain or perform vital services, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they shall, as applicable and at all times reasonably possible, comply with Social Distancing Requirements as defined in Section II.K. The intent is also to ensure that when people within the City interact with one another they maintain six (6) feet of physical distance from others, and wear face coverings (especially when indoors). All provisions of this Order should be interpreted to effectuate this intent.

### V.   GENERAL

   A.   **Superseding Order.** Emergency Order Nos. 2020-01 through 2020-22 issued by the Office of the Mayor City and County of Honolulu related to the COVID-19 pandemic) are hereby rescinded (to the extent they have not been already) and are superseded by this Order. Section 5 of the Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) issued on March 18, 2020, is hereby superseded to the limited extent necessary to carry out this Order.

   B.   **Duration.** This Order shall take effect at 12:00 a.m. on August 20, 2020, and shall continue in force and effect through September 16, 2020, or until it is extended, rescinded, superseded, or amended by a subsequent order, or as otherwise provided under Haw. Rev. Stat. ch. 127A.

   C.   **Enforcement.** All law enforcement of the State of Hawai'i and City shall ensure compliance with and enforce these Orders in accordance with Haw. Rev. Stat. § 127A-29 and Mayor's Rules.

**EX04-073**

D.    **Promulgation/posting.** This Order shall be posted on the City website as soon as practicable in one or more appropriate places, and shall remain posted while in effect.

E.    **Severability.** If any provision of the Orders or their application to any person or circumstance is held to be invalid, the remainder of the Orders, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of the Orders are severable.

KIRK W. CALDWELL
Mayor
City and County of Honolulu

Date: _August 19, 2020_

Time: _5:00 pm_

APPROVED:

PAUL S. AOKI
Corporation Counsel Designate
City and County of Honolulu

APPROVED:

DAVID Y. IGE
Governor

15

**EX04-074**

## EXHIBIT A

### Designated Businesses and Operations

1.    Beaches.  Consistent with Governor David Y. Ige's COVID-19 related proclamations and approval of this Order, all beaches and sand bars within the City are closed except:

   a.    To transit across or through beaches to access the ocean waters for outdoor exercise purposes, such as surfing, solo paddling, and swimming.  No person shall otherwise walk, run, sit, stand, lie down, lounge, sunbathe, or loiter on any state beach or sand bar in Hawai'i.

   b.    The beach or sand area may only be used from sunrise to sunset, unless the person is engaged in shore fishing or permitted outdoor exercise.

   c.    All other State or City restrictions related to COVID-19 must be followed, including, but not limited to, any applicable quarantine restrictions.

2.    Public and private golf courses within the City operating in accordance with the Phase 1 guidelines set forth in the Professional Golfers' Association/Aloha Section's "Procedures for Reintroduction to the Game and Business of Golf" as may be updated/amended and to the extent reasonably practicable.;

3.    Certain real estate services (*effective June 5, 2020*).  All real property sales and management activities should be accomplished by remote/electronic means whenever possible.  Starting June 5, 2020, whenever in-person real property sales and management activities are warranted, and subject to the following restrictions and conditions, the services shall constitute a Designated Business and Operation:

   a.    Restrictions:
      i.    Any open house, brokers' open, meeting with client(s), property viewings, inspections, appraisals, or similar events shall be limited in number of attendees in accordance with Order 3 of this Order, and comply with Social Distancing Requirements to the extent applicable and reasonably possible, except that all persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order.

   b.    Permitted real estate activities:
      i.    Residential rental property management.
      ii.    Satisfaction of, and compliance with current/pending contract contingencies and other legally mandated activities, such as:
      - Property inspection
      - Inventory
      - Termite inspection
      - Appraisal
      - Survey

**EX04-075**

- Removal of items from property
- Repairs/Cleaning
- Signing
- Final walk through
- Key transfer

c.   Fulfilling listing agreement/property management obligations such as:
  i.   Pre-listing property viewing / analysis for Comparative Market Analysis (CMA) 86 pricing
  ii.   Photography / scanning
  iii.   Virtual recording for virtual tours and virtual open houses (to post on property websites, etc.)
  iv.   Inspection of vacant listings to ensure safety, maintenance, upkeep, etc.
  v.   Viewings, limited in accordance with Order 3 of this Order (regarding gatherings).;

4.   New and used car and truck dealerships - sales and leasing activities (with restrictions). Licensed new and used car and truck dealerships provided they first develop and implement appropriate COVID-19 mitigation plans and procedures consistent with City, State, and CDC guidelines, including, but not limited to: measures to ensure compliance with Social Distancing Requirements to the extent applicable and reasonably possible, except that all persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order; and limitations on gatherings consistent with Order 3 of this Order.;

5.   Automated service providers.  Service providers that do not require human interaction between the service provider and the customer, including, but not limited to, fully automated car washes; provided that the service provider implements sanitation measures consistent with CDC guidelines - https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html.;

6.   Mobile service providers.  Businesses that provide services on a mobile basis in which no human interaction between the service provider and the customer, including, but not limited to, mobile pet grooming and car washing/detailing businesses; provided that the service provider implements sanitation measures consistent with CDC guidelines - https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html;

7.   Educational services provided on a one-on-one basis that can be conducted in compliance with Social Distancing Requirements.  Businesses that provide services such as private tutoring, music lessons, etc., one a one-on-one basis (e.g., one teacher and one student) that are able to comply with Social Distancing Requirements at all times and implementing sanitation measures consistent with CDC guidelines - https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html.;

8.   Retail and service businesses provided all of the following:

2

EX04-076

a. Each retail and service business must set and maintain an occupancy limit for their facilities that allows employees, customers, and visitors to maintain at least six-feet of physical distance from one another at all times, and which complies with other applicable law. Alternatively, such businesses may continue to limit occupancy to no more than one (1) person per 200 square feet of the gross operation area (which equates to approximately 50 percent of the maximum occupancy load).

b. Social Distancing Requirements (as defined in Section II.K.) are adhered to at all times to the extent applicable and reasonably practicable, except that all persons shall comply with the face covering requirements set forth in Order 5 of this Order.

c. The City's "COVID-19 Guidance for Businesses" (https://www.oneoahu.org/business-guidance) and applicable guidance from the CDC (available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html) are followed to the greatest extent possible.

d. If fitting rooms are made available, precautions must be taken to mitigate the spread of COVID-19, including frequent sanitizing of frequently touched surfaces, quarantining tried on merchandise for at least 24 hours, and ensuring appropriate physical distancing can be maintained in the fitting room area.

e. Within shopping malls, the following requirements and conditions apply:
   - The operators of food-court dining areas shall either comply with applicable sections of the "Restaurants" section contained in this Exhibit A (physical distancing of tables, limiting groups, etc.) to the extent reasonably practicable, or keep the area closed.
   - The operators of play areas, entertainment areas, arcades, and game rooms within a shopping mall may operate subject to relevant provisions of this Order. For example, indoor arcades may operate to the extent they are able to comply with the section entitled "indoor attractions," provided that the operation of the specific "indoor attraction", e.g., arcades, is not prohibited; and, common areas may be utilized consistent with restrictions on "gatherings" under Order 3 of the Order.
   - All persons within shopping malls, including common areas, shall comply with the face coverings requirements set forth in Order 5 of this Order, and the operators of shopping malls shall implement measures to ensure compliance with the face covering requirements.;

9. RESERVED. Outdoor sport fields, courts, open areas, and pools for individual or small group activities which includes public and private outdoor sport fields, courts, open areas, pools, and similar facilities ("Outdoor Facilities") were previously allowed to open and operate. However, due to ongoing and heightened public health concerns linked to gatherings and the spread of COVID-19, effective immediately and until further notice, the above-cited must close and may not operate within the City. The definition of

3

Outdoor Facilities does not include private residential (e.g., private homes, condominiums, etc.) facilities, provided that the use of such facilities is non-commercial, and utilized consistent with the limitations on "social gatherings" set forth in Order 3 of this Order.

10.    Drive-in services.  Starting on May 15, 2020, drive-in services (e.g., spiritual/religious services) may be conducted provided all of the following:

    a.    All persons attending the service must drive up in an enclosed vehicle and remain in that same vehicle during the entire service.

    b.    Vehicle windows, sunroofs and convertible tops must remain closed during the entire service, unless the vehicle is parked more than six (6) feet away from any other vehicle.

    c.    Each vehicle may only be occupied by members of the same household or living unit.

    d.    All City, state, and federal laws related to vehicle operation must be followed.

    e.    Organizers and employees of the services must follow current City, State, and CDC guidelines.

    f.    Generally, no food, beverages, equipment, or materials of any kind may be distributed or collected during the service.  However, organizers may use unattended drop-boxes, or distribute preordered food, beverages, equipment, or materials consistent with CDC guidelines and this Order.  Attendees of the service must remain in their vehicles at all times, except to use the restroom while complying with Social Distancing Requirements (including wearing a face covering and maintaining six (6) feet of physical distance between others).  Where restroom facilities are provided, the organizers must ensure the availability of handwashing stations or sanitizer, and the routine maintenance and cleaning of the facilities consistent with CDC guidance.;

11.    In-person spiritual services.  In-person spiritual services may be conducted provided all of the following are implemented:

    a.    All persons attending the service must maintain six (6) feet of physical distance between others, except members of the same household or living unit.  Organizers are encouraged to limit the number of persons attending their in-person spiritual services to ensure this physical distancing requirement is met.

    b.    All persons attending the service shall comply with the face coverings requirements set forth in Order 5 of this Order.

    c.    Compliance with the conditions and limitations on singing, and/or playing a wind instrument, and similar activities set forth in section 23 below.

4

**EX04-078**

    d.     Organizers and employees are strongly encouraged to develop and implement appropriate COVID-19 mitigation plans and procedures for their respective in-person services, which should include, but are not limited to, addressing the following issues:

        i.     Safeguards for higher risk populations consistent with CDC guidance, available at https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Higher-Risk.

        ii.    Persons who are sick.

        iii.   Personal hygiene.

        iv.   Usage of hand sanitizer and sanitizing products.

        v.    Cleaning and disinfection.

        vi.   Online and remote access and/or drive-in services.

        vii.  Signage.

        viii. Limiting community sharing of worship materials and other frequently touched items.

    e.     Organizers and employees of in-person spiritual services must follow to the greatest extent possible current COVID-19 related: City guidelines; State of Hawaii guidelines' CDC guidelines (available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/index.html), and their respective spiritual organizations' guidelines.;

12.    Restaurants. This section applies to restaurants only. For purposes of this section, a "Restaurant" means a place which is regularly and in a bona fide manner used and kept open for the serving of meals to patrons for compensation and which has suitable kitchen facilities connected therewith, containing the necessary equipment and supplies for cooking an assortment of foods which may be required for ordinary meals. Additionally, to be considered a "Restaurant" under this section, at least thirty percent (30%) of the establishment's gross revenue must derive from the sale of foods. Restaurants in the City may provide seated table service dining under the following requirements, conditions, and privileges:

    a.     General.

        i.     Continued compliance with all State of Hawai'i and City regulatory and legal standards for operating a food services business.

        ii.    Compliance with Social Distancing Requirements (as modified by this "Restaurants" section).

        iii.   Development, posting, and implementation of written protocols ("COVID-19 Mitigation Plan") consistent with this section; Centers for Disease Control and Prevention ("CDC") guidance (available here: https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html), as updated or superseded; and, to the extent practicable, the National Restaurant Association's Reopening Guidance (available at https://restaurant.org/Downloads/PDFs/business/COVID19-Reopen-Guidance.pdf) .

EX04-079

b.   Operations.

    i.   Face coverings (as defined in Order 5).

- Employees - All restaurant employees must wear face coverings during their shifts, consistent with Order 5 of the Order.
- Customers - Customers must wear face coverings when entering and leaving the restaurant facility, consistent with Order 5 of the Order. Customers may remove the face coverings while seated, but they are encouraged to wear face coverings when not actively eating or drinking.

    ii.   Group dining is limited to a maximum of five (5) individuals.

    iii.   Seating shall be arranged so that six (6) feet of separation is maintained between dining groups. No standing bar/dining areas are allowed.

    iv.   Prohibit groups within the restaurant from intermingling.

    v.   Condiments shall be by request in single-use disposable packets, or reusable condiment containers that are sanitized between parties.

    vi.   Tables and chairs must be fully sanitized after each group (or individual customer) leaves the restaurant.

    vii.   When non-disposable dishware and utensils are used, they must be sanitized after each use consistent with Hawaii Department of Health guidance and regulations, and "best practices" of the U.S. Food & Drug Administration ("FDA") (available here: https://www.fda.gov/food/food-safety-during-emergencies/best-practices-re-opening-retail-food-establishments-during-covid-19-pandemic), as updated or superseded.

    viii.   Provide disposable menus or menu boards, or sanitize reusable menus after each use.

    ix.   Hourly touch-point sanitization (workstations, equipment, screens, door knobs, restrooms, etc.) required.

    x.   No self-service buffets or drink stations.

    xi.   Generally, singing and playing wind instruments are prohibited. However, singing and/or playing wind instruments may be performed *outdoors* provided all of the following:

- Any person(s) singing and/or playing a wind instrument shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument. Members of the same performing group singing and/or playing a wind instrument may be closer than ten (10) feet together while performing.

- To the extent reasonable and practicable, a physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument from any other person(s), but not including members of the same performing group.

Singing and/or playing wind instruments may be performed *indoors* provided all of the following:

6

**EX04-080**

- Any person(s) singing and/or playing a wind instrument shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument. Members of the same performing group singing and/or playing a wind instrument may be closer than ten (10) feet together while performing.

- A physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument from any other person(s), but not including members of the same performing group.

- For purposes of subsection b.xi. "performing group" means persons who are compensated for singing and/or playing a wind instrument.

xii. Additional restrictions for restaurants holding a liquor license. For restaurants operating under this section that hold a liquor license issued by the Liquor Commission of the City and County of Honolulu, State of Hawaii, (including Class 2, 5, 6, 10, 11, 12, 13, 14, 15, 16, 17, or 18 liquor licenses), the following restrictions and penalties also apply:

- Hours for on premises consumption. Licensees (operating restaurants under this section) shall cease the sale, service, and consumption of liquor at or before 10:00 p.m. The start time for the sale, service, and consumption of liquor shall remain the same, based upon the class of license.

c. Hygiene.

i. Employer must provide hand washing capability or sanitizer for employees and customers.
ii. An adequate supply of soap, disinfectant, hand sanitizer, and paper towels must be available at all times.
iii. Frequent hand washing/sanitizing by employees is required.

d. Staffing.

i. Provide training for employees regarding these requirements and each restaurant's respective COVID-19 Mitigation Plan (as defined in subsection a.iii above).
ii. Conduct pre-shift screening, maintain staff screening log.
iii. No employee displaying symptoms of COVID-19 should provide services to customers. Symptomatic or ill employees should not report to work.
iv. No person should work within 72 hours of exhibiting a fever or other COVID-19 symptoms, and follow the CDC's "What To Do If You Are Sick" guidance, available at https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html.
v. Employer must establish a plan for employees getting ill and a return-to-work plan following CDC guidance, which can be found online at:

7

**EX04-081**

https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html.

e.    Cleaning and Disinfecting.

    i.    Cleaning and disinfecting must be conducted in compliance with CDC guidance.

    ii.    When an active employee is identified as being COVID-19 positive by testing, cleaning and disinfecting must be performed as soon after the confirmation of a positive test as practical consistent with CDC guidance.

    iii.    CDC guidance can be found online at: https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html

f.    Encouraged practices. Restaurants are encouraged to do the following:

    i.    Have customers enter and exit through different entries using one-way traffic, where possible.

    ii.    Start or continue entryway, curbside, and home delivery.

    iii.    Encourage making reservations, preordering for dine-in service, and ordering for contactless pickup and delivery either by telephone or other remote means.

    iv.    Implement cashless and receiptless transactions.

g.    Pilot sidewalk/outdoor dining privilege. From the effective date of this section, through the termination of Mayor's COVID-19-related Emergency Proclamation (as supplemented or extended), restaurants abutting City property may use City Property for dining and take-out operations under the following conditions:

    i.    The restaurant must be on the ground floor and abut paved City property

    ii.    Upon 24-hour's notice, the restaurant must vacate City property for regular maintenance by City (e.g. steam cleaning).

    iii.    The restaurant are responsible for own equipment, furniture, and supplies, which must be stored elsewhere during closed hours.

    iv.    The utilized City property may only be used by the restaurant during its business normal hours, but shall not be used between the hours of 11:00 p.m. and 7:00 a.m.

    v.    The restaurant is responsible for compliance with any additional requirements relating to its Hawaii Department of Health Food Establishment Permit.

    vi.    Liquor sales, if any, on the utilized City property must be authorized under the restaurant's liquor license and applicable law.

    vii.    No additional signage is permitted within the utilized City property.

    viii.    Dining services must be consistent with the requirements of this section, including Social Distancing Requirements and physical spacing of tables and customers.

8

**EX04-082**

ix.     Furniture must be located at least six (6) feet from any vehicular ramp, driveway or street intersection.

x.     No live or amplified music is allowed on the utilized City property.

xi.     Furniture shall not be placed over planter strips and tree wells

xii.     Furniture shall be outside an eight (8)-foot radius around bus stops and a five (5)-foot radius around fire hydrants.

xiii.     All fire lanes shall be open and accessible at all times.

xiv.     The restaurant is responsible for rubbish collection.

xv.     Restaurants must cease operations completely when Mayor's COVID-19-related Emergency Proclamation (as supplemented) is no longer in effect.

xvi.     Violations of these requirements will result in forfeiture of this privilege.

xvii.     Sidewalk/outdoor dining under this section may include parklets (i.e., use of abutting parking/street spaces converted to dining space), subject to pedestrian clearance, traffic, and safety issues as determined by the City through the department(s) having authority over those issues.

xviii.     Where sidewalks are present on all or part of the utilized City property, the restaurant must ensure a clear right of way of at least 36 inches at all times, (although 48 inches is recommended).

xix.     For restaurants abutting "pedestrian malls", as more specifically defined in Section 29-1.1, et seq. of the Revised Ordinances of the City and County of Honolulu 1990 (as amended), the following additional requirements apply:

- A clear 20-foot wide right of way to accommodate delivery and emergency vehicles must be maintained at all times
- Operation cannot exceed mall hours
- No liquor service is allowed
- All rubbish must be removed nightly
- If the ground of the City property utilized consists of pavers, the restaurant must take precautions to prevent and address food, liquid, and grease spills

xx.     For restaurants abutting a City park or playground, use of the City Property is limited to seven (7) feet from property line, and no more than one row of tables.

xxi.     Activities permitted under this section may begin upon acceptance by the City of a completed liability form and proof of insurance.;

h.     Enforcement. Any Restaurant in violation of any provision under this "Restaurant" section shall be subject to (1) immediate closure for 24 hours by the Honolulu Police Department to provide an opportunity to cure the violation and provide staff training to protect the public health; and (2) the penalties generally authorized by this Order. Any Restaurant holding a liquor license issued by the Honolulu Liquor Commission in violation of any provision of this "Restaurant" section shall also be subject to (1) immediate closure for 24 hours by the Honolulu Police Department and/or the Honolulu Liquor Commission to provide an opportunity to cure the violation and provide staff training to protect the public health; and (2) the penalties enforceable pursuant to the Rules of the Liquor

9

EX04-083

Commission of the City and County of Honolulu, State of Hawaii, and the Liquor Laws of Hawaii under Hawaii Revised Statutes Chapter 281, which may include a reprimand, fine, suspension, and/or revocation of the liquor license.

13.  Outdoor attractions with limitations.  Public and private <u>outdoor</u> attractions such as zoos, sea life attractions, water parks, recreational/commercial boating vessels (to the extent permitted under the State's COVID-19-related proclamations/orders and other applicable law), campgrounds, outdoor markets (including People's Open Markets), shooting ranges, archery ranges, and similar outdoor facilities ("**Outdoor Attraction(s)**") <u>may</u> reopen under the following conditions:

  a.  Groups are limited to a maximum of five (5) individuals.  Where multiple groups are present, operators must implement measures to ensure that they maintain six (6) feet of physical distance between each other at all times (i.e., no mingling between groups).

  b.  Operators must implement measures to ensure that participants and groups waiting to use a facility or an activity open under this section maintain physical distance of six (6) feet from one another at all times.  Outdoor Attractions to open under this section are encouraged, but not required, to implement a reservation system to eliminate or reduce waiting times.

  c.  Indoor portions of the facility must remain closed, unless such portion is authorized under another section of this Order and complies with any restrictions imposed (e.g., retail and services businesses, etc.).

  d.  Individuals must comply with any lawful requirements imposed by the Outdoor Attraction operator.

  e.  To the extent consistent with this section, and to the extent reasonably practicable: (1) the facility operators and participants shall follow applicable guidance from the CDC (available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html); and (2) established and reputable COVID-19-related guidelines for the facility and the activity at issue.

  f.  Nothing in this section requires a public or private Outdoor Attraction to open.;

14.  Personal service providers.  This section applies to barbers, beauty operators (including cosmetologists, hairdressers, estheticians, and nail technicians/nail salon workers), electrologists, tattoo/permanent makeup artists, massage therapists (non-health care setting), tanning service providers, tailors/seamstresses, pet-trainers, and other similar one on one personal service providers (collectively "**Personal Service Providers**"). Starting May 29, 2020, Personal Service Providers in the City may resume operations under the following requirements and conditions:

  a.  General.

    i.  Compliance with all State of Hawaiʻi and City statutory and regulatory requirements and standards for the service provided by the Personal

**EX04-084**

Service Provider. (E.g., barbers must comply with Haw. Rev. Stat. ch. 438 and Haw. Admin. R. § 16-73-1 et seq.; beauty operators must comply with Haw. Rev. Stat. ch. 439 and Haw. Admin. R. § 16-78-1 et seq.; and both barbers and beauty operators must comply with the Rules Relating to Safety Guidelines for Barbers and Beauty Operators, attached as Exhibit I to the Governor of the State of Hawaii's Eighth Supplementary Proclamation Related to the COVID-19 Emergency, issued on May 18, 2020 and available at https://governor.hawaii.gov/wp-content/uploads/2020/05/2005088-ATG_Eighth-Supplementary-Proclamation-for-COVID-19-distribution-signed.pdf. Massage therapists must comply with Haw. Rev. Stat. ch. 452 and Haw. Admin. R. § 16-84-1 et seq.). All Personal Service Providers are encouraged to visit https://cca.hawaii.gov/pvl/hrs/ to determine if they are regulated under Hawaii law.

ii.     Compliance with applicable CDC guidelines (available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html.

iii.    Compliance with standards and guidelines issued by industry-specific associations or similar organizations of the respective Personal Service Provider's operations, to the extent reasonably practicable.

iv.     Compliance with the City's "COVID-19 Guidance for Businesses" to the greatest extent possible. https://www.oneoahu.org/business-guidance.

b.    Specific Requirements. Personal Services Providers must:

i.      Arrange seating in the establishment so that customers are separated from other customers by six (6) feet between booths/stations or have physical barriers between them.

ii.     Ensure Social Distancing Requirements are adhered to at all times to the degree applicable and to extent reasonably practicable, except that all persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order. Notwithstanding this requirement, customers may temporarily remove the face covering when necessary to complete the personal service at issue, and individuals who cannot wear a face covering due to a medical or health condition, and individuals under five (5) years of age are exempted from the requirement to wear a face covering.

iii.    Implement additional mitigation measures when strict physical distancing of at least six (6) feet is not feasible for a specific task. Such measures include, but are not limited to, the use of physical barriers, additional PPE (e.g., plastic face shields/masks), and minimization of such personal services, enhanced cleaning, and increased ventilation of the area with outside air.

iv.     Ensure that all equipment that comes into direct contact with customers/clients and all furniture in service areas (such as chairs, capes, and the shampooing area in a barber shop or salon) is completely cleaned

11

and disinfected between each customer/client in accordance with CDC guidelines and applicable law.

v.    Implement screening measures to screen service providers and customers/clients for signs and symptoms of COVID-19 before arriving at the service provider location.  If a service provider or client/customer answers "yes" to Questions 1-3, they should not provide or receive services at the Personal Service Provider's facility.  Personal Service Providers may provide services to those clients/customers who answer "yes" to Questions 4 and 5.

1)    Do you now, or have you had in the past fourteen (14) days:
   •    A cough or sore throat?
   •    Fever or do you feel feverish?
   •    Shortness of breath?
   •    Loss of taste or smell?
2)    Have you been out of the State in the last fourteen (14) days?
3)    Have you had close personal/physical contact with or cared for someone diagnosed with or tested positive for COVID-19?

* * * * *

4)    If you answered "yes" to Question 3, are you a health care worker?
5)    If you answered "yes" to Question 4, are you cleared to work at your healthcare facility?

c.    Prior to reopening, all Personal Service Providers are encouraged to develop, post and implement written protocols ("**COVID-19 Mitigation Plan**") consistent with this section; Centers for Disease Control and Prevention ("CDC") guidance (available here:  https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html, as updated or superseded; and, to the extent practicable, with standards and guidelines issued by industry-specific associations or similar organizations.  The plan should include policies regarding the following control measures: PPE utilization; on-location physical distancing; hygiene; sanitation; self-screening and symptom monitoring; incident reporting; and location disinfection procedures.

d.    Handwashing stations and/or disinfectants must be available to personal service providers and customers/clients throughout the workplace and frequently replenished.

e.    No waiting areas are allowed.

f.    No beverage service shall be provided.

g.    When making personal service appointments, Personal Service Providers should advise customers/clients of new requirements, which may include, but are not limited to:

i.    Customer/client must self-screen for signs and symptoms of COVID-19 before arriving at the service provider location.

12

EX04-086

ii.    Customers/clients should not plan on bringing other guests with them, unless they are bringing children younger than 16 for an appointment.

iii.    Customers/clients should advise Personal Service Providers via call, email or text that they have arrived at the location for the appointment, and are waiting for instructions to enter.

iv.    Customers/clients should put on a face covering prior to leaving the vehicle, and they should be prepared to wash their hands for at least 20 seconds or use sanitizer prior to starting their service.

v.    Payments for service should be through credit or debit cards or a touchless system to reduce the handling of cash.

h.    For walk-in appointments, the Personal Service Provider should post a notice on the front door or window regarding access to the facility. The notice should include the phone number that the guest should call to determine availability of services. If service is available at the time, the walk-up guest will need to answer questions regarding COVID-19 exposure and current health, and put on a face covering before entering the location.

i.    Personal Service Providers are encouraged to follow additional best practices:

i.    Reducing the number of customers/clients serviced at one time. E.g., using only 50% of the available work stations.

ii.    Operators must implement measures to ensure that participants and groups waiting to use a facility or an activity open under this section maintain physical distance of six (6) feet from one another at all times.

iii.    Cashless and receiptless transactions.

iv.    Customers/clients entering and exiting through different entries using one-way traffic, where possible.

v.    Reserved hours for operation limited to high-risk populations.

vi.    A manager or shop owner should be on site during business hours at all times.

vii.    Advising customers to limit the number of items they bring into the premises.;

15.    **Business offices.** This section applies to business offices, whether for-profit, non-profit, or educational entities, regardless of the nature of the business or service, the function it performs, or its corporate or entity structure, that were not previously authorized to utilize their offices under the City's COVID-19-related emergency orders. Business offices may operate under the following requirements and conditions:

a.    General.

i.    Compliance with all City, State, and federal statutory and regulatory requirements.

ii.    Compliance with all appropriate CDC guidelines – https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html

13

**EX04-087**

iii. Compliance with any standards and guidelines issued by industry-specific associations or similar organizations of the respective business.

iv. Compliance with the City's "COVID-19 Guidance for Businesses" – https://www.oncoahu.org/business-guidance.

v. Compliance with the State's COVID-19 guidelines including, but not limited to:

    1) https://health.hawaii.gov/coronavirusdisease2019/what-you-can-do/how-to-prevent-the-spread-of-covid-19/.

    2) https://health.hawaii.gov/coronavirusdisease2019/files/2020/04/What-To-Do-If-You-Have-Been-Tested-For-COVID19_040120.pdf

    3) https://health.hawaii.gov/coronavirusdisease2019/files/2020/05/What-to-Do-if-a-Person-at-Your-Worksite-has-COVID-19.pdf

b. Specific Requirements.

i. The business shall ensure and promote compliance with the Social Distancing Requirements to the greatest extent applicable and reasonably possible, except that all persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order.

ii. All occupied desks, cubicles and open workspaces, and furniture used for sitting or standing must be spaced at least six (6) feet apart to the extent reasonably practical.

iii. The business shall ensure cleaning and disinfecting of its facility in compliance with CDC guidelines – https://www.cdc.gov/coronavirus/2019-ncov/community/clean-disinfect/index.html.

iv. Consistent with Order 3 of this Order, there shall be no "social gatherings" at a business office open under this section.

v. The business shall develop, post, and implement policies based on guidance from the CDC, Department of Labor, Occupational Safety and Health Administration ("OSHA") and the Hawai'i Department of Health ("HDOH") to limit and mitigate the spread of COVID-19, including, but not limited to, the following:

    1) Promoting healthy hygiene practices.

    2) Improving and intensifying cleaning and disinfection practices.

    3) Improving ventilation and circulation of outside air to the extent practicable.

    4) Monitoring for sickness.

    5) Closing common areas for eating, and ensuring physical distancing at locations and times where employees, clients, or guests may congregate.

    6) Providing necessary personal protective equipment.

    7) Reducing the number of employees at the office on a daily basis by allowing for and encouraging employees to work remotely to the maximum extent practicable and/or implementing staggered work schedules.

14

**EX04-088**

8) Providing employees at higher risk for severe illness from COVID-19 (based on CDC guidance) with special accommodations, at the employee's request, to avoid contact with, and mitigate the risk of, the employee's exposure to co-workers and others in connection with the business, to the maximum extent possible.

9) Providing plans to return to work in phases to the extent practicable.

10) If someone at work tests positive for COVID-19 – https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html:

16. Education and care facilities. This section applies to all private education, adult care, and special needs care facilities ("Education/Care Facilities"). State-regulated education and care facilities are not included, but may reopen as allowed by the State and/or the Department of Education. A business falling within the definition of an Essential Business (e.g., "childcare" under Section II.F.20 of the Order) and this section, may operate under either. Starting June 19, 2020, Education/Care Facilities may reopen under the following requirements and conditions:

a. General.

i. Compliance with all City, State, and federal statutory and regulatory requirements.

ii. Compliance with all applicable CDC guidelines to the extent they do not conflict with this Order (available at https://www.cdc.gov/coronavirus/2019-ncov/community/index.html), (e.g., guidelines for schools (K-12), colleges/universities, youth programs, and workplaces).

iii. Compliance with any standards and guidelines issued by industry/education-specific associations or similar organizations of the respective Education/Care Facility at issue, to the extent they do not conflict with this Order.

iv. Compliance with the City's "COVID-19 Guidance for Businesses" – https://www.oneoahu.org/business-guidance, to the extent applicable.

v. Compliance with the State's COVID-19 guidelines (to the extent applicable) including, but not limited to:

1) https://health.hawaii.gov/coronavirusdisease2019/what-you-can-do/how-to-prevent-the-spread-of-covid-19/.

2) https://health.hawaii.gov/coronavirusdisease2019/files/2020/04/What-To-Do-If-You-Have-Been-Tested-For-COVID19_040120.pdf

3) https://health.hawaii.gov/coronavirusdisease2019/files/2020/05/What-to-Do-if-a-Person-at-Your-Worksite-has-COVID-19.pdf

b. Specific Requirements.

i. Physical distancing, face coverings, and groups.

15

EX04-089

1)   For Education/Care Facilities providing services to individuals with special needs, pre-elementary- and elementary-aged individuals:
- Ensure physical distancing of at least six (6) feet between individuals to the extent reasonably practicable given the age and capability of the individuals and the activities at issue.
- Require face coverings for instructors/service providers consistent with CDC guidelines, if any exist.
- Require face coverings consistent with CDC guidelines, if any exist, for students/clients/customers to the extent reasonably practicable given the age and tolerance of the individuals and the activity at issue.
- Maintain stable groups (cohorts) of ten (10) or fewer students/clients/customers each day, with the same instructors/service providers, to the extent reasonably practicable.

2)   For all other Education/Care Facilities:
- Ensure physical distancing of at least six (6) feet between individuals at all times to the extent reasonably practicable.
- Require face coverings for instructors/service providers consistent with CDC guidelines, if any exist.
- Require face coverings consistent with CDC guidelines, if any exist, for students/clients/customers.

ii.   Activities such as singing, the playing of wind instruments, and other similar activities that increase the presence and propulsion of respiratory droplets in the air are discouraged; however, such activities are permitted provided the following mitigation measures are taken:

If the activity takes place *outdoors*:

- Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc. Members of the same performing group singing and/or playing a wind instrument, etc. may be closer than ten (10) feet together while performing, provided the group consists of less than ten (10) persons.
- To the extent reasonable and practicable, a physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

If the activity takes place *indoors*:

16

EX04-090

- Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc. Members of the same performing group singing and/or playing a wind instrument, etc. may be closer than ten (10) feet together while performing, provided the group consists of less than ten (10) persons.
- A physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

iii. The Education/Care Facility shall ensure and promote compliance with the Social Distancing Requirements (that are not specifically addressed in this section) to the extent applicable and reasonably possible.

iv. All occupied desks, cubicles and open workspaces, and furniture used for sitting or standing must be spaced at least six (6) feet apart to the extent reasonably practicable.

v. The Education/Care Facility shall ensure cleaning and disinfecting of its facility in compliance with CDC guidelines – https://www.cdc.gov/coronavirus/2019-ncov/community/clean-disinfect/index.html.

vi. The Education/Care Facilities shall develop, post, and implement policies based on guidance from the CDC, Department of Labor, OSHA and the HDOH to limit and mitigate the spread of COVID-19, including, but not limited to, the following:

1) Promoting healthy hygiene practices.
2) Improving and intensifying cleaning and disinfection practices.
3) Improving ventilation and circulation of outside air to the extent practicable.
4) Monitoring for sickness.
5) Ensuring physical distancing at locations and times where individuals may congregate.
6) Providing necessary personal protective equipment.
7) Allowing for and encouraging individuals to work or conduct the activity at issue remotely to the extent practicable.
8) Providing those at higher risk for severe illness from COVID-19 (based on CDC guidance) with special accommodations, at their request, to avoid contact with, and mitigate the risk of, the individual's exposure to others in connection with the business, operation, or facility to the extent applicable and reasonably possible.
9) Providing plans to return to work or the activities at issue in phases to the extent practicable.
10) If someone at work tests positive for COVID-19 – https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html:

17

**EX04-091**

17.   Indoor attractions such as bowling alleys, arcades, mini golf, and other similar indoor entertainment facilities/operations ("**Indoor Attractions**") were previously allowed to operate. However, due to ongoing and heightened public health concerns linked to gatherings and the spread of COVID-19, effective immediately and until further notice, bowling alleys, arcades, mini golf, and other similar indoor entertainment facilities/operations must close and may not operate within the City.

Museums, art galleries, movie theaters, and other similar indoor entertainment facilities/operations may continue to operate under the following requirements and conditions:

a.   General.

i.   Compliance with all City, State, and federal statutory and regulatory requirements.

ii.   Compliance with all applicable CDC guidelines to the extent they do not conflict with this Order (available at https://www.cdc.gov/coronavirus/2019-ncov/community/index.html).

iii.   Compliance with any standards and guidelines issued by industry/activity-specific associations or similar organizations of the respective Indoor Attraction at issue, to the extent they do not conflict with this Order.

iv.   Compliance with the City's "COVID-19 Guidance for Businesses" – https://www.oneoahu.org/business-guidance, to the extent applicable.

v.   Compliance with the State's COVID-19 guidelines (to the extent applicable) including, but not limited to:

1)   https://health.hawaii.gov/coronavirusdisease2019/what-you-can-do/how-to-prevent-the-spread-of-covid-19/.

2)   https://health.hawaii.gov/coronavirusdisease2019/files/2020/04/What-To-Do-If-You-Have-Been-Tested-For-COVID19_040120.pdf

3)   https://health.hawaii.gov/coronavirusdisease2019/files/2020/05/What-to-Do-if-a-Person-at-Your-Worksite-has-COVID-19.pdf

b.   Specific Requirements.

i.   Groups are limited to a maximum of five (5) individuals. Where multiple groups are present, operators must implement measures to ensure that they maintain six (6) feet of physical distance between each other at all times (i.e., no mingling between groups).

ii.   To the extent practicable, face coverings must be worn at all times. (E.g., face coverings generally must be worn in a movie theatre facility; however, individuals may remove the face covering while seated to eat and drink, or if one of the exemptions to face covering requirements in Order 5 of the Order).

iii.   Operators must implement measures to ensure that individuals and groups waiting to use a facility or an activity open under this section maintain physical distance of six (6) feet from one another at all times. Indoor

18

**EX04-092**

Attractions to open under this section are encouraged, but not required, to implement a reservation system to eliminate or reduce waiting times.

iv.   Activities such as singing, the playing of wind instruments, and other similar activities that increase the presence and propulsion of respiratory droplets in the air are discouraged; however, such activities are permitted provided the following mitigation measures are taken:

If the activity takes place *outdoors*:

- Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc. Members of the same performing group singing and/or playing a wind instrument, etc. may be closer than ten (10) feet together while performing, provided the group consists of less than ten (10) persons.
- To the extent reasonable and practicable, a physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

If the activity takes place *indoors*:

- Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc. Members of the same performing group singing and/or playing a wind instrument, etc. may be closer than ten (10) feet together while performing, provided the group consists of less than ten (10) persons.
- A physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

v.   Individuals must comply with any lawful requirements imposed by the Indoor Attraction operator.

vi.   Nothing in this section requires a public or private Indoor Attraction to open.

vii.   Indoor Attraction operators shall develop, post, and implement policies based on guidance from the CDC, Department of Labor, OSHA and the HDOH to limit and mitigate the spread of COVID-19, including, but not limited to, the following:

1)   Promoting healthy hygiene practices.
2)   Improving and intensifying cleaning and disinfection practices.
3)   Improving ventilation and circulation of outside air to the extent practicable.
4)   Monitoring for sickness.
5)   Ensuring physical distancing at locations and times where individuals may congregate.

19

**EX04-093**

6) Providing necessary personal protective equipment.
7) Allowing for and encouraging individuals to work or conduct the activity at issue remotely to the extent practicable.
8) Providing those at higher risk for severe illness from COVID-19 (based on CDC guidance) with special accommodations, at their request, to avoid contact with, and mitigate the risk of, the individual's exposure to others in connection with the business, operation, or facility to the extent applicable and reasonably possible.
9) Providing plans to return to work or the activities at issue in phases to the extent practicable.
10) If someone at work tests positive for COVID-19 – https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html:

18. RESERVED.;

19. RESERVED. Outdoor organized team sports (phase 2) which applies to outdoor team sports such as baseball, soccer, football, outdoor volleyball, outdoor basketball, and similar outdoor team sports ("**Sports Program(s)**") were previously allowed to operate. However, due to ongoing and heightened public health concerns linked to gatherings and the spread of COVID-19, effective immediately and until further notice, the above-cited must close and may not operate within the City.

20. Fitness facilities. This section includes fitness centers, gyms, spas, yoga, barre, spin, dance studios, hula hālau, and other similar types of facilities ("**Fitness Facilities**"). Starting June 19, 2020, Fitness Facilities in the City may resume operations under the following requirements and conditions, except that all group classes (i.e., three (3) or more persons) in Fitness Facilities are prohibited:

   a. General.
      i. Compliance with all appropriate City, State, and federal statutory and regulatory requirements.
      ii. Development, posting, and implementation of written protocols ("**COVID-19 Mitigation Plan**") consistent with City, State, industry-specific associations or organizations of the respective facility (e.g., USA Gymnastics), and CDC guidance to mitigate the spread of COVID-19 including, but not limited to, the following:
         1) https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html
         2) https://www.oneoahu.org/business-guidance.

   b. Specific Requirements. Fitness Facility operators must:
      i. Not conduct or allow group classes (i.e., three (3) or more persons) to be performed within the Fitness Facility. One-to-one personal training in

20

<table>
<tr><td></td><td>compliance with the "personal service providers" section of this Order and online classes are permitted.</td></tr>
</table>

ii.    Limit occupancy to no more than fifty percent (50%) of the maximum occupant load of the Fitness Facility and of any rooms or areas within the facility with a maximum occupant load. However, pools must be closed.

iii.    Ensure that occupants maintain a minimum of six (6) feet of physical distance between each other at all times. If equipment cannot be arranged to facilitate six (6) feet of physical distancing, it must be blocked from being used.

iv.    If no maximum occupant load exists, operators must limit occupancy to ensure occupants are able to maintain six (6) feet of physical distance between each other at all times.

v.    Limit locker room access and the number of persons who use amenities of the facilities (e.g., sauna, etc.) at any one time to ensure physical distancing of six (6) feet can be maintained.

vi.    Keep childcare areas and self-service food and drink stations closed.

vii.    Keep water fountains closed, except for those designed to refill water bottles in a contact-free manner.

viii.    Limit training for close contact activities (wrestling, mixed martial arts, etc.) to skill-building drills and conditioning in which physical distancing of six (6) feet or more between individuals may generally be maintained.

ix.    Post signs to encourage physical distancing and disinfecting throughout the facility.

x.    Position staff to monitor physical distancing and disinfecting requirements.

xi.    Provide handwashing stations or hand sanitizer (at least 60% alcohol content) throughout the facility for use by employees/clients/guest.

xii.    Ensure Social Distancing Requirements are adhered to at all times to the degree applicable and to the extent reasonably practicable, except that all persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order.

xiii.    Any occupied desks, cubicles and open workspaces, and furniture used for sitting or standing must be spaced at least six (6) feet apart.

xiv.    Ensure frequent cleaning and disinfecting of equipment, restrooms, locker rooms, and other high touch/high usage areas of the facility in accordance with CDC guidelines available at: https://www.cdc.gov/coronavirus/2019-ncov/community/clean-disinfect/index.html.

xv.    The business shall develop, post, and implement policies based on guidance from the CDC, Department of Labor, Occupational Safety and Health Administration ("OSHA") and the Hawai'i Department of Health ("HDOH") to limit and mitigate the spread of COVID-19, including, but not limited to, the following:

EX04-095

1)   Providing training for employees of each facilities' COVID-19 Mitigation Plan.
2)   Establishing a plan for employees who may get ill as well as a return-to-work plan in accordance with City, State, and CDC guidelines which are available at:
   a.   https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html.
   b.   https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html
   c.   https://health.hawaii.gov/coronavirusdisease2019/what-you-can-do/how-to-prevent-the-spread-of-covid-19/
      i.   https://health.hawaii.gov/coronavirusdisease2019/files/2020/04/What-To-Do-If-You-Have-Been-Tested-For-COVID19_040120.pdf
      ii.  https://health.hawaii.gov/coronavirusdisease2019/files/2020/05/What-to-Do-if-a-Person-at-Your-Worksite-has-COVID-19.pdf
3)   Creating safeguards for higher risk populations consistent with CDC guidance available at: https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Higher-Risk.
4)   Limitations on one-to-one personal training, and compliance with the personal service providers section of this Order (to the extent applicable).
5)   RESERVED.
6)   Promoting healthy hygiene practices.
7)   Improving and intensifying cleaning and disinfection practices.
8)   Improving ventilation and circulation of outside air to the extent practicable.
9)   Monitoring for sickness.
10)  Ensuring physical distancing at locations and times where employees, clients, or guests may congregate.
11)  Providing necessary personal protective equipment.
12)  Allowing for and encouraging employees to work remotely to the extent practicable.
13)  Providing employees at higher risk for severe illness from COVID-19 (based on CDC guidance) with special accommodations, at the employee's request, to avoid contact with, and mitigate the risk of, the employee's exposure to co-workers and others in connection with the business, to the maximum extent possible.
14)  Providing plans to return to work in phases to the extent practicable.

22

    c.    Encouraged Practices.

        i.    Consider appointment-based usage of the Fitness Facility to limit the number of persons in the facility.

        ii.    Consider utilizing touchless forms of client/guest check-in.

        iii.    Consider offering virtual fitness classes whenever possible, especially for higher risk populations.

        iv.    Strongly encourage clients/guests to bring their own filled water bottles with them to the facility.;

21.    Film and television production.  Starting June 5, 2020, all local, national, and international film production, television production, streaming production, and similar production may operate in the City based on the guidelines and recommendations for production cast and crew members available at: https://www.honolulu.gov/rep/site/ocd/ocd_docs/Guidelines_and_Best_Practices_for_fil ming_on_the_Island_of_Oahu_during_the_time_of_COVID_060320.pdf. Compliance with the Order and the COVID-19 related proclamations issued by the State is required, including all travel quarantine requirements as modified by the guidelines and recommendations available at: https://www.honolulu.gov/rep/site/ocd/ocd_docs/Modified_Quarantine_Procedures-Honolulu-060320.pdf.;

22.    RESERVED.  Due to ongoing and heightened public health concerns linked to gatherings and the spread of COVID-19, effective immediately and until further notice, bars may not operate within the City.  For purposes of this section, "bars" means an establishment holding a Class 5, 6, 10, 11, 12, 13, 14, 15, 16, 17, or 18 liquor license as defined by the Rules of the Liquor Commission of the City and County of Honolulu, State of Hawaii and establishments that are primarily engaged in the serving of alcoholic beverages for consumption by guests on the premises regardless of whether food is served, including but not limited to taverns, cocktail lounges, karaoke rooms/areas, and cabarets, and including outdoor areas of such establishments.

Bars impermissibly operating shall be subject to immediate closure by the Honolulu Police Department and subject to penalties authorized by this Order.  Liquor licensees impermissibly operating bars shall also be subject to immediate closure by the Honolulu Liquor Commission and be subject to penalties enforceable pursuant to the Rules of the Liquor Commission of the City and County of Honolulu, State of Hawaii, and the Liquor Laws of Hawaii under Hawaii Revised Statutes Chapter 281, which may include a reprimand, fine, suspension, and/or revocation of the liquor license.;

23.    Singing, and/or playing a wind instrument, and similar activities.  Activities such as singing, the playing of wind instruments, and other similar activities that increase the presence and propulsion of respiratory droplets in the air (which are not addressed in another section) ("singing and/or playing a wind instrument, etc.") are discouraged at gatherings and events.  However, such activities are permitted provided they are performed at a gathering/business/operation authorized under the Order, and the following mitigation measures are taken:

a. If the activity takes place *outdoors*:

    i. Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc. Members of the same performing group singing and/or playing a wind instrument, etc. may be closer than ten (10) feet together while performing, provided the group consists of less than ten (10) persons.

    ii. To the extent reasonable and practicable, a physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

b. If the activity takes place *indoors*:

    i. Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc. Members of the same performing group singing and/or playing a wind instrument, etc. may be closer than ten (10) feet together while performing, provided the group consists of less than ten (10) persons.

    ii. A physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

24

**EX04-098**

# OFFICE OF THE MAYOR
## CITY AND COUNTY OF HONOLULU

530 SOUTH KING STREET, ROOM 300 · HONOLULU, HAWAII 96813
PHONE: (808) 768-4141 · FAX: (808) 768-4242 · INTERNET: www.honolulu.gov



KIRK W. CALDWELL
MAYOR

ROY K. AMEMIYA, JR.
MANAGING DIRECTOR

GEORGETTE T. DEEMER
DEPUTY MANAGING DIRECTOR

August 25, 2020

## OFFICE OF THE MAYOR
## CITY AND COUNTY OF HONOLULU
## EMERGENCY ORDER NO. 2020-25
## (COVID-19 [Novel Coronavirus])

### SECOND STAY AT HOME / WORK FROM HOME ORDER

By the authority vested in me as Mayor of the City and County of Honolulu (the **"City"**) pursuant to Revised Charter of the City and County of Honolulu 1973 (2017 Edition), as amended; the Revised Ordinances of the City and County of Honolulu 1990, as amended; the Hawai'i Revised Statutes, as amended (**"Haw. Rev. Stat."**), the Constitution and laws of the State of Hawai'i, I, KIRK W. CALDWELL, hereby issue this Second Stay At Home / Work From Home order (the **"Order"**) to further address the emergency declared in the Proclamation COVID-19 [Novel Coronavirus] that I issued on March 4, 2020, Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued on March 18, 2020, the Second Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued May 6, 2020 Third Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued June 20, 2020, and the Fifth Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) I issued August 6, 2020.

### OVERVIEW

The virus that causes Coronavirus 2019 Disease (**"COVID-19"**) is easily transmitted, especially in group settings, and it is essential that the spread of COVID-19 be slowed to protect the ability of public and private health care providers to handle the influx of new patients and to safeguard public health and safety. This Order addresses these ongoing concerns.

At the present time, there is a resurgence of COVID-19 within the City. As of August 24, 2020, the City has had 6,181 confirmed cases of COVID-19, a record 4,374 of which are active cases, 352 related hospitalizations, and 41 related deaths.

Due to the risk of the rapid spread of the virus causing COVID-19, and the need to protect all members of the City, especially including our members most vulnerable to the virus and also health care providers, this Order requires all individuals anywhere in the City to shelter in place — that is, stay at home and work from home — except for certain essential activities and work to provide essential business and government services or perform essential public infrastructure

construction, including housing. This Order is **effective at 12:00 a.m. on August 27, 2020 and will continue through September 9, 2020** subject to the limited exceptions and under the terms and conditions more particularly set forth below.

Pursuant to Haw. Rev. Stat. § 127A-25 and the Rules of the Mayor City and County of Honolulu, dated March 20, 2020 (**"Mayor's Rules"**) promulgated under that section, each of the orders contained in this Order ("the Orders") shall have the force and effect of law. The Orders are in accordance with and incorporate by reference all of my prior COVID-19 related emergency proclamations and Hawai'i Governor David Y. Ige's COVID-19 related emergency proclamations.

Violation of any of the Orders is punishable as a misdemeanor, with fines of up to $5,000, up to a year in jail, or both. Haw. Rev. Stat. § 127A-29; Mayor's Rules.

## I.    ORDERS

**Order 1:** All individuals currently living within the City are ordered to stay at their place of residence. To the extent individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain physical distancing of at least six (6) feet from any other person when they are outside their residence and comply with Social Distancing Requirements (as defined in Section II.). All persons may leave their residences only for Essential Activities, Essential Governmental Functions, or to operate or visit Essential Businesses, as those terms are defined in Section II. Individuals experiencing homelessness are exempt from this Order 1 only, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to use COVID-19 risk mitigation practices in their operation).

**Order 2:** All businesses with a facility in the City, except Essential Businesses (as defined in Section II.F.), are required to cease all activities within such facilities, except Minimum Basic Operations (as defined in Section II.G.). For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home). All Essential Businesses are strongly encouraged to remain open. To the extent applicable and to the greatest extent feasible, Essential Businesses shall comply with Social Distancing Requirements, including the six-foot physical distancing requirement for both employees and members of the public (including customers standing in line inside and outside of the facility).

**Order 3:** Gatherings.

    **A.**    Indoor and outdoor social gatherings of any type and any number of people are prohibited. For purposes of this Order, a "social gathering" is a gathering or event that brings together persons from multiple households or living units at the same time for a discrete, shared or group experience in a single room, space, or place such as a private home, park, auditorium, stadium, arena, conference room, lunch room, meeting hall, or other indoor or outdoor space.

**EX04-100**

    **B.**    This limitation on social gatherings does not apply to gatherings/events/activities that are permitted under Section II. Nothing in this Order prohibits the gathering of members of a household or living unit on their property (including shared common areas).

**Order 4:** All travel, including, but not limited to, travel on foot, bicycle, scooter, motorcycle, automobile, or public transit, except Essential Travel and Essential Activities (as defined in Section II), is prohibited. People must use public transit only for purposes of performing Essential Activities; or to travel to and from Essential Businesses or maintain Essential Governmental Functions. People riding on public transit must comply with Social Distancing Requirements, as applicable, including the face covering requirements contained in Order 5 of this Order. This Order allows travel into or out of the City to perform Essential Activities, operate or visit Essential Businesses, or maintain Essential Governmental Functions.

**Order 5:** Non-Medical Grade Face Coverings.

All individuals within the City shall wear face coverings while outdoors in public spaces when maintaining a physical distance of six (6) feet from persons who are not members of the same household or living unit is not feasible.

All individuals within the City shall wear face coverings while indoors in public spaces, including, but not limited to, enclosed common areas of commercial and residential buildings.

All employees who work at businesses or perform services at Essential Businesses, as provided in Section II.F. of this Order, and City departments shall wear non-medical grade face coverings over their noses and mouths when engaged and interacting with customers, visitors, and other employees of the Essential Business or City department at issue.

All customers and visitors of businesses and organizations defined as Essential Businesses, as provided in Section II.F. of this Order, and City departments shall wear non-medical grade face coverings over their noses and mouths to provide additional protection for employees and customers of Essential Businesses and City department at issue.

All passengers and users of public modes of transportation (TheBus and TheHandi-Van) shall wear non-medical grade face coverings over their noses and mouths when on board.

An owner or operator of an Essential Business under this Order or City department *may* refuse admission or service to any individual who fails to wear face coverings.

Face coverings under this Order may not be worn only under the following circumstances:

-     Within banks, financial institutions, or using automated teller machines where the inability to verify the identity of the customer or visitor of the bank, financial institution or automated teller machine poses a security risk;

-     By individuals with medical conditions or disabilities where the wearing of a face covering may pose a health or safety risk to the individual;

3

**EX04-101**

- By individuals engaging in physical activity outdoors where physical distancing can be maintained (e.g., walking, jogging, hiking, etc.);

- By children under the age of 5;

- By first responders (Honolulu Police Department, Honolulu Fire Department, Honolulu Emergency Services Department) to the extent that wearing non-medical grade face coverings may impair or impede the safety of the first responder in the performance of his/her duty;

- By children in childcare, educational, and similar facilities consistent with the latest guidance from the Centers for Disease Control and Prevention (**"CDC"**) for such facilities;

- As allowed by another provision of this Order.

The wearing of face coverings under this Order is intended to complement, not serve as a substitute, for physical distancing and cleanliness.

Definition: "Non-medical grade face covering" or "face covering" as used in this Order, means a tightly woven fabric without holes, vents, or valves, that is secured to the head with either ties or straps, or simply wrapped and tied around the wearer's nose and mouth. It can be made of a variety of fabrics such as cotton, silk, or linen and may be factory-made, sewn by hand, or made from household items such handkerchiefs, scarfs, or shirts.

Recommendation: This Order requires non-medical grade face coverings to be worn in certain circumstances. Individuals who are unable to wear a non-medical grade face covering due to medical conditions or disabilities where the wearing of a face covering may pose a health or safety risk to the person are encouraged to wear a face shield instead.

Any seller of non-medical grade face coverings or materials or supplies to make or manufacture such face coverings shall abide by Haw. Rev. Stat. § 127A-30.

**Order 6:** Closure of City and State Parks

City and County of Honolulu parks and botanical gardens (**"City Parks"**) and State of Hawai'i parks within the City (**"State Parks"**), are closed for use except as set forth below:

A.  Individuals may travel through City and State Parks to engage in and return from ocean activities such as surfing, solo paddling, swimming, and other activities allowed by law.

B.  Individuals may travel through City and State Parks to use comfort stations and showers which shall remain open.

C.  Shooting and archery ranges may remain open as determined by the City's Department of Parks and Recreation.

D.  To the extent applicable, fishing is permitted, but no group of two (2) or more individuals may engage in fishing and gathering.

4

**EX04-102**

E.   Individuals may travel through City and State Parks to perform critical health, education, social services, and related activities for homeless, other at-risk persons, and animal control services.

**Order 7:** Closure of Beaches

Consistent with Governor David Y. Ige's COVID-19 related proclamations and approval of this Order, all beaches and sand bars within the City are closed except:

A.   To transit across or through beaches to access the ocean waters for outdoor activities such as surfing, solo paddling, swimming, and *individual* fishing or gathering (no group of two (2) or more individuals may engage in fishing or gathering). No person shall otherwise walk, run, sit, stand, lie down, lounge, sunbathe, or loiter on any state beach or sand bar in Hawai'i.

B.   All other State or City restrictions related to COVID-19 must be followed, including, but not limited to, any applicable quarantine restrictions.

**Order 8:** Singing and/or playing a wind instrument is prohibited.

In general, singing, and/or playing a wind instrument, and similar activities that increase the presence and propulsion of respiratory droplets in the air are prohibited. However, such activities are permitted provided they are performed at a gathering/business/operation authorized under the Order, and the following mitigation measures are taken:

A.   If the activity takes place *outdoors*:

1.   Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc. Members of the same performing group singing and/or playing a wind instrument, etc. may be closer than ten (10) feet together while performing, provided the group consists of less than ten (10) persons.

2.   To the extent reasonable and practicable, a physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

B.   If the activity takes place *indoors*:

1.   Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc.

5

**EX04-103**

2. A physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

## II. DEFINITIONS AND EXEMPTIONS

A. For purposes of this Order, individuals may leave their residence only to perform any of the following **"Essential Activities."** However, people at high risk of severe illness from COVID-19 and people who are sick are urged to stay in their residence to the extent possible except as necessary to seek medical care.

1. To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, obtaining medical supplies or medication, visiting a health care professional, or obtaining supplies needed to work from home.

2. To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example only and without limitation, canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products, and products necessary to maintain the safety, sanitation, and essential operation of residences.

3. To engage in outdoor activity in locations as allowed by law, provided the individuals comply with Social Distancing Requirements as defined in this section, such as, by way of example and without limitation, swimming, surfing, walking, or running (with or without pets).

4. To perform work providing essential products and services at an Essential Business, Essential Government Function, or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations (as defined in Section II.G.).

5. To care for a person or pet in another household.

6. To obtain services, goods, or supplies from, or engage in activities at, Essential Businesses (as defined in Section II.F.) or Essential Government Functions.

7. To visit graveyards, mausoleums, and similar sites consistent with the restrictions in this Order.

8. To engage in any other activity required or allowed by law.

6

**EX04-104**

**B.**     For purposes of this Order, individuals may leave their residence to work for or
obtain services at any **"Healthcare Operations"** including hospitals, clinics,
dentists, pharmacies, pharmaceutical and biotechnology companies, other
healthcare facilities, healthcare suppliers, home healthcare services providers,
mental health providers, or any related and/or ancillary healthcare services,
organizations collecting blood, platelets, plasma, and other necessary materials,
licensed medical marijuana dispensaries and licensed medical marijuana
production centers, eye care centers, including those that sell glasses and contact
lenses. "Healthcare Operations" also includes veterinary care and all healthcare
services provided to animals. Further, "Healthcare Operations" includes prepaid
health care plan contractors as that term is defined under Haw. Rev. Stat. ch. 393,
and other employer-sponsored health and welfare benefit plans, and/or individual
or group health insurance plans that provides healthcare insurance benefits for
payment or reimbursement for healthcare services provided by Healthcare
Operations. This exemption shall be construed broadly to avoid any impacts to
the delivery of healthcare, broadly defined. "Healthcare Operations" does not
include fitness and exercise gyms and similar facilities. "Healthcare Operations"
shall be conducted and performed in compliance with Social Distancing
Requirements to the extent applicable and reasonably possible, except that all
persons shall comply with the face coverings requirements set forth in Order 5 of
this Order.

**C.**     For purposes of this Order, individuals may leave their residence to provide any
services or perform any work necessary to the operations and maintenance of
**"Essential Infrastructure,"** including, but not limited to, public works
construction, construction of housing (in particular affordable housing or housing
for individuals experiencing homelessness), airport operations, water, sewer, gas,
electrical, oil refining, roads and highways, public transportation, solid waste
collection and removal, internet, and telecommunications systems (including the
provision of essential global, national, and local infrastructure for computing
services, business infrastructure, communications, and web-based services),
provided that they carry out those services or that work in compliance with Social
Distancing Requirements to the extent applicable and reasonably possible, except
that all persons shall comply with the face coverings requirements set forth in
Order 5 of this Order. This Order shall be construed and applied in compliance
and consistent with the United States Department of Homeland Security,
Cybersecurity & Infrastructure Security Agency Memorandum on Identification
of Essential Critical Infrastructure Workers During COVID-19 Response, updated
August 12, 2020 (and any subsequent updates and guidance memoranda thereto).

**D.**     Further, nothing in this Order shall prohibit any individual, or government
department or agency, from performing or accessing "Essential Governmental
Functions." **"Essential Government Functions"** means all services needed to
ensure the continuing operation of the government agencies and provide for the
health, safety and welfare of the public and includes, but is not limited to, all first
responders, emergency management personnel, emergency dispatchers, members
of the judiciary and related court personnel, law enforcement personnel, jails and

7

prison personnel, and health, education, and social service providers. All Essential Governmental Functions shall be conducted and performed in compliance with Social Distancing Requirements to the extent applicable and reasonably possible, except that all persons shall comply with the face coverings requirements set forth in Order 5 of this Order.

E.   For the purposes of this Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function they perform, or its corporate or entity structure.

F.   For the purposes of this Order, **"Essential Businesses"** must comply with Social Distancing Requirements to the extent applicable and reasonably possible, except that all persons shall comply with the face coverings requirements set forth in Order 5 of this Order. "Essential Businesses" means:

1.   Healthcare Operations and Essential Infrastructure;

2.   Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries and also sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences;

3.   Food cultivation, including farming, livestock, and fishing;

4.   Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals;

5.   Newspapers, television, radio, and other media services;

6.   Gas stations and auto and bicycle supply, auto and bicycle repair, towing services, and related facilities;

7.   Banks and related financial institutions. This provision shall be construed and applied in compliance and consistent with the United States Department of Homeland Security, Cybersecurity & Infrastructure Security Agency Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, dated August 12, 2020 (and any subsequent guidance memoranda thereto), and the United States Department of the Treasury Memorandum for Financial Services Sector Essential Critical Infrastructure Workers, dated March 22, 2020 (and any subsequent guidance memoranda thereto);

8.   Hardware stores;

8

**EX04-106**

9. Plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses;

10. Businesses providing mailing and shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods or services to residences and end users or through commercial channels, and including post office boxes;

11. Educational institutions—including public and private K-12 schools, colleges, and universities—for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six (6)-feet per person is maintained to the greatest extent possible. Restrictions on operations for educational institutions contained in this Order do not apply to the University of Hawaii System or the State Department of Education.;

12. Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

13. Restaurants and other facilities that prepare and serve food, but only for delivery or carry out.

a. Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only, provided that social distancing of six (6)-feet per person is maintained to the greatest extent possible. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;

b. Cafeterias, lunchrooms, or dining facilities providing food and beverage services located within "healthcare facilities" as that term is defined under Haw. Rev. Stat. § 321-15.2 and similar facilities, may continue to do so under this order, provided that consumption within the cafeteria, lunchroom, or dining facility located within the healthcare facility is restricted to employees of the healthcare facility; patients of the healthcare facility; and no more than two (2) authorized visitors of the patient of the healthcare facility that have been appropriately screened by the healthcare facility in compliance with all of the facility's protocols related to infectious disease control measures and processes.;

14. Businesses that supply products needed for people to work from home;

9

EX04-107

15. Businesses that supply other Essential Businesses with the support or supplies necessary to operate;

16. Airlines, taxis, and other private transportation providers, vehicle rental services, paratransit, and other private, public, and commercial transportation and logistics providers providing transportation services necessary for Essential Activities and other purposes expressly authorized in this Order;

17. Home-based care for seniors, adults, or children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including care givers such as nannies who may travel to the child's home to provide care, and other in-home services, including meal delivery;

18. Facilities and shelters for seniors, adults, and children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

19. Professional services, such as legal or accounting services, insurance services, real estate services (including appraisals and title services) when necessary to assist in compliance with legally mandated activities;

20. Childcare facilities providing services that enable employees to work, or engage in activities as permitted. Childcare facilities must operate in accordance with State of Hawai'i Department of Human Services requirements;

21. Businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, kennels, and adoption facilities;

22. Hotels and motels, to the extent used for lodging; and service providers to hotels and motels that provide services that are necessary to maintaining the safety, sanitation, and essential operations of the hotel and/or motel;

23. Funeral, mortuary, cremation, burial, cemetery, and related services, provided that each death-related event (funeral, etc.) is: (a) limited to 10 individuals maximum (with members from different households/living units maintaining physical distance of at least six (6) feet between each other at all times); (b) face coverings are worn consistent with Order 5; and (c) there is compliance with all other applicable Social Distancing Requirements;

EX04-108

24.    Critical trades. Building and construction tradesmen and tradeswomen, and other trades, including but not limited to, plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operations of residences, Essential Activities, and Essential Businesses;

25.    Critical labor union functions that are essential activities that include the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses or Essential Government Functions, provided that these checks should be done by telephone or remotely;.

26.    Licensed private detectives and agencies and guards and agencies as those terms are defined under Haw. Rev. Stat. ch. 463.

27.    Fabric Sellers/Suppliers, under the following conditions:

    a.    The business is primarily engaged in selling fabric and related supplies ("Fabric Store(s)");

    b.    Only two customers are allowed in the Fabric Store at a time, and the Fabric Store has implemented effective procedures to prevent any line from forming outside (appointment-only system, etc.);

    c.    All orders from the Fabric Store, other than those to be made in person pursuant to sub-section II.F.27.b. (above), are facilitated exclusively online, or by other remote means;

    d.    Orders from the Fabric Store, other than those to be made in person pursuant to sub-section II.F.27.b. (above), are fulfilled by no-contact delivery; a business providing mailing and shipping and delivery services to residences and end users or through commercial channels; or by curbside pick-up consistent with Social Distancing Requirements;

    e.    In-person and pick-up orders from the Fabric Store are solely for the purpose of obtaining materials necessary to make masks; and

    f.    The physical presence of workers at the Fabric Store is limited to the greatest extent feasible.

11

**EX04-109**

28.    In-person spiritual services.  In-person spiritual services may be conducted provided Social Distancing Requirements are adhered to including, but not limited to, the wearing of face coverings and physical distancing.

29.    Film and television production.  All local, national, and international film production, television production, streaming production, and similar production may operate in the City based on the guidelines and recommendations for production cast and crew members available at: https://www.honolulu.gov/rep/site/oed/oed_docs/Guidelines_and_Best_Pr actices_for_filming_on_the_Island_of_Oahu_during_the_time_of_COVI D_060320.pdf.  Compliance with the Order and the COVID-19 related proclamations issued by the State is required, including all travel quarantine requirements as modified by the guidelines and recommendations available at: https://www.honolulu.gov/rep/site/oed/oed_docs/Modified_Quarantine_Pr ocedures-Honolulu-060320.pdf.

G.    For the purposes of this Order, **"Minimum Basic Operations"** include the following, provided that employees comply with Social Distancing Requirements as defined in this section, to the extent applicable and reasonably possible, except that all persons shall comply with the face coverings requirements set forth in Order 5 of this Order, while carrying out such operations:

1.    The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.

2.    The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

H.    For the purposes of this Order, **"Essential Travel"** includes travel for any of the following purposes.  Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements to the extent applicable and reasonably possible, except that all persons shall comply with the face coverings requirements set forth in Order 5 of this Order.

1.    Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses, or Minimum Basic Operations.

2.    Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

3.    Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

4.    Travel to return to a place of residence from outside the jurisdiction.

12

**EX04-110**

5.      Travel required by law enforcement or court order.

6.      Travel required for non-residents to return to their place of residence outside the City.  Individuals are strongly encouraged to verify that their transportation out of the City remains available and functional prior to commencing such travel.

I.      For purposes of this order, residences include hotels, motels, shared rental units, and similar facilities.

J.      For purposes of this order **Social Distancing Requirements** include the following:

1.      High risk populations.  Elderly and others at high risk for COVID-19 are urged to stay in their residences to the extent possible, except as necessary to seek medical care.

2.      Persons who are sick.  Persons who are sick or have a fever or cough or are exhibiting symptoms such as shortness of breath or difficulty breathing, chills, repeated shaking with chills, muscle pain, headache, sore throat, or new loss of taste or smell, are urged to stay in their residences to the extent possible, except as necessary to seek medical care.

3.      Personal hygiene.  Persons are encouraged to wash their hands with soap and water for at least twenty seconds as frequently as possible or use hand sanitizer, cover coughs and sneezes (into the sleeve or elbow, not hands), regularly clean high-touch surfaces, and avoid unnecessary contact with others (shaking hands, etc.).

4.      Six (6)-foot distances.  All persons shall maintain a minimum of six (6)-feet of physical separation from all other persons.  Essential Businesses (to the degree applicable) shall designate with signage, tape, or by other means six (6)-foot spacing for employees and customers in line to maintain appropriate distance.  Employees shall monitor and enforce the six (6)-foot distancing requirement set forth in this Order, whether outside waiting lines or as customers move about inside a facility.  Checkout operations shall be modified, to the extent reasonably feasible, to provide this separation or to provide a transparent shield or barrier between customers and checkout clerks.

5.      Limited Customer Occupancy.  Each Essential Business facility shall determine the maximum number of customers that may be accommodated while maintaining the specified separation distance and limiting the number of customers in the facility or at the operation to that maximum number at any time, to the extent there is no conflict with any existing law or order.

13

**EX04-111**

6.  Face Coverings.  All persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order.

7.  Hand sanitizer and sanitizing products.  Essential Businesses (to the degree applicable) shall make hand sanitizer and sanitizing products readily available for employees and customers. Employees handling items from customers, such as cash or credit cards, shall frequently utilize hand sanitizers.

8.  Disinfection.  Essential Businesses (to the degree applicable) shall regularly disinfect all high-touch surfaces.

9.  Safeguards for high risk populations.  Essential Businesses (to the degree applicable) are urged to implement processes to safeguard elderly and high risk customers.

10.  Online and remote access.  Essential Businesses (to the degree applicable) shall post online whether a facility is open and how best to reach the facility and continue services by phone or remotely. Essential Businesses (to the degree applicable) shall encourage their customers to do their business remotely by phone or online to the extent possible.

11.  Pickup at store or delivery.  Essential Businesses (to the degree applicable) shall provide for, if feasible, online ordering and purchase of goods and customer pickup of orders at a location outside the facility or shall provide for delivery to customer locations.

12.  Signage.  Essential Businesses (to the degree applicable) shall post a sign at the entrance of the facility informing all employees and customers that they must comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order; avoid entering the business or operation if they have a cough or fever or otherwise do not feel well; maintain a six-foot distance from one another; and not shake hands or engage in unnecessary physical contact.

## III.  BASIS FOR THE ORDER

This Order is issued based on evidence of COVID-19 within the City, as reported by the Centers for Disease Control and Prevention (CDC), the State Department of Health, and guidance from the City's medical advisory experts, scientific evidence and best practices regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, and evidence that the age, condition, and health of a significant portion of the population of the City places it at risk for serious health complications, including death, from COVID-19.

Due to the outbreak of the COVID-19 virus in the general public, which is a pandemic according to the World Health Organization, there is a public health emergency throughout the City.  In addition, some individuals who contract the COVID-19 virus have no symptoms or have mild

14

symptoms, which means they may not be aware they carry the virus. Because even people without symptoms can transmit the virus, and because evidence shows that it is easily spread, gatherings can result in preventable transmission of the virus.

The scientific evidence shows that at this stage of the emergency, the spread of the virus is spiraling out of control. It is essential to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed, while also allowing access to basic life necessities. One proven way to slow the transmission is to limit interactions among people to the greatest extent practicable. This Order helps preserve critical and dwindling healthcare capacity in the City while allowing essential community activity and functions to continue.

This Order is also issued in light of the fact that as of August 24, 2020, the City has had 6,181 confirmed cases of COVID-19, a record 4,374 of which are active cases, 352 related hospitalizations, and 41 related deaths.

## IV.   INTENT

The intent of this Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the maximum extent possible. When people need to leave their places of residence, whether to obtain or perform vital services, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they shall, as applicable and at all times reasonably possible, comply with Social Distancing Requirements as defined in Section II., except that all persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order. All provisions of this Order should be interpreted to effectuate this intent.

## V.   GENERAL

A.   **Superseding Order.** Emergency Order Nos. 2020-01 through 2020-24 issued by the Office of the Mayor City and County of Honolulu related to the COVID-19 pandemic) are hereby rescinded (to the extent they have not been already) and are superseded by this Order. Section 5 of the Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) issued on March 18, 2020, is hereby superseded to the limited extent necessary to carry out this Order.

B.   **Duration.** This Order shall take effect at 12:00 a.m. on August 27, 2020 and shall continue in force and effect through September 9, 2020, or until it is extended, rescinded, superseded, or amended by a subsequent order, or as otherwise provided under Haw. Rev. Stat. ch. 127A.

C.   **Enforcement.** All law enforcement of the State of Hawai'i and City shall ensure compliance with and enforce these Orders in accordance with Haw. Rev. Stat. § 127A-29 and Mayor's Rules.

**EX04-113**

D.   **Promulgation/posting.** This Order shall be posted on the City website as soon as practicable in one or more appropriate places, and shall remain posted while in effect.

E.   **Severability.** If any provision of the Orders or their application to any person or circumstance is held to be invalid, the remainder of the Orders, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of the Orders are severable.

KIRK W. CALDWELL
Mayor
City and County of Honolulu

APPROVED:

PAUL S. AOKI
Corporation Counsel Designate
City and County of Honolulu

APPROVED:

DAVID Y. IGE
Governor

16

**EX04-114**

# OFFICE OF THE MAYOR
# CITY AND COUNTY OF HONOLULU

530 SOUTH KING STREET, ROOM 300 · HONOLULU, HAWAII 96813
PHONE: (808) 768-4141 · FAX: (808) 768-4242 · INTERNET: www.honolulu.gov



KIRK W. CALDWELL
MAYOR

ROY K. AMEMIYA, JR.
MANAGING DIRECTOR

GEORGETTE T. DEEMER
DEPUTY MANAGING DIRECTOR

September 8, 2020

### OFFICE OF THE MAYOR
### CITY AND COUNTY OF HONOLULU
### EMERGENCY ORDER NO. 2020-26
### (COVID-19 [Novel Coronavirus])

### AMENDED SECOND STAY AT HOME / WORK FROM HOME ORDER

By the authority vested in me as Mayor of the City and County of Honolulu (the **"City"**) pursuant to Revised Charter of the City and County of Honolulu 1973 (2017 Edition), as amended; the Revised Ordinances of the City and County of Honolulu 1990, as amended; the Hawai'i Revised Statutes, as amended (**"Haw. Rev. Stat."**), the Constitution and laws of the State of Hawai'i, I, KIRK W. CALDWELL, hereby issue this Amended Second Stay At Home / Work From Home order (the **"Order"**) to further address the emergency declared in the Proclamation COVID-19 [Novel Coronavirus] that I issued on March 4, 2020, Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued on March 18, 2020, the Second Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued May 6, 2020 Third Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) that I issued June 20, 2020, and the Fifth Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) I issued August 6, 2020.

### OVERVIEW

The virus that causes Coronavirus 2019 Disease (**"COVID-19"**) is easily transmitted, especially in group settings, and it is essential that the spread of COVID-19 be slowed to protect the ability of public and private health care providers to handle the influx of new patients and to safeguard public health and safety. This Order addresses these ongoing concerns.

At the present time, a resurgence of COVID-19 continues within the City. As of September 2, 2020, the City had a seven (7) day moving average of 1.7 new cases for every 10,000 people that live in the City. As of September 4, 2020, the City had a total of 8,575 confirmed cases of COVID-19, 516 related hospitalizations, and 69 related deaths.

Due to the risk of the rapid spread of the virus causing COVID-19, and the need to protect all members of the City, especially including our members most vulnerable to the virus and also

**EX04-115**

health care providers, this Order requires all individuals anywhere in the City to shelter in place — that is, stay at home and work from home — except for certain essential activities and work to provide essential business and government services or perform essential public infrastructure construction, including housing. This Order is **effective at 12:00 a.m. on September 10, 2020 and will continue through September 23, 2020** subject to the limited exceptions and under the terms and conditions more particularly set forth below.

Pursuant to Haw. Rev. Stat. § 127A-25 and the Rules of the Mayor City and County of Honolulu, dated March 20, 2020 (**"Mayor's Rules"**) promulgated under that section, each of the orders contained in this Order ("the Orders") shall have the force and effect of law. The Orders are in accordance with and incorporate by reference all of my prior COVID-19 related emergency proclamations and Hawai'i Governor David Y. Ige's COVID-19 related emergency proclamations.

Violation of any of the Orders is punishable as a misdemeanor, with fines of up to $5,000, up to a year in jail, or both. Haw. Rev. Stat. § 127A-29; Mayor's Rules.

## I.   ORDERS

**Order 1:** All individuals currently living within the City are ordered to stay at their place of residence. To the extent individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain physical distancing of at least six (6) feet from any other person when they are outside their residence and comply with Social Distancing Requirements (as defined in Section II.). All persons may leave their residences only for Essential Activities, Essential Governmental Functions, or to operate or visit Essential Businesses, as those terms are defined in Section II. Individuals experiencing homelessness are exempt from this Order 1 only, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to use COVID-19 risk mitigation practices in their operation).

**Order 2:** All businesses with a facility in the City, except Essential Businesses (as defined in Section II.F.), are required to cease all activities within such facilities, except Minimum Basic Operations (as defined in Section II.G.). For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home). All Essential Businesses are strongly encouraged to remain open. To the extent applicable and to the greatest extent feasible, Essential Businesses shall comply with Social Distancing Requirements, including the six-foot physical distancing requirement for both employees and members of the public (including customers standing in line inside and outside of the facility).

**Order 3:** Gatherings.

      A.      Indoor and outdoor social gatherings of any type and any number of people are prohibited. For purposes of this Order, a "social gathering" is a gathering or event that brings together persons from multiple households or living units at the same time for a discrete, shared or group experience in a single room, space, or place

**EX04-116**

such as a private home, park, auditorium, stadium, arena, conference room, lunch room, meeting hall, or other indoor or outdoor space.

B.      This limitation on social gatherings does not apply to gatherings/events/activities that are permitted under Section II. Nothing in this Order prohibits the gathering of members of a household or living unit on their property (including shared common areas).

**Order 4:** All travel, including, but not limited to, travel on foot, bicycle, scooter, motorcycle, automobile, or public transit, except Essential Travel and Essential Activities (as defined in Section II), is prohibited. People must use public transit only for purposes of performing Essential Activities; or to travel to and from Essential Businesses or maintain Essential Governmental Functions. People riding on public transit must comply with Social Distancing Requirements, as applicable, including the face covering requirements contained in Order 5 of this Order. This Order allows travel into or out of the City to perform Essential Activities, operate or visit Essential Businesses, or maintain Essential Governmental Functions.

**Order 5:** Non-Medical Grade Face Coverings.

All individuals within the City shall wear face coverings while outdoors in public spaces when maintaining a physical distance of six (6) feet from other individuals is not feasible.

All individuals within the City shall wear face coverings while indoors in public spaces, including, but not limited to, enclosed common areas of commercial and residential buildings.

All employees who work at businesses or perform services at Essential Businesses, as provided in Section II.F. of this Order, and City departments shall wear non-medical grade face coverings over their noses and mouths when engaged and interacting with customers, visitors, and other employees of the Essential Business or City department at issue.

All customers and visitors of businesses and organizations defined as Essential Businesses, as provided in Section II.F. of this Order, and City departments shall wear non-medical grade face coverings over their noses and mouths to provide additional protection for employees and customers of Essential Businesses and City department at issue.

All passengers and users of public modes of transportation (TheBus and TheHandi-Van) shall wear non-medical grade face coverings over their noses and mouths when on board.

An owner or operator of an Essential Business under this Order or City department *may* refuse admission or service to any individual who fails to wear face coverings.

Face coverings under this Order may not be worn only under the following circumstances:

-       Within banks, financial institutions, or using automated teller machines where the inability to verify the identity of the customer or visitor of the bank, financial institution or automated teller machine poses a security risk;

3

**EX04-117**

- By individuals with medical conditions or disabilities where the wearing of a face covering may pose a health or safety risk to the individual;

- By individuals engaging in physical activity outdoors where physical distancing can be maintained (e.g., walking, jogging, hiking, etc.);

- By children under the age of 5;

- By first responders (Honolulu Police Department, Honolulu Fire Department, Honolulu Emergency Services Department) to the extent that wearing non-medical grade face coverings may impair or impede the safety of the first responder in the performance of his/her duty;

- By children in childcare, educational, and similar facilities consistent with the latest guidance from the Centers for Disease Control and Prevention (**"CDC"**) for such facilities;

- As allowed by another provision of this Order.

The wearing of face coverings under this Order is intended to complement, not serve as a substitute, for physical distancing and cleanliness.

Definition: "Non-medical grade face covering" or "face covering" as used in this Order, means a tightly woven fabric without holes, vents, or valves that is secured to the head with either ties or straps, or simply wrapped and tied around the wearer's nose and mouth. It can be made of a variety of fabrics such as cotton, silk, or linen and may be factory-made, sewn by hand, or made from household items such handkerchiefs, scarfs, or shirts.

Recommendation: This Order requires non-medical grade face coverings to be worn in certain circumstances. Individuals who are unable to wear a non-medical grade face covering due to medical conditions or disabilities where the wearing of a face covering may pose a health or safety risk to the person are encouraged to wear a face shield instead.

Any seller of non-medical grade face coverings or materials or supplies to make or manufacture such face coverings shall abide by Haw. Rev. Stat. § 127A-30.

**Order 6:** Re-opening of City Parks and State Parks/Trails

City and County of Honolulu parks and botanical gardens (**"City Parks"**) and State of Hawai'i parks and trails within the City (**"State Parks/Trails"**), are re-opened for limited use as set forth below:

A.   Individuals may engage in any lawful activity (e.g., walking, running, biking, sitting, fishing, etc.), but only by oneself. No group use or group activities are allowed.

B.   Shooting and archery ranges may remain open as determined by the City's Department of Parks and Recreation.

4

**EX04-118**

**C.** Bicycle paths and designated community garden plots shall be open, but basketball and tennis courts, swimming pools, and playgrounds shall remain closed.

**D.** Parking lots of City Parks and State Parks/Trails shall generally be open to allow individuals to engage in permitted activities as described in Orders 6 and 7.

**E.** State Parks/Trails are re-opened for the above limited use as announced by the State Department of Land and Natural Resources consistent with this Amended Second Stay At Home / Work From Home Order and Governor Ige's approval of this Order.

**Order 7:** Re-opening of Beaches

Consistent with Governor David Y. Ige's COVID-19 related proclamations and approval of this Order, all beaches and sand bars within the City are re-opened for limited use as set forth below:

**A.** Individuals may engage in any lawful activity (e.g., walking, running, sitting, fishing, etc.) on the beach, but only by oneself. No group use or group activities are allowed.

**B.** All other State or City restrictions related to COVID-19 must be followed, including, but not limited to, any applicable quarantine restrictions.

**C.** Beaches are re-opened for the above limited use as announced by the State Department of Land and Natural Resources consistent with this Amended Second Stay At Home / Work From Home Order and Governor Ige's approval of this Order.

**Order 8:** Singing and/or playing a wind instrument is prohibited.

In general, singing, and/or playing a wind instrument, and similar activities that increase the presence and propulsion of respiratory droplets in the air are prohibited. However, such activities are permitted provided they are performed at a gathering/business/operation authorized under the Order, and the following mitigation measures are taken:

**A.** If the activity takes place *outdoors*:

1. Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc. Members of the same performing group singing and/or playing a wind instrument, etc. may be closer than ten (10) feet together while performing, provided the group consists of less than ten (10) persons.

2. To the extent reasonable and practicable, a physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from

5

any other person(s), but not including members of the same performing group.

B.   If the activity takes place *indoors*:

1.   Any person(s) singing and/or playing a wind instrument, etc. shall maintain physical distancing of at least ten (10) feet from any other person(s) while singing and/or playing a wind instrument, etc.

2.   A physical barrier (e.g., plexiglass) of sufficient size to mitigate the spread of COVID-19 shall separate any person(s) singing and/or playing a wind instrument, etc. from any other person(s), but not including members of the same performing group.

## II.   DEFINITIONS AND EXEMPTIONS

A.   For purposes of this Order, individuals may leave their residence only to perform any of the following **"Essential Activities."**  However, people at high risk of severe illness from COVID-19 and people who are sick are urged to stay in their residence to the extent possible except as necessary to seek medical care.

1.   To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, obtaining medical supplies or medication, visiting a health care professional, or obtaining supplies needed to work from home.

2.   To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example only and without limitation, canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products, and products necessary to maintain the safety, sanitation, and essential operation of residences.

3.   To engage in outdoor activity in locations as allowed by law, provided the individuals comply with Social Distancing Requirements as defined in this section, such as, by way of example and without limitation, swimming, surfing, walking, or running (with or without pets).

4.   To perform work providing essential products and services at an Essential Business, Essential Government Function, or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations (as defined in Section II.G.).

5.   To care for a person or pet in another household.

6

**EX04-120**

6.     To obtain services, goods, or supplies from, or engage in activities at, Essential Businesses (as defined in Section II.F.) or Essential Government Functions.

7.     To visit graveyards, mausoleums, and similar sites consistent with the restrictions in this Order.

8.     To engage in any other activity required or allowed by law.

B.     For purposes of this Order, individuals may leave their residence to work for or obtain services at any **"Healthcare Operations"** including hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other healthcare facilities, healthcare suppliers, home healthcare services providers, mental health providers, or any related and/or ancillary healthcare services, organizations collecting blood, platelets, plasma, and other necessary materials, licensed medical marijuana dispensaries and licensed medical marijuana production centers, eye care centers, including those that sell glasses and contact lenses. "Healthcare Operations" also includes veterinary care and all healthcare services provided to animals. Further, "Healthcare Operations" includes prepaid health care plan contractors as that term is defined under Haw. Rev. Stat. ch. 393, and other employer-sponsored health and welfare benefit plans, and/or individual or group health insurance plans that provides healthcare insurance benefits for payment or reimbursement for healthcare services provided by Healthcare Operations. This exemption shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. "Healthcare Operations" does not include fitness and exercise gyms and similar facilities. "Healthcare Operations" shall be conducted and performed in compliance with Social Distancing Requirements to the extent applicable and reasonably possible, except that all persons shall comply with the face coverings requirements set forth in Order 5 of this Order.

C.     For purposes of this Order, individuals may leave their residence to provide any services or perform any work necessary to the operations and maintenance of **"Essential Infrastructure,"** including, but not limited to, public works construction, construction of housing (in particular affordable housing or housing for individuals experiencing homelessness), airport operations, water, sewer, gas, electrical, oil refining, roads and highways, public transportation, solid waste collection and removal, internet, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services), provided that they carry out those services or that work in compliance with Social Distancing Requirements to the extent applicable and reasonably possible, except that all persons shall comply with the face coverings requirements set forth in Order 5 of this Order. This Order shall be construed and applied in compliance and consistent with the United States Department of Homeland Security, Cybersecurity & Infrastructure Security Agency Memorandum on Identification

7

of Essential Critical Infrastructure Workers During COVID-19 Response, updated August 12, 2020 (and any subsequent updates and guidance memoranda thereto).

D.   Further, nothing in this Order shall prohibit any individual, or government department or agency, from performing or accessing "Essential Governmental Functions." **"Essential Government Functions"** means all services needed to ensure the continuing operation of the government agencies and provide for the health, safety and welfare of the public and includes, but is not limited to, all first responders, emergency management personnel, emergency dispatchers, members of the judiciary and related court personnel, law enforcement personnel, jails and prison personnel, and health, education, and social service providers. All Essential Governmental Functions shall be conducted and performed in compliance with Social Distancing Requirements to the extent applicable and reasonably possible, except that all persons shall comply with the face coverings requirements set forth in Order 5 of this Order.

E.   For the purposes of this Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function they perform, or its corporate or entity structure.

F.   For the purposes of this Order, **"Essential Businesses"** must comply with Social Distancing Requirements to the extent applicable and reasonably possible, except that all persons shall comply with the face coverings requirements set forth in Order 5 of this Order. "Essential Businesses" means:

1.   Healthcare Operations and Essential Infrastructure;

2.   Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries and also sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences;

3.   Food cultivation, including farming, livestock, and fishing;

4.   Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals;

5.   Newspapers, television, radio, and other media services;

6.   Gas stations and auto and bicycle supply, auto and bicycle repair, towing services, and related facilities;

8

**EX04-122**

7. Banks and related financial institutions. This provision shall be construed and applied in compliance and consistent with the United States Department of Homeland Security, Cybersecurity & Infrastructure Security Agency Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, dated August 12, 2020 (and any subsequent guidance memoranda thereto), and the United States Department of the Treasury Memorandum for Financial Services Sector Essential Critical Infrastructure Workers, dated March 22, 2020 (and any subsequent guidance memoranda thereto);

8. Hardware stores;

9. Plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses;

10. Businesses providing mailing and shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods or services to residences and end users or through commercial channels, and including post office boxes;

11. Educational institutions—including public and private K-12 schools, colleges, and universities—for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six (6)-feet per person is maintained to the greatest extent possible. Restrictions on operations for educational institutions contained in this Order do not apply to the University of Hawaii System or the State Department of Education;

12. Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

13. Restaurants and other facilities that prepare and serve food, but only for delivery or carry out.

    a. Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only, provided that social distancing of six (6)-feet per person is maintained to the greatest extent possible. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;

    b. Cafeterias, lunchrooms, or dining facilities providing food and beverage services located within "healthcare facilities" as that term

9

**EX04-123**

is defined under Haw. Rev. Stat. § 321-15.2 and similar facilities, may continue to do so under this order, provided that consumption within the cafeteria, lunchroom, or dining facility located within the healthcare facility is restricted to employees of the healthcare facility; patients of the healthcare facility; and no more than two (2) authorized visitors of the patient of the healthcare facility that have been appropriately screened by the healthcare facility in compliance with all of the facility's protocols related to infectious disease control measures and processes.;

14. Businesses that primarily supply products necessary for people to work from home such as computer and communications hardware and software, but not including businesses primarily engaged in selling furniture;

15. Businesses that supply other Essential Businesses with the support or supplies necessary to operate;

16. Airlines, taxis, and other private transportation providers, vehicle rental services, paratransit, and other private, public, and commercial transportation and logistics providers providing transportation services necessary for Essential Activities and other purposes expressly authorized in this Order;

17. Home-based care for seniors, adults, or children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including care givers such as nannies who may travel to the child's home to provide care, and other in-home services, including meal delivery;

18. Facilities and shelters for seniors, adults, and children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

19. Professional services, such as legal or accounting services, insurance services, real estate services (including appraisals and title services) when necessary to assist in compliance with legally mandated activities;

20. Childcare facilities providing services that enable employees to work, or engage in activities as permitted. Childcare facilities must operate in accordance with State of Hawai'i Department of Human Services requirements;

21. Businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, kennels, and adoption facilities;

10

**EX04-124**

22. Hotels and motels, to the extent used for lodging; and service providers to hotels and motels that provide services that are necessary to maintaining the safety, sanitation, and essential operations of the hotel and/or motel;

23. Funeral, mortuary, cremation, burial, cemetery, and related services, provided that each death-related event (funeral, etc.) is: (a) limited to 10 individuals maximum (with members from different households/living units maintaining physical distance of at least six (6) feet between each other at all times); (b) face coverings are worn consistent with Order 5; and (c) there is compliance with all other applicable Social Distancing Requirements;

24. Critical trades. Building and construction tradesmen and tradeswomen, and other trades, including but not limited to, plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operations of residences, Essential Activities, and Essential Businesses;

25. Critical labor union functions that are essential activities that include the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses or Essential Government Functions, provided that these checks should be done by telephone or remotely;

26. Licensed private detectives and agencies and guards and agencies as those terms are defined under Haw. Rev. Stat. ch. 463.

27. Fabric Sellers/Suppliers, under the following conditions:

   a. The business is primarily engaged in selling fabric and related supplies ("**Fabric Store(s)**");

   b. Only two customers are allowed in the Fabric Store at a time, and the Fabric Store has implemented effective procedures to prevent any line from forming outside (appointment-only system, etc.);

   c. All orders from the Fabric Store, other than those to be made in person pursuant to sub-section II.F.27.b. (above), are facilitated exclusively online, or by other remote means;

   d. Orders from the Fabric Store, other than those to be made in person pursuant to sub-section II.F.27.b. (above), are fulfilled by no-contact delivery; a business providing mailing and shipping and delivery services to residences and end users or through

11

**EX04-125**

commercial channels; or by curbside pick-up consistent with Social Distancing Requirements;

e.    In-person and pick-up orders from the Fabric Store are solely for the purpose of obtaining materials necessary to make masks; and

f.    The physical presence of workers at the Fabric Store is limited to the greatest extent feasible.

28.    In-person spiritual services. In-person spiritual services may be conducted provided Social Distancing Requirements are adhered to including, but not limited to, the wearing of face coverings and physical distancing.

29.    Film and television production. All local, national, and international film production, television production, streaming production, and similar production may operate in the City based on the guidelines and recommendations for production cast and crew members available at: https://www.honolulu.gov/rep/site/oed/oed_docs/Guidelines_and_Best_Pr actices_for_filming_on_the_Island_of_Oahu_during_the_time_of_COVI D_060320.pdf. Compliance with the Order and the COVID-19 related proclamations issued by the State is required, including all travel quarantine requirements as modified by the guidelines and recommendations available at: https://www.honolulu.gov/rep/site/oed/oed_docs/Modified_Quarantine_Pr ocedures-Honolulu-060320.pdf.

G.    For the purposes of this Order, **"Minimum Basic Operations"** include the following, provided that employees comply with Social Distancing Requirements as defined this section, to the extent applicable and reasonably possible, except that all persons shall comply with the face coverings requirements set forth in Order 5 of this Order, while carrying out such operations:

1.    The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.

2.    The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

H.    For the purposes of this Order, **"Essential Travel"** includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements to the extent applicable and reasonably possible, except that all persons shall comply with the face coverings requirements set forth in Order 5 of this Order.

1.    Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses, or Minimum Basic Operations.

12

2.  Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

3.  Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

4.  Travel to return to a place of residence from outside the jurisdiction.

5.  Travel required by law enforcement or court order.

6.  Travel required for non-residents to return to their place of residence outside the City. Individuals are strongly encouraged to verify that their transportation out of the City remains available and functional prior to commencing such travel.

I.  For purposes of this order, residences include hotels, motels, shared rental units, and similar facilities.

J.  For purposes of this order **Social Distancing Requirements** include the following:

1.  High risk populations. Elderly and others at high risk for COVID-19 are urged to stay in their residences to the extent possible, except as necessary to seek medical care.

2.  Persons who are sick. Persons who are sick or have a fever or cough or are exhibiting symptoms such as shortness of breath or difficulty breathing, chills, repeated shaking with chills, muscle pain, headache, sore throat, or new loss of taste or smell, are urged to stay in their residences to the extent possible, except as necessary to seek medical care.

3.  Personal hygiene. Persons are encouraged to wash their hands with soap and water for at least twenty seconds as frequently as possible or use hand sanitizer, cover coughs and sneezes (into the sleeve or elbow, not hands), regularly clean high-touch surfaces, and avoid unnecessary contact with others (shaking hands, etc.).

4.  Six (6)-foot distances. All persons shall maintain a minimum of six (6)-feet of physical separation from all other persons. Essential Businesses (to the degree applicable) shall designate with signage, tape, or by other means six (6)-foot spacing for employees and customers in line to maintain appropriate distance. Employees shall monitor and enforce the six (6)-foot distancing requirement set forth in this Order, whether outside waiting lines or as customers move about inside a facility. Checkout operations shall be modified, to the extent reasonably feasible, to provide this separation or to provide a transparent shield or barrier between customers and checkout clerks.

13

**EX04-127**

5.    Limited Customer Occupancy.  Each Essential Business facility shall determine the maximum number of customers that may be accommodated while maintaining the specified separation distance and limiting the number of customers in the facility or at the operation to that maximum number at any time, to the extent there is no conflict with any existing law or order.

6.    Face Coverings.  All persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order.

7.    Hand sanitizer and sanitizing products.  Essential Businesses (to the degree applicable) shall make hand sanitizer and sanitizing products readily available for employees and customers. Employees handling items from customers, such as cash or credit cards, shall frequently utilize hand sanitizers.

8.    Disinfection.  Essential Businesses (to the degree applicable) shall regularly disinfect all high-touch surfaces.

9.    Safeguards for high risk populations.  Essential Businesses (to the degree applicable) are urged to implement processes to safeguard elderly and high risk customers.

10.    Online and remote access.  Essential Businesses (to the degree applicable) shall post online whether a facility is open and how best to reach the facility and continue services by phone or remotely. Essential Businesses (to the degree applicable) shall encourage their customers to do their business remotely by phone or online to the extent possible.

11.    Pickup at store or delivery.  Essential Businesses (to the degree applicable) shall provide for, if feasible, online ordering and purchase of goods and customer pickup of orders at a location outside the facility or shall provide for delivery to customer locations.

12.    Signage.  Essential Businesses (to the degree applicable) shall post a sign at the entrance of the facility informing all employees and customers that they must comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order; avoid entering the business or operation if they have a cough or fever or otherwise do not feel well; maintain a six-foot distance from one another; and not shake hands or engage in unnecessary physical contact.

## III.    BASIS FOR THE ORDER

This Order is issued based on evidence of COVID-19 within the City, as reported by the Centers for Disease Control and Prevention (CDC), the State Department of Health, and guidance from the City's medical advisory experts, scientific evidence and best practices regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-

EX04-128

19 specifically, and evidence that the age, condition, and health of a significant portion of the population of the City places it at risk for serious health complications, including death, from COVID-19.

Due to the outbreak of the COVID-19 virus in the general public, which is a pandemic according to the World Health Organization, there is a public health emergency throughout the City. In addition, some individuals who contract the COVID-19 virus have no symptoms or have mild symptoms, which means they may not be aware they carry the virus. Because even people without symptoms can transmit the virus, and because evidence shows that it is easily spread, gatherings can result in preventable transmission of the virus.

The scientific evidence shows that at this stage of the emergency, the spread of the virus is spiraling out of control. It is essential to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed, while also allowing access to basic life necessities. One proven way to slow the transmission is to limit interactions among people to the greatest extent practicable. This Order helps preserve critical and dwindling healthcare capacity in the City while allowing essential community activity and functions to continue.

This Order is also issued in light of the fact that as of September 2, 2020, the City had a seven (7) day moving average of 1.7 new cases for every 10,000 people that live in the City. As of September 4, 2020, the City had a total of 8,575 confirmed cases of COVID-19, 516 related hospitalizations, and 69 related deaths.

## IV.    INTENT

The intent of this Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the maximum extent possible. When people need to leave their places of residence, whether to obtain or perform vital services, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they shall, as applicable and at all times reasonably possible, comply with Social Distancing Requirements as defined in Section II., except that all persons shall comply with the Non-Medical Grade Face Coverings requirements set forth in Order 5 of this Order. All provisions of this Order should be interpreted to effectuate this intent.

## V.    GENERAL

A.    **Superseding Order.**  Emergency Order Nos. 2020-01 through 2020-25 issued by the Office of the Mayor City and County of Honolulu related to the COVID-19 pandemic) are hereby rescinded (to the extent they have not been already) and are superseded by this Order. Section 5 of the Supplemental Proclamation of Emergency or Disaster (COVID-19 [Novel Coronavirus]) issued on March 18, 2020, is hereby superseded to the limited extent necessary to carry out this Order.

B.    **Duration.**  This Order shall take effect at 12:00 a.m. on September 10, 2020 and shall continue in force and effect through September 23, 2020, or until it is

15

**EX04-129**

extended, rescinded, superseded, or amended by a subsequent order, or as otherwise provided under Haw. Rev. Stat. ch. 127A.

C.    **Enforcement.** All law enforcement of the State of Hawai'i and City shall ensure compliance with and enforce these Orders in accordance with Haw. Rev. Stat. § 127A-29 and Mayor's Rules.

D.    **Promulgation/posting.** This Order shall be posted on the City website as soon as practicable in one or more appropriate places, and shall remain posted while in effect.

E.    **Severability.** If any provision of the Orders or their application to any person or circumstance is held to be invalid, the remainder of the Orders, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of the Orders are severable.

KIRK W. CALDWELL
Mayor
City and County of Honolulu


APPROVED:

PAUL S. AOKI
Corporation Counsel Designate
City and County of Honolulu


APPROVED:

DAVID Y. IGE
Governor

16

**EX04-130**

| From: | Bonilla, Grace |
|---|---|
| To: | Scott.Isbell@marshmma.com |
| Cc: | jonathan.d.clark@marsh.com; Warren Boone |
| Subject: | Islands Restaurants; CID 501275; RFI letter |
| Date: | Tuesday, April 7, 2020 2:56:16 PM |
| Attachments: | Islands Restaurants; CID 501275.pdf |

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello Mr. Isbell,

Please see attached letter for Islands Restaurants LP.

Best Regards,


**Grace M. Bonilla-Román**
Loss Adjuster | Dallas Operations
FM Global | Affiliated FM | One Cowboys Way | Suite 600 | Frisco, Texas 75034 USA
**O:** +1 (972) 731-1821
**E:** grace.bonilla@fmglobal.com

**AFM**™

_Member of the FM Global Group_

Affiliated FM Insurance Company
One Cowboys Way,
Frisco, TX 75034
T: 972 731 1821  F: 972 731 1808
E: grace.bonilla@fmglobal.com

April 7, 2020

Mr. Scott Isbell                                              Via Email: Scott.Isbell@marshmma.com
Director-Hospitality Practice Group
Marsh & McLennan Insurance Agency LLC

| | | |
|---|---|---|
| Reference: | Insured: | Islands Restaurants, L.P. |
| | Location(s): | Multiple locations |
| | Policy No: | SS790 |
| | Date of Loss: | 16-March-2020 |
| | Description: | Impact associated with COVID-19 |
| | Claim ID: | 501275 |

Dear Mrs. Isbell:

Thank you for your time on the phone yesterday morning. This will confirm our discussion of 30-Mar-2020 and 6-April-2020 regarding the above referenced matter.

Briefly recapping, according to the loss notice, there is Property Damage and Business Income loss due to the coronavirus (COVID-19) at various insured locations. We did not receive a list of the insured locations that have been impacted. Per our discussion, you indicated that the client is still compiling information regarding the locations impacted and whether there is the actual, not suspected, presence of the virus at any of the insured locations.

Although we understand the client is currently gathering details regarding this matter, we are including in this letter the information that we need in order to continue with our investigation activities. We understand this loss is reported for a claim to be submitted under the Policy's ADDITIONAL COVERAGES for COMMUNICABLE DISEASE RESPONSE and INTERRUPTOIN BY COMMUNICABLE DISEASE. Pertinent sections of Affiliated FM Insurance Company No. SS790 state in part, as follows:

## "E. BUSINESS INTERRUPTION COVERAGE EXTENSIONS

### 3. Communicable Disease - Business Interruption

If a described location owned, leased or rented by the Insured has the actual not suspected presence of communicable disease and access to such described location is limited, restricted or prohibited by:

a) An order of an authorized governmental agency regulating such presence of communicable disease; or

b) A decision of an Officer of the Insured as a result of such presence of communicable disease,

this Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such described location with such presence of communicable disease.

This coverage is subject to the Qualifying Period as stated in the Declarations section of this Policy.

CLAIM ID: 501275
Page 2



The Declarations section of the Policy states the following regarding the qualifying period:

    4.  Communicable Disease Property Damage and Business Interruption:

        Qualifying Period: This Company will not be liable for loss or damage unless access is limited, restricted or prohibited in excess of 48 hours.

We are requesting the following information which will allow us to proceed with our investigation:

1) Provide a list containing the addresses and occupancy of the impacted locations.
2) Identify whether there was the actual presence of the coronavirus (COVID-19) at any of the insured location(s) that resulted in the limiting, restriction or closure of these locations.
3) Provide support to confirm the actual presence of the COVID-19 at each location.
4) If an employee infected with a communicable disease is or was identified at a location, please confirm the date the infected employee was present at a location and whether this was the basis for the decision to limit, restrict or prohibit access to the location.
5) Provide a copy of the order of any authorized governmental agency and/or copies of any communications by an Officer of Islands Restaurants LP limiting, restricting or prohibiting access to the specific location(s) due to the actual presence of the COVID-19.

Please provide this information as soon as you are able. This list is not intended to be all inclusive and additional requests for information may be necessary to assist in our investigation of this claim.

Once we have had an opportunity to complete our investigation and review of your policy information, we will confirm any applicable coverages, loss payables, and deductibles in effect.

Neither this letter nor our investigation is an admission or denial of liability and does not waive any right or duties of either party under the Affiliated FM Insurance Company Policy. Anything done or to be done by Affiliated FM Insurance Company, or on its behalf, in connection with the above described matter, including but not limited to, any investigation into the cause or amount of loss or other matter relative thereto, shall not waive, invalidate, forfeit or modify any of its rights under the policies issued by it.

We would like to thank you for your cooperation in this matter and we look forward to working with you on this loss. In the interim, should you have any questions or comments, please feel free to contact us.

Sincerely,

*Grace M. Bonilla*

Grace M. Bonilla
Staff Adjuster
Dallas Claims Operations

# EXHIBIT 6



April 20, 2020

Ms. Grace M. Bonilla                    Via Email: grace.bonilla@fmglobal.com
Staff Adjuster
Dallas Claims Operations
Affiliated FM Insurance Company

    Re:     *Response to your April 7, 2020 letter*

Dear Ms. Bonilla:

My colleagues at Islands Restaurants, LP and I have been trying to gather the information you requested. Our responses are contained later in this letter.

However, before we provide that information, we wanted to correct one thing that stood out to us as inaccurate in your April 7, 2020 letter.

You stated that "We understand this loss is reported for a claim to be submitted under the Policy's ADDITIONAL COVERAGES for COMMUNICABLE DISEASE RESPONSE and INTERRUTOIN (sic) BY COMMUNICABLE DISEASE." We disagree and want to make sure you and Affiliated FM Insurance Company (Affiliated FM) have the correct information.

We have not intended to limit the notice of our claim in any way to a particular portion of our policy or category of what you call "additional coverages." Rather, we have promptly attempted to provide fair notice to Affiliated FM that we are making a claim under the policy. We are relying on Affiliated FM to investigate our claim in light of our entire policy and all coverages for which we have timely paid all premiums.

Without your assistance in the making and analysis of our claim, we are unable to yet determine which portion(s) of our policy apply to the facts of what has occurred to our business.

Please let us know if you have questions about this clarification.

Here are our responses to your five requests for information and/or documents:

April 20, 2020
Page 2

<u>Request 1</u>: Provide a list containing the addresses and occupancy of the impacted locations.

>  <u>Response</u>:
>  - There are 63 locations impacted.
>  - We have enclosed a list of all of these locations for your review.
>  - We do not understand what you mean as to the occupancy of these locations. If the enclosed information is not sufficient to respond to your request, please provide clarification as to what you still need.

<u>Request 2</u>: Identify whether there was the actual presence of the coronavirus (COVID-19) at any of the insured location(s) that resulted in the limiting, restriction or closure of these locations.

>  <u>Response</u>:
>  - We are not aware if there was or was not an actual presence of COVID-19 in our locations.
>  - We were expecting that our insurance company would conduct an investigation of the claim, including those facts if it felt that information was necessary.
>  - We were following the local and/or statewide orders to close our restaurants to in-person dining and/or all together.

<u>Request 3</u>: Provide support to confirm the actual presence of the COVID-19 at each location.

>  <u>Response</u>:
>  - Again, we don't know if there was or was not an actual presence of COVID-19 in our locations.

<u>Request 4</u>: If an employee infected with a communicable disease is or was identified at a location, please confirm the date the infected employee was present at a location and whether this was the basis for the decision to limit, restrict or prohibit access to the location.

>  <u>Response</u>:
>  - Two of our employees tested positive for COVID-19. One was employed at the North Long Beach location, notified us on March 31, 2020, and was last present in the restaurant 11 days prior on March 20, 2020. The other employee was employed at the Agoura Hills location, notified us on April 1, 2020, and was last present in the restaurant one day prior on March 31, 2020.
>  - Once notified that they were infected, precautions were taken including closing the locations, deep cleaning the locations, and requiring the infected employees to follow our quarantine protocol which ensured they no longer interacted with our locations and/or employees in person for 14 days.
>  - These employees' infections had nothing to do with our store closures which were closed pursuant to the local and statewide orders, which were in place prior to the dates the employees tested positive.

April 20, 2020
Page 3

Request 5: Provide a copy of the order of any authorized governmental agency and/or copies of any communications by an Officer of Islands Restaurants LP limiting, restricting or prohibiting access to the specific location(s) due to the actual presence of the COVID-19.

Response:
- We would think that you would have copies of authorized governmental agency orders since they are publically available, but we have enclosed them as well as a reference list in response to your request.
- There were no communications by an Officer of Islands as you describe because there were not restrictive actions taken due to any actual known presences of COVID- 19. There were however, three separate communications distributed pursuant to the local and statewide orders, and we have attached those.

Additionally, we wanted to advise you that I, rather than Scott Isbell at Marsh & McLennan Insurance Agency LLC, will be the point of contact for the claim. If you need any additional information, please let me know and I will coordinate with the necessary people to respond.

As part of your response and for our planning purposes, can you please let us know how long you expect Affiliated FM's investigation of the claim will last? This will assist us as we attempt to prepare to promptly respond to any questions you or others at Affiliated FM may have during your investigation.

We remain ready, willing, and able to answer questions you may have regarding our business as you investigate the claim. We look forward to your response.

Sincerely,

Warren Boone
Vice President of Human Resources
Islands Restaurants, LP

Enclosures

Islands Restaurant Closures                    2020

| Location | County | Reduced Capacity by Order | Dining Room Closed by Order | Restaurant Status | Applicable Orders |
|---|---|---|---|---|---|
| 404 Washington Boulevard, Marina Del Rey, CA, 90292-5214 | Los Angeles | 3/15/2020 | 3/15/2020 | Takeout Only | LA Mayor 3/15/20, CA Executive Order N-33-20, LA County 3/16/20 |
| 3533 East Foothill Boulevard, Pasadena, CA, 91107-3119 | Los Angeles | 3/16/2020 | 3/16/2020 | Takeout Only | LA County 3/16/20, CA Executive Order N-33-20 |
| 550 North Tustin Street, Orange, CA, 92867-7612 | Orange | 3/17/2020 | 3/17/2020 | Takeout Only | Orange County 3/17/20, CA Executive Order N-33-20 |
| 18621 Brookhurst Street, Fountain Valley, CA, 92708 | Orange | 3/17/2020 | 3/17/2020 | Takeout Only | Orange County 3/17/20, CA Executive Order N-33-20 |
| 4020 Barranca Parkway, Suite 1, Irvine, CA, 92604-4742 | Orange | 3/17/2020 | 3/17/2020 | Takeout Only | Orange County 3/17/20, CA Executive Order N-33-20 |
| 3200 North Sepulveda Boulevard, Manhattan Beach, CA, 90266 | Los Angeles | 3/16/2020 | 3/16/2020 | Takeout Only | LA County 3/16/20, CA Executive Order N-33-20 |
| 101 East Orange Grove Avenue, Burbank, CA, 91502-1829 | Los Angeles | 3/16/2020 | 3/16/2020 | Takeout Only | LA County 3/16/20, CA Executive Order N-33-20 |
| 250 South State College Boulevard, Brea, CA, 92821-5820 | Orange | 3/17/2020 | 3/17/2020 | Takeout Only | Orange County 3/17/20, CA Executive Order N-33-20 |
| 117 West Broadway, Glendale, CA, 91204 | Los Angeles | 3/16/2020 | 3/16/2020 | Takeout Only | LA County 3/16/20, CA Executive Order N-33-20 |
| 12224 Carmel Mountain Road, San Diego, CA, 92128 | San Diego | 3/17/2020 | 3/17/2020 | Takeout Only | San Diego County 3/16/20, CA Executive Order N-33-20 |
| 7637 Balboa Avenue, San Diego, CA, 92111 | San Diego | 3/17/2020 | 3/17/2020 | Takeout Only | San Diego County 3/16/20, CA Executive Order N-33-20 |
| 240 South Melrose Drive, Vista, CA, 92081-6616 | San Diego | 3/17/2020 | 3/17/2020 | Takeout Only | San Diego County 3/16/20, CA Executive Order N-33-20 |
| 3962 Grand Avenue, Chino, CA, 91710 | San Bernardino | 3/18/2020 | 3/18/2020 | Takeout Only | San Bernardino County 3/18/20, CA Executive Order N-33-20 |
| 72-353 Highway 111, Palm Desert, CA, 92260 | Riverside | 3/16/2020 | 3/18/2020 | Takeout Only | Riverside County 3/16/20, CA Executive Order N-33-20 |
| 2647 Pacific Coast Highway, Torrance, CA, 90505 | Los Angeles | 3/16/2020 | 3/16/2020 | Takeout Only | LA County 3/16/20, CA Executive Order N-33-20 |
| 26582 Towne Centre Drive, Foothill Ranch, CA, 92610 | Orange | 3/17/2020 | 3/17/2020 | Takeout Only | Orange County 3/17/20, CA Executive Order N-33-20 |
| 889 Palomar Airport Road, Carlsbad, CA, 92011-1109 | San Diego | 3/17/2020 | 3/17/2020 | Takeout Only | San Diego County 3/16/20, CA Executive Order N-33-20 |
| 10669 Westview Parkway, San Diego, CA, 92126 | San Diego | 3/17/2020 | 3/17/2020 | Takeout Only | San Diego County 3/16/20, CA Executive Order N-33-20 |
| 2441 Fenton Parkway, San Diego, CA, 92108 | San Diego | 3/17/2020 | 3/17/2020 | Takeout Only | San Diego County 3/16/20, CA Executive Order N-33-20 |
| 6081 Center Drive Suite 104, Los Angeles, CA, 90045 | Los Angeles | 3/15/2020 | 3/15/2020 | Takeout Only | LA Mayor 3/15/20, CA Executive Order N-33-20, LA County 3/16/20 |
| 29271 Agoura Road, Agoura Hills, CA, 91301 | Los Angeles | 3/16/2020 | 3/16/2020 | Takeout Only | LA County 3/16/20, CA Executive Order N-33-20 |
| 300 East Colorado Boulevard, Suite 240, Pasadena, CA | Los Angeles | 3/16/2020 | 3/16/2020 | Closed | LA County 3/16/20, CA Executive Order N-33-20 |
| 21001 North Tatum Boulevard Suite 36-1160, Phoenix, AZ | Maricopa | 3/17/2020 | 3/17/2020 | Takeout Only | Phoenix 3/17/18, AZ Executive Order 2020-09 |
| 2201 West Malvern Avenue, Fullerton, CA, 92833 | Orange | 3/17/2020 | 3/17/2020 | Takeout Only | Orange County 3/17/20, CA Executive Order N-33-20 |
| 12320 Seal Beach Boulevard, Seal Beach, CA, 90740 | Orange | 3/17/2020 | 3/17/2020 | Takeout Only | Orange County 3/17/20, CA Executive Order N-33-20 |
| 11425 Foothill Boulevard, Rancho Cucamonga, CA, 91730 | San Bernardino | 3/18/2020 | 3/18/2020 | Takeout Only | San Bernardino 3/18/20, CA Executive Order N-33-20 |
| 3645 Central Avenue, Riverside, CA, 92506 | Riverside | 3/16/2020 | 3/18/2020 | Takeout Only | Riverside County 3/16/20, CA Executive Order N-33-20 |
| 24180 Valencia Boulevard, Santa Clarita, CA, 91355 | Los Angeles | 3/16/2020 | 3/16/2020 | Takeout Only | LA County 3/16/20, CA Executive Order N-33-20 |
| 1380 Bison Avenue, Newport Beach, CA, 92660 | Orange | 3/17/2020 | 3/17/2020 | Takeout Only | Orange County 3/17/20, CA Executive Order N-33-20 |
| 2255 Otay Lakes Road, Chula Vista, CA, 91915 | San Diego | 3/17/2020 | 3/17/2020 | Takeout Only | San Diego County 3/16/20, CA Executive Order N-33-20 |
| 55 South Pine Avenue, Long Beach, CA, 90802 | Los Angeles | 3/16/2020 | 3/16/2020 | Closed | LA County 3/16/20, CA Executive Order N-33-20 |
| 1295 Magnolia Avenue, Corona, CA, 92879-2092 | Riverside | 3/16/2020 | 3/19/2020 | Takeout Only | Riverside County 3/16/20, CA Executive Order N-33-20 |
| 11400 Porter Ranch Drive, Northridge, CA, 91326 | Los Angeles | 3/15/2020 | 3/15/2020 | Takeout Only | LA Mayor 3/15/20, CA Executive Order N-33-20 |
| 40497 Margarita Road, Temecula, CA, 92591-2857 | Riverside | 3/16/2020 | 3/19/2020 | Takeout Only | Riverside County 3/16/20, CA Executive Order N-33-20 |
| 105 South Festival Drive, Anaheim, CA, 92808 | Orange | 3/17/2020 | 3/17/2020 | Takeout Only | Orange County 3/17/20, CA Executive Order N-33-20 |
| 7861 Edinger Avenue, Huntington Beach, CA, 92647 | Orange | 3/17/2020 | 3/17/2020 | Takeout Only | Orange County 3/17/20, CA Executive Order N-33-20 |
| 139 North Barranca Street, West Covina, CA, 91791 | Los Angeles | 3/16/2020 | 3/16/2020 | Takeout Only | LA County 3/16/20, CA Executive Order N-33-20 |
| 1902 Taylor Road, Roseville, CA, 95661 | Placer | 3/19/2020 | 3/19/2020 | Takeout Only | Placer County 3/19/20, CA Executive Order N-33-20 |
| 1588 Leucadia Boulevard, Encinitas, CA, 92024 | San Diego | 3/17/2020 | 3/17/2020 | Takeout Only | San Diego County 3/16/20, CA Executive Order N-33-20 |
| 1213 Simi Town Center Way, Simi Valley, CA, 93065 | Ventura | 3/17/2020 | 3/17/2020 | Takeout Only | Ventura County 3/17/20, CA Executive Order N-33-20 |
| 7531 Carson Boulevard, Long Beach, CA, 90808 | Los Angeles | 3/16/2020 | 3/16/2020 | Closed | LA County 3/16/20, CA Executive Order N-33-20 |
| 1450 Ala Moana Boulevard Suite 4230, Honolulu, HI, 96814 | Honolulu | 3/25/2020 | 3/25/2020 | Closed | HI 3rd Supplementary Proclamation |
| 2455 Iron Point Road, Folsom, CA, 95630 | Sacramento | 3/19/2020 | 3/20/2020 | Takeout Only | CA Executive Order N-33-20 |
| 1609 Hawthorne Boulevard, Redondo Beach, CA, 90278 | Los Angeles | 3/16/2020 | 3/16/2020 | Takeout Only | LA County 3/16/20, CA Executive Order N-33-20 |
| 935 Broadbeck Drive, Thousand Oaks, CA, 91320-1273 | Ventura | 3/17/2020 | 3/17/2020 | Takeout Only | Ventura County 3/17/20, CA Executive Order N-33-20 |
| 10055 West McDowell Road, Avondale, AZ, 85392-4894 | Maricopa | 3/19/2020 | 3/20/2020 | Takeout Only | AZ Executive Order 2020-09 |
| 300 Del Monte Center, Monterey, CA, 93940 | Monterey | 3/17/2020 | 3/17/2020 | Takeout Only | Monterey 3/17/20, CA Executive Order N-33-20 |
| 5750 Fleet Street Suite 120, Carlsbad, CA, 92008 | San Diego | 3/17/2020 | 3/17/2020 | Office Closed | San Diego County 3/16/20, CA Executive Order N-33-20 |
| 3240 El Camino Real, Irvine, CA, 92602 | Orange | 3/17/2020 | 3/17/2020 | Office Closed | Orange County 3/17/20, CA Executive Order N-33-20 |
| 14141 Ventura Boulevard Suite 2, Sherman Oaks, CA, 91423 | Los Angeles | 3/15/2020 | 3/15/2020 | Takeout Only | LA Mayor 3/15/20, CA Executive Order N-33-20 |
| 13762 Jamboree Road, Irvine, CA, 92602-1200 | Orange | 3/17/2020 | 3/17/2020 | Takeout Only | Orange County 3/17/20, CA Executive Order N-33-20 |
| 6600 Topanga Canyon Boulevard #1062, Canoga Park, CA, 91303 | Los Angeles | 3/15/2020 | 3/15/2020 | Closed | LA Mayor 3/15/20, CA Executive Order N-33-20 |

| | | | | | |
|---|---|---|---|---|---|
| 799 The Shops at Mission Viejo, Suite A, Mission Viejo, CA, 92691 | Orange | 3/17/2020 | 3/17/2020 | Takeout Only | Orange County 3/17/20, CA Executive Order N-33-20 |
| 12751 Towne Center Drive, Suite X, Unit N-11, Cerritos, CA, 90703 | Orange | 3/17/2020 | 3/17/2020 | Takeout Only | Orange County 3/17/20, CA Executive Order N-33-20 |
| 2501 El Camino Real, Suite 204, Carlsbad, CA, 92008 | San Diego | 3/17/2020 | 3/17/2020 | Takeout Only | San Diego County 3/16/20, CA Executive Order N-33-20 |
| 162 South Rancho Santa Fe Road, Suite E10, Encinitas, CA, 92024 | San Diego | 3/17/2020 | 3/17/2020 | Takeout Only | San Diego County 3/16/20, CA Executive Order N-33-20 |
| 12955 El Camino Real, San Diego, CA, 92130 | San Diego | 3/17/2020 | 3/17/2020 | Closed | San Diego County 3/16/20, CA Executive Order N-33-20 |
| 11925 Carmel Mountain Road Suite 801, San Diego, CA, 92128 | San Diego | 3/17/2020 | 3/17/2020 | Takeout Only | San Diego County 3/16/20, CA Executive Order N-33-20 |
| 3901 Irvine Boulevard, Irvine, CA, 92602 | Orange | 3/17/2020 | 3/17/2020 | Closed | Orange County 3/17/20, CA Executive Order N-33-20 |
| 180 Promenade Way Suite L, Thousand Oaks, CA, 91362 | Ventura | 3/17/2020 | 3/17/2020 | Closed | Ventura County 3/17/20, CA Executive Order N-33-20 |
| 3333 Bear Street Suite 151, Costa Mesa, CA, 92626 | Orange | 3/17/2020 | 3/17/2020 | Closed | Orange County 3/17/20, CA Executive Order N-33-20 |
| 3333 Bristol Street Suite 2505, Costa Mesa, CA, 92626 | Orange | 3/17/2020 | 3/17/2020 | Closed | Orange County 3/17/20, CA Executive Order N-33-20 |
| 121 S. Hope Ave, Suite 150, Santa Barbara, CA, 93105-3158 | Santa Barbara | 3/17/2020 | 3/17/2020 | Takeout Only | Santa Barbara County 3/17/20, CA Executive Order N-33-20 |

EXECUTIVE DEPARTMENT
STATE OF CALIFORNIA

**EXECUTIVE ORDER N-33-20**

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** in a short period of time, COVID-19 has rapidly spread throughout California, necessitating updated and more stringent guidance from federal, state, and local public health officials; and

**WHEREAS** for the preservation of public health and safety throughout the entire State of California, I find it necessary for all Californians to heed the State public health directives from the Department of Public Health.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8627, and 8665 do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1) To preserve the public health and safety, and to ensure the healthcare delivery system is capable of serving all, and prioritizing those at the highest risk and vulnerability, all residents are directed to immediately heed the current State public health directives, which I ordered the Department of Public Health to develop for the current statewide status of COVID-19. Those directives are consistent with the March 19, 2020, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, found at: https://covid19.ca.gov/. Those directives follow:

ORDER OF THE STATE PUBLIC HEALTH OFFICER
March 19, 2020

To protect public health, I as State Public Health Officer and Director of the California Department of Public Health order all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors, as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19. In addition, and in consultation with the Director of the Governor's Office of Emergency Services, I may designate additional sectors as critical in order to protect the health and well-being of all Californians.

Pursuant to the authority under the Health and Safety Code 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this order is to go into effect immediately and shall stay in effect until further notice.

The federal government has identified 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or

destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. I order that Californians working in these 16 critical infrastructure sectors may continue their work because of the importance of these sectors to Californians' health and well-being.

This Order is being issued to protect the public health of Californians. The California Department of Public Health looks to establish consistency across the state in order to ensure that we mitigate the impact of COVID-19. Our goal is simple, we want to bend the curve, and disrupt the spread of the virus.

The supply chain must continue, and Californians must have access to such necessities as food, prescriptions, and health care. When people need to leave their homes or places of residence, whether to obtain or perform the functions above, or to otherwise facilitate authorized necessary activities, they should at all times practice social distancing.

2) The healthcare delivery system shall prioritize services to serving those who are the sickest and shall prioritize resources, including personal protective equipment, for the providers providing direct care to them.

3) The Office of Emergency Services is directed to take necessary steps to ensure compliance with this Order.

4) This Order shall be enforceable pursuant to California law, including, but not limited to, Government Code section 8665.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 19th day of March 2020.

GAVIN NEWSOM
Governor of California

**ATTEST:**

ALEX PADILLA
Secretary of State



State of California—Health and Human Services Agency

# California Department of Public Health



SONIA Y. ANGELL, MD, MPH
*State Public Health Officer & Director*

GAVIN NEWSOM
*Governor*

### Coronavirus Disease 2019 (COVID-19) and Retail Food, Beverage, and Other Related Service Venues
### March 16, 2020

This guidance is based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19). The California Department of Public Health (CDPH) will update this guidance as needed and as additional information becomes available.

Local environmental health and public health agencies may have additional guidance and/or requirements regarding these operations in their jurisdiction.

## Background

COVID-19 is a respiratory illness caused by a novel virus that has been spreading worldwide. Community-acquired cases have now been confirmed in California. We are gaining more understanding of COVID-19's epidemiology, clinical course, immunogenicity, and other factors as time progresses, and the situation is changing daily. CDPH is in the process of monitoring COVID-19, conducting testing with local and federal partners, and providing guidance and resources to prevent, detect and respond to the occurrence of COVID-19 cases in California.

At this time, community transmission of COVID-19 has occurred in California. Venues where people gather for drinking or dining should prepare for possible impacts of COVID-19 and take precautions to prevent the spread of COVID-19 as well as other infectious diseases, including influenza and gastroenteritis.

## Illness Severity

The complete clinical picture with regard to COVID-19 is not fully understood. Reported illnesses have ranged from mild to severe, including illness resulting in death. Older people and people with certain underlying health conditions like heart disease, lung disease and diabetes, for example, seem to be at greater risk of serious illness.

## Context

Retail Food, Beverage, and Other Related service venues bring people from multiple communities into close contact with each other and have the potential to increase COVID-19 transmission. This guidance document describes steps that retail food, beverage, and other related service venue owners and management should take for the protection of



patrons to prevent further COVID-19 transmission. This is not an exhaustive list of all food and beverage sites that should utilize social distancing, and does not relate to manufacturing or production of beer and wine. The CDPH guidance has sanitation, personal hygiene, and social distancing as an important foundation for the prevention of COVID-19 in these venues.

The goals of these actions are: (1) to protect people attending and working at the venue and the local community from COVID-19 infection; and (2) to reduce community transmission and introductions of COVID-19 into new communities. Below we provide guidance for bars, wineries, breweries, pubs, restaurants/cafeterias, food trucks, grocery stores, certified farmers' markets, and charitable food distribution sites.

**Retail Beverage Service Venues**
- Bars, wineries, breweries and pubs should be closed, except for venues that are currently authorized to provide off sale beer and wine to be consumed off premises are allowed.
- This guidance is not intended to affect production of beer and wine.
- Bars, breweries, pubs, and wineries that include meals provided by a full kitchen should follow the restaurant guidance below if they provide delivery or pick-up options.

**Retail Food Service and Other Related Service Venues**
Restaurants/Cafeterias
- Restaurants should be closed for in-restaurant seated dining, and should be open only to drive-through or other pick-up/delivery options.
- Remind employees of best hygiene practices including washing their hands often with soap and water for at least 20 seconds.
- Increase frequency of cleaning and sanitizing per <u>CDC Environmental Cleaning and Disinfection guidance</u> of all hard surfaces, including tables and counter tops that are being utilized by employees and patrons during pickup/delivery options.

Food Trucks
- Increase frequency of cleaning of menus, cash registers, receipt trays, condiment holders, writing instruments and other non-food contact surfaces frequently touched by patrons and employees.
- Ensure that social distancing of six feet per person for non-family members is maintained and make clear that family members can participate together, stand in line together, etc.
- Limiting the number of people in lines.
- Increase frequency of cleaning and sanitizing per <u>CDC Environmental Cleaning and Disinfection guidance</u> of all hard surfaces.
- Remind employees of best hygiene practices including washing their hands often with soap and water for at least 20 seconds.

Grocery Stores and Charitable Food Distribution Sites
- The food distribution chain is critical to the public's health.

- Grocery stores and charitable food distribution sites should remain fully open and operational.
- As with other settings, ensure that social distancing of six feet per person for non-family members is maintained and make clear that family members can participate in activities together, stand in line together, etc.
- Social distancing of six feet per person, particularly between individuals who have come together on a one-time or rare basis.
- Limiting the number of customers at any given time as necessary to reduce outdoor/indoor crowding and lines to meet social distancing guidance.
- Increase cleaning and sanitizing frequency of restroom and other high contact areas.
- Train employees on best hygiene practices including washing their hands often with soap and water for at least 20 seconds.
- Additional opportunities throughout the venue for persons to reduce the spread of the virus through hand washing or sanitizing stations.
- Eliminate events/marketing that target individuals that the CDPH has identified as higher risk of serious illness for COVID-19.
- Stores that have online ordering with outside pick-up or delivery options should encourage use of these when possible *in lieu* of indoor shopping.

Certified Farmers' Markets
- Space booths accordingly to increase social distancing among patrons in line and walking about the market.
- Ensure that social distancing of six feet per person for non-family members is maintained and make clear that family members can participate in activities together, stand in line together, etc.
- Limit the number of customers at any given time as necessary to reduce outdoor/indoor crowding and lines to meet social distancing guidance.
- Increase cleaning and sanitizing frequency of restroom and other high contact areas.
- Train employees on best hygiene practices including washing their hands often with soap and water for at least 20 seconds.
- Offer additional hand washing or sanitizing stations throughout the venue.
- Eliminate events/marketing that target individuals that the CDPH has identified as higher risk of serious illness for COVID-19.
- Encourage activities such as pre-bagging to expedite purchasing.
- Suspend sampling activities.
- Increase frequency of cleaning of tables, payment devices, and other surfaces.
- Eliminate non-essential/non-related services, such as bands or other entertainment.
- At the end of the market, continue to utilize local food recovery systems to feed/donate extra products to populations in need.
- If applicable, continue accepting EBT payment.

**Other Information**



ERIC GARCETTI
MAYOR

## Public Order Under City of Los Angeles Emergency Authority

Issue Date: March 15, 2020

**Subject:** New City Measures to Address COVID-19

On March 4, 2020, I declared a local emergency in relation to the arrival of the COVID-19 virus in our community, and on March 12, 2020, I ordered a number of measures to be taken across the City to protect members of the public and City workers from an undue risk of contracting the COVID-19 virus. Our precautions over the past weeks and what we do over the next few days and weeks will determine how well we weather this emergency.

On March 11, 2020, the World Health Organization characterized COVID-19 as a pandemic. The Centers for Disease Control and Prevention advises us that COVID-19 spreads easily from person to person and has issued guidelines recommending that the public adopt policies and routines to enable social distancing wherever possible.

Here in the City of Los Angeles, we must redouble our efforts to maintain hand hygiene, respiratory etiquette, and social distancing. It is absolutely critical that we as a City do everything we can to slow the pace of community spread and avoid unnecessary strain on our medical system. To aid in our efforts, under the emergency authorities vested in my office under the laws of the City of Los Angeles, today I am ordering that a series of temporary restrictions be placed on certain establishments throughout our City in which large numbers of people tend to gather and remain in close proximity. By virtue of authority vested in me as Mayor of the City of Los Angeles pursuant to the provisions of the Los Angeles Administrative Code, Chapter 3, Section 8.29 to promulgate, issue, and enforce rules, regulations, orders, and directives, I hereby declare the following orders to be necessary for the protection of life and property and I hereby order, effective at 11:59 p.m. tonight, until March 31, 2020 at 12:00 p.m., that:

1.    All bars and nightclubs in the City of Los Angeles that do not serve food shall be closed to the public.

2.    Any bars or nightclubs in the City of Los Angeles that serve food may remain open only for purposes of continuing to prepare and offer food to customers via delivery service or to be picked up. Dine-in food service is prohibited.

3.    All restaurants and retail food facilities in the City of Los Angeles shall be prohibited from serving food for consumption on premises. Restaurants and retail food facilities may continue to operate for purposes of preparing and offering food to customers via delivery service, to be picked up or for drive-thru. For those establishments offering food pick-up options, proprietors are directed to establish social distancing practices for those patrons in the queue for pick-up.

4.    The following are exempt from this Order:

      A. Cafeterias, commissaries, and restaurants located within hospitals, nursing homes, or similar facilities
      B. Grocery stores
      C. Pharmacies
      D. Food banks
      E. Los Angeles World Airports concessionaires

5.    Trucks and other vehicles engaged in the delivery of grocery items to grocery stores, when such items are to be made available for sale to the public, are hereby exempt from having to comply with any City rules and regulations that limit the hours for such deliveries, including, without limitation, Los Angeles Municipal Code Section 12.22 A.23(b)(3) and Los Angeles Municipal Code Section 114.03.

6.    All movie theaters, live performance venues, bowling alleys and arcades shall be closed to the public.

7.    All gyms and fitness centers shall be closed to the public.

Any violation of the above prohibitions may be referred to the Office of the City Attorney for prosecution under Los Angeles Administrative Code Section 8.77, which provides for fines not to exceed $1,000 or imprisonment not to exceed six months. Each individual officer should use their discretion in enforcing this order and always keep the intent of the order in mind.

In addition, I hereby issue guidance to the leaders of the City's houses of worship and urge them, in the strongest possible terms, to limit gatherings on their premises and to explore and implement ways to practice their respective faiths while observing social distancing practices.

Finally, I hereby order that no landlord shall evict a residential tenant in the City of Los Angeles during this local emergency period if the tenant is able to show an inability to pay rent due to circumstances related to the COVID-19 pandemic. These

circumstances include loss of income due to a COVID-19 related workplace closure, child care expenditures due to school closures, health care expenses related to being ill with COVID-19 or caring for a member of the tenant's household who is ill with COVID-19, or reasonable expenditures that stem from government-ordered emergency measures. Nothing in this subsection shall be construed to mean that the tenant will not still be obligated to pay lawfully charged rent. Tenants will have up to six months following the expiration of the local emergency period to repay any back due rent. Tenants may use the protections afforded in this subsection as an affirmative defense in an unlawful detainer action. This subsection shall remain in effect during the pendency of the local emergency period.

This order may be extended prior to March 31, 2020.

# SAFER AT HOME ORDER FOR CONTROL OF COVID-19

Temporary Prohibition of Events and Gatherings of 10 Persons or More
Closure of Non-Essential Businesses and Areas
Date Order Issued: March 19, 2020

**Please read this Order carefully. Violation of or failure to comply with this Order is a crime punishable by fine, imprisonment, or both. (California Health and Safety Code § 120295; Los Angeles County Code § 11.02.080.)**

**SUMMARY OF THE ORDER:** This Health Officer Order amends and supplements the Order of the County of Los Angeles Health Officer (Health Officer) issued on March 16, 2020, to control the spread of the Novel Coronavirus (COVID-19) within the County of Los Angeles. The purpose of this Order is to further restrict and limit the gathering of persons and require the closure of malls, shopping centers, children's playgrounds, and non-essential retail businesses in an effort to stem or slow the spread of COVID-19 within the greater Los Angeles community.

Because of the continued rapid spread of COVID-19 and the need to protect the most vulnerable members of our community, this Order prohibits all indoor public and private gatherings and all outdoor public and private events within a confined space, where at least 10 people are expected to be in attendance at the same time. This Order applies within the County of Los Angeles Public Health Jurisdiction, beginning at 11:59 p.m. on March 19, 2020 and continues through April 19, 2020, subject to the terms and conditions more particularly set forth below.

For all gatherings that are not prohibited and for all Essential Businesses, the Health Officer orders those persons attending an event or gathering and the venues holding the event or gathering implement the following infection control precautions: (1) practice social distancing within the confined space by requiring attendees to be separated by six (6) feet, to the extent feasible; (2) provide access to hand washing facilities with soap and water or hand sanitizer that contains at least 60 percent alcohol; (3) post a sign in a conspicuous place at the public entry to the venue instructing members of the public to not attend if they are experiencing symptoms of respiratory illness, including fever or cough; and (4) adhere to communicable disease control recommendations provided by the Los Angeles County Department of Public Health. As a point of clarity, this Order does not prohibit any individual or family from outdoor activities such as hiking, walking, shopping at Essential Businesses, including grocery stores and restaurants offering delivery, drive thru or carry out service, so long as all persons practice social distancing to the extent practicable.

Further, this Health Officer Order, requires all indoor malls, shopping centers, playgrounds and non-essential businesses to close. This Order applies to all cities in Los Angeles County except the cities of Pasadena and Long Beach. This Order does not supersede any stricter limitation imposed by a local public entity.

The County Health Officer will continue to monitor the rate of COVID-19 disease spread, State and CDC recommendations, and the impact of the required measures, and as needed, may revisit, extend, expand, or otherwise modify this Order to protect the public's health.

**UNDER THE AUTHORITY OF THE CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, THE COUNTY OF LOS ANGELES HEALTH OFFICER ORDERS:**

1. Effective 11:59 p.m. on March 19, 2020 and continuing through April 19, 2020, all public and private group events and gatherings, as defined below, of 10 or more people are prohibited anywhere within the Los Angeles County Public Health Jurisdiction.

Safer at Home Order for Control of COVID-19: Temporary Prohibition of Events and Gatherings of 10 Persons or More
Closure of Non-Essential Businesses and Areas
Page 1 of 6                                                                                         3/19/2020

COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH
ORDER OF THE HEALTH OFFICER


2. For public and private gatherings attended by between 2-9 persons, held in a confined or enclosed space, and not prohibited by this Order, the organizer or the owner, manager, or operator of the venue holding the gathering shall:

   a. Enforce social distancing measures by requiring attendees who remain at the event or gathering for over 5 minutes to be separated by at least six (6) feet from other attendees during the entirety of the event or gathering. Persons who attend the event or gathering as a group, e.g., a group of family members or household contacts, may sit or remain together, but groups of attendees must be separated by a distance of at least six (6) feet.

   b. Provide access to hand washing facilities with soap and water or with hand sanitizer that contains at least 60 percent alcohol.

   c. Post a sign in a conspicuous place at all public entries to the venue that instructs members of the public to not enter or attend if they are experiencing symptoms of respiratory illness, including fever or cough.

   d. Adhere to communicable disease control recommendations provided by the Los Angeles County Department of Public Health, including guidance for cleaning and disinfecting the site. See guidance posted at www.publichealth.lacounty.gov/media/Coronavirus/.

3. The Health Officer orders the immediate closure of the following types of commercial properties and businesses:

   a. Non-Essential Retail Businesses.

   b. Indoor Malls and Indoor Shopping Centers, including all stores therein regardless whether they are Essential or Non-Essential Retail Businesses. As an exception, Essential Businesses that are part of an Indoor Mall or Indoor Shopping Center, that are accessible to the public from the exterior of the Indoor Mall or Indoor Shopping Center may remain open. The interior of the Indoor Mall or Indoor Shopping Center shall remain closed to the public.

   c. Owners and operators of Outdoor Malls and Shopping Centers shall enforce social distancing measures among their visitors as provided in Section 2 a-d.

   d. Indoor or Outdoor Playgrounds for Children, except for those located within childcare centers.

4. This Order does not supersede any stricter limitation imposed by a local public entity within the Los Angeles County Public Health Jurisdiction.

5. This Order shall be exempt, for a 24-hour period following the effective date above, to allow employees and business owners to access to their workplaces to gather belongings, so long as social distancing requirements are followed. Such workplaces shall remain closed to the public in accordance with this Order.

## *REASONS FOR THE ORDER*

6. This Order is based upon scientific evidence and best practices, as currently known and available, to protect members of the public from avoidable risk of serious illness and death resulting from the spread of COVID-19, as well as to protect the healthcare system from a surge of cases into its emergency rooms and hospitals. The Order supports the CDC's efforts to institute more stringent and necessary social distancing measures to reduce community transmission of COVID-19.

7. Existing community transmission of COVID-19 in Los Angeles County presents a substantial and significant risk of harm to the health of residents. Currently, there is no vaccine available to protect against and no specific treatment for COVID-19. As of March 19, 2020, there have been at least 231 cases of COVID-19 and 2 deaths reported in Los Angeles County. There remains a

Safer at Home Order for Control of COVID-19: Temporary Prohibition of Events and Gatherings of 10 Persons or More
Closure of Non-Essential Businesses and Areas
Page 2 of 6                                                                                    3/19/2020



COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH

ORDER OF THE HEALTH OFFICER

strong likelihood of a significant and increasing number of suspected cases of community transmission.

8. The virus that causes COVID-19 can be spread easily through person-to-person contact. This risk of transmission is increased when people are in close proximity. All gatherings pose an increased risk for community transmission of COVID-19 and thus, are a substantial risk to public health. As such, places where people gather, such as Indoor and Outdoor Malls, Shopping Centers, Children's Playgrounds, and Non-Essential Retail Businesses, provide significant opportunities for patrons or groups of patrons to have close contact with each other. Thus, the reasons that persons gathering at these locations are likely to exacerbate the spread of COVID-19 include, without limitation: (a) that these gatherings and businesses will attract people from throughout the county when there is widespread COVID-19 community transmission, (b) the prolonged time period during which many people are in close proximity at these locations, (c) the difficulty in tracing and controlling additional exposures when large numbers of people visit a Mall, Shopping Center, Playground or Non-Essential Retail Business, and (d) the visitor may be unknowingly infected with COVID-19 and may not follow adequate hygienic and social distancing practices.

9. In the absence of a specific immunization or treatment for COVID-19, social distancing is the only and most readily available tool to prevent this disease. Increasing social distancing and limiting events and gatherings slow transmission of communicable diseases. Accordingly, to reduce the community transmission of COVID-19, the Health Officer has ordered the temporary prohibition of all Events and Gatherings, as defined in Section 10, the closure of Indoor Malls and Shopping Centers as defined in Section 11, and is also requiring the closure of certain businesses, as described in Section 12.

## *DEFINITIONS*

10. For purposes of this Order, Events and Gatherings are any gathering, assembly, event, or convening that brings together or is likely to bring together 10 or more persons at the same time in an indoor or outdoor confined or enclosed space for greater than 5 minutes, for any purpose including a business, cultural, athletic, entertainment, social, or other special event.

11. For purposes of this Order, Indoor Malls and Shopping Centers are defined for as either:

    A building with seven (7) or more "sales or retail establishments" or

    A series of buildings on a common site, either under common ownership or common control or developed together, with seven (7) or more "sales or retail establishments."

12. Non-Essential Retail Businesses are retail establishments that provide goods or services to the public that do not come within the definition of Essential Businesses set forth in Paragraph 13 of this Order.

13. For purposes of this Order, Essential Businesses are defined as the following:

    (a) Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruit and vegetables, pet supply, water, fresh meats, fish, and poultry, and any other household consumer products (such as cleaning or personal care products). This includes stores that sell groceries and sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences;

    (b) Food cultivation, including farming, livestock, and fishing;

Safer at Home Order for Control of COVID-19: Temporary Prohibition of Events and Gatherings of 10 Persons or More
Closure of Non-Essential Businesses and Areas
Page 3 of 6                                                                                          3/19/2020

COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH
ORDER OF THE HEALTH OFFICER

(c) Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals;

(d) Newspapers, television, radio, magazine, podcast and other media services;

(e) Gas stations, and auto-supply, auto-repair, car dealerships and related facilities;

(f) Banks, credit unions, and related financial institutions;

(g) Hardware stores, nurseries; building supplies;

(h) Plumbers, electricians, exterminators, custodial/janitorial workers, handyman services, funeral home workers and morticians, moving services, HVAC installers, carpenters, vegetation services, tree maintenance, landscapers, gardeners, property managers, private security personnel and other service providers who provide services to maintain the safety, sanitation, and essential operation to properties and other Essential Businesses;

(i) Businesses providing mailing and shipping services, including post office boxes;

(j) Educational institutions (including public and private K-12 schools, colleges, and universities) for purposes of facilitating distance learning or performing essential functions, provided that social distancing of 6-feet per person is maintaining to the greatest extent possible;

(k) Laundromats, dry cleaners, laundry service providers, personal grooming services;

(l) Restaurants and other food facilities that prepare and serve food, but only for delivery, drive thru or carry out;

(m) Businesses that supply office or computer products needed by people who work from home;

(n) Businesses that supply other Essential Businesses with the support or supplies necessary to operate;

(o) Businesses that ship, truck, provide logistical support or deliver groceries, food, goods or services directly to residences, Essential Businesses, Healthcare Operations, Essential Infrastructure;

(p) Airlines, taxis, and other private transportation providers providing transportation services necessary for activities of daily living and other purposes expressly authorized in this Order;

(q) Businesses that provide parts and service for Essential Infrastructure;

(r) Home-based care for seniors, adults, disabled persons, or children;

(s) Residential facilities and shelters for seniors, adults, disabled persons, and children;

(t) Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities, and the permitting, inspection, construction, transfer and recording of ownership, of housing and anything incidental thereto;

(u) Military/Defense Contractors/FFRDC (Federally Funded Research and Development Centers). For purposes of this Order, essential personnel may leave their residence to provide any service or perform any work deemed essential for national security including, but not limited to defense, intelligence and aerospace development and manufacturing for the Department of Defense, the Intelligence Community, and NASA and other federal government, and or United States Government departments and agencies. Essential

Safer at Home Order for Control of COVID-19: Temporary Prohibition of Events and Gatherings of 10 Persons or More
Closure of Non-Essential Businesses and Areas
Page 4 of 6                                                                                                3/19/2020


personnel include prime, sub-primes, and supplier contractor employees, at both the prime contract level and any supplier levels at any tier, working on federal United States Government contracts such as contracts rated under the Defense Priorities and Allocations System (DPAS) and contracts for national intelligence and national security requirements.;

(v) Childcare facilities providing services that enable employees exempted in this Order to work as permitted. To the extent possible, childcare facilities must operate under the following mandatory conditions: (1) Childcare must be carried out in stable groups of 12 or fewer ("stable" means the same 12 or fewer children are in the same group each day); (2) Children shall not change from one group to another; (3) If more than one group of children is cared for at once facility, each group shall be in a separate room. Groups shall not mix with each other; (4) Childcare providers shall remain solely with one group of children.

(w) Hotels, motels, shared rental units and similar facilities.

14. This Order is intended to deter the spread of COVID-19 by preventing people from being in unnecessary close contact. Certain activities are essential to the functioning of the County and the well-being of our residents and must continue.

15. The limitations on events and gatherings contained in this Order do not apply to the following sites or situations where residents must obtain or participate in governmental or other essential services (those that meet basic human needs): (a) attendance at regular school classes, work at Essential Businesses, and essential governmental services, such as access to court, social and administrative services; (b) places where people are in transit or waiting for transit including airports or bus or train stations or terminals; (c) congregate living situations, including dormitories; or (d) hospitals and healthcare facilities.

a. This Order does not prohibit use of enclosed spaces where 10 or more people may be present at different times during the day, as long as 10 or more people are not present in the space at the same time.

b. This Order does not apply to the following essential infrastructure or operations:

i. Healthcare Operations (hospitals, clinics, laboratories, dentists, pharmacies, pharmaceutical and biotechnology companies, other licensed healthcare facilities, healthcare suppliers, home healthcare service providers, mental health providers, cannabis dispensaries with a medicinal cannabis license, medical or scientific research companies, or any related and/or ancillary healthcare services, manufacturers, distributors and servicers of medical devices, diagnostics, and equipment, veterinary care, and all healthcare provided to animals. This exemption shall be broadly construed to avoid any impact to the delivery of healthcare, broadly defined. Healthcare Operations does not include fitness and exercise gyms and similar exercise or training facilities.

ii. Essential Infrastructure, including but not limited to, public health, public works construction, construction of housing (in particular affordable housing or housing for individuals experience homelessness), airport operations, port operations, water, sewer, gas, electrical, oil refining, road and highways, public transportation, solid waste collection and removal, internet and telecommunications systems (including the provision of essential global, national, local infrastructure for computing services, business infrastructure, communications, and web-based services), and manufacturing and distribution companies deemed essential as part of the Essential Infrastructure supply chain, provided that they carry out those services or that work in compliance with social distancing requirements, to the extent practicable.

Safer at Home Order for Control of COVID-19: Temporary Prohibition of Events and Gatherings of 10 Persons or More
Closure of Non-Essential Businesses and Areas
Page 5 of 6                                                                                    3/19/2020

COUNTY OF LOS ANGELES DEPARTMENT OF PUBLIC HEALTH 
ORDER OF THE HEALTH OFFICER

<u>ADDITIONAL TERMS</u>

16. This Order does not, in any way, restrict: (a) first responder access to the site(s) named in this Order during an emergency or (b) local, state or federal officers, investigators, or medical or law enforcement personnel from carrying out their lawful duties at the site(s) named in this Order.

17. The entities subject to this Order that are not required to close may otherwise remain open for business and perform essential functions and operations during the duration of this Order.

18. The County shall promptly provide copies of this Order by: (a) posting it on the Los Angeles Department of Public Health's website (www.publichealth.lacounty.gov), (b) posting it at the Kenneth Hahn Hall of Administration located at 500 West Temple Street, Los Angeles, CA 90012, (c) providing it to any member of the public requesting a copy, (d) issuing a press release to publicize the Order throughout the county, and (e) by serving via email on large facilities known to the County's Health Officer that are likely to be subject to this Order (but service via email is not required for compliance).

   a. The owner, manager, or operator of any facility that is likely to be impacted by this Order is strongly encouraged to post a copy of this Order onsite and to provide a copy to any member of the public requesting a copy.

   b. Because guidance may change, the owner, manager, or operator of any facility that is subject to this Order is ordered to consult the Los Angeles County Department of Public Health's website (www.publichealth.lacounty.gov) daily to identify any modifications to the Order and is required to comply with any updates until the Order is terminated.

19. If any subsection, sentence, clause, phrase, or word of this Order or any application of it to any person, structure, gathering, or circumstance is held to be invalid or unconstitutional by a decision of a court of competent jurisdiction, then such decision will not affect the validity of the remaining portions or applications of this Order.

20. This Order incorporates by reference, the March 4, 2020 Proclamation of a State of Emergency issued by Governor Gavin Newsom and the March 4, 2020 declarations of a local and public health emergency issued by the Los Angeles County Board of Supervisors and Los Angeles County Health Officer, respectively, and as they may be supplemented.

21. To protect the public's health, the Health Officer may take additional action(s) for failure to comply with this Order. Violation of this Order is a misdemeanor punishable by imprisonment, fine or both under California Health and Section Code Section 120295 *et seq.* Further, pursuant to Sections 26602 and 41601 of the California Government Code and Section 101029 of the California Health and Safety Code, the Health Officer requests that the Sheriff and the Chiefs of Police in all cities located in the Los Angeles County Public Health Jurisdiction ensure compliance with and enforcement of this Order.

**IT IS SO ORDERED:**

Date: _MARCH 19, 2020_

Muntu Davis, MD, MPH

Health Officer, County of Los Angeles

Safer at Home Order for Control of COVID-19: Temporary Prohibition of Events and Gatherings of 10 Persons or More
Closure of Non-Essential Businesses and Areas
Page 6 of 6                                                                                                         3/19/2020

# NEWS RELEASE


County of Los Angeles
**Public Health**

313 N. Figueroa Street, Room 806 • Los Angeles, CA 90012 • (213) 240-8144 • media@ph.lacounty.gov
Facebook.com/LAPublicHealth • Twitter.com/LAPublicHealth

**For Immediate Release:**
March 16, 2020

**For more information contact:**
Public Health Communications
(213) 240-8144
media@ph.lacounty.gov

**LA County Public Health Issues Order to Prohibit Group Events and Gatherings, Require Social Distancing Measures and the Closure of Certain Businesses**

LOS ANGELES – Today the Los Angeles County Health Officer (Health Officer) issued an order to prohibit all indoor and outdoor, public and private events and gatherings within a confined space, where 50 or more members of the public are expected to attend at the same time, to require social distancing measures and temporary closure of certain businesses. The decision for the Order is based on evidence of increasing community transmission requiring the immediate implementation of additional community mitigation efforts for organizations to help reduce the spread of COVID-19 within the county. This Order will remain in effect at least through March 31, 2020.

To further protect against the spread of COVID-19, the Health Officer's Order also requires persons in charge of events and gatherings attended by 10-49 persons to ensure that attendees follow specific social distancing measures, as well as, follow infection control guidelines for the duration of the event and prohibits dining in at restaurants. Restaurants may continue to serve food to customer via delivery, take-out or drive-thru. Furthermore, the Order requires the closing of businesses where it is common for patrons to be in close contact with each other for extended periods of time, such as, movie theaters, gyms and fitness centers, arcades, bowling alleys and bars and nightclubs that do not serve food.

"Chairwoman Kathryn Barger continues to take swift action to protect the more than 10 million individuals in Los Angeles County. I would like to thank all the local leaders who are working tirelessly to address what is a quickly changing situation here in Los Angeles County. Our goal is to slow the transmission of COVID-19, but we can't do it alone," said Barbara Ferrer, PhD, MPH, MEd, Director of Public Health. "Each and every one of us, both businesses and residents, must do our part by practicing social distancing and taking common sense infection control precautions. We urgently need to flatten the curve of COVID-19 in order to keep our hospitals and emergency rooms from becoming overwhelmed with COVID-19 patients. Flattening the curve requires conscientious social distancing efforts by all our LA County residents during this time of crisis. Our collective efforts during this pandemic can literally save the lives of our loved ones and most vulnerable residents."

"This Order is designed to implement both the Center for Disease Control's (CDC) Interim Guidance for Large Events and Mass Gatherings and the California Department of Public Health's Gathering Guidance to limit the spread of COVID-19," said County Health Officer, Muntu Davis, MD, MPH. "I know that it will significantly impact the lives of our residents and businesses. But, without a specific vaccine or treatment, these community mitigation strategies are the only and most readily available tools we

have to slow the spread of COVID-19 and protect the health and well-being of our communities in LA County."

Community mitigation efforts include social distancing and temporary closures. Social distancing strategies increase distance between people in specific settings where people commonly come into close contact with one another. Closures refer to the temporary closures of specific settings where people gather, and act to enhance efforts to implement social distancing.

The Health Officer's Order specifically requires that:

- Events and gatherings of 50 members or more are prohibited at least until April 1, 2020.
  - This order applies to conferences, arenas, stadiums, convention centers, and meeting spaces. These are places where persons, often strangers, sit and remain in close proximity of one another for extended periods of time.
- For all public and private events and gatherings of 10-49 persons, the Health Officer requires that event organizers and venue operators to do the following:
    Enforce social distancing measures by requiring attendees or groups of attendees, such as a group of family members or household contacts, who remain at the event to be separated by a distance of at least six feet during the entirety of the event or gathering.
  - Provide access to hand washing facilities with soap and water or hand sanitizer that contains at least 60 percent alcohol.
  - Post a conspicuous sign at the entry of the event or gathering that instructs persons that have symptoms of respiratory illness to not attend.
  - Adhere to cleaning and infection control guidance provided by Public Health.
- The Order specifically requires the closure of bars and nightclubs that do not serve food, gyms, fitness centers, movie and performance theaters, bowling alleys and arcades.
- This Order does not supersede any stricter limitation imposed by a local public entity within the Los Angeles County. Certain activities are essential to the functioning of the County and the well-being of our residents and must continue. This Order does not apply to sites and situations where people obtain essential services and essential goods to meet their basic needs, such as:
  - Regular school classes, work, or essential services locations.
  - Grocery stores or retail stores.
  - Pharmacies.
  - Places of transit, like airports, metro stations, or bus stations.
  - Hospitals or health care facilities.
  - Schools and universities/colleges.
  - Congregate living situations, including dormitories.

Both the State and County Public Health have provided infection control guidance to facilities and businesses not covered by this order.

Public Health has issued the following guidance during this time of increased spread:

- Avoid non-essential travel, public gatherings, and places where large groups of people congregate.
- Event organizers postpone or cancel non-essential gatherings of 50 or more until at least the end of March.
- Limit gatherings of individuals who are at higher risk for severe illness from COVID-19 (people older than 65, pregnant women, and those with chronic illness) to no more than 10 people.
- This guidance does not apply to activities such as attendance at regular school classes, work, or essential services, including public transportation, airport travel or shopping.
- If you are mildly sick with a fever, stay home and call your doctor if you are concerned and/or your symptoms worsen. Individuals who are elderly, have underlying health conditions or pregnant should consider contacting their providers earlier when they are sick.

- Exclude employees and visitors with any fever and/or respiratory infection symptoms and visitors with recent travel to any country or region with significant community transmission (including communities in the US) from all schools, businesses, and gatherings of any size.
- Follow all social distancing recommendations issued by Public Health.

A copy of the Order and additional things you can do to protect yourself, your family and your community can be found on the Public Health website, at: www.publichealth.lacounty.gov

Always check with trusted sources for the latest accurate information about novel coronavirus:

- Los Angeles County Department of Public Health
  http://publichealth.lacounty.gov/media/Coronavirus/
- California Department of Public Health https://www.cdph.ca.gov/Programs /CID/DCDC/Pages/Immunization/ncov2019.aspx
- Centers for Disease Control and Prevention (CDC) https://www.cdc.gov/coronavirus/2019-ncov/index.html
- World Health Organization https://www.who.int/health-topics/coronavirus
- LA County residents can also call 2-1-1

The Department of Public Health is committed to promoting health equity and ensuring optimal health and well-being for all 10 million residents of Los Angeles County. Through a variety of programs, community partnerships and services, Public Health oversees environmental health, disease control, and community and family health. Nationally accredited by the Public Health Accreditation Board, the Los Angeles County Department of Public Health comprises nearly 4,500 employees and has an annual budget of $1.2 billion. To learn more about Los Angeles County Public Health, please visit www.publichea lth.lacounty.gov , and follow LA County Public Health on social media at twitter.com/l acounty.gov, and follow LA County Public Health on social media at twitter.com/lap ublichealth, facebook.co m/lapublichealth, instagra m.com/lapublichealth and youtube.com/ lapublichealth.

#####

**HEALTH OFFICER ORDER FOR THE CONTROL OF COVID-19
DIRECTING VULNERABLE INDIVIDUALS LIVING IN
THE COUNTY TO SHELTER AT THEIR PLACE OF RESIDENCE,
RESTRICTIONS OF CERTAIN BUSINESSES, AMONG OTHER ORDERS
DATE OF ORDER: <u>MARCH 17, 2020</u>**

**Please read this Order carefully. Violation of or failure to comply with this Order is a
misdemeanor punishable by fine, imprisonment, or both, pursuant to Health and Safety
Code section 120295 et seq.**

**WHEREAS,** the intent of this Order is to strengthen the steps the County of Ventura has already
taken to protect our residents and particularly the most vulnerable in our population from
COVID-19; and

**WHEREAS,** on March 15, 2020 Governor Gavin Newsom announced that California is taking
additional measures to protect those most at risk of serious, life-threatening complications from
COVID-19, including urging those most vulnerable to COVID-19 to socially isolate at home,
such as people age 65 and older and those with underlying medical conditions that make them
more susceptible to serious illness from the coronavirus; and

**WHEREAS,** the intent of this Order is to ensure that specified individuals self-isolate in their
places of residence to the maximum extent feasible to slow the spread of COVID-19 to the
maximum extent possible, and all provisions of this Order should be interpreted to effectuate this
intent; and

**WHEREAS,** social isolation is considered useful as a tool to control the spread of pandemic
viral infections; and

**WHEREAS,** social isolation is the shared responsibility of all individuals in the County; and

**WHEREAS,** this Order is issued based on evidence of increasing occurrence of COVID-19
within the County and scientific evidence that the age, condition, and health of a significant
portion of the population of the County places it at risk for serious health complications,
including death, from COVID-19; and

**WHEREAS,** the scientific evidence shows that at this stage of the emergency, it is essential to
slow virus transmission as much as possible to protect the most vulnerable and to prevent the
health care system from being overwhelmed and that one proven way to slow the transmission is
to limit interactions among people to the greatest extent practicable;

**WHEREAS,** by reducing the spread of the COVID-19 virus, this Order also helps preserve
critical and limited healthcare capacity in the County; and

**WHEREAS,** this Order comes after the release of substantial guidance from the Centers for
Disease Control and Prevention, the California Department of Public Health, and other public

health officials throughout the United States and around the world, including a variety of prior orders to combat the spread and harms of COVID-19;

**NOW, THEREFORE,** PURSUANT TO SECTIONS 101040, 101085 AND 120175 OF THE HEALTH AND SAFETY CODE, IT IS HEREBY ORDERED AS FOLLOWS:

1. All individuals currently living within Ventura County, equal to or older than 75 years of age, or equal to or older than 70 years of age with an active or unstable comorbidity, are ordered to shelter at their place of residence from March 18, 2020 to April 1, 2020. To the extent such individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain physical distancing of at least six feet from any other person. Exceptions shall only exist as necessary to seek medical care, nutrition, or to perform essential work in healthcare or government.

2. All permanent food facilities, as defined by Health and Safety Code § 113849, may only prepare and offer food that is provided to customers via delivery service, via pick-up for takeout dining, and via drive-thru. Bars and nightclubs that offer food to consumers may remain open only for purposes of continuing to prepare and offer food to consumers via delivery service, via pick-up, or via drive-thru. Permanent food facilities that provide and offer food to consumers for pick up must require patrons or groups of patrons who are ordering food and beverages to be and remain at least six (6) feet apart from each other while inside the facility.

3. The following types of businesses are ordered to close (March 18, 2020 to April 1, 2020):
   a. Bars and nightclubs that do not serve food.
   b. Movie theaters, live performance venues, bowling alleys, and arcades.
   c. Gyms, and fitness centers, and aquatic centers.
   d. Wineries, breweries, and tap rooms that provide tastings.

4. This Order is issued in accordance with, and incorporates by reference, the March 4, 2020 Proclamation of a State of Emergency issued by Governor Newsom, the March 12, 2020 Declaration of Local Health Emergency issued by the Health Officer, the March 17, 2020 Resolution of the Board of Supervisors of the County of Ventura Proclaiming a Local Emergency and Ratifying and Extending the Declaration of a Local Health Emergency, the March 12, 2020 State of California Executive Order N-25-20, and the March 16, 2020 California Department of Public Health guidance on Retail Food, Beverage, and Other Related Service Venues.

5. The violation of any provision of this Order constitutes a threat to public health. Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order.

6. This Order shall become effective at 12:01 a.m. on March 18, 2020 and will continue to be in effect until 11:59 p.m. on April 1, 2020, or until it is extended, rescinded, superseded, or amended in writing by the Health Officer.

7. The Health Officer will continue to assess the quickly evolving situation and may issue additional Orders related to COVID-19.

8. Copies of this Order shall promptly be: (1) made available at the County of Ventura Public Health Office at 2240 East Gonzalez Road, ste. 210, Oxnard, California 93036; (2) posted on the County Public Health Department website (available at www.vchca.org/ph); and (3) provided to any member of the public requesting a copy of this Order.

9. If any provision of this Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the reminder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

**IT IS SO ORDERED:**

_Robert Levin, MD_                                    Dated: March 17, 2020

Robert Levin, M.D.
Ventura County Health Officer

## ORANGE COUNTY OPERATIONAL AREA
## EMERGENCY OPERATIONS CENTER

FOR IMMEDIATE RELEASE

Molly Nichelson
EOC Public Information Officer
714-628-7062

### PRESS RELEASE # 007
Date:  3-17-20     Time:  14:26 hours

# County Health Officer Issues Order
# to Slow Spread of COVID-19

County Health Officer Dr. Nichole Quick issued a Health Officer's Order today to protect the health and wellbeing of Orange County, CA residents.

"We are taking these mitigation steps in line with a directive issued by Governor Newsom to help slow the spread of COVID-19," said Dr. Nichole Quick, County Health Officer. "We recognize community members may experience anxiety related to the social disruption caused by COVID-19, and want to encourage residents to reach out to loved ones using appropriate methods like telephone, video messaging, email and text."

Please see the attached order for further details.

As this is a rapidly evolving situation, this Order may be revised and/or extended at any time.

For general information about COVID-19, please call the OC Health Care Agency's (H.CA) Health Referral Line at (800) 564-8448, visit http://www.ochealthinfo.com/novelcoronavirus, or follow the HCA on Facebook (@ochealthinfo) and Twitter (@ochealth).

For any further questions, please call the County of Orange Public Information Hotline at (714) 628-7085.

Release authorized by: *Jenice Witt*   Title: *DES/CEO*

Email or Faxed/time: *14:51*

Media Station: _____

Sent by: _____   Date/Time: *3/17/20  14:51*

## ORDER OF THE LOCAL HEALTH OFFICER

Pursuant to California Health and Safety Code sections 101040, 120175, and 120175.5 (b), the Orange County Health Officer ORDERS AS FOLLOWS:

Effective immediately and continuing until 11:59 p.m. on March 31, 2020, the following will be in effect in Orange County:

1. All public and private gatherings of any number of people, including at places of work, occurring outside a single household or living unit are prohibited. However, nothing in this Order prohibits the gathering of members of a household or living unit.

    a. This prohibition applies to all professional, social, and community gatherings, regardless of their sponsor, that are not engaged in Essential Activities, as defined below. Gatherings that involve Essential Activities should only be conducted when they cannot not be postponed or achieved without gathering, meaning that some other means of communication cannot be used to perform the Essential Activity. For gatherings involving Essential Activities, maintaining a six-foot separation of Social Distancing between persons, except family members, is recommended to the greatest extent possible.

    b. "Essential Activities" include:

        i. All services needed to ensure the continuing operation of the government agencies and provide for the health, safety and welfare of the public.

        ii. Healthcare operations (e.g. hospitals) and essential infrastructure;

        iii. First responders, emergency management personnel, emergency dispatchers, court personnel, and law enforcement personnel.

        iv. Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries and also sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences;

        v. Food cultivation, including farming, livestock, and fishing;

vi.   Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals;

vii.   Newspapers, television, radio, and other media services;

viii.   Gas stations and auto-supply, auto-repair, and related facilities;

ix.   Banks and related financial institutions;

x.   Hardware stores;

xi.   Plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences;

xii.   Businesses providing mailing and shipping services, including post office boxes;

xiii.   Educational institutions – including public and private K-12 schools, colleges, and universities – for purposes of facilitating distance learning or performing essential functions, provided that Social Distancing of six-feet per person is maintained to the greatest extent possible;

xiv.   Laundromats, dry cleaners, and laundry service providers;

xv.   Restaurants and other facilities that prepare and serve food, but only for delivery or carry out. Schools and other entities that typically provide free food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;

xvi.   Businesses that supply products needed for people to work from home;

xvii.   Businesses that supply other essential businesses with the support or supplies necessary to operate;

xviii.  Businesses that ship or deliver groceries, food, goods or services directly to residences;

xix.  Airlines, taxis, and other private transportation providers providing transportation services;

xx.  Home-based care for seniors, adults, or children;

xxi.  Residential facilities and shelters for seniors, adults, and children;

xxii.  Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities;

xxiii.  Childcare facilities providing services that enable employees exempted in this Order to work as permitted. To the extent possible, childcare facilities must operate under the following mandatory conditions:

  1.  Childcare must be carried out in stable groups.

  2.  Children shall not change from one group to another.

  3.  If more than one group of children is cared for at one facility, each group shall be in a separate room. Groups shall not mix with each other.

  4.  Childcare providers shall remain solely with one group of children.

c.  "Social Distancing" is maintaining a six-foot separation from all persons except for family members.

2.  All bars and other establishments that serve alcohol, and do not serve food, shall close consistent with guidance provided by the California Department of Public Health for Retail Food, Beverage, and Other Related Service Venues.

3.  All restaurants and other business establishments that serve food shall close all on-site dining consistent with guidance provided by the California Department of Public Health for Retail Food, Beverage, and Other Related Service Venues. All food served shall be by delivery, or through pick-up or drive-thru. Social Distancing shall be required for persons picking up food on site.

a.  "Social Distancing" is maintaining a six-foot separation from all persons except for family members.

4. A strong recommendation is made that all persons who are 65 years and older, or have a serious chronic medical condition (like heart disease, lung disease, and diabetes), or have a compromised immune system remain at home consistent with guidance provided by the California Department of Public Health on Self-Isolation for Older Adults and Those Who Have Elevated Risk.

5. A strong recommendation is made for persons exhibiting mild to moderate symptoms of COVID-19 to self-isolate themselves in their place of residence unless seeking medical care.

6. All businesses shall enact Social Distancing, increased sanitation standards, and shall make every effort to use telecommuting for its workforce. All businesses shall suspend any policy or procedure requiring doctor verification for sick or other leave approval.

   a. "Social Distancing" is maintaining a six-foot separation from all persons except for family members.

7. A strong recommendation is made that all residents are to heed any orders and guidance of state and local health officials related to COVID-19.

8. This Order is necessary to protect and preserve the public health from, and prevent, the increasing transmission of COVID-19 in California and the significant risk of widespread introduction and transmission of COVID-19 into the County.

9. Pursuant to Health and Safety Code section 120175.5 (b) all governmental entities in the County shall take necessary measures within the governmental entity's control to ensure compliance with this Order and to disseminate this Order to venues or locations within the entity's jurisdiction where a large gathering may occur.

10. Violation of this Order is subject to fine, imprisonment, or both. (California Health and Safety Code section 120295.)

11. To the extent necessary, this Order may be enforced by the Sheriff or chiefs of police pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029.

As this is a rapidly evolving situation, this Order may be revised and/or extended at any time.

**IT IS SO ORDERED:**

Date: March 17, 2020

Dr. Nichole Quick
Orange County Health Officer

## EMERGENCY REGULATIONS

As Director of Emergency Services for the County of Orange, I am authorized to promulgate regulations for the protection of life and property pursuant to Government Code Section 8634 and Orange County Codified Ordinance Section 3-1-6(b)(1). The following shall be in effect for the duration of the Orange County Health Officer Order issued above which is incorporated in its entirety by reference:

The Orange County Health Officer Order shall be promulgated as a regulation for the protection of life and property.

Any person who violates or who refuses or willfully neglects to obey this regulation is subject to fine, imprisonment, or both. (Government Code section 8665.)

Date: March 17, 2020

Frank Kim
Chief Executive Officer, County of Orange

**ORDER OF THE HEALTH OFFICER OF THE COUNTY OF RIVERSIDE**

**CANCELLING ALL GATHERINGS WITH EXPECTED PRESENCE ABOVE 10 INDIVIDUALS**

**DATE OF ORDER: MARCH 16, 2020**

Please read this Order carefully. Violation of or failure to comply with this Order is a crime punishable by fine, imprisonment, or both. (California Health and Safety Code § 120295; County Ordinances 533 and 556.)

UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, TITLE 17 CALIFORNIA CODE OF REGULATIONS SECTION 2501, AND RIVERSIDE COUNTY CODE SECTION 533.6, THE HEALTH OFFICER OF THE COUNTY OF RIVERSIDE ("HEALTH OFFICER") ORDERS:

1.  All gatherings within the jurisdiction of the Public Health Officer of the County of Riverside with an expected presence of at least **10** individuals taking place between March 16, 2020 and April 30, 2020 inclusive are hereby **prohibited**, regardless of venue. If a venue is subdivided into multiple spaces separated by physical walls or sufficient airspace, the limit per subdivision of space is 10. This order supersedes the Order of March 12, 2020 regarding mass gatherings.

2.  It is further ordered that even for gatherings below this size, if a minimum social distance of six feet between attendees cannot be maintained in the venue or a subdivision thereof, the gathering is **prohibited**.

3.  This Order does not apply to courts of law, medical providers, public utilities, critical county, city, and special district operations, critical school operations such as nutrition programs, continuity of business operations, logistics/distribution centers, congregate living settings, daycare and childcare, shelters, public transportation, airport travel, or necessary shopping at fuel stations, stores or malls. However, these settings are instructed to observe all applicable state and federal guidelines for infection control.

4.  To the extent possible, daycare and childcare facilities must operate under the following mandatory conditions: A. Childcare must be carried out in stable groups of 12 or fewer ("stable" means that the same 12 or fewer children are in the same group each day). B. Children shall not change from one group to another. C. If more than one group of children is cared for at one facility, each group shall be in a separate room. Groups shall not mix with each other. D. Childcare providers shall remain solely with one group of children.

5.  This Order is issued as a result of the worldwide pandemic of COVID-19 disease, also known as "novel coronavirus," which has infected at least 128,000 individuals worldwide in 116 countries and is implicated in over 4,700 worldwide deaths, including fifteen (15) cases in Riverside County.

6.  This Order is issued based on evidence of increasing transmission of COVID-19 both within the County of Riverside and worldwide, scientific evidence regarding the most effective approach to slow transmission of communicable diseases generally and COVID-19 specifically, as well as best practices as currently known and available to protect the public from the risk of spread of or exposure to COVID-19.

7.  This Order is intended to reduce the likelihood of exposure to COVID-19, thereby slowing the spread of COVID-19 in communities worldwide. As the presence of individuals increases, the difficulty and magnitude of tracing individuals who may have been exposed to a case rises

exponentially, increasing the likelihood that such gatherings will impair efforts at mitigating the spread of the illness.

8. This Order is issued in accordance with, and incorporates by reference, the: March 4, 2020 Proclamation of a State Emergency issued by Governor Gavin Newsom; the March 8, 2020 Declaration of Local Health Emergency based on an imminent and proximate threat to public health from the introduction of novel COVID-19 in Riverside County; the March 10, 2020 Resolution of the Board of Supervisors of the County of Riverside proclaiming the existence of a Local Emergency in the County of Riverside regarding COVID-19; the March 10, 2020 Resolution of the Board of Supervisors of the County of Riverside ratifying and extending the Declaration of Local Health Emergency due to COVID-19; the guidance issued on March 11, 2020 by the California Department of Public Health regarding large gatherings of 250 people or more; and the guidance issued on March 15, 2020 by the Governor of California.

9. This Order comes after the release of substantial guidance from the Centers for Disease Control and Prevention, the California Department of Public Health, and other public health officials through the United States and around the world recommending the cancellation of gatherings involving more than ten (10) or more persons in a single space at the same time.

10. This Order is made in accordance with all applicable State and Federal laws, including but not limited to: Health and Safety Code sections 101030, et seq.; Health and Safety Code sections 120100, et seq.; and Title 17 of the California Code of Regulations section 2501.

11. To the extent necessary, pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all Chiefs of Police in the County ensure compliance with and enforcement of this Order.

12. Copies of this Order shall promptly be: (1) made available at the County of Riverside Health Administration office located at 4065 County Circle Drive; Riverside, CA 92503; (2) posted on the County of Riverside Public Health Department's website (rivcoph.org); and (3) provided to any member of the public requesting a copy of this Order.

**IT IS SO ORDERED:**

Dated:  March 16, 2020

Dr. Cameron Kaiser, MD, MPH, FAAFP
Public Health Officer
County of Riverside


Approved as to form and legality:

Dated:  March 16, 2020

Gregory P. Priamos
County Counsel
County of Riverside

351 N. Mountain View Ave., San Bernardino, CA 92415 | Phone: 909.387.9146 | Fax: 909.387.6228



**SAN BERNARDINO COUNTY**

**Public Health**

**Trudy Raymundo**
Director

**Corwin Porter**
Assistant Director

**Maxwell Ohikhuare, M.D.**
Health Officer

**Erin Gustafson, M.D., MPH**
Acting Health Officer

## ORDER OF THE HEALTH OFFICER OF THE COUNTY OF SAN BERNARDINO

## CANCELLING ALL GATHERINGS

## DATE OF ORDER: MARCH 17, 2020

Please read this Order carefully. Violation of or failure to comply with this Order is a crime punishable by fine, imprisonment, or both. (California Health and Safety Code § 120295; County Code Section 31.0101 Et. Seq.)

UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, TITLE 17 CALIFORNIA CODE OF REGULATIONS SECTION 2501, AND SAN BERNARDINO COUNTY CODE SECTION 31.0101 ET. SEQ., THE HEALTH OFFICER OF THE COUNTY OF SAN BERNARDINO ("HEALTH OFFICER") ORDERS:

1. This Order revokes and replaces the Order originally issued on March 12, 2020. That order is no longer in effect as of the effective date and time of this Order.

2. Effective as of 12:01 a.m. on March 18, 2020 and continuing until 11:59 p.m. on April 6, 2020, public or private Gatherings, as defined in this Order, are hereby prohibited in the County. A "gathering" is any event or convening that brings together people in a single room or single space at the same time, such as an auditorium, stadium, arena, large conference room, meeting hall, cafeteria, or any other indoor or outdoor space. Nothing in this Order prohibits the gathering of members of a household or living unit.

3. This Order does not apply to activities such as attendance at regular school classes, work, or essential services. Certain activities are essential to the functioning of our state and must continue. Hence, this Order does not apply to essential public transportation, airport travel, grocery stores or charitable food distribution, certified farmers' markets, and shopping at a store or mall. This Order also does not apply to congregate living situations, including dormitories and homeless encampments.

4. All bars, adult entertainment establishments, and other business establishments that serve alcohol and do not serve food, shall close. All movie theatres, gyms, and health clubs shall close. Food and beverage establishments are required to follow guidance released from the California Department of Public Health on March 16, 2020 (www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-

**BOARD OF SUPERVISORS**

ROBERT A. LOVINGOOD    JANICE RUTHERFORD    DAWN ROWE    CURT HAGMAN    JOSIE GONZALES
First District         Second District       Third District  Chairman, Fourth District  Vice Chair, Fifth District